ORAL ARGUMENT NOT YET SCHEDULED

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 20-7077

JOSHUA ATCHLEY, *et al.*,
*Plaintiffs-Appellants*,

v.

ASTRAZENECA UK LIMITED, *et al.*,
*Defendants-Appellees*.

Appeal from the United States District Court for the District of Columbia,
No. 1:17-cv-02136-RJL (Hon. Richard J. Leon)

## OPENING BRIEF FOR PLAINTIFFS-APPELLANTS
## JOSHUA ATCHLEY, *ET AL.*

DAVID C. FREDERICK
JOSHUA D. BRANSON
ANDREW E. GOLDSMITH
KELLOGG, HANSEN, TODD,
 FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
dfrederick@kellogghansen.com
jbranson@kellogghansen.com
agoldsmith@kellogghansen.com

*Counsel for Plaintiffs-Appellants*
*Joshua Atchley, et al.*

January 11, 2021

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Plaintiffs-Appellants certify as follows:

## A.     Parties and Amici

Appellants here and Plaintiffs in the district court are listed in Attachment A.

Plaintiffs Gary Huffman, Karen Huffman, Torie Murphy, and the Estate of Jason Huffman voluntarily dismissed without prejudice their claims on October 26, 2018.  Plaintiff Lori Silveri voluntarily dismissed without prejudice her claims on December 31, 2018.

Appellees here and Defendants in the district court are AstraZeneca UK Limited, AstraZeneca Pharmaceuticals LP, GE Healthcare USA Holding LLC, GE Medical Systems Information Technologies, Inc., GE Medical Systems Information Technologies GmbH, Johnson & Johnson, Cilag GmbH International, Ethicon Endo-Surgery, LLC, Ethicon, Inc., Janssen Ortho LLC, Janssen Pharmaceutica N.V., Johnson & Johnson (Middle East) Inc., Ortho Biologics LLC, Pfizer Inc., Pfizer Enterprises SARL, Pfizer Pharmaceuticals LLC, Pharmacia & Upjohn Company LLC, Wyeth Pharmaceuticals Inc., F. Hoffmann-La Roche Ltd., Genentech, Inc., and Hoffmann-La Roche Inc.

**B.     Rulings Under Review**

Plaintiffs-Appellants seek review of Judge Leon's Order (District Court

Docket ("Dkt.") 139, JA___) and accompanying Memorandum Opinion (Dkt.138,

JA___-___), dated July 17, 2020, which granted Defendants-Appellees' motion to

dismiss for failure to state a claim and foreign Defendants-Appellees' motion to

dismiss for lack of personal jurisdiction.

**C.     Related Cases**

Plaintiffs-Appellants are unaware of this case having been previously before

this Court or any other court, or of any pending related cases.

# ATTACHMENT A

JOSHUA ATCHLEY
BENNY ATCHLEY
CONNIE ATCHLEY
ELISSA ATCHLEY
KATELYN WEATHERFORD
JOHN ARAGON, SR.
BRIAN BEAUMONT
DEMPSEY BENNETT
DORIS BENNETT
DARNELL BENNETT
BRANDEAUX CAMPBELL
ANGIE CAPRA
ANTHONY CAPRA, SR.
SHARON CAPRA
MARK CAPRA
VICTORIA CAPRA
A.C., a minor
JARED CAPRA
S.C., a minor
DANIELLE CAPRA
EMILY CAPRA
JACOB CAPRA
JOANNA CAPRA
JOSEPH CAPRA
JULIA-ANNE CAPRA
MICHAEL CAPRA
RACHEL LEE
SARAH JOHNSON
SALLY CHAND, individually, and for the estate of MICHAEL CHAND, SR.
MICHAEL CHAND, JR.
CHRISTINA MAHON
RYAN CHAND
BRENDA CHAND
KARA CONNELLY
JEAN DAMMANN
MARK DAMMANN
KEVIN CONNELLY
JIMMY CONNOLLY
MELISSA DOHENY
KATHY KUGLER
ROBERT KUGLER
AMY RITCHIE
DREW EDWARDS

DONIELLE EDWARDS
ALAN EDWARDS
BRENDA EDWARDS
DANE EDWARDS
LOGAN EDWARDS
SAMANTHA EDWARDS
IAN EDWARDS
HANNAH EDWARDS
AUSTIN EMORY
BRANDON EMORY, individually, and for the estate of MICHAEL ADAM EMORY
L.E., a minor
MARIA de la luz VILLA
BOBBY EMORY
CAROLYN BALDWIN, for the estate of KATHY LOUISE BURNS
TANYA EVRARD
JACOB HARBIN
DANNY HARBIN
LINDA HARBIN
ELIJAH HARBIN
ESTHER TATE
LEASA DOLLAR
EUGENE DELOZIER
BILLY JOHNSON
BRIDGET JUNEAU, individually, and for the estate of WILLIAM JUNEAU
STEPHANIE JUNEAU
WILLIAM KELSO
JOHN KIRBY
REBEKAH KIRBY
CAREN KLECKER
GREGORY KLECKER, individually, and for the estate of DEBORAH KLECKER
LEROY LANCASTER
MICHAEL LUKOW
BRUCE LUKOW
RIKKI LUKOW
KRISTEN KELLEY
ANDREW LUKOW
JOSEPH LUKOW
ANGELA ROBINSON
RANDALL THOMPSON
NATHAN MCCLURE

NIKITA MCNEAL
J.M., a minor
JOSEPH MIXSON
JOHN MIXSON
KARON MIXSON
ALICIA MIXSON
RICHARD NEIBERGER
MARY NEIBERGER
ERIC NEIBERGER, individually, and for
the estate of CHRISTOPHER NEIBERGER
AMI NEIBERGER
ROBERT NEIBERGER
ANTHONY DONALD PELLECCHIA
ANTHONY PELLECCHIA
KATHRYN ANN JOHNSON
DANIEL PRICE
TERRI OVERTON
STEVEN PRICE
CARL REIHER
SHAY HILL, for the estate of ALAN
ROGERS
LUIS ROSA-VALENTIN
LUIS ROSA-ALBERTY
M.R., a minor
ALEX ROSA-VALENTIN
ILIANA ROSA-VALENTIN
ELENA SHAW
EMILY SHAW
CASEY SHAW
L.S., a minor
ERIN DRUCTOR, individually, and for the
estate of BLAKE STEPHENS
KATHLEEN STEPHENS
TRENT STEPHENS
DEREK STEPHENS
RHETT STEPHENS
SUMMER STEPHENS
BRITTANI HOBSON
SUSAN ARNOLD, individually, and for the
estate of RONALD TUCKER
DAVID ARNOLD
SAMANTHA TUCKER
DAISY TUCKER
BRANDON ARNOLD
RACHELLE IDOL
JAMES VAUGHN

JENNINE VAUGHN
CLIFFORD VAUGHN
MICHELE WHITE, individually, and for
the estate of DELMAR WHITE
SHELBY WHITE
S.W., a minor
ROBERT WHITE
ROBERT WINEGAR
PATRICIA CLAVENNA
ELYSE WINEGAR
MARY JAGELLO
ROBERT LLOYD WINEGAR
MELISSA WITTE
WILLIAM WITTE, individually, and for the
estate of KEVIN WITTE
WILLIAM ZAPPA
HAEKYUNG ZAPPA
PATSY BELL
RICHARD LANDECK
VICTORIA LANDECK
JENNIFER LANDECK
CARRIE THOMPSON, individually, and
for the estate of SEAN THOMAS
A.T., a minor
DANIEL THOMAS, SR.
DIANA THOMAS
DANIEL THOMAS, JR.
DAVID THOMAS
KELLY GILLIS
MELINDA FLICK
MICHELLE WEST
MADISON WEST
NISTASHA PEREZ
MICHAEL MURPHY-SWEET
ELIZABETH MURPHY-SWEET
ANONA GONELLI
ROBERT J. KUHLMEIER
THERESA A. KUHLMEIER
THERESA A. KUHLMEIER
EDWARD KUHLMEIER
THOMAS KUHLMEIER
JOHN KUHLMEIER
DAVID KUHLMEIER
ROBERT W. KUHLMEIER
TANJA KUHLMEIER, individually, and for
the estate of DANIEL KUHLMEIER

K.K., a minor
DONNA FARLEY
NOEL J. FARLEY
BARBARA FARLEY
BRETT FARLEY, individually, and for the
estate of STEVEN FARLEY
JESSICA FARLEY
CAMERON FARLEY
CHRIS FARLEY
VICKIE MCHONE
NOEL S. FARLEY
DAVID FARLEY
CARLA PROFFITT
DAWN WILLIAMSON
LESLIE HARDCASTLE, individually, and
for the estate of JOSHUA REEVES
J.R., a minor
JAMES REEVES
W. JEAN REEVES
JARED REEVES
SHERRI HOILMAN
JONI LITTLE
MARIA LANE
MARK MUNNS
MARTHA STEWART
CRISTA MUNNS
BREE REUBEN
CASEY REUBEN
BEN REUBEN
PATRICK REUBEN
QUINTEN REUBEN
LINDA REUBEN
FRANCIS COTÉ
NANCY COTÉ
SAMANTHA DUNFORD
MAXIMILLIAN SHROYER
CHRISTOPHER COTÉ, individually, and
for the estate of JONATHON COTÉ
BARBARA ALEXANDER, individually,
and for the estate of RONALD WITHROW
JOHNNY ALEXANDER
SHAWN RYAN
SANDRA RYAN
A.R., a minor
BARB THIEDE
JASON RYAN

BILLY RYAN
ANGIE RYAN
TERESA BECKLEY
GRANT VON LETKEMANN II
KELLY VON LETKEMANN
SCOTT SCURRAH
MASINA TULIAU
JENNIFER LINK
JESSICA REW
SARA LILLY
RYAN HICKMAN
E.H., a minor
SHARON JOHNSTON
JUDY COLLADO, individually, and for the
estate of JAY COLLADO
KAIYA COLLADO
MARICEL MURRAY
W. ANN MEULI
J.M., a minor
BRYAN S. SHELTON, individually, and
for the estate of RANDOL SHELTON
DARLENE SHELTON
BRYAN T. SHELTON
AMANDA SHELTON
TAMMY KINNEY
TAMMIE DENBOER
DEREK GAJDOS
SHARONDA PARLIN
CYNTHIA PARLIN
MARIA VIDAL
JIMMY RUNDELL
ROBIN DAVIDSON, individually, and for
the estate of STEVEN PACKER
CHRISTOPHER PACKER
DANIELLE PACKER
JASON DAVIDSON
ZACHARY DAVIDSON
KATHERINE CROW
K.E.C., a minor
K.A.C., a minor
CANDACE HUDSON
DAVID BUSH
JONATHAN CONTRERAS, SR.
CARLOS CONTRERAS
CESAR CONTRERAS
HERNAN CONTRERAS

NOEL CONTRERAS
DANNYEL CONTRERAS
NORMA CONTRERAS
THERESA INOUYE
JERRY INOUYE
JULIE PAYNE, individually, and for the
estate of CAMERON PAYNE
K.P., a minor
A-L.P., a minor
DENISE JACKSON
AUNDRA CRAIG
JOYCE CRAIG
T.M.C., a minor
JONATHAN CRAIG
MICHAEL COOK
ANDRE BROWN
VALENCIA COOK
DEBRA COOK-RUSSELL
NASHIMA CRAIG
ARIFAH HARDY
MATTHEW CRAIG
TONY BOTELLO
TAUSOLO AIETI
POLOKA AIETI
IMO AIETI
LISI AIETI
CHRISTOPHER BOUTEN
ERIN BOUTEN
JORDAN BRACKETT
BRANDON BYBEE
MARK CASHMAN
BRIAN CASEY
BRITTANY HOGAN
SHELLEY CASEY
RICHARD CASEY
JOHNNY CASTILLO
MICHAEL DUNN
ANDREW FUKUZAWA
FRANCISCO GIETZ
ABELINO GOMEZ
PATRICK HANLEY
EDWARD HANLEY
KATHERINE HANLEY
CECELIA HANLEY
BENJAMIN JOHNSON
TAMALA JOHNSON

GREG JOHNSON
BRANDON JOHNSON
BROOKE PLUMB
C. RICHARD LOONEY
MARTHA LOONEY
BARRY MCDONALD
MATTHEW MERGELE
JARETH PAYNE
LUCAS SASSMAN
MELISSA SASSMAN
JEREMY SMITH
DONALD SPENCER
JARED STEVENS
DERRICK STINNETT
BRANDI STINNETT
LAURIE MANYLIGHTNINGS, for the
estate of LELAND THOMPSON
PATRICK TUTWILER
CRYSTAL TUTWILER
RYAN WILSON
JAMI WILSON
JOSHUA WOLD
CELESTE YANTIS
PRESLEY ALEXANDER
E.W., a minor
HERBERT GILL
JAMES GMACHOWSKI
JOSHUA GRZYWA
NEYSA GRZYWA
KURTISS LAMB
LISA LAMB
JOSE LOPEZ
J.L., a minor
DAVID MCINTOSH
DONALD MCINTOSH
TYLER NORAGER
SHALEE NORAGER
M.N., a minor
JASON ROBINSON
FRANCES ROBINSON
E.R., a minor
WILLIAM WEATHERLY
MICHAEL WEATHERLY
JARROD LAGRONE
CHRISTOPHER HALSKI
VIRGINIA BILLITER

ERIC BILLITER
ADRIANNE KIDD
DANIEL DUDEK
MARGARET DUDEK
SARAH DUDEK
ANDREW DUDEK
KATIE WOODARD
CHELSEA ADAIR, individually, and for
the estate of JAMES ADAIR
A.A., a minor
MATTHEW ADAMSON
R.A., a minor
KARAR ALABSAWI
ROSEMARIE ALFONSO, individually, and
for the estate of CARLO ALFONSO
K.B., a minor
KOUSAY AL-TAIE, individually, and for
the estate of AHMED AL-TAIE
NAWAL AL-TAIE
HATHAL TAIE
JAKE ALTMAN
NADJA ALTMAN
J.A., a minor
MAIRA ALVAREZ, individually, and for
the estate of CONRAD ALVAREZ
K.A., a minor
A.A., a minor
C.A., a minor
CHERYL ANAYA
CARMELO ANAYA JR.
TRISTA MOFFETT, individually, and for
the estate of MICHAEL ANAYA
CATHY ANDINO, individually, and for the
estate of EDWIN ANDINO, II
VERONICA PENA ANDRADE
VERONICA D. ANDRADE
ROBERTO ANDRADE, SR., individually,
and for the estate of ROBERTO
ANDRADE, JR.
MATTHEW ANDREAS
NICHOLAS ANNA
MONICA ARIZOLA
ROBERTO AARON ARIZOLA
ROBERTO ARIZOLA, SR.
CECILIA ARIZOLA
RICARDO ARIZOLA

DANNY ARIZOLA
TREY BAILEY
MCKENZIE BAILEY
SAMANTHA BALSLEY, individually, and
for the estate of MICHAEL BALSLEY
L.R-W., a minor
AFONSO BANDHOLD
HENRY BANDHOLD, JR.
MARIANA BANDHOLD
LAUREL BARATTIERI, individually, and
for the estate of GUY BARATTIERI
PATRICIA WHEATLEY
CODY BARHAM
TODD BARNUM
DUSTIN BAUER
T.H., a minor
S.B., a minor
K.B., a minor
KARI CAROSELLA, individually, and for
the estate of JUSTIN BAUER
JEREMY BAUER
JACOB BAUER
CONNIE HADDOCK
GREGORY BAUER
DAVID BAXTER, JR.
NICOLE BAXTER
DAVID BAXTER, SR.
BRIAN BEEM
ELIZABETH BEEM
KELLY BEEM
KAITLYN BEEM
CASSANDRA BEEM
JOSEPH BEEM
MATTHEW BENSON
DANIEL BENSON
CAROL BENSON
B.B., a minor
C.B., a minor
MELISSA BENSON
BRENTYN BISHOP
JOHN BLICKENSTAFF
PAM JONES
TRISTA CARTER
ADRIANNE BLICKENSTAFF
A.B., a minor
C.B, a minor

M.B., a minor
MISTY BLICKENSTAFF
JARED BLICKENSTAFF
DENISE VENNIX
JEREMY BLOHM, individually, and for the
estates of ALAN BLOHM and
CHRISTOPHER BLOHM
KIANA BLOHM
PAULA BOBB-MILES, individually, and
for the estate of BRANDON BOBB
JOHNNY MILES, SR.
RACQUEL MILES
JOHNNY MILES, JR.
EVAN BOGART
LANI BOGART
DOUGLAS BOGART
CANA HICKMAN
CHRISTOPHER BOGART
JOHN BOTTS
DARA BOTTS
ELIZABETH CUNNINGHAM
STEVE BOTTS
JENNIFER BOTTS
MARIO BOWEN
MICHELLE KLEMENSBERG
ANDREW BRADLEY
CONSTANCE BRIAN, individually, and
for the estate of BRIAN BRIAN
AMBER HENSLEY
MICHAEL BRIGGS
TAKARRA BRIGGS
M.D.R. II, a minor
M.J.B., a minor
M.J.B., a minor
JOSHUA BROOKS
DANIEL BROOKS
ELIZABETH MASTERSON, individually,
and for the estate of JOSHUA BROWN
TAYLOR BROWN, individually, and for
the estate of SCOTT BROWN
ALAN BURKS, individually, and for the
estate of PETER BURKS
JACKIE HLASTAN
GEORGIA BURKS
ALISON MCRUIZ
SARAH PHILLIPS

ZACHARY BURKS
LARRY CABRAL, JR.
JASMYN RAUDA, individually, and for the
estate of ROLAND CALDERON
BENJAMIN CARRINGTON
TERRY CARTER
LINDA CARTER
SHAUN CHANDLER
JULEONNA CHANDLER
ELIZABETH CHISM, individually, and for
the estate of JOHNATHAN CHISM
DANNY CHISM
VANESSA CHISM
JULIE CHISM
ANN CHRISTOPHER, individually, and for
the estate of KWESI CHRISTOPHER
THOMAS COE II
HEATHER COE
V.T.C., a minor
ALEJANDRO CONTRERASBAEZ
JESSICA CONTRERASBAEZ
PETER PASILLAS
J.C., a minor
A.C., a minor
JOSHUA COPE
PHILIP COPE
ERICA OWENS
JACOB COPE
LINDA COPE
JONATHAN COPE
L.C., a minor
KATHY CRABTREE, individually, and for
the estate of DANIEL CRABTREE
M.C., a minor
DEBRA WIGBELS
JUDY CRABTREE
JOSHUA CRAVEN
HOLLY CRAVEN
MEAGHUN CROOKSTON
LEESHA CROOKSTON, individually, and
for the estate of DUNCAN CROOKSTON
JOHN DAGGETT
COLLEEN CZAPLICKI
KENDALL RASMUSSON
LOUIS DAHLMAN
LUCAS DAHLMAN

AMBER DAHLMAN
KAY STOCKDALE
AYLA DAVIS
E.D., a minor
GUY DAVIS
TERESITA DAVIS
CHRISTOPHER DAVIS
MARIA CALLE, individually, and for the estate of GEORGE DELGADO
CYNTHIA DELGADO
ANTHONY DEMATTIA
PHILIP DERISE
LORAMAY DIAMOND, individually, and for the estate of SEAN DIAMOND
SALLY WILEY
JAMES WILEY
JASON DIAMOND
TAYLOR DIAMOND
MADISON DIAMOND
A.D., a minor
SEAN R. DIAMOND
KENDRICK DIXON
KADAIVION DIXON
DANIEL DIXON, individually, and for the estates of ROBERT DIXON and ILENE DIXON
DAVID DIXON
GRETCHEN LANG
L.R., a minor
M.R., a minor
SHAWN DONNERY
TONYA DRESSLER, individually, and for the estate of SHAWN DRESSLER
ARDITH DRESSLER
MELISSA DRESSLER
TANYA DRESSLER
DANIEL DRESSLER
JAMES DRESSLER
KENNETH DREVNICK, individually, and for the estate of DANIEL DREVNICK
DENNIS DUNN
SHARON SMITH, individually, and for the estate of TERRENCE DUNN
TIMOTHY DUVALL, JR.
TAMMY EAKES
JOHN EAKES

JOSHUA ECKHOFF
JULIA EDDS, individually, and for the estate of JONATHAN EDDS
BARRY EDDS
JOEL EDDS
ANGELINE JACKSON, individually, and for the estate of CODY EGGLESTON
KAYTRINA JACKSON
SHILYN JACKSON
TIMOTHY ELLEDGE, individually, and for the estate of MICHAEL ELLEDGE
EDWARD ELLIOTT, individually, and for the estate of DANIEL ELLIOTT
LEROY ESCO JR.
TARYN ESCO
L.E., a minor
A.P., a minor
KEYONDRA PERRIN
STEPHANIE ZOBAY, individually, and for the estate of STEPHEN EVERHART
RUSSELL C. FALTER
JOHN SACKETT
MARJORIE FALTER
DAVID LUCAS
MICHAEL LUCAS
LINDA FALTER
RUSSELL J. FALTER, individually, and for the estate of SHAWN FALTER
TIMOTHY LUCAS
MARSHA NOVAK
ANDREW LUCAS
ANTHONY FARINA
KATHLEEN PIRTLE
CARROL ALDERETE, individually, and for the estate of CLAY FARR
ANTHONY ALDERETE
MATTHEW FIESER
JACKIE FARRAR-FINKEN
CAROLINE FINKEN
EMILIE FINKEN
JOAN HENSCHEID
MARK FINKEN
JEAN PRUITT
RICHARD FINKEN
DAVID FINKEN
ALAN FINKEN

PETER FINKEN
JAMES FLEMING, III
MARK FLETCHER
NORMAN FORBES IV
LONNIE FORD, individually, and for the
estate of JOSHUA FORD
LINDA MATTISON-FORD
JESSICA MATSON
HELEN FRASER
RICHARD FRASER, individually, and for
the estate of DAVID FRASER
RICHARD LEE
CHARLOTTE FREEMAN, individually,
and for the estate of BRIAN FREEMAN
I.F., a minor
G.F., a minor
FRED FRIGO
NOALA FRITZ, individually, and for the
estates of JACOB FRITZ and LYLE FRITZ
ETHAN FRITZ
DANIEL FRITZ
SCOTT FRITZ
KRISTEN BLEDSOE-FRITZ
NANCY FUENTES, individually, and for
the estate of DANIEL FUENTES
ARMANDO FUENTES
TATYANA FUENTES
JULIO FUENTES
EMMA MCGARRY
D.F., a minor
SAMANTHA GAGE, individually, and for
the estate of JOSEPH GAGE
M.G., a minor
LUIS GARZA
BREANNA GASPER, individually, and for
the estate of FRANK GASPER
JAMIE BARNES
RANDALL GEIGER, individually, and for
the estate of WAYNE GEIGER
KIMBERLEY GEIGER
JESSECA TSOSIE
ANTHONY GERBER
LINDA GIBSON, individually, and for the
estate of BRENNAN GIBSON
JOHN GIBSON
STEPHANIE WEBSTER

SEAN ELLIOTT
TRAVIS GIBSON
TYLER GINAVAN
CHRISTOPHER GOLEMBE
KATHRYN HEAD
MIGUEL GONZALEZ
JOEL GORBUTT
KEVIN GRAVES, individually, and for the
estate of JOSEPH GRAVES
COURTNAY GRAY, individually, and for
the estate of BRENTON GRAY
CAYDEN GRAY
JOHN GREER
STEPHANIE SANDER
CHRISTOPHER GREER
JOSEPH GREER
CARL GREER
CHARLES GREGSTON
ASHLEY HOUPPERT, individually, and
for the estate of JAMES GUDRIDGE
ROBERT HAAF
MONICA HAAF
J.A.H., a minor
MARY HAAF
JAMES HAAF
ASHLEY SIMS
MICHAEL HABSIEGER
BRENDA HABSIEGER, individually, and
for the estate of ANDREW HABSIEGER
AMBER HABSIEGER, for the estate of
JACOB HABSIEGER
DEREK HADFIELD
ASHLEY HADFIELD
ROBERT HADFIELD II
KRISTI HADFIELD
JENNIFER ROTON
KELLI HAKE, individually, and for the
estate of CHRISTOPHER HAKE
G.H., a minor
DENICE YORK
RUSSEL YORK
JENNIFER YORK
JASON YORK
PETER HAKE
JILL HAKE
KERI HAKE

ZACHARY HAKE
SKYLAR HAKE
JESSICA WILLIAMS, individually, and for
the estate of JAMES HALE
J.H., a minor
J.H., a minor
J.H., a minor
JERRAL HANCOCK
STACIE TSCHERNY
J.H., a minor
A.H., a minor
SAVANNAH TSCHERNY
JEFFREY HARPER
SEAN HARRINGTON
PAUL HARRIS
ANNE HARRIS
DAVID WADE HARTLEY, individually,
and for the estate of JEFFERY HARTLEY
DAVID WAYNE HARTLEY
KAYLIE HARTLEY
NANNETTE BYRNE-HAUPT
LYNN FOREHAND, individually, and for
the estate of RYAN HAUPT
LANCE HAUPT
RHONDA HAUPT
TIFANY THOMPSON
SABRINA CUMBE
CHRISTOPHER HEIDLING
STANLEY HEIDLING
TERRA RHOADS
JESSICA HEINLEIN, individually, and for
the estate of CHARLES HEINLEIN, JR.
CHARLES HEINLEIN, SR.
LANITA HERLEM, individually, and for
the estate of BRYANT HERLEM
ERNESTO HERNANDEZ III
LAURA HERNANDEZ
ERNESTO HERNANDEZ IV
N.H., a minor
ERNESTO HERNANDEZ II
ENDI HERRERA
JONATHAN HESLOP
DAVID EUGENE HICKMAN,
individually, and for the estate of DAVID
EMANUEL HICKMAN
VERONICA HICKMAN

DEVON HICKMAN
RUSSEL HICKS SR., individually, and for
the estate of COREY HICKS
RUSSEL HICKS JR.
JAMES HOCHSTETLER
LEANNE HOCHSTETLER
J.H., a minor
KYLE MARSHALL
GREGORY HOGANCAMP
JOSHUA HOLLADAY
SHIRLEY ATKINSON
CRYSTAL HASTINGS
ROBIN HONEYCUTT
JANICE KWILOS-EDMUNDS
ROBERT HUNT
A.H., a minor
M.H., a minor
BOONCHOB PRUDHOME
MAX HURST, individually, and for the
estate of DAVID HURST
LILLIAN HURST
CHRISTOPHER HURST
MARK HURST
ERIC HURST
DWAYNE HURST
DEVIN HURST
SIERRA HURST
TARA HUTCHINSON
LINDA GRESS
DOMINICK IWASINSKI
TRACY TAYLOR, individually, and for the
estate of KENNETH IWASINSKI
AMANDA TAYLOR
MARGARITA ARISTIZABAL,
individually, and for the estate of ALFRED
JAIRALA
J.J., a minor
SEBASTIAN NIUMAN
JERRALD JENSEN
OLNEY JOHNSON
BRANDON JOSEY
CHRISTOPHER JOYNER
ANNE JOYNER
NECOLE SMITH
CORY KENFIELD
EVAN KIRBY

STEVEN KIRBY
MARCIA KIRBY
ANDREW KIRCHOFF
RANDALL KLINGENSMITH
JEANETTE KNAPP, individually, and for
the estate of DAVID KNAPP
LAWRENCE KRUGER, individually, and
for the estate of ERIC KRUGER
DOUGLAS KRUGER
KRISTY KRUGER
E.K., a minor
C.K., a minor
DAVID KUBE, individually, and for the
estate of CHRISTOPHER KUBE
JONATHAN KUBE
JESSICA KUBE
JENNIFER KUBE
JASON KUBE
DONNA KUGLICS, individually, and for
the estate of MATTHEW KUGLICS
LES KUGLICS
DANIEL KULICKA
DAN LAIRD
ANGELA LAIRD
JORDAN LAIRD
HUNTER LAIRD
C.L., a minor
MATTHEW LAMMERS
ALICIA LAMMERS
STACY PATE
BARBARA LAMMERS
GARY LAMMERS
CHRISTOPHER LANDRY
ROADY LANDTISER
TYLER LATHAM
SUZZETTEE LAWSON, individually, and
for the estate of ISAAC LAWSON
C.L., a minor
DARREN LESLIE
CHRISTOPHER LEVI
BEAU LEVINE, individually, and for the
estate of HUNTER LEVINE
JESSICA LEVINE
OLIVIA LEVINE
DONNA LEWIS, individually, and for the
estate of JASON LEWIS

G.L., a minor
J.L., a minor
J.L., a minor
JEAN MARIANO
ANTHONY LILL, individually, and for the
estate of ERIC LILL
KORTNE JONES
SKYE OTERO
M.L., a minor
CODY LILL
SHELLEY SMITH, individually, and for the
estate of KYLE LITTLE
WILLIAM LITTLE
BRENDA LITTLE
KIRA SIKES
WILLIAM LITTLE, JR.
KYLE LLOYD
RIGOBERTO LOPEZ-GARCIA
DANIEL LUCKETT
KONRAD LUDWIG
ADAM MAGERS
JOHN MAINE
DAVID MANGANELLA
LUIGI MARCIANTE, individually, and for
the estate of LUIGI MARCIANTE JR.
MARIA MARCIANTE
ENZA BALESTRIERI
STEPHANIE MARCIANTE
L.M., a minor
DONNIE MARION, individually, and for
the estate of ADAM MARION
PAMELA MARION
EDWARD MARISCAL
GINA MARSHALL-RICKFORD,
individually, and for the estate of
BRADLEY MARSHALL
TANNER MARSHALL
WESLEY MARSHALL
GERRALD MARSHALL
FRANCIS MARSHALL
KIMBERLY MAYO
REBECCA OLIVER, individually, and for
the estate of VIRGIL MARTINEZ
DANIEL OLIVER
KIMBERLEE AUSTIN-OLIVER

DEBORAH NOBLE, individually, and for
the estate of CHARLES MATHENY, IV
CHARLES MATHENY, III
DAVID NOBLE
MICHELLE BENAVIDEZ, individually,
and for the estate of KENNITH MAYNE
DANIEL BENAVIDEZ, SR.
DANIEL BENAVIDEZ, JR.
CHRISTINA BIEDERMAN
JENNIFER MORMAN
LORI MCCOY, individually, and for the
estate of GREGORY MCCOY
LOGAN MCCOY
T.M., a minor
TABITHA MCCOY, individually, and for
the estate of STEVE MCCOY
L.M., a minor
R.M., a minor
KATHERINE MCRILL-FELLINI,
individually, and for the estate of ROBERT
MCRILL
BRIAN COKE
RONALD MCRILL
DANIEL MENKE, individually, and for the
estate of JONATHAN MENKE
PAULA MENKE
NICHOLE LOHRIG
MATTHEW MENKE
TIM MERRILL, individually, and for the
estate of JASON MERRILL
SUE MERRILL
ALYSSA MERRILL
AMBER PIRANEO
ASHLEA LEWIS
CHRISTOPHER MILLER
JOSEPH MILLER
KIMBERLY MILLER
DANA SVENSON
SHANNON MILLICAN, individually, and
for the estate of JOHNATHON MILLICAN
PAUL MILLICAN
MICHAEL MILLS
M.M., a minor
M.M., a minor
MICHAEL MOCK, individually, and for the
estate of WILLSUN MOCK

MANUEL MOLINA
JOSUE MOLINA, individually, and for the
estate of JOSHUA MOLINA
MARIA MOLINA
SAMUEL MONTALBANO
ANDREW MOORES
GLENN MORRIS, individually, and for the
estate of DANIEL MORRIS
LUKE MURPHY
WILETTE MURPHY
RANDOLPH NANTZ, II
WAYNE NEWBY, individually, and for the
estate of NICHOLAS NEWBY
THERESA HART
NATHAN NEWBY
FLOR FUENTES, individually, and for the
estate of DANIEL NEWSOME
TYLER OGDEN
SHERYL CHEN
JERRIN OGDEN
JOSE OLGUIN, individually, and for the
estate of RANDELL OLGUIN
JENNIE MORIN
ANITA BAKER
JANET RIOS
PATRICK O'NEILL
JARED OSBURN
TIMOTHY O'SULLIVAN
MICHAEL OWEN
LAURIE MILLER
R.O., a minor
GILBERT PAIZ, JR.
EDDIE JO PALINSKY, individually, and
for the estate of JERRY PALINSKY, JR.
JERRY PALINSKY II
ADINA PALINSKY
JERRY PALINSKY, SR.
KATHLEEN HOKE
JOEL PALINSKY
KARALEEN HERB
CHEYENNE FLAGG
WILLIAM PARKER
DIXIE FLAGG, individually, and for the
estate of RICHARD PARKER
MEGHAN PARKER-CROCKETT
MICHAEL PASCO

NICHOLAS PAUPORE
MARIA PAUPORE
CODY PAUPORE
MAILEY PAUPORE
COLIN PEARCY
LAIRD PEARCY
ANNE PEARCY
JODY STRIKER
KARYN MCDONALD
ANDREW PEARCY
PATRICK PEARCY
MERLESE PICKETT, individually, and for
the estate of EMANUEL PICKETT
HARRY CROMITY
MARLEN PICKETT
KEMELY PICKETT
VIVIAN PICKETT
KYSHIA SUTTON
BRENNA CORBIN
LOWELL KEITH THOMPSON
LISA THOMPSON, individually, and for
the estate of JOSHUA PLOCICA
PEGGY PORTWINE, individually, and for
the estate of BRIAN PORTWINE
HOLLY BURSON, individually, and for the
estate of JEROME POTTER
MARIAH COWARD, individually, and for
the estate of AARON PRESTON
DMITRI QUIST
DOUGLAS RAGONE
D.R., a minor
DAVID RAGONE
BARBARA RAGONE
DANIEL RAGONE
DENISE SMITH
JUDAS RECENDEZ
JASON REGESTER
CARMEN BILLEDEAUX
LOIS RICHARD
JOSEPH RICHARD JR.
NATHAN RICHARDS
STEVEN RICHARDS
JOHN STEARNS, individually, and for the
estates of MICHELLE RING and SHIRLEY
STEARNS
MARC STEARNS

ERIK ROBERTS
E.C.R., a minor
ROBIN ROBERTS
JAMES ROBERTS
CARA ROBERTS
COLIN ROBERTS
MANUEL ROMAN
MARCO ROMAN
MARIA MURPHY
ESTRELLA VILLANUEVA
MANUEL ROMAN, SR.
THALIA ROMAN
ARACELLYS ROMAN
JAMILEX ROMAN
JULIE ROSENBERG, individually, and for
the estate of MARK ROSENBERG
JASON RZEPA
CASSANDRA RZEPA
C.R., a minor
K.R., a minor
BRIAN SAARISTO
BARBARA LIIMATAINEN
CHERYL SAARISTO
BRIAN SAARISTO, JR.
LEAH SAARISTO
NANETTE SAENZ, individually, and for
the estate of CARLOS SAENZ
FRANCES CASTRO
BRIAN SCHAR
JOSHUA SCHICHTL
MARK SCHICHTL
KAYLA NELSON
KRISTIE NELSON
JIM SCHUMANN, individually, and for the
estate of JASON SCHUMANN
BENJAMIN SCHUMANN
RACHEL GILLETTE, individually, and for
the estate of STEPHEN SCOTT
SHANNON SHUMATE
LAUREN SHUMATE
L.S., a minor
L.S., a minor
JOHN SKLANEY, III
JUDY HUENINK, individually, and for the
estate of BENJAMIN SLAVEN
SEAN SLAVEN

CHASTITY LAFLIN
NICOLE LANDON
MISTI FISHER
RONALD SLOAN
CHRISTOPHER SMITH
JAMES SMITH
PATRICIA SMITH
MICHAEL SMITH, individually, and for
the estate of TIMOTHY SMITH
JARED SOWINSKI
AUSTIN SOWINSKI
DIANE SOWINSKI, individually, and for
the estate of NICHOLAS SOWINSKI
RAYMOND SPENCER, SR., individually,
and for the estate of RAYMOND
SPENCER, JR.
SYLVIA SPENCER
BRADLEY STARCEVICH, individually,
and for the estate of LUCAS STARCEVICH
GLENDA STARCEVICH
TRENTON STARCEVICH
ANGEL MAYES, individually, and for the
estate of ANTONIO STIGGINS
DONALD MAYES
SHAUN STILTNER
WILLIAM STOUT
CALLIE MCGEE
TAMARA STOUT
STEPHANIE BENEFIELD
AUDREY BARBER, individually, and for
the estate of BRANDON STOUT
TRACY ANDERSON
JEFFREY ANDERSON
ELIZABETH ISLAS
ANDREW ANDERSON
ADAM STOUT
TRAVIS STRONG
TAYLOR HESTON
ANTHONY DURKACS
DEBORAH BEAVERS, individually, and
for the estate of JOHN SULLIVAN
DAVID IVERSON, individually, and for the
estate of NICOLE SUVEGES
ALLEN SWINTON
TEMIKA SWINTON
T.R.S., a minor

T.M.S., a minor
TYREASHA BRYANT
LINDA PRITCHETT
JOHN TAKAI
MAE TAKAI
JONAMAE TAKAI
NIANA TAKAI
K.T., a minor
I.T., a minor
BRIAN TAYLOR
MICHELLE TAYLOR, individually, and
for the estate of DAVID TAYLOR, JR.
J.D.J.T., a minor
PHYLLIS TAYLOR
JOHN TAYLOR
EDWARD TERRY, SR.
EDWARD TERRY, JR.
GLENNDON TERRY
MARK THOMSEN
ARDELL THOMSEN
RALPH THOMSEN
COREY SCHLENKER, individually, and
for the estate of WILLIAM THORNE
JOEY ROBINSON
MARVIN THORNSBERRY
CYNTHIA THORNSBERRY
L.T., a minor
M.T., a minor
N.T., a minor
A.B., a minor
TIMOTHY TIFFNER, individually, and for
the estate of BENJAMIN TIFFNER
JUDITH TIFFNER
JOSHUA TIFFNER
SETH TIFFNER
SARAH CROSBY
PHILIP TRIMBLE
JANET SCHOONOVER
ANDREW TRIMBLE
RICHARD TRIMBLE
LADONNA LANGSTRAAT
JOHN TRIMBLE
CHARLOTTE TEETSEL
KAYELEEN LULOFF
JOHN TULLY, individually, and for the
estate of MICHAEL TULLY

MARILYN TULLY
HEATHER FARKAS
SLADE TULLY
JOHN TULLY, II
NANCY UMBRELL, individually, and for
the estate of COLBY UMBRELL
MARK UMBRELL, individually, and for
the estate of COLBY UMBRELL
JOHN VACHO, individually, and for the
estate of CAROL VACHO
ASHLEY LESLIE
MARY JANE VANDEGRIFT, individually,
and for the estates of MATTHEW
VANDEGRIFT and JOHN VANDEGRIFT
ANDRES VAZQUEZ
BARBARA PALACIO-VAZQUEZ
A.V., a minor
M.G.V., a minor
J.B.V., a minor
MARISEL VAZQUEZ
MARIA VAZQUEZ, individually, and for
the estate of OMAR VAZQUEZ
TRAVIS VENDELA
MARIANNE VENDELA
JOSE VERA
CAROL POLLEY
KEITH VEVERKA
DOUGLAS VEVERKA
RONALD VEVERKA
SANDRA SOLIDAY
LISA RAMACI, individually, and for the
estate of STEVEN VINCENT
ISABELL VINCENT, individually, and for
the estate of CHARLES VINCENT
CHRISTOPHER VIOLETTE
MICHELLE WAGER
BRYAN WAGNER
MARGARET WAKEMAN
DAVID WAKEMAN, individually, and for
the estate of DUSTIN WAKEMAN
WILLIAM WAKEMAN
JUSTIN WALDECK
BILLY WALLACE
STEFANIE WALLACE
AUSTIN WALLACE
DEVON WALLACE

C.W., a minor
JEREMY WALLACE
LINDSAY YOUNG, individually, and for
the estate of BRETT WALTON
SYDNEY WALTON
PATRICK WARD
JARRETT WARD
KYLE WELCH
JOSHUA WELLS
LYDIA LANTRIP
BILLIE WELLS, JR.
DAVID LANTRIP, JR.
J.W., a minor
MARK WHETZEL
JENNIFER WHETZEL
DIANNA WHETZEL
JENNIFER WHITE, individually, and for
the estate of LUCAS WHITE
WESLEY WILLIAMSON
JAMES WILSON
VICTOR WISE, II
BEVERLY WOLFER, individually, and for
the estate of STUART WOLFER
DAVID WOODARD
D.W., a minor
GINA WRIGHT
JOHN ROBERT YOUNG
SHARON DEBRABANDER
DENNIS DEBRABANDER
NICOLE DEBRABANDER
JOELLA PRATT
RICKY ZHORNE, JR.
BENJAMIN ZIBUTIS

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS,
AND RELATED CASES ................................................................................i

TABLE OF AUTHORITIES ..................................................................xx

GLOSSARY ...........................................................................................xxvi

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF THE ISSUES ................................................................1

STATUTES ..................................................................................................1

STATEMENT OF THE CASE ....................................................................2

     A.     Legal Background ................................................................3

     B.     Factual Background ............................................................5

          1.     Jaysh al-Mahdi and the Iraqi Ministry of Health ..................5

          2.     Defendants' payments to Jaysh al-Mahdi ................................11

          3.     Jaysh al-Mahdi's Hezbollah-sponsored terrorist
campaign ................................................................14

     C.     Procedural History ............................................................15

SUMMARY OF ARGUMENT ..................................................................16

STANDARD OF REVIEW ........................................................................19

ARGUMENT ..............................................................................................19

I.     PLAINTIFFS SUFFICIENTLY PLEAD PRIMARY-
LIABILITY CLAIMS (COUNTS THREE AND FOUR) ..........19

     A.     Plaintiffs Allege Proximate Cause ....................................19

B. The Ministry Was Not A Causation-Defeating Intermediary ...................................................... 22

C. Causation Would Exist Even If The Ministry Were An Independent Intermediary .................................................. 26

    1. Defendants' free-goods payments funded terrorism................. 27

    2. Defendants paid cash bribes directly to terrorists.................... 29

II. PLAINTIFFS SUFFICIENTLY PLEAD SECONDARY-LIABILITY CLAIMS (COUNTS ONE AND TWO) ....................... 31

A. Defendants Substantially Assisted Jaysh al-Mahdi ........................ 32

    1. Factors 1 and 2: Nature of act and assistance ......................... 33

    2. Factors 3 and 4: Presence and relationship............................. 36

    3. Factor 5: State of mind............................................................. 37

    4. Factor 6: Duration ................................................................... 41

B. Hezbollah Committed, Planned, Or Authorized The Relevant Terrorist Acts ........................................................ 41

    1. Hezbollah planned and authorized Jaysh al-Mahdi's terrorist attacks against Plaintiffs (Count One)............................................................................ 42

        a. Plaintiffs' allegations are sufficient............................... 42

        b. The district court's ruling is incorrect ........................... 46

    2. Hezbollah planned and authorized Jaysh al-Mahdi's broader terrorist campaign (Count Two).................... 48

III. PLAINTIFFS SUFFICIENTLY PLEAD PERSONAL JURISDICTION .............................................................................. 50

A. The Foreign Defendants Formed Suit-Related Contacts With The United States .................................................. 50

      1.    Defendants tied their transactions to the United States .......................................................................50

      2.    The district court's reasoning is unpersuasive ..........................53

  B.    Personal Jurisdiction Serves Vital National-Security Interests.................................................................................57

  C.    The State-Law Claims Should Be Reinstated .....................................59

  D.    At A Minimum, Jurisdictional Discovery Is Warranted .....................59

CONCLUSION ...............................................................................................60

CERTIFICATE OF COMPLIANCE

ADDENDUM

**CASES**

*Abecassis v. Wyatt*, 785 F. Supp. 2d 614 (S.D. Tex. 2011) ...............4, 22, 27, 33, 38

*Adelson v. Hananel*, 652 F.3d 75 (1st Cir. 2011) .....................................................58

*Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519
(6th Cir. 2000) ........................................................................................39

*Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544
(6th Cir. 2007) ...................................................................................51, 53

*Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*,
525 F.3d 8 (D.C. Cir. 2008)....................................................................28

*Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102 (1987) ...........................57

*Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1
(1st Cir. 2009)..........................................................................................53

*Banneker Ventures, LLC v. Graham*, 798 F.3d 1119
(D.C. Cir. 2015)..........................................................................19, 30, 31

*Bartlett v. Société Générale de Banque Au Liban SAL*,
2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020) ......................33, 34, 36, 37, 45

* *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685
(7th Cir. 2008) ..............................................................4, 22, 24, 26, 33, 40

* *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985)............ 50, 52, 54, 56, 57, 58

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver,
N.A.*, 511 U.S. 164 (1994) .......................................................................31

*Chiquita Brands Int'l, Inc.*, *In re*, 284 F. Supp. 3d 1284
(S.D. Fla. 2018) ...................................................................................4, 22

Authorities principally relied upon are designated by an asterisk (*).

*Crosby v. Twitter, Inc.*, 921 F.3d 617 (6th Cir. 2019) ...............................................35

*Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*,
593 F.3d 1249 (11th Cir. 2010) .....................................................................54

*Doe v. Exxon Mobil Corp.*, 654 F.3d 11 (D.C. Cir. 2011),
*vacated*, 527 F. App'x 7 (D.C. Cir. 2013) .....................................................39

*El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668 (D.C. Cir. 1996),
*abrogated sub nom. Samantar v. Yousuf*, 560 U.S. 305
(2010) .............................................................................................................60

*Elahi v. Islamic Rep. of Iran*, 124 F. Supp. 2d 97 (D.D.C. 2000) ...........................45

*Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, --- F. Supp.
3d ----, 2020 WL 6143654 (E.D.N.Y. Oct. 20, 2020)..................33, 34, 36

*Estate of Klieman ex rel. Kesner v. Palestinian Auth.*, 923 F.3d 1115
(D.C. Cir. 2019), *vacated*, 140 S. Ct. 2713 (2020)......................................50

*Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67
(E.D.N.Y. 2019).................................................................................44, 45, 47

*Goldberg v. UBS AG*, 660 F. Supp. 2d 410 (E.D.N.Y. 2009) ...........................4, 57

*Guidry v. U.S. Tobacco Co.*, 188 F.3d 619 (5th Cir. 1999)....................................59

* *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ...................17, 18, 32, 33, 34,
36, 37, 38, 39, 40,
41, 49

*Helmer v. Doletskaya*, 393 F.3d 201 (D.C. Cir. 2004) ...........................................50

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) .......................................58

*Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984)..........................................56

*Kemper v. Deutsche Bank AG*, 911 F.3d 383 (7th Cir. 2018) ................................27

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118
(2014)..............................................................................................................21

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013)..................................................................................53

*Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018).................. 31-32, 38, 39, 40

*Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33 (E.D.N.Y. 2019)......................22, 33

*Nat'l Council of Resistance of Iran v. Dep't of State*, 373 F.3d 152 (D.C. Cir. 2004) .......................................................................23, 24

*O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312 (3d Cir. 2007)....................53, 54

*Oetiker v. Jurid Werke, GmbH*, 556 F.2d 1 (D.C. Cir. 1977)..................................59

* *Owens v. BNP Paribas, S.A.*:

    235 F. Supp. 3d 85 (D.D.C. 2017) ("*Owens II*") ...................................25, 28

    897 F.3d 266 (D.C. Cir. 2018) ("*Owens IV*") ................. 3, 19, 20, 22, 23, 24, 26, 27, 28, 29, 31, 47

* *Owens v. Rep. of Sudan*:

    531 F.3d 884 (D.C. Cir. 2008)...............................................................28

    864 F.3d 751 (D.C. Cir. 2017) ("*Owens III*"), *vacated and remanded sub nom. Opati v. Rep. of Sudan*, 140 S. Ct. 1601 (2020)...........................................................20, 22, 26, 40

*Paroline v. United States*, 572 U.S. 434 (2014) ................................................20, 21

*Pro Axess, Inc. v. Orlux Distrib., Inc.*, 428 F.3d 1270 (10th Cir. 2005) .......................................................................58

*Rael v. Cadena*, 604 P.2d 822 (N.M. 1979)...........................................................40

*Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013)..............................................24, 27

*Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019)......................35

*Smith v. District of Columbia*, 413 F.3d 86 (D.C. Cir. 2005)..................................20

*St. Jude Med., Inc. v. Lifecare Int'l, Inc.*, 250 F.3d 587 (8th Cir. 2001) ........................................................................51

*Strike 3 Holdings, LLC v. Doe*, 964 F.3d 1203 (D.C. Cir. 2020) ...........................46

*Techniarts Eng'g v. United States*, 51 F.3d 301 (D.C. Cir. 1995)...........................47

*TIG Ins. Co. v. Rep. of Argentina*, 967 F.3d 778 (D.C. Cir. 2020)........................35

*uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421 (7th Cir. 2010) ..........................53

*United States v. Akinyoyenu*, 199 F. Supp. 3d 106 (D.D.C. 2016)..........................44

*United States v. Bostick*, 791 F.3d 127 (D.C. Cir. 2015).........................................47

*United States v. The Brig Burdett*, 34 U.S. (9 Pet.) 682 (1835) ............................23

*United States v. Johnson*, 970 F.2d 907 (D.C. Cir. 1992) .......................................47

*United States v. Pregler*, 925 F.2d 268 (8th Cir. 1991).........................................49

*United States v. Right to Use & Occupy 3.38 Acres of Land*, 484 F.2d 1140 (4th Cir. 1973) .......................................................................47

*Urquhart-Bradley v. Mobley*, 964 F.3d 36 (D.C. Cir. 2020).................19, 53, 55, 59

*Walden v. Fiore*, 571 U.S. 277 (2014).....................................................................54

*Wultz v. Islamic Rep. of Iran*, 755 F. Supp. 2d 1 (D.D.C. 2010)...................4, 22, 33

**STATUTES AND RULES**

Anti-Terrorism Act, 18 U.S.C. § 2331 *et seq.*:

§ 2331(1)(A) .............................................................................................48

§ 2331(1)(C)..............................................................................................53

§ 2333(a) .....................................................................................................5

§ 2333(d) ....................................................................................5

§ 2333(d)(1) .............................................................................36

§ 2333(d)(2) ............................. 17, 18, 32, 35, 36, 39, 41, 48, 49

§ 2334(a) ..................................................................................57

§ 2334(d) ..................................................................................57

§ 2338............................................................................................1

Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222,
     130 Stat. 852 (2016):

§ 2(a)(1) ...................................................................................57

§ 2(a)(4) ...................................................................................4-5

§ 2(a)(5) ...................................................................................32

§ 2(a)(6) ..................................................................................5, 57

§ 2(b)....................................................................................5, 17, 22, 35

1 U.S.C. § 1 ....................................................................................49

18 U.S.C. § 1962 ............................................................................48

28 U.S.C. § 1291 ..............................................................................1

28 U.S.C. § 1367(a)...........................................................................1

## OTHER MATERIALS

49 Fed. Reg. 2836-02 (Jan. 23, 1984)........................................25

58 Fed. Reg. 52,523-01 (Oct. 8, 1993) .......................................25

H.R. Rep. No. 115-858 (2018)........................................................4

Judgement, *Prosecutor v. Kordić*, ICTY No. IT-95-14/2-A
    (Dec. 17, 2004), https://www.icty.org/x/cases/
    kordic_cerkez/acjug/en/cer-aj041217e.pdf ....................................................47

Merriam-Webster:

    https://bit.ly/3n7xxa2 ....................................................................................44

    https://bit.ly/2X0TsoU ...........................................................................42, 43

Restatement (Third) of Torts (2020).....................................................................34, 39

S. Rep. No. 102-342 (1992) ...................................................................................3, 4, 21

# GLOSSARY

| | |
|---|---|
| ATA | Anti-Terrorism Act, 18 U.S.C. § 2331 *et seq.* |
| EFP | Explosively Formed Penetrator |
| FTO | Foreign Terrorist Organization |
| J&J | Johnson & Johnson |
| JASTA | Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 (2016) |
| Ministry | Iraq's Ministry of Health |

# JURISDICTIONAL STATEMENT

The district court had jurisdiction over the federal-law claims under 18 U.S.C. § 2338, and the state-law claims under 28 U.S.C. § 1367(a).  This Court has jurisdiction under 28 U.S.C. § 1291.  The district court entered final judgment on July 17, 2020.  JA___.  Plaintiffs timely appealed on August 14, 2020.  JA___-___.

# STATEMENT OF THE ISSUES

1.     Whether Plaintiffs sufficiently allege that Defendants proximately caused their injuries under the Anti-Terrorism Act.

2.     Whether Plaintiffs sufficiently allege that Defendants are secondarily liable under the Anti-Terrorism Act.

3.     Whether Plaintiffs sufficiently allege personal jurisdiction over the foreign Defendants, or whether the district court abused its discretion by denying jurisdictional discovery.

# STATUTES

Pertinent statutes appear in the addendum.

## STATEMENT OF THE CASE

Plaintiffs-Appellants are American service members and civilians, and their families, who served our country in Iraq. While in Iraq, between 2005 and 2011, each was brutally attacked by a Hezbollah-sponsored terrorist group called "Jaysh al-Mahdi." Defendants-Appellees are large medical-supply companies that knowingly financed those attacks. The reason was straightforward: Jaysh al-Mahdi openly controlled Iraq's Ministry of Health ("Ministry"), and Defendants obtained lucrative contracts from that Ministry by making corrupt payments to the terrorists who ran it. Those payments supplied Jaysh al-Mahdi with vital funding for attacking Americans throughout Iraq. Due largely to its 2005-era control of the Ministry, Jaysh al-Mahdi became the deadliest terrorist group in the country. It massacred thousands of people, including Plaintiffs and their family members.

Defendants bribed Jaysh al-Mahdi operatives both in cash and in "free goods." With the former, Defendants used crooked local agents to deliver cash kickbacks to the terrorists who gave them business. With the latter, Defendants structured their transactions with the Ministry to deliver batches of extra, off-book medical goods for Jaysh al-Mahdi to divert for terrorist ends. Those goods functioned in Iraq as cash-equivalents – routinely monetized on the black market or used as currency to pay terrorist salaries – and Defendants knew they funded Jaysh al-Mahdi's terrorist operations. Indeed, Defendants finalized their deals at

2

in-person meetings surrounded by fighters, weapons, and propaganda that made clear they were helping terrorists. Public news reports also confirmed the connection between their payments and terrorism. Yet Defendants wanted to profit off the Ministry, and they were willing to pay terrorists for the opportunity. For that, they are liable under the Anti-Terrorism Act ("ATA") and state laws.

The district court (Leon, J.) dismissed Plaintiffs' claims, largely because it viewed the Ministry as a causal "intermediary" that precluded liability. That view misreads the ATA's text, flouts Congress's intent, and conflicts with this Court's cases. It also reflects a more basic error. Throughout, the decision below twists the allegations to fit its theory about the Ministry: it draws contested inferences in Defendants' favor, recasts the complaint to match those inferences, and ignores the most incriminating allegations altogether. None of that is proper on a motion to dismiss. As alleged, the Jaysh al-Mahdi-controlled Ministry was no intermediary at all, much less an "independent intermediary" that defeats liability. *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 275 (D.C. Cir. 2018) ("*Owens IV*"). And the court's other rulings about Hezbollah and personal jurisdiction reflect a similar failure to accept Plaintiffs' allegations as pleaded. This Court should reverse.

### A. Legal Background

Congress enacted the ATA in 1992 to "open[] the courthouse door to victims of international terrorism." S. Rep. No. 102-342, at 45 (1992). The statute

serves the dual objectives of "providing victims of terrorism with a remedy" and stopping "the flow of money" to terrorists. *Id.* at 22. Congress thus designed the ATA's civil remedy to impose "liability at any point along the causal chain of terrorism." *Id.* By authorizing litigation to "cut[] terrorists' financial lifelines," Congress intended to promote "longstanding efforts to reduce global terrorism and thus protect Americans here and abroad." H.R. Rep. No. 115-858, at 3-4 (2018).

In the years after the ATA's enactment, courts implemented Congress's purpose of "cut[ting] the terrorists' lifeline" by imposing liability on terrorist funders. *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 690-91 (7th Cir. 2008) (en banc). Courts regularly applied the ATA to entities that financed terrorist groups, without requiring victims to trace individual dollars to individual attacks.[1] Some courts held terrorist funders liable for themselves committing acts of "international terrorism," *e.g.*, *Boim*, 549 F.3d at 689-90, while others held them secondarily liable as aiders-abettors, *e.g.*, *Abecassis*, 785 F. Supp. 2d at 645-49.

In 2016, Congress enacted the Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 ("JASTA"), which preserves ATA primary liability while also codifying "causes of action for [secondary] liability." *Id.*

---

[1] *See*, *e.g.*, *In re Chiquita Brands Int'l, Inc.*, 284 F. Supp. 3d 1284, 1318-20 (S.D. Fla. 2018); *Abecassis v. Wyatt*, 785 F. Supp. 2d 614, 647-51 (S.D. Tex. 2011); *Wultz v. Islamic Rep. of Iran*, 755 F. Supp. 2d 1, 41-57 (D.D.C. 2010); *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 429 (E.D.N.Y. 2009).

§ 2(a)(4); *see* 18 U.S.C. § 2333(a) (primary), (d) (secondary).  In recognizing

aiding-abetting liability, Congress found that companies that "contribute material

support or resources, directly or indirectly, to persons or organizations that pose a

significant risk of committing acts of terrorism" should "reasonably anticipate

being brought to court in the United States."  JASTA § 2(a)(6).  Its "purpose" was

to "provide civil litigants with the broadest possible basis . . . to seek relief against"

entities that send resources "directly or indirectly" to terrorists.  *Id*. § 2(b).

## B.      Factual Background

The complaint alleges these facts, based on myriad witnesses and

documents.  JA___-___(¶¶ 41-43).[2]  Most are omitted from the decision below.

### 1.      Jaysh al-Mahdi and the Iraqi Ministry of Health

**a.**      For over two decades, Iraq's Ministry of Health has been one of the

most corrupt institutions in the world.  JA___-___, ___-___, ___-___(¶¶ 48-51,

105-11, 137-38).  The Ministry first gained notoriety under the U.N. Oil-For-Food

Program, which imposed strict controls on Western companies selling goods to

Saddam Hussein's regime.  JA___-___(¶¶ 44-53).  The Saddam-era Ministry, and

its import subsidiary "Kimadia," devised several schemes to circumvent the Oil-

For-Food Program and extract kickbacks from medical-goods suppliers selling in

---

[2] All paragraph cites are to the Third Amended Complaint (Dkt.124).

Iraq.  *Id*.  Those kickbacks – which virtually every Defendant or an affiliate paid – supplied Saddam's regime with funding for terrorism.  JA___, ___(¶¶ 49, 53).

In March 2003, the United States invaded Iraq and removed Saddam from power.  JA___(¶ 54).  About 18 months later, the Ministry began to fall under the control of the Shiite terrorist group Jaysh al-Mahdi (Arabic for the "Mahdi Army," often abbreviated as "JAM").  JA___, ___-___(¶¶ 3 n.1, 63-76).  Jaysh al-Mahdi was founded and led by anti-American cleric Muqtada al-Sadr, with guidance and direction from Hezbollah, the Iran-backed Lebanese terrorist group.  JA___-___(¶¶ 56-59).  Jaysh al-Mahdi's purpose was to extirpate the American presence in Iraq.  JA___(¶ 333).  It became Iraq's deadliest terrorist group, responsible for more American casualties there than even al-Qaeda.  JA___-___(¶¶ 58-62).

The Ministry was integral to Jaysh al-Mahdi's terrorist enterprise.  Starting in 2004, Jaysh al-Mahdi executed an "occupational cleansing" to purge the Ministry of officials disloyal to its terrorist cause.  JA___-___(¶¶ 63-70).  By early 2005, Sadr cemented the takeover by replacing the Ministry's leadership with his own operatives.  JA___-___(¶¶ 68-71).  The Ministry soon became an instrument of terrorist violence.  JA___-___(¶¶ 78-104).  Jaysh al-Mahdi transformed the Ministry's Baghdad headquarters into a terrorist base.  JA___(¶¶ 89-90).  It converted the hospitals into command-and-control centers.  JA___-___(¶¶ 86-87).  It used the ambulances to transport death squads.  JA___(¶ 86).  And it placed

6

thousands of terrorist fighters on the Ministry's payroll. JA___(¶ 85). As the U.S. Embassy in Baghdad concluded in a 2006 report, the Ministry and its infrastructure were "openly under the control of the Mehdi Army." JA___(¶ 79).

Jaysh al-Mahdi's control of the Ministry was no secret. By late 2004, Jaysh al-Mahdi propaganda festooned Ministry facilities throughout Iraq. JA___(¶ 73). Pictures of Muqtada al-Sadr adorned the walls; terrorist slogans like "Death to America" were ubiquitous; and Jaysh al-Mahdi's all-black flag decorated the entrances. *Id.* Armed Jaysh al-Mahdi fighters walked the halls. JA___(¶ 180). The Deputy Health Minister stocked his office with terrorist weaponry, and he routinely led terrorist attacks from the roof of the Ministry's headquarters. JA___(¶¶ 89-90). As a result, one witness recounted, the headquarters resembled a "Mahdi Army camp." JA___(¶ 90). The terrorist presence was so open and so pervasive that U.S. officials could not even enter the building. JA___(¶ 180).

Major Western newspapers at the time reported on Jaysh al-Mahdi's takeover of the Ministry. They described (for example) how the Ministry had fallen "under the control of the Shia cleric Moqtada al-Sadr" and was providing "millions of dollars" to Sadr's "Shiite Muslim militia." JA___-___(¶ 183). A *CBS News* report detailed how the "Mahdi Army" had turned Ministry hospitals into "command and control centers." JA___(¶ 87). And one *USA Today* reporter, after

7

witnessing the Jaysh al-Mahdi propaganda throughout the Ministry's headquarters, reported there was no "doubt[] about who runs the place." JA___(¶ 180).

**b.** Jaysh al-Mahdi also used the Ministry to raise funds for terrorism. JA___-___(¶¶ 105-12). Mimicking Hezbollah's conduct in Lebanon, Sadr seized the Ministry so that Jaysh al-Mahdi could capture the corrupt revenue that Kimadia had long extracted from foreign contractors. JA___, ___(¶¶ 64, 173). Like Hezbollah, Jaysh al-Mahdi used its political wing (called the "Sadrist Trend") to formalize its control of the country's health apparatus;[3] like Hezbollah, Jaysh al-Mahdi then pursued a "welfare as warfare" agenda that weaponized the health infrastructure against its enemies. JA___-___, ___-___, ___(¶¶ 64-76, 84-88, 358). Jaysh al-Mahdi followed Hezbollah's playbook with great success. As one U.S. investigator documented, "official corruption [was] tolerated at the [Ministry] because it ha[d] become the ministry occupied by the Mahdi Army." JA___(¶ 81).

Defendants made corrupt payments to Jaysh al-Mahdi in two ways, both of which followed Oil-For-Food precedents. First, Defendants structured their transactions to provide Jaysh al-Mahdi with extra batches of in-kind drugs and medical devices, free of charge, on top of the quantities for which Kimadia paid.

---

[3] The Sadrist Trend, consisting of "Sadrists," formally assumed control of the Ministry in the wake of Iraq's 2005 elections. JA___(¶ 68). Although the district court characterized Sadrists as merely "linked to JAM," JA___(Op.3), the two operated together and were functionally indistinguishable, JA___(¶ 59).

8

JA___-___(¶¶ 116-41).  Defendants included those "free goods" in the same shipments as the "purchased goods" and packaged them in a manner conducive to street resale, which allowed Jaysh al-Mahdi to monetize them on the black market. JA___, ___-___, ___-___(¶¶ 5, 50-51, 119-20).  Because of the contracts' structure, Ministry officials did not have to account for the extra goods in inventory.  JA___-___(¶¶ 117-20).  For that reason, one Ministry insider stated, the "free goods" were "very easy to disappear" for terrorist aims.  JA___(¶ 132).

Defendants made "free goods" payments because it allowed them to pay in-kind bribes using medical products that were cheap to manufacture and easy to disguise as legitimate shipments.  JA___-___, ___(¶¶ 50-52, 117-18).  As Defendants knew, their "free" goods functioned as cash equivalents – regularly sold and bartered (like gold or diamonds) on black markets – and they never reached any public-health facility.  JA___-___, ___-___(¶¶ 119-20, 137-39).

Second, Defendants also paid Jaysh al-Mahdi cash bribes, called "commissions," to obtain contracts from Kimadia.  JA___-___(¶¶ 142-64).  Much as they had done under Oil-For-Food, Defendants bribed the Jaysh al-Mahdi operatives who ran the Ministry by funneling "commission" money through their corrupt local agents.  JA___, ___-___, ___-___, ___-___, ___-___, ___-___, ___-___, ___-___(¶¶ 49, 148-49, 191-92, 213-18, 246-48, 253-54, 284-85, 312-13).

**c.** Defendants' corrupt sales to the Ministry financed Jaysh al-Mahdi terrorist attacks on Americans. JA___-___(¶¶ 165-79). As documented by U.S. anti-corruption personnel, Ministry employees, and other Iraqi officials, Jaysh al-Mahdi openly used the Ministry and Kimadia to fund terrorist operations. JA___-___, ___-___(¶¶ 108-12, 165-75). Corrupt payments – which provided off-book, fungible resources for which Jaysh al-Mahdi operatives inside the Ministry needed not account – were especially easy to appropriate for terrorist ends. JA___-___(¶ 179). That was true of both Defendants' cash bribes and their "free goods" deliveries. Jaysh al-Mahdi "finance[d] operations from diverted medicines," and it often paid rank-and-file terrorist fighters in pharmaceuticals rather than cash. JA___-___, ___(¶¶ 169, 176). Jaysh al-Mahdi was so dependent on the Ministry's resources that it became known as "The Pill Army." JA___, ___(¶¶ 9, 176).

In February 2007, those facts led the U.S. government to coordinate the prosecution of Deputy Health Minister Hakim al-Zamili for "effectively hijack[ing] the Ministry of Health" on Jaysh al-Mahdi's behalf. JA___(¶ 94). The prosecution rested on evidence that Zamili had "orchestrated kickback schemes related to inflated contracts for equipment and services, with millions of dollars allegedly funneled to Mr. Sadr's Mahdi Army." JA___-___(¶ 171).

The resulting nexus to terrorism was strong. U.S. officials called corruption in Iraq "the second insurgency" that "provid[ed] the money, the people and the

10

motivation to fight Americans." JA___(¶ 172).  That phenomenon was nowhere more evident than at the Ministry.  The Ministry's corruption became so pronounced by 2007 that General Odierno ordered an operation against the "Jaysh al Mahdi (JAM) fighters" who had captured it.  JA___-___.[4]  As his order stated, the Ministry was "infiltrated by criminal elements," "pose[d] a significant threat to [Coalition forces]," and functioned as "an enabler for corruption, [extra-judicial killing], use of ambulances to bypass checkpoints, and insurgent logistics flow."  JA___(*MNC-I Order* at 1).  Such "endemic corruption" at the Ministry enabled "internal JAM affiliated leadership and external JAM to continue their illicit operations utilizing [Ministry] resources."  JA___(*MNC-I Order* at 2).

### 2. Defendants' payments to Jaysh al-Mahdi

a.     Every Defendant made corrupt payments to obtain contracts from the Ministry from at least 2004 until 2013.  JA___(¶ 7).  For each Defendant, Plaintiffs allege an array of drugs or devices it sold (or manufactured for sale) to the Ministry; identify its contract numbers and "free goods" percentages; specify cash bribes it paid on multiple transactions; and describe the corrupt local agents (often called "Scientific Bureaus") it used to effect the payments.  JA___-___(¶¶ 188-

---

[4] Multi-National Corps – Iraq, *Operation Black Crescent*, FRAGO_020 to OPORD 07-01, at 2 (June 6, 2007) (Dkt.132-3) ("*MNC-I Order*").

209) (AstraZeneca), JA___-___(¶¶ 210-44) (GE Healthcare), JA___-___(¶¶ 245-80) (J&J), JA___-___(¶¶ 281-309) (Pfizer), JA___-___(¶¶ 310-32) (Roche).[5]

At least two corporate entities participated in each transaction: a supplier acted as the contracting entity that nominally transacted with Kimadia, and a manufacturer (affiliated with the supplier) made the goods being sold. JA___-___(¶¶ 121-22). Both entities typically appeared on the Kimadia contracts, and they worked hand-in-hand to complete the transactions. JA___-___(¶¶ 156-57). Defendants include nine suppliers, eleven manufacturers, and one parent company that supervised its subsidiaries' corrupt conduct. JA___, ___, ___, ___, ___(¶¶ 188, 211, 245, 281, 310) (noting each Defendant's role).

Defendants knew (or recklessly disregarded) that their corrupt payments funded Jaysh al-Mahdi terrorist attacks. JA___-___, ___-___(¶¶ 10-11, 180-87). Defendants completed their contracts at meetings surrounded by Jaysh al-Mahdi propaganda and fighters. JA___, ___-___(¶¶ 121, 180-81). They retained local Scientific Bureaus that were fluent in Iraqi politics and aware that Jaysh al-Mahdi raised funds through the Ministry. JA___-___(¶ 182). And each had a corporate-

---

[5] There are 21 defendants from five corporate families: AstraZeneca (JA___(¶¶ 17-18)); GE Healthcare (JA___(¶¶ 19-21)); Johnson & Johnson ("J&J") (JA___(¶¶ 22-29)); Pfizer (JA___(¶¶ 30-34)); and Roche (JA___-___(¶¶ 35-37)).

security department that exposed it to extensive public and non-public reporting documenting the Ministry's role in terrorism.  JA___-___(¶¶ 183-86).

    **b.**    Defendants comprise 15 American entities and six foreign entities. JA___-___(Op.1-2 nn.1-2).[6]  The foreign Defendants are affiliates of the domestic ones, and all maintained globally integrated supply chains in which the foreign and domestic affiliates worked in concert to fulfill Jaysh al-Mahdi's orders.  JA___-___, ___-___, ___-___, ___-___, ___-___(¶¶ 188-98, 210-21, 252-61, 281-91, 310-18).  Every foreign Defendant provided Jaysh al-Mahdi with drugs and devices it sourced from the United States; procured and submitted U.S. export certificates and FDA approvals to facilitate its corrupt sales; and certified its U.S. sourcing in the contracts and related documentation.  JA___-___, ___-___, ___-___, ___-___, ___-___(¶¶ 203-09, 233-44, 272-80, 296-309, 322-32).

    The U.S. sourcing was no coincidence.  Due to the unique strengths of U.S. high-tech manufacturing, Defendants deliberately chose to make their most valuable drugs and devices here.  *E.g.*, JA___, ___-___(¶¶ 239, 305).  That was especially true of the "active pharmaceutical ingredients," which produce a drug's intended pharmacological effect.  JA___, ___(¶¶ 122, 189 n.164).  The foreign Defendants used the United States to source the active ingredients for nearly all of

---

[6] "Op." is the district court's Memorandum Opinion (Dkt.138).

the blockbuster drugs they sold to Kimadia.  JA___, ___, ___, ___(¶¶ 189, 252, 283, 311).  Although they sometimes "formulated" the drugs elsewhere – combining those ingredients with inactive substances – the active ingredients drove virtually all of their drugs' value.  JA___, ___, ___(¶¶ 122, 189 n.164, 276).  Jaysh al-Mahdi coveted those U.S.-made goods in particular.  JA___-___(¶¶ 152-53).

### 3. Jaysh al-Mahdi's Hezbollah-sponsored terrorist campaign

Defendants' payments financed a deadly terrorist campaign against Americans in Iraq.  The U.S. military viewed Jaysh al-Mahdi as a "terrorist organization" more lethal than al-Qaeda in Iraq.  JA___-___(¶¶ 347-48).  The Jaysh al-Mahdi threat reflected its mastery of sophisticated, Hezbollah-taught terrorist tactics.  JA___-___(¶¶ 338-46).  Most lethal were explosively formed penetrators ("EFPs"), an advanced device designed to penetrate American tank armor.  JA___-___(¶¶ 341-42).  Jaysh al-Mahdi used EFPs and other weaponry to attack Plaintiffs and their family members.  JA___, ___-___(¶¶ 14, 339-46).

The U.S. government did not designate Jaysh al-Mahdi as a Foreign Terrorist Organization ("FTO").  JA___-___(¶¶ 355-56).  But Hezbollah, a designated FTO since 1997, was instrumental to Jaysh al-Mahdi's terrorist attacks.  JA___-___(¶¶ 357-63).  Hezbollah co-founded Jaysh al-Mahdi as its terrorist proxy; recruited Iraqis to join its ranks; designed Jaysh al-Mahdi's terrorist tactics; instructed Jaysh al-Mahdi fighters how to deploy them; and planned and authorized

14

the attacks that followed.  JA\_\_\_-\_\_\_(¶¶ 364-407).  As one prominent journalist observed, Jaysh al-Mahdi was the "Iraqi branch of Hezbollah."  JA\_\_\_(¶ 364).

### C.    Procedural History

Plaintiffs are U.S. citizens, and their families, whom Jaysh al-Mahdi killed or injured between 2005 and 2011.  JA\_\_\_-\_\_\_(¶¶ 409-3180).  Every Plaintiff brings two primary-liability (JA\_\_\_-\_\_\_(¶¶ 3208-21)) and two aiding-abetting (JA\_\_\_-\_\_\_(¶¶ 3181-3207)) claims under the ATA.  They also assert state-law claims arising from the same conduct.  JA\_\_\_-\_\_\_(¶¶ 3222-54).

The district court dismissed Plaintiffs' claims.  The court stated that, as alleged, "defendants' provision of free goods and cash payments to the Ministry financed JAM."  JA\_\_\_(Op.4).  It noted allegations that "JAM 'captured' the Ministry" and that Defendants "engaged in corrupt transactions with that compromised entity."  JA\_\_\_(Op.17).  And it accepted that "defendants knowingly provided medical goods to the Ministry for economic gain and were aware those goods would be used by JAM to support terrorist attacks."  JA\_\_\_(Op.28).

The court still concluded that the "Ministry's involvement" precluded liability.  JA\_\_\_(Op.20).[7]  Reasoning that "the law does *not* require" a causation-defeating entity to remain "independen[t] from terrorist groups," it held that the

---

[7] The court rejected Defendants' political-question-doctrine and act-of-war defenses.  JA\_\_\_-\_\_\_(Op.15-18).

Jaysh al-Mahdi-controlled Ministry broke the causal link to Jaysh al-Mahdi.

JA___-___(Op.20-21). The court thus dismissed the primary-liability claims on causation grounds, JA___-___(Op.18-23), and dismissed the secondary-liability claims for similar reasons, JA___-___(Op.26-29). It further held that no FTO "committed, planned, or authorized" most of the attacks. JA___-___(Op.23-24).

The court also held it lacked personal jurisdiction over the six foreign Defendants. JA___-___(Op.6-14). It discounted the foreign Defendants' practice of "sourcing from the United States" because it viewed that practice as not "material to the Ministry contracts." JA___(Op.12). When Plaintiffs asked for jurisdictional discovery on the issue, JA___-___(Dkt.133, at 23-25), the court did not respond. Instead, it dismissed the claims with prejudice. JA___(Op.29).

## SUMMARY OF ARGUMENT

**I.** Plaintiffs plead proximate cause by alleging that Defendants supplied Jaysh al-Mahdi with fungible financing that enhanced its ability to attack Americans in Iraq. The Ministry's role amplifies that conclusion. Jaysh al-Mahdi controlled the Ministry – it was operationally vital to Jaysh al-Mahdi's power in Iraq – and it functioned nothing like an independent, causation-defeating intermediary. In holding otherwise, the district court misinterpreted this Court's cases and misread (or ignored) Plaintiffs' allegations about the Ministry's role.

Regardless, causation would exist even if the district court were correct about the Ministry. A sovereign intermediary does not always preclude causation; it merely demands facts tying a defendant to the terrorists (rather than to just the sovereign). The complaint meets that standard. It alleges that Defendants structured their corrupt payments to bypass any sovereign health program and instead to benefit the terrorists who ran the Ministry. Those payments included not only "free goods" deliveries, but also cash bribes paid directly to Jaysh al-Mahdi operatives. The district court disregarded most of these allegations, and the ones it did acknowledge it impermissibly construed in Defendants' favor.

**II.A.** Defendants are secondarily liable because they aided and abetted Jaysh al-Mahdi's terrorist acts. Defendants' aid to Jaysh al-Mahdi exceeds the assistance in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), this Court's landmark case that Congress adopted in the ATA. The district court held otherwise by recycling its flawed causal analysis about the Ministry. That analysis is even less persuasive as to aiding-abetting liability, which Congress extended to companies that fund terrorists "indirectly." JASTA § 2(b). The court also erred by adopting a specific-intent standard at odds with the statute's text.

**B.** Plaintiffs allege that an FTO, Hezbollah, "committed, planned, [and] authorized" Jaysh al-Mahdi's terrorist acts. 18 U.S.C. § 2333(d)(2). Hezbollah played a key role in orchestrating the attacks that killed and injured Plaintiffs. The

17

district court characterized Hezbollah's role as "general," but it overlooked the close causal nexus – involving specific tactical and geographic indicators – tying Hezbollah to every attack.  Rather than credit those allegations, the court demanded a level of attack-by-attack evidentiary detail that is out of step with JASTA's text and irreconcilable with basic pleading standards.

Beyond the individual attacks, Hezbollah also planned and authorized Jaysh al-Mahdi's broader terrorist campaign.  The district court held the campaign was not an "act," 18 U.S.C. § 2333(d)(2), but it cited no textual support for that conclusion.  It also disregarded *Halberstam* itself, where the "act assisted" was a multiyear "campaign" much like Jaysh al-Mahdi's here.

**III.**    Plaintiffs allege personal jurisdiction over the foreign Defendants. Those Defendants purposefully availed themselves of the United States by using U.S. drugs, U.S. affiliates, and U.S. documentation to make their corrupt payments.  Those U.S. contacts were material and enhanced the value of the terrorist financing provided.  The district court discounted those contacts by artificially cleaving them from the broader transactions of which they were part. The court's approach – accepting a jurisdictional contact only if the contact is tortious in isolation – is legally mistaken.  It also relies on unwarranted factual inferences to downplay the contacts' causal significance.  Finally, the court abused its discretion by ignoring Plaintiffs' request for jurisdictional discovery.

**STANDARD OF REVIEW**

The Court reviews de novo the dismissal of Plaintiffs' complaint for failure to state a claim, *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1128 (D.C. Cir. 2015), and for lack of personal jurisdiction, *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 43 (D.C. Cir. 2020).  On both issues, the Court assumes the truth of Plaintiffs' allegations and draws reasonable inferences in Plaintiffs' favor. *Banneker*, 798 F.3d at 1129; *Urquhart-Bradley*, 964 F.3d at 40 n.2.  The Court reviews for abuse of discretion the denial of jurisdictional discovery.  *Id*. at 43.

**ARGUMENT**

**I.     PLAINTIFFS SUFFICIENTLY PLEAD PRIMARY-LIABILITY CLAIMS (COUNTS THREE AND FOUR)**

Primary liability arises when a defendant's conduct causes a plaintiff's injury and constitutes "international terrorism" under the ATA.  *See Owens IV*, 897 F.3d at 270 & n.1 (describing elements).  Plaintiffs allege, and the district court did not disagree, that Defendants committed acts of "international terrorism" by violating two predicate criminal statutes.  JA___-___(¶¶ 3208-21).  The court erroneously dismissed those claims on proximate-cause grounds.

**A.     Plaintiffs Allege Proximate Cause**

To plead proximate cause, Plaintiffs must allege that (1) Defendants' conduct was "'a substantial factor' in the sequence of events" that led to their injuries, and (2) the injuries were "reasonably foreseeable or anticipated as a

natural consequence" of the conduct.  *Owens IV*, 897 F.3d at 273 (quoting *Owens v. Rep. of Sudan*, 864 F.3d 751, 794 (D.C. Cir. 2017) ("*Owens III*")).  Causation is absent only when the "link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity."  *Owens III*, 864 F.3d at 794 (quoting *Paroline v. United States*, 572 U.S. 434, 445 (2014)), *vacated on other grounds sub nom. Opati v. Rep. of Sudan*, 140 S. Ct. 1601 (2020).  Whether the causal link is too attenuated in a given case "is ordinarily a question for the jury."  *Smith v. District of Columbia*, 413 F.3d 86, 102 (D.C. Cir. 2005).

Plaintiffs plead causation by alleging that Defendants' funding substantially contributed to Jaysh al-Mahdi's terrorist operations in Iraq.  JA___-___(¶¶ 165-86).  Such funding, this Court has held, proximately causes a terrorist group's attacks when the support "foster[s] the[] growth" of that group.  *Owens III*, 864 F.3d at 794.  Thus, in *Owens III*, the Court upheld a finding that Sudan proximately caused two al-Qaeda-committed Embassy bombings, carried out in other countries, by providing al-Qaeda with fungible support that helped it "grow its membership" and "develop its capabilities."  *Id*. at 797.  Sudan did not "directly advance[]" the "embassy bombings."  *Id*. at 799.  Nor did Sudan "directly fund al Qaeda" at all.  *Id*. at 795.  Rather, Sudan's "financial support" – conveyed indirectly through "tax exceptions" and "access to the formal banking system" – made it easier for al-Qaeda's "broader organization" to commit attacks.  *Id*. at 794-97.

Defendants' support was even more substantial. Rather than conveying indirect benefits to Jaysh al-Mahdi, they bribed terrorists while transacting with an entity the terrorists openly controlled. JA___-___, ___-___(¶¶ 165-66, 180-83). At the time, Jaysh al-Mahdi stocked the Ministry with terrorist commanders; used the Ministry's headquarters as a base; deployed its ambulances to transport death squads; transformed its hospitals into command-and-control sites; and raised funds through its contracting machinery. JA___-___(¶¶ 63-112). Given the Ministry's multilayered nexus to terrorism, the link between Defendants' transactions and Jaysh al-Mahdi's attacks was strong. *Supra* pp. 10-11. Indeed, Sadr seized control of the Ministry for that very reason: to secure *both* financing *and* an operational nerve center under one roof. JA___-___, ___-___, ___-___(¶¶ 68-70, 167, 176); JA___(*MNC-I Order* at 1) (noting "insurgent logistics flow"). The connection to terrorism was no "fortuity," *Paroline*, 572 U.S. at 445; it was the entire point.

Permitting a causal inference in such circumstances accords with the ATA's design. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014) ("Proximate-cause analysis is controlled by the nature of the statutory cause of action."). The ATA's founding goal was to "interrupt, or at least imperil, the flow of money" "at any point along the causal chain of terrorism," S. Rep. No. 102-342, at 22, and Congress recently reaffirmed its intent to curtail the flow of "support, directly or indirectly, to foreign organizations or persons that engage in

21

terrorist activities," JASTA § 2(b).  If the statute is to fulfill Congress's objective

of "cut[ting] the terrorists' lifeline," the causation standard must encompass at least

the "financiers" whose resources support terrorist violence.  *Boim*, 549 F.3d at 691.

Here, Plaintiffs allege that Defendants' funding strengthened Jaysh al-Mahdi and

materially enhanced its ability to conduct the attacks that killed and injured them.

JA___-___, ___, ___-___(¶¶ 8-10, 167, 171-75).  That is enough, under *Owens III*

and the mine run of cases addressing proximate cause under the ATA.[8]

### B.     The Ministry Was Not A Causation-Defeating Intermediary

1.     The district court ruled "[t]he Ministry's involvement here defeats

plaintiffs' causation theory."  JA___(Op.20).  It relied on *Owens IV*, which held

that "an independent intermediary" separating a defendant from terrorists can

"create[] a more attenuated chain of causation."  897 F.3d at 275.  There, a bank

"provided financial assistance to Sudan, which in turn funded and otherwise

supported [two] al Qaeda[] attack[s]."  *Id*. at 269.  The Court held Sudan was an

"intermediating country" that severed the bank's link to terrorism.  *Id*. at 275-76.

This case is different because the Ministry was not the "independent

intermediary" Sudan was.  *Id.* at 275.  In *Owens IV*, Sudan's independence from

---

[8] *See*, *e.g.*, *Boim*, 549 F.3d at 690-91; *Miller v. Arab Bank, PLC*, 372
F. Supp. 3d 33, 46-47 (E.D.N.Y. 2019); *Chiquita*, 284 F. Supp. 3d at 1317-18;
*Abecassis*, 785 F. Supp. 2d at 649; *Wultz*, 755 F. Supp. 2d at 53.

al-Qaeda (and from the bank) made it an "intermediating" actor that introduced a separate step – Sudan's own decision to fund terrorists – into the causal chain. *Id.* at 274-75. Here, there was no such separation. The Ministry was not some autonomous sovereign that received Defendants' funds and then independently chose to aid terrorists; it was captured by Jaysh al-Mahdi and functioned as Jaysh al-Mahdi's terrorist instrument. JA___, ___-___, ___-___, ___-___(¶¶ 3, 65-66, 94, 165-68). Bribing Ministry officials was the same as bribing Jaysh al-Mahdi.

Settled agency-law principles confirm that conclusion. Courts have long treated agents acting under a principal's control as "substituted for the principal in every respect." *United States v. The Brig Burdett*, 34 U.S. (9 Pet.) 682, 689 (1835). The same is true of terrorists. In a related context, this Court held that an entity becomes a terrorist group's agent when the group "so dominates and controls" the entity that the two "can no longer be considered meaningfully independent." *Nat'l Council of Resistance of Iran v. Dep't of State*, 373 F.3d 152, 158 (D.C. Cir. 2004) (Roberts, J.). In those circumstances, courts "look past their separate juridical identities and . . . treat them as aliases." *Id*. at 157. The Ministry was such an "alias" – subject to Jaysh al-Mahdi's domination and control – and so lost its "separate juridical status." *Id*. Under traditional agency principles, an alias like that is equivalent to its principal and plays no "intermediating" role at all.

Treating a terrorist alias like the Ministry as a causation-defeating intermediary would frustrate the ATA's purpose. Congress did not intend to "cut off" direct donations to terrorists while allowing the same payments to occur "via juridically separate agents subject to [the terrorists'] control." *Id.* at 157-58 ("alias concept" key to "denying support . . . to terrorist organizations"). Here, it is common ground that direct payments from Defendants to Jaysh al-Mahdi operatives would support causation. Congress could not have intended the opposite outcome just because some payments here flowed through one extra terrorist-controlled entity along the way. If that were all it took to evade liability – "launder[ing] donations" through a terrorist-controlled "intermediate organization[]" – "the statute would be a dead letter." *Boim*, 549 F.3d at 702.

**2.** The district court held that the Ministry, though terrorist-controlled, remained a causation-defeating intermediary because "the law does *not* require independence from terrorist groups." JA___-___(Op.20-21). The court identified nothing in the ATA's text, structure, or history to support that proposition. Rather, it cited a pair of cases involving sovereign countries that defeated causation because they *were* independent of the terrorists at issue. *See Owens IV*, 897 F.3d at 275 (Sudan); *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013) (Iran). Indeed, this Court literally used the words "independent intermediary" to describe both of them. *Owens IV*, 897 F.3d at 275 (citing *Rothstein*, 708 F.3d at 97).

24

The district court disregarded this Court's characterization of those cases and instead invoked Sudan's and Iran's status as "*state sponsors of terrorism*." JA___(Op.21). But that shows only that both countries "repeatedly provided support for acts of international terrorism." 58 Fed. Reg. 52,523-01, 52523 (Oct. 8, 1993) (Sudan designation; no finding of terrorist control); 49 Fed. Reg. 2836-02, 2836 (Jan. 23, 1984) (same for Iran). Providing *support for* acts committed by external terrorist groups is different from being an *agent of* terrorists. Sudan did the former – it financed al-Qaeda, thus precipitating its state-sponsor designation – but it was never "acting on al Qaeda's behalf." *Owens v. BNP Paribas S.A.*, 235 F. Supp. 3d 85, 99 (D.D.C. 2017) ("*Owens II*"). That is why Sudan, like Iran but unlike the Ministry, remained a "truly independent intermediary." *Id.* at 97.

The district court also thought the Ministry retained intermediating attributes because it "ran legitimate programs." JA___(Op.21). That misreads Plaintiffs' allegations. Although the Ministry "in theory" was supposed to "offer[] free medical care to all Iraqis," JA___(¶ 2), it actually functioned "more as a terrorist apparatus than a health organization," JA___(¶ 3). In fact, Jaysh al-Mahdi used the Ministry to purge doctors, hijack Iraq's health infrastructure, and deny care to its enemies. JA___-___(¶¶ 66-88). Jaysh al-Mahdi was so synonymous with the Ministry that it was known as "The Pill Army." JA___(¶ 176). Whatever "welfare services" remained served only to build Jaysh al-Mahdi's membership

25

and "reinforce its terrorist activities," *Boim*, 549 F.3d at 698; *see* JA\_\_\_, \_\_\_-\_\_\_, \_\_\_(¶¶ 59, 64-71, 167).  This was the model Hezbollah made famous:  practicing "welfare as warfare" by deploying health assets to build support for terror operations.  JA\_\_\_, \_\_\_-\_\_\_, \_\_\_(¶¶ 64, 71, 358).  Such programs are tied to terrorism and do not break the causal chain.  *See Boim*, 549 F.3d at 698-701.

*Owens III* reinforces the point.  There, Sudan caused al-Qaeda's attacks by channeling indirect funding to al-Qaeda through "al Qaeda-affiliated businesses." 864 F.3d at 783.  Under the district court's logic, those businesses should have defeated causation, because they "provided legitimate employment for al Qaeda operatives" and performed "infrastructure projects."  *Id*.  But such "legitimate" programs remained tied to al-Qaeda's terrorist enterprise and did not defeat causation.  *See id*. at 794-99.  As the complaint describes in great detail, *supra* pp. 5-11, the Ministry was even less a "legitimate" intermediary here.

## C. Causation Would Exist Even If The Ministry Were An Independent Intermediary

The Court should reverse even if it views the Ministry as an intermediary. A sovereign intermediary does not preclude causation automatically; it demands "some facts demonstrating a substantial connection between the defendant and terrorism."  *Owens IV*, 897 F.3d at 275.  Plaintiffs allege two such connections.

## 1. Defendants' free-goods payments funded terrorism

Defendants' free-goods payments funded terrorism. The purpose of "free goods" – what made them in-kind kickbacks rather than ordinary-course transactions – was to supply off-book product that *bypassed* the Ministry's sovereign functions. *Supra* pp. 8-9. The complaint grounds that allegation in witness recollections (JA___-___(¶¶ 41-43)), Oil-For-Food precedent (JA___-___(¶¶ 50-51)), Kimadia's procurement structure (JA___-___, ___-___(¶¶ 117-120, 132-133)), and Iraqi black-market dynamics (JA___-___(¶¶ 137-140)). As those facts make clear, the free-goods payments were structured not to support Iraqi healthcare, but to give Jaysh al-Mahdi something valuable to monetize.

Such allegations make this case unique. In prior cases, the intermediaries negated any inference that the defendants' resources reached terrorists. In *Owens IV*, for example, the plaintiffs failed to allege that "any currency processed by [the bank] for Sudan was . . . in fact sent to al Qaeda." 897 F.3d at 276; *see Kemper v. Deutsche Bank AG*, 911 F.3d 383, 394 (7th Cir. 2018) (similar for Iran); *Rothstein*, 708 F.3d at 97 (same). Here, by contrast, Defendants knew their goods financed Jaysh al-Mahdi's attacks. JA___-___(¶¶ 165-87). Those allegations are sufficient, intermediary or not. *See Abecassis*, 785 F. Supp. 2d at 649 (sustaining allegation that Oil-For-Food "kickbacks" "bypassed" sovereign Iraqi programs).

The decision below opines that Defendants never "engaged directly with JAM to 'bypass' the Ministry." JA___(Op.22). But the complaint alleges that Defendants negotiated their "free goods" with the Jaysh al-Mahdi operatives who occupied Ministry positions. JA___-___, ___-___, ___-___(¶¶ 134-36, 139, 165); *see* JA___-___(¶¶ 78-103) (naming the operatives).[9] The terrorists may have used the Ministry's contracting machinery to collect payment, but the payments funded terrorism just the same. *Id*. The decision below elides that distinction. Put simply, an intermediary is causally significant only if it undermines the inference that the defendant's resources funded terrorism. *See Owens IV*, 897 F.3d at 275-76. If the intermediary is instead a "funnel to provide money to terrorists" – as the Ministry was here – it does not negate causation. *Owens II*, 235 F. Supp. 3d at 97.

The district court also cited the free goods' journey through "Kimadia warehouses" before being "stolen" by terrorists. JA___(Op.20). But a temporary stop at a terrorist-controlled warehouse has no causal significance. *See Owens v. Rep. of Sudan*, 531 F.3d 884, 895 (D.C. Cir. 2008) ("direct and unbroken factual line between [defendant's] actions and the terrorist act[s]" is unnecessary). The

---

[9] The district court erred in emphasizing the complaint's references to "MOH" or "Kimadia." JA___(Op.22). The complaint alleges there was "no meaningful distinction between the Ministry and Jaysh al-Mahdi." JA___(¶ 166). Its use of the words "MOH" or "Kimadia" were not concessions, and the court should not have treated them as such. *See Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 20-21 & n.8 (D.C. Cir. 2008).

decision below repeatedly emphasizes the temporal sequence – the terrorists

monetized the goods "*after* defendants shipped" them, *e.g.*, JA___(Op.20) – but

fails to explain why that sequence should make any legal difference.  Just as a

terrorist donor could not evade liability by laundering its donations through an

intermediate bank account, Defendants cannot nullify causation by routing their

shipments through warehouses they knew the terrorists controlled.

### 2. Defendants paid cash bribes directly to terrorists

The causal chain is even stronger for Defendants' cash bribes.  Defendants

paid those bribes, called "commissions" in Iraq, to the Jaysh al-Mahdi terrorists

who controlled their contracts.  JA___-___, ___(¶¶ 6, 142).  These were, by

definition, extra-legal payments made *directly* to Jaysh al-Mahdi terrorists, and

they never passed through official Ministry accounts.  JA___, ___-___(¶¶ 8, 142-

45).  Whatever the proper view of the Ministry, providing such "funds directly to a

terrorist organization" creates proximate cause.  *Owens IV*, 897 F.3d at 275.

The district court did not dispute the legal point that cash bribes would

create ATA liability.  Rather, it rejected the cash-bribe allegations as "lacking in

any specific factual basis."  JA___(Op.22).  That was error.  Plaintiffs allege that

Defendants paid standard 20% bribes on each of their contracts during the relevant

period.  JA___-___, ___-___(¶¶ 4, 142-44).  The complaint identifies the terrorist

operatives responsible for collecting the bribes;[10] the agents Defendants used to deliver the bribes;[11] and many specific contracts on which they paid the bribes.[12]  It also describes the entire transaction lifecycle, detailing each chokepoint Jaysh al-Mahdi used to extract payment.  JA\_\_\_-\_\_\_(¶¶ 145-64).  Plaintiffs even quantify two of GE Healthcare's bribes ($6 million and $10 million) and note that one was negotiated in a Baghdad restaurant.  JA\_\_\_-\_\_\_(¶ 214).  Those allegations are entitled to an assumption of truth.  *Banneker*, 798 F.3d at 1128-29.

Those allegations are especially plausible because the Oil-For-Food-era Ministry demanded a similarly standard cash "kickback to be paid by all suppliers."  JA\_\_\_(¶ 49).  Most Defendants paid that cash kickback too, despite knowing it benefited terrorists.  JA\_\_\_(¶ 53).  It is hardly implausible to allege that they kept doing the same thing once Jaysh al-Mahdi took control.  JA\_\_\_(¶ 158).  In fact, Defendants bribed Jaysh al-Mahdi operatives using the same corrupt agents they had used to pay their Oil-For-Food kickbacks.  *Supra* note 11.  Several also paid similar bribes in other markets besides Iraq.  JA\_\_\_, \_\_\_-\_\_\_(¶¶ 199, 292-93).

---

[10] JA\_\_\_-\_\_\_, \_\_\_-\_\_\_(¶¶ 77-101, 106-12).

[11] JA\_\_\_-\_\_\_, \_\_\_-\_\_\_, \_\_\_-\_\_\_, \_\_\_-\_\_\_(¶¶ 200-01, 223-32, 262-70, 319-20).

[12] JA\_\_\_-\_\_\_, \_\_\_-\_\_\_, \_\_\_-\_\_\_, \_\_\_-\_\_\_, \_\_\_-\_\_\_, \_\_\_-\_\_\_(¶¶ 191-92, 213-18, 246-48, 253-54, 284-85, 312-13) (alleging Defendants paid cash bribes on the same specific transactions associated with their "free goods" payments).

The district court mentioned none of this. Instead, citing three complaint paragraphs, the court discarded the "cash bribes" as "conclusory" and offered no further analysis. JA___(Op.22) (citing ¶¶ 8, 142, 145). Not only did it ignore the scores of allegations above; it identified no actual deficiency in the complaint's factual recitation.[13] Plaintiffs need not proffer "detailed factual allegations" about the bribes. *Banneker*, 798 F.3d at 1129. In *Owens IV*, for example, the Court "infer[red] the existence" of "transactions between [the bank] and Sudan before the [Embassy] bombings," despite the plaintiffs' "failure to allege" them specifically. 897 F.3d at 274-75. Affording Plaintiffs here comparable "inferences derived from the facts alleged," *id*. at 275, the cash-bribe allegations are more than sufficient.

## II. PLAINTIFFS SUFFICIENTLY PLEAD SECONDARY-LIABILITY CLAIMS (COUNTS ONE AND TWO)

Defendants also are secondarily liable for Jaysh al-Mahdi's terrorist acts. JA___-___(¶¶ 3181-3207). Secondary liability "reaches persons who do not engage in the proscribed activities at all, but who give a degree of aid to those who do." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 176 (1994). It thus requires no causal relationship between Defendants' conduct and Plaintiffs' injuries. *See Linde v. Arab Bank, PLC*, 882 F.3d 314, 331

---

[13] The court said Defendants paid "*MOH officials*" rather than "JAM." JA___(Op.22) (quoting ¶ 142). That again is a distinction without a difference; the former were members of the latter. JA___, ___-___(¶¶ 66, 77-103); *supra* note 9.

(2d Cir. 2018) (defendants need not be "proximate cause of plaintiffs' injuries" for secondary liability). Instead, Defendants are liable so long as they "aid[ed] and abet[ted]" Jaysh al-Mahdi in its terrorist acts. 18 U.S.C. § 2333(d)(2).

Congress instructed courts to apply *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), as the "legal framework" for secondary liability. JASTA § 2(a)(5). *Halberstam* identifies three elements of aiding-abetting liability: (1) the principal violator must "perform a wrongful act," (2) "the defendant must be generally aware of his role" in the "overall illegal or tortious activity," and (3) "the defendant must knowingly and substantially assist the principal violation." 705 F.2d at 487-88. The district court reached only the third element, holding that Plaintiffs failed to plead substantial assistance. JA\_\_\_-\_\_\_(Op.26-29). That ruling is incorrect. *Infra* Part II.A. Plaintiffs also plead (*infra* Part II.B) that an FTO "committed, planned, [and] authorized" the relevant acts. 18 U.S.C. § 2333(d)(2).

### A. Defendants Substantially Assisted Jaysh al-Mahdi

*Halberstam* demonstrates that Defendants' assistance was "substantial." There, the principal tort was a "long-running burglary enterprise" in which a man stole valuables from homes and, on one occasion, murdered a resident. 705 F.2d at 488. The Court affirmed that the burglar's live-in companion, Linda Hamilton, was liable for aiding the enterprise as a whole and the murder committed in its course. *See id*. at 475-76. Hamilton was a "passive but compliant partner" whose

assistance was limited to back-office tasks, like keeping the books and collecting payments. *Id*. at 474-76. She took no part in anything violent. *See id*. at 475-76, 488. But her financial acts were substantial assistance "in the context of the enterprise [she] aided." *Id*. at 488. And because "violence" was a "foreseeable risk" of that burglary enterprise, she was liable for the murder. *Id*.

The Court determined that Hamilton's assistance was "substantial" using six highly fact-dependent factors. *See id.* at 483-84. Each supports Plaintiffs' claims, especially at the pleading stage.

### 1. Factors 1 and 2: Nature of act and assistance

**a.** *Halberstam*'s first factor explains that "the *nature of the act* involved dictates what aid might matter, *i.e.*, be substantial." 705 F.2d at 484. The acts here involve terrorism, and financing of the type Defendants provided matters greatly to terrorists. *See Boim*, 549 F.3d at 690-91 (explaining importance of "financial angels" to terrorist operations). That is why courts routinely hold that funding a terrorist group aids and abets the group's attacks.[14] Just as the burglary enterprise in *Halberstam* benefited from Hamilton's help generating "'legitimate' wealth,"

---

[14] *See*, *e.g.*, *Bartlett v. Société Générale de Banque Au Liban SAL*, 2020 WL 7089448, at *12-16 (E.D.N.Y. Nov. 25, 2020); *Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, --- F. Supp. 3d ----, 2020 WL 6143654, at *12 (E.D.N.Y. Oct. 20, 2020); *Miller*, 372 F. Supp. 3d at 47-48; *Abecassis*, 785 F. Supp. 2d at 645-49; *Wultz*, 755 F. Supp. 2d at 53, 57.

705 F.2d at 488, so did Jaysh al-Mahdi's terrorist enterprise benefit from the wealth that Defendants supplied via their Ministry contracts, *see supra* Part I.

*Halberstam* also suggested a "proportionality test" under which "a defendant's responsibility for the same amount of assistance increases with the blameworthiness of the tortious act." 705 F.2d at 484 n.13; *see* Restatement (Third) of Torts § 28 cmt. d (2020) ("Third Restatement") ("enormity of a wrong . . . may appropriately cause such lesser acts to be considered aiding and abetting"). Few things are as blameworthy as Jaysh al-Mahdi's shameful attacks. JA___-___(¶¶ 347-54). For conduct so heinous, even "relatively trivial" aid is substantial. *Halberstam*, 705 F.2d at 484 n.13. Defendants' aid easily clears that bar.

*Halberstam*'s second factor concerns the "*amount and kind of assistance given* the wrongdoer." *Id.* at 484 (brackets omitted). Defendants each gave Jaysh al-Mahdi at least several million dollars per year in cash and cash-equivalent products. JA___, ___, ___, ___, ___, ___(¶¶ 198, 221, 251, 261, 291, 318). That assistance was greater than in *Halberstam*, where Hamilton's assistance was not "overwhelming as to any given burglary." 705 F.2d at 488. It also far exceeds the "hundreds of thousands of Eurodollars" another court recently held "substantial" after a persuasive analysis of *Halberstam*. *Henkin*, 2020 WL 6143654, at *12; *see Bartlett*, 2020 WL 7089448, at *13 (similar). Defendants' payments were likewise substantial because they materially intensified Jaysh al-Mahdi's terrorist campaign.

**b.** The district court held Defendants' aid insubstantial because they did not "directly assist[] JAM itself." JA___(Op.27). Once again, that depends on the view that "defendants provided medical goods and devices to the Ministry, not JAM." JA___(Op.26). The premise remains flawed. Just as the Ministry does not defeat causation, *supra* Part I.B-C, neither does it preclude secondary liability.

The court's causal analysis is even less persuasive in this context. The word "direct" appears nowhere in § 2333(d)(2). *See Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 223 n.5 (2d Cir. 2019) (JASTA "does not, by its terms, limit aiding-and-abetting liability to those who provide direct support to terrorist organizations"). Quite the opposite: Congress's stated "purpose" was to impose aiding-abetting liability on defendants that provide "support, *directly or indirectly*, to [terrorists]." JASTA § 2(b) (emphasis added). Congress's "declaration of purpose" is strong evidence of its intent, *TIG Ins. Co. v. Rep. of Argentina*, 967 F.3d 778, 785-86 (D.C. Cir. 2020), and forecloses any direct-assistance test.

Rather than analyze JASTA's text, the district court derived its test from a footnote in *Crosby v. Twitter, Inc.*, 921 F.3d 617 (6th Cir. 2019), stating that courts "routinely dismiss ATA claims" without "a direct link between the defendants and the individual perpetrator." *Id*. at 627 n.6. That may be true of cases, like *Crosby*, involving lone-wolf "individual perpetrator[s]" who are not part of the terrorist group the defendants aided. *Id*. at 626-27 & n.6 (social-media companies aided

35

ISIS, but shooter had no link to ISIS).  In such cases, defendants fall outside the

statute not because of some direct-assistance requirement, but because their alleged

aid is not even to "the person who committed [the relevant] act of international

terrorism."  18 U.S.C. § 2333(d)(2).  Here, by contrast, Jaysh al-Mahdi was the

"person" committing the terrorist acts, *id*. § 2333(d)(1), and Defendants

substantially aided Jaysh al-Mahdi, *supra* Part I; *see Henkin*, 2020 WL 6143654, at

*9-11 & n.11 (indirect support to organizational terrorist perpetrator suffices).

Nothing in JASTA's text or structure requires such aid to be "direct."

The district court also downplayed Defendants' bribes as unlike

"instructions on how to build a bomb or obtain an assault rifle."  JA___(Op.27).

But Defendants gave Jaysh al-Mahdi the *resources* necessary to purchase such

weapons.  JA___, ___-___(¶¶ 8, 167-75); *see Bartlett*, 2020 WL 7089448, at *11-

13 (explaining why even "bureaucratic" financing is "substantial" when it aids

terrorism).  The court's finding that such payments did not "plainly assist JAM in

its terrorist enterprise," JA___(Op.27), is simply a factual conclusion at odds with

Plaintiffs' allegations.  And it is equally at odds with *Halberstam*, in which

Hamilton's clerical assistance involved nothing so violent.  *See* 705 F.2d at 484.

### 2.    Factors 3 and 4:  Presence and relationship

The third factor asks whether a defendant was "*present at the time* of" the

tort.  *Halberstam*, 705 F.2d at 488.  In material-aid (as opposed to verbal-

encouragement) cases, this factor carries little importance. *Compare id.* at 482

*with Bartlett*, 2020 WL 7089448, at \*13 (presence irrelevant to "funding

activities"). After all, Hamilton herself was "not present at the time of the murder

or even at the time of any burglary." *Halberstam*, 705 F.2d at 488 (emphasis

omitted). Presence is no more relevant here. Jaysh al-Mahdi did not need

Defendants' physical presence; it needed their funding. JA___-___(¶¶ 165-75).

As for the fourth factor, Defendants' "*relation to the tortious actor*,"

*Halberstam*, 705 F.2d at 488, Defendants had a business relationship with Jaysh al-

Mahdi's fundraisers, JA___-___(¶¶ 4-11). Given Jaysh al-Mahdi's need for

funding, that bolsters the substantiality of Defendants' aid. True, there was no

"special relationship with JAM" like the romantic partnership in *Halberstam*.

JA___(Op.28). But that difference cuts in Plaintiffs' favor, as the relationship in

*Halberstam* caused the Court to be "wary" of inferring assistance from "spousal

support activities." 705 F.2d at 488. No such concerns exist here.

### 3. Factor 5: State of mind

**a.** *Halberstam*'s fifth factor concerns "the *state of mind* of the

defendant." 705 F.2d at 484. This factor turns on whether Defendants' "assistance

was knowing." *Id*. at 488. It was. To begin, the corrupt structure of Defendants'

transactions reflects an intent to funnel off-book resources to Jaysh al-Mahdi.

*Supra* Part I.C. The "very object of sidestepping" U.S. anticorruption laws "was to

provide money for [Jaysh al-Mahdi] to achieve ends other than providing for the welfare of Iraqi civilians." *Abecassis*, 785 F. Supp. 2d at 647 (sustaining ATA claims based on Oil-For-Food kickbacks). Such corruption allegations alone "support an inference that the defendants knew that money paid in kickbacks would be used to support terrorist activity." *Id.*; *see Halberstam*, 705 F.2d at 487 (inferring knowledge from transactions' "unusual circumstances").

Additional allegations strengthen that inference. Defendants negotiated their contracts at in-person meetings inside the Ministry's headquarters, amid the trappings of Jaysh al-Mahdi's terrorist agenda. JA___, ___, ___(¶¶ 10, 121, 180). Defendants' agents there were surrounded by posters paying homage to known terrorist Muqtada al-Sadr; Jaysh al-Mahdi's unmistakable flag; terrorist fighters and weapons; and even "Death to America" slogans. JA___, ___-___, ___-___, ___-___(¶¶ 10, 73-74, 89-90, 180-81). The visual cues alone informed Defendants they were "playing a 'role' in [Jaysh al-Mahdi's] violent or life-endangering activities." *Linde*, 882 F.3d at 329-30 (quoting *Halberstam*, 705 F.2d at 477). And widespread press coverage further deepened their knowledge they were helping terrorists. JA___-___(¶¶ 183-86). The district court thus agreed that, as alleged, Defendants "were aware [their] goods would be used by JAM to support terrorist attacks." JA___(Op.28). That is powerful evidence of substantiality.

**b.** The district court held that Defendants lacked the requisite "state of mind" because they were not "'one in spirit' with JAM's desire to kill American citizens." JA___(Op.28). That restriction is unfounded.

Secondary liability applies to those who "*knowingly* provid[e] substantial assistance." 18 U.S.C. § 2333(d)(2) (emphasis added). The word "knowingly" demands only "general awareness" of a defendant's "role as part of an overall illegal or tortious activity." *Halberstam*, 705 F.2d at 487-88. It does "not require proof of . . . specific intent." *Linde*, 882 F.3d at 329. In fact, an aider-abettor need not even "have a full understanding" or "know[] all of the details" of the tort. *Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 535-36 (6th Cir. 2000). Congress did not intend the word "substantial" to create a backdoor state-of-mind test harsher than the scienter standard that appears on JASTA's face.

Nor is a specific-intent standard consistent with aiding-abetting doctrine. In *Halberstam*, Hamilton harbored no violent intent. *See* 705 F.2d at 475-76. This Court has since confirmed that an "aider and abettor" need not "share the same purpose as the principal." *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 34-36 (D.C. Cir. 2011), *vacated on other grounds*, 527 F. App'x 7 (D.C. Cir. 2013). And it is now hornbook law, at least for economic torts, that the state-of-mind factor concerns "the intimacy of a defendant's knowledge." Third Restatement § 28 cmt. d; *see id.* cmt. c (defendant need not have "desired the tortious outcome"). The

39

district court followed none of those authorities.  Instead, it looked to one of the nearly 20 cases *Halberstam* cited, extracted out a stray three-word phrase ("one in spirit")[15] describing it, and fashioned the phrase into a test at odds with JASTA's text and *Halberstam*'s own facts.  That analysis is unpersuasive at every step.

To be sure, subjective intent remains relevant and, if shown, would magnify a defendant's culpability.  *See Linde*, 882 F.3d at 329 & n.10 (rejecting "specific intent" test but noting "evidence of the secondary actor's intent can bear on his state of mind").  But it is not a litmus test for secondary liability.  As *Owens III* explained, "courts have required neither specific intent nor direct traceability to establish the liability of material supporters of terrorism."  864 F.3d at 799.  That is for good reason:  requiring that "a defendant *intended* that his contribution be used for terrorism would as a practical matter eliminate liability."  *Id*. (quoting *Boim*, 549 F.3d at 698-99) (ellipses and brackets omitted).  Such an impractical standard was never part of the ATA, *see Boim*, 549 F.3d at 690-91, and it is even less the standard Congress intended to govern JASTA's liberal aiding-abetting provision.

---

[15] The "one in spirit" phrase described *one example* of a case finding aiding-abetting liability; it was not a universal test.  *Halberstam*, 705 F.2d at 484 (citing *Rael v. Cadena*, 604 P.2d 822 (N.M. 1979)).

### 4. Factor 6:  Duration

The sixth factor – duration – confirms that Defendants' assistance was substantial.  The district court agreed this factor supports Plaintiffs because the "alleged aid spanned over a decade," but concluded "that *alone* is not enough." JA\_\_\_-\_\_\_(Op.28-29).  The court's cursory treatment of this factor gave it far too little weight.  *See Halberstam*, 705 F.2d at 488 (multiyear duration "*strongly* influenced [the Court's] weighing of Hamilton's assistance") (emphasis added).  Duration alone may not create liability, but on top of the other factors, it points decisively to liability.  *See id*. at 484 (explaining duration's importance).

### B. Hezbollah Committed, Planned, Or Authorized The Relevant Terrorist Acts

JASTA applies to terrorist acts "committed, planned, or authorized" by an FTO.  18 U.S.C. § 2333(d)(2).  Defendants concede that Hezbollah allegedly participated in "committ[ing]" 22 of the attacks here.  JA\_\_\_(Op.24 & n.6).  Those attacks targeted 35 of the 395 direct victims in this case.  JA\_\_\_(Op.23).  One of them was a 2007 attack on the Green Zone committed by a joint Jaysh al-Mahdi-Hezbollah cell.  JA\_\_\_-\_\_\_(¶¶ 735-39).  The 22 conceded attacks overlook that the same joint cell attacked the Green Zone in early 2008, JA\_\_\_-\_\_\_, \_\_\_-\_\_\_(¶¶ 397, 738-39), which caused the "Battle of Sadr City," JA\_\_\_-\_\_\_, \_\_\_-\_\_\_(¶¶ 345, 397), and killed or injured 58 more victims, JA\_\_\_(Dkt.132, at 53 & n.52).

The FTO-*committed* attacks thus account for over 90 of the 395 direct victims. Defendants do not meaningfully contest the FTO element for those attacks. But liability also extends to attacks "planned" or "authorized" by an FTO. Hezbollah planned and authorized the remaining attacks here. JA___(¶ 408).

**1.  Hezbollah planned and authorized Jaysh al-Mahdi's terrorist attacks against Plaintiffs (Count One)**

**a.  Plaintiffs' allegations are sufficient**

Hezbollah co-founded Jaysh al-Mahdi in 2003 and played a key role in the terrorist attacks that ensued. JA___, ___-___, ___-___(¶¶ 56, 364, 367-76). Hezbollah's activities satisfied JASTA's FTO element in two ways.

**Planning.** Hezbollah planned Jaysh al-Mahdi's attacks. JA___-___(¶¶ 389-403). To "plan" something means to "arrange the parts of: [to] design." *Plan*, Merriam-Webster, https://bit.ly/2X0TsoU. Hezbollah took several steps to arrange and design the attacks that targeted Plaintiffs. It devised the attack methodologies (such as explosively formed penetrators ("EFPs") and 107mm rockets) that Jaysh al-Mahdi used against Plaintiffs; instructed Jaysh al-Mahdi how to deploy them; dispatched operatives to direct the attacks; and recruited and equipped Jaysh al-Mahdi fighters to carry them out. JA___-___, ___-___, ___-___(¶¶ 366-70, 393-401, 404-07). Hezbollah even memorialized its scheme to orchestrate these attacks in a document it called a "planning guide." JA___, ___-___(¶¶ 399, 402).

42

Those planning activities linked Hezbollah to Plaintiffs' individual attacks in three ways. *First*, each attack displayed a unique tactical sophistication that carried Hezbollah's signature. *See*, *e.g.*, JA___-___(¶¶ 395-96) (EFPs were "exclusively associated with Hizballah" and spread via Hezbollah's multipronged plan to foster explosive attacks).[16] Jaysh al-Mahdi could not have executed those attack types without Hezbollah's direction. JA___-___, ___-___(¶¶ 357, 402).

*Second*, each attack occurred within an Iraqi province where Hezbollah terrorists played a day-to-day operational role. *Compare* JA___-___(¶ 403) *with* JA___-___(¶¶ 409-3180). In those particular areas, Hezbollah's tactical involvement in Jaysh al-Mahdi's attacks was especially pronounced.

*Third*, each attack here advanced Hezbollah's strategic goal of harming Americans in Iraq. JA___-___, ___(¶¶ 364-70, 389). That was Hezbollah's guiding purpose: not to build up Jaysh al-Mahdi in the abstract, but to sponsor terrorism against Americans specifically. *Id.* By devising a plan to achieve that goal and orchestrating Jaysh al-Mahdi's terrorist campaign to accomplish it, Hezbollah "planned" *all* the attacks carried out in service of its goal. *See Plan*, Merriam-Webster, https://bit.ly/2X0TsoU (to "plan" something means to "have [it]

---

[16] For each attack type at issue, the complaint details the Jaysh al-Mahdi tactic and links it directly to corresponding Hezbollah training and oversight. *Compare* JA___-___(¶¶ 339-46) *with* JA___-___(¶¶ 392-402).

in mind:  [to] intend"); *Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 96-97 (E.D.N.Y. 2019) (sustaining allegations that Hezbollah was "involved in supporting and coordinating an extensive campaign of terrorist activity against American citizens in Iraq," despite lack of attack-by-attack allegations).

**Authorization.**  Hezbollah also *authorized* Jaysh al-Mahdi's attacks. "[C]ourts have recognized that the term 'authorized' is broad."  *United States v. Akinyoyenu*, 199 F. Supp. 3d 106, 115 (D.D.C. 2016).  To "authorize" something is "to endorse, empower, justify, or permit" it through "some recognized or proper authority (such as custom, evidence, personal right, or regulating power)." *Authorize*, Merriam-Webster, https://bit.ly/3n7xxa2.

Hezbollah exerted authority over Jaysh al-Mahdi in several ways.  It exercised *religious* authority through Secretary-General Hassan Nasrallah and Grand Ayatollah Hussein Fadlallah, who wielded spiritual power over Jaysh al-Mahdi fighters.  JA\_\_\_-\_\_\_(¶¶ 377-80).  It exerted *personal* authority through direct influence over Sadr himself.  JA\_\_\_, \_\_\_(¶¶ 365, 387).  And it exerted *operational* authority by training and directing Jaysh al-Mahdi fighters.  JA\_\_\_-\_\_\_, \_\_\_-\_\_\_(¶¶ 364-76, 389-403).  Jaysh al-Mahdi in turn ratified Hezbollah's authority, swearing fealty to Hezbollah and conducting public marches chanting, "We are Hezbollah."  JA\_\_\_-\_\_\_, \_\_\_-\_\_\_(¶¶ 372-73, 378).  Sadr even described Jaysh al-Mahdi as Hezbollah's "striking arm in Iraq."  JA\_\_\_(¶ 371).

44

Hezbollah leveraged all three forms of authority to incite the attacks that injured Plaintiffs. JA___-___(¶¶ 377-88). For example, Grand Ayatollah Fadlallah issued a 2004 *fatwa* directing Jaysh al-Mahdi fighters that they had a religious duty to attack Americans in Iraq. JA___-___(¶¶ 384-85). Such religious instructions played a key role in enabling the attacks against Plaintiffs, *id.*, and they constituted "authorization" under any definition. *See Elahi v. Islamic Rep. of Iran*, 124 F. Supp. 2d 97, 103 n.8 (D.D.C. 2000) ("[a] Fatwa is an edict of a religious leader, authorizing a faithful Muslim to commit murder").

The only two other courts to assess comparable FTO allegations sustained them. *See Freeman*, 413 F. Supp. 3d at 96-97; *Bartlett*, 2020 WL 7089448, at *8. In *Freeman*, the plaintiffs similarly alleged Hezbollah's role in "supporting and coordinating an extensive campaign of terrorist activity" in Iraq. 413 F. Supp. 3d at 97. Although the allegations did not "name[] the precise individuals clandestinely involved in committing each attack," they "point[ed] to the high-level involvement of Hezbollah and its affiliates." *Id*. Those allegations allowed an inference that Hezbollah "was responsible, at minimum, for authorizing the 92 attacks at issue in th[e] case." *Id*. at 96; *see Bartlett*, 2020 WL 7089448, at *8 (likewise sustaining FTO allegations when "Hezbollah trained the Iraqi militias" that committed EFP and other attacks). The allegations here are even stronger.

### b. The district court's ruling is incorrect

The district court rejected those allegations as revealing only "[g]eneral support" for Jaysh al-Mahdi. JA___(Op.24). The court, without acknowledging the tactical and geographic nexus tying Hezbollah to each attack, discerned no allegations that Hezbollah "*itself* had a significant role in a particular attack." JA___(Op.25). But the complaint alleges exactly that. EFP attacks, which account for most of the attacks here, illustrate the point. Hezbollah played a key role in *every* EFP attack – by sourcing the weapons, directing their use, and providing the necessary training – leading one intelligence report to assess EFPs as "exclusively associated with Hizballah." JA___, ___-___(¶¶ 370, 395-96). These were highly sophisticated weapons carrying Hezbollah's tactical signature, and Hezbollah's wide-ranging involvement ensured that its role extended to each individual EFP attack. *Id*. The district court never explained why it viewed such weapon-specific allegations as "[g]eneral." JA___(Op.24). But the court's implication – the only one that explains its ruling – was that Plaintiffs should have provided details about Hezbollah's participation in the individual minutiae of every attack.

If that is what the court meant, it was mistaken. At the pleading stage, Plaintiffs need not adduce "precise facts" about Hezbollah's role in each attack, nor need they "prove" its participation. *Strike 3 Holdings, LLC v. Doe*, 964 F.3d 1203, 1211 (D.C. Cir. 2020). They need not even "allege facts addressing

directly," *Owens IV*, 897 F.3d at 274-75, the role Hezbollah played in each attack. Rather, Plaintiffs are entitled to "all reasonable inferences" about Hezbollah's involvement in "committing, planning, or, at the very least, authorizing the attacks." *Freeman*, 413 F. Supp. 3d at 97. Whatever the scope of "planned" and "authorized," the extensive allegations about Hezbollah here raise at least a plausible inference of attack-by-attack involvement sufficient to warrant discovery.

Regardless, the district court misapplied the statute. A person can "plan"[17] or "authorize"[18] an act by arranging or approving the broader scheme that the act serves; direct involvement in the act's fine details is unnecessary. For example, a Hezbollah operative who instructs Jaysh al-Mahdi fighters to use 107mm rockets against U.S. forces in Iraq – and trains them with that purpose in mind – surely "plans" and "authorizes" the resulting attacks, even if the operative does not then dictate the exact time or location of each strike. JA___, ___-___(¶¶ 369, 397).

---

[17] *Cf. United States v. Bostick*, 791 F.3d 127, 145 (D.C. Cir. 2015) (Kavanaugh, J.) ("two or more acts" can "constitut[e] parts of a common scheme or plan"); *United States v. Johnson*, 970 F.2d 907, 913-14 (D.C. Cir. 1992) (acts sharing common features can be "individual manifestations" of "a general plan") (emphasis omitted); Judgement ¶¶ 975-76, *Prosecutor v. Kordić*, ICTY No. IT-95-14/2-A (Dec. 17, 2004), https://bit.ly/38kQAZ2 (defendant "plann[ed]" each individual murder, expulsion, and detention committed in villages under his "general plan" to "'cleans[e]' these areas of Muslims").

[18] *Cf. Techniarts Eng'g v. United States*, 51 F.3d 301, 305 (D.C. Cir. 1995) (contract can be "authorized by statute" categorically); *United States v. Right to Use & Occupy 3.38 Acres of Land*, 484 F.2d 1140, 1142 (4th Cir. 1973) ("authorization" to acquire asset "need not refer to the specific transaction").

The decision below offers no linguistic reason to conclude otherwise. After all, Congress extended liability beyond attacks that an FTO directly "commit[s]." 18 U.S.C. § 2333(d)(2). The district court's view – that the FTO must participate directly in the details of every attack – erases that textual distinction.

Nor do Plaintiffs claim, as the district court surmised, that secondary liability extends to "any attack committed by a non-FTO merely because it had in the past received 'material support and resources' from a designated FTO." JA___(Op.25). Had some FTO merely supplied Jaysh al-Mahdi with money, for example, such support alone would not have "planned" or "authorized" attacks. But Hezbollah's operational involvement here was much more extensive. The causal link between Hezbollah and each attack – connecting the two through tactics, geography, and intention – elevated Hezbollah's role well above such "general support."

### 2. Hezbollah planned and authorized Jaysh al-Mahdi's broader terrorist campaign (Count Two)

Plaintiffs also allege that Defendants aided Jaysh al-Mahdi's broader terrorist campaign. JA___-___(¶¶ 3190-3207). The campaign was another "act of international terrorism": it was dangerous, manifested terroristic intent, and violated the "criminal laws of the United States." 18 U.S.C. § 2331(1)(A); *see* JA___-___(¶ 3202). As to the last requirement, Sadr and his associates conducted Jaysh al-Mahdi's affairs through a pattern of racketing activity that violated the RICO statute. 18 U.S.C. § 1962; JA___, ___-___(¶¶ 3193, 3202).

48

Defendants substantially assisted Jaysh al-Mahdi's terrorist enterprise for the reasons above. *Supra* Part II.A. And however the Court views the individual attacks, Hezbollah "planned" and "authorized" the broader campaign. JA___-___(¶¶ 364-407). The district court did not deny the latter point but ruled that the campaign was not "*an act* of international terrorism." JA___(Op.25) (quoting 18 U.S.C. § 2333(d)(2)). For the court, it was "unnatural" to read the word *act* to mean anything besides a "particular attack." JA___(Op.25).

That was error. The court cited no interpretive principle suggesting that maintaining a racketeering enterprise – a standalone federal crime – is not an "act." Courts often use the word "act" to describe a multifaceted enterprise. *See, e.g.*, *United States v. Pregler*, 925 F.2d 268, 269 (8th Cir. 1991) ("[a] [three-year] conspiracy is an ongoing act"). Under the Dictionary Act, moreover, the singular word "act" includes the plural. *See* 1 U.S.C. § 1. And in *Halberstam* itself, the "act assisted" was not the individual murder but the broader "burglary enterprise." 705 F.2d at 488. Just as the Court held Hamilton liable for assisting the "act" of a "five-year-long burglary campaign," so have Plaintiffs pleaded Defendants' liability for assisting the "act" of a multiyear terrorist campaign. *Id*.

## III. PLAINTIFFS SUFFICIENTLY PLEAD PERSONAL JURISDICTION

The district court dismissed the six foreign Defendants for lack of personal jurisdiction. JA___-___(Op.6-14).[19]  They are subject to specific jurisdiction if they created suit-related "minimum contacts" with this forum.  *Estate of Klieman ex rel. Kesner v. Palestinian Auth.*, 923 F.3d 1115, 1120 (D.C. Cir. 2019), *vacated on other grounds*, 140 S. Ct. 2713 (2020).  For Plaintiffs' ATA claims, the forum is the "United States as a whole." *Id*.  Because Plaintiffs plead an adequate connection to the United States, the Court should reverse.

### A. The Foreign Defendants Formed Suit-Related Contacts With The United States

#### 1. Defendants tied their transactions to the United States

A defendant creates "minimum contacts" by "purposefully avail[ing] himself of the benefits and protections of [the forum's] laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 482 (1985).  Under that principle, a defendant "has minimum contacts with a forum if she enters into a contract that has a substantial connection with the forum." *Helmer v. Doletskaya*, 393 F.3d 201, 205 (D.C. Cir. 2004).  The connection turns on the "the terms of the contract and the parties' actual course of dealing." *Burger King*, 471 U.S. at 479.

---

[19] All agree that general jurisdiction exists over Plaintiffs' ATA claims against the 15 U.S. Defendants.  JA___(Op.2 n.2).

The foreign Defendants' corrupt contracts had a substantial connection to the United States. In selling to Kimadia, each foreign Defendant: (1) worked with affiliated U.S. manufacturers to source and deliver U.S.-made drugs or devices to Jaysh al-Mahdi, JA___, ___-___(¶¶ 122, 156-57); (2) procured U.S. export certificates and FDA approvals to facilitate the sale of those goods, JA___-___(¶¶ 152-56); and (3) certified to Kimadia the American "origin" of the goods it sourced from the United States, JA___(¶ 122). *See* JA___-___(¶¶ 203-09) (AstraZeneca), ___-___(¶¶ 233-44) (GE Healthcare), ___-___(¶¶ 272-80) (J&J), ___-___(¶¶ 296-309) (Pfizer), ___-___(¶¶ 322-32) (Roche). By affiliating with U.S. companies to source U.S. drugs and procure U.S. documentation, the foreign Defendants purposefully availed themselves of the United States. *See Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 551 (6th Cir. 2007) ("procuring" goods from forum constitutes purposeful availment); *St. Jude Med., Inc. v. Lifecare Int'l, Inc.*, 250 F.3d 587, 591-93 (8th Cir. 2001) (similar).

Reliance on the United States was a material part of the foreign Defendants' tortious conduct. *Supra* pp. 13-14. They chose to source their most valuable products from the United States to benefit from the unique advantages of U.S. manufacturing.[20] Because Kimadia prioritized FDA-approved drugs, moreover,

---

[20] JA___-___, ___-___, ___-___, ___-___, ___-___(¶¶ 203-06, 233-39, 276-79, 300-07, 322-30).

51

the foreign Defendants' procurement of U.S. documentation was essential to the scheme. JA___-___(¶ 153). And because of how the foreign Defendants structured their supply chains, their contracts required them to work hand-in-hand with their U.S. affiliates.[21] Without those U.S. contacts, the foreign Defendants could not have sent their cash and cash-equivalent drugs to Jaysh al-Mahdi.

Those ties to the United States also strengthened the causal link to terrorism. The foreign Defendants' expensive American-made products made for an especially valuable form of terrorist finance, by enabling Jaysh al-Mahdi to fetch higher black-market prices. JA___-___, ___, ___-___(¶¶ 12, 122, 153). For the goods whose contractual "origin" was the United States, the foreign Defendants also stamped "U.S." on the packaging.[22] In that way, the foreign Defendants magnified the black-market value of their "free goods" by denoting the U.S. connection not only in the contracts, *e.g.*, JA___(Dkt.130-5, at 48), but also on the very face of the bribes themselves. Because Plaintiffs' claims "arise out of or relate to those activities," they support jurisdiction. *Burger King*, 471 U.S. at 472.

---

[21] JA___, ___, ___-___(¶¶ 122, 146, 156-57) (describing supplier-manufacturer cooperation); *see* JA___-___(¶¶ 201-07) (AstraZeneca); JA___-___(¶¶ 233-41) (GE Healthcare); JA___-___(¶¶ 272-77) (J&J); JA___-___(¶¶ 296-306) (Pfizer); JA___-___(¶¶ 322-30) (Roche).

[22] JA___, ___-___, ___, ___, ___, ___(¶¶ 152, 204-05, 242, 275, 307, 328).

## 2. The district court's reasoning is unpersuasive

The court discounted those U.S. contacts because the "manufacturing or sourcing practices were [not] themselves unlawful." JA___(Op.11). That legal standard – recognizing a forum contact only if it is itself illegal – is unfounded. To count in the jurisdictional calculus, a contact need only be "suit-related." *Urquhart-Bradley*, 964 F.3d at 44. The "relatedness test is a flexible, relaxed standard," *Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 9 (1st Cir. 2009), and it does not require a claim to "'formally' arise from defendant's contacts," *Air Prods.*, 503 F.3d at 553. Indeed, courts often derive jurisdiction from forum contacts that are not themselves tortious.[23]

A contact-must-be-tortious standard is especially unwarranted here. Because ATA claims definitionally require support to *foreign* terrorists, 18 U.S.C. § 2331(1)(C), the U.S. nexus will virtually never be what makes the conduct illegal. The Court should not adopt a jurisdictional standard that would effectively immunize all foreign persons from ATA liability. Rather, it should tailor its

---

[23] *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 172-73 (2d Cir. 2013) (contact was maintenance of bank account in forum; tort was delivering funds to Hezbollah in Lebanon); *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 324 (3d Cir. 2007) (contact was mailing brochures to forum; tort was out-of-forum negligence); *Air Prods.*, 503 F.3d at 551-53 (contact was negotiating with manufacturer; tort was asset transfer "occurr[ing] wholly outside the state"); *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 430-31 (7th Cir. 2010) (contact was advertising in forum; tort was out-of-forum trademark infringement).

analysis to the "nature of the [ATA] tort," *Walden v. Fiore*, 571 U.S. 277, 287 (2014), and authorize jurisdiction when payments to foreign terrorists occur as part of transactions that materially touch the United States. Those U.S. contacts here may not be tortious standing alone, but they create a substantial "relationship among the defendant, the forum, and the litigation." *Id*. at 291.

The district court's contrary holding defies the Supreme Court's instruction to shun "mechanical tests" in favor of a "highly realistic" approach to personal jurisdiction. *Burger King*, 471 U.S. at 478-79. Defendants are sophisticated entities engaging in complex business transactions, and their final acts – handing cash and drugs to terrorists in Iraq – did not happen in isolation. It is unrealistic to view those acts as divorced from the supply chains, approvals, and affiliate relationships that enabled them. *See Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1270 (11th Cir. 2010) ("*Burger King* requires a realistic examination of the entire course of dealing."). Each is one stage of a broader transaction, and the link between them is "intimate enough to keep . . . jurisdiction reasonably foreseeable." *O'Connor*, 496 F.3d at 323.

The district court further discounted the U.S. sourcing as not "material to the Ministry contracts." JA___(Op.12). The complaint, however, alleges the opposite. It alleges that the foreign Defendants purposefully sourced their most valuable drugs from the United States and that Jaysh al-Mahdi prioritized obtaining those

U.S.-made drugs in particular. *Supra* pp. 51-52. It also alleges that Jaysh al-Mahdi demanded contractual country-of-origin terms in part to verify the U.S. connection. JA___-___, ___, ___-___, ___-___(¶¶ 12, 122, 152-53, 306-07).

The foreign Defendants adduced little evidence in response. Five of the six (all except GE Healthcare) submitted a cherry-picked subset of their Kimadia contracts, JA___-___(Dkts.130-2 – 130-5), but none refuted the allegations that it executed other contracts with U.S. sourcing terms and also procured American active ingredients for every alleged transaction, JA___-___(Dkt.133, at 6-7) (summarizing evidence). Nor did any Defendant proffer evidence about the many contracts they declined to submit, the reason for (or frequency of) their U.S. sourcing practices, or the sourcing's effect on their goods' black-market value.

The district court nonetheless found the sourcing practices immaterial by citing one sentence fragment from the complaint, purportedly showing that the origin requirement "appears to have been because the Ministry was 'suspicious of counterfeit drugs,' not because U.S.-sourcing increased the[ir] value." JA___(Op.12) (quoting ¶ 122). But the complaint's *very next sentence* refutes that conclusion, alleging that "[Ministry] officials also prioritized obtaining U.S.-manufactured drugs, which tended to be most valuable." JA___(¶ 122). Rather than ignoring the latter allegation, the court should have presumed it true and read it in Plaintiffs' favor. *Urquhart-Bradley*, 964 F.3d at 40 n.2.

The district court also found "many" goods "were sourced from countries *other* than the United States." JA___(Op.12). But the court did not deny that the foreign Defendants sourced their *most important* goods – the ones Jaysh al-Mahdi needed the most and the ones vital to the entire scheme – from the United States. *Supra* pp. 51-52. Sourcing other, less-important goods from elsewhere does not diminish the significance of those U.S. contacts. *See Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984) (jurisdiction existed "in New Hampshire . . . even though only a small portion of [defamatory content was] distributed" there).

In any event, the court's factual premise is inaccurate. Because GE Healthcare proffered no evidence, there was no basis to find that GE Healthcare made *any* (much less "many") products outside of the United States. JA___-___(¶¶ 233-44). As for the non-U.S. "origin" terms in some of the other Defendants' contracts, they refer to drug *formulation* rather than active-ingredient manufacturing. *Supra* pp. 13-14; JA___(¶ 122). Active-ingredient manufacturing was the essential, hard-to-replicate process that made the drugs attractive to terrorists. JA___, ___, ___(¶¶ 122, 153, 189 n.164). Formulation, by contrast, could happen anywhere. *Id*. The non-GE Defendants' showing that they formulated some drugs overseas does not weaken the U.S.-based "course of dealing" for the more-important active ingredients. *Burger King*, 471 U.S. at 479.

**B.    Personal Jurisdiction Serves Vital National-Security Interests**

Exercising jurisdiction over the foreign Defendants also "comport[s] with fair play and substantial justice." *Burger King*, 471 U.S. at 476.  For this prong of the inquiry, courts balance the defendant's burden, the forum's interest, the plaintiff's interest in obtaining relief, judicial efficiency, and social policies.  *See Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113 (1987).  The foreign Defendants made no arguments below about those factors, and the district court overlooked Plaintiffs' showing that they weigh heavily in favor of jurisdiction.  *Compare* JA___-___(Dkt.133, at 22-23) *with* JA___-___(Op.6-14).

The United States has a weighty interest in affording a remedy for American terror victims in American courts.  The ATA reflects Congress's judgment that "terrorism is a serious and deadly problem that threatens the vital interests of the United States," JASTA § 2(a)(1), and that companies that "contribute material support or resources, directly or indirectly, to [terrorists] . . . necessarily direct their conduct at the United States, and should reasonably anticipate being brought to court" here, *id*. § 2(a)(6).  That is why the ATA bars forum non-conveniens arguments, 18 U.S.C. § 2334(d), and includes broad jurisdictional and venue provisions to protect plaintiffs' choice of forum, *id*. § 2334(a).  Those protections manifest the ATA's core intent:  to "give American nationals broad remedies in a procedurally privileged U.S. forum." *Goldberg*, 660 F. Supp. 2d at 422.

The decision below thwarts that intent. No other forum is realistically able to hear Plaintiffs' ATA claims. The district court's jurisdictional ruling thus functionally immunizes the foreign Defendants from a federal statute that Congress found essential to U.S. national security. By holding that the Due Process Clause overrides Congress's legislative choice to subject such companies to suit in American courts, the decision below undermines "the Government's interest in combating terrorism." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010). That counter-terrorism interest reflects an "urgent objective of the highest order," *id.*, and the district court erred in disregarding it.

All this provides another reason to reverse the district court's minimum-contacts analysis. The Supreme Court has held that the "fair play and substantial justice" factors "sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Burger King*, 471 U.S. at 477. Here, the American "interest in adjudicating th[is] dispute," *id.*, is more than powerful enough to support that outcome. Given the vital national-security interests at stake, personal jurisdiction would be warranted even on a "borderline showing of [minimum contacts]." *Pro Axess, Inc. v. Orlux Distrib., Inc.*, 428 F.3d 1270, 1280 (10th Cir. 2005); *see Adelson v. Hananel*, 652 F.3d 75, 84 (1st Cir. 2011) ("[A]n especially strong showing of reasonableness may serve to fortify a borderline showing of relatedness and purposefulness.");

*Guidry v. U.S. Tobacco Co.*, 188 F.3d 619, 631 (5th Cir. 1999) (similar). And because the contacts here are hardly "borderline," the overriding interest in affording Plaintiffs a remedy amply justifies jurisdiction.

### C. The State-Law Claims Should Be Reinstated

The district court dismissed Plaintiffs' state-law claims because it dismissed the ATA claims. JA___(Op.14). If the ATA claims survive, pendent jurisdiction would exist over the state-law claims. *See Oetiker v. Jurid Werke, GmbH*, 556 F.2d 1, 4-5 (D.C. Cir. 1977). The latter claims should be reinstated.

### D. At A Minimum, Jurisdictional Discovery Is Warranted

Alternatively, the Court should remand for jurisdictional discovery. This Court has "held many times that, if a party demonstrates that it can supplement its jurisdictional allegations through discovery, then jurisdictional discovery is justified." *Urquhart-Bradley*, 964 F.3d at 48. Plaintiffs below sought jurisdictional discovery, JA___-___(Dkt.133, at 23-25), but the court denied the request without acknowledgment, JA___-___(Op.6-14). That "*sub silentio* denial" was an abuse of discretion. *Urquhart-Bradley*, 964 F.3d at 48.

Plaintiffs deserve discovery on two issues. *First*, discovery would enhance Plaintiffs' jurisdictional allegations about the foreign Defendants' Kimadia contracts. Although the court characterized U.S. sourcing and U.S. manufacturing

as not "material to the Ministry contracts," JA___(Op.12), its conclusion rests on contested inferences that Plaintiffs are at least entitled to test in discovery.

*Second*, discovery would supplement Plaintiffs' allegations about the foreign Defendants' ties to their U.S. affiliate Defendants. *Supra* p. 52 & note 21. The court discounted those ties as "typical manufacturer-distributor relationship[s] among corporate affiliates," JA___(Op.13 n.5), but that characterization would make no difference if the foreign Defendants used such relationships to facilitate their corrupt payments to Jaysh al-Mahdi. Moreover, the district court's characterization conflicts with the contracts, which suggest that the foreign Defendants did not observe corporate formalities in practice. JA___(Dkt.133, at 24 & n.14). Discovery into the foreign Defendants' reliance on affiliated American personnel could thus demonstrate additional U.S. contacts. *See El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 676 (D.C. Cir. 1996) (ordering discovery into foreign company's contacts with in-forum "subsidiary" given allegations that "the two corporations have worked together on certain transactions"), *abrogated on other grounds sub nom. Samantar v. Yousuf*, 560 U.S. 305 (2010).

## CONCLUSION

The judgment below should be reversed.

Respectfully submitted,

 /s/ *Joshua D. Branson*
DAVID C. FREDERICK
JOSHUA D. BRANSON
ANDREW E. GOLDSMITH
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
dfrederick@kellogghansen.com
jbranson@kellogghansen.com
agoldsmith@kellogghansen.com

*Counsel for Plaintiffs-Appellants*
*Joshua Atchley, et al.*

January 11, 2021

# CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rule of Appellate Procedure 32(g), that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the portions of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), the brief contains 12,997 words.

I further certify that this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared using Microsoft Word 2013 in a proportionally spaced typeface (Times New Roman, 14 point).

 /s/ *Joshua D. Branson*
Joshua D. Branson

January 11, 2021

# ADDENDUM

**TABLE OF CONTENTS**

Page

Anti-Terrorism Act, 18 U.S.C. § 2331 *et seq.*:

    18 U.S.C. § 2331 (excerpt) ....................................................................Add. 1

    18 U.S.C. § 2333 (excerpt) ....................................................................Add. 2

    18 U.S.C. § 2334 (excerpt) ....................................................................Add. 3

    18 U.S.C. § 2338....................................................................................Add. 4

Justice Against Sponsors of Terrorism Act,
Pub. L. No. 114-222, 130 Stat. 852 (2016) (excerpt) .......................................Add. 5

**§ 2331. Definitions.**

As used in this chapter—

  **(1)** the term "international terrorism" means activities that—

  **(A)** involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

  * * * * *

  **(C)** occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum;

  * * * * *

## 18 U.S.C. § 2333

**§ 2333.  Civil remedies.**

**(a) Action and jurisdiction.**—Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

* * * * *

**(d) Liability.**—

    **(1) Definition.**—In this subsection, the term "person" has the meaning given the term in section 1 of title 1.

    **(2) Liability.**—In an action under subsection (a) for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism.

* * * * *

**§ 2334.  Jurisdiction and venue.**

**(a) General venue.**—Any civil action under section 2333 of this title against any person may be instituted in the district court of the United States for any district where any plaintiff resides or where any defendant resides or is served, or has an agent. Process in such a civil action may be served in any district where the defendant resides, is found, or has an agent.

* * * * *

**(d) Convenience of the forum.**—The district court shall not dismiss any action brought under section 2333 of this title on the grounds of the inconvenience or inappropriateness of the forum chosen, unless—

   **(1)** the action may be maintained in a foreign court that has jurisdiction over the subject matter and over all the defendants;

   **(2)** that foreign court is significantly more convenient and appropriate; and

   **(3)** that foreign court offers a remedy which is substantially the same as the one available in the courts of the United States.

* * * * *

**§ 2338.  Exclusive Federal jurisdiction.**

The district courts of the United States shall have exclusive jurisdiction over an action brought under this chapter.

## Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852

\* \* \* \* \*

## § 2.  FINDINGS AND PURPOSE.

(a) FINDINGS.—Congress finds the following:

(1) International terrorism is a serious and deadly problem that threatens the vital interests of the United States.

(2) International terrorism affects the interstate and foreign commerce of the United States by harming international trade and market stability, and limiting international travel by United States citizens as well as foreign visitors to the United States.

(3) Some foreign terrorist organizations, acting through affiliated groups or individuals, raise significant funds outside of the United States for conduct directed and targeted at the United States.

(4) It is necessary to recognize the substantive causes of action for aiding and abetting and conspiracy liability under chapter 113B of title 18, United States Code.

(5) The decision of the United States Court of Appeals for the District of Columbia in Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983), which has been widely recognized as the leading case regarding Federal civil aiding and abetting and conspiracy liability, including by the Supreme Court of the United States, provides the proper legal framework for how such liability should function in the context of chapter 113B of title 18, United States Code.

(6) Persons, entities, or countries that knowingly or recklessly contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism that threaten the security of nationals of the United States or the national security, foreign policy, or economy of the United States, necessarily direct their conduct at the United States, and should reasonably anticipate being brought to court in the United States to answer for such activities.

(7) The United States has a vital interest in providing persons and entities injured as a result of terrorist attacks committed within the United States with full access to the court system in order to pursue civil claims against persons, entities, or countries that have knowingly or recklessly provided material support or resources, directly or indirectly, to the persons or organizations responsible for their injuries.

(b) PURPOSE.—The purpose of this Act is to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States.

* * * * *

# CERTIFICATE OF SERVICE

I hereby certify that, on January 11, 2021, I caused to be filed electronically the initial version of the Opening Brief for Plaintiffs-Appellants Joshua Atchley, *et al.*, with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ *Joshua D. Branson*
Joshua D. Branson