**INITIAL VERSION**

**ORAL ARGUMENT NOT YET SCHEDULED**

No. 20-7077

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

JOSHUA ATCHLEY, ET AL,

*Plaintiffs-Appellants,*

v.

ASTRAZENECA UK LTD, ET AL.,

*Defendants-Appellees.*

On Appeal from the United States District Court for the District of Columbia (No. 17-cv-2136 (RJL))

# AMICUS CURIAE BRIEF OF 44 FORMER MILITARY OFFICERS, INTELLIGENCE OFFICIALS, AND ANALYSTS IN SUPPORT OF APPELLANTS AND REVERSAL

Tejinder Singh
Erica Oleszczuk Evans
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Avenue
Suite 850
Bethesda, MD 20814
Telephone: (202) 362-0636
Facsimile: (866) 574-2033
tsingh@goldsteinrussell.com

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), *amici curiae* 44 Former Military Officers, Intelligence Officials, and Analysts hereby certify as follows:

**(A) Parties and *Amici*.** All parties, intervenors, and *amici* appearing before the district court and in this Court thus far are listed in the Opening Brief for Plaintiffs-Appellants except for *amici curiae* Law Professors, American Association for Justice, and *amici curiae* who submit this brief.

**(B) Rulings Under Review.** References to the rulings at issue appear in the Opening Brief for Plaintiffs-Appellants.

**(C) Related Cases.** The case on review was not previously before this Court or any other court. Counsel is not aware of any related case pending before this Court or any court.

## RULE 29(d) CERTIFICATION

A separate *amicus* brief was necessary because the *amici* joining this brief seek only to discuss the specific points on which their interest in and expertise about the practical realities of terrorism is most relevant. Other *amici* would not have the same credibility making these points, and so the inclusion of these points in an omnibus *amicus* brief would not work. Similarly, the *amici* here know less about other legal issues in the case, and it would make little sense to address those in this brief.

January 19, 2021

/s/ Tejinder Singh

Tejinder Singh

# TABLE OF CONTENTS


CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..... i

RULE 29(d) CERTIFICATION ..... ii

TABLE OF AUTHORITIES ..... iv

GLOSSARY ..... vi

INTEREST OF AMICI ..... 1

SUMMARY OF ARGUMENT ..... 2

ARGUMENT ..... 5

- I. The Complaint Plausibly Alleges That Hezbollah Planned and Authorized the Terrorist Attacks That Injured Plaintiffs ..... 5
  - A. The Complaint's Allegations Regarding Hezbollah's Role in the Attacks Are Clear and Detailed ..... 5
  - B. In Light of *Amici*'s Experience, Judicial Findings of Fact, and U.S. Government Sources, the Complaint's Allegations That Hezbollah Planned and Authorized the Attacks Are Plausible ..... 9
- II. An Interpretation of JASTA That Does Not Reach the Attacks in This Case Would Undermine the Statute's Stated Purpose ..... 17

CONCLUSION ..... 24

APPENDIX: THE AMICI ..... 1a

## TABLE OF AUTHORITIES*

## CASES

*Fritz v. Islamic Republic of Iran*,
320 F. Supp. 3d 48 (D.D.C. 2018) ........ 10, 11, 12, 13

*Frost v. Islamic Republic of Iran*,
383 F. Supp. 3d 33 (D.D.C. 2019) ........ 11

*Gill v. Arab Bank, PLC*,
893 F. Supp. 2d 474 (E.D.N.Y. 2012) ........ 19

**Karcher v. Islamic Republic of Iran*,
396 F. Supp. 3d 12 (D.D.C. 2019) ........ 11, 12, 13, 14

*Stansell v. Revolutionary Armed Forces of Colom.*,
771 F.3d 713 (11th Cir. 2014) ........ 19

## STATUTES

18 U.S.C. § 2333 ........ 4

18 U.S.C. § 2333(d)(2) ........ 17

Justice Against Sponsors of Terrorism Act,
Pub. L. No. 114-222, 130 Stat. 852 (2016) ... 1, 3, 4, 5, 17, 19, 20, 21, 23

§ 2(b) ........ 1, 20

## OTHER AUTHORITIES

Briefing Slides for Brigadier Gen. Kevin J. Bergner, Ali Musa Daqduq (AMD) aka. Hamid "The Mute" (July 2, 2007) ........ 15

Matthew Levitt, *Hezbollah: A Case Study of Global Reach*, Remarks to a Conference on "Post-Modern Terrorism: Trends, Scenarios, and Future Threats" (Sept. 8, 2003), https://www.aclu.org/files/fbimappingfoia/20111110/ACLURM001616.pdf ........ 20

* Authorities upon which we chiefly rely are marked with asterisks.

Press Release, U.S. Dep't of the Treasury, Treasury Designated Hizballah Commander Responsible for American Deaths in Iraq (Nov. 19, 2012), https://www.treasury.gov/press-center/press-releases/Pages/tg1775.aspx ...................................................... 15

*The Status of the War and Political Developments in Iraq: Hearing Before the H. Comm. on Armed Servs.*, 110th Cong. (2008) ................................................................................................ 14

Transcript, Press Conference with General David Petraeus & Ambassador Ryan Crocker, Fed. News Serv., Inc. (Sept. 12, 2007), https://www.press.org/sites/default/files/20070912_petraeus_crocker.pdf ........................................................ 12

*The U.S. Army in the Iraq War: Volume 1* (Col. Joel D. Rayburn & Col. Frank K. Sobchak eds., 2019) .................................................. 10

U.S. Dep't of State, Country Reports on Terrorism (Apr. 30, 2008), https://2001-2009.state.gov/s/ct/rls/crt/2007/103711.htm ........ 11

U.S. Dep't of State, Designation of the Islamic Revolutionary Guard Corps, Fact Sheet (Apr. 8, 2019), https://www.state.gov/designation-of-the-islamic-revolutionary-guard-corps/ ................................................................. 10

*U.S. Policy Towards the Islamic Republic of Iran: Hearing Before the S. Comm. on Armed Servs.*, 111th Cong. (2010) ................ 20

## GLOSSARY

| | |
|---|---|
| FTO | Foreign Terrorist Organization |
| IRGC | Islamic Revolutionary Guard Corps |
| JASTA | Justice Against Sponsors of Terrorism Act |

## INTEREST OF AMICI*

The 44 undersigned *amici*, identified in the appendix to this brief, are former U.S. and Coalition military officers and intelligence officials who served in Operation Iraqi Freedom, or analysts who have studied it. All have first-hand experience with the terrorist threat posed by Jaysh al-Mahdi, Hezbollah, and Iran's Qods Force in Iraq—as well as a strong interest in ensuring that U.S. service members who were killed or injured by these groups benefit from Congress' effort to provide Americans with the "broadest possible basis" to seek relief against companies that "provided material support, directly or indirectly" to terrorists. Justice Against Sponsors of Terrorism Act (JASTA), Pub. L. No. 114-222, § 2(b), 130 Stat. 852, 853 (2016).

Some *amici* fought Jaysh al-Mahdi and Hezbollah on the battlefield, commanding battalions or companies of soldiers whom those terrorist groups attacked. Others worked as intelligence officers analyzing those terrorist groups. Although the details of *amici*'s backgrounds differ,

* This brief is filed with the consent of all parties. No party or its counsel authored this brief in whole or in part. No person other than the *amici* and their counsel contributed any money toward preparing or submitting this brief.

all are intimately familiar with the tactics, techniques, and procedures used by Jaysh al-Mahdi and other Shi'a terrorists to attack American service members in Iraq.

*Amici* write to provide the Court with the benefit of their real-world perspective on Shi'a terrorism in Iraq. In particular, *amici* believe that the district court's ruling that Hezbollah did not "commit, plan, or authorize" Jaysh al-Mahdi's attacks against plaintiffs misapprehends how Hezbollah operates in Iraq and elsewhere. This brief explains that error, and respectfully urges this Court to correct it.

## SUMMARY OF ARGUMENT

Plaintiffs' complaint alleges that but for Hezbollah's involvement, Jaysh al-Mahdi could not have carried out the attacks in Iraq that caused plaintiffs' injuries. Over dozens of paragraphs, replete with citations to authoritative sources, the complaint explains that Hezbollah operatives in Iraq directed Jaysh al-Mahdi's terrorist violence. It details how Jaysh al-Mahdi operated as an arm of Hezbollah, and how its members publicly and privately identified with Hezbollah. It also explains how Hezbollah trained and armed Jaysh al-Mahdi terrorists, and instructed them to kill

Americans in Iraq. Hezbollah, which at all relevant times was a designated foreign terrorist organization (FTO), did all of this in collaboration with and to further the ends of Iran's Islamic Revolutionary Guard Corps (IRGC) and the Qods Force, which were themselves later designated as FTOs in large part for their role in Iraq.

All of that notwithstanding, the district court held that "plaintiffs do not allege that an FTO 'committed, planned, or authorized' the attacks at issue." JA__(Op. 23) (citation omitted). The court refused to credit plaintiffs' allegation that Hezbollah committed, planned, or authorized Jaysh al-Mahdi's attacks (other than 22 attacks in which Hezbollah operatives directly and personally participated). *See ibid.* In the court's view, JASTA could not apply unless an FTO had a firsthand role in the details of each individual alleged attack. *See* JA__(Op. 24-27). And according to the court, the complaint alleged only that Hezbollah provided "general support and encouragement" to Jaysh al-Mahdi, which was not enough. *See* JA__(Op. 24). The district court was wrong about the gravamen of the allegations in the complaint and also about the law.

The complaint alleges that Hezbollah made Jaysh al-Mahdi's terror campaign possible. This allegation is supported by *amici*'s experience, judicial decisions based on detailed expert testimony, and declassified government documents explicating Hezbollah's role in Jaysh al-Mahdi's operations. These sources show that, at Iran's behest, Hezbollah built Jaysh al-Mahdi up as a proxy to attack Americans in Iraq, and then orchestrated those attacks. That support was neither "general" nor limited to mere "encouragement." Instead, Hezbollah exercised day-to-day operational supervision over attacks in Iraq. It also provided training and planning tailored to the sophisticated attacks Jaysh al-Mahdi carried out. And it did so with the specific intent to cause terrorist violence against Americans in Iraq, like plaintiffs in this case.

With respect to the law, this means that Hezbollah committed, planned, and authorized Jaysh al-Mahdi's attacks on Americans in Iraq. When Congress enacted the civil remedies provision of the Antiterrorism Act of 1990, 18 U.S.C. § 2333, and JASTA, it was legislating against the backdrop of real terrorist violence—and in the real world, foreign terrorist organizations often act either through proxies or in conjunction with them. By providing for liability whenever attacks were committed,

planned, or authorized by an FTO, Congress made clear its intent to go beyond attacks in which the individual terrorist who pulled the trigger or detonated the explosive was an FTO member. When, as here, an FTO provides the impetus for an attack and the capability to carry it out, JASTA protects the victims.

## ARGUMENT

### I. The Complaint Plausibly Alleges That Hezbollah Planned and Authorized the Terrorist Attacks That Injured Plaintiffs

### A. The Complaint's Allegations Regarding Hezbollah's Role in the Attacks Are Clear and Detailed

The complaint alleges that "Jaysh al-Mahdi's campaign of terror against Americans and Sunni Iraqis could not have occurred without the planning and authorization provided by Hezbollah, a Lebanese-based Shi'a terrorist organization that orchestrates terror attacks against Americans around the world on behalf of Iran." JA__(¶ 357). That is because Hezbollah both helped found "Jaysh al-Mahdi to inflict 'mass casualties' on Americans in Iraq," and because "Hezbollah has since orchestrated Jaysh al-Mahdi's campaign of terror against Americans in Iraq." JA__-__(¶ 357).

The complaint does not merely allege that Hezbollah supported Jaysh al-Mahdi. It goes further to allege that Hezbollah "directed Jaysh al-Mahdi terrorists, who carried out terrorist attacks against Americans on Hezbollah's behalf." JA__(¶ 366). Specifically, "[b]y January 2004, nearly 800 Hezbollah agents had been sent to Iraq, where they were deployed to direct Jaysh al-Mahdi's terrorist campaign." JA__(¶ 368). Hezbollah's "chief terrorist mastermind, Imad Mugniyeh," JA__(¶ 364), was in Iraq where he "personally supervise[d] Jaysh al-Mahdi's campaign of terror until his death in February 2008, at which point he was replaced by other Hezbollah operatives," JA__-__(¶ 368). The complaint also identifies—by name—other senior Hezbollah operatives who were deployed "to direct Jaysh al-Mahdi's campaign of terror against Americans in Iraq." JA__(¶ 369).

The complaint also details the degree to which Jaysh al-Mahdi publicly identified as an arm of Hezbollah. Indeed, Muqtada al-Sadr declared that he was "Hezbollah's striking arm in Iraq"—and he as well as other high-ranking Jaysh al-Mahdi operatives repeatedly confirmed their formal links to Hezbollah. JA__(¶ 371) (quotation marks omitted). Jaysh al-

Mahdi terrorists also marched under Hezbollah flags and banners, publicly swore fealty to Hezbollah, and chanted phrases like, "Mahdi Army and Hezbollah are one," and "we are Hezbollah." JA__-__, JA__-__(¶¶ 372-73, 378) (citation omitted). The complaint also describes U.S. government sources that have acknowledged the degree to which Hezbollah trained and armed Jaysh al-Mahdi groups (so-called "Special Groups," which is just another name for Jaysh al-Mahdi's terrorist cells in this context) so that these groups could attack Americans in Iraq. JA__-__(¶¶ 375-76).

To flesh out the allegation that Hezbollah "authorized" Jaysh al-Mahdi's attacks against American service members in Iraq, the complaint describes how Hezbollah leveraged its religious and spiritual authority to sanction violence by Jaysh al-Mahdi terrorists in Iraq. JA__-__(¶¶ 377-86). These included direct incitements to violence against Americans through *fatwas*, sermons, speeches, and literature addressed to Jaysh al-Mahdi members and to Iraqi Shi'as. Among other statements, the leader of Hezbollah stated that Hezbollah supported "a comprehensive Iraqi resistance, with all its aspects, especially the military aspect," and endorsed "jihad against the occupation forces." JA__(¶ 382) (citations

and emphasis omitted). Later, he called for "all-out war" against the United States, over a chorus of "Death to America" chants. *Ibid.* (citations and emphasis omitted). These calls were highly influential to members of Jaysh al-Mahdi, because they gave religious sanction to violence. JA__(¶ 383).

In support of the allegation that Hezbollah "planned" Jaysh al-Mahdi's terrorist attacks against American service members in Iraq, the complaint explains that Jaysh al-Mahdi recruits would travel to Hezbollah camps in Iran to receive training, and that all of this training was "intended for use against [Coalition forces]." JA__(¶ 389) (alteration in original; citation omitted). This "rigorous" training, JA__(¶ 392), included basic weapons, JA__(¶ 393), improvised explosive devices, JA__(¶ 394), explosively formed penetrator bombs, JA__(¶ 395), rockets, JA__(¶ 397), mortars, JA__(¶ 398), rocket-propelled grenades, JA__(¶ 399), complex attacks, JA__(¶ 400), and kidnapping, JA__(¶ 401).

With respect to the use of explosively formed penetrators, which were a Hezbollah signature weapon, the complaint alleges that Hezbollah chose specific geographies, provided instruction and technical assis-

tance, helped manufacture the weapons, trained Jaysh al-Mahdi commanders and members in the use of the weapons, and deployed senior Hezbollah terrorists in Iraq to coordinate explosively formed penetrator attacks against Americans. JA__(¶ 396).

On the basis of these allegations, the complaint explains how specific Jaysh al-Mahdi attacks were planned and authorized by Hezbollah. JA__-__(¶ 403). The complaint also explains that many of Jaysh al-Mahdi's weapons, including specifically the types of explosives used in the attacks that injured plaintiffs, came from Hezbollah and Iran. JA__-__(¶¶ 404-07).

### B. In Light of *Amici*'s Experience, Judicial Findings of Fact, and U.S. Government Sources, the Complaint's Allegations That Hezbollah Planned and Authorized the Attacks Are Plausible

The complaint's allegations track *amici*'s understanding of the role Hezbollah played in Jaysh al-Mahdi's campaign of terror. There is no doubt that Iran, and specifically the Qods Force, sought to cultivate Shi'a forces in Iraq to attack U.S. forces there. There also is no doubt that Hezbollah was the Qods Force's partner in this strategy, and that Jaysh al-Mahdi was one of Hezbollah's and the Qods Force's principal proxies. The

upshot is that Hezbollah did not merely provide "general support and encouragement" to Jaysh al-Mahdi, as the district court surmised. Instead, it provided vital and concrete support without which the attacks that injured plaintiffs could not have occurred. This support included training and weapons that were essential to the success of the attacks, as well as day-to-day operational planning and direction by Hezbollah operatives on the ground in Iraq itself. And Hezbollah did all of this with the specific intent to cause terrorist violence against Americans in Iraq.

We now know that Iran was conducting a "full-scale unconventional warfare campaign in Iraq" by Fall 2005. *The U.S. Army in the Iraq War: Volume 1*, at 498 (Col. Joel D. Rayburn & Col. Frank K. Sobchak eds., 2019). Through this campaign, Iran was "responsible for the deaths of at least 603 American service members in Iraq since 2003." U.S. Dep't of State, Designation of the Islamic Revolutionary Guard Corps, Fact Sheet (Apr. 8, 2019), https://www.state.gov/designation-of-the-islamic-revolutionary-guard-corps/. Those deaths were caused, in substantial part, by attacks carried out by Jaysh al-Mahdi.

To carry out its unconventional warfare campaign, Iran relied on Hezbollah. The findings of fact in *Fritz v. Islamic Republic of Iran*, 320

F. Supp. 3d 48 (D.D.C. 2018), *Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33 (D.D.C. 2019), and *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12 (D.D.C. 2019), are instructive here. In each of these cases, the plaintiffs presented evidence, including expert testimony, about Iran's tactics and relationship with Hezbollah. The courts found that "Hezbollah is an Iranian proxy," which carries out attacks directly and also serves as a liaison between Iran and other terrorist cells, *e.g.*, Jaysh al-Mahdi and its Special Groups. *Fritz*, 320 F. Supp. 3d at 60-61; *see also Frost*, 383 F. Supp. 3d at 39 n.5 (taking judicial notice of facts connecting Iran to Hezbollah and to Shi'a militants in Iraq); 383 F. Supp. 3d at 40 (specifically finding that Iran and Hezbollah have provided funding and support to Muqtada al-Sadr). These findings are consistent with the State Department's determination that the Qods Force acted "in concert with Lebanese Hizballah" in sponsoring Shi'a terrorism in Iraq. U.S. Dep't of State, Country Reports on Terrorism (Apr. 30, 2008), https://2001-2009.state.gov/s/ct/rls/crt/2007/103711.htm. Hezbollah was Iran's preferred proxy for this work because Hezbollah operatives spoke Arabic (like the Iraqi fighters they were training) and because using Hez-

bollah to do the more hands-on work allowed Iran to maintain some semblance of deniability in the event of discovery. *See Karcher*, 396 F. Supp. 3d at 23, 29; *Fritz*, 320 F. Supp. 3d at 64.

One aspect of Hezbollah's role was training for Jaysh al-Mahdi Special Group terrorists. This training was not "general"—but instead tailored to the particular types of attacks that Jaysh al-Mahdi used to injure plaintiffs. The training emphasized the specific weapons and tactics at issue here, including explosively formed penetrator bombs, which were a sophisticated Hezbollah signature weapon that required a high level of technical expertise to manufacture and use—as well as rockets, mortars, sniper rifles, and kidnapping tactics.

This specific training was essential to the success of these complex attacks. General David Petraeus, then-commander of Multinational Forces-Iraq, stated in 2007 that the "sophistication of attacks" carried out in Iraq "would [by] no means be possible without Iranian support," especially with regard "to the explosively formed projectiles" and "rockets" used in Iraq, which were certainly Iranian in origin. Transcript, Press Conference with General David Petraeus & Ambassador Ryan Crocker,

Fed. News Serv., Inc. (Sept. 12, 2007), https://www.press.org/sites/default/files/20070912_petraeus_crocker.pdf. That tracks multiple judicial findings that "[w]ithout [the] Iranian-backed training, the Special Groups would have been 'nowhere' near as effective as they were." *Fritz*, 320 F. Supp. 3d at 64 (citation omitted); *see also Karcher*, 396 F. Supp. 3d at 29 (recounting testimony that "the Special Groups and other local Shi'a terror cells could not have deployed and implemented" responses to U.S. countermeasures against explosively formed penetrators "without the IRGC's active involvement, training, equipment, and support") (citation omitted). And of course, it is consistent with the complaint's allegation that "Jaysh al-Mahdi's campaign of terror against Americans and Sunni Iraqis could not have occurred without the planning and authorization provided by Hezbollah." JA__(¶ 357).

Hezbollah's role did not stop with training. It also included day-to-day operational planning and direction. As the court found in *Karcher*, Jaysh al-Mahdi's Special Groups "received their training, weapons *and operational direction directly from Hezbollah* and [the Qods Force]." *Karcher*, 396 F. Supp. 3d at 24 (emphasis added) (citation omitted). General Petraeus testified to Congress that the Special Groups were "funded,

trained, armed, and *directed* by Iran's Quds force with help from Lebanese Hezbollah." *The Status of the War and Political Developments in Iraq: Hearing Before the H. Comm. on Armed Servs.*, 110th Cong. 5, 8 (2008) (statement of Gen. David Petraeus) (emphasis added). And Lieutenant General Michael Oates, the former head of the U.S. military's task force to defeat improvised explosive devices, testified in *Karcher* that "Hezbollah and the IRGC were *directing* an orchestrated campaign (conducted by their Iraqi surrogates) of violence against U.S. service members and were responsible for hundreds of attacks," a finding that was backed up by "intelligence reports, detainee interrogations, weapons cache discoveries and experience with IRGC 'ratlines,'" all of which "confirmed the *central role the IRGC and Hezbollah* played in *devising* and supporting lethal attacks on U.S. service members in Iraq." Expert Report of Michael L. Oates at 4, *Karcher v. Islamic Rep. of Iran*, No. 16-cv-00232 (D.D.C. filed Aug. 26, 2019, Dkt. 85). Nineteen retired Generals with first-hand professional knowledge likewise confirmed that "[w]hile the selection of a specific [target] may have been the result of independent decisions made by individual terrorists or a local cell commander," the Shi'a "terror campaign as a whole was the result of a single, unified

design, jointly executed by the IRGC, [the Qods Force], and Hezbollah." *Amicus* Br. of Retired Generals at 7, *Freeman v. HSBC Holdings PLC*, No. 19-3970 (2d Cir. filed Mar. 18, 2020, Dkt. 90-1).

Hezbollah accomplished this level of supervision by putting people on the ground in Iraq. For example, Coalition forces in Iraq captured a senior Hezbollah commander, Ali Mussa Daqduq, in 2007. Daqduq is identified by name in the complaint as a "senior terrorist planner[]" deployed by Hezbollah to Iraq "to direct Jaysh al-Mahdi's campaign of terror against Americans." JA__(¶ 369). During interrogation, he revealed that his mission "was to provide operational planning, tactical training, and to assess the capability of the Shia insurgents," while also playing the "direct role of helping form the [Jaysh al-Mahdi] Special groups and the advising of their leadership at all levels." Briefing Slides for Brigadier Gen. Kevin J. Bergner, Ali Musa Daqduq (AMD) aka. Hamid "The Mute," at 001154 (July 2, 2007) (on file with author). Aided by the Qods Force, Daqduq made four trips into Iraq before his capture in 2007, each lasting four to six weeks. *Id.* at 001157. The Treasury Department found that Daqduq was "responsible for planning and carrying out numerous acts of terrorism in Iraq." Press Release, U.S. Dep't of the Treasury, Treasury

Designated Hizballah Commander Responsible for American Deaths in Iraq (Nov. 19, 2012) (citation omitted), https://www.treasury.gov/press-center/press-releases/Pages/tg1775.aspx. This level of on-the-ground involvement goes well beyond general "encouragement"; it shows that senior Hezbollah operatives were involved in day-to-day affairs.

Finally, it matters that when Hezbollah did all this, it specifically intended to cause terror attacks against Americans in Iraq. Hezbollah helped create Jaysh al-Mahdi and its Special Groups for the purpose of carrying out attacks against Coalition forces. It provided Jaysh al-Mahdi with training, weapons, and funding to ensure that Jaysh al-Mahdi would be effective in that purpose. Hezbollah's leaders repeatedly incited Iraqi Shi'as to violence against the United States through *fatwas*, sermons, speeches and publications—using their religious and moral authority to direct Jaysh al-Mahdi's terrorist activities. Jaysh al-Mahdi fighters, in turn, identified as Hezbollah, swore fealty to Hezbollah, and sought to carry out Hezbollah's agenda in Iraq. By all appearances, the attacks that injured plaintiffs were part of a Hezbollah and Qods Force agenda—carried out by Jaysh al-Mahdi proxies, but masterminded by FTOs.

## II. An Interpretation of JASTA That Does Not Reach the Attacks in This Case Would Undermine the Statute's Stated Purpose

Based on the foregoing, the Court should hold that Hezbollah committed, planned, and/or authorized the attacks in this case, such that JASTA's provision for aiding and abetting applies. 18 U.S.C. § 2333(d)(2). Even under the district court's framing, which is that the statute applies only if an FTO had a significant role in a particular attack, JA__(Op. 23-24), the complaint states a claim because it alleges that Hezbollah played an indispensable role in the attacks that injured plaintiffs.

At the outset, JASTA cannot be limited to cases in which an FTO operative pulled the trigger or detonated the explosive that caused the injury. Such an interpretation would read the words "planned" and "authorized" out of the statute. It would also read the word "committed" unduly narrowly, because the process of committing an attack surely includes more than just the very last moment of the attack. Put simply, JASTA must apply to attacks in which an FTO was involved, but the actual violence was perpetrated by somebody else. That makes sense because, as explained above, FTOs frequently act through proxies. To the

extent the district court held otherwise, its decision cannot be reconciled with the text of the statute and should be emphatically rejected.

The most straightforward path to reversal here is to hold that Hezbollah planned and/or authorized the attacks in this case. At the pleading stage, this allegation need only be plausible. The complaint easily meets that standard.

With respect to "planning," the attacks in question fell within Hezbollah's large-scale plans for the region, and its day-to-day plans as well. As the complaint alleges, and as we know, Hezbollah's plan was to attack Americans in Iraq using local proxies, including specifically Jaysh al-Mahdi, which was formed with assistance from Hezbollah for this purpose. This plan was not just a vague aspiration; it included the use of specific weapons, such as explosively formed penetrators and rockets, which required specialized training to manufacture and deploy—and were specifically designed to be used against armored Coalition vehicles. Those weapons, or the unusual parts for them, came from Iran, and were delivered by the Qods Force or Hezbollah to Jaysh al-Mahdi for use on Americans in Iraq. They were used by Jaysh al-Mahdi operatives who had been trained by Hezbollah and the Qods Force. We also know from

the confessions of high-level Hezbollah operatives like Daqduq, as well as sworn statements from multiple high-ranking American military officers, that Hezbollah's planning included day-to-day operational instructions provided by Hezbollah operatives in Iraq to Jaysh al-Mahdi terrorists. Thus, the strategic and operational framework—*i.e.*, the "plan"—for each attack that injured plaintiffs was masterminded by FTOs. Indeed, the complaint alleges that but for these FTOs' plans, the attacks could not have occurred. That is enough for an attack to have been "planned" by an FTO under JASTA.

It would make little sense to require more—*e.g.*, to require a plaintiff to show that Hezbollah operatives planned every detail of the attack—for two reasons. First, requiring such granularity would place an impossible burden of proof on the victims of terrorism and their families, who will almost never have access to the shadowed conversations that precede individual attacks. *Cf. Stansell v. Revolutionary Armed Forces of Colom.*, 771 F.3d 713, 732 (11th Cir. 2014) (tailoring the "proper standard" in light of the "realities of terrorism"); *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 508 (E.D.N.Y. 2012) (noting "realities" of terrorism in interpreting ATA).

Second, a more granular planning requirement is inconsistent with how decentralized terror networks behave. Many designated FTOs, including the Qods Force and Hezbollah, use proxies to attack Americans. *See U.S. Policy Towards the Islamic Republic of Iran: Hearing Before the S. Comm. on Armed Servs.*, 111th Cong. 15, 19 (2010) (statement of Lt. Gen. Ronald L. Burgess, Dir. of the Def. Intel. Agency) (explaining that the Qods Force generally "directs and supports groups actually executing the attacks, thereby maintaining plausible deniability within the international community"); Matthew Levitt, *Hezbollah: A Case Study of Global Reach*, Remarks to a Conference on "Post-Modern Terrorism: Trends, Scenarios, and Future Threats" at 4 (Sept. 8, 2003), https://www.aclu.org/files/fbimappingfoia/20111110/ACLURM001616.pdf ("Hezbollah is extremely adept at recruiting members from local populations in areas where they have networks on the ground."). Inevitably, the use of proxies involves a degree of delegation. Low-level terrorists may choose, for example, the exact target or timing of an attack. It is implausible that when Congress enacted a statute designed to provide Americans injured by acts of terrorism with the "broadest possible basis" to seek relief, JASTA § 2(b), it intended to place such

attacks—which carry out the FTO's wishes, and would not have occurred but for the FTO's involvement—beyond the statute's reach because the FTO did not micromanage the details.

Independent of planning, JASTA's threshold condition is met if an FTO "authorized" the attack. The complaint plainly alleges this. It alleges that Jaysh al-Mahdi acted as a proxy for Hezbollah and the Qods Force, pursuing those FTOs' agenda in Iraq. It also alleges that Hezbollah's leaders issued orders to carry out attacks like the ones in this case, while Hezbollah's operatives on the ground provided the training, resources, weapons, and knowhow to make the attacks happen. Moreover, there is no suggestion in the complaint that in committing the attacks in this case, Jaysh al-Mahdi was doing anything other than what Hezbollah intended for it to do. That is enough to plead that the attacks were authorized by Hezbollah.

A more granular showing of authorization is not required. FTOs are entirely capable of delivering blanket authorizations to their proxies, and there is no reason to treat the victims of attacks pursuant to those broad authorizations as any less deserving of relief than the victims of attacks that were authorized individually. When, as here, an FTO calls for

attacks against Americans—and when other terrorists answer that call by killing and maiming Americans—Congress intended to provide the broadest possible basis for relief.

The district court worried that if the statute were read this way, "a plaintiff could bring an ATA aiding-and-abetting claim for any attack committed by a non-FTO merely because it had in the past received 'material support and resources' from a designated FTO." JA__(Op. 25) (citation omitted). That is simply not true. Not every form of material support or resources will constitute authorization or planning for attacks. A small donation of cash for a charitable purpose, for example, clearly would not count. But when, as here, an FTO trains the members of a non-FTO how to emulate the FTO's terrorist attacks; when it provides specialized weapons and other resources to facilitate those attacks; when its leaders issue *fatwas* and sermons inciting such attacks; and when it sends high-ranking operatives to help with the attacks, there is nothing wrong with imposing liability if the non-FTO then kills Americans. Concerns about overbroad liability standards are especially misplaced when, as here, a non-FTO like Jaysh al-Mahdi openly aligns itself with Hezbollah and against the United States, because nobody at the time

could plausibly have believed that aiding and abetting Jaysh al-Mahdi's attacks was innocent behavior.

The flip-side argument is equally compelling. The district court's holding risks placing essentially all terrorism-by-proxy cases outside of JASTA's reach. Under the district court's reading of the statute, an FTO can provide critically important weapons and training to a specific group within a specific geography, along with encouragement to kill nearby Americans, and the recipient can publicly agree with that mission and then carry it out according to the FTO's playbook—but as long as the FTO does not get into the weeds of any particular attack, nobody who aided and abetted the attacker is liable. Or in the alternative, the FTO can expand into a new geography by creating a splinter group with a new name, which acts as a proxy for the original FTO, and again JASTA will be thwarted with respect to the splinter group's attacks. That result ignores the realities of modern terrorism, and the Court should not accept it.

## CONCLUSION

This Court should reverse the judgment below.

Respectfully submitted,

/s/Tejinder Singh

Tejinder Singh
Erica Oleszczuk Evans
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Avenue
Suite 850
Bethesda, MD 20814
Telephone: (202) 362-0636
Facsimile: (866) 574-2033
tsingh@goldsteinrussell.com

January 19, 2021

## APPENDIX: THE AMICI

1. **General (Ret.) George W. Casey Jr.** served as the senior U.S. military commander in Iraq from June 2004 to February 2007, commanding Multi-National Forces – Iraq before being succeeded by General Petraeus. From April 2007 to April 2011, General Casey served as the 36th Chief of Staff of the U.S. Army.

2. **General (Ret.) Stan McChrystal** is a retired four-star general who commanded the U.S. and International Security Assistance Forces (ISAF) Afghanistan and the nation's premier military counter-terrorism force, the Joint Special Operations Command (JSOC). As head of JSOC, he commanded special-operations forces in Iraq focused (among other things) on countering Iran's and Hezbollah's role in sponsoring attacks by Shiite terrorists against U.S. forces.

3. **General (Ret.) Vincent Brooks** retired from the U.S. Army in 2019 after 39 years of service. In his final assignment, he commanded all American, South Korean, and multinational forces in the Republic of Korea. He served as a commanding general or deputy commanding general for 12 consecutive years, including 6 years focused on the Middle

East. In addition, he developed the National Military Strategic Plan for the War on Terrorism in 2004.

4. **General (Ret.) James T. Conway** was the 34th Commandant of the U.S. Marine Corps and served multiple command tours in Iraq.

5. **General (Ret.) James D. Thurman** retired from U.S. Army in 2013 after more than 38 years of service. He was Commander of US Forces Korea from 2011 to 2013 and Commander, US Army Forces Command 2010 to 2011. He served as the Army G3/5/7 from 2007 to 2010. He commanded 4th Infantry Division at Fort Hood, Texas and Baghdad, Iraq from 2004 until January 2007. During that period, he deployed the Division to Iraq and in 2006 assumed Command of Multi Division Baghdad with responsibility for all coalition operations in Baghdad.

6. **Lieutenant General (Ret.) H.R. McMaster** retired from the U.S. Army in 2018 after 34 years of service. From 2005 to 2006, he commanded the 3rd Armored Cavalry Regiment (3rd ACR) deployed to South Baghdad and Tal Afar, Iraq. From February 2007 to May 2008, he served as adviser to the Commanding General of Multi-National Force-Iraq. From 2008 to 2017, his served as Director, Concept Development

and Learning at Training and Doctrine Command (TRADOC); Commander of Task Force Shafafiyat in Afghanistan; Commander of the Army's Maneuver Center of Excellence at Fort Benning; and Deputy Commander, Futures at TRADOC. In February 2017, he was appointed the nation's 26th National Security Advisor.

7. **Lieutenant General (Ret.) Douglas E. Lute** served as the Operations Officer at U.S. Central Command from 2004-2006, the Director of Operations at the Joint Staff from 2006-2007, and then as Assistant to the President and Deputy National Security Advisor for President Bush from 2007-2009.

8. **Lieutenant General (Ret.) Sean B. MacFarland** retired from the U.S. Army in 2018 after 37 years of service. He served as Deputy Commanding General/Chief of Staff, United States Army Training and Doctrine Command and as the Commanding General of Combined Joint Task Force – Operation Inherent Resolve from 2015 to 2016, leading the campaign against ISIS in Iraq and Syria. In 2006, he served as a brigade combat team commander with the 1st Armored Division in Anbar Province from 2006 to 2007 and was instrumental in forming the "Anbar

Awakening." Following this assignment, he served on the Joint Staff as Chief of the Iraq Division, during the peak of the "Surge."

9. **Lieutenant General (Ret.) John F. Mulholland** commanded the 5th Special Forces Group (Airborne). In this role, he led the Combined Joint Special Operations Task Force-West (Task Force Dagger), which participated in the opening phase of Operation Iraqi Freedom until June 2003. He later served in Iraq as the Deputy Commanding General, Joint Special Operations Command (JSOC) between 2006 and 2007. From 2007 until 2008, he commanded all theater special operations forces in Iraq while serving as the Commanding General, Special Operations Command Central. He also served as the Deputy Commander, United States Special Operations Command (USSOCOM) from 2012 until 2014.

10. **Lieutenant General (Ret.) Michael Oates** retired from the U.S. Army in 2011 after 32 years of service. From November 2003 through March 2004, he served as Chief of Staff to the Deputy Administrator and Chief Operating Officer, Coalition Provisional Authority ("CPA") in Baghdad. From June 2004 to February 2007, he served as Deputy Commanding General (Operations), 101st Airborne

Division at Fort Campbell, Kentucky and Operation Iraqi Freedom, Iraq. He assumed command of the 10th Mountain Division in April 2007, and in June 2008 he assumed command of Multi-National Division Center/South, Operation Iraqi Freedom, Iraq. From December 2009 through April 2011, he served as the Director of the Joint Improvised Explosive Device Defeat Organization (JIEDDO).

11. **Lieutenant General (Ret.) Ken Tovo** was the commander of the 10th Special Forces Group (Airborne) from July 2005 until November 2007. As such, he was the commander of the Combined Joint Special Operations Task Force – Arabian Penninsula (CJSOTF-AP) from late January 2006 until September 2006, and then from March 2007 until November 2007. His Task Forces conducted numerous operations against JAM and JAM Special Groups.

12. **Lieutenant General (Ret.) Keith C. Walker** served as the Chief of Staff, 1st Cavalry Division, III Corps, Fort Hood, Texas during Operation Iraqi Freedom in Iraq from July 2003 until May 2005. He later served as the Commanding General, Iraq Assistance Group, Operation Iraqi Freedom, Iraq from June 2008 until June 2009. Prior to his

retirement, he served as Director of the U.S. Army Capabilities Integration Center.

13. **Lieutenant General (Ret.) Sir Graeme Lamb** is a retired British Army officer of 38 years of experience and a former Commander of the British Field Army. He served as Deputy Commander to General David Petraeus in Iraq, commanding Multi-National Forces – Iraq.

14. **Brigadier General (Ret.) Ricky Gibbs** commanded the 4th Brigade Combat Team during the Surge in Iraq, during which his soldiers fought JAM and al-Qaeda for 15 months.

15. **Brigadier General (Ret.) Jon Lehr** served in the U.S. Army for 35 years, including the Iraq Surge from 2007-2008. During this period, he served as Commander of the 4th Brigade Combat Team deployed to Diayala Province, Iraq.

16. **Colonel (Ret.) Greg Baine** commanded the Combined Task Force 2-30 Infantry in Iraq, during which he led an organization of 1,100+ U.S. combat forces and foreign partners assigned to multiple units deployed to Baghdad, Iraq, from November 2007 to February 2009, as part of Operation Iraqi Freedom.

17. **Colonel (Ret.) Robert M. Balcavage** enlisted in the U.S. Army in 1983, was commissioned in the Infantry through USMA, and served in the Army for 30 years, to include commanding the 1st Battalion, 501st Infantry, during 15 months of the Surge, in Babil Province, Iraq, 2006-2007.

18. **Colonel (Ret.) Daniel (Dan) Barnett** retired after over 27 years of service in the U.S. Army and commanded the 1st Squadron, 2d Cavalry Regiment during Operation Iraqi Freedom from 2007 to 2009 in the Jaysh al-Mahdi stronghold of Sadr City.

19. **Colonel (Ret.) Greg Bell** commanded the 2-377 Parachute Field Artillery Regiment, 4th Brigade Combat Team (Airborne) operating as Task Force Steel, a combined Fires and Maneuver Task Force for 15 months in Iraq. The battalion primarily operated from FOB Kalsu in the Sunni-Shia Triangle.

20. **Colonel (Ret.) Beverly Beavers** served as the Operations Officer for the 21st Combat Support Hospital, 1st Medical Brigade from March 2003-February 2004 at Camp Anaconda, Balad, Iraq.

21. **Colonel (Ret.) Leo E. Bradley III** served in the U.S. Army from 1986 to 2015, mostly in Explosive Ordnance Disposal (EOD)

capacities. Mr. Bradley commanded the 184th Ordnance Battalion (EOD) in Iraq from December 2004 through December 2005, which comprised most of the EOD resources in Iraq at that time. From June 2011 through July 2012, he exercised operational control over all U.S. Army, Navy, and Air Force (along with some NATO) EOD and counter-IED resources in Afghanistan as the commander of Combined Joint Task Force Paladin.

22. **Colonel (Ret.) Nycki Brooks** served as an Executive Officer to the Senior Intelligence Officer (J2) Multi-National Forces–Iraq (MNF-I) from 2003 to 2005, then as Director of the Analytic Center for MNF-I from 2006-2007 and thereafter as Special Advisor to Commanding General, MNF-I from 2007 to 2009. During that time, she was one the U.S. Army's leading subject matter experts on Shi'a insurgent groups that operated in Iraq between 2003 and 2011. She later served as J2/Director of Intelligence, Combined Joint Special Operations Command–Afghanistan from 2015 to 2016.

23. **Colonel (Ret.) Bryan Denny** served in Iraq from 2004-2006 with the 2nd Squadron, 14th Cavalry, 1st Brigade, 25th Infantry Division, and then again from 2007-2009 as the Deputy Commander of the 2nd Cavalry Regiment.

24. **Colonel (Ret.) Kevin Lutz** served from 2001 through 2003 as an explosive ordnance disposal ("EOD") battalion commander who led EOD and counter-improvised explosive device ("C-IED") operations in Afghanistan during Operations Enduring Freedom I and II, and in 2003 through 2004 as a Lieutenant Colonel selected by the Department of the Army's Vice Chief of Staff to stand up the Army IED Improvised Explosive Device] Task Force. In June 2005, he was selected to establish and command all EOD and C-IED efforts in Iraq.

25. **Colonel (Ret.) Patrick Mackin** served as a Lieutenant Colonel in Baghdad and Diyala Province from April 2007 through June 2008 with the U.S. Army's 4th Stryker Brigade.

26. **Colonel (Ret.) Mark E. Mitchell** is a retired U.S. Army Special Forces colonel and former Acting Assistant Secretary of Defense for Special Operations and Low-Intensity Conflict; he also served as a Director for Counterterrorism on the National Security Council. While on active duty he served in Iraq every year from 2003-2011 and commanded an Iraq-wide joint special operations task force from 2010-2011.

27. **Colonel (Ret.) Chad McRee** commanded the 759th Military Police Battalion, which he led as a battalion Task Force in Iraq from

August 2006-November 2007. He later served as Director of the Army's Anti-Terrorism Operations Intelligence Center in the Pentagon.

28. **Colonel (Ret.) James Phillips** commanded a Cavalry Squadron as part of 2d Brigade, 2d Infantry Division assigned to the 4th Infantry Division and the 1st Cavalry Division in Baghdad from October 2006-December 2007, during the surge.

29. **Colonel Eric Schacht** served multiple tours in Iraq, including as the commander of an 808-person Infantry Task Force deployed to Samarra and Adhamiyah.

30. **Colonel (Ret.) Frank Sobchak** commanded a Special Forces Company in combat in Ninewah Province, Iraq in 2005. He was also the Senior Director and co-editor for the official U.S. Army operational study of the Iraq War sponsored by the Chief of Staff of the Army.

31. **Colonel (Ret.) David Sutherland** served in the U.S. Army for more than three decades and commanded at all levels including combat Brigade Command during Surge Operations in Iraq. He was one of the Surge Brigade Commanders and the Coalition force commander in the volatile Diyala Province from October 2006-December 2007.

32. **Dr. and Lieutenant Colonel (Ret.) Jeanne Godfroy** is a retired U.S. Army Military Intelligence Officer who served three 12-month tours in Iraq (2003-04, 2004-05, and 2007-08). She leveraged those experiences as one of the authors of the two-volume *U.S. Army in the Iraq War*, in which she researched and wrote extensively about Iraq's insurgent and terrorist activity.

33. **Lieutenant Colonel (Ret.) Mark Grdovic** is a retired Army Special Forces officer. He was involved in the 2003 invasion of North Iraq and returned in 2007-2008 with Combined Joint Special Operations Task Force – Arabian Peninsula. During this tour of duty, he served as the MNF-I Commander's envoy to Prime Minister Maliki during the JAM uprising and crisis in Basra.

34. **Dr. and Lieutenant Colonel (Ret.) John Nagl** was the Operations Officer of Task Force 1-34 Armor in Al Anbar, Iraq from 2003-04. A Rhodes Scholar with a doctorate from Oxford University, he is the author of *Learning to Eat Soup with a Knife* (University of Chicago Press) and helped write the U.S. Army/Marine Corps Counterinsurgency Field Manuel.

35. **Lieutenant Colonel (Ret.) Troy Perry** commanded 2-69 Combined Arms Maneuver Battalion, 3rd Brigade, 3rd Infantry Division from 2006-2008. The battalion conducted combat operations in Baghdad, Iraq (Karada Peninsula) from March 2007 to May 2008 as part of the Surge.

36. **Lieutenant Colonel (Ret.) Steve Wood** was the Executive Officer and Aide de Camp to the Multi-National Force Iraq Chief for Intelligence in Baghdad, Iraq from 2006-07. He was later part of the Directors Initiative Group at JIEDDO from 2007-09 where he focused on strategic planning and intelligence in support of the Iraq and Afghanistan theaters.

37. **Lieutenant Colonel (Ret.) Matt Zais** was the executive officer of the Chief of Staff of the Army's Operation Iraqi Freedom Study Group and a co-author of the two-volume *U.S. Army in the Iraq War*. He later served as the director for Iraq on the National Security Council.

38. **Command Sergeant Major (Ret.) Glenn Patti** was part of the Special Operations Task Force in Iraq for Counter Malign Iranian Influence in 2007.

39. **Andrew Faldini** is a former Senior Executive with DOD and the Intelligence Community, whose rank was the civilian equivalent of a General Officer, who was Chief, Counterterrorism Operations, Iraq Survey Group, Defense Intelligence Agency in 2004.

40. **Professor Todd Huntley** is the director of the National Security Law Program at the Georgetown University Law Center. He previously served as the Chief, Information Operations Law at U.S. Special Operations Command and as the legal advisor to the Joint Military Information Support Command.

41. **Nicholas G. Kikis** is a former Senior Executive with DOD and the Intelligence Community, whose rank was the civilian equivalent of a General Officer, with 33 years of U.S. Government service, spanning all aspects of organizational leadership, risk management, and global operations.

42. **Russell L. McIntyre** served from 2004-2014 as a member of the Department of Defense to include from 2008 to 2014 as a member of the Senior Executive Service where he worked closely with the Joint Improvised Explosive Device Defeat Organization (JIEDDO), other Department of Defense agencies, the Federal Bureau of Investigation

and allied governments to develop and deploy Counter-Improvised Explosive Device (C-IED) technology, techniques, tactics and procedures.

43. **Dr. Daveed Gartenstein-Ross** is the Chief Executive Officer of the private firm Valens Global, is an analyst and scholar whose career has focused on understanding terrorist groups and other violent non-state actors. Dr. Gartenstein-Ross's previous positions include Senior Advisor to the Director of the U.S. Department of Homeland Security's Office for Community Partnerships and Adjunct Assistant Professor in Georgetown University's Security Studies Program.

44. **Bill Roggio** is a Senior Fellow at the Foundation for Defense of Democracies and Co-Founder and Editor of the Long War Journal. He is a military veteran and was embedded with the U.S. Marine Corps, U.S. Army, and Iraqi Forces in Iraq between 2005 and 2008.

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and D.C. Cir. R. 32(e)(1), this document contains 4,342 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook font.

January 19, 2021

/s/ Tejinder Singh
Tejinder Singh

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system on January 19, 2021. All participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ Tejinder Singh

Tejinder Singh