ORAL ARGUMENT NOT YET SCHEDULED

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

### No. 20-7077

_____

JOSHUA ATCHLEY, *ET AL.*,
*Plaintiffs-Appellants*,

v.

ASTRAZENECA UK LIMITED, *ET AL.*,
*Defendants-Appellees.*

_____

On Appeal from the United States District Court
for the District of Columbia
Case No. 1:17-cv-02136 (Hon. Richard J. Leon)

_____

## BRIEF OF EIGHT UNITED STATES SENATORS
## AS *AMICI CURIAE*
## IN SUPPORT OF PLAINTIFFS-APPELLANTS

_____

Michael A. Petrino
Jonathan E. Missner
**STEIN MITCHELL BEATO &
MISSNER LLP**
901 Fifteenth St., NW, Suite 700
Washington, D.C. 20005
(202) 737-7777
mpetrino@steinmitchell.com

*Counsel for* Amici Curiae

January 19, 2021

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), *amici curiae* certify that:

## A. Parties and Amici

All parties, intervenors, and *Amici* appearing in the District Court and before this Court are listed in the Brief for Plaintiffs-Appellants.

## B. Rulings Under Review

The rulings under review are listed in the Brief for Plaintiffs-Appellants.

## C. Related Cases

*Amici Curiae* are not aware of this case having been previously before this Court or any other court, or of any pending related cases.

# CERTIFICATION REGARDING A SEPARATE BRIEF

Pursuant to Circuit Rule 29(d), *amici* certify that a separate *amicus* brief was necessary because the *amici* joining this brief, United States Senators, seek only to discuss the specific points for which their interest and expertise is most relevant. Other *amici* would not have the same interest or expertise in making these points, and so the inclusion of these points in an omnibus *amicus* brief would not be feasible. Similarly, the *amici* here know less about other legal issues in this case, which are beyond *amici*'s interest or expertise, and thus cannot join a single brief that addresses those other legal issues.

January 19, 2021

/s/ *Michael. A. Petrino*

Michael A. Petrino
*Counsel for* Amici Curiae

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS,
AND RELATED CASES..................................................................i

CERTIFICATION OF A SEPARATE BRIEF..........................................ii

TABLE OF CONTENTS ...........................................................iii

TABLE OF AUTHORITIES.........................................................iv

IDENTITY, INTERESTS OF *AMICI CURIAE*,
AND SOURCE OF AUTHORITY TO FILE........................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ..........................3

ARGUMENT ........................................................................9

I.  Congress Enacted The ATA (And JASTA) To Provide
U.S. Terror Victims With A Civil Remedy Based On
Common Law Tort Principles And To Disrupt Terror Financing.....9

    A.  ATA: Section 2333(a)..................................................9

    B.  JASTA: Section 2333(d) ...........................................14

    C.  The *Halberstam v. Welch* Framework ............................17

    D.  The *Halberstam* Framework Applied To JASTA Cases.......20

II.  The District Court Committed Three Reversible Errors.............23

    A.  The District Court Incorrectly Held That
§ 2333(d)(2) Requires A "Direct Link Between
The Defendants And The Individual Perpetrator."..............23

    B.  The District Court Mistakenly Suggests That
Financing Alone Is Not Actionable And Also That
Plaintiffs Must Link A Defendant To A Specific Attack......27

    C.  The District Court's "One In Spirit"
Requirement Contravenes *Halberstam* And
Incorrectly Imposes A Specific Intent Standard. ................30

CONCLUSION .....................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)..............................................21

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)..............................................21

*Boim v. Holy Land Found. for Relief and Dev.,*
  549 F.3d 685 (7th Cir. 2008) (*en banc*) ("*Boim III*") ........ 5, 8, 15, 18, 27

*Central Bank of Denver, N.A. v.*
  *First Interstate Bank of Denver, N.A.,*
  511 U.S. 164 (1994)..............................................5

*Direct Sales Co. v. United States,*
  319 U.S. 703 (1943)..............................................22

*Gill v. Arab Bank, PLC,*
  893 F. Supp. 2d 474 (E.D.N.Y. 2012) ................................30

*Goldberg v. UBS AG,*
  660 F. Supp. 2d 410 (E.D.N.Y. 2009) ...............................30

*Halberstam v. Welch,*
  705 F.2d 472 (D.C. Cir. 1983)................3, 6, 7, 8, 15, 16, 17, 18, 19, 20,
                                     21, 22, 26, 27, 29, 31, 32, 33

*Lelchook v. Islamic Republic of Iran,*
  393 F. Supp. 3d 261 (E.D.N.Y. 2019) ...............................30

*Linde v. Arab Bank, PLC,*
  882 F.3d 314, 329 (2d Cir. 2018) .............................. 8, 16, 32

Authorities principally relied on are designated by an asterisk (*).

iv

*Linde v. Arab Bank, PLC*,
  97 F. Supp. 3d 287 (E.D.N.Y. 2015),
  *vacated on other grounds*, 882 F.3d 314 (2d Cir. 2018) ...................... 29

*Miller v. Arab Bank, Pub. Ltd. Co.*,
  372 F. Supp. 3d 33 (E.D.N.Y. 2019) .................................................... 30

*Owens v. BNP Paribas, S.A.*,
  897 F.3d 266 (D.C. Cir. 2018) ............................................................... 5

*Rothstein v. UBS AG*,
  708 F.3d 82, 97-98 (2d Cir. 2013) .................................................... 5, 15

*\*Siegel v. HSBC N. Am. Holdings, Inc.*,
  933 F.3d 217 (2d Cir. 2019) ............................................................ 8, 27

*United States v. Falcone*,
  109 F.2d 581 (2d Cir.), *aff'd*, 311 U.S. 205 (1940) ............................. 22

*United States v. Haldeman*,
  559 F.2d 31 (D.C. Cir. 1976) .............................................................. 32

*United States v. Peoni*,
  100 F.2d 401 (2d Cir. 1938) ............................................................... 18

## Statutes

1 U.S.C. § 1 ........................................................................................ 16

18 U.S.C. § 2333 ............................................................................. 1, 4

18 U.S.C. § 2333(d) ........................... 2, 3, 5, 14, 15, 24, 33

18 U.S.C. § 2333(d)(1) ............................................. 16, 24, 25

18 U.S.C. § 2333(d)(2) ................................. 6, 8, 24, 25, 34

28 U.S.C. § 1605B .......................................................................... 15

50 U.S.C. § 1701 *et seq.* ............................................................... 4

*Justice Against Sponsors of Terrorism Act,
  Pub. L. No. 114-222, 130 Stat. 582 (2016) ................. 2, 6, 7, 15, 16, 17,
  24, 25, 28, 29

The Antiterrorism Act of 1990,
  Pub. L. No. 101-519, 104 Stat. 2250 (1991)......................................... 14

## Other Authorities

*Antiterrorism Act of 1990: Hearing on S.2465*, Testimony before Senate
  Subcomm. on Courts and Admin. Practice of the Senate Comm. on the
  Judiciary, S. Hrg. 101-1198 (1990) ("Senate Hearing")................ 12, 13

Federal Courts Administration Act of 1992,
  S. Rep. 102-342, 102d Cong., 2d Sess. (1992).......................... 5, 14, 28

Statement of Sen. Cornyn,
  162 Cong. Rec. S2845 (daily ed. May 17, 2016). ................................ 16

Statement of Sen. Grassley,
  136 Cong. Rec. S4567 (daily ed. Apr. 19, 1990) ................................ 10

Statement of Sen. Grassley,
  136 Cong. Rec. S14279 (daily ed. Oct. 1, 1990) ................................. 13

## Rules

Circuit Rule 29(d) ...................................................................................... 3

Fed. R. App. P. 29(a)(4)(E) ...................................................................... 1

## IDENTITY, INTERESTS OF *AMICI CURIAE*, AND SOURCE OF AUTHORITY TO FILE[1]

This brief is respectfully submitted by the following eight United States Senators as *amici curiae*:

>Charles E. Grassley
>Richard Blumenthal
>Mike Crapo
>Joni K. Ernst
>James M. Inhofe
>John Kennedy
>Marco Rubio
>Sheldon Whitehouse

*Amici* believe that the civil provisions of the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, are not only an important tool to provide redress to American victims of terrorism and their families, but are also an integral component of our nation's broader strategy to combat the financing of international terrorism and advance vital American national security and foreign policy interests. In fact, Congress expanded and strengthened the ATA by enacting the Justice Against Sponsors of

---

[1] All parties have consented to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* certify that: no party's counsel authored this amicus brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this amicus brief; and no person contributed money that was intended to fund preparing or submitting of this amicus brief.

Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 582 (2016), which created an express cause of action for civil conspiracy and aiding and abetting, codified in 18 U.S.C. § 2333(d).

*Amici* submit this brief due to their concern that a growing body of recent cases, including the decision from the District Court, profoundly misconstrue and misapply the plain language of 18 U.S.C. § 2333(d) and Congress's express intent—codified in JASTA's Findings and Purpose, § 2—by incorrectly applying far more stringent pleading requirements than in analogous aiding-and-abetting contexts. *Amici* believe that Congress intended for those same, bedrock tort principles to apply in JASTA cases.

Furthermore, *amici* strongly believe that federal courts should not diminish or dilute Congress's express, bipartisan efforts to empower United States victims of international terrorism to pursue claims against secondary actors, who aid and abet or conspire with terrorist groups or their agents, alter egos, or proxies.

Finally, Congress expressly incorporated into JASTA—through a direct citation—the civil aiding-and-abetting and conspiracy standards from this Court's still-binding decision in *Halberstam v. Welch*, 705 F.2d

472 (D.C. Cir. 1983). *Amici* have a particular interest in encouraging this Court to faithfully apply the principles from that decision, which governs JASTA aiding-and-abetting cases like this one brought under 18 U.S.C. § 2333(d).

*Amici* take no position on the ultimate merits of Plaintiffs' claims or their ability to marshal evidence to support the facts alleged, but *amici* strongly believe the District Court applied erroneous legal standards to Plaintiffs' § 2333(d) aiding-and-abetting claim. *Amici* therefore urge reversal of the judgment below.

All parties have consented to the filing of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The District Court's ruling is another unfortunate decision in a growing body of cases that reflect unease with applying JASTA's plain text and this Court's *Halberstam* decision. The District Court's decision is contrary to JASTA's text and its express Findings and Purpose. Through both the ATA and JASTA, Congress has empowered United States nationals injured by acts of international terrorism, to sue those who committed such acts as well as those who aided and abetted or conspired with terrorist organizations. Congress established

this civil cause of action not through any novel legal innovation, but rather by simply providing that common law tort principles, routinely applied by federal courts across the country, should *also* apply to suits by U.S. terror victims seeking redress for harms related to terrorist acts.

Congress was not only concerned with providing terror victims, and their close family members, with a means to seek compensation. Through the ATA (and later JASTA), Congress added to its broad framework for disrupting the financial support of terrorist entities. For example, Congress has legislated to deprive designated Foreign Terrorist Organizations ("FTO"), such as Hezbollah, from accessing the U.S. financial system. *See* International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq*. Similarly, the ATA's civil provision, § 2333, imposes liability "at *any* point along the causal chain of terrorism" and "interrupt[s], or at least imperil[s], the flow of money" to terrorist entities. *See* Federal Courts Administration Act of 1992, S. Rep. 102-342, 102d Cong., 2d Sess. at 22 (1992) (emphasis added).[2]

---

[2] Emphasis added throughout unless otherwise indicated.

Although Congress contemplated liability that would track the commonsense principles developed in "the law of torts," *id.* at 48, a body of early cases nonetheless rejected secondary liability under the ATA in light of the Supreme Court's ruling in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164 (1994). *See Boim v. Holy Land Found. for Relief and Dev.*, 549 F.3d 685, 689-92 (7th Cir. 2008) (*en banc*) ("*Boim III*"); *Rothstein v. UBS AG*, 708 F.3d 82, 97-98 (2d Cir. 2013); *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 277-80 (D.C. Cir. 2018) (applying a prior version of the ATA). As Judge Posner held, "statutory silence on the subject of secondary liability means there is none; and section 2333(a) ... does not mention aiders and abettors or other secondary actors." *Boim III*, 549 F.3d at 689.

Accordingly, in 2016, Congress further expanded liability under the ATA by enacting JASTA, which creates an express statutory cause of action for secondary liability. JASTA § 4 (codified at 18 U.S.C. § 2333(d)). Once again, Congress relied on common law tort principles to address the myriad factual scenarios presented by 21st century terrorism. In JASTA, Congress expressly adopted a case from this Court, *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), as "the proper legal framework for how

such liability should function in the context of [the ATA and JASTA]," and Congress expressly noted that *Halberstam* "has been widely recognized as the leading case regarding Federal civil aiding and abetting and conspiracy liability." JASTA § 2(a)(5). Congress also stressed the importance of a broad definition of culpable states of mind in imposing civil liability by providing that "[p]ersons, entities, or countries" that "knowingly or recklessly contribute material support" to terrorist entities should be held accountable both criminally and civilly. *Id*. § 2(a)(6).

*Amici* believe that the District Court misapplied JASTA, by making three reversible errors that, if allowed to stand, would effectively nullify JASTA's "broad" civil relief and national security purpose in deterring support for terrorist organizations, their agents, and proxies.

*First*, the District Court erred by holding that secondary liability requires a "direct link between the defendants and the individual perpetrator." Op. 26. This holding ignores the plain text of § 2333(d)(2), which does *not* contain the word "directly" and contains no language that contradicts JASTA's enacted legislative purpose. That express purpose is to "provide[] civil litigants" with a cause of action "against persons, entities, and foreign countries … that have provided material

6

support, *directly or indirectly*, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA § 2(b).

*Second*, the District Court erred by holding that "general support to JAM" was not sufficient for liability. Op. 24. The court incorrectly imposed the requirement that a JASTA plaintiff must plead a "link between the support and [an individual act]," for example, by pleading that the defendant provided "instructions on how to build a bomb or obtain an assault rifle." *Id.* at 27. This holding directly contradicts this Court's governing standard from *Halberstam*, which only requires Defendants to be generally aware of their role in an enterprise whose foreseeable consequences include terrorism. *See Halberstam*, 882 F.3d at 330. The holding also contradicts Congress's purpose to empower ATA plaintiffs to target terrorist *financing*—not merely provision of direct operational assistance to the terrorists who committed a given attack. Moreover, the District Court's holding, also contradicts the Second Circuit's holding in *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 224 n.5 (2d Cir. 2019) and the Seventh Circuit's holding in *Boim III*, 549 F.3d at 701-02. This Court will create a Circuit split if it affirms the District Court's holding that JASTA requires a "link"

between the material support of terrorist groups and the individual terrorist acts that group commits.

*Third*, the District Court incorrectly held that JASTA requires an aider-and-abettor to be "one in spirit" with terrorists, such that they shared the desire to commit violent attacks. Op. 28. But aiding-and-abetting claims under § 2333(d)(2) require only that a defendant be "generally aware of [a] role in a continuing [terrorist] enterprise" from which violent attacks were a natural and foreseeable consequence. *Halberstam*, 705 F.2d at 488. JASTA does *not* require plaintiffs to show "specific intent"—*i.e.*, that a defendant has an "intent to participate in a criminal scheme as something that he wishes to bring about and seek by his action to make succeed." *See Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018).

If nothing else, the Court should address the harmful results the District Court's ruling threatens to create. For example, under that ruling, victims of terrorism cannot seek compensation from those who knowingly or recklessly finance terrorism. Victims are effectively directed, instead, to bring a meaningless lawsuit against judgment-

proof terrorists—in contravention of both the ATA's and JASTA's purpose to address terrorist financing anywhere in the causal chain.

Moreover, the ruling threatens to license those who transact business with a terrorist group's intermediary—even where there is every reason to know (or to foresee) that the transactions materially support violent terrorist acts. Under this theory, defendants can escape liability simply by proclaiming that they only sought to reap profits, not to finance attacks—thereby washing their hands of their contribution to terrorist violence.

Although Defendants may claim to be agnostic to the source of their profits, the U.S. Code is not. Congress, through JASTA's text, structure, and history, has made the decision to expose intermediaries and terrorist financiers to civil liability. The District Court's contrary opinion should be reversed.

## ARGUMENT

### I. Congress Enacted The ATA (And JASTA) To Provide U.S. Terror Victims With A Civil Remedy Based On Common Law Tort Principles And To Disrupt Terror Financing.

#### A. ATA: Section 2333(a)

In April 1990, Senator Chuck Grassley introduced S.2465, the "Anti-Terrorism Act of 1990." which received strong bipartisan support

in Congress. *See* Statement of Sen. Grassley, 136 Cong. Rec. S4567, S4593 (daily ed. Apr. 19, 1990). Senator Grassley's bill provided in relevant part that "[a]ny national of the United States injured in his person, property, or business by reason of an act of international terrorism may sue therefor in any appropriate district court of the United States ..." *Id.*

From the beginning, it was clear that the legislation aimed not merely to address the issue of victim compensation but also to harness the initiative and resources of the private sector in pursuit of the larger aims of U.S. counterterrorism policy. In the course of introducing the bill, Senator Grassley explained that it "will serve as a further incentive to those with the deep pockets, such as the airline industry, to spend resources and go after terrorists: This bill establishes an express cause of action to gain compensation as fruit of their efforts." *Id.*

In the summer of 1990, the Senate Judiciary Committee's Subcommittee on Courts and Administrative Practice held a hearing on the subject of S.2465. Witnesses included Alan J. Kreczko (Deputy Legal Adviser, Department of State) and Steven R. Valentine (Deputy

Assistant Attorney General, Civil Division, Department of Justice), as well as several family members of persons killed in terrorist attacks and a handful of outside experts. Participants repeatedly took the opportunity to underscore their understanding that § 2333(a) was to be more than just a mechanism for victim compensation; it was also a mechanism for deterring terrorists and disrupting their financial foundations, and thus formed an integral part of U.S. counterterrorism policy.

The first witness, Alan Kreczko, told the Committee that S.2465 would "add to the arsenal of legal tools that can be used against those who commit acts of terrorism against U.S. citizens abroad." *Antiterrorism Act of 1990: Hearing on S.2465*, Testimony before Senate Subcomm. on Courts and Admin. Practice of the Senate Comm. on the Judiciary, S. Hrg. 101-1198, at 11 (1990) ("Senate Hearing"). He explained that the State Department endorsed the bill "as a useful addition to our efforts to strengthen the rule of law against terrorists." *Id.* at 11, 12.

Following Mr. Kreczko, Steven Valentine offered the views of the Justice Department regarding S.2465. Echoing the State Department's position, Mr. Valentine offered a robust endorsement of § 2333(a):

> The department strongly supports the fundamental objectives of Senate bill 2465. They are of great importance to the United States. The enactment of Senate bill 2465 would bring to bear a significant new weapon against terrorists *by providing a means of civil redress for those who have been harmed by terrorist acts* …. Senate bill 2465 would supplement our criminal law enforcement efforts by creating [such a remedy].

Senate Hearing at 25.

In similar fashion, Joseph A. Morris, the President and General Counsel of the Lincoln Legal Foundation, testified that "by its provisions for compensatory damages, treble damages, and the imposition of liability at any point along the causal chain of terrorism, [§ 2333(a)] would interrupt, or at least imperil, the flow of terrorism's lifeblood: money." *Id*. at 85.

In addition, Daniel Pipes (then-director of the Foreign Policy Research Institute) explained that "it is absolutely critical to go after the funds because *he who controls the funds controls the organization. It is not enough simply to go after the footmen, the soldiers, the*

terrorists, the individuals. One must strike at the heart of the organization, and that means going after the funding." *Id.* at 110.

In the wake of this hearing, in late September 1990, the Subcommittee on Courts and Administrative Practice favorably reported the Antiterrorism Act bill. *See* Statement of Sen. Grassley, 136 Cong. Rec. S14279, S14284 (daily ed. Oct. 1, 1990). In the course of introducing the amendment, Senator Grassley explained that the bill would "strengthen our ability to both deter and punish acts of terrorism." *Id.* He concluded by emphasizing the connection between § 2333 and the overall goal of suppressing terror financing:

> We must make it clear that terrorists' assets are not welcome in our country. And if they are found, terrorists will be held accountable where it hurts them most: at their lifeline, their funds. With the Grassley-Heflin bill, we put terrorists on notice: To keep their hands off Americans and their eyes on their assets.

*Id.* The Senate agreed to the amendment without further debate, and the amended bill went on to be enacted as Pub. L. No. 101-519, 104 Stat. 2250 (1991). The Antiterrorism Act of 1990 thus became law in November 1990. *See id.* § 132(b)(4), 104 Stat. 2250, 2251.

Congress's express reference to tort principles dovetailed with its commitment to impose "*liability at any point along the causal chain of*

*terrorism*" and "interrupt, or at least imperil, the flow of money." S. Rep. 102-342, at 22. That approach was intended to preserve the statute's flexibility in addressing terrorism's varying forms. The legislative history of the ATA makes clear that rigid limits and narrow parsing of legal elements were antithetical to Congress's intent. As a key report explains, "the substance of … an action [under the ATA] is not defined by the statute, because the fact patterns giving rise to such suits will be as varied and numerous as those found in the law of torts. This bill opens the courthouse door to victims of international terrorism." S. Rep. 102-342, at 48.

## B. JASTA: Section 2333(d)

JASTA was enacted in 2016 to accomplish two goals: First, to address congressional concerns about asserted claims of sovereign immunity relating to the September 11, 2001 attacks, *see* 28 U.S.C. § 1605B; and second, to expand the ATA by enacting an express cause of action for secondary liability, *see* § 2333(d). This latter section was intended to codify the substantive common law tort analysis set forth in *Boim III*, which cited and relied upon the D.C. Circuit's *Halberstam v. Welch* decision. *See Boim III*, 549 F.3d at 691.

Thus, § 2333(d) codified common law secondary liability, finding it "necessary to recognize the substantive causes of action for aiding and abetting and conspiracy liability under chapter 113B of title 18, United States Code." JASTA § 2(a)(4). It did so in light of and in response to *Boim III*'s holding that "statutory silence on the subject of secondary liability means there is none; and section 2333(a) authorizes awards of damages to private parties but does not mention aiders and abettors or other secondary actors." 549 F.3d at 689. *Accord Rothstein,* 708 F.3d at 97-98.

In this context, Congress enacted JASTA to expand liability. Congress expressly adopted a series of findings and a legislative purpose statement. *See* JASTA § 2. Those legislative findings stated that

> The purpose of this Act is to provide civil litigants with the ***broadest possible basis***, consistent with the Constitution of the United States, ***to seek relief*** against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, ***directly or indirectly***, to foreign organizations or persons that engage in terrorist activities against the United States.

JASTA § 2(b); *see also Linde v. Arab Bank, PLC*, 882 F.3d 314, 320 (2d Cir. 2018) ("Congress enacted JASTA, which expands ATA civil liability.").[3]

Congress effected this broad remedial purpose in two key ways. First, it expanded the definition of "person"—who can be liable under JASTA—to the broadest possible definition, to "include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." § 2333(d)(1) (incorporating the broad definition from 1 U.S.C. § 1).

Second, Congress provided that common law tort principles should apply to JASTA claims, and specifically identified this Court's decision in *Halberstam*, "which has been widely recognized as the leading case regarding Federal civil aiding-and-abetting and conspiracy liability, including by the Supreme Court of the United States," as providing "the proper legal framework for how such liability

---

[3] As Sen. Cornyn explained, JASTA "helps fulfill the promise of the original Anti-Terrorism Act, which was intended to 'interrupt, or at least imperil, the flow of money' to terrorist groups." 162 Cong. Rec. S2845, S2846 (daily ed. May 17, 2016).

should function in the context of chapter 113B of title 18, United States Code [*i.e.*, the ATA's civil and criminal provisions]." JASTA § 2(a)(5).

Taken together, the expansive definition of "person" and the reliance on *Halberstam* create a broad liability statute. The reasons for Congress's approach are set forth in the statute's Findings, which include:

- Some terrorist organizations act through affiliated groups or individuals and raise significant funds outside of the United States.
- Persons, entities, or countries that knowingly or recklessly contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism necessarily direct their conduct at the United States.

*See* JASTA §§ 2(a)(3), 2(a)(6).

## C.    The *Halberstam v. Welch* Framework

Congress deliberately identified this Court's decision in *Halberstam v. Welch* as the proper framework for civil aiding-and-abetting and conspiracy liability under the ATA. The decision squares with the ATA's purpose to cut off the support to FTOs regardless of the accessorial tortfeasor's motivation because it clarifies that civil secondary liability reaches not just those who intend to cause violence, or who choose to facilitate that violence, but also those who choose to

support criminal or tortious enterprises that *foreseeably* lead to violence.

For more than sixty years, federal courts have recognized the important distinction between criminal and civil aiding-and-abetting liability. As Judge Learned Hand explained in *United States v. Peoni*, the intent standard in the *civil* aiding-and-abetting context is that the wrongful conduct be the natural consequence of the defendant's original act, while *criminal* intent to aid and abet requires that the defendant have a "purposive attitude" toward the commission of the offense. 100 F.2d 401, 402 (2d Cir. 1938). While, as Judge Posner correctly noted in *Boim III*, "terrorism is *sui generis*" and analogies to other types of torts will necessarily be imperfect, 549 F.3d at 698, *Halberstam* provides the leading discussion and example of secondary liability for conduct that is not *intended* or even expected to result in violence—but that knowingly supports illicit conduct, the foreseeable consequences of which include violence.

In *Halberstam*, this Court delineated a specific legal framework for civil aiding-and-abetting claims. Under that framework (and thus under JASTA), Plaintiffs must ultimately establish three elements:

(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of its role as part of an overall illegal or tortious activity at the time it provides the assistance; and (3) the defendant must knowingly and substantially assist the principal violation. *See* 705 F.2d at 487. Regarding substantial assistance, this Court identified six factors to consider: (1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance. *Id.* at 483-84.

*Halberstam*'s facts are just as relevant as its legal framework. There, the defendant, Linda Hamilton, was found civilly liable for aiding and abetting the murder of Dr. Michael Halberstam by her boyfriend, Bernard Welch, during a burglary. *See* 705 F.2d at 474 ("[Ms. Hamilton is] civilly liable, as a joint venturer ... for the killing of Michael Halberstam"). However, Hamilton, who assisted what she claimed was her long-term boyfriend's antiques business, did not know about the murder—or even the burglary:

It was not necessary that Hamilton knew specifically that Welch was committing burglaries. Rather, when she assisted him, ***it was enough that she knew he was involved in some type of personal property crime at night***—whether as a fence, burglar, or armed robber made no difference—because violence and killing is a foreseeable risk in any of these enterprises.

*Id.* at 488. Hamilton acted as her boyfriend's "banker, bookkeeper, recordkeeper, and secretary," and denied knowing of the criminal nature of his "evening forays." *Id.* at 486-87. The Court acknowledged that Hamilton's actions were "neutral standing alone," but nevertheless found that "it defies credulity that Hamilton did not know that something illegal was afoot." *Id.* at 486, 488. Thus, the Court concluded that because she "knew about and acted to support Welch's illicit enterprise," she "had a general awareness of her role in a continuing criminal enterprise." *Id.* at 488. The Court concluded that although she did not intend to facilitate violence, the murder was "a natural and foreseeable consequence of the activity Hamilton helped Welch to undertake." *Id.* at 488.

### D.  The *Halberstam* Framework Applied To JASTA Cases

In most JASTA cases, *Halberstam* is actually broader than necessary. In *Halberstam*, the murder was committed in furtherance

of a criminal enterprise whose object was to profit from the sale of stolen goods. In JASTA cases, violence *is* the predominant object of a terrorist organization's criminal enterprise, and its other illegal conduct supports that primary object. Because the defining feature of terrorist organizations is politically motivated violence, acts of terrorism are not only a foreseeable consequence of providing them with substantial assistance, but an almost certain outcome.

As *Halberstam* noted, "[f]oreseeability is surely an elusive concept and does not lend itself to abstract line-drawing." 705 F.2d at 485. At the initial pleading stage, however, factual allegations need only "be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678-80 (2009). For pleading purposes, therefore, it is clear that violence *may* be a foreseeable consequence of knowingly providing substantial assistance to a terrorist organization in a variety of fact-specific circumstances which rise above the "speculative level."

The District Court appears to express an unease with applying the concept of foreseeability to civil cases in the terrorism context. But the same limitations that apply in those more familiar civil contexts

similarly apply in the JASTA context. For example, merely purchasing a ticket on Iraqi Airways would not subject the purchaser to aiding-and-abetting liability because—aside from arguably not being a "substantial" contribution—violence is not a natural and foreseeable consequence from purchasing an airline ticket. In the same way, unwitting customers of Welch's "antique business" would not be liable for Halberstam's murder.

Criminal law provides a useful analog. There, the law considers whether an accessory's assistance has "inherent capacity for harm" and whether providing the assistance is itself illegal or "neutral, standing alone" as in *Halberstam. Compare Direct Sales Co. v. United States*, 319 U.S. 703, 710-11 (1943) (nature of the assistance "makes a difference in the quantity of proof required to show knowledge") *and United States v. Falcone*, 109 F.2d 579, 581 (2d Cir.), *aff'd*, 311 U.S. 205 (1940) (the legal sale of dry goods useful for distilling alcohol to known bootleggers, although perhaps sufficient for civil secondary liability, is insufficient for criminal secondary liability).

Particularly at the pleading stage, plausibility rests in part on either the nature of the conduct alleged (whether it is itself unusual or

overtly illegal) or whether the assistance is rendered to facially "legitimate agencies, operations, and programs" or to persons or entities engaged in unlawful or violent activities. The more unusual or self-evidently criminal the assistance, the more plausible the allegation that violence is a foreseeable consequence of such conduct. Similarly, the more closely linked an entity or person is to terrorism or support for other violent activities, the more plausible the allegation that violence is a foreseeable consequence of the assistance given to that entity or person.

## II. The District Court Committed Three Reversible Errors.

Against this legal backdrop, the District Court's decision contains three fundamental errors, each of which provides an independent basis to reverse.

### A. The District Court Incorrectly Held That § 2333(d)(2) Requires A "Direct Link Between The Defendants And The Individual Perpetrator."

The District Court's "direct link" holding, Op. 26, if permitted to stand, suggests that § 2333(d)(2) precludes liability when a defendant knowingly aids-and-abets (or conspires with) an individual terrorist agent, alter ego, or proxy of a terrorist organization that did not

himself or herself commit the acts of terrorism at issue. This is incorrect.

The word "directly" does not appear in § 2333(d)(2). But twice in JASTA's findings, Congress expressly stated its intention that civil liability under § 2333(d) include contribution of material support or resources "directly *or indirectly*." JASTA §§ 2(a)(7), (2)(b). This is because terrorist organizations often use agents and alter egos to both raise funds for their activities and to perpetrate terrorist attacks. *Id.* at § 2(a)(3) ("Some foreign terrorist organizations, acting through affiliated groups or individuals, raise significant funds outside of the United States for conduct directed and targeted at the United States.").

Congress's intent is also evident from its broad use of the term "person" in § 2333(d)(1) and (2). The District Court's ruling would have this Court erroneously hold that § 2333(d)(2) requires that the defendant assist the individual perpetrator who committed the attack in § 2333(d)(2)'s second clause. This reading is textually unsupported.

Congress *could* have drafted § 2333(d)(2) to read:

In an action under [§ 2333(a)] for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization ... as of the date on which such

act of international terrorism was committed, planned, or authorized, liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the **individual** who committed such an act of international terrorism.

Congress's choice to use the word "person" and specifically define it "expansively" in § 2333(d)(1) was intended, as explained above, to deter terrorist organizations that "act[] through affiliated groups ... [to] raise significant funds outside of the United States," and reflected an awareness that those who "knowingly or recklessly contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism necessarily direct their conduct at the United States." JASTA §§ 2(a)(3) and 2(a)(6).

*Halberstam* confirms that secondary liability can exist even if a defendant has not acted directly with the person who performs the specific act that causes injury. Indeed, this Court—in the context of conspiracy—specifically opined that "[a] conspirator need not participate actively in or benefit from the wrongful action in order to be found liable. He need not even have planned or known about the injurious action ... so long as the purpose of the tortious action was to

advance the overall object of the conspiracy." 705 F.2d at 481. This Court carried over the principle of indirect assistance to its aiding-and-abetting analysis by holding that a defendant need only be *"generally aware of his role* as part of an overall illegal or tortious activity." *Id.* at 487-88. The Court also held that "a person who assists a tortious act may be liable for *other reasonably foreseeable acts* done in connection with it." *Id.* at 484. This Court did not require, as the District Court appears to, that a defendant must directly facilitate the wrongdoing that caused the injury.

Finally, the District Court's statement that "numerous courts" have endorsed the "direct link" requirement provides this Court with little support for affirmance. Op. 26. As explained immediately above, this Court's decision in *Halberstam* directly contradicts the District Court's "direct link" holding. More so, the Second Circuit—which encompasses district courts in which many JASTA cases are brought—has expressly held that "the statute does not, by its terms, limit aiding-and-abetting liability to those who provide direct support to terrorist organizations." *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 224 n.5 (2d Cir. 2019). And the Seventh Circuit in *Boim III* addressed

donations to a purported "charity"—the Holy Land Foundation, that did not itself commit violent terrorist acts—upholding a judgment against two groups who gave money to the Foundation knowing the money was being funneled to Hamas and also holding "donors to terrorism [should not] be able to escape liability because terrorists and their supporters launder donations *through a chain of intermediate organizations*." 549 F.3d 685, 701-02. Accordingly, the District Court's "directness" requirement, if affirmed by the Court, would not only contradict a prior decision of this Court, but would also create a circuit split with the Second and Seventh Circuit.

The Court should therefore reverse the District Court's unsupported "directness" requirement.

## B. The District Court Mistakenly Suggests That Financing Alone Is Not Actionable And Also That Plaintiffs Must Link A Defendant To A Specific Attack.

The District Court held that a JASTA plaintiff must plead a "link between [the] support and the principal violation," Op. 28, for example, pleading that the defendant provided "instructions on how to build a bomb or obtain an assault rifle." *Id.* at 27. This is incorrect for two reasons.

*First*, JASTA defendants can be liable even if they do not provide terrorists with materiel or operations support. As explained above, a bedrock purpose of ATA and JASTA is to impose liability "at any point along the causal chain of terrorism" and to "interrupt, or at least imperil, the flow of money." S. Rep. 102-342, at 22. And the ATA's legislative history is replete with references to striking at the source of *financing*.

Moreover, Congress, in JASTA's Findings and Purpose, expressly referred to how "terrorist organizations, acting through affiliated groups or individuals, raise significant funds outside of the United States." JASTA § 2(a)(3). Congress also found JASTA was necessary to provide a cause of action against those who "knowingly or recklessly contribute material support or resources, directly or indirectly." *Id.* § 2(a)(6). Put simply, JASTA provides that "material support or resources" can be *money*—or cash-equivalent goods that can be sold for money—and that money can be provided *indirectly*.

Indeed, in *Halberstam*, Hamilton's contributions cannot be meaningfully traced to the shooting or the gun. Yet this Court affirmed an aiding-and-abetting judgment against her for acting as her

boyfriend's "banker, bookkeeper, recordkeeper, and secretary." *Halberstam*, 705 F.2d at 487.

*Second*, the District Court's ruling incorrectly suggests that a JASTA defendant must materially support a specific attack. But, even as to financial transactions, JASTA does not require plaintiffs to plead (or even show) that specific funds or resources went to fund a specific attack. Lower courts have repeatedly rejected a requirement that plaintiffs trace specific transactions to specific attacks. For example, in *Linde*, an Eastern District of New York court "rejected defendant's argument that plaintiffs were required to trace specific dollars to specific terrorist attacks." *Linde*, 97 F. Supp. 3d 287, 323 (E.D.N.Y. 2015), *vacated on other grounds*, 882 F.3d 314 (2d Cir. 2018).

This makes perfect sense. Because money is fungible, "[a] contribution, if not used directly, arguably would be used indirectly by substituting it for money in [a terrorist organization's] treasury; money transferred by [a terrorist organization's] political wing in place of the donation could be used to buy bullets." *Gill v. Arab Bank, PLC,* 893 F. Supp. 2d 474, 507 (E.D.N.Y. 2012). Further, funds from multiple different sources are often comingled, making funds from any given source difficult

to trace. Requiring JASTA plaintiffs to trace funds from a specific source to a specific attack, "would render the statute powerless to stop the flow of money to international terrorists, and would be incompatible with the legislative history of the ATA." *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 429 (E.D.N.Y. 2009).

*Linde*, *Goldberg*, and *Gill* were all ATA cases. Because JASTA's express purpose was to *expand* ATA liability even further, it would make no sense now to impose a traceability requirement. Indeed, more recent JASTA decisions denying motions to dismiss did not require a complaint to trace specific funds from the defendant financial institution to the individuals who participated directly in the relevant attack. *See Lelchook v. Islamic Republic of Iran*, 393 F. Supp. 3d 261, 267 (E.D.N.Y. 2019); *Miller v. Arab Bank, Pub. Ltd. Co.*, 372 F. Supp. 3d 33, 33 (E.D.N.Y. 2019).

### C. The District Court's "One In Spirit" Requirement Contravenes *Halberstam* And Incorrectly Imposes A Specific Intent Standard.

The District Court incorrectly held that plaintiffs must allege "defendants were 'one in spirit' with JAM's desire to kill American citizens in Iraq or that defendants intended to help JAM succeed in

doing so." Op. 28. Although "one in spirit" appears in *Halberstam*, the District Court has shorn this language from its context and repurposed it in a way that misapplies *Halberstam's* holding. The term "one in spirit" appears in passing while discussing a 1979 New Mexico case where a bystander encouraged an attacker to assault a third person. *See Halberstam*, 705 F.2d at 485. In that example, the defendant really was "one in spirit" with the attacker, as he expressly encouraged the attack, demonstrating that he specifically intended the result of the attack, by shouting "Kill him!" and "Hit him more." *Id.* at 481 (discussing *Rael v. Cadena*, 93 N.M. 684, 604 P.2d 822 (1979)).

But the Court did not hold that specific intent was *required* to find aiding-and-abetting. In fact, the Court never found that Hamilton encouraged Welch to murder Dr. Halberstam, or intended the result at all. The Court instead held that Hamilton's continuous service as a banker, bookkeeper, recordkeeper, and secretary for Welch demonstrated that she "desired to make the venture succeed"—the "venture" being Welch's racket selling stolen property, not murder. *Halberstam*, 705 F.2d at 488. This Court affirmed Hamilton's liability

for aiding-and-abetting even though she did not specifically intend for Welch to murder Halberstam.

As in *Halberstam*, JASTA does not require a plaintiff to plead or prove that a defendant specifically intended the *results* of a terrorist act. Simply put, there is no "specific intent" requirement—which the Second Circuit, in an ATA case, has described as "intent to participate in a criminal scheme as 'something that he wishes to bring about and seek by his action to make it succeed'" or that a defendant "knew of the specific attacks at issue when it provided financial services for [an FTO]." *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018); *see also United States v. Haldeman*, 559 F.2d 31, 113 (D.C. Cir. 1976) ("A person who knowingly does an act which the law forbids intending with bad purpose either to disobey or disregard the law, may be found to act with specific intent.").

JASTA merely requires that a plaintiff allege that the defendant "knowingly provide[d] substantial assistance" to the person who committed the act of terrorism (in addition to plausibly alleging that a plaintiff was injured by an act of terrorism "committed, planned or authorized" by a foreign terrorist organization). 18 U.S.C. § 2333(a),

(d). Under *Halberstam*, the *mens rea* requirement is "a general awareness of [one's] role in a continuing criminal enterprise" or "an overall illegal or tortious activity." 705 F.2d at 487-88. Furthermore, *Halberstam* holds that defendants, who are liable for aiding and abetting, are responsible for the "reasonably foreseeable acts done in connection with" the criminal or tortious activity. *Id.* at 484. Taken together, a JASTA aiding-and-abetting plaintiff must allege that a defendant was generally aware of his role as part of an overall illegal or tortious activity—*i.e.*, a terrorist enterprise—whose foreseeable consequences include acts of international terrorism. JASTA does not require a defendant to have intended those terrorist acts.

The Court should reverse the District Court and hold that JASTA does not require a plaintiff to plead or prove that a defendant specifically intended the results of a terrorist group's acts.

## CONCLUSION

*Amici* take no position on the ultimate merits of Plaintiffs' claims or their ability to marshal evidence to support the facts alleged. However, because the District Court applied erroneous legal standards

to Plaintiffs' § 2333(d)(2) aiding-and-abetting claim, *amici* urge reversal of the judgment below.


Dated:  January 19, 2021          Respectfully submitted,

                                  */s/  Michael A. Petrino*
                                  Michael A. Petrino
                                  Jonathan E. Missner
                                  **STEIN MITCHELL BEATO &
                                      MISSNER LLP**
                                  901 Fifteenth St., NW, Suite 700
                                  Washington, D.C. 20005
                                  (202) 737-7777
                                  mpetrino@steinmitchell.com

                                  *Counsel for* Amici Curiae

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in D.C. Cir. R. 32(e)(3) and Fed. R. App. P. 32(a)(7)(B). This brief contains 6,358 words excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as counted by the word-counting feature of Microsoft Word.

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook.

*/s/ Michael A. Petrino*
Michael A. Petrino
*Counsel for* Amici Curiae

## CERTIFICATE OF SERVICE

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure and Circuit Rule 25(c), I hereby certify that on this 19th day of January, 2021, a true and correct copy of the foregoing was filed with the Clerk of the United States Court of Appeals for the D.C. Circuit via the Court's CM/ECF system, which will send notice of such filing to all counsel who are registered CM/ECF users.

*/s/ Michael A. Petrino*
Michael A. Petrino
*Counsel for* Amici Curiae