**NOT YET SCHEDULED FOR ORAL ARGUMENT**

**Case No. 20-7077**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

JOSHUA ATCHLEY, ET AL.,
*Plaintiffs-Appellants*,

v.

ASTRAZENECA UK LIMITED, ET AL.,
*Defendants-Appellees*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**BRIEF FOR DEFENDANTS-APPELLEES**

Neil H. MacBride
Kenneth L. Wainstein
DAVIS POLK & WARDWELL LLP
901 15th Street, N.W.
Washington, DC 20005
(202) 962-7030 (Telephone)
neil.macbride@davispolk.com

Paul S. Mishkin
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
(202) 450-4292 (Telephone)
paul.mishkin@davispolk.com

*Counsel for Defendants-Appellees
AstraZeneca Pharmaceuticals LP
and AstraZeneca UK Limited*

March 12, 2021

Beth S. Brinkmann
  *Counsel of Record*
John E. Hall
David M. Zionts
Jordan L. Moran
Megan C. Keenan
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, N.W.
Washington, DC 20001
(202) 662-5312 (Telephone)
bbrinkmann@cov.com

*Counsel for Defendant-Appellee
F. Hoffmann-La Roche Ltd*

*Additional Counsel Listed
on Inside Cover*

Patrick J. Carome
David W. Bowker
Leon T. Kenworthy
Claire Bergeron
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
(202) 663-6000 (Telephone)
patrick.carome@wilmerhale.com

*Counsel for Defendants-Appellees
Genentech, Inc. and Hoffmann-La
Roche Inc.*


John B. Bellinger III
David J. Weiner
John David Cella
ARNOLD & PORTER KAYE
SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, DC 20001
(202) 942-5000 (Telephone)
john.bellinger@arnoldporter.com

Robert Reeves Anderson
ARNOLD & PORTER KAYE
SCHOLER LLP
1144 Fifteenth Street, Suite 3100
Denver, CO 80202-1370
(303) 863-2325 (Telephone)
reeves.anderson@arnoldporter.com

*Counsel for Defendants-Appellees
GE Healthcare USA Holding LLC,
GE Medical Systems Information
Technologies, Inc., and GE
Medical Systems Information
Technologies GmbH*

Lisa S. Blatt
Christopher N. Manning
Melissa B. Collins
Brian T. Gilmore
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000 (Telephone)
lblatt@wc.com

*Counsel for Defendants-Appellees
Pfizer Inc., Pfizer
Pharmaceuticals LLC, Pfizer
Enterprises SARL, Pharmacia &
Upjohn Company LLC, and
Wyeth Pharmaceuticals LLC*


Kannon K. Shanmugam
Jeh C. Johnson
Stacie M. Fahsel
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, N.W.
Washington, DC 20006
(202) 223-7300 (Telephone)
kshanmugam@paulweiss.com

Jessica S. Carey
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
United States
(212) 373-3000 (Telephone)
jcarey@paulweiss.com

*Counsel for Defendants-Appellees
Johnson & Johnson, Cilag GmbH
International, Ethicon Endo-
Surgery, LLC, Ethicon, Inc.,*

*Janssen Ortho LLC, Janssen Pharmaceutica NV, Johnson & Johnson (Middle East) Inc., and Ortho Biologics LLC*

# CERTIFICATE AS TO PARTIES, RULINGS & RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), counsel for Defendants-Appellees hereby certify as follows:

**(A)      Parties and Amici.**  All parties appearing before the district court and in this court are listed in the Brief for Plaintiffs-Appellants.  The following individuals have entered appearances as amici after Plaintiffs filed their initial brief:

- Professors William D. Ariza, William C. Banks, Erwin Chemerinsky, Brooke D. Coleman, Geoffrey S. Corn, William V. Dunlap, Stephen Dycus, Brenner M. Fissell, Jimmy Gurulé, Michael J. Kelly, Lee Kovarsky, Peter Margulies, Andrew Siegel, Adam Steinman, Rachel E. VanLandingham, Howard M. Wasserman, and Louise Weinberg

- General (Ret.) George W. Casey Jr., General (Ret.) Stan McChrystal, General (Ret.) Vincent Brooks, General (Ret.) James T. Conway, General (Ret.) James D. Thurman, Lieutenant General (Ret.) H.R. McMaster, Lieutenant General (Ret.) Douglas E. Lute, Lieutenant General (Ret.) Sean B. MacFarland, Lieutenant General (Ret.) John F. Mulholland, Lieutenant General (Ret.) Michael Oates, Lieutenant General (Ret.) Ken Tovo, Lieutenant General (Ret.) Keith C. Walker, Lieutenant General (Ret.) Sir Graeme Lamb, Brigadier General (Ret.) Ricky Gibbs, Brigadier General (Ret.) Jon Lehr, Colonel (Ret.) Greg Baine, Colonel (Ret.) Robert M. Balcavage, Colonel (Ret.) Daniel (Dan) Barnett, Colonel (Ret.) Greg Bell, Colonel (Ret.) Beverly Beavers, Colonel (Ret.) Leo E. Bradley III, Colonel (Ret.) Nycki Brooks, Colonel (Ret.) Bryan Denny, Colonel (Ret.) Kevin Lutz, Colonel (Ret.) Patrick Mackin, Colonel (Ret.) Mark E. Mitchell, Colonel (Ret.) Chad McRee, Colonel (Ret.) James Phillips, Colonel Eric Schacht, Colonel (Ret.) Frank Sobchak, Colonel (Ret.) David Sutherland, Dr. and Lieutenant Colonel

(Ret.) Jeanne Godfroy, Lieutenant Colonel (Ret.) Mark Grdovic, Dr. and Lieutenant Colonel (Ret.) John Nagl, Lieutenant Colonel (Ret.) Troy Perry, Lieutenant Colonel (Ret.) Steve Wood, Lieutenant Colonel (Ret.) Matt Zais, Command Sergeant Major (Ret.) Glenn Patti, Andrew Faldini, Professor Todd Huntley, Nicholas G. Kikis, Russell L. McIntyre, Dr. Daveed Gartenstein-Ross, and Bill Roggio

- Senators Charles E. Grassley, Richard Blumenthal, Mike Crapo, Joni K. Ernst, James M. Inhofe, John Kennedy, Marco Rubio, and Sheldon Whitehouse

- Stuart W. Bowen, Jr., Vincent Foulk, Elizabeth Warner, Chris King, James F. Mattil, Arthur Brennan, and Paul Tyson

**(B)     Ruling Under Review.**  The ruling under review is the memorandum opinion and order issued by the Honorable Richard J. Leon of the United States District Court for the District of Columbia in Case No. 1:17-cv-2136 on July 17, 2020, dismissing Plaintiffs' Complaint for failure to state a claim under the Anti-Terrorism Act, and for lack of personal jurisdiction over the Foreign Defendants on the Anti-Terrorism Act claims and over all Defendants on the state-law claims.  *Atchley v. AstraZeneca UK Ltd.*, 474 F. Supp. 3d 194 (D.D.C. 2020).

**(C)     Related Cases.**  This case has not previously been before this Court or any court other than the U.S. District Court for the District of Columbia.  The vast majority (more than 950) of the plaintiffs in this case have filed lawsuits against other defendants in various federal

ii

courts seeking civil damages for the same injuries, alleging that the Islamic Republic of Iran and various financial institutions are liable under the Anti-Terrorism Act and state law for causing those injuries or aiding-and-abetting the same attacks from which those injuries arose. *See Bartlett v. Société Générale de Banque au Liban SAL*, No. 1:19-cv-00007 (E.D.N.Y.); *Donaldson v. HSBC Holdings PLC*, No. 1:18-cv-07442 (E.D.N.Y.); *Freeman v. HSBC Holdings PLC*, No. 1:14- cv-06601 (E.D.N.Y.); *Fritz v. Islamic Republic of Iran*, No. 1:15-cv-00456 (D.D.C.); *Estate of Hartwick v. Islamic Republic of Iran*, No. 1:18-cv-01612 (D.D.C.); *Holladay v. Islamic Republic of Iran*, No. 1:17-cv-00915 (D.D.C.); *Karcher v. Islamic Republic of Iran*, No. 1:16-cv-00232 (D.D.C.); *Neiberger v. Islamic Republic of Iran*, No. 1:16-cv-02193 (D.D.C.); *O'Sullivan v. Deutsche Bank AG*, No. 1:17-cv-08709 (S.D.N.Y.); *O'Sullivan v. Deutsche Bank AG*, No. 1:18-cv-12325 (S.D.N.Y.); *Stephens v. HSBC Holdings PLC*, No. 1:18-cv-07439 (E.D.N.Y.); *Tavera v. HSBC Bank USA, N.A.*, No. 1:18-cv-07312 (E.D.N.Y.); *Tollefson v. Islamic Republic of Iran*, No. 1:17-cv-01726 (D.D.C.); *Williams v. Islamic Republic of Iran*, No. 1:18-cv-02425 (D.D.C.); *Martinez v. Islamic Republic of Iran*, No. 1:20-cv-00622 (D.D.C.).

**TABLE OF CONTENTS**

**Page**

CERTIFICATE AS TO PARTIES, RULINGS & RELATED CASES........i

TABLE OF AUTHORITIES......................................................vii

GLOSSARY .............................................................................xi

INTRODUCTION ....................................................................1

JURISDICTIONAL STATEMENT ..........................................4

STATUTORY AUTHORITY .....................................................4

ISSUES PRESENTED ............................................................4

STATEMENT OF THE CASE .................................................5

I.       Background......................................................................6

    A.     The Armed Conflict In Iraq ...................................6

    B.     Iraq's Need For Medical Goods And The Supplier
          Defendants' Transactions With The Iraqi Health
          Ministry .................................................................7

    C.     The Health Ministry's Political Leadership And Jaysh
          al-Mahdi's Looting Of The Ministry...................12

II.      Procedural History .......................................................13

STANDARD OF REVIEW......................................................16

SUMMARY OF ARGUMENT ...............................................17

ARGUMENT..........................................................................21

I.       The District Court Correctly Dismissed Plaintiffs' Direct-
    Liability Claims.............................................................22

A. Neither The Supplier Defendants' Transactions With The Iraqi Health Ministry, Nor The Manufacturer Defendants' Even More Removed Production of Goods, Proximately Caused Plaintiffs' Injuries.................................23

B. Defendants Did Not Commit Acts Of International Terrorism.................................36

II. The District Court Correctly Dismissed Plaintiffs' Aiding-And-Abetting Claims.................................39

A. Jaysh al-Mahdi Was Not A Designated Foreign Terrorist Organization And Plaintiffs Do Not Allege That Such An Organization "Committed, Planned, Or Authorized" Nearly All Of The Attacks. .............................40

B. Defendants Did Not Provide "Substantial Assistance" To Jaysh al-Mahdi Or Its Alleged Acts Of International Terrorism By Manufacturing Medical Goods Or Supplying Them To The Iraqi Health Ministry. ..................44

C. Defendants Did Not "Knowingly" Assume A Role In Terrorist Acts. .................................52

III. The Anti-Terrorism Act's "Act-of-War" Prohibition Bars Plaintiffs' Complaint Because Their Injuries Are By Reason Of Acts Occurring In The Course Of Armed Conflict Between Military Forces. .................................56

IV. The District Court Correctly Ruled It Lacked Personal Jurisdiction Over The Foreign Defendants.................................61

A. Plaintiffs' Claims Of Injury In Iraq Do Not Arise From, Or Relate To, The Foreign Defendants' Alleged Sourcing Of Some Medical Goods From The United States. .................................63

B. There Is No Anti-Terrorism Act Exception To Due Process. .................................68

C.  The District Court Did Not Abuse Its Discretion In Denying Jurisdictional Discovery. ........................................ 69

CONCLUSION ................................................................................... 70

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.,*
503 F.3d 544 (6th Cir. 2007)..................................................................67

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ..............................................................................17

*Ballard v. Savage,*
65 F.3d 1495 (9th Cir. 1995)..................................................................64

*Beydoun v. Wataniya Rests. Holding, Q.S.C.,*
768 F.3d 499 (6th Cir. 2014)...........................................................64, 68

*Boim v. Holy Land Found. for Relief & Dev.,*
549 F.3d 685 (7th Cir. 2008) (en banc).........................................30, 46

*\*Brill v. Chevron Corp.,*
804 F. App'x 630 (9th Cir. 2020) ...............................2, 26, 37, 45, 53

*\*Bristol-Myers Squibb Co. v. Superior Court of Cal.,*
137 S. Ct. 1773 (2017)............................................................63, 67, 69

*Burger King Corp. v. Rudzewicz,*
471 U.S. 462 (1985)..............................................................................68

*Citizens for Responsibility & Ethics in Washington v. U.S.*
*Dep't of Justice,*
922 F.3d 480 (D.C. Cir. 2019).........................................................16, 17

*Crosby v. Twitter, Inc.,*
921 F.3d 617 (6th Cir. 2019)...........................................................42, 45

*Estate of Klieman v. Palestinian Auth.,*
923 F.3d 1115 (D.C. Cir. 2019).......................................................63, 64

Authorities upon which we chiefly rely are marked with asterisks.

*Halberstam v. Welch,*
705 F.2d 472 (D.C. Cir. 1983) .................... 15, 20, 47, 48, 49, 50, 51, 52

*Holder v. Humanitarian Law Project,*
561 U.S. 1 (2010) ........................................................................ 40

*Hull v. Eaton Corp.,*
825 F.2d 448 (D.C. Cir. 1987) ................................................ 35

*Kaempe v. Myers,*
367 F.3d 958 (D.C. Cir. 2004) ................................................ 17

*Kaplan v. Cent. Bank of the Islamic Republic of Iran,*
896 F.3d 501 (D.C. Cir. 2018) ........................................ 21, 61

*\*Kemper v. Deutsche Bank AG,*
911 F.3d 383 (7th Cir. 2018) ........................ 2, 26, 28, 37, 38

*Khairkhwa v. Obama,*
703 F.3d 547 (D.C. Cir. 2012) ................................................ 60

*Kingdomware Techs., Inc. v. United States,*
136 S. Ct. 1969 (2016) ............................................................ 45

*Linde v. Arab Bank, PLC,*
882 F.3d 314 (2d Cir. 2018) ........................ 39, 47, 51, 52

*Linder v. Portocarrero,*
963 F.2d 332 (11th Cir. 1992) ................................................ 60

*Livnat v. Palestinian Auth.,*
851 F.3d 45 (D.C. Cir. 2017) ........................................ 63, 69

*Molock v. Whole Foods Mkt. Grp., Inc.,*
952 F.3d 293 (D.C. Cir. 2020) ................................................ 17

*Monge v. RG Petro-Mach. (Grp.) Co.,*
701 F.3d 598 (10th Cir. 2012) ................................................ 64

*Nat'l Council of Resistance of Iran v. Dep't of State,*
373 F.3d 152 (D.C. Cir. 2004) ................................................ 30

*Nurriddin v. Bolden*,
818 F.3d 751 (D.C. Cir. 2016) ........................................................ 17

\*Owens v. BNP Paribas, S.A. ("Owens IV"),
897 F.3d 266 (D.C. Cir. 2018) .... 2, 14, 18, 22, 23, 24, 25, 28, 29, 34, 35

*Owens v. Republic of Sudan* ("*Owens III*"),
864 F.3d 751 (D.C. Cir. 2017) ........................................................ 24

*Platten v. HG Bermuda Exempted Ltd.*,
437 F.3d 118 (1st Cir. 2006) ........................................................ 64

*Rothstein v. UBS AG*,
708 F.3d 82 (2d Cir. 2013) ................................................ 25, 34, 35

\*Siegel v. HSBC N. Am. Holdings, Inc.,
933 F.3d 217 (2d Cir. 2019) ............................................. 2, 39, 47, 55

*St. Jude Med., Inc. v. Lifecare Int'l, Inc.*,
250 F.3d 587 (8th Cir. 2001) ........................................................ 67

*Taamneh v. Twitter, Inc.*,
343 F. Supp. 3d 904 (N.D. Cal. 2018) .......................................... 43

*United States v. Pregler*,
925 F.2d 268 (8th Cir. 1991) ........................................................ 43

*Waite v. AII Acquisition Corp.*,
901 F.3d 1307 (11th Cir. 2018) ........................................... 63, 64, 68

*Walden v. Fiore*,
571 U.S. 277 (2014) ................................................................ 63, 65

*Waldman v. Palestine Liberation Org.*,
835 F.3d 317 (2d Cir. 2016) ............................................... 64, 68

*Zapata v. HSBC*,
825 F. App'x 55 (2d Cir. 2020) ................................................ 38

**Statutes**

18 U.S.C. §2331 .............................................. 5, 16, 36, 37, 38, 56, 58, 59, 60

18 U.S.C. §2333 ........................ 4, 13, 22, 36, 39, 40, 42, 43, 44, 46, 51, 52

18 U.S.C. §2336 .............................................................. 5, 16, 56, 59, 61

18 U.S.C. §2339A .......................................................................... 38, 42

18 U.S.C. §2339B ................................................................................ 40

18 U.S.C. §2339C ............................................................................... 38

Justice Against Sponsors of Terrorism Act,
Pub. L. No. 114-222, 130 Stat. 852 (2016) ........................................ 47

**Regulatory Authorities**

Off. Foreign Assets Control, Specially Designated Nationals and
Blocked Persons, and Amended Iraqi General Licenses,
F.D.I.C. FIL-34-2004, 2004 WL 569364 (Mar. 23, 2003) .................... 8

Suspending the Iraq Sanctions Act,
68 Fed. Reg. 26,459 (May 7, 2003) .................................................... 8

**Other Authorities**

Oxford English Dictionary (3d ed. 2002) ................................................ 59

*Prosecutor v. Milosevic*, ICTY Case No. IT-02-54-T, Decision
on Motion for Judgment of Acquittal (June 16, 2004) ...................... 60

Restatement (Second) of Torts §876, cmt. d (1979) ............................... 46

# GLOSSARY

This brief does not use abbreviations or acronyms that are not in common usage. When the brief quotes the Complaint or judicial decisions, it sometimes includes the following abbreviations as used in the quoted source without alteration:

MOH                 Iraqi Ministry of Health

ATA                 Anti-Terrorism Act, 18 U.S.C. §2331 *et seq.*

## INTRODUCTION

After the fall of Saddam Hussein, the U.S. Government urged American and European companies to help rebuild war-torn Iraq, especially Iraq's national healthcare system. The Defendants here stepped forward, providing the Iraqi government life-saving breast cancer treatments, hemophilia injections, ultrasounds, electro-cardiogram machines, and other medical goods. Some defendants manufactured those products; others supplied them to Iraq's Health Ministry, which was responsible for delivering public healthcare to 25 million Iraqis.

Throughout this period, armed conflict divided Iraq. Militia groups, many aligned with Iraq's political factions, battled each other and U.S. military forces. Tragically, thousands of U.S. servicemembers were killed or wounded during armed conflict with these militias. Plaintiffs allege that one militia, Jaysh al-Mahdi, looted government ministries, including the Health Ministry, to add to the militia's resources.

In an unprecedented invocation of the federal Anti-Terrorism Act, this lawsuit claims that the Defendant medical companies are responsible for injuries suffered by Plaintiffs during armed attacks by

1

Jaysh al-Mahdi in Iraq. But that is belied by the Complaint's own allegations that the Manufacturing Defendants produced medical goods; the Supplier Defendants provided those goods to the sovereign Health Ministry; Jaysh al-Mahdi looted that Ministry; Jaysh al-Mahdi subsequently sold stolen goods on the black market to fund its operations; and Jaysh al-Mahdi attacked U.S. forces. This Court and other circuits have uniformly dismissed Anti-Terrorism Act lawsuits against companies whose alleged conduct was similarly distant from alleged acts of international terrorism. *See Owens v. BNP Paribas, S.A.*, 897 F.3d 266 (D.C. Cir. 2018); *Kemper v. Deutsche Bank AG*, 911 F.3d 383 (7th Cir. 2018); *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019); *Brill v. Chevron Corp.*, 804 F. App'x 630 (9th Cir. 2020).

The district court correctly dismissed the Complaint—not based on "contested inferences" (Br. 3), but on specific allegations in the Complaint that refute Plaintiffs' legal arguments. Defendants' manufacture or sale of medicine and medical devices to a foreign-sovereign, U.S.-supported Health Ministry did not proximately cause Plaintiffs' injuries, did not reflect terroristic aims, and did not constitute "knowingly" providing "substantial assistance" to militia attacks. Allegations of corruption—

which Defendants strongly deny—cannot make up for the Complaint's inability to allege that Defendants committed or supported *international terrorism*. The defects in the Complaint do not end there because it runs afoul of Congress's prohibition on Anti-Terrorism Act lawsuits seeking damages for injuries caused by acts that occurred in the course of armed conflict between military forces, which keeps American tort principles off of the battlefield.

In addition, the district court correctly held that there is no basis for personal jurisdiction over the Foreign Defendants. They had no contacts with the United States giving rise to Plaintiffs' claims, and Plaintiffs' attempt to rely on utterly tangential and unrelated contacts—that some Foreign Defendants happened to source some medical goods from the United States—was correctly rejected by the district court.

Defendants forcefully and unequivocally condemn the attacks on U.S. troops in Iraq. And they sympathize with Plaintiffs' desire for justice for injuries inflicted by Jaysh al-Mahdi. But to accuse these medical companies of "knowingly financ[ing] those attacks" on U.S. servicemembers (Br. 2) is misdirected, refuted by the Complaint's allegations, and legally baseless. This Court should affirm the dismissal.

3

## JURISDICTIONAL STATEMENT

The district court lacked personal jurisdiction over the Foreign Defendants on the Anti-Terrorism Act claims and over all Defendants on the state-law claims. *Infra* §IV. Defendants otherwise adopt Plaintiffs' jurisdictional statement.

## STATUTORY AUTHORITY

Relevant provisions of the Anti-Terrorism Act are reproduced in the Addendum.

## ISSUES PRESENTED

1. Whether the district court correctly dismissed claims of direct liability under the Anti-Terrorism Act, 18 U.S.C. §2333(a), because Defendants, by either manufacturing medical goods or supplying such goods to the Iraqi Health Ministry, did not commit any acts of international terrorism proximately causing any injuries occurring in armed attacks by the Jaysh al-Mahdi militia.

2. Whether the district court correctly dismissed claims of aiding-and-abetting liability under the Anti-Terrorism Act, 18 U.S.C. §2333(d)(2), because Defendants, by either manufacturing medical goods or supplying such goods to the Iraqi Health Ministry, did not knowingly

and substantially assist acts of international terrorism committed by the Jaysh al-Mahdi militia.

3.  Whether this suit, seeking damages for armed attacks on U.S. forces by the Jaysh al-Mahdi militia, is precluded by the Anti-Terrorism Act's "act-of-war" prohibition against suits to recover for injury caused by acts occurring in the course of armed conflict between military forces of any origin, 18 U.S.C. §§2336(a), 2331(4), (6).

4.  Whether the district court correctly dismissed Plaintiffs' claims against the Foreign Defendants for lack of personal jurisdiction because those claims do not arise out of, or relate to, contacts between the Foreign Defendants and the United States, and did not abuse its discretion in denying jurisdictional discovery.

## STATEMENT OF THE CASE

This lawsuit seeks treble damages for armed attacks by the Jaysh al-Mahdi militia on U.S. military forces between 2005-2011, in which Plaintiffs or their family members were killed or wounded.  The Complaint attempts to hold Defendants liable for Plaintiffs' injuries under the Anti-Terrorism Act, both directly and as aiders-and-abettors, because some Defendants supplied medical goods to Iraq's Health

Ministry, and because some of those goods were then stolen by Jaysh al-Mahdi from the Ministry and subsequently sold by that militia on the black market to support its operations.

## I.     Background

### A.     The Armed Conflict In Iraq

In March 2003, Coalition and U.S. armed forces invaded Iraq and toppled Saddam Hussein's regime.    JA__ (¶54).    That marked the beginning of nearly a decade of armed conflict in Iraq, as Sunni and Shi'a militias engaged in combat against U.S. forces and each other.  *See* JA__, __, __, __-__, __ (¶¶14, 16, 56, 61-62, 350).  By the "official end of the war in Iraq" in December 2011, there were 4,496 U.S. servicemembers who had been killed and another 32,252 wounded.  JA__-__(Dkt.128-14); JA__-__(Dkt.128-15).

One military force in the armed conflict was Jaysh al-Mahdi (Arabic for "Mahdi Army"), a "sophisticated" Shi'a militia.  JA__, __-__, __-__ (¶¶56, 59-60, 183).  By 2004, Jaysh al-Mahdi controlled "large swaths of Iraq," using "command-and-control" headquarters in eastern Baghdad to coordinate operations "throughout Iraq."  JA__ (¶61).  Jaysh al-Mahdi's "complex" attacks against U.S. forces used military tactics and weaponry,

including "coordinated rocket attacks," "mortar strikes," "advanced anti-tank missiles," and "surface-to-air missiles." JA__, __-__, __-__, __-__ (¶¶337, 341, 345-46, 393-400). Jaysh al-Mahdi organized itself into "Company-, Battalion-, and Brigade-level" units under a "hierarchical command structure," and by 2007 "boasted at least 60,000 fighters." JA__, __, __-__ (¶¶102, 335, 338). The Complaint alleges that "all of the Mahdi Army's weapons except for AK-47 rifles c[a]me from Iran." JA__ (¶404).

## B. Iraq's Need For Medical Goods And The Supplier Defendants' Transactions With The Iraqi Health Ministry

After Saddam's fall, the United States invested billions of dollars to rebuild Iraq. JA__-__(Dkt.128-16). Iraq's healthcare sector was a key focus. "During Saddam's rule and ever since, Iraq has maintained a government-run healthcare system that in theory offers free medical care to all Iraqis." JA__ (¶2). The Iraqi Health Ministry was responsible for that nationwide "system of socialized medicine," and employed "every public-sector doctor, pharmacist, nurse, and medical technician in Iraq." JA__ (¶72). The Ministry supplied Iraq's healthcare providers with

medicines and medical supplies through its import subsidiary, Kimadia. JA__, __-__ (¶¶2, 119).

Shortly after Saddam's defeat, the U.S. Treasury Department issued a General License allowing Kimadia to use the U.S. banking system, and the U.S. Government reversed its prior designation of Iraq as a state-sponsor of terrorism. Suspending the Iraq Sanctions Act, 68 Fed. Reg. 26,459 (May 7, 2003); Off. Foreign Assets Control, Specially Designated Nationals and Blocked Persons, and Amended Iraqi General Licenses, F.D.I.C. FIL-34-2004, 2004 WL 569364, *4 (Mar. 23, 2003).

Years of neglect had left Iraq's public healthcare system in tatters. More than half of the Health Ministry's warehouses had been looted, and it faced serious procurement challenges. JA__-__(Dkt.128-16). The Ministry's annual budget was therefore increased 60-fold to "well more than $1 billion." JA__ (¶116).

The Ministry also received significant U.S. funding. In 2006, for example, the U.S. Agency for International Development reported that it was "supporting the Iraqi Ministry of Health (MoH) to strengthen essential health services, improve the capacity of health personnel, and

respond to the specific health needs of vulnerable populations such as women and children." JA__(Dkt.128-48).

The U.S. Government also encouraged the private sector to supply the Ministry with medicines and medical equipment. JA__-__(Dkt.128-38); JA__-__(Dkt.128-41); JA__(Dkt.128-43); JA__(Dkt.128-44). The Supplier Defendants[1] answered that call. They provided the Ministry with life-saving medical goods, including cancer treatments, antipsychotic medicines, catheters, sutures, arterial sheaths, and ultrasound and electrocardiogram machines. JA__, __-__, __, __-__, __, __, __ (¶¶178, 197, 216, 226, 247, 289, 316). As required by Iraqi law, the Supplier Defendants submitted bids to Kimadia, negotiated contracts with Ministry officials, and shipped medical goods to Ministry warehouses, where the goods were transferred to Ministry employees. JA__-__, __, __-__ (¶¶120-21, 123, 128).

Kimadia required bidders to specify a "quantity of extra goods" they "would provide for free." JA__ (¶120). Although the Complaint alleges

---

[1] AstraZeneca UK Limited, GE Medical Systems Information Technologies GmbH, Johnson & Johnson (Middle East) Inc., Cilag GmbH International, Janssen Pharmaceutica N.V., Pfizer Inc., Wyeth Pharmaceuticals Inc., Pfizer Enterprises SARL, F. Hoffmann-La Roche Ltd. JA__, __, __, __, __ (¶¶188, 211, 245, 281, 310).

that free goods were a "form of bribery," JA__ (¶118), free goods are a common industry practice to provide a discounted price-per-unit, as reflected by the Complaint's allegation that, to this day, the "demand for 'free goods' still appears on the face of Kimadia's standard instructions," JA__, __-__ (¶¶120, 139-41). The Complaint alleges, however, that Kimadia officials used this "structure of the Iraqi procurement process" to order more goods than necessary, which Ministry employees then stole from Ministry warehouses and sold on the black market. JA__, __-__, __-__ (¶¶107, 119-20, 128). Looting was rampant due to poor "inventory control[s]" and was "not limited" to free goods. JA__-__, __-__ (¶¶138, 179).

The Complaint asserts, without support specific to each Supplier Defendant, that cash "commissions" were paid to Ministry officials during the procurement process. *E.g.*, JA__ (¶192). It alleges generically that some companies paid commissions to Saddam-era officials, JA__ (¶6), and that "as a general matter, companies doing business with

Kimadia" post-2004 were "required" to pay bribes. JA__-__, __ (¶¶4, 142).[2]

The Manufacturer Defendants[3] are not alleged to have provided anything to the Ministry. *E.g.*, JA__ (¶188). They manufactured goods (or in many cases just ingredients for goods) that Supplier Defendants allegedly supplied to the Ministry. *E.g.*, JA__-__, __-__ (¶¶189, 191). Although the Complaint makes conclusory assertions that the Manufacturing Defendants "actively participated in the corrupt payments," *e.g.*, JA__ (¶194), it alleges only that Manufacturers "disregarded" other entities' actions, "register[ed] with the MOH Technical Department," and "submitt[ed] paperwork" confirming that the Suppliers could sell their products, *e.g.*, JA__-__, __ (¶¶147-48, 194).

---

[2] Before the district court, Plaintiffs emphasized that following the public disclosure of their lawsuit, the Department of Justice inquired about the allegations that certain Defendants engaged in corruption in their dealings with the Iraqi Health Ministry. The record should reflect that the Department has since closed those inquiries without further action.

[3] AstraZeneca Pharmaceuticals LP, GE Healthcare USA Holding LLC, GE Medical Systems Information Technologies, Inc., Ethicon, Inc., Ethicon Endo-Surgery, LLC, Janssen Ortho LLC, Ortho Biologics LLC, Pfizer Pharmaceuticals LLC, Pharmacia & Upjohn Company LLC, Genentech, Inc., Hoffmann-La Roche Inc. JA__, __, __, __, __ (¶¶188, 211, 245, 281, 310).

## C. The Health Ministry's Political Leadership And Jaysh al-Mahdi's Looting Of The Ministry

"[A]fter Saddam's fall," Muqtada al-Sadr became "the leader of masses of impoverished Iraqi Shi'a" and "channeled his popularity" into a political movement. JA__-__ (¶¶57-59). In 2005 elections, his Sadrist party won numerous seats in Parliament. JA__ (¶68). As in other parliamentary systems, the delegates formed a coalition government in which "ministries … were divvied up by political party." *Id.* Sadrists initially became the leaders of "several ministries," including the Health Ministry. *Id.* The Health Ministry's leaders appointed supporters to positions throughout its bureaucracy. JA__, __-__, __-__ (¶¶66, 68, 71).

The Complaint alleges that the Sadrists' leadership of the Health Ministry from 2005 to 2008 created opportunities for Jaysh al-Mahdi due to that militia's affiliation with the Sadrists. JA__ (¶59). Members of the militia "infiltrate[d]" the Ministry and "work[ed] around the fringes." JA__ (¶168). "[W]ith the tacit approval of ministry employees," Jaysh al-Mahdi members took advantage of lax inventory controls to "loot," "steal," "siphon," "divert," and "misappropriate" medical supplies from Ministry warehouses and Ministry hospitals. JA__, __-__, __-__, __-__, __-__, __ (¶¶3, 107-08, 130-31, 133, 138 & n.98, 173, 178). Militia agents then

12

"smuggled" these stolen supplies and sold them on black markets. JA__, __-__, __, __-__, __-__, __, __ (¶¶8, 108, 117, 128-33, 138 & n.98, 172, 178 & n.135). The Complaint alleges that Ministry officials made "heroic efforts" to "tackle this practice," but were hampered by "corruption within [their] own ranks." JA__-__ (¶¶129-30). Sadrist leadership of the Ministry ended in 2008 when "a different party won the right to appoint the Minister of Health." JA__ (¶104).

## II. Procedural History

The Complaint asserts claims for direct and aiding-and-abetting liability under the Anti-Terrorism Act, 18 U.S.C. §2333(a), (d)(2), as well as state-law claims. It alleges that Jaysh al-Mahdi committed armed attacks in Iraq that wounded or killed Plaintiffs or their family members: 364 U.S. servicemembers, 30 contractors and other individuals accompanying U.S. forces or supporting the war effort, and a journalist covering the war. Hundreds of these Plaintiffs have separately sued the neighboring country of Iran, and banks that did business with Iran, seeking damages for the same injuries. *Supra* pp.ii-iii. This Complaint, however, claims that the Supplier Defendants' transactions with the Iraqi Health Ministry make Defendants liable for Plaintiffs' injuries.

Defendants moved to dismiss on various grounds, including for lack of personal jurisdiction over the Foreign Defendants[4] and for failure to state a claim as to all Defendants.  After three amended complaints, extensive briefing, and argument, the district court granted Defendants' motions.

The district court dismissed Plaintiffs' direct-liability claims for lack of proximate causation.  It ruled that, under *Owens v. BNP Paribas, S.A.* ("*Owens IV*"), 897 F.3d 266 (D.C. Cir. 2018), the sovereign Health Ministry's "intervening role defeated causation." JA__(Op.21).  The court relied on contradictions between Plaintiffs' legal arguments and allegations in the Complaint that confirm that "the Ministry ran legitimate programs," and that the alleged free goods "were expressly contemplated by defendants' contracts with the Ministry, were provided to Ministry officials, and were delivered directly to Kimadia warehouses, after which they were stolen."  *Id.*

---

[4] AstraZeneca UK Limited, GE Medical Systems Information Technologies GmbH, Cilag GmbH International, Janssen Pharmaceutica N.V., Pfizer Enterprises SARL, F. Hoffmann-La Roche Ltd.  The Foreign Defendants and Supplier Defendants largely overlap.  *See supra* notes 1-2.

The court also dismissed Plaintiffs' aiding-and-abetting claims. The court found that, for most Plaintiffs, the Complaint did not allege that their injuries arose from an act of terrorism "committed, planned, or authorized by" a designated foreign terrorist organization, as the Anti-Terrorism Act requires for aiding-and-abetting liability. The court explained that "the Secretary of State has *never* designated" Jaysh al-Mahdi as a foreign terrorist organization, and the Complaint alleges only "[g]eneral support or encouragement" from Hezbollah, the designated organization on which Plaintiffs attempt to rely. JA__-__(Op.23-24). Separately, the court held that the Complaint did not meet the statutory requirement that a defendant aid and abet the person who committed the act of international terrorism, because the Complaint "allege[s] that defendants provided medical goods and devices to the Ministry, not [Jaysh al-Mahdi]." JA__(Op.26). And "even assuming defendants were sufficiently connected to [Jaysh al-Mahdi]," the court applied the factors from *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), and concluded they "demonstrate defendants' purported aid was *not* substantial." JA__(Op.27).

15

The court declined to resolve on the pleadings Defendants' additional argument that all of Plaintiffs' Anti-Terrorism Act claims must be dismissed under the statute's "act-of-war" prohibition, which specifies that "[n]o action shall be maintained" under the statute for injury arising from "any act occurring in the course of … armed conflict," including between "military forces of any origin." JA__-__(Op.17-18) (quoting 18 U.S.C. §§2331(4)(C), 2336(a)).

The court dismissed all claims against the Foreign Defendants for lack of personal jurisdiction. It held that Plaintiffs' claims did not arise from any purported contacts between the Foreign Defendants and the forum, reasoning that the alleged "sourcing" of some medical products or ingredients from the United States was "at best tangential to plaintiffs' claims" regarding actions in Iraq. JA__(Op.11). The court also held that it lacked pendent personal jurisdiction over Plaintiffs' state-law claims. JA__(Op.14).

## STANDARD OF REVIEW

"The Court reviews de novo the dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim," *Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of*

16

*Justice*, 922 F.3d 480, 486 (D.C. Cir. 2019), as well as dismissal under Rule 12(b)(2) for lack of personal jurisdiction, *Molock v. Whole Foods Mkt. Grp., Inc.*, 952 F.3d 293, 295 (D.C. Cir. 2020).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court does not accept "inferences [that] are unsupported by the facts set out in the complaint" or "legal conclusions couched as factual allegations." *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016) (citations and alterations omitted). Nor does it "accept as true the complaint's factual allegations insofar as they contradict … matters subject to judicial notice," such as "public records." *Kaempe v. Myers*, 367 F.3d 958, 963, 965 (D.C. Cir. 2004).

## SUMMARY OF ARGUMENT

1. The district court correctly dismissed Plaintiffs' direct-liability claims under the Anti-Terrorism Act. Those claims fail because neither the Manufacturing Defendants' production of life-saving medical goods, nor the Supplier Defendants' provision of such goods to Iraq's Health

Ministry, proximately caused Plaintiffs' injuries. In particular, the asserted chain of causation includes the Ministry, an intervening sovereign actor, from which Jaysh al-Mahdi allegedly looted goods.

Although Plaintiffs' brief argues that the Ministry was an "agent" or "alias" of Jaysh al-Mahdi, the Complaint establishes that the Ministry was a sovereign entity with legitimate governmental operations, including responsibility for Iraq's public healthcare system. The district court therefore correctly dismissed the direct-liability claims because, under *Owens IV*, allegations that Defendants supplied a foreign sovereign Ministry with medical goods that a militia later stole and then sold do not demonstrate that Defendants proximately caused Plaintiffs' injuries from the militia's attacks. And that is all the more obvious for the Manufacturer Defendants, who are not alleged even to have transacted with the Ministry and are thus even further separated from Plaintiffs' injuries.

The direct-liability claims independently fail because the Complaint also does not plead that Defendants committed acts of international terrorism. To meet the statutory definition of "international terrorism," a complaint must allege, *inter alia*, that the

18

defendant appears to have intended to intimidate or coerce a civilian population, or to influence government policy by intimidation, coercion, mass destruction, kidnapping, or assassination. This Complaint alleges no such thing.

2. The district court also correctly dismissed Plaintiffs' aiding-and-abetting claims. Jaysh al-Mahdi was never designated as a "foreign terrorist organization," so the vast majority of the attacks are not alleged to have been "committed, planned, or authorized" by such an organization as required by the statute. Plaintiffs strain to overcome that deficiency by alleging that Hezbollah trained, armed, and inspired Jaysh al-Mahdi fighters as part of a decade-plus "campaign," but that is not an allegation that Hezbollah "committed, planned, or authorized" each specific Jaysh al-Mahdi attack that injured Plaintiffs.

The Complaint also fails to allege that Defendants aided and abetted any Jaysh al-Mahdi attack. The Supplier Defendants are alleged to have supplied medical goods to a sovereign Health Ministry, not to have assisted a militia, so they are not alleged to have aided "the person who committed the act of international terrorism" as required by the statute. And the Manufacturer Defendants did not even transact with

the Ministry.  Additionally, applying the *Halberstam* factors, the district court correctly held that Defendants are not alleged to have provided "substantial assistance" to Jaysh al-Mahdi's attacks because the Complaint does not allege that Defendants had any relationship with Jaysh al-Mahdi, played an essential role in any of its attacks, or intended to advance its agenda.  Further, allegations that the Supplier Defendants provided the Ministry free goods as required by Kimadia contracts, or reports of alleged corruption in the Ministry's ranks, do not come anywhere near showing that the Supplier Defendants, let alone the Manufacturer Defendants, "knowingly" assumed a role in acts of international terrorism.

3.  Dismissal is independently required by the Anti-Terrorism Act's "act-of-war" prohibition against maintaining any suit under the statute for injury or loss by reason of an act occurring in the course of armed conflict "between military forces of any origin."  It is obvious on the face of the Complaint that Jaysh al-Mahdi's attacks on U.S. forces occurred in the course of such armed conflict.

4.  The district court correctly dismissed the claims against the Foreign Defendants for lack of personal jurisdiction.  The sole U.S.

20

contact Plaintiffs invoke on appeal is that some of the goods that the Foreign Defendants supplied to the Ministry (or just some ingredients in those goods) were manufactured by other companies in the United States. But Plaintiffs' claims against the Foreign Defendants are based on transactions with an Iraqi Ministry, and on Plaintiffs' injuries at the hands of an Iraqi militia. Those claims for liability do not arise out of, or relate to, any Foreign Defendants' sourcing of goods or ingredients from the United States.

## ARGUMENT

Plaintiffs' claims that manufacturers and suppliers of medical goods are liable for armed militia attacks, based on their sales to a foreign sovereign Health Ministry that was looted by the militia, fall far outside the Anti-Terrorism Act.

All of the claims against the Foreign Defendants must also be dismissed for lack of personal jurisdiction. Although that jurisdictional issue precedes the merits, *see Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 504-05 (D.C. Cir. 2018), this brief first addresses the Complaint's failure to state any valid legal claim, because that merits issue will need to be resolved with respect to the non-Foreign

Defendants, and because a full understanding of Plaintiffs' Anti-Terrorism Act claims underscores that those claims do not arise out of, or relate to, any alleged contacts with the forum by the Foreign Defendants.

## I.   The District Court Correctly Dismissed Plaintiffs' Direct-Liability Claims.

Congress specified that the Anti-Terrorism Act's treble-damages remedy is for injuries "by reason of an act of international terrorism." 18 U.S.C. §2333(a).  To hold a defendant directly liable under Section 2333(a), the defendant's own conduct must have "constituted an act of international terrorism."  *Owens IV*, 897 F.3d at 272.  Direct liability also requires the plaintiff to have been "injured 'by reason of' [the defendant's]" act of international terrorism, which "demands a showing of proximate causation."  *Id.* at 272-73.  Applying this Court's *Owens IV* decision, the district court correctly concluded that the Complaint's allegations "do not establish the substantial connection between defendants and [Jaysh al-Mahdi] necessary for proximate causation." JA__(Op.20).  And the Complaint also fails to plead facts supporting the incredible proposition that leading manufacturers and suppliers of life-saving medical goods committed acts of international terrorism.

22

**A.** **Neither The Supplier Defendants' Transactions With The Iraqi Health Ministry, Nor The Manufacturer Defendants' Even More Removed Production of Goods, Proximately Caused Plaintiffs' Injuries.**

1. A plaintiff's injuries are "by reason of" a defendant's actions only if those actions "were a 'substantial factor' in the sequence of events that led to the[] injuries" and, separately, the injuries were "foreseeable." *Owens IV*, 897 F.3d at 273 (citation and quotation marks omitted). To meet the "substantial factor" test, a complaint must allege "some direct relation between the injury asserted and the injurious conduct alleged," because "'the central question' for proximate causation is 'whether the alleged violation led directly to the plaintiff's injuries.'" *Id.* at 273 n.8 (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006)).

Thus, "when a defendant is more than one step removed from a terrorist act or organization, plaintiffs suing under the ATA must allege some facts demonstrating a substantial connection between the defendant and terrorism." *Id.* at 275-76. And "when an intermediary" stands between a defendant and an attack, and that intermediary "is a sovereign state with 'many legitimate agencies, operations, and programs to fund,' the need for additional allegations supporting substantiality is all the more acute." *Id.* at 276. Therefore, in *Owens IV*,

23

the Court held that allegations that the defendant bank illegally processed $6 billion for Sudan, "which in turn funded and otherwise supported al Qaeda's attack" on U.S. Embassies, were inadequate to demonstrate a substantial connection between the defendant and terrorism, even though (unlike here) the sovereign was a designated sponsor of terrorism, and al-Qaeda, of course, was a designated terrorist organization. *Id.* at 269-70.

Plaintiffs' heavy reliance on an earlier case, *Owens v. Republic of Sudan* ("*Owens III*"), 864 F.3d 751, 783-84 (D.C. Cir. 2017), *vacated sub nom. Opati v. Rep. of Sudan*, 140 S. Ct. 1601 (2020), is misplaced. That case stemmed from the same attacks as *Owens IV*, but the defendant was Sudan itself, not a bank doing business with Sudan. Plaintiffs suggest *Owens III* is relevant because Sudan supposedly provided al-Qaeda only "indirect[]" "'financial support,'" such as "'tax exceptions.'" Br. 20. That characterization ignores the allegations that Sudan was al-Qaeda's "partner" and "directly" supported al-Qaeda by "provid[ing] financial, governmental, military, and intelligence support." *Owens III*, 864 F.3d at 782-84. Supplying a U.S.-supported Health Ministry with medical

goods, some of which a militia later stole, is nothing like Sudan's alleged partnership with al-Qaeda.

Consistent with *Owens IV*, other Circuits recognize that a defendant does not proximately cause injuries inflicted by terrorists based on the defendant's transacting with a foreign government that may separately support terrorists. In *Rothstein v. UBS AG*, the Second Circuit held that a bank's transfer to Iran of "hundreds of millions of dollars" did not proximately cause injuries resulting from attacks committed by Iranian-backed terrorists. 708 F.3d 82, 93-97 (2d Cir. 2013) (emphasis omitted). Although Iran's status as a designated sponsor of terrorism "made it more likely" that the funds "would be used for terrorism," "the fact remain[ed] that Iran is a government, and as such it has many legitimate agencies, operations, and programs to fund." *Id.* at 97. The court thus dismissed the complaint because there was no factual allegation that, "if UBS had not transferred U.S. currency to Iran," that would have meant that "Iran, with its billions of dollars in reserve, would not have funded the attacks in which plaintiffs were injured." *Id.*

Similarly, in *Kemper v. Deutsche Bank AG*, the Seventh Circuit rejected an argument that a bank caused a U.S. soldier's death in Iraq by allegedly engaging in illegal business with Iranian government institutions, which then funded terrorists in Iraq. The Court held that "a sovereign's affirmative choice to engage in a wrongful act will usually supersede a third party's choice to do business with that sovereign." 911 F.3d 383, 393 (7th Cir. 2018). And the Court explained that, while "[t]he desire to hold someone responsible for this grievous loss is eminently understandable," "Deutsche Bank is the wrong defendant," because "its actions are too attenuated from the terrorist attack that killed Spc. Schaefer to hold it liable for his death." *Id.* at 396; *see also Brill v. Chevron Corp.*, 804 F. App'x 630, 632 (9th Cir. 2020) (holding that "oil purchases" that "included kickbacks" that Saddam used to fund terrorism lacked the requisite "direct relationship" to terror victims' injuries).

2. Consistent with the foregoing decisions, Defendants did not proximately cause attacks committed by Jaysh al-Mahdi based on their supplying medical goods to the Ministry responsible for providing healthcare to millions of Iraqis. The Complaint alleges a lengthy and

26

attenuated sequence of events that cannot support imposing direct liability on Defendants:

*First*, the Manufacturer Defendants supplied medical goods (or their components) to the Supplier Defendants. *E.g.*, JA__ (¶188).

*Second*, the Supplier Defendants provided medicines and medical equipment to Kimadia, which procured such medical goods for the Ministry's use in carrying out its governmental function to provide public healthcare throughout Iraq. *E.g.*, JA__-__, __-__ (¶¶119-21, 189-91).

*Third*, employees within the Ministry took advantage of poor "inventory control[s]" and "looted," "stole[]," and "divert[ed]" some goods from Ministry warehouses and hospitals. JA__, __, __-__, __-__ (¶¶5, 107, 129-30, 138).

*Fourth*, "Jaysh al-Mahdi agents working at MOH" sold the goods they had stolen on the black market. JA__, __-__ (¶¶5, 129-32).

*Fifth*, Jaysh al-Mahdi used its black-market proceeds to support the militia's operations, JA__ (¶8), although the militia was primarily funded by neighboring Iran and Hezbollah, JA__, __, __ (¶¶56, 366, 404). *See also* Former Military Officers Br. 12.

*Sixth*, Jaysh al-Mahdi fighters carried out armed attacks against U.S. military forces, injuring Plaintiffs or their family members. JA__ (¶408).

These allegations self-evidently place Defendants "more than one step removed from a terrorist act or organization." *Owens IV*, 897 F.3d at 275.

3. In an attempt to evade the intervening role of the sovereign Health Ministry in this lengthy sequence, Plaintiffs argue the Ministry is an "alias" or "agent" of Jaysh al-Mahdi. Br. 22-26. But the Complaint contradicts Plaintiffs' contention that the Ministry had no "separate juridical status" or "legitimate" functions not "tied to terrorism" (*id.*), and alleges instead that the Ministry was a "sprawling bureaucracy" responsible for Iraq's public healthcare system, including using Defendants' medicines to deliver healthcare. JA__, __ (¶¶2, 72). As the district court recognized (JA__(Op.21)), by asserting that the political party running the Ministry had political motives for delivering healthcare, Br. 25-26, Plaintiffs concede the relevant point: the Health Ministry performed legitimate government functions and did not "exist solely to perform terrorist acts." *Kemper*, 911 F.3d at 392.

Indeed, courts have ruled that even designated state-sponsors of terrorism (which Iraq and its Health Ministry were not) retain legitimate governmental functions and are intervening entities that typically defeat causation. For example, in *Owens IV*, the plaintiffs argued that Sudan "was functioning primarily as a terrorist haven, rather than a normal nation-state." Appellants' Reply Br. 2, *Owens IV*, 897 F.3d 266 (No. 17-7037), 2017 WL 3189016. But this Court held that Sudan still maintained legitimate sovereign functions. *Owens IV*, 897 F.3d at 275-76. Plaintiffs' suggestion that the *U.S.-supported* Iraqi Health Ministry had no legitimate government functions is even less plausible and is contradicted by their Complaint.

The Complaint's allegations detailing how Jaysh al-Mahdi stole goods from the Ministry reinforce that the Ministry was not Jaysh al-Mahdi's "alias" or "agent." According to the Complaint, when shipments "arrived at a Kimadia warehouse," they were "signed for by a Kimadia warehouse manager" and transferred to "MOH warehouses." JA__ (¶128). Only later were some goods "stolen" or "diverted" by employees supportive of Jaysh al-Mahdi. JA__, __-__ (¶¶107, 128). To do so, Jaysh al-Mahdi agents had to "infiltrate" the Ministry and resort to "looting,"

29

"theft," "misappropriation," "smuggl[ing]," and "siphon[ing]" to obtain the medical goods. JA__, __-__, __, __-__, __-__, __, __ (¶¶3, 107-08, 117, 130, 138 & n.98, 168, 172). Indeed, the Ministry tried to "tackle this practice" of theft and looting with "heroic efforts" by "doctors, administrators and ministerial officials." JA__ (¶¶129-30). If the Ministry were an alias or agent of Jaysh al-Mahdi, then Jaysh al-Mahdi would not have had to "infiltrate" and "loot" the Ministry, while fending off the Ministry's "heroic efforts" to stop it.

Plaintiffs' invocation (at 23-24) of cases involving actual terrorist fronts confirms how different this case is. In *Boim v. Holy Land Foundation for Relief & Development*, Hamas set up charities as "funnel[s]" to "launder donations." 549 F.3d 685, 701-02 (7th Cir. 2008) (en banc). And in *National Council of Resistance of Iran v. Department of State*, an Iranian dissident group was determined by the FBI to be an "integral part" of a designated terrorist organization. 373 F.3d 152, 158 (D.C. Cir. 2004). That is a far cry from Plaintiffs' revisionist labeling of Iraq's Health Ministry—which was funded by the Iraqi and U.S. governments, managed that country's healthcare system, and employed

every public-sector doctor, pharmacist, nurse, and medical technician—as nothing more than an alias of the Jaysh al-Mahdi militia.

The U.S. Government's support for the Ministry, acknowledged in the Complaint, further undermines Plaintiffs' characterization. *See* JA__ (¶113) (discussing "[t]he U.S. government's aid programs interfacing with MOH" and "U.S. funded health projects"). Judicially-noticeable records confirm that, at the same time Sadrist politicians led the Ministry, the United States provided the Ministry hundreds of millions of dollars' worth of support, including "truckloads of medical and capital equipment … transferred to Kimadia." JA__-__ (Dep't of State, Report on Iraq Relief and Reconstruction (Apr. 2005)); *see also* JA__-__ (U.S. Agency for Int'l Dev., Reconstruction Weekly Update (Jan. 20, 2006)) (reporting that "supplies ordered" for U.S.-funded healthcare centers "have arrived in the MoH Baghdad warehouse"). The U.S. Government also encouraged companies to supply the Ministry, and even contracted with some of the Defendants to supply medical equipment for Ministry facilities. JA__ (Special Inspector General for Iraq Reconstruction, Quarterly Report to Congress (Oct. 2006)).

Plaintiffs' argument implies that the United States' "truckloads" of assistance, and encouragement of private-sector support, were provided to a Ministry that had no legitimate government function and was a mere alias of terrorists. Because the Complaint's alleged "causal nexus" is based on any transactions with the Ministry and "not limited to … corrupt payments," JA__ (¶179), accepting Plaintiffs' premise would mean that the U.S. Government itself proximately caused Jaysh al-Mahdi's armed attacks on U.S. forces that injured Plaintiffs.

4. Plaintiffs propose an equally meritless fallback argument to try to support direct liability. They argue (at 17, 27) that, by allegedly engaging in corruption, the Supplier Defendants "structured" their transactions with the Ministry "to benefit the terrorists," but the Complaint pleads the opposite. The "structure" Plaintiffs' argument now emphasizes was the provision of free goods, Br. 27, but the Complaint alleges that free goods were accounted for in "Kimadia's standard instructions," packaged in a way that did not "distinguish these 'free goods' from the rest of the goods destined for Iraqi inventory," and then delivered to Ministry warehouses; only later were some goods stolen from those warehouses. JA__, __ (¶¶120, 123). Nowhere does the Complaint

allege facts suggesting that Defendants structured these deliveries to benefit a militia.

Plaintiffs' assertion (at 29) that "payments [were] made *directly* to Jaysh al-Mahdi terrorists" is similarly not alleged in the Complaint. As the district court noted, the Complaint's "conclusory assertions" of "commissions" are "lacking in any specific factual basis." JA__(Op.22). The Complaint's supposed basis for inferring bribe payments is that the Ministry "historically" received bribes under Saddam—not that there was some practice specific to the Sadrist-led Ministry. JA__-__ (¶163). Even if the Complaint adequately alleged bribery, it speaks of bribes paid to "MOH officials." JA__, __-__ (¶¶145, 150). Far from bypassing the Ministry, the Complaint alleges payments went "through MOH." JA__ (¶114).

This fallback argument by Plaintiffs ultimately rests on the same meritless "alias" theory as their primary argument. In footnotes, Plaintiffs concede that the alleged free goods and commissions went to "'MOH officials' rather than '[Jaysh al-Mahdi],'" and then argue that there was "no meaningful distinction between the Ministry and Jaysh al-Mahdi." Br. 28 n.9, 31 n.13. In other words, despite Plaintiffs' insistence

(at 26) that they can prevail "even if [the Court] views the Ministry as a[ sovereign] intermediary," they revert back to the flawed argument that the Ministry was only a front for Jaysh al-Mahdi.

5. Because the Complaint contradicts the notion that the Ministry and Jaysh al-Mahdi were one and the same, *Owens IV* controls. The Supplier Defendants transacted with a sovereign Ministry, so "the need for additional allegations supporting substantiality is all the more acute." 897 F.3d at 276. The Complaint contains no additional allegations to support a "substantial connection between the defendant[s] and terrorism." *Id.* at 275. Any proceeds from Jaysh al-Mahdi's alleged looting and black-market sales of stolen goods paled in comparison to the Ministry's massive procurement budget. *E.g.*, JA__ (¶116) (Ministry's annual procurement budget was "well more than $1 billion after 2004, when the Sadrists controlled MOH"). And Defendants' transactions could not have been "necessary for [Jaysh al-Mahdi] to carry out [attacks on U.S. forces]," *Owens IV*, 897 F.3d at 276, because neighboring Iran and its proxies supplied virtually "[a]ll of the Mahdi Army's weapons," JA__ (¶404). *See also Rothstein*, 708 F.3d at 97 (affirming dismissal where plaintiffs failed to plead that, but for defendant's conduct, "Iran, with its

billions of dollars in reserve, would not have funded the attacks in which plaintiffs were injured."). Accordingly, the Complaint fails to plead that the Supplier Defendants' transactions with the Health Ministry proximately caused Plaintiffs' injuries in Jaysh al-Mahdi armed attacks.

6. The Manufacturer Defendants' alleged conduct is even further removed from Plaintiffs' injuries. Aside from "registering to do business as [] manufacturer[s]" and "submitting paperwork" confirming the Supplier Defendants could sell their products, *e.g.*, JA__, __ (¶¶156, 194), the Manufacturer Defendants are not alleged to have had any connection to the Ministry, much less to the Jaysh al-Mahdi attacks that injured Plaintiffs. And that flaw cannot be overcome by a conclusory assertion that the Suppliers acted as "agents" of the Manufacturers, *e.g.*, JA__ (¶157), which is not based on any allegations of anything close to the "day-to-day control" over operations necessary to establish agency. *Hull v. Eaton Corp.*, 825 F.2d 448, 458 (D.C. Cir. 1987).

7. Because the Complaint pleads no "substantial connection between the defendant and terrorism," the proximate causation analysis ends there. *Owens IV*, 897 F.3d at 275. But even if it continued, it would fail the additional requirement of foreseeability, because armed militia

attacks are not a natural consequence of transacting with a Health Ministry.

**B. Defendants Did Not Commit Acts Of International Terrorism.**

Although the district court did not reach other defects in the direct-liability claims in light of its proximate causation ruling, this Court may affirm dismissal on a separate ground: the Complaint fails to plead Defendants committed an act of international terrorism.

Direct liability requires that the defendant committed an "act of international terrorism." 18 U.S.C. §2333(a). Congress defined "international terrorism" for purposes of §2333 to include only acts that are "violent" or "dangerous to human life," criminal, and involve conduct beyond U.S. boundaries. 18 U.S.C. §2331(1)(A). And it further limited the definition to only such acts that "appear to be intended" to achieve one of three aims: "to intimidate or coerce a civilian population"; "to influence the policy of a government by intimidation or coercion"; or "to affect the conduct of a government by mass destruction, assassination, or kidnapping." 18 U.S.C. §2331(1)(B).

1. To state a direct-liability claim, the Anti-Terrorism Act requires Plaintiffs to allege facts that would lead an "objective observer" to

conclude that Defendants "desire[d]" to achieve one of the three terroristic goals listed in §2331(1)(B). *Kemper*, 911 F.3d at 390.

The Complaint alleges the opposite. An objective observer could not conclude that medical-goods transactions with the Health Ministry reflected terroristic motives listed in §2331(1)(B). Indeed, the Complaint alleges that the Supplier Defendants had *economic* motives: "to grow their market share in Iraq." JA__ (¶115); *see also* JA__ (¶116) (Ministry's increased budget was "motive for Defendants to engage in corrupt transactions").

Courts have recognized that a complaint alleging economic motives does not plead "international terrorism" under §2331(1)(B). In *Kemper*, for example, the defendant bank allegedly took "wrongful actions" to "evade" U.S. sanctions in dealing with "Iranian entities" connected to terrorism. 911 F.3d at 390. But "[t]o the objective observer," those acts "were motivated by economics"—a "lucrative" "sanctions-evading business"—"and not by a desire to 'intimidate or coerce.'" *Id.* This case, in which Defendants allegedly transacted with a U.S.-backed Health Ministry, is even clearer. *See also Brill*, 804 F. App'x at 632 (corrupt oil purchases that helped Saddam fund terrorism "do not constitute acts of

international terrorism"); *Zapata v. HSBC*, 825 F. App'x 55, 56 (2d Cir. 2020) (adopting reasoning of district court, 414 F. Supp. 3d 342, 355, 358-59 (E.D.N.Y. 2019), that because bank's motive for money-laundering for terrorists was "greed," money-laundering was not "international terrorism"). Allegations of corruption or evasion of sanctions or money-laundering, where well-founded, are addressed through criminal prohibitions under other laws, not the Anti-Terrorism Act's private remedy for international terrorism.

2. The Complaint also fails to plead that supplying medical goods to a Health Ministry "involve[d] violent acts or acts dangerous to human life" that were "a violation of the criminal laws of the United States or of any State" (or would be, if committed within U.S. jurisdiction). 18 U.S.C. §2331(1)(A). "[D]oing business with companies and countries that have significant legitimate operations" is not inherently "violent" or "dangerous to human life." *Kemper*, 911 F.3d at 390. And the predicate crimes the Complaint invokes, 18 U.S.C. §§2339A, 2339C, require "knowing" support for, or financing of, terrorism. The Complaint does not support the absurd notion that Defendants *knew* that the provision of their medical goods to a U.S.-backed Health Ministry would be used to

fund terrorist acts. *See infra* pp.52-56. Nor can the Complaint meet the criminal "knowing" standard by attempting to plead a lesser "recklessly disregard[ing]" standard. JA__, __-__ (¶¶3210, 3216).

## II. The District Court Correctly Dismissed Plaintiffs' Aiding-And-Abetting Claims.

Congress placed strict limits on aiding-and-abetting liability under the Anti-Terrorism Act. Such liability applies only if the plaintiff's injury arises from an act of international terrorism "committed, planned, or authorized by an organization that has been designated a foreign terrorist organization" by the Executive Branch. 18 U.S.C. §2333(d)(2). And it applies only to a "person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." *Id.* It requires not just "provision of material support to a ... terrorist *organization*," but that the defendant "aid[ed] and abett[ed] an *act* of international terrorism" that injured the plaintiff. *Siegel v. HSBC N. Am. Holdings*, 933 F.3d 217, 224 (2d Cir. 2019) (quoting *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018)).

The district court correctly dismissed the aiding-and-abetting claims. Jaysh al-Mahdi has never been designated a foreign terrorist

organization, and Plaintiffs cannot skirt this requirement by alleging that Hezbollah provided "general support or encouragement" for Jaysh al-Mahdi. JA__(Op.24). Moreover, the Complaint does not establish that Defendants knowingly and substantially assisted Jaysh al-Mahdi's attacks on U.S. servicemembers by providing medical goods to a U.S.-supported Health Ministry.

## A. Jaysh al-Mahdi Was Not A Designated Foreign Terrorist Organization And Plaintiffs Do Not Allege That Such An Organization "Committed, Planned, Or Authorized" Nearly All Of The Attacks.

The Complaint concedes that the U.S. government never designated Jaysh al-Mahdi a foreign terrorist organization, "reflect[ing] a concern among some U.S. policymakers about the best way to influence Sadr." JA__ (¶355). This reflects a U.S. Government determination not to declare Jaysh al-Mahdi the type of organization "so tainted by [its] criminal conduct that any contribution to such an organization facilitates that conduct." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 7 (2010) (quoting note following 18 U.S.C. §2339B).

In §2333(d)(2), Congress required that a designated organization play a specific role in the particular terrorist act causing a plaintiff's injury—it must have committed, planned, or authorized that act. Yet

here, the never-designated Jaysh al-Mahdi allegedly committed, on its own, more than 90% of the attacks at issue. The district court correctly held that those attacks do not satisfy the statute's threshold requirement for aiding-and-abetting liability.[5]

Plaintiffs cannot evade that clear statutory limitation by purporting to link every attack to Hezbollah, a separate group that is a designated foreign terrorist organization. The Complaint makes conclusory assertions that Hezbollah "planned" or "authorized" 373 of the attacks, but its only factual allegations are that Hezbollah generally "support[ed]," "trained" and "armed" Jaysh al-Mahdi fighters. JA__-__, __ (¶¶364-70, 389). For example, Plaintiffs highlight allegations that Jaysh al-Mahdi used Hezbollah's "signature" explosive devices, which required Hezbollah "sourcing" and "training," Br. 43, 46, but such allegations would at most satisfy different statutory provisions governing

---

[5] The Complaint alleges that Hezbollah and Jaysh al-Mahdi jointly committed 22 of the attacks, Br. 41, but aiding-and-abetting liability fails for those (and all) attacks for lack of knowingly providing substantial assistance. *See infra* pp.52-56. Although one of the 22 attacks that Hezbollah allegedly co-committed with Jaysh al-Mahdi purportedly sparked the weeks-long "Battle of Sadr City," JA__-__ (¶345), it does not follow, as Plaintiffs suggest (at 42), that Hezbollah committed every attack during that battle.

"material support," *e.g.*, 18 U.S.C. §2339A. Congress did not incorporate "material support" in §2333(d)(2), and instead required a closer connection between the designated foreign terrorist organization and the act of terrorism: that it "committed," "planned," or "authorized" the act.

Nor can Plaintiffs avoid the statutory requirement by alleging that Hezbollah "greatly inspired" Jaysh al-Mahdi operatives because inspiration does not amount to "planning" or "authorizing" attacks. *See Crosby v. Twitter, Inc.*, 921 F.3d 617, 626 (6th Cir. 2019) (Islamic State organization did not "authorize" attack committed by Islamic State-"inspir[ed]" terrorist). Plaintiffs' resort to general allegations, such as that Hezbollah "orchestrat[ed] Jaysh al-Mahdi's terrorist campaign" writ large, Br. 43, confirms that they cannot allege the specific actions the statute requires.

Plaintiffs similarly reach far beyond the text of the Anti-Terrorism Act with their invocation of the Racketeer Influenced and Corrupt Organizations Act. Again trying to fit a square peg into a round hole, Plaintiffs combine every Jaysh al-Mahdi attack into a "campaign," which they label a "racketeering enterprise" and argue is a single "act of international terrorism" that "Hezbollah 'planned' and 'authorized.'" Br.

49.  "[I]t would be quite unnatural," as the district court rightly observed, to read the singular "act of international terrorism" to encompass a generalized "campaign" spanning 16 years.  JA__(Op.25).

Plaintiffs' cases are not to the contrary.  For instance, *United States v. Pregler* was not a terrorism case, and it did not "describe a multifaceted enterprise" as a single "act," Br. 49; it observed that a "conspiracy" is a "continuing course of conduct."  925 F.2d 268, 269-70 (8th Cir. 1991).  The issue is not whether, in some other context, the word "act" could include a series of events.  Br. 49.  It is whether the term "act of international terrorism," which specifically gives rise to the injury for which a plaintiff seeks damages, 18 U.S.C. §2333(a), (d)(2), could somehow cover an amorphous "enterprise," notwithstanding the clear limitations Congress imposed through the statute's text and structure.  *See Taamneh v. Twitter, Inc.*, 343 F. Supp. 3d 904, 916 (N.D. Cal. 2018) (statutory phrase "an act" cannot refer to a terrorist organization's "general course of conduct").  The district court correctly rejected the rewriting of the statute that Plaintiffs' arguments would require.

**B. Defendants Did Not Provide "Substantial Assistance" To Jaysh al-Mahdi Or Its Alleged Acts Of International Terrorism By Manufacturing Medical Goods Or Supplying Them To The Iraqi Health Ministry.**

1. Aiding-and-abetting liability can be imposed under the Anti-Terrorism Act only if a defendant "aids and abets … the person who committed" the act of international terrorism from which the plaintiff's injury arose. 18 U.S.C. §2333(d)(2). Here, the Complaint alleges that Jaysh al-Mahdi—not the Health Ministry—is the person that committed all attacks, alone or in a few instances with others. Br. 36.

The district court correctly rejected Plaintiffs' argument that Defendants "aid[ed] and abet[ted] Jaysh al-Mahdi in its terrorist acts," Br. 32, because the Complaint "allege[s] that [D]efendants provided medical goods and devices *to the Ministry,*" JA__(Op.26) (emphasis added), not to Jaysh al-Mahdi. Plaintiffs' argument rests on the flawed premise, which the Complaint contradicts, that the Ministry and Jaysh al-Mahdi were one and the same. *Supra* pp.28-31. The Complaint does not plead that the Defendants "aid[ed] and abet[ted] … the person who committed such an act of international terrorism." 18 U.S.C. §2333(d)(2). This is particularly obvious for the Manufacturer Defendants, who

44

provided medical goods only to the Supplier Defendants, who in turn supplied the Ministry.

Moreover, courts correctly require a "direct link between the defendant and individual perpetrator" to support aiding-and-abetting liability under the Anti-Terrorism Act. *Crosby*, 921 F.3d at 627 n.6; *see also Brill*, 804 F. App'x at 632 (no aiding-and-abetting liability where plaintiffs alleged "[a]t most … a contractual relationship with a third party" that financed terrorism). Plaintiffs cannot dilute that requirement by pointing to the phrase "directly or indirectly" in a preamble to the 2016 amendment to the statute. Br. 35. Preambles "cannot change the scope of the operative clause" of a statute, *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1978 (2016), and the operative text plainly requires that the defendant "aid and abet" the "person who committed" the terrorist act, without any suggestion that it could be through some means other than directly aiding and abetting that person.

Plaintiffs' focus on the term "direct" is also beside the point because the Complaint does not allege that Defendants provided assistance to Jaysh al-Mahdi at all, even "indirectly" within the meaning of the

preamble. Indeed, Plaintiffs' *amici* Senators contend that the statutory purpose is to reach the funding of terrorists through their "agents" or "alter egos," and to deter "support for terrorist organizations, their agents, and proxies." Senators Br. 6, 24. The Senators highlight *Boim*, in which Hamas used charities as fronts to launder donations, as exemplifying "indirect" assistance to terrorists that the statute should cover. *Id.* at 26-27. But the Iraqi Health Ministry was a *U.S.-supported foreign government agency*, not an agent, alter ego, or proxy of the Jaysh al-Mahdi militia, and *amici* Senators do not suggest otherwise.[6]

2. Even if Defendants' transactions with the Ministry could be distorted into assistance to Jaysh al-Mahdi, the Complaint does not allege *substantial* assistance to the acts of international terrorism that injured Plaintiffs, as further required under §2333(d)(2). Congress stated

---

[6] The Ministry's intervening role bolsters the conclusion that Defendants did not aid and abet Jaysh al-Mahdi, similar to how that role interrupts proximate causation for the direct-liability claims. Proximate cause and substantial assistance are related concepts. Liability "for the act of [an]other" must be based on "assistance" that was "a substantial factor in causing the resulting tort." Restatement (Second) of Torts §876, cmt. d (1979). Proximate causation likewise considers whether an act was a "substantial factor" in the injury. *Supra* p.23. Thus, "[i]n determining liability" for aiding and abetting, "the factors are the same as those used in determining the existence of legal causation." Restatement §876, cmt. d.

that *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), provides guidance on Anti-Terrorism Act aiding-and-abetting liability, Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, §2(a)(5), 130 Stat. 852, 852 (2016), and under *Halberstam*, an aider-and-abettor must "knowingly and substantially assist the principal violation," 705 F.2d at 488. As the Second Circuit held, "aiding and abetting an *act* of international terrorism requires more than the provision of material support to a designated terrorist *organization*." *Siegel*, 933 F.3d at 224 (quoting *Linde*, 882 F.3d at 329) (emphasis in original).

The district court properly applied *Halberstam*'s factors to the Complaint's allegations and concluded that Defendants could not have played any role, much less a "substantial" one, in "[Jaysh al-Mahdi's] terrorist activities." JA__(Op.29). The facts of *Halberstam* highlight the sort of assistance that is "substantial": the defendant there played an "essential" part in her boyfriend's burglary enterprise and "perceived her role and … the value of her assistance" as such. 705 F.2d at 488. The instant case is nothing like that. Defendants' medical transactions were far from necessary to fund Jaysh al-Mahdi's armed attacks; any connection between Defendants and the militia was at best attenuated;

and Defendants did not share the militia's wrongful aims. The *Halberstam* factors are doubly decisive for the Manufacturer Defendants, which are alleged only to have produced goods that *other Defendants* sold to the Ministry.

*Nature and Kind.* The first factor—"the nature of the act encouraged"—"dictates what aid might matter, *i.e.*, be substantial." *Halberstam*, 705 F.2d at 484. The second considers the "amount [and kind] of assistance given." *Id.* (alteration in original). Here, there is an obvious mismatch between the violation—armed militia attacks against U.S. military forces—and the alleged assistance, *i.e.*, supplying life-saving medical goods to a sovereign, U.S.-supported Health Ministry. JA__-__, __-__, __, __-__ (¶¶191, 226, 247, 312).

These two factors consider whether the injurious act was "heavily dependent" on the alleged assistance, and whether the assistance was "indisputably important" and an "essential part" of the principal's illegal activities. 705 F.2d at 488. Although Plaintiffs' brief asserts without citation that Defendants' transactions "materially intensified Jaysh al-Mahdi's terrorist campaign," Br. 34, that assertion neither appears in, nor is supported by, the Complaint.

Far from alleging that cancer treatments and electrocardiogram machines stolen from the Iraqi Health Ministry were an essential part of Jaysh al-Mahdi's armed attacks against U.S. forces, the Complaint alleges that "[a]ll of the Mahdi Army's weapons except for the AK-47 rifles come from" a different source: "Iran." JA__ (¶404). Indeed, Plaintiffs' own *amici*, former military officers, describe Iran's funding, training, and arming of Jaysh al-Mahdi—not Defendants' medical transactions—as "essential" to "the attacks that injured Plaintiffs." Former Military Officers Br. 8-12.[7] Many of the Plaintiffs have themselves sued Iran over the same injuries. *Supra* pp.ii-iii.

*Presence and Relationship.* Plaintiffs concede that the third factor for determining whether assistance was "substantial"—"presence at the time of the tort"—favors Defendants. Br. 36-37. Plaintiffs seek to minimize this factor by noting that the defendant in *Halberstam* was not present at the murder, Br. 37, but her presence did not matter because "the success of the tortious enterprise clearly required" the defendant's "role." 705 F.2d at 488. Again, Plaintiffs allege nothing like that here.

---

[7] The former officers argue only that Hezbollah planned or authorized Jaysh al-Mahdi's attacks, not that Defendants knowingly assisted Hezbollah or Jaysh al-Mahdi.

The fourth factor, "relation to the tortfeasor," similarly supports Defendants. *Halberstam*, 705 F.2d at 484. Plaintiffs assert that "Defendants had a business relationship with Jaysh al-Mahdi's fundraisers," Br. 37 (citing JA__-__ (¶¶4-11)), by which they mean "officials inside the Ministry," JA__ (¶4). That is a tacit admission that the Complaint alleges no relationship *with Jaysh al-Mahdi*.

These third and fourth factors support all Defendants, but even more so the Manufacturer Defendants, who are not alleged to have had any presence in Iraq or relationship with even the Ministry, let alone with Jaysh al-Mahdi.

*State of Mind. Halberstam*'s fifth factor, state of mind, considers whether the defendant "was one in spirit with the [principal wrongdoer]." 705 F.2d at 484, 488. Plaintiffs accuse the district court of treating intent as a "litmus test for [aiding-and-abetting] liability," Br. 40, but the court correctly applied *Halberstam*, which explained that state of mind "assume[d] a special importance" there because the defendant's "long-term intention to participate in an ongoing illicit enterprise" with the tortfeasor "reflected her intent and desire to make [the tortfeasor's] venture succeed." 705 F.2d at 488. The Complaint here does not allege

that Defendants intended or desired that Jaysh al-Mahdi succeed in any of its military objectives, let alone its attacks on U.S. servicemembers.

Plaintiffs' argument would reduce the state-of-mind factor to a knowledge inquiry, Br. 39-40, but that improperly conflates two separate aiding-and-abetting requirements: "knowingly" and "substantial." 18 U.S.C. §2333(d)(2). *Halberstam* analyzed the "knowingly" and "substantial" requirements separately, with state of mind as one factor in the "substantial" inquiry. 705 F.2d at 488; *see Linde*, 882 F.3d at 329 n.10 (explaining that the "knowing" requirement does not demand "specific intent," but "intent can bear on [the defendant's] state of mind, one of the factors properly considered" under *Halberstam*'s substantial assistance analysis). Furthermore, the Complaint does not adequately allege even that Defendants knew they were assuming a role in terrorist activities. *See infra* pp.52-56. And all the more so for the Manufacturer Defendants, who did not transact with the Ministry.

*Duration.* *Halberstam* notes "duration of the assistance provided" may be relevant to whether assistance was substantial because it "affects" other factors. 705 F.2d at 484. Because the other factors weigh heavily against a finding of substantial assistance, as the district court

51

determined, duration is of little relevance here. JA__-__(Op.28-29). Indeed, Plaintiffs argue the "alleged aid spanned over a decade," Br. 41 (quoting JA__-__(Op.28-29)), but the Sadrists—the Iraqi political movement with which Jaysh al-Mahdi was affiliated—led the Health Ministry for at most four of those years. *See* JA__, __ (¶¶68, 104). A decade-plus of transactions with *the Health Ministry* was not substantial assistance to *Jaysh al-Mahdi's attacks*.

## C. Defendants Did Not "Knowingly" Assume A Role In Terrorist Acts.

Congress also specified that aiding-and-abetting liability can be imposed under the Anti-Terrorism Act only on a defendant who "*knowingly* provid[ed] substantial assistance" to "the person who committed such an act of international terrorism." 18 U.S.C. §2333(d)(2) (emphasis added). The statute thus requires an aider-and-abettor "to be 'aware' that, by assisting the principal, it is itself assuming a 'role' in terrorist activities." *Linde*, 882 F.3d at 329 (quoting *Halberstam*, 705 F.2d at 477). And "awareness that one is playing a role in [terrorist] activities" requires more than "knowledge of the organization's connection to terrorism." *Id.* at 330.

The Complaint fails to plausibly plead that Defendants knew they were playing any role in Jaysh al-Mahdi's terrorist activities. Plaintiffs argue that "corruption allegations" support an inference of knowledge, Br. 38, but alleged knowledge of participating in Iraqi governmental corruption is not knowledge of playing a role in Jaysh al-Mahdi's attacks. And contrary to Plaintiffs' brief, the Complaint does not allege that the purportedly "corrupt structure" of the Supplier Defendants' transactions "reflects an intent to funnel off-book resources *to Jaysh al-Mahdi*." Br. 37 (emphasis added). Rather, the Complaint alleges that the transactions "continued" corrupt "Saddam-era practices," *i.e.*, practices that pre-dated Jaysh al-Mahdi's existence. JA__-__ (¶4). The Ninth Circuit addressed similar allegations and concluded that a defendant's knowledge that it was paying "kickbacks," even to a state sponsor of terrorism (Saddam-era Iraq), did not indicate it "knew its kickbacks would be used to provide financial support to [a] terrorist organization." *Brill*, 804 F. App'x at 632. That analysis applies equally here.

Plaintiffs also ask the Court to infer the requisite knowledge from the Supplier Defendants' supposed presence at the Ministry, arguing they should have taken "visual cues" from their surroundings, Br. 38, but

53

the Complaint alleges that other entities, not Defendants' employees, visited the Ministry.  JA__ (¶180).  Furthermore, posters of political leader Muqtada al-Sadr, whose party was assigned leadership of the Ministry as part of a coalition government, and the presence of weapons at a time Baghdad was undeniably dangerous, JA__, __-__, __, __ (¶¶10, 73, 89, 180), are not "visual cues" that Jaysh al-Mahdi would steal medical goods, sell them on the black market, and use proceeds to fund its attacks.

The Complaint also cites press reports, but those mostly identified the Ministry's political leadership.  *E.g.*, JA__ (¶183, bullet 1 ("health minister" "belong[s] to Mr. Sadr's political movement")).  Reports of "diversion" of Ministry resources to a militia appeared in 2007, in the context of a high-profile arrest, which suggested a crackdown on militia infiltration.  JA__ (¶183, bullet 11); *see also* JA__ (Multi-National Corps–Iraq, Operation Black Crescent (June 2007)) (U.S. General reporting that Ministry was "clean[ing] up militia influence").  As late as 2008, the press reported in vague terms that Sadrist-run ministries were under "scrutiny," JA__ (¶183, bullet 15), but that same year non-Sadrists assumed leadership at the Health Ministry.  JA__ (¶104).  Tellingly, in

attempting to link the Ministry to Jaysh al-Mahdi, the Complaint relies heavily on classified diplomatic cables that were not leaked until 2010. *See, e.g.*, JA__ (¶1).

Moreover, amidst this cloudy wartime reporting, one thing was crystal-clear in the public record: the U.S. Government publicly reported to Congress its continued support and funding of the Iraqi Health Ministry. *Supra* p.31.

In a case presenting stronger allegations than those made here, the Second Circuit dismissed Anti-Terrorism Act aiding-and-abetting claims for failure to plead the statutory "knowingly" requirement. There, HSBC allegedly "was aware of [Al Rajhi Bank's] links to terrorist organizations" and was "concerned that Al Rajhi's account may have been used by terrorists." *Siegel*, 933 F.3d at 220 (quotation marks and citation omitted). The plaintiffs identified "public reports that [Al Rajhi Bank] and some of its senior officials supported terrorist organizations, including al-Qaeda." *Id.* at 224 n.6. And HSBC committed sanctions violations in a "'scheme' to evade U.S. regulators." *Id.* at 221. The court recognized, however, that none of that was sufficient to infer that HSBC knew "it was assuming a role in [al-Qaeda's] terrorist activities." *Id.* at

224. The Complaint here likewise fails the "knowingly" requirement because "[a]t most" it alleges "that [Defendants] [were] aware that [the Health Ministry] was believed by some to have links to [Jaysh al-Mahdi]." *Id.*

All of these reasons for dismissal apply with even greater force to the Manufacturer Defendants. They are not alleged to have engaged in corrupt transactions or to have seen purported "visual cues" at the Ministry, and the Complaint does not support the notion that they knew that, by manufacturing goods *for other medical companies*, they were assuming a role in Jaysh al-Mahdi's armed attacks.

## III. The Anti-Terrorism Act's "Act-of-War" Prohibition Bars Plaintiffs' Complaint Because Their Injuries Are By Reason Of Acts Occurring In The Course Of Armed Conflict Between Military Forces.

In addition to the limitations placed on direct and aiding-and-abetting liability, Congress specified that "[n]o action shall be maintained" under the Anti-Terrorism Act for "injury or loss by reason of an act of war." 18 U.S.C. §2336(a). Congress defined "act of war" to include not only acts during "declared war" and "armed conflict" between "nations," but also "any act occurring in the course of … armed conflict between military forces of any origin." *Id.* §2331(4).

This lawsuit, pleading injuries from attacks in the course of armed conflict between military forces including the U.S. military and Jaysh al-Mahdi, *i.e.* "the Mahdi Army," is a paradigm of a suit the statute bars. Although the district court declined to resolve Defendants' "act-of-war" argument—characterizing it as raising factual questions (and dismissing on other grounds)—the argument can properly be resolved at this stage. The Complaint's allegations alone bring this case within the statutory prohibition, providing an alternative ground on which this Court may affirm dismissal of all claims.

There is no serious question that there was "armed conflict between military forces" in Iraq, which was engulfed in what was popularly called the "Iraq War" during the entire period at issue. The Complaint describes an armed "insurgency against U.S. forces," JA__ (¶183, bullet 2), attacks on military targets, *e.g.*, JA__, __-__, __-__, __ (¶¶59, 61-62, 102-03, 2550), and prolonged military battles, JA__, __-__ (¶¶337, 345). The U.S. Government legally classified "the ongoing hostilities" in Iraq after 2004 as "a non-international armed conflict." U.S. Suppl. Br. 7, *United States v. Hamidullin*, 888 F.3d 62 (4th Cir. 2018) (No. 15-4788), 2017 WL 4163478.

With respect to "military forces," both the U.S. military and Jaysh al-Mahdi meet that requirement. The Anti-Terrorism Act's definition of "act of war" expressly and separately includes "armed conflict" between "two or more nations," 18 U.S.C. §2331(4)(B), and "armed conflict" between "military forces of any origin," *id.* §2331(4)(C). That structure necessarily means that "military forces of any origin" includes forces that do not belong to any nation.

The Complaint's allegations establish that Jaysh al-Mahdi was such a military force: the Mahdi Army had "60,000 fighters" "operat[ing] throughout Iraq, with regional command centers" and multiple "brigades," JA__, __-__ (¶¶61, 338); used military weapons and complex infantry tactics, *e.g.*, JA__-__, __ (¶¶339-46, 1085); and "seized control of large swaths of Iraq," JA__ (¶61). The Complaint describes Jaysh al-Mahdi as a "militia" with "military ends." JA__, __ (¶¶13, 166). Indeed, former U.S. military officers appearing as Plaintiffs' *amici* explain (at 1, 10) that they "fought Jaysh al-Mahdi … on the battlefield, commanding battalions or companies of soldiers" that were "attacked" in a "full-scale unconventional warfare campaign in Iraq." *See also* Iraq Expert Br. 13-14 (describing Jaysh al-Mahdi as an "army"). Jaysh al-Mahdi's actions

58

fit the definition of militia—a *"military force* that engages in rebel or terrorist activities in opposition to a regular army."  Oxford English Dictionary (3d ed. 2002) (emphasis added).

Every injury in this case was caused by acts "occurring in the course of" armed conflict between the U.S. military and Jaysh al-Mahdi.  18 U.S.C. §2331(4).  Ninety-two percent of the injured individuals were uniformed members of the U.S. military directly participating in armed conflict; many, for example, were killed or wounded in the six-week Battle of Sadr City.  *E.g.*, JA__, __, __, __, __, __, __ (¶¶429, 596, 634, 673, 685, 705, 1085).  The other 8% were likewise injured as part of their participation in the armed conflict, such as "military contractor[s]" supporting the "dispos[al] of captured munitions," JA__ (¶490), and in one instance a journalist reporting on the conflict, JA__ (¶3055).

Below, Plaintiffs made two arguments invoking the law of war to try to escape §2336(a).  First, Plaintiffs argued that Jaysh al-Mahdi was not a "military force" because it did not comply with the law of war, but the statute contains no such condition.  National militaries do not always adhere to the law of war, yet they remain "military forces."  Nor is it implied by the ordinary meaning of "military forces of any origin," which

describes many non-national forces that violate the law of war. *See, e.g.*, *Khairkhwa v. Obama*, 703 F.3d 547, 549 (D.C. Cir. 2012) ("Taliban military forces"); *Linder v. Portocarrero*, 963 F.2d 332, 333 (11th Cir. 1992) ("Nicaraguan anti-government military forces (contras)"); *Prosecutor v. Milosevic*, ICTY Case No. IT-02-54-T, Decision on Motion for Judgment of Acquittal, ¶23 (June 16, 2004) ("the [Kosovo Liberation Army] [is] an organised military force").

If law-of-war compliance were a prerequisite for being deemed a "military force" under the statute, Congress would have said so, and it would not have needed to carve out specific non-complying forces. Yet in a 2018 amendment, Congress specified that the term "military force" does not include persons that "ha[ve] been designated" foreign terrorist organizations, 18 U.S.C. §2331(6)—organizations that regularly violate the law of war and, under Plaintiffs' reading, could never have qualified as military forces in the first place.

Second, Plaintiffs argued that law-of-war violations are not acts "occurring in the course of armed conflict." But that argument defies the statutory text, which specifies that "act of war" includes "any act," not "any *lawful* act," occurring in the course of armed conflict between

60

military forces. Law-of-war violations *necessarily* occur in the course of armed conflict, or else the law of war would not apply. Plaintiffs' argument would also render superfluous the prohibition in §2336(a) against Anti-Terrorism Act suits that are based on injury by reason of an "act of war." The act-of-war prohibition "becomes salient only if the act in question qualifies as 'an act of international terrorism' in the first place," which by statutory definition is unlawful. *Kaplan*, 896 F.3d at 513.

Congress's directive that "no action shall be maintained" for injuries occurring during armed conflict between military forces reflects a determination not to permit private suits over such injuries, which would lead to untenable battlefield fact-finding and myriad other challenges. That is what the Complaint claims here: that Defendants are liable for Jaysh al-Mahdi's armed attacks against U.S. military forces and related personnel, as part of armed conflict between U.S. and Mahdi Army forces. The statute prohibits such a suit.

## IV. The District Court Correctly Ruled It Lacked Personal Jurisdiction Over The Foreign Defendants.

The Complaint includes as defendants some companies that are foreign entities. It attempts to invoke U.S. court jurisdiction over those

Foreign Defendants based on allegations that they transacted with a foreign Health Ministry, from which a foreign militia stole goods, after which the militia carried out armed attacks in a foreign country.

As the district court recognized (JA__(Op.6 n.3)), and Plaintiffs do not dispute, the court lacked *general* personal jurisdiction over any of the Foreign Defendants. And Plaintiffs abandon on appeal any challenge to the district court's rulings that there is no *specific* personal jurisdiction based on Defendants purportedly "align[ing] themselves with conduct [by Jaysh al-Mahdi] that was purposefully directed at the United States," JA__(Op.7) (quotation marks omitted), or "paying certain banking fees through the New York banking system," JA__(Op.11).

All that is left is Plaintiffs' argument that the court had specific personal jurisdiction over the Foreign Defendants because they allegedly "sourced" from the United States some of the medical goods they supplied to the Iraqi Health Ministry. By this, Plaintiffs mean that some of the goods (or their ingredients) were manufactured by the Foreign Defendants' U.S. affiliates. The district court correctly held that "those practices are at best tangential to plaintiffs' claims" and cannot establish specific personal jurisdiction. JA__(Op.11).

**A.** **Plaintiffs' Claims Of Injury In Iraq Do Not Arise From, Or Relate To, The Foreign Defendants' Alleged Sourcing Of Some Medical Goods From The United States.**

The district court correctly held that it lacked specific personal jurisdiction over the Foreign Defendants based on Plaintiffs' Anti-Terrorism Act claims. "[S]pecific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quotation marks omitted). For such jurisdiction to exist, "the *suit* must aris[e] out of or relat[e] to the defendant's contacts with the *forum*," *Bristol-Myers Squibb Co. v. Superior Court of Cal.*, 137 S. Ct. 1773, 1780 (2017) (quotation marks omitted), which here is "the United States as a whole," *Livnat v. Palestinian Auth.*, 851 F.3d 45, 55 (D.C. Cir. 2017).

This Court has not decided how close the relationship between the plaintiff's claims and the defendant's forum contacts must be to meet the "arises out of or relates to" standard. *See Estate of Klieman v. Palestinian Auth.*, 923 F.3d 1115, 1126 (D.C. Cir. 2019), *reinstated in relevant part*, 820 F. App'x 11 (D.C. Cir. 2020). Some courts hold that in a tort case, a defendant's forum contact must be "a 'but-for' cause of the tort." *Id.* (quoting *Waite v. AII Acquisition Corp.*, 901 F.3d 1307, 1314 (11th Cir.

2018)); *see Ballard v. Savage*, 65 F.3d 1495, 1500 (9th Cir. 1995). Other courts require "the typically stricter proximate cause or 'legal cause' test." *Klieman*, 923 F.3d at 1126; *see Beydoun v. Wataniya Rests. Holding, Q.S.C.*, 768 F.3d 499, 507-08 (6th Cir. 2014); *Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 137 (1st Cir. 2006). For the Anti-Terrorism Act, the Second Circuit has described "[t]he relevant 'suit-related conduct'" as "the conduct that could have subjected [defendants] to liability under the ATA." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 335 (2d Cir. 2016).

This Court need not decide here the precise relationship required between claims and forum contacts, because specific personal jurisdiction is lacking under any standard. At a minimum, where a defendant's forum "contacts are tangential" to the plaintiff's "injuries," they do not support the forum's specific personal jurisdiction over the defendant. *Monge v. RG Petro-Mach. (Grp.) Co.*, 701 F.3d 598, 618 (10th Cir. 2012).

The sole contact Plaintiffs put forward between the Foreign Defendants and the United States—alleged "sourcing" of some medical goods (or their ingredients) from other companies that manufactured them in the United States—is entirely tangential to Plaintiffs' claims for

liability based on medical transactions in Iraq and militia attacks in Iraq. And that cannot be transformed into suit-related conduct based on an assertion that "American-made products" were "especially valuable" to the Ministry because they were "FDA-approved." Br. 52. That contention focuses on value *to the Ministry*, whereas the relevant question is whether the suit arises from or relates to "the *defendant's* conduct connect[ing] [it] to the forum." *Walden*, 571 U.S. at 290 (emphasis added). As the district court observed, if "the mere fact that the 'value' of a foreign transaction is 'magnif[ied]' because the goods sold were originally manufactured in the United States" sufficed for jurisdiction, "personal jurisdiction would extend to countless transactions between foreign entities that involve a U.S.-made product." JA__(Op.13) (quotation marks omitted; alterations in original).

Plaintiffs further err in asserting (at 51-52) that the Foreign Defendants could not have supplied the Ministry without U.S.-sourced medicines and "U.S. documentation" proving that sourcing. Many of the Foreign Defendants' contracts specified countries *other* than the United States as the country of origin for the contracted goods. *See* JA__-__

65

(declarations attaching contracts).  For some Foreign Defendants, that describes most or all contracts.[8]

The Complaint explains why many contracts specified country of origin: "The source of the drugs was material to Kimadia" because "MOH officials were suspicious of counterfeit drugs."  JA__ (¶122); *see also* JA__-__ (¶153).  The Ministry was ensuring it received authentic medicines, not demanding U.S.-origin medicines, which is confirmed by Defendants' supply of many non-U.S.-origin medicines.  The Complaint certainly does not plead that *Jaysh al-Mahdi needed to steal* U.S.-origin medicines.

The district court did not, as Plaintiffs argue, "recogniz[e] a forum contact only if it is itself illegal."  Br. 53.  The court found that Defendants' sourcing practices were not themselves unlawful, "[*n*]*or*" were they "suit-related conduct."  JA__(Op.11) (emphasis added).  Plaintiffs identify no case supporting the notion that a foreign company that sells products abroad, for use abroad, can be sued in the United

---

[8] Plaintiffs criticize the Foreign Defendants for "adduc[ing] little evidence," Br. 55, but the Foreign Defendants moved to dismiss on the pleadings and submitted contracts that were incorporated by reference in the Complaint.

States for alleged wrongdoing abroad, just because the foreign company sourced some products from the United States.

Both cases on which Plaintiffs rely (at 51, 53) concerning "procuring" goods from a U.S. forum, involved contract claims *about that procurement.* *See Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 548, 551 (6th Cir. 2007); *St. Jude Med., Inc. v. Lifecare Int'l, Inc.*, 250 F.3d 587, 591-92 (8th Cir. 2001). Much more relevant is the Supreme Court's ruling in *Bristol-Myers Squibb* that the "bare fact" that a defendant contracted with an in-forum distributor to sell products did not subject that defendant to specific jurisdiction for claims by third-parties allegedly injured by the defendant's sales outside the forum. *See* 137 S. Ct. at 1783.

Under any standard, the presence of U.S. manufacturers in the Foreign Defendants' supply chains has no meaningful "affiliation" with "the underlying controversy"—a lawsuit alleging that Foreign Defendants supplied medical goods to a foreign Health Ministry, and that Plaintiffs were injured by foreign militia attacks—such that a U.S. court's exercise of jurisdiction over the Foreign Defendants would be "regulat[ing]" "an occurrence that [took] place in the forum." *Id.* at 1780

(quotation marks omitted).  The Foreign Defendants' transactions with the foreign Ministry did not proximately cause Plaintiffs' injuries at all, *supra* pp.23-28, and their sourcing of some goods from the United States certainly did not proximately cause Plaintiffs' injuries.  *See, e.g.*, *Beydoun*, 768 F.3d at 508.  U.S. sourcing of goods by the Foreign Defendants is not "the conduct that could have subjected them to liability under the ATA," which was rooted, instead, in alleged conduct in Iraq. *Waldman*, 835 F.3d at 335.  And sourcing of goods from the United States could not have been a "'but-for' cause" of Plaintiffs' injuries, *Waite*, 901 F.3d at 1314, because many of the contracted-for products allegedly stolen and sold by Jaysh al-Mahdi were sourced from *outside* the United States.  In short, the district court was exactly right that the alleged sourcing was "at best tangential to plaintiffs' claims."  JA__(Op.11).

**B.    There Is No Anti-Terrorism Act Exception To Due Process.**

The Court can consider "other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice'" only "[o]nce it has been decided" that the claims arise out of, or relate to, forum contacts. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985).  Plaintiffs nonetheless argue (at 57-59) that

"Congress's legislative choice" in enacting the Anti-Terrorism Act should lead the Court to relax the constitutional requirement that "the suit must aris[e] out of or relat[e] to the defendant's contacts with the forum." *Bristol-Myers Squibb*, 137 S. Ct. at 1780 (quotation marks and emphasis omitted). But this Court already rejected a similar argument that "applying due-process protections to limit personal jurisdiction in Antiterrorism Act cases would thwart Congress's intent to provide redress in U.S. courts for terrorism abroad." *Livnat*, 851 F.3d at 53. It found "no indication that Congress thought ordinary due-process requirements would not apply here," and "regardless, Congress cannot wish away a constitutional provision." *Id*.[9]

### C. The District Court Did Not Abuse Its Discretion In Denying Jurisdictional Discovery.

The district court acted well within its discretion in denying jurisdictional discovery, which is not appropriate when the discovery "would not change [the court's] analysis." *Livnat*, 852 F.3d at 57. Plaintiffs' vague assertion (at 59-60) that "discovery would enhance

---

[9] Due Process cannot be overcome by asserting "[n]o other forum is realistically able to hear Plaintiffs' claims." Br. 58. Moreover, Plaintiffs do not argue that they cannot file suit in the Foreign Defendants' home countries.

Plaintiffs' jurisdictional allegations about the … Kimadia contracts" does not articulate what such discovery could yield; Plaintiffs' allegations about the Foreign Defendants' contracts with the Health Ministry are legally irrelevant. The same is true for additional allegations of "affiliate relationships" (at 54, 60), because the Complaint does not plead an agency relationship that could permit attribution of an affiliate's in-forum conduct to a Foreign Defendant. *Supra* pp.28-31.[10]

## CONCLUSION

The Court should affirm the district court's judgment.

---

[10] The only basis for personal jurisdiction over any Defendant on the state-law claims is pendent jurisdiction "[i]f the federal-law claims survive." Br. 59. Because the federal claims fail, the district court properly dismissed all state-law claims.

DATED: March 12, 2021                    Respectfully submitted,


/s/ Neil H. MacBride*
Neil H. MacBride
Kenneth L. Wainstein
DAVIS POLK & WARDWELL LLP
901 15th Street, N.W.
Washington, DC 20005
(202) 962-7030 (Telephone)
neil.macbride@davispolk.com

Paul S. Mishkin
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
(202) 450-4292 (Telephone)
paul.mishkin@davispolk.com

*Counsel for Defendants-Appellees
AstraZeneca Pharmaceuticals LP
and AstraZeneca UK Limited*


/s/ Patrick J. Carome*
Patrick J. Carome
David W. Bowker
Leon T. Kenworthy
Claire Bergeron
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
(202) 663-6000 (Telephone)
patrick.carome@wilmerhale.com

/s/ Beth S. Brinkmann
Beth S. Brinkmann
    *Counsel of Record*
John E. Hall
David M. Zionts
Jordan L. Moran
Megan C. Keenan
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street N.W.
Washington, DC 20001
(202) 662-5312 (Telephone)
bbrinkmann@cov.com

*Counsel for Defendant-Appellee
F. Hoffmann-La Roche Ltd*


/s/ Lisa S. Blatt*
Lisa S. Blatt
Christopher N. Manning
Melissa B. Collins
Brian T. Gilmore
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000 (Telephone)
lblatt@wc.com

*Counsel for Defendants-Appellees
Pfizer Inc., Pfizer
Pharmaceuticals LLC, Pfizer
Enterprises SARL, Pharmacia &*

---

* Signed with the consent of the parties.  *See* D.C. Cir. R. 32(a)(2).

*Counsel for Defendants-Appellees Genentech, Inc. and Hoffmann-La Roche Inc.*

*/s/ John B. Bellinger III\**
John B. Bellinger III
David J. Weiner
John David Cella
ARNOLD & PORTER KAYE
SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, DC 20001
(202) 942-5000 (Telephone)
john.bellinger@arnoldporter.com

Robert Reeves Anderson
ARNOLD & PORTER KAYE
SCHOLER LLP
1144 Fifteenth Street, Suite 3100
Denver, CO 80202-1370
(303) 863-2325 (Telephone)
reeves.anderson@arnoldporter.com

*Counsel for Defendants-Appellees GE Healthcare USA Holding LLC, GE Medical Systems Information Technologies, Inc., and GE Medical Systems Information Technologies GmbH*

*Upjohn Company LLC, and Wyeth Pharmaceuticals LLC*

*/s/ Kannon K. Shanmugam\**
Kannon K. Shanmugam
Jeh C. Johnson
Stacie M. Fahsel
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, N.W.
Washington, DC 20006
(202) 223-7300 (Telephone)
kshanmugam@paulweiss.com

Jessica S. Carey
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
United States
(212) 373-3000 (Telephone)
jcarey@paulweiss.com

*Counsel for Defendants-Appellees Johnson & Johnson, Cilag GmbH International, Ethicon Endo-Surgery, LLC, Ethicon, Inc., Janssen Ortho LLC, Janssen Pharmaceutica NV, Johnson & Johnson (Middle East) Inc., and Ortho Biologics LLC*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,991 words.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Century Schoolbook 14-point font.

Respectfully submitted,

*/s/ Beth S. Brinkmann*
Beth S. Brinkmann

## CERTIFICATE OF SERVICE

I hereby certify that on March 12, 2021, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

Respectfully submitted,

*/s/ Beth S. Brinkmann*
Beth S. Brinkmann

**ADDENDUM**

# TABLE OF CONTENTS

|  | **Page** |
|---|---|
| 18 U.S.C. §2331 | A-1 |
| 18 U.S.C. §2333 | A-3 |
| 18 U.S.C. §2336 | A-4 |
| 18 U.S.C. §2339A | A-5 |
| 18 U.S.C. §2339C | A-7 |

**18 U.S.C. §2331:**

As used in this chapter—

(1)  the term "international terrorism" means activities that—

(A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

(B) appear to be intended—

(i) to intimidate or coerce a civilian population;

(ii) to influence the policy of a government by intimidation or coercion; or

(iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

(C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

\*  \*  \*

(4)  the term "act of war" means any act occurring in the course of—

(A) declared war;

(B) armed conflict, whether or not war has been declared, between two or more nations; or

(C) armed conflict between military forces of any origin.

A-1

\* \* \*

(6)  the term "military force" does not include any person that—

(A) has been designated as a—

(i) foreign terrorist organization by the Secretary of State under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189); or

(ii) specially designated global terrorist (as such term is defined in section 594.310 of title 31, Code of Federal Regulations) by the Secretary of State or the Secretary of the Treasury; or

(B) has been determined by the court to not be a "military force".

\* \* \*

**18 U.S.C. §2333:**

(a)  Action and Jurisdiction.—

Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

\*   \*   \*

(d) Liability.—

(1) Definition.—

In this subsection, the term "person" has the meaning given the term in section 1 of title 1.

(2) Liability.—

In an action under subsection (a) for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism.

**18 U.S.C. §2336:**

(a) Acts of War.—

No action shall be maintained under section 2333 of this title for injury or loss by reason of an act of war.

\*   \*   \*

**18 U.S.C. §2339A:**

(a) Offense.—

Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of section 32, 37, 81, 175, 229, 351, 831, 842(m) or (n), 844(f) or (i), 930(c), 956, 1091, 1114, 1116, 1203, 1361, 1362, 1363, 1366, 1751, 1992, 2155, 2156, 2280, 2281, 2332, 2332a, 2332b, 2332f, 2340A, or 2442 of this title, section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), section 46502 or 60123(b) of title 49, or any offense listed in section 2332b(g)(5)(B) (except for sections 2339A and 2339B) or in preparation for, or in carrying out, the concealment of an escape from the commission of any such violation, or attempts or conspires to do such an act, shall be fined under this title, imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. A violation of this section may be prosecuted in any Federal judicial district in which the underlying offense was committed, or in any other Federal judicial district as provided by law.

(b) Definitions.—As used in this section—

(1) the term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials;

(2) the term "training" means instruction or teaching designed to impart a specific skill, as opposed to general knowledge; and

(3) the term "expert advice or assistance" means advice or assistance derived from scientific, technical or other specialized knowledge.

**18 U.S.C. §2339C:**

(a) Offenses.—

(1) In general.—Whoever, in a circumstance described in subsection (b), by any means, directly or indirectly, unlawfully and willfully provides or collects funds with the intention that such funds be used, or with the knowledge that such funds are to be used, in full or in part, in order to carry out—

> (A) an act which constitutes an offense within the scope of a treaty specified in subsection (e)(7), as implemented by the United States, or

> (B) any other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act,

shall be punished as prescribed in subsection (d)(1).

(2) Attempts and conspiracies.—

Whoever attempts or conspires to commit an offense under paragraph (1) shall be punished as prescribed in subsection (d)(1).

(3) Relationship to predicate act.—

For an act to constitute an offense set forth in this subsection, it shall not be necessary that the funds were actually used to carry out a predicate act.


\*   \*   \*

A-7