ORAL ARGUMENT NOT YET SCHEDULED

# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 20-7077

JOSHUA ATCHLEY, *et al.*,
*Plaintiffs-Appellants*,

v.

ASTRAZENECA UK LIMITED, *et al.*,
*Defendants-Appellees*.

Appeal from the United States District Court for the District of Columbia,
No. 1:17-cv-02136-RJL (Hon. Richard J. Leon)

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS JOSHUA ATCHLEY, *ET AL.*

DAVID C. FREDERICK
JOSHUA D. BRANSON
ANDREW E. GOLDSMITH
KELLOGG, HANSEN, TODD,
 FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
dfrederick@kellogghansen.com
jbranson@kellogghansen.com
agoldsmith@kellogghansen.com

*Counsel for Plaintiffs-Appellants
Joshua Atchley, et al.*

April 2, 2021

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES .......................................................................... iii

GLOSSARY ............................................................................................. vii

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 1

ARGUMENT .............................................................................................. 3

I.    PLAINTIFFS PLEAD PROXIMATE CAUSE ............................................. 3

      A.    The Ministry Was A Jaysh al-Mahdi Alias ................................... 3

            1.    Defendants misread the complaint ...................................... 4

            2.    The Ministry was not "U.S.-supported" ................................ 8

            3.    Defendants' cases are inapposite ...................................... 10

      B.    Defendants' Payments Bypassed Any Intermediating
            Programs ................................................................................ 11

      C.    Defendants' Other Causation Arguments Lack Merit ................... 13

II.   PLAINTIFFS PLEAD SECONDARY LIABILITY ..................................... 14

      A.    Plaintiffs Allege Substantial Assistance ................................... 14

      B.    Plaintiffs Allege Scienter ........................................................ 17

      C.    Plaintiffs Satisfy The Plan-or-Authorize Element ...................... 19

III.  PLAINTIFFS PLEAD PERSONAL JURISDICTION OVER
      THE FOREIGN DEFENDANTS ............................................................ 20

      A.    Plaintiffs Allege Suit-Related U.S. Contacts ............................. 20

      B.    Defendants' Position Undermines National Security ................... 22

      C.    Jurisdictional Discovery Is Warranted ..................................... 23

IV.  DEFENDANTS' ALTERNATIVE ARGUMENTS LACK
     MERIT ...............................................................................................23

     A.  Plaintiffs Plead Acts Of "International Terrorism"..............................23

     B.  The Manufacturers Are Liable ..............................................................25

     C.  The Act-of-War Defense Does Not Warrant Dismissal.....................25

CONCLUSION ...........................................................................................................30

CERTIFICATE OF COMPLIANCE

ADDENDUM

**TABLE OF AUTHORITIES**

Page

**CASES**

*Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519
(6th Cir. 2000) ..................................................................................15, 17

*Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*,
525 F.3d 8 (D.C. Cir. 2008)...................................................................4

\* *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685
(7th Cir. 2008) ..............................................................................7, 23, 24

*Brill v. Chevron Corp.*, 804 F. App'x 630 (9th Cir. 2020)................................11, 24

*Bristol-Myers Squibb Co. v. Superior Ct.*, 137 S. Ct. 1773 (2017) ........................21

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985)...........................................23

*CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*,
316 F. Supp. 3d 635 (S.D.N.Y. 2018) ...........................................................5

*Chiquita Brands Int'l, Inc.*, *In re*, 284 F. Supp. 3d 1284
(S.D. Fla. 2018) ...............................................................................23

*Crosby v. Twitter, Inc.*, 921 F.3d 617 (6th Cir. 2019) .............................................19

*EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*,
894 F.3d 339 (D.C. Cir. 2018).....................................................................13

*Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, --- F. Supp.
3d ----, 2020 WL 6143654 (E.D.N.Y. Oct. 20, 2020).............................15, 18

\* *Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017,
2021 WL 1132515 (U.S. Mar. 25, 2021) .................................. 2-3, 20, 21, 22

*Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474 (E.D.N.Y. 2012) ...........25, 26, 27, 28

Authorities principally relied upon are designated by an asterisk (\*).

\* *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ............................2, 14, 15, 16, 17, 18, 20, 25

*Hurd v. Dist. of Columbia*, 864 F.3d 671 (D.C. Cir. 2017) ....................................8, 9

*Hussain v. Obama*, 718 F.3d 964 (D.C. Cir. 2013) .................................................30

*Kemper v. Deutsche Bank AG*, 911 F.3d 383 (7th Cir. 2018) ...............10, 11, 14, 24

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018).......................8

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123 (D.C. Cir. 2004).......................................................................13, 15

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013).......................................................................................21, 22

*Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018) ...................................18, 24

*Livnat v. Palestinian Auth.*, 851 F.3d 45 (D.C. Cir. 2017) ......................................22

*Meyer v. Holley*, 537 U.S. 280 (2003) ....................................................................25

*Morris v. Khadr*, 415 F. Supp. 2d 1323 (D. Utah 2006) ...................................29, 30

\* *Owens v. BNP Paribas, S.A.*, 897 F.3d 266 (D.C. Cir. 2018) ("*Owens IV*") ....................................................................................3, 10, 11

\* *Owens v. Rep. of Sudan*:

531 F.3d 884 (D.C. Cir. 2008).......................................................................13

864 F.3d 751 (D.C. Cir. 2017) ("*Owens III*"), *vacated sub nom. Opati v. Rep. of Sudan*, 140 S. Ct. 1601 (2020)...............................................................................7, 8

*Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471 (1997) ...............................................24

*Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013)...................................................11

*Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019)................18, 19

*Teknek, LLC*, *In re*, 563 F.3d 639 (7th Cir. 2009) ......................................................5

*Terrorist Bombings of U.S. Embassies in E. Africa*, *In re*,
552 F.3d 93 (2d Cir. 2008) ...........................................................................30

*United States v. Assi*, 586 F. Supp. 2d 841 (E.D. Mich. 2008) ..............................30

*United States v. Salamanca*, 990 F.2d 629 (D.C. Cir. 1993)................................24

*United States v. Shabban*, 612 F.3d 693 (D.C. Cir. 2010)...................................24

*United States v. Yunis*, 924 F.2d 1086 (D.C. Cir. 1991)......................................26

*Weiss v. Arab Bank, PLC*, 2007 WL 4565060
(E.D.N.Y. Dec. 21, 2007) ........................................................................29, 30

*Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202 (2d Cir. 2014).....................18

*Wultz v. Islamic Rep. of Iran*, 755 F. Supp. 2d 1 (D.D.C. 2010)...........................23

*Zukerman v. U.S. Postal Serv.*, 961 F.3d 431 (D.C. Cir. 2020) ...............................4

**STATUTES AND RULES**

Anti-Terrorism Act, 18 U.S.C. § 2331 *et seq.*:

§ 2331(1)(A) .....................................................................................24

§ 2331(1)(B)......................................................................................23

§ 2331(4)...........................................................................................26

§ 2331(4)(A) ......................................................................................26

§ 2331(4)(B)..................................................................................26, 27

§ 2331(4)(C)...............................................................................3, 26, 27

§ 2331(6)(A)(i) ..................................................................................28

§ 2331(6)(B)......................................................................................29

§ 2333(d)(2) ......................................................................................14

§ 2339D............................................................................................29

Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222,
§ 2(b), 130 Stat. 852 (2016)......................................................14

Fed. R. Evid. 201(b)............................................................................9

## OTHER MATERIALS

85 Fed. Reg. 1369 (Jan. 10, 2020) ........................................................29

H.R. Rep. No. 115-858 (2018)........................................................28, 29

Restatement (Third) of Agency (2006).................................................25

Restatement (Third) of Torts (2020).....................................................16

S. Rep. No. 102-342 (1992) .................................................................28

*Webster's Third New International Dictionary* (3d ed. 2002) ...............26

# GLOSSARY

| | |
|---|---|
| Act | Anti-Terrorism Act, 18 U.S.C. § 2331 *et seq.* |
| Appellees Br. | Brief for Defendants-Appellees (filed Mar. 12, 2021) |
| Br. | Opening Brief for Plaintiffs-Appellants Joshua Atchley, *et al.* (filed Feb. 12, 2021) |
| Commanders Br. | Amicus Curiae Brief of 44 Former Military Officers, Intelligence Officials, and Analysts in Support of Appellants (filed Jan. 19, 2021) |
| Corruption Br. | Brief for Amici Curiae Iraq Anti-Corruption Experts in Support of Plaintiffs-Appellants (filed Feb. 3, 2021) |
| Ministry | Iraq's Ministry of Health |
| Professors Br. | Brief of Law Professors as Amici Curiae in Support of Plaintiffs-Appellants (filed Jan. 19, 2021) |
| Reconstruction Br. | Brief for Amici Curiae Iraq Reconstruction Experts in Support of Defendants-Appellees (filed Mar. 19, 2021) |
| Senators Br. | Brief of Eight United States Senators as Amici Curiae in Support of Plaintiffs-Appellants (filed Jan. 19, 2021) |

**INTRODUCTION AND SUMMARY OF ARGUMENT**

This appeal arises from a motion to dismiss the district court granted without discovery. The allegations are thus presumed true and read liberally. Accepting the complaint as written, Defendants bribed the terrorists who ran Iraq's Ministry of Health. Because those bribes funded terrorist attacks on Americans, including Plaintiffs and their families, they create liability under the Anti-Terrorism Act.

Defendants' brief distorts the function of a motion to dismiss. It nowhere engages with the complaint's meticulous description of Jaysh al-Mahdi's top-to-bottom control of the Ministry. Rather, Defendants pick out stray words like "bureaucracy" and "loot," misinterpret them, and build a new factual narrative atop the resulting inferences. They then add some Internet research, JA___-___, to conjure an alternate reality: the terrorist-run, murderous Ministry morphs into a "U.S.-supported" sovereign performing "government functions," and vile terrorist Muqtada al-Sadr morphs into a "political leader" merely "delivering healthcare" to needy Iraqis. Appellees Br. 27-28, 54. So reimagined, Defendants maintain, the Ministry is an independent intermediary that severs their link to terrorism.

These are factual assertions, not pleading arguments. The complaint alleges in vivid detail – with names, dates, witness accounts, and contemporaneous documents – that Jaysh al-Mahdi wielded terrorist control of the Ministry. Those comprehensive allegations warrant judicial respect at this stage. And a terrorist

front like the Ministry defeats neither causation nor aiding-abetting liability.

Defendants try to argue the facts, but they barely contest the legal point. That is

for good reason: the district court's core holding – that even terrorist-controlled

intermediaries preclude liability, JA___-___(Op.20-21) – misreads the statute.

Defendants' aiding-abetting arguments are especially unpersuasive. Linda

Hamilton was a mere back-office assistant, and this Court held her liable for

aiding-abetting a murder she knew nothing about. *Halberstam v. Welch*, 705 F.2d

472 (D.C. Cir. 1983). Defendants' conduct – pumping millions of dollars into a

terrorist group that slaughtered hundreds of Americans – was far more culpable.

As eight bipartisan U.S. Senators explain as amici, Defendants' position not only

conflicts with *Halberstam*, but also flouts Congress's broad intent to curtail

terrorist financing. That is why Congress drafted the statute to create secondary

liability for "indirect" terrorist funding. Defendants err in rewriting the text.

Plaintiffs' Hezbollah and personal-jurisdiction allegations are likewise

sufficient. Defendants caricature the complaint – portraying Hezbollah's role as

"general," and their own U.S. contacts as "tangential," Appellees Br. 42, 64 –

while ignoring the detailed allegations as pleaded. Their flawed factual challenges

are no basis for dismissal. On personal jurisdiction, the Supreme Court also

recently rejected Defendants' lead argument that forum contacts are relevant only

if they *cause* the tort. *Compare* Appellees Br. 63-64 *with Ford Motor Co. v. Mont.*

*Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017, 2021 WL 1132515 (U.S. Mar. 25, 2021). That alone warrants reversal of the jurisdictional ruling below.

Finally, Defendants fail in urging affirmance on other grounds. Plaintiffs plead that Defendants' provision of material support to terrorists involved acts of "international terrorism," and Plaintiffs allege that the manufacturers are liable for the acts of their agent suppliers. The district court also correctly refused to dismiss the claims based on Defendants' act-of-war argument. That defense covers attacks by "military forces," 18 U.S.C. § 2331(4)(C), not terrorist groups like Jaysh al-Mahdi that ignore the laws of war. In arguing otherwise, Defendants invoke irrelevant characteristics – like Jaysh al-Mahdi's use of militarized jargon and military-grade weapons – shared by virtually every terrorist group in existence. Basing act-of-war immunity on such characteristics disregards Congress's intent.

## ARGUMENT

## I. PLAINTIFFS PLEAD PROXIMATE CAUSE

### A. The Ministry Was A Jaysh al-Mahdi Alias

Plaintiffs plead proximate cause by alleging that Defendants' corrupt payments enhanced Jaysh al-Mahdi's ability to commit terrorist attacks in Iraq. Br. 19-26. The Ministry was a terrorist front, not an "independent intermediary." *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 275 (D.C. Cir. 2018) ("*Owens IV*").

The district court granted the factual premise that "JAM 'captured' the Ministry," JA___(Op.17), but dismissed the claims anyway. Defendants now do the opposite: they shun the court's legal standard and argue the facts instead. Appellees Br. 23-34. Both approaches fail.

### 1.    Defendants misread the complaint

The Ministry, as U.S. Embassy Baghdad concluded in a 2006 report, was "openly under the control of the Mehdi Army." JA___(¶ 79). Facts confirming the takeover include that (1) Sadr installed hand-picked terrorists throughout the leadership ranks, JA___, ___-___(¶¶ 69-70, 77-102); (2) Jaysh al-Mahdi murdered or expelled dissenters, JA___, ___-___(¶¶ 66, 91-92); (3) 70,000 terrorists occupied Ministry positions and controlled its key facilities, JA___, ___(¶¶ 66, 180); (4) Jaysh al-Mahdi deployed the infrastructure – including ambulances and hospitals – as terrorist assets, JA___-___, ___-___(¶¶ 86-88, 103); and (5) the U.S. military ran multiple operations premised on Jaysh al-Mahdi's control, Br. 10-11.

The district court should have read these allegations "liberally" and afforded Plaintiffs all reasonable inferences. *Zukerman v. U.S. Postal Serv.*, 961 F.3d 431, 436 (D.C. Cir. 2020). It also should have "interpret[ed] ambiguous text in the complaint" favorably to Plaintiffs. *Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 20 n.8 (D.C. Cir. 2008). Yet Defendants ask the Court to affirm by ignoring the facts above and twisting the complaint in *their* favor:

4

**a.      Word choice.**  Defendants say (at 12-13, 29-30) the complaint uses words – like "looting" and "stolen" – that connote the Ministry's independence. But Jaysh al-Mahdi "looted" and "stole" by exploiting the health resources *it controlled* for terrorist purposes.  *E.g.*, JA___-___(¶ 130) ("looting" due to Jaysh al-Mahdi's "control").  Those words signify illegality, not independence.  Indeed, courts routinely describe alter-ego relationships with the very words Defendants tout.  *E.g.*, *In re Teknek, LLC*, 563 F.3d 639, 649 (7th Cir. 2009) (alter egos of entity "looted" it); *CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, 316 F. Supp. 3d 635, 652 (S.D.N.Y. 2018) (alter ego would "steal [entity's] assets").

**b.      "Heroic" resistance.**  Defendants also seize on (at 13, 30) a sentence fragment describing some "heroic efforts" to resist Jaysh al-Mahdi.  But those efforts failed, JA___-___(¶¶ 129-30), and the Iraqis who mounted them were murdered or forced to flee, JA___, ___, ___-___(¶¶ 66, 80, 91-93).  By openly killing or expelling the objectors, the terrorists intimidated everyone else into compliance.  JA___, ___-___, ___, ___-___(¶¶ 66, 76, 95, 166-74).  The dissenters' fate simply confirms the extent of Jaysh al-Mahdi's control.

**c.      "Sprawling bureaucracy."**  Defendants portray Plaintiffs' description of the Ministry's bureaucracy as conceding its legitimacy.  Appellees Br. 7-8, 28-29 (citing ¶¶ 2, 72).  But the cited allegations describe the Ministry's functions "in theory," JA___-___(¶ 2); the complaint elsewhere describes how

Jaysh al-Mahdi hijacked those functions in practice, JA\_\_\_, \_\_\_-\_\_\_(¶¶ 3, 78-112). The Ministry was indeed a "sprawling bureaucracy" that was *supposed to* perform legitimate functions. JA\_\_\_(¶ 72). But Jaysh al-Mahdi commandeered the institution and transformed it into a tool of terrorism. JA\_\_\_-\_\_\_(¶¶ 66-90). The bureaucracy Defendants trumpet, according to a landmark U.S. Army study cited by amici, became a "sectarian killing machine." Corruption Br. 7.

Defendants rebrand (at 28, 54) all this as "political" activity by "political leader" Muqtada al-Sadr. In fact, Sadr was a sworn anti-American terrorist responsible for more U.S. deaths in Iraq than al-Qaeda. JA\_\_\_-\_\_\_(¶¶ 60-62, 333-56). His use of the Ministry – deploying ambulances in terrorist attacks, murdering patients in their hospital beds, and funneling so many drugs to terrorists they became "the Pill Army," JA\_\_\_(¶ 176) – was terrorism, not politics. Br. 25-26. That he also owned a political party is true enough. As with Hezbollah in Lebanon, however, the political party was a front for terrorism. JA\_\_\_-\_\_\_, \_\_\_(¶¶ 56-62, 358). Indeed, the murderous Deputy Health Minister was a Sadrist politician *and* a Jaysh al-Mahdi commander. JA\_\_\_, \_\_\_-\_\_\_(¶¶ 84, 93-97).

The terrorist-run Ministry presided over the total collapse of Iraq's health system. JA\_\_\_, \_\_\_-\_\_\_, \_\_\_-\_\_\_, \_\_\_-\_\_\_(¶¶ 3, 129-33, 137-39, 169). Yet Defendants insist (at 28) the Ministry still performed unspecified "government functions." By this, they appear to mean that so long as the Ministry provided

medical care to a single patient, even a terrorist, it must be a causation-defeating

intermediary. That is not the law. Many terrorist fronts perform some

"legitimate"-seeming activities – like building infrastructure, *Owens v. Rep. of

Sudan*, 864 F.3d 751, 783 (D.C. Cir. 2017) ("*Owens III*"), *vacated sub nom. Opati

v. Rep. of Sudan*, 140 S. Ct. 1601 (2020); or dispensing "social welfare" services,

*Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 698 (7th Cir. 2008) (en

banc). If such terrorist-directed, terrorist-benefiting activities were enough to

extinguish causation, the "statute would be a dead letter." *Id.* at 702.

Defendants cannot square their position with *Owens III*. That case had

intermediaries too – "al-Qaeda-affiliated businesses" – that provided "legitimate

employment" and "export[ed] . . . agricultural projects." 864 F.3d at 782-83.[1]

Defendants fail to explain why the Ministry defeats causation when those

businesses did not. All they say is that Sudan also gave al-Qaeda other forms of

"military" and "intelligence" support. Appellees Br. 24 (quoting *Owens III*, 864

F.3d at 782-84). But the Court led with Sudan's indirect "financial support" in

upholding proximate cause, because Sudan's financing grew al-Qaeda's "broader

organization." *Owens III*, 864 F.3d at 794-95; *see id.* at 799 (describing liability

---

[1] Defendants inaccurately assert (at 24) that "al-Qaeda, of course, was a designated terrorist organization" at the time. The designation actually occurred *after* the embassy bombings and was irrelevant to both *Owens* opinions. *Owens III*, 864 F.3d at 797.

for fungible "donations" to terrorists).  Sudan also "expell[ed] bin Laden in 1996," two years before the bombings, thus reducing its support in a way Defendants never did.  *Id*. at 795-97.  The causal nexus here was at least as strong.  Br. 20-22.

## 2.    The Ministry was not "U.S.-supported"

Defendants also refer repeatedly (at 2, 24, 29, 40, 46, 48) to the "U.S.-supported Health Ministry."  That is another disputed factual assertion.  The U.S. government did not support the terrorist-run Ministry, much less encourage Defendants' corrupt payments to terrorists.  JA___-___, ___-___, ___-___(¶¶ 76, 88, 113).  On the contrary:  the U.S. government prosecuted the Ministry's de-facto leader, JA___-___(¶¶ 93-96), and it viewed the Ministry as a "significant threat" and hub for "insurgent logistics flow," JA___-___(Dkt.132-3).

Defendants contend otherwise based on hearsay they found on the Internet.  Appellees Br. 8-10, 31 (citing JA___-___).  The Court should not consider those materials.  *See Hurd v. Dist. of Columbia*, 864 F.3d 671, 687 (D.C. Cir. 2017) (disallowing "documents supportive of [defendant's] view of potentially disputed issues of fact").  Defendants say (at 17) their online research comprises public records subject to judicial notice, but such extrinsic records cannot resolve disputed facts before discovery.  *See Hurd*, 864 F.3d at 686-87 (refusing to notice government "arrest records"); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998-1001 (9th Cir. 2018) (refusing to notice "agency report").

The U.S. government's alleged support for the Ministry is not a fact beyond "reasonable dispute" whose accuracy can "readily [be] determined from sources whose accuracy cannot reasonably be questioned." *Hurd*, 864 F.3d at 686 (quoting Fed. R. Evid. 201(b)). Rather, Defendants' jumble of hearsay – including anonymously authored newsletters[2] and now-defunct webpages[3] – contains disputed statements by untested sources. Defendants even rely on two reports by the Special Inspector General for Iraq Reconstruction, when the head of that very agency has filed an amicus brief refuting their factual narrative. *Compare* JA___-___, ___-___(Dkts.128-43, 128-44) *with* Corruption Br. 1-2.

Defendants also try to smuggle in facts through a dueling amicus brief, joined by five people who lacked first-hand experience with the Ministry during the relevant period. Reconstruction Br. 1-4. The Court should ignore their unfounded assertions. Their brief is riddled with misstatements that invite cross-examination, not affirmance. *Compare*, *e.g.*, Reconstruction Br. 10-11 (asserting U.S. government "funding of the Ministry") *with* Haveman Interview[4] 8-9 (Reply Add. 8-9) (lead amicus admitting in 2005 that U.S. health-reconstruction funds

---

[2] JA___-___, ___-___(Dkts.128-27, 128-48).

[3] JA___-___, ___-___(Dkts.128-38, 128-41).

[4] Special Inspector General for Iraq Reconstruction, Interview with James Haveman and Robert Goodwin (Dec. 22, 2005).

were *not* "funneled through the ministries" but through a "parallel system, with outside control of what was built, how it was built and by whom").

### 3. Defendants' cases are inapposite

Defendants' reliance (at 23-26) on prior intermediary cases is misplaced. *First*, the defendants' resources in those cases stopped with the intermediaries and never reached any terrorist. Br. 27-29. Not so here, where Defendants knew their goods and cash flowed to Jaysh al-Mahdi. JA\_\_\_-\_\_\_(¶¶ 165-87). The district court agreed with that much, noting that Defendants were "aware [their] goods would be used by JAM to support terrorist attacks." JA\_\_\_(Op.28). Defendants cite no other case dismissing Anti-Terrorism-Act claims despite well-pleaded allegations that a defendant's resources funded terrorism.

*Second*, other cases involved independent sovereigns making an "affirmative choice" to fund downstream terrorists, which "supersede[d] [the defendant's] choice to do business with that sovereign." *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 393 (7th Cir. 2018). Their status as "state-sponsors of terrorism," Appellees Br. 29, only confirms the point: each country made an independent, causation-severing policy choice to support external terrorists. *See Kemper*, 911 F.3d at 386-87, 393-94. The terrorist-run Ministry did not. Br. 22-25.

*Third*, the terrorist attacks in other cases were not even in the same country as the intermediary. *See Owens IV*, 897 F.3d at 268-69 (intermediary was Sudan;

10

attacks in Kenya and Tanzania); *Brill v. Chevron Corp.*, 804 F. App'x 630, 632 (9th Cir. 2020) (Iraq/Israel); *Kemper*, 911 F.3d at 393 (Iran/Iraq); *Rothstein v. UBS AG*, 708 F.3d 82, 87 (2d Cir. 2013) (Iran/Israel). Such geographic distance reveals a causal separation absent here. This case is not about money filtering through an Iranian "network of banks or shipping lines" to reach local terrorists in another country. *Kemper*, 911 F.3d at 392-93. Defendants instead paid terrorists *in Iraq*, who targeted American service-members *in Iraq*. JA___-___(¶¶ 60-64). Indeed, Defendants finalized their payments mere blocks away from where many Plaintiffs died. JA___, ___(¶¶ 89, 180). No other case involved a nexus so close.

## B. Defendants' Payments Bypassed Any Intermediating Programs

Even if the Ministry retained intermediating attributes, Defendants' corrupt payments had "a substantial connection [to] terrorism." Br. 26-31 (quoting *Owens IV*, 897 F.3d at 275). That provides an independent basis for reversal.

**Free goods.** Defendants' "free goods" functioned not as "life-saving medical goods," Appellees Br. 22, but as cash-equivalent products for Jaysh al-Mahdi to monetize, JA___-___, ___-___, ___-___(¶¶ 117-20, 137-39, 169). Their purpose – the reason Jaysh al-Mahdi demanded them – was to *bypass* any "legitimate agencies, operations, and programs." *Owens IV*, 897 F.3d at 276 (quoting *Rothstein*, 708 F.3d at 97). Defendants thus err in claiming (at 6) it was

11

happenstance that their free goods "were then stolen by Jaysh al-Mahdi from the Ministry."  Enabling such diversion was the point.  Br. 8-9, 27-29.

It is no answer that free goods appear on "Kimadia's standard instructions."  Appellees Br. 32.  Kimadia is the most corrupt entity in a famously corrupt country; its standard practices are designed to extract extra-legal revenue for whatever group controls it.  JA___-___, ___-___, ___-___(¶¶ 48-51, 137-38, 145-64).  Defendants also orchestrated "off-the-books payoff[s]" that never appeared in Kimadia's instructions.  JA___(¶ 136).  Defendants are right (at 10, 32-33) that Jaysh al-Mahdi is not the only group that demanded such bribes:  they began under Oil-For-Food and continue today.  JA___-___, ___-___(¶¶ 50-52, 139-41).  But that strengthens the allegations.  Defendants bribed Saddam's regime despite its sworn enmity toward the United States.  JA___-___(¶¶ 44-53).  Bribing Jaysh al-Mahdi once it took over the Ministry was business as usual.

**Cash bribes.**  Defendants also paid cash "commissions" to Jaysh al-Mahdi operatives.  Br. 29-31.  Defendants, like the district court, call (at 33) the allegations "conclusory" without meaningful discussion.  For example, Plaintiffs allege GE Healthcare paid at least two bribes to Dr. Adel Muhsin – a notorious Jaysh al-Mahdi operative, JA___-___(¶¶ 78-83) – worth $6 million and $10 million apiece.  JA___(¶ 214).  Defendants do not respond.

Such allegations do not depend on the Ministry being a Jaysh al-Mahdi alias (though it was). *Cf.* Appellees Br. 33-34. True, the people Defendants bribed were "[Ministry] officials." JA___, ___-___(¶¶ 145, 150). But they were *also* Jaysh al-Mahdi operatives, JA___-___, ___-___(¶¶ 77-102, 165-68), and the cash bribes went to the individual terrorists rather than the Ministry itself, Br. 29-31. That is what made it bribery. JA___, ___, ___-___(¶¶ 4, 8, 142-45).

## C.  Defendants' Other Causation Arguments Lack Merit

Defendants next divide (at 26-28) the allegations into six artificial "steps." But those steps form a single causal sequence. *See Owens v. Rep. of Sudan*, 531 F.3d 884, 895 (D.C. Cir. 2008) ("direct and unbroken factual line" unnecessary). The extra "steps" Defendants invent were the natural consequences of their conduct and not "intervening cause[s] in any legally significant way." *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*, 894 F.3d 339, 346 (D.C. Cir. 2018).

Defendants likewise err in citing (at 34) Jaysh al-Mahdi's alternate funding sources. This Court has rejected the very argument Defendants make: that a terrorist funder can avoid culpability by pointing to others doing the same thing. *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1129 (D.C. Cir. 2004) (rejecting but-for cause for terrorism, because "joint tortfeasors" could rely on others' conduct to "absolve them all"). Defendants cannot "escap[e]

13

liability" just because they are "lucky enough" that Iran and Hezbollah were "committing similarly wrongful acts." *Kemper*, 911 F.3d at 391.

## II. PLAINTIFFS PLEAD SECONDARY LIABILITY

### A. Plaintiffs Allege Substantial Assistance

Causation aside, Defendants are secondarily liable for Jaysh al-Mahdi's terrorist acts. Br. 31-41. Each *Halberstam* factor supports Plaintiffs.

**Nature of act and assistance.** Defendants gave Jaysh al-Mahdi fungible cash and cash-equivalents to divert for terrorist ends. Br. 32-36. Those payments – worth millions of dollars, *id.* – were substantial because they intensified Jaysh al-Mahdi's terrorist campaign. JA___-___, ___-___, ___-___ (¶¶ 8-10, 167, 171-76).

Defendants' assertion (at 44-46) that their aid was "not to Jaysh al-Mahdi" rehashes their flawed causation arguments, *supra* Part I, and misreads the statute besides, Br. 35-36. Using the Ministry to nullify secondary liability would thwart Congress's "purpose" to provide the "*broadest possible basis*" to seek relief from those that "provide[] material support, directly *or indirectly*, to [terrorists]." Pub. L. No. 114-222, § 2(b), 130 Stat. 852, 853 (2016) (emphases added).

Defendants' view (at 45) of "indirectly" is unpersuasive. Although a preamble cannot override operative text, it bears heavily on the text's meaning. Br. 35; Professors Br. 20-22. And the text here *never says* that aiding-abetting requires *direct* assistance to "the person who committed" the terrorist acts.

14

18 U.S.C. § 2333(d)(2); *see* Senators Br. 23-30; Professors Br. 23-24.  As the amicus Senators thus explain (at 9), allowing companies to pay "a terrorist group's intermediary" would contradict the statute's "text, structure, and history."  *See also Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, --- F. Supp. 3d ----, 2020 WL 6143654, at *10-11 (E.D.N.Y. Oct. 20, 2020) (similar).

Defendants also cherry-pick (at 48) from *Halberstam* to suggest the aid must be "essential" or "indisputably important to" the tort.  705 F.2d at 488.  But those phrases described Hamilton's own role; the Court did not require essentiality in every case.  *Id.*  Quite the opposite:  terrorism is so "offensive" that even "relatively trivial" funding is substantial under *Halberstam*.  *Id.* at 484 n.13.  Plaintiffs already explained (Br. 34) that principle, and Defendants ignore it.

In any event, Defendants' multimillion-dollar bribes were important, Br. 19-31 – more so than Hamilton's "secretarial work," which was "neutral standing alone."  705 F.2d at 475, 488.  Jaysh al-Mahdi's other funding sources, Appellees Br. 49, do not show otherwise.  "Substantial assistance, after all, does not mean *necessary* assistance."  *Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 537 (6th Cir. 2000).  This Court has already held that terrorist funders are causally responsible for violence they fund, even when other funders make their money unnecessary.  *Kilburn*, 376 F.3d at 1129-30.  Aiding-abetting is no different.

**Presence and relationship.** This case involves material aid, not verbal encouragement. The presence and relationship factors thus favor Plaintiffs. *Compare* Appellees Br. 49-50 *with* Br. 36-37; Professors Br. 26-27.

**State of mind.** This factor supports liability because Defendants' assistance was knowing. Br. 37-38. The district court erred in demanding specific intent. Br. 38-40; Senators Br. 30-33; Professors Br. 27-28.

Defendants cite (at 50) Hamilton's "intent and desire to make [the tortfeasor's] venture succeed," but the Court inferred that desire from her "knowing" assistance and "continuous participation." *Halberstam*, 705 F.2d at 488. The same inference is warranted here. Br. 37-38, 41. Defendants may not have shared Jaysh al-Mahdi's violent aims, but neither did Hamilton: she was "passive but compliant" and knew nothing of violence. 705 F.2d at 474, 488.

Nor do Plaintiffs "conflate[]," Appellees Br. 51, the scienter and state-of-mind inquiries. The former requires only "general awareness." *Halberstam*, 705 F.2d at 488. The latter is a sliding scale under which substantiality increases with "the intimacy of a defendant's knowledge." Restatement (Third) of Torts § 28 cmt. d (2020). Defendants' knowledge was more intimate than Hamilton's and so supports an inference of substantiality. *Cf. Halberstam*, 705 F.2d at 487-88.

**Duration.** The district court erred in giving this factor no weight. Br. 41. Defendants' effort (at 52) to reduce the period to four years misreads the

16

complaint. JA___(¶ 104). And even four years approaches the "five-year" span that "strongly" supported liability in *Halberstam*. 705 F.2d at 488.

## B.    Plaintiffs Allege Scienter

Defendants also were "generally aware of [their] role as part of an overall illegal or tortious activity." *Id.* at 487-88. An aider-abettor need not "have a full understanding" of the tort. *Aetna*, 219 F.3d at 535-36. Rather, it is enough to know that "something illegal [is] afoot." *Halberstam*, 705 F.2d at 486.

Plaintiffs plead the requisite awareness. JA___-___(¶¶ 180-87). As the district court observed, "defendants knowingly provided medical goods to the Ministry for economic gain and were aware those goods would be used by JAM to support terrorist attacks." JA___(Op.28). Plaintiffs have explained (Br. 12-13, 37-38) the basis for that knowledge, and Defendants respond (at 54-56) merely by debating the facts. Defendants sent their employees and agents into the Ministry's headquarters, JA___-___, ___(¶¶ 148, 180), where they encountered overwhelming indicia of Jaysh al-Mahdi terrorism, JA___-___, ___-___(¶¶ 73-75, 180-81). Defendants also knew of the wave of media reports documenting the terrorist connection. JA___-___(¶¶ 182-87). Defendants' effort (at 54-55) to soften those reports misreads Plaintiffs' allegations[5] and raises jury arguments at best. *See*

---

[5] Defendants errantly separate the Sadrists from Jaysh al-Mahdi, JA___(¶ 59), and overlook reports about Jaysh al-Mahdi specifically, *e.g.*, JA___-

*Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 211 (2d Cir. 2014) ("'lenient'

standard" governs terrorism "scienter issues," which demand "resolution by the

trier of fact"); *Henkin*, 2020 WL 6143654, at *8-12 (similar).

Of course, Defendants' bribes did not start with Jaysh al-Mahdi. Appellees

Br. 53. But their long-running corruption heightened their appreciation of how

contract bribery at the Ministry worked. Br. 37; JA\_\_\_-\_\_\_(¶¶ 48-53). And by

2005 at the latest, Defendants knew the bribes were aiding Jaysh al-Mahdi

terrorists. JA\_\_\_-\_\_\_, \_\_\_-\_\_\_(¶¶ 108-12, 180-83). That is more than enough to

allege they knowingly "play[ed] a 'role' in [Jaysh al-Mahdi's] violent or life-

endangering activities." *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir.

2018) (quoting *Halberstram*, 705 F.2d at 477). Defendants are incorrect (at 52)

that *Linde*'s distinction between aiding-abetting and material support – made after

*a trial* where the jury received no instruction on the former – requires more at the

*pleading* stage. Professors Br. 15-18, 24-25; *Henkin*, 2020 WL 6143654, at *10.

Defendants' analogy (at 55-56) to *Siegel v. HSBC North America Holdings,

Inc.*, 933 F.3d 217 (2d Cir. 2019), is inapt. There, the court declined to extend

liability to a "bank [that] provides routine banking services to a foreign,

unaffiliated financial institution," which in turn separately "provides support to a

---

\_\_\_(¶ 183) (second bullet: "Mehdi Army"; fifth bullet: "controlled by the Mahdi Army"; eleventh bullet: "Shiite Muslim militia").

terrorist organization." *Id.* at 223.  The intermediary (a Saudi bank) was independent of – and in a different country from – the downstream terrorists (al-Qaeda in Iraq) at issue.  *Id*. at 224-25.  Critically, the plaintiffs did not allege that any terrorist ever "received any of th[e] funds" provided by the defendant.  *Id*. at 225.  This case differs in every respect.  *Supra* Part I.A-B.

### C. Plaintiffs Satisfy The Plan-or-Authorize Element

Hezbollah "planned" and "authorized" Jaysh al-Mahdi's attacks.  Br. 41-48.  Defendants downplay (at 42) Hezbollah's role as "material support," but they ignore Hezbollah's close connection to each attack, Br. 42-44.  Plaintiffs explained why Hezbollah's role far exceeded general support, Br. 46-48 – and a suite of top U.S. military commanders have now confirmed the point in detail, Commanders Br. 5-23.  Defendants' paper-thin response (at 41-42) all but concedes the issue.

*Crosby v. Twitter, Inc.*, 921 F.3d 617 (6th Cir. 2019), provides a useful contrast.  That case involved a lone-wolf shooter who attacked a nightclub all "by himself and without [terrorists'] help."  *Id*. at 626.  He was "self-radicalized and never had any contact" with any designated terrorist organization.  *Id*.  Jaysh al-Mahdi's deep institutional linkages with Hezbollah were not comparable.

Defendants' criticism (at 42-43) of Count Two likewise fails.  The word "act" encompasses the crime of maintaining a terrorist enterprise.  Br. 48-49.

Defendants do not even acknowledge *Halberstam*, which defined the "act assisted" as a multiyear "burglary campaign." 705 F.2d at 488.

## III. PLAINTIFFS PLEAD PERSONAL JURISDICTION OVER THE FOREIGN DEFENDANTS

### A. Plaintiffs Allege Suit-Related U.S. Contacts

The foreign Defendants chose to source from the United States the most lucrative drugs they sold to the Ministry. Br. 50-53. Defendants' only response is to portray (at 62) those contacts as "tangential to Plaintiffs' claims." But the tort is giving U.S.-made goods to terrorists. Using U.S. supply chains, U.S. regulatory documents, and U.S.-origin certifications to turbocharge the bribes is not tangential. Br. 52-57. There is an ample " 'connection' between [Plaintiffs'] suit and [Defendants'] activities" in the United States. *Ford*, 2021 WL 1132515, at *5.

Defendants lean heavily on causal principles in downplaying their contacts as "tangential." Appellees Br. 63-64, 68 (citing jurisdictional-causation cases and claiming only tortious contacts are relevant). The Supreme Court has now repudiated those arguments. *See Ford*, 2021 WL 1132515, at *5 (rejecting "causal test" and upholding jurisdiction based on non-tortious, non-causal forum contacts). The Court can dispatch Defendants' jurisdictional position on that basis alone.

Defendants' other contentions raise fact disputes. *First*, they attribute the Ministry's origin requirement to suspicion of "counterfeit drugs." Appellees Br. 66 (quoting ¶ 122). Like the district court, they ignore the *next sentence* describing

U.S. drugs' unique "valu[e] on the black market."  JA___(¶ 122).  At any rate, the two concerns were related:  the terrorists' aversion to counterfeiting reflected their desire for authentic, valuable drugs that only the foreign Defendants' U.S. contacts could provide.  JA___-___, ___, ___-___(¶¶ 12, 122, 153).

*Second*, Defendants emphasize (at 65-66, 68) that some of their contracts contained non-U.S. "origin" terms.  Not true for GE Healthcare, which proffered no evidence of any such contract.  Br. 56.  Regardless, Defendants conflate the unimportant formulation process with the essential active-ingredient process, which they concede occurred in the United States for every blockbuster drug at issue.  Br. 56-57.  Those high-value drugs with U.S.-made active ingredients – not the cheaper, easier-to-make ones sometimes sourced abroad – were the key to their business relationship with Jaysh al-Mahdi.  *Id.*  The U.S. contacts did not become "tangential" just because Defendants had some non-forum contacts too.  *See Ford*, 2021 WL 1132515, at *5-6 (all causation-determinative contacts outside forum).[6]

Defendants' position conflicts with *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013), which concerned Anti-Terrorism-Act claims against a Lebanese bank for wiring money to Hezbollah through a U.S.

---

[6] Defendants' reliance (at 67) on *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773 (2017), is misplaced.  Jurisdiction there failed because the sole forum distributor had nothing to do with the sales at issue.  *Id*. at 1783.

correspondent account.  *Id*. at 165-66.  The U.S. account was unnecessary to the tort:  the bank could have wired money "through correspondent accounts anywhere in the world."  *Id*. at 171.  And everything else about the tort occurred abroad.  *Id*. at 168-69.  Yet the Second Circuit upheld jurisdiction because the U.S. account was "used as an instrument" to violate the Act.  *Id*. at 171.  Here, Defendants went even further by *originating* the "instruments" of their terrorist payoffs in the United States.  Br. 50-53.  *Licci* would support jurisdiction had Defendants merely shipped goods *through* the United States – just as the Lebanese bank's money merely passed through New York on its way to terrorists.  732 F.3d at 170-72.  Defendants' latticework of U.S. supply-chain contacts was more substantial.

## B.     Defendants' Position Undermines National Security

The Court should decline Defendants' request (at 68-69) to use the Due Process Clause to vitiate a national-security statute.  Br. 57-59.  The point is not that Congress can "wish away a constitutional provision," *Livnat v. Palestinian Auth.*, 851 F.3d 45, 53 (D.C. Cir. 2017), but that federal policy informs "whether jurisdiction comports with due-process standards," *id*. at 56; *see Ford*, 2021 WL 1132515, at *8 (citing forum's "significant interests" in jurisdiction).  That is why the Supreme Court held that a strong fair-play-and-substantial-justice showing (conceded here) justifies a "lesser showing of minimum contacts."  Br. 58 (quoting

*Burger King v. Rudzewicz*, 471 U.S. 462, 477 (1985)). Congress's national-security interests support affording Plaintiffs redress in a U.S. court.

## C. Jurisdictional Discovery Is Warranted

Alternatively, the Court should order jurisdictional discovery. Br. 59-60. Defendants call (at 70) such discovery "legally irrelevant," but they base that conclusion on the very factual inferences (at 64-69) discovery is needed to test.

## IV. DEFENDANTS' ALTERNATIVE ARGUMENTS LACK MERIT

### A. Plaintiffs Plead Acts Of "International Terrorism"

Counts Three and Four allege Defendants committed "international terrorism." JA\_\_\_-\_\_\_(¶¶ 3208-21). Defendants' challenges (at 36-39) fail. *First*, Defendants' payments to terrorists "appear[ed] to be intended" to promote the three statutory terrorist aims. 18 U.S.C. § 2331(1)(B). That element "is not a state-of-mind requirement; it is a matter of external appearance." *Boim*, 549 F.3d at 694. It is met when conduct's "foreseeable consequences" promote terrorist aims. *Id*. Here, Defendants knew – as would any objective observer – that the consequences of their conduct included Jaysh al-Mahdi attacks that sought to (and did) achieve those aims. *Supra* Parts I, II.B. Such allegations alone support an inference of apparent terroristic intent. *See*, *e.g.*, *Boim*, 549 F.3d at 693-95; *In re Chiquita Brands Int'l, Inc.*, 284 F. Supp. 3d 1284, 1319 (S.D. Fla. 2018); *Wultz v. Islamic Rep. of Iran*, 755 F. Supp. 2d 1, 48-49 (D.D.C. 2010).

That conclusion tracks the principle that "people usually intend the natural consequences of their actions." *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 487 (1997); *see United States v. Salamanca*, 990 F.2d 629, 636 n.2 (D.C. Cir. 1993). Whatever Defendants subjectively desired, the law presumes they intended the natural consequences of their terrorist payoffs. *Boim*, 549 F.3d at 693-94. Defendants' cases are off-point because each involved conduct that did *not* cause terrorism. *Cf. Kemper*, 911 F.3d at 394; *Brill*, 804 F. App'x at 632.

The complaint does not "allege[] the opposite." Appellees Br. 37. Because people often have multiple motives, economic intent does not displace the apparent intent the statute contemplates. *See United States v. Shabban*, 612 F.3d 693, 696 (D.C. Cir. 2010) ("multiple intentions do[] not mean" that "requisite statutory intent" is lacking). That is especially true for GE Healthcare, which hired an agent (whose intent is imputed) with personal ties to Jaysh al-Mahdi. JA___(¶ 229). At best, the resolution of these issues is "for a jury." *Linde*, 882 F.3d at 327.

*Second*, Defendants' conduct involved "acts dangerous to human life" that violated criminal statutes. 18 U.S.C. § 2331(1)(A); *see* JA___-___(¶¶ 3211, 3218). Funding terrorists is inherently dangerous, "like giving a loaded gun to a child." *Boim*, 549 F.3d at 690. Defendants' response (at 38-39) recycles the flawed causation and knowledge arguments refuted above. *Supra* Parts I, II.B.

**B.     The Manufacturers Are Liable**

The manufacturers (Appellees Br. 11 n.3) are "vicariously liable" for the acts of their agent suppliers.  *See Meyer v. Holley*, 537 U.S. 280, 285 (2003). Agency requires that an agent act "on the principal's behalf and subject to the principal's control."  Restatement (Third) of Agency § 1.01 (2006).  Here, Iraqi law required manufacturers to provide written authorizations designating their suppliers as their "sole and exclusive . . . represent[atives]" in Iraq, JA___-___(¶¶ 156-57), and the manufacturers had the right to control the transactions the suppliers negotiated on their behalf, JA___-___, ___, ___, ___, ___, ___-___, ___(¶¶ 156-57, 193, 219, 249, 255, 287, 314).  Defendants' sentence fragment on this issue (at 35) does not even preserve their position.

Besides, the manufacturers participated in the aiding-abetting by paying bribes to register with the Ministry, confirming their affiliates' transactions, and making goods they knew funded terrorism.  JA___, ___-___, ___, ___, ___, ___(¶¶ 194, 220, 250, 256, 288, 315).  That role exceeds the "secretarial work" the Court found substantial in *Halberstam*.  705 F.2d at 475.

**C.     The Act-of-War Defense Does Not Warrant Dismissal**

The district court correctly rejected Defendants' act-of-war argument. JA___-___(Op.17-18).  That defense raises questions "best addressed on a motion for summary judgment or at trial."  *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474,

510 (E.D.N.Y. 2012); *see* JA___, ___-___, ___-___(¶¶ 55, 347-56, 409-10); *see also*, *e.g.*, JA___-___, ___(¶¶ 462-64, 1735-36) (attacks on civilian Plaintiffs). Defendants cite no case dismissing claims on act-of-war grounds.

An "act of war" must occur "in the course of" (1) a "declared war," (2) an "armed conflict . . . between two or more nations," or (3) an "armed conflict between military forces of any origin." 18 U.S.C. § 2331(4). Defendants' attempt to invoke the third prong misunderstands the statute's text and purpose.

1.      The act-of-war defense, as its first two prongs show, focuses on national armies. *Id.* § 2331(4)(A)-(B). In cases that do not involve such armies, Congress used the term "military forces," *id*. § 2331(4)(C), to limit the defense to similar groups that "act in substantial conformity with the laws of war," *Gill*, 893 F. Supp. 2d at 517. That flows from the text: the adjective "military" ordinarily pertains "to the methods and customs of war or of organized fighting men," as in military "discipline." *Webster's Third New International Dictionary* 1433 (3d ed. 2002). This Court thus upheld a jury instruction in a related context that groups must act "in accordance with the laws and customs of war to qualify as military organizations." *United States v. Yunis*, 924 F.2d 1086, 1098 (D.C. Cir. 1991). The same definition, which "track[s] . . . the Geneva Convention," *id*., governs the Anti-Terrorism Act's comparable language, *see Gill*, 893 F. Supp. 2d at 511-17.

26

Jaysh al-Mahdi systematically disregarded the laws of war. It intentionally massacred civilians; waged "jihad" from mosques, schools, ambulances, and hospitals; used children in attacks; and perpetrated a mass sectarian cleansing. JA___, ___-___, ___-___(¶¶ 13, 333, 350-53). Jaysh al-Mahdi also kidnapped the relatives of several Plaintiffs and tortured them, murdered them in captivity, and mutilated the bodies. JA___-___(¶¶ 827-73). All the while, its fighters ignored the Geneva Conventions by refusing to carry arms openly or distinguish themselves from civilians. JA___(¶ 352). These are criminal acts of terrorists, not acts of war carried out by a "military force." *Gill*, 893 F. Supp. 2d at 516-17.

Defendants misread (at 58) the phrase "of any origin." 18 U.S.C. § 2331(4)(C). That phrase covers armies that, though not belonging to a "nation[,]" *id.* § 2331(4)(B), still "behave[] as traditional military forces do," *Gill*, 893 F. Supp. 2d at 516. It might include militaries belonging to not-fully-sovereign governments (Taiwan), multinational entities (NATO), or subnational governments (Kurdish Peshmerga). But it does not sweep in non-militaries like Jaysh al-Mahdi, which waged an unlawful terrorist insurgency against the very democracy the Sadrists nominally supported. JA___-___, ___-___(¶¶ 80, 347-50).

It is no answer that "[n]ational militaries do not always adhere to the law of war." Appellees Br. 59. Congress *separately* addressed conflicts "between two or more nations," 18 U.S.C. § 2331(4)(B), so that national armies remain exempt

even if they violate the laws of war, *see* S. Rep. No. 102-342, at 46 (1992) (defense aimed at "injuries that result from military action by recognized governments"). Defendants' position reduces that second prong to pure surplusage by treating every armed group in the world as a "military force" under the third prong. *Infra* p. 30. Besides, national militaries "traditionally," even if not "universally," act in "substantial conformance with the laws of war." *Gill*, 893 F. Supp. 2d at 515. Congress modeled the military-forces prong on the traditional case. *Id*.

2. Jaysh al-Mahdi's role as a Hezbollah "proxy," Commanders Br. 4, reinforces that conclusion. In 2018, Congress clarified that the term "military force" cannot encompass designated terrorist organizations. 18 U.S.C. § 2331(6)(A)(i); *see* H.R. Rep. No. 115-858, at 4-5 (2018). Attacks by Hezbollah – including the 22 attacks it committed jointly with Jaysh al-Mahdi, Br. 41 – thus cannot be "acts of war." So with the remaining attacks: all were committed by Hezbollah-sponsored terrorists using Hezbollah training, weapons, and tactics. Br. 42-48; Commanders Br. 5-16. Had Hezbollah operatives physically pulled the trigger in those attacks, they indisputably would have lost any act-of-war immunity. Exempting them from the Act just because Hezbollah enlisted its proxy to carry them out would upend the legislative scheme. Commanders Br. 17-23. That is especially true because many were committed by the Jaysh al-Mahdi cell

"Asa'ib Ahl al-Haq," JA___, ___(¶¶ 83, 334), which the U.S. government also has designated as a terrorist organization, 85 Fed. Reg. 1369, 1369 (Jan. 10, 2020).

Defendants' spin on the 2018 statute is unpersuasive. Designated terrorists do "regularly violate the law of war" and should "never have qualified as military forces." Appellees Br. 60. Congress stepped in not to change the standard, but because one court (applying Defendants' logic) mistakenly equated Hezbollah with a "military." *See* H.R. Rep. No. 115-858, at 4 & n.9. By abrogating that decision, the amendment restored "Congress' original intent." *Id*. at 5. It also expressly preserved courts' ability to "determine[ ]" that *undesignated* terrorists are "not . . . a 'military force.' " 18 U.S.C. § 2331(6)(B). A law-of-war-violating Hezbollah proxy like Jaysh al-Mahdi exemplifies what Congress had in mind.

3.　　Defendants characterize (at 58-59) Jaysh al-Mahdi as a "military force" by citing its military-style jargon and weapons. Such characteristics are irrelevant. *See Weiss v. Arab Bank, PLC*, 2007 WL 4565060, at \*6 (E.D.N.Y. Dec. 21, 2007) ("[t]o describe, in common parlance, . . . that the terrorists engage in military or paramilitary-type activities does not mean [they are] a 'military force'"); *Morris v. Khadr*, 415 F. Supp. 2d 1323, 1333 (D. Utah 2006) ("'military' training" can be "employ[ed] . . . in a terroristic fashion"); 18 U.S.C. § 2339D (criminalizing receiving "military-type training" from designated terrorists). Jaysh

al-Mahdi may have called itself a jihadist "army" and used military-grade weapons – virtually all terrorists do. But that does not bring it within the act-of-war defense.

The world's worst terrorists routinely launch military-style attacks on Western military targets. *See*, *e.g.*, *Morris*, 415 F. Supp. 2d at 1333; *Weiss*, 2007 WL 4565060, at *2, *5 (attacks on soldiers). Defendants cite no textual or structural evidence that Congress intended to immunize such terrorism from the Anti-Terrorism Act. Nor could they. Treating terrorists as militaries whenever they acquire sophisticated weapons and inspire colloquial "battlefield" rhetoric, Commanders Br. 1 – something true of al-Qaeda,[7] Hezbollah,[8] and virtually every other terrorist group in existence[9] – would pervert the statute. *See* JA___(¶ 347).

### CONCLUSION

The judgment below should be reversed.

---

[7] *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93, 138 (2d Cir. 2008) (al-Qaeda "military committee" and "military commander").

[8] *United States v. Assi*, 586 F. Supp. 2d 841, 846 (E.D. Mich. 2008) ("Hizballah military operation[s]").

[9] *E.g.*, *Hussain v. Obama*, 718 F.3d 964, 968 (D.C. Cir. 2013) ("battlefront with Taliban warriors"); *Gill*, 893 F. Supp. 2d at 479 (Hamas's "military control").

Respectfully submitted,

 /s/ *Joshua D. Branson*
DAVID C. FREDERICK
JOSHUA D. BRANSON
ANDREW E. GOLDSMITH
KELLOGG, HANSEN, TODD,
 FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
dfrederick@kellogghansen.com
jbranson@kellogghansen.com
agoldsmith@kellogghansen.com

*Counsel for Plaintiffs-Appellants*
*Joshua Atchley, et al.*

April 2, 2021

**CERTIFICATE OF COMPLIANCE**

I certify, pursuant to Federal Rule of Appellate Procedure 32(g), that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(ii) because, excluding the portions of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), the brief contains 6,498 words.

I further certify that this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared using Microsoft Word 2013 in a proportionally spaced typeface (Times New Roman, 14 point).

 /s/ *Joshua D. Branson*
Joshua D. Branson

April 2, 2021

# ADDENDUM

**Special Inspector General for Iraq Reconstruction, Interview with James Haveman and Robert Goodwin (Dec. 22, 2005)**

Screened by NARA (RF) October 23, 2020
FOIA # RD 63945

**Interview with**
**James "Jim"Haveman, former Senior Advisor to Ministry of Health**
(b) (6), (b) (7)(C)
**Robert "Bob" Goodwin, former Chief of Staff, Ministry of Health**
Robert.Goodwin@pentagon.af.mil
December 22, 2005

Phone interview conducted by Wendy Hirsch and Nell Todd, contractors, Lessons Learned

<u>**NOT FOR DIRECTO ATTRIBUTUION.   INTERNAL USE ONLY.**</u>

**Background**
Haveman has an extensive background in international relief and health.  He was asked to accept a White House appointment – through the Pentagon – to serve as a senior advisor to the Ministry of Health in Iraq.  This was in April 2003.

He then was given three chief of staff candidates.  He interviewed the candidates, and asked Bob Goodwin to join him in that position.

Bob Goodwin worked for Al Kaupinen in 2001, was a captain in the Air Force, and has disaster relief experience.  He has been involved with State, DoD, and USAID, knew some Arabic, and had experience in both the Middle East as well as the Sudan peace process.

Haveman and Goodwin arrived in Iraq the first week of June 2003 and left 28 April 2004.

**Stateside Training**
Haveman and Goodwin had two weeks to prepare for their deployment and spent time completing medical/deployment requirements to include equipment issue (chem./bio equipment familiarization); interviewing potential team members and receiving extensive briefings from military, civilian, and Iraqi subject matter experts to include HHS, USAID, DoD Departments and Abt Associates.  as

Haveman and Goodwin asked two Iraqi doctors to accompany them to Baghdad.  These two men were part of a stateside effort that helped to plan reconstruction efforts (IRDC – Iraq Reconstruction and Development Center) and accepted the offer It was important to Haveman and Goodwin to have the Iraqi perspective right from the beginning as part of their team.

**Overall Philosophy**
Haveman and Goodwin believed it was essential to involve the Iraqis from day one. Goodwin was involved in Afghanistan reconstruction efforts and immediately recognized that the Iraqi people had much more intellectual capacity and would be able to run the complex systems in their government.  They unfortunately had been cut off from outside information for 20 plus years and were not familiar with recent medical and management

**Reply Add. 1**

techniques. The Iraqis knew their healthcare systems and what needed to be fixed but had never had the authority or resources to make changes. Haveman and Goodwin saw themselves as mentors and teachers….to help with management and strategic thinking and to lend expertise and direction when needed and warranted. They designed their team to help meet the needs that the Iraqis identified and asked for other assistance from the UN, USAID and the World Bank.

Haveman and Goodwin's goal was to build an Iraqi-led organization and to empower the new Iraqi minister once appointed. They also focused on not allowing parallel health systems to spring up (e.g. NGO-led health clinics that operated outside of the MOH). They were able to hand over the management of the Ministry to the Iraqis in March 2004 and it was the first Ministry to "achieve sovereignty" or to be transitioned by the CPA. Haveman and Goodwin saw their primary mission as looking out for the interests of the Iraqis even though they represented the United States as part of the Coalition Provisional Authority. Hence, they worked to create a very strict drug formulary (based on well known generics) and did other things for the long term financial health of the Ministry.

Haveman and Goodwin went to the ministry everyday. It was about a five mile drive from the green zone to the ministry (depending on the route). They used a combination of their own military staff (using CPA vehicles) and Coalition Forces support to plan and execute missions to the Ministry. As time progressed, the Coalition Forces had trouble supporting their missions due to a focus on combat operations and the increasing number of CPA personnel/requests for transport. There were also fewer CPA vehicles able to be used as the number of CPA personnel increased. They then purchased Iraqi vehicles and started going on their own to the ministry. Later they ordered armored vehicles that took about 7 months to be delivered. Bob had overseen purchase of armored vehicles in his past employment with USAID; he was able to put this experience to use in drawing up the requirements for the vehicles for MOH. As their team composition changed to meet Iraqi needs (more pharmacists and specialists instead of personnel with combat/operations experience) they hired 4 South African security personnel to augment their staff and to take charge of their travel. The cost of the security and the vehicles were covered by Iraqi dollars and the armored vehicles were split between their staff and the Iraqi minister's staff. They also hired a separate team of South Africans to provide personal security for the Iraqi minister and all armored vehicles were transferred to the Minister when CPA stood down..

**The Ministry of Health: During ORHA**
During ORHA a man named Steve Browning, who was an engineer by training, was asked to take the lead on health. During this time, everyone was operating in an "emergency mode". Every morning command control would hand out assignments and in the evening they would meet again to talk about how things went during the day.

NGOs, WHO and USAID's DART were also supplying emergency relief. Haveman and Goodwin felt that some of these NGOs were operating within their own parameters, not the parameters that the ministry had established. They also had the perspective that they were there to run things, or that they had been running things for years (e.g. WHO), and

so this should/would continue. Goodwin also thought that people were tending to think in terms of an Afghanistan model where USAID and NGOs were running healthcare services for the Afghanis instead of supporting the Iraqis in service delivery. This was evident in how the USAID contracts were written which had little reference to any Iraqi authority or provisional government.

Some of the NGOs left because there wasn't the humanitarian crisis that was originally envisioned.

**Looting and Reconstruction**
When they arrived, the ministry building (two eleven story towers) had been looted and damaged. To give context, 6 tons of paper that had been disrupted during looting, had to be hauled away. The Oil for Food contract room had been set on fire. There wasn't any furniture. Employees were not getting paid. The majority of the Iraqi staff was coming to work each day just to standing outside in the parking lots. They had one request "chairs so they could sit out in the parking lot more comfortably". Goodwin and Haveman instead wanted to get them furniture so they could go back to work.

The Ministry of Housing and Construction had funds for emergency capital expenditures for all ministries. Haveman and Goodwin laid out their capital expenditure needs to this ministry and eventually the Program Review Board approved about $1.9 million in the seized assets to repair the MOH building.

They were able to hire a local contractor to do the basic repairs (this process was managed by the ministry). They received furniture and other equipment from OTI's "Ministry in a Box" program and WHO provided some basic equipment, as well.

The ministry issued its own contracts for funds allocated under the national budget. Bot the CPA staff and the Iraqi ministry staff were involved in the signing off on contracts and invoice payment. One project was for $40 million worth of generators. They went through a selection process, but in order to give the selected company starting capital, they had to transport $6 million in cash to Jordon. They were required to independently develop an "entire security operation" to transport these funds. They also had to secure stadiums and other buildings so they could make emergency cash payments to ministry employees. (The banking system didn't really get up and running until February or March 2004).

**Development of MoH Budget**
One of Haveman and Goodman's first tasks was to develop a budget for the Ministry of Health. In July they finalized the first budget that the MoH ever had. Haveman brought in John Walker from Michigan to assist with this process. They created a $250 million budget to support about 240 hospitals, 1200 clinics, and 120,000 employees. This equated to about $20 per capita. In contrast to Saddam Hussain's time where the whole budget was approximately $16M or about 70 cents per capita. From that point on they expended according to the budget. They also did something unique in making sure that

the Director Generals out in each governate had access to money instead of having everying controlled in Baghdad which was how Saddam did business. One of their greatest challenges was getting the Iraqis to spend money since they had never had access to resources in the past and did not have any decision making authority. They were risk adverse and used to asking the Minister for permission on even the most basic of decisions. They also did not believe that they would get more money the next month so they would not spend their current operating budget. They had to send out advisors to help them spend this money and coached them through the process and assisted them in developing procedures for expending funds.

The PRB was a resource for additional funds but are not sure if their budget was made up of funds from the DFI, seized, vested etc. The source of the funds was not in their realm of responsibility, but something that took place in David Oliver's shop.

Eventually, the Iraqis built upon the original budget done by Haveman and John Walker and developed their own budget for 2004. They defended their own budget in front of the Ministry of Planning and Ministry of Finance. Haveman and Goodwin worked hard to develop the capacity for the Ministry of Health and the Minister to defend their budget and to exercise their independence from the Ministy of Finance and Planning. Traditionally, these two ministries had been very powerful. There seemed to be tension between the Ministry of Planning and the Ministry of Finance.

**Restrictions on Contracting**
When COL Anthony Bell (HCA) came on board, he initially wanted all contracting at CPA to come under him. Goodwin (an Acquisition Program Manager while in the Air Force) felt it did not make sense to use US procurement law to expend Iraqi funds as there was little way to verify contractors to the same standard as in the US and the need for rapid contracting. There was also little capacity in CPA to assist with these contracts and the Iraqis were not familiar with the FAR. Instead they partnered directly with the Iraqis at the Ministry to evaluate contractors for technical ability and cost and money was paid out through the Ministry's financial procedures. They worked to ensure that MOH had authority to do its own contracting from the national budget; however worked with PMO for appropriated funds. (Interviewers note: CPA Memorandum 4 allowed for certain ministries to undertake their own contracting, if their procedures had been approved by the CPA). Goodwin Note: I believe CPA Memorandum four was written long after some CPA contracts were already awarded.

**Strategy Session and Shift in Approach**
It was their goal to transition from emergency and triage mentality that most of the Iraqis had to a longer-term strategic planning mentality. They designed a plan to get the Iraqis to think of their healthcare system for 2005 and beyond. Before Haveman and Goodwin arrived, the senior level Baathists had been removed from the Ministry. This included the Minister, Deputy Minister and Director Generals. Haveman and the entire staff decided to move into the ministry to work along side the Iraqis and partnered with the Iraqis that had now stepped into leadership positions until a new minister was appointed in Sept of 2003. At that time, and until they left, they assisted the Minister with reorganizing and managing the ministry so that it worked better than the stoved-piped/centrally controlled system of the past.

When Haveman arrived he saw many signs, including hospitals with empty beds, which pointed towards a need to focus on a primary care approach. Iraqis were accustomed to a hospital-focused approach and initially were set to rebuild hospitals. Haveman wrote a paper on the subject, outlining the reasons to focus on primary healthcare. This idea was presented during the August 2003 planning meeting, and everyone agreed to this plan. (In August 2003 they sponsored a threeo-day strategic planning session with all of their partners, including NGO representatives (CARE), WHO, UNICEF, the World Bank, European Union, DfID, USAID, Iraqi leaders, Red Cross, Iraqi Red Crescent and others.) The goal was to think 2005 and beyond.

The session was facilitiated jointly by Haveman and David Nabarro from WHO and out of the process 9 workgroups were identified as well as what they would look at as part of the healthcare system. Abt helped facilitate the workgroup meetings.

**Development of IRRF II and Spending Plan**
Haveman and Goodwin worked with the Dave Oliver and his team to prepare a request to support IRRF II. They presented their plan and budget to Oliver and helped to write the narrative piece relating to the health sector, in the emergency supplemental legislation.

Later, once $800M had been appropriated for MOH, Haveman and Goodwin felt that they had to educate the PMO on the activities of the MoH and how these funds should be used. To help with the shift from a hospital based healthcare system to one centered on primary care, the focus was to be on building new health clinics and in doing basic repairs to hospitals to ensure they had water, air, sewage and power. They needed to work aggressively to ensure that the PMO accepted their priorities, which were Iraqi priorities and everything from clinic design to location was dictated by the Iraqis. The CPA staff simply helped assist with them getting the work done. Part of the challenge was taking the Iraqi product into the "design-build" part of the contracting process. As the PMO tried to make changes to get things on contract we insisted that the Iraqis needed to be consulted. This was difficult as the PMO staff was primarily based in the Green Zone and were not getting down to the ministry. Early on, Haveman recalls being told by a military officer involved with PMO, that the Iraqi's wouldn't have any say in planning these funds but thankfully their were others in the PMO that did not share this perspective.

Iraqi's at the ministry were involved in developing the proposed requirements – where clinics should be located, (how far apart, how many people they would serve, etc), and also the design that should be used for the clinics. They found a kindred spirit in David Rains, who worked in the Program Management sector of the PMO and was responsible for creating the plan for MOH. Haveman and Goodwin took him to meet with the Iraqis and he came to understand the wisdom in the recommendations the Iraqis made. He traveled down to the Ministry on numerous occasions to work with the staff at the Minstry to further refine the requirements.

After the $800M was appropriated for MOH, USAID asked to receive $250M of this amount to support a stand-alone maternal and child healthcare program. Haveman recalls

**Reply Add. 5**

sitting with Lew Lucke and Bremer negotiating this program in January or February of 2004. In the end, Bremer agreed with Haveman that much of what USAID was asking for the Iraqis at the Ministry were already doing.  Instead Goodwin and Haveman agreed to providing approximately $25 M for a follow-on USAID health contract as well as $17M for training of medical personnel.

Haveman and Goodwin were not involved with the award of the DB contract, beyond the initial planning.   They were informed that Parsons had won the award.  They felt that part of the challenge with the DB process, is although they had a plan, once it went over to Parsons, there were a lot of layers and it was an involved process to get things done. To their knowledge, not a single clinic has been built to date, under the award.

Haveman and Goodwin were against building a new hospital in Basrah as there were other more important priorities.  They also pushed for new constuction instead of renovating 50 year old buildings and were eventually cut out of the process and full responsibility was given to USAID to implement with Bechtel.


**Relationship with USAID**
Abt ran USAID's main health project.  Their contract (and thus statement of work (SOW)) was written before the war.  Goodwin felt that Abt's approach assumed there was no Ministry of Health, and they would be running the show (i.e. the ministry).

Abt had several management problems (refer to the USAID Audit).  However, Goodwin tried to work with Abt as much as possible.  He invited one of their technical advisors into the budget process and offered their whole team space within the ministry.   Abt had some funds for capital expenditures, and it seemed to Goodwin to be an ideal scenario for both of them.   However, Goodwin felt that USAID and Abt "wanted to do their own thing".  They weren't doing what the Iraqis wanted and the feeling was that USAID had to get them to change their approach or their contract would be terminated.   Goodwin then worked with them on the revision of their SOW.  Abt's contract was ultimately not extended.

**Role of US Contractors**
Goodwin and Haveman felt there was tremendous benefit in using Iraqi contractors to do work (US contractors were very  expensive (security costs accounted for approximately 50% of the total contract) as they required armored vehicles, and security details that Iraqi contractors would not require.  It also did not infuse money into the Iraqi economy and there high unemployment rates.  When Iraqis found out how it cost a US contractor to build one clinic they were incredulous; it was too much money for one clinic.  They could do it much cheaper and faster.

But perhaps more importantly, both Haveman and Goodwin  felt that, by hiring Americans, we were taking away ownership from the Iraqis.  Goodwin mentioned that as with traditional development programs if the Americans build it and it breaks it is their

responsibility. If the Iraqis were involved and owned the program then they would take ultimate responsibility for its success or failure.

Further, US companies had a hard time mobilizing staff. This was one of the problems suffered by the USAID contractor Abt. Part of this, according to Goodwin, was the media coverage. The media presented a much different view of the environment in Iraq than the reality on the ground so family pressure made it was harder to keep people to stay and harder to get new people to go over to Iraq.

## Closing Thoughts

Haveman felt that a tremendous number of things happened in a day (like building a 747 while flying it" and that days seemed like weeks and weeks like months. Haveman, Goodwin and team worked from approximately 8 a.m. to 3 p.m. down at the Ministry and then a full day of work back in the Green Zone. Many evenings were spent at the Iraqi Minister's house outside the Green Zone working on issues and long-term planning. Haveman felt prepared to handle the grueling environment and was there to use the team to support the ministry and build capacity to where it could operate on its own. He reported into CPA leadership weekly on goals and results and daily meetings were held with the Senior Advisors. These meetings were effective in sharing lessons learned and collaborating among ministries. Some of the success of ministries was based on experience and Haveman had experience as a senior healthcare executive and oversaw the $12 billion budget for the State of Michigan.. He also said that a lot of what got accomplished (or didn't) came down to personalities – how different persons involved in the process worked together, or struggled over decisions. But that is also what made things work as diverse perspectives were needed to solve very complex problems.

### Successes/Lessons Learned

**1. Rear Support**

The Pentagon gave great rear support through the health affairs office. When they needed a subject matter expert, that office was able to quickly recruit and mobilize people. This was a "huge plus". Other agencies did not provide their ministers with the same type of support. For instance, the Department of Labor pulled a very successful and experienced minister back to his job.

**2. Management Training**

Ministry staff needed basic accounting, finance, and contracting training. We should have spent more time organizing this type of training for ministry staff. This should have been done cross-ministry to allow for integration and collaboration.

**3. Long-Term Perspective**

Some went into Iraq with a short-term, not long-term perspective, but it takes years to effectively set up this type of institution. We needed to make sure that our short-term decisions and partnerships with the Iraqis would be sustainable in the long-run.

**4. Ministry-centered Planning**

Prioritization and planning should have come from the ministry, not other organizations. This prevents duplications (clinics being built next to clinics) but also

ensures that reconstruction programs mirror the Iraqi vision and development strategy. There is no reason to have parallel health systems.

### 5. Trusting Iraqis

Advisors need to train, teach, and help manage. But then they need to let go. Iraqis need to take ownership of their plans and take responsibility for the successes and failure. Many other advisors did not take this approach at their ministries; they were more heavy-handed.

### 6. Collaboration of Sr. Advisors, Continuity, Experience

Collaboration existed between the senior advisors, but it seemed to be ad hoc. It is important to share ideas and coordinate efforts.

In addition, the lack of continuity of advisors "hurt us". Government departments need to take responsibility and support their staff for taking on this type of assignment. They shouldn't be "pulled back".

Finally, there were not enough senior advisors that had experience in "running" large organizations and systems. That's the type of skill sets that were needed to assist the Ministries.

### 7. Iraq is not Afghanistan

Many people in Washington tended to think that Iraq was like Afghanistan and that the Iraqis did not have the capacity to run their own ministries. The perspective that we could have possibly had a plan crafted from Washington for reconstruction was also improbably as one had to be on the ground to fully understand the Iraqi perspective and the needs of the ministry. They have the knowledge to fix their own system but needed coaching and mentorship to design and implement the changes and to develop systems that would reduce corruption. We needed to recognize and build off of their talent, rather than assuming there was a complete lack of intellectual infrastructure.

### 8. Managing expectations

Haveman noted that one of the difficulties Iraqis had with the US reconstruction program is a) the amount of time it took and b) the amount of money that was spent for little result. They felt that Americans were "God-like" being able to get rid of Saddam in 30 days when they could not do so in 30 years and had the expectation Americans could wave a wand and everything would be fixed. Saddam had not invested anything in the basic infrastructure for 20 years and it will take many years to fix the problems. They were also dismayed at the proportion of money that actually ended up as physical investments in Iraq and that which was spent in paying contractors.

### 9. Provide funds directly to Ministries

Haveman believed that the appropriated funds should have been funneled through the ministries, to support the ministries objectives and Iraqi priorities for the

**Reply Add. 8**

healthcare system they wanted to build. They would have needed assistance in managing the funds (skills and systems infrastructure), but could have been advised on how to do it.   Instead the PMO created a parallel system, with outside control of what was built, how it was built and by whom.

# CERTIFICATE OF SERVICE

I hereby certify that, on April 2, 2021, I caused to be filed electronically the initial version of the Reply Brief for Plaintiffs-Appellants Joshua Atchley, *et al.*, with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

 /s/ *Joshua D. Branson*  
Joshua D. Branson