# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 20-7077

JOSHUA ATCHLEY, *et al.*,
*Plaintiffs-Appellants*,

v.

ASTRAZENECA UK LIMITED, *et al.*,
*Defendants-Appellees*.

Appeal from the United States District Court for the District of Columbia,
No. 1:17-cv-02136-RJL (Hon. Richard J. Leon)

**SUPPLEMENTAL BRIEF FOR PLAINTIFFS-APPELLANTS
JOSHUA ATCHLEY, *ET AL.***

DAVID C. FREDERICK
JOSHUA D. BRANSON
ANDREW E. GOLDSMITH
DEREK C. REINBOLD
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
dfrederick@kellogghansen.com
jbranson@kellogghansen.com
agoldsmith@kellogghansen.com
dreinbold@kellogghansen.com

*Counsel for Plaintiffs-Appellants
Joshua Atchley, et al.*

August 26, 2024

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ........................................................................ ii

GLOSSARY ............................................................................................ v

INTRODUCTION ..................................................................................... 1

STATEMENT ........................................................................................... 2

    A.    This Court's Opinion ............................................................. 2

    B.    Subsequent Proceedings ....................................................... 7

ARGUMENT ............................................................................................ 8

I.    THE COURT SHOULD REAFFIRM ITS PRIOR JUDGMENT ................. 8

    A.    Bribing Terrorists Supports Aiding-Abetting Liability After *Twitter* ............................................................................... 9

    B.    *Twitter* Does Not Undermine The Court's Aiding-Abetting Analysis ............................................................. 15

        1.    Knowledge and Substantiality ..................................... 15

        2.    Intent ....................................................................... 18

        3.    Nexus ....................................................................... 21

    C.    *Twitter* Does Not Affect The Court's Other Holdings ......................... 24

II.    THE GOVERNMENT'S BRIEF DOES NOT SUPPORT DISMISSAL ............................................................................. 25

CONCLUSION ....................................................................................... 29

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

**TABLE OF AUTHORITIES**

Page

**CASES**

*ABF Cap. Mgmt. v. Askin Cap. Mgmt., L.P.*, 957 F. Supp. 1308
(S.D.N.Y. 1997)..........................................................................................14

*Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519
(6th Cir. 2000) ...........................................................................................14

*Am. Fam. Mut. Ins. Co. v. Grim*, 440 P.2d 621 (Kan. 1968)........................... 21-22

*Amazon Servs. LLC v. U.S. Dep't of Agric.*, 109 F.4th 573
(D.C. Cir. 2024)..........................................................................................10

*Bohon v. FERC*, 92 F.4th 1121 (D.C. Cir. 2024) .......................................................9

*Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685
(7th Cir. 2008) .....................................................................................14, 22

*Bonacasa v. Standard Chartered PLC*, 2023 WL 7110774
(S.D.N.Y. Oct. 27, 2023).................................................................16, 18, 19, 22

*Camp v. Dema*, 948 F.2d 455 (8th Cir. 1991) ...........................................12, 15, 19

\* *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ......................6, 12, 13, 14, 17,
18, 21, 22

*Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842
(2d Cir. 2021)............................................................................................17

*Keel v. Hainline*, 331 P.2d 397 (Okla. 1958).....................................................14, 22

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*,
376 F.3d 1123 (D.C. Cir. 2004)...................................................................22

*King v. Habib Bank Ltd.*, 2023 WL 8355359
(S.D.N.Y. Dec. 1, 2023) ..................................................... 16-17, 18, 20, 22

Authorities principally relied upon are designated by an asterisk (*).

*Moore v. Hartman*, 704 F.3d 1003 (D.C. Cir. 2013) ....................................................9

*Ofisi v. BNP Paribas, S.A.*, 77 F.4th 667 (D.C. Cir. 2023) ...............................18, 20

*Oguaju v. United States*, 378 F.3d 1115 (D.C. Cir. 2004) ..........................................9

*Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017),
    *vacated and remanded sub nom. Opati v. Republic of Sudan*,
    590 U.S. 418 (2020) ........................................................................................22

*Rasul v. Myers*, 563 F.3d 527 (D.C. Cir. 2009) ........................................................9

*Ruan v. United States*, 597 U.S. 450 (2022) ..................................................... 28-29

*Sealed Case, In re*, 246 F.3d 696 (D.C. Cir. 2001) ................................................25

*Texas v. United States*, 798 F.3d 1108 (D.C. Cir. 2015) ..................................... 8-9

\* *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023) ..........................1, 2, 7, 8, 9, 10, 11,
                                  13, 15, 16, 17, 18,
                            19, 20, 21, 22, 23, 24
                              25, 26, 27, 28, 29

*United States v. Dewalt*, 92 F.3d 1209 (D.C. Cir. 1996) ........................................28

*Von Saher v. Norton Simon Museum of Art at Pasadena*, 754 F.3d 712
    (9th Cir. 2014) ..............................................................................................26

*Woods v. Barnett Bank of Fort Lauderdale*, 765 F.2d 1004
    (11th Cir. 1985) ......................................................................................12, 19

*Zobay v. MTN Grp. Ltd.*, 695 F. Supp. 3d 301
    (E.D.N.Y. 2023) ...........................................................16, 18, 20, 22, 24

**STATUTES AND RULES**

Anti-Terrorism Act, 18 U.S.C. § 2331 *et seq.*:

    § 2333(d)(2) ...............................................................................7, 19, 24, 28

Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 (2016):

§ 2(a)(5) ...................................................................................18

§ 2(a)(6) ...................................................................................14

§ 2(b).................................................................................14, 20

18 U.S.C. § 2339B(a)(1) .......................................................................29

**OTHER MATERIALS**

*AstraZeneca UK Ltd. v. Atchley*, – S. Ct. –, 2024 WL 3089470 (U.S. June 24, 2024) ..........................................................................8

Br. for United States as Amicus Curiae in Supp. of Reversal, *Twitter, Inc. v. Taamneh*, No. 21-1496 (U.S. filed Dec. 6, 2022) ....................................................................................27

Oral Arg. Tr., *Twitter, Inc. v. Taamneh*, No. 21-1496 (U.S. Feb. 22, 2023)................................................................................27

Restatement (Third) of Torts (2020)........................................................21

S. Rep. No. 102-342 (1992) ...................................................................14

# GLOSSARY

| | |
|---|---|
| Act | Antiterrorism Act, 18 U.S.C. §2331 *et seq.* |
| Amendment | Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 (2016) |
| Ministry | Iraq's Ministry of Health |
| Pet. | Defendants' Petition for a Writ of Certiorari, *AstraZeneca UK Ltd. v. Atchley*, No. 23-9 (U.S. filed June 30, 2023) |
| Senators Br. | Brief of Eight United States Senators as *Amici Curiae* in Support of Plaintiffs-Appellants, *Atchley v. AstraZeneca UK Ltd.*, No. 20-7077 (filed Apr. 23, 2021) |
| U.S. Br. | Brief for the United States as Amicus Curiae, *AstraZeneca UK Ltd. v. Atchley*, No. 23-9 (U.S. filed May 21, 2024) |
| U.S. *Twitter* Br. | Brief for the United States as Amicus Curiae in Support of Reversal, *Twitter, Inc. v. Taamneh*, No. 21-1496 (U.S. filed Dec. 6, 2022) |

**INTRODUCTION**

This appeal asks whether it violates the Antiterrorism Act to knowingly give "millions of dollars of cash and cash-equivalents" to terrorists who are slaughtering American soldiers. *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 210 (D.C. Cir. 2022). Last time, the Court said yes. The terrorist group Jaysh al-Mahdi had "completely overrun" Iraq's Ministry of Health, and Defendants secured lucrative contracts from that Ministry by "giving corrupt payments" to the terrorists who ran it. *Id*. at 209-10. Meanwhile, Jaysh al-Mahdi used the Ministry "as a vehicle for terrorist activity." *Id*. at 209. It "massacred thousands of people, including Plaintiffs and their family members." *Id*. Through those allegations, the Court explained, Plaintiffs' meticulous complaint pleads that Defendants' corrupt payments "provided illegal support to the terrorist acts that harmed them." *Id*.

The Supreme Court then decided *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023). The victims there sought to hold social-media companies liable for failing to fully exclude ISIS from their generally available platforms. The Court refused to extend aiding-abetting liability that far. In doing so, *Twitter* invoked common-law principles that require "conscious, voluntary, and culpable" conduct. *Id*. at 493. All three adjectives describe this case. Defendants illegally gave Jaysh al-Mahdi millions of dollars while dealing with a Ministry they knew the terrorists commanded. And they knew their bribes "helped finance Jaysh al-Mahdi's

terrorist attacks on Americans, including plaintiffs." *Atchley*, 22 F.4th at 212-13. They were nothing like social-media platforms passively failing to root out terrorist content. Their bribes were far more culpable, as this Court's opinion shows.

*Twitter* may warrant some modest changes to that opinion, as is often true after a GVR. Indeed, the government supported a GVR (but opposed plenary review) mainly because this Court had not used all the same words as *Twitter*. But that is form, not substance. Functionally, this Court's previous analysis tracks *Twitter*'s common-law framework. The Court now can make that explicit and resolve nearly all the government's concerns. And to the extent the government invented other issues it said "may complicate" the analysis, U.S. Br. 19, it was mistaken. Reading the complaint as written – not as Defendants reimagine it – Defendants' conduct was plenty culpable. This Court was right all along.

## STATEMENT

### A. This Court's Opinion

This Court's last opinion scrutinized the complaint at length. The allegations span "588 pages" and "spell[ ] out connections" based on "hundreds of identified sources" detailing these "extraordinary events." *Atchley*, 22 F.4th at 213. Stressing that the allegations "must be accepted as true at this motion-to-dismiss stage," *id*. at 210, the Court rejected many of Defendants' arguments as

2

urging an "untenably skeptical reading of the complaint," *id*. at 228. Taking a proper view of the complaint, the Court read the allegations as follows:

**1.** Iraq's Ministry of Health has long been among the most corrupt institutions in the world. *Id.* at 210-11. In late 2004, Jaysh al-Mahdi seized control of the Ministry and its lucrative contracting apparatus. *Id*. at 211-12. It then "used the Ministry as a front and headquarters for its campaign of terrorist violence." *Id*. at 212. It employed the Ministry's headquarters as a base of operations. JA127 (¶¶ 89-90). It converted Ministry hospitals into command-and-control centers. JA125-26 (¶¶ 86-87). It placed thousands of terrorist fighters on the Ministry's payroll. JA125 (¶ 85). And it dispatched Ministry ambulances to "transport[] terrorist 'death squads' around Baghdad." *Atchley*, 22 F.4th at 212. As the U.S. military documented at the time, the Ministry was a hub for "insurgent logistics flow" that posed a "significant threat to [Coalition forces]." JA794.

None of this was a secret. Jaysh al-Mahdi's dominance "was obvious to anyone physically present at Ministry headquarters." *Atchley*, 22 F.4th at 212. Terrorist propaganda festooned Ministry facilities. JA121-22 (¶ 73). Pictures of Muqtada al-Sadr decorated the walls alongside terrorist slogans like "Death to America." *Id.* Jaysh al-Mahdi's all-black flag adorned the entrances, while armed fighters patrolled the halls. *Atchley*, 22 F.4th at 212; JA121-22 (¶¶ 73-75). As the

U.S. Embassy summarized in a 2006 report, the Ministry and its facilities were "openly under the control" of Jaysh al-Mahdi.  JA123 (¶ 79).

2.     Jaysh al-Mahdi used the Ministry to fund terrorist attacks.  JA135-38, 163-70 (¶¶ 105-112, 165-179).  Defendants funded such attacks through "corrupt payments in both cash and goods to Jaysh al-Mahdi."  *Atchley*, 22 F.4th at 212.

Defendants used local agents to deliver "cash kickbacks to the terrorists who gave them business."  *Id*. at 209; JA153-63 (¶¶ 142-164).  They also "delivered extra, off-the-books batches of valuable medical goods that Jaysh al-Mahdi monetized on the black market."  *Atchley*, 22 F.4th at 209.  Defendants included the "free goods" in the same shipments as the "purchased goods" and packaged them for easy street resale.  JA99, 112-13, 140-42 (¶¶ 5, 50-51, 119-120).  Because Ministry officials did not have to account for the extra goods, they were easy to appropriate for terrorist aims.  JA140-42, 147 (¶¶ 117-120, 132).

The "free goods" supplied Jaysh al-Mahdi with an especially potent source of terrorist funding.  Jaysh al-Mahdi "finance[d] operations from diverted medicines," JA166 (¶ 169), and it often used the free goods "as cash equivalents to pay terrorist fighters," *Atchley*, 22 F.4th at 209.  Jaysh al-Mahdi was so dependent on the Ministry's resources that it became known as "The Pill Army."  *Id*. at 213.  As the Court thus concluded, Defendants' "stream of bribes and free goods helped finance Jaysh al-Mahdi's terrorist attacks on Americans."  *Id*. at 212-13.

Defendants knew they were funding terrorist attacks. JA142, 163-76 (¶¶ 121, 165-187). They "finalized their contracts at the Ministry headquarters surrounded by terrorist propaganda and other indicia of Jaysh al-Mahdi's control." *Atchley*, 22 F.4th at 213. They also retained local agents who knew Jaysh al-Mahdi used the Ministry to raise funds for its terrorist activities. JA171-72 (¶ 182). And they had "corporate security and compliance operations" that exposed them to extensive reporting on the terrorist connections. *Atchley*, 22 F.4th at 213.

3.      The Court also identified plausible allegations that "Hezbollah both planned and authorized the attacks against [Plaintiffs]." *Id.* at 218. The U.S. government did not designate Jaysh al-Mahdi as a terrorist organization. JA246-47 (¶¶ 355-356). But Hezbollah, designated since 1997, was key to Jaysh al-Mahdi's terrorist attacks. *Atchley*, 22 F.4th at 216-19. Hezbollah co-founded Jaysh al-Mahdi as its terrorist proxy; recruited Iraqis to join its ranks; designed Jaysh al-Mahdi's terrorist tactics; and instructed Jaysh al-Mahdi fighters on how to deploy them against Americans in particular. JA250-73 (¶¶ 364-403).

"Hezbollah's alleged involvement in planning the attacks that injured and killed plaintiffs was deep and far reaching." *Atchley*, 22 F.4th at 218. That "planning role" was especially "evident in attacks using Penetrators," a signature Hezbollah weapon designed to puncture U.S. tank armor that Hezbollah directed Jaysh al-Mahdi to use in most of the attacks here. *Id*. at 219; *see* JA265-66

(¶¶ 395-396).  Hezbollah's exertion of "religious, personal, and operational authority over Jaysh al-Mahdi show[s] that it 'authorized' the attacks as well." *Atchley*, 22 F.4th at 219.  And joint Hezbollah–Jaysh al-Mahdi cells "committed twenty-two of the attacks at issue," which Defendants do not dispute.  *Id.* at 216.

      4.      The Court's reading of the complaint led it to "reverse on three points of law" relevant here.  *Id*. at 209.[1]  *First*, it held the allegations "support an inference that defendants aided and abetted acts of international terrorism."  *Id*. at 210.  Defendants' corrupt payments to Jaysh al-Mahdi, the Court concluded, was "knowing assistance that was sufficiently 'substantial'" to constitute aiding-abetting.  *Id*. at 224.  The Court scrutinized the "six factors" in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), but did not treat any "factor alone" as "dispositive."  *Id.* at 221.  What mattered, the Court explained, was whether "the relevant considerations show that defendants substantially assisted the acts of terrorism."  *Id*.  Defendants' knowing corrupt payments substantially assisted "Jaysh al-Mahdi's violent terrorizing, maiming, and killing of U.S. nationals in Iraq."  *Id*. at 222.  As for Defendants' state of mind, the Court found culpable "Defendants' alleged awareness that, by bribing the Ministry, they were funding [Jaysh al-Mahdi's] terrorist attacks on Americans in Iraq."  *Id*. at 223.

---

[1] The Court also reversed on personal jurisdiction, which Defendants did not appeal.  *Atchley*, 22 F.4th at 231-38.

6

*Second*, the Court held the allegations sufficient to plead that Hezbollah "committed, planned, or authorized," 18 U.S.C. § 2333(d)(2), the specific attacks at issue, *see Atchley*, 22 F.4th at 216-19. The Court did not reach Plaintiffs' "alternative theory" that Hezbollah planned Jaysh al-Mahdi's broader terrorist "campaign." *Id*. at 216. The Court instead discerned a sufficient link between Hezbollah and each of the individual "attacks" that harmed Plaintiffs. *Id*. at 219.

*Third*, the Court held "that plaintiffs have adequately alleged proximate causation" for the direct-liability claims. *Id*. at 226. The "detailed allegations" supported an inference that Defendants' corrupt payments were "a substantial factor in plaintiffs' injuries." *Id*. at 227. It was also "reasonably foreseeable that financially fortifying Jaysh al-Mahdi would lead to the attacks that plaintiffs suffered." *Id*. The Court distinguished the Ministry from the "independent intermediar[ies]" that defeated causation in other cases. *Id*. at 227-28. Defendants did not merely "aid[] an autonomous nation with many functions and priorities"; they dealt with "a single agency that had been overtaken by terrorists." *Id*. at 228.

**B.     Subsequent Proceedings**

In February 2023, the full Court unanimously denied Defendants' rehearing petitions. Doc. No. 1984411. Three months later, the Supreme Court decided *Twitter*. There, victims of an ISIS nightclub shooting in Turkey sued three social-media companies for aiding the attack. 598 U.S. at 478-79. The victims alleged

7

that the social-media companies "knew that ISIS was using their platforms but failed to stop it from doing so." *Id*. at 478. The Supreme Court held that was "mere passive nonfeasance" and dismissed the claims. *Id*. at 500. Rejecting secondary liability for such passive inaction, the Court stressed, did not foreclose claims based on "aid that is more direct, active, and substantial." *Id*. at 502.

Defendants here then sought certiorari, requesting a GVR or alternatively plenary review. The Supreme Court called for the views of the United States, which opposed plenary review but recommended a GVR because this Court had rendered its decision "without the benefit of [the Supreme] Court's guidance" in *Twitter*. U.S. Br. 10-11. The government observed that "the conduct alleged in this case . . . differ[s] in a number of respects" from *Twitter*. *Id*. at 13. But because the government thought *Twitter* might still "bear on [this Court's] analysis," it viewed a GVR as following the Supreme Court's "usual practice." *Id*. at 11.

The Supreme Court granted, vacated, and remanded "for further consideration in light of" *Twitter*. *AstraZeneca UK Ltd. v. Atchley*, – S. Ct. –, 2024 WL 3089470, at *1 (U.S. June 24, 2024). It denied plenary review.

**ARGUMENT**

**I.    THE COURT SHOULD REAFFIRM ITS PRIOR JUDGMENT**

"[I]t is well-settled that a GVR has no precedential weight and does not dictate how the lower court should rule on remand." *Texas v. United States*, 798

F.3d 1108, 1116 (D.C. Cir. 2015).  This Court thus often reaffirms its prior rulings

after a GVR.  *See, e.g.*, *Bohon v. FERC*, 92 F.4th 1121, 1122 (D.C. Cir. 2024);

*Moore v. Hartman*, 704 F.3d 1003, 1004 (D.C. Cir. 2013) (per curiam); *Rasul v.*

*Myers*, 563 F.3d 527, 533 (D.C. Cir. 2009) (per curiam); *Oguaju v. United States*,

378 F.3d 1115, 1116 (D.C. Cir. 2004).  It should do so here.

A. **Bribing Terrorists Supports Aiding-Abetting Liability After** *Twitter*

The post-GVR question is whether Defendants' "corrupt provision of free

goods and cash bribes to do business with a Ministry completely overrun by Jaysh

al-Mahdi," *Atchley*, 22 F.4th at 210, remains sufficiently "conscious, voluntary,

and culpable" to support aiding-abetting liability, *Twitter*, 598 U.S. at 493.  The

answer is yes.  The Court should confirm that Defendants' years-long scheme of

bribing terrorists is still blameworthy enough to state a claim after *Twitter*.

1. *Twitter* recognized the "deep-rooted common-law basis" for aiding-

abetting liability under the Act.  *Id.*  Applying that common-law tradition, *Twitter*

instructed courts evaluating aiding-abetting claims to look for "conscious,

voluntary, and culpable participation in another's wrongdoing."  *Id.*

The allegations in *Twitter* fell short.  The social-media companies there

passively "failed to stop ISIS" from misusing their "generally available virtual

platforms."  *Id.* at 505.  The companies took no active steps to fund or otherwise

help ISIS.  *Id*. at 499-501.  In fact, they committed no "affirmative misconduct" at

all.  *Id*. at 500.  They even "remove[d] at least some ISIS-sponsored accounts" when "brought to their attention."  *Id*. at 498 n.13.  Yet the plaintiffs still sought to characterize the companies' inaction as aiding-abetting.  *Id*. at 498-502.

Twitter held such "passive nonfeasance" allegations inadequate without some "strong showing of assistance and scienter."  *Id*. at 500.  That is because "both tort and criminal law have long been leery of imposing aiding-and-abetting liability for mere passive non-feasance."  *Id.*  Culpable assistance demands more, "lest mostly passive actors like banks become liable for all of their customers' crimes by virtue of carrying out routine transactions."  *Id.* at 491; *see Amazon Servs. LLC v. U.S. Dep't of Agric.*, 109 F.4th 573, 575 (D.C. Cir. 2024) (applying *Twitter* to dismiss aiding-abetting claims alleging the "mere provision of a neutral service").  Such expansive results would thrust secondary liability "far beyond its essential culpability moorings."  *Twitter*, 598 U.S. at 503.  But as Justice Jackson noted, the Court's unanimous decision hinged on its "view of the facts" and was "narrow in important respects."  *Id.* at 507 (Jackson, J., concurring).

The allegations here bear no resemblance to the passive-inaction allegations *Twitter* rejected.  Defendants were not social-media companies that sat passively while terrorists abused their platforms.  They "secured lucrative medical-supply contracts by giving [Jaysh al-Mahdi] millions of dollars in cash and cash-equivalents over a period of many years."  *Atchley*, 22 F.4th at 210.  They

10

packaged their "free goods" to facilitate easy black-market diversion. *Id*. at 212.

And they did so with "awareness that, by bribing the Ministry, they were funding

[Jaysh al-Mahdi's] terrorist attacks on Americans in Iraq." *Id*. at 223. Defendants'

corrupt acts – affirmative, not passive – thus "provided illegal support to the

terrorist acts that harmed [Plaintiffs]." *Id*. at 209. That is just the sort of "direct,

active, and substantial" aid *Twitter* suggested would suffice. 598 U.S. at 502.

*Twitter*'s disparate treatment of the "allegations specific to Google"

illustrates the point. *Id*. at 505. Unlike Twitter, Google allegedly "shared

advertising revenue with ISIS." *Id*. So the Supreme Court addressed those

funding allegations separately. *Id*. at 505-06. It affirmed their dismissal for a

different reason: the plaintiffs "allege[d] nothing about the amount of money that

Google supposedly shared" or "the number of accounts" involved. *Id*. at 505.

Faced with a bare-bones complaint in which the amount of money paid could have

been "only $50," the Court held that, "[w]ithout more," the plaintiffs had "not

plausibly alleged" substantial assistance. *Id*. at 505-06. As this Court recognized,

the allegations here suffer from no such flaw. *See Atchley*, 22 F.4th at 222

(Defendants gave "several million dollars per year" over "a period of years").

    **2.**    This Court's opinion further tracks the historical "common-law

principles" *Twitter* recognized. 598 U.S. at 491-92. Three are especially relevant.

*First*, common-law courts often find aiding-abetting liability when the defendant aids the primary actor under "unusual circumstances." *Atchley*, 22 F.4th at 221 (quoting *Halberstam*, 705 F.2d at 487). In *Halberstam*, Linda Hamilton's clerical work made her liable for murder because she performed services "in an unusual way under unusual circumstances," making even her "passive but compliant" role culpable. 705 F.2d at 474, 487. Similarly, in *Woods v. Barnett Bank of Fort Lauderdale*, which *Twitter* cited approvingly, 598 U.S. at 492, the court inferred a bank's "knowing assistance" of fraud "from atypical business actions," including writing a reference letter for an underwriter "without even minimal investigation." 765 F.2d 1004, 1012 (11th Cir. 1985).

The allegations of knowing illegal conduct are at least as strong here. Defendants engaged in "atypical business transactions," *Camp v. Dema*, 948 F.2d 455, 459 (8th Cir. 1991), by bribing Jaysh al-Mahdi with cash and goods, JA139-63 (¶¶ 116-164). Defendants also negotiated those bribes inside the Ministry's headquarters, surrounded by terrorist propaganda. *Atchley*, 22 F.4th at 221; JA121, 170-71 (¶¶ 73, 180-181). Supplying aid under circumstances so unusual would be culpable even "with a minimal showing of knowledge." *Camp*, 948 F.2d at 459. And the knowledge here was not minimal: even the district court said Defendants "were aware" their goods "would be used . . . to support terrorist attacks." JA835.

*Twitter* confirmed that aiding-abetting liability remains available in cases involving such "affirmative misconduct."  598 U.S. at 500.  The Court explained that "some set of allegations involving aid to a known terrorist group would justify holding a secondary defendant liable for all of the group's actions or perhaps some definable subset of terrorist acts."  *Id.* at 502.  A prime example, the Court said, would be "where [a] provider of routine services does so in an unusual way."  *Id.* One way a medical "distributor" can act culpably is to deliver medicines "far in excess of normal amounts."  *Id*. (citing case about "morphine distributor").

Defendants' conduct was far worse than the Supreme Court's example. They engaged in transactions outside the regular course of business through "the corrupt provision of free goods and cash bribes" to terrorists.  *Atchley*, 22 F.4th at 221.  They not only secretly routed cash to terrorists, but also supplied off-book "free goods of great value in funding terrorist acts."  *Id*.  This Court's opinion analogized those bribes to Hamilton's provision of "otherwise-innocuous services" in "an unusual way under unusual circumstances."  *Id*. (quoting *Halberstam*, 705 F.2d at 487).  *Twitter* confirms that the analogy fits.  As alleged, Defendants were hardly "passive actors . . . carrying out routine transactions."  598 U.S. at 491.

*Second*, courts "adapt[ ]" common-law principles to fit "new facts."  *Twitter*, *Id.* at 487-88.  Unlike *Twitter*, this is a terrorist-*funding* case where the aid took the form of fungible cash and cash-equivalents.  Courts have long recognized that

13

secondary actors are culpable when they knowingly finance unlawful acts.[2] The

Act commands the same result here. Congress intended to impose liability on

terrorist funders, *see* Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-

222, § 2(a)(6), (b), 130 Stat. 852-53 (2016) ("Amendment"), and the Act has long

reflected Congress's goal of stopping "the flow of money" to terrorists, S. Rep. No.

102-342, at 22 (1992). Indeed, financial contributions – unlike mere social-media

platforms – supply terrorists with a vital "lifeline" for their attacks, *Boim v. Holy

Land Found. for Relief & Dev.*, 549 F.3d 685, 690-91 (7th Cir. 2008) (en banc).

    *Third*, common-law courts employ a "proportionality test" under which

"a defendant's responsibility for the same amount of assistance increases with the

blameworthiness of the tortious act." *Halberstam*, 705 F.2d at 484 n.13. *Keel v.

Hainline*, for example, involved students throwing classroom erasers at each other.

331 P.2d 397, 399 (Okla. 1958). The "free-for-all" was blameworthy enough to

find "even a minimally-involved participant liable." *Halberstam*, 705 F.2d at 484.

---

[2] *See*, *e.g.*, *Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 537 (6th Cir. 2000) ($275,000 loan was substantial assistance); *ABF Cap. Mgmt. v. Askin Cap. Mgmt., L.P.*, 957 F. Supp. 1308, 1330 (S.D.N.Y. 1997) ("Participation in the financing of a[n] [unlawful] scheme, particularly where . . . the financing was not routine, constitutes substantial assistance.").

Jaysh al-Mahdi's attacks were far more heinous.  Under the common law, the "extraordinary blameworthiness of Jaysh al-Mahdi's terrorist attacks" magnifies Defendants' culpability.  *Atchley*, 22 F.4th at 222.

**B.**     ***Twitter* Does Not Undermine The Court's Aiding-Abetting Analysis**

In seeking a GVR, Defendants purported to identify mismatches between *Twitter* and this Court's aiding-abetting analysis.  Those mismatches are trivial and do not undermine the Court's prior judgment.

### 1.     Knowledge and Substantiality

**a.**     *Twitter* casts no doubt on this Court's analysis of the Act's knowing-and-substantial-assistance element.  *Atchley*, 22 F.4th at 221-24.  *Twitter* clarified that this element aims "to capture conscious and culpable conduct," 598 U.S. at 504, and calls for courts to balance "the nature and amount of assistance" with "the defendant's scienter," *id.* at 492-93.  A "party who engages in atypical business transactions . . . may be found liable as an aider and abettor with a minimal showing of knowledge."  *Camp*, 948 F.2d at 459.  Conversely, a party engaged in "normal everyday business practices would need a higher degree of knowledge." *Id.*; *see Twitter*, 598 U.S. at 490-92, 504 (citing *Camp* four times).  "[L]ess substantial assistance require[s] more scienter," and "vice versa."  598 U.S. at 492.

This Court functionally performed the balancing *Twitter* contemplated.  The Court considered "six factors" bearing on Defendants' culpability, including their

15

"state of mind." *Atchley*, 22 F.4th at 221. The Court thus weighed Defendants'

"awareness" that "they were funding an entity's terrorist attacks on Americans in

Iraq," which the Court explained "drives home the substantial character of their

aid." *Id*. at 223. It also weighed that these were not "one-off transaction[s] by a

firm unfamiliar with its counterparty, but a set of enduring, carefully cultivated

relationships consisting of scores of transactions." *Id*. at 224. Moreover, the Court

stressed the "corrupt" nature of Defendants' unusual dealings, distinguishing them

from the routine "financial services" other courts have deemed non-culpable. *Id*. at

221. All this meant that, "on balance, the relevant considerations show that

defendants substantially assisted the acts of terrorism." *Id*. The same is true now.

The Supreme Court's "conscious and culpable" standard is just another way of

describing what this Court already found. *Twitter*, 598 U.S. at 504.

Every court to consider *Twitter* has read it similarly. The first upheld claims

against a telecommunications company for "facilitating a steady flow of funds" to

an Iranian terrorist front. *Zobay v. MTN Grp. Ltd.*, 695 F. Supp. 3d 301, 346

(E.D.N.Y. 2023). The second affirmed that a bank's knowing "provision of

banking and financing services" to a terrorist-linked fertilizer supplier remained

culpable after *Twitter*. *Bonacasa v. Standard Chartered PLC*, 2023 WL 7110774,

at *11 (S.D.N.Y. Oct. 27, 2023). And the third confirmed that "*Twitter* largely

align[s] with . . . Second Circuit precedent," *King v. Habib Bank Ltd.*, 2023 WL

8355359, at *2 (S.D.N.Y. Dec. 1, 2023), which allows aiding-abetting claims against banks that service terrorist fronts, *see*, *e.g.*, *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 866 (2d Cir. 2021). This Court's prior reasoning aligns with that same precedent. *See Atchley*, 22 F.4th at 222-25 (citing *Kaplan*).

True, the Court's opinion arguably "separated the 'knowing' and 'substantial' subelements," which *Twitter* warns against. 598 U.S. at 503-04; *see Atchley*, 22 F.4th at 222. But here, unlike in *Twitter*, any such distinction was semantic. Labels aside, the Court's reasoning – in a section titled "***Knowing and Substantial Assistance***" – focused on the right considerations. *Id*. at 221. Indeed, the Court's "state of mind" analysis persuasively considered all the facts that bear on Defendants' knowledge and culpability under *Twitter*. *Compare Atchley*, 22 F.4th at 220-21, 223-24, *with Twitter*, 598 U.S. at 504-07. To the extent *Twitter* warrants minor changes to that analysis – clarifying, for example, that the "'knowing' subelement" is more than a "carbon copy of the antecedent" general-awareness element, *id*. at 503-04 – such changes hardly affect the outcome. Now, as before, knowingly funneling corrupt payments to terrorists entails a "level of blameworthiness" the law has long condemned. *Id*. at 489.

**b.** Defendants also criticized this Court's opinion for hewing too closely to *Halberstam*. Pet. 14-15. Congress identified *Halberstam* as "'provid[ing] the proper legal framework' for 'civil aiding and abetting . . . liability.'" *Twitter*, 598

U.S. at 485 (quoting Amendment § 2(a)(5)). The Supreme Court thus applied "*Halberstam*'s 'legal framework,' viewed in context of the common-law tradition from which it arose." *Id*. At the same time, it cautioned against "any approach that too rigidly focuses on *Halberstam*'s facts or its exact phraseology." *Id*. at 493.

That guidance again requires (at most) cosmetic changes to this Court's opinion. While the Court analyzed *Halberstam*'s six factors in turn, it agreed no "factor alone is dispositive, and the weight of each varies with the circumstances." *Atchley*, 22 F.4th at 221. The Court can therefore reaffirm its ruling – using the same legal principles and the same facts – without "hew[ing] tightly to the precise formulations that *Halberstam* used." *Twitter*, 598 U.S. at 493. Indeed, every court to apply *Twitter* has employed a similar analysis – still scrutinizing *Halberstam*'s factors, but doing so holistically. *See Zobay*, 695 F. Supp. 3d at 343-51; *Bonacasa*, 2023 WL 7110774, at *10-12; *King*, 2023 WL 8355359, at *2-3; *see also Ofisi v. BNP Paribas, S.A.*, 77 F.4th 667, 675-76 (D.C. Cir. 2023) (evaluating common-law aiding-abetting claims by applying *Halberstam* factors alongside *Twitter*). A holistic analysis, flexibly adapted to the facts of this case as *Twitter* requires, *see* 598 U.S. at 493, continues to support the Court's previous judgment.

### 2. Intent

Nor does *Twitter* undermine the Court's weighing of Defendants' intent. *Twitter* derived its common-law "culpability" standard from cases that did *not*

require specific intent.[3] *Twitter* thus adopted a sliding-scale approach, merging knowledge and substantiality into a "single inquiry designed to capture conscious and culpable conduct." 598 U.S. at 503-04. Those twin considerations – knowledge and substantiality – "work[] in tandem, with a lesser showing of one demanding a greater showing of the other." *Id*. at 491-92. That sliding-scale test necessarily forecloses any specific-intent requirement. So does the statute's text, which pegs liability to "know[ledge]," not intent. 18 U.S.C. § 2333(d)(2).

True, the social-media companies' benign intent in *Twitter* weakened their culpability. *See* 598 U.S. at 502-04. That was important because the plaintiffs' inaction allegations demanded "more scienter before [the] court could infer conscious and culpable assistance." *Id.* at 491-92. Without unlawful intent, the plaintiffs could not show the "more" they needed. *Id*. Put simply, the platforms' "undisputed lack of intent to support ISIS" mattered because the passive-nonfeasance theory was already so dubious. *Id*. at 504-05. Active-misconduct claims are different, as courts have recognized. *See Bonacasa*, 2023 WL 7110774, at *10 ("because Plaintiffs allege affirmative misfeasance, rather than merely

---

[3] *Compare Woods*, 765 F.2d at 1009-10 (requiring only "knowledge" or "reckless conduct," not intent), *and Camp*, 948 F.2d at 460 (defining "culpable conduct" as requiring "some degree of knowledge," not intent), *with Twitter*, 598 U.S. at 490-92 (citing *Woods* and *Camp*).

19

passive nonfeasance, *Twitter* requires a much less significant showing of scienter"); *Zobay*, 695 F. Supp. 3d at 343-51; *King*, 2023 WL 8355359, at *2-3.

This Court's state-of-mind analysis resembled *Twitter*'s, just with different facts. It recognized that a secondary actor is more culpable when it "share[s] the same goals as the principal." *Atchley*, 22 F.4th at 223. But "specific intent" is not "required." *Id*. On the facts here, the Court explained, Defendants' corrupt dealings reflected a state of mind culpable enough to make their aid substantial. *Id*. at 222-25. That remains true after *Twitter*. This Court has since confirmed that *Twitter* does not require "specific intent for the precise criminal venture to succeed." *Ofisi*, 77 F.4th at 674 (citing *Twitter*, *Halberstam*, and *Atchley*).

Any other rule would flout the Act's "purpose" of providing "the broadest possible basis" to impose liability on those that "provide[] material support, directly or indirectly, to [terrorists]." Amendment § 2(b). That is why a bipartisan coalition of U.S. Senators urged reversal here, telling this Court that a specific-intent requirement would cripple Congress's efforts to "address terrorist financing anywhere in the causal chain." Senators Br. 8-9. It is also why the government has long disclaimed any shared-intent requirement, including here. *See* U.S. Br. 2 ("liability can be imposed under Section 2333(a) if common law tort standards are met even in the absence of specific intent"). Of course, a "defendant's intent will

normally be a substantial factor." *Id*. Here, Defendants' intent – to obtain corrupt contracts by giving material support directly to terrorists – was culpable enough.

### 3. Nexus

*Twitter* clarified that the Act requires a defendant to have "aided and abetted the act of international terrorism that injured the plaintiffs." 598 U.S. at 497. Seizing on that holding, Defendants' certiorari petition argued that this Court had mistakenly fixated on the nexus to Jaysh al-Mahdi generally, rather than its "specific attacks." Pet. 14. But the Court *did* focus on the "terrorist acts against plaintiffs," concluding that Defendants "aided and abetted *those attacks*." *Atchley*, 22 F.4th at 225 (emphasis added). That conclusion remains correct.

Aiding-abetting an attack does not "demand a strict nexus between the alleged assistance and [that] terrorist act." *Twitter*, 598 U.S. at 497. A nexus suffices when the aid culpably contributes to "a *foreseeable* terror attack." *Id*. at 502 (emphasis added). Foreseeability "does not require the defendant to have known 'all particulars of the primary actor's plan.'" *Id*. at 495 (quoting Restatement (Third) of Torts § 10 cmt. c). Thus, Hamilton was liable for a murder she never directly assisted, because "violence" was a "foreseeable consequence" of the "personal property crime[s]" she did aid. *Halberstam*, 705 F.2d at 488. Another aider-abettor was liable for arson because fire was a foreseeable risk of the nighttime break-in he helped. *See Am. Fam. Mut. Ins. Co. v. Grim*, 440 P.2d 621,

626 (Kan. 1968); *Twitter*, 598 U.S. at 495-96 (discussing *Grim*).  And the student in *Keel* was liable even though he "may not even have given any particular aid to the boy who threw the eraser" at issue.  *Halberstam*, 705 F.2d at 482.

Jaysh al-Mahdi's attacks on Plaintiffs foreseeably resulted from Defendants' bribes.  Bankrolling terrorists naturally creates a foreseeable risk of terrorist attacks.  *See Boim*, 549 F.3d at 690-91.  In *Owens v. Republic of Sudan*, for instance, the Court held that Sudan's funding of "al Qaeda-affiliated businesses" foreseeably aided al-Qaeda's embassy bombings in other countries several years later.  864 F.3d 751, 783, 794 (D.C. Cir. 2017), *vacated and remanded on other grounds sub nom. Opati v. Republic of Sudan*, 590 U.S. 418 (2020).  The Court did not demand a direct line between Sudan's dollars and the explosives used. A "direct traceability" test, the Court noted, would render the statute "'ineffectual' because material support 'is fungible' and 'terrorist organizations can hardly be counted on to keep careful bookkeeping records.'"  *Id*. at 799 (quoting *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1130 (D.C. Cir. 2004)).  That is why all three courts to apply *Twitter* to terrorist-financing allegations have found an adequate nexus.  *See Zobay*, 695 F. Supp. 3d at 347; *Bonacasa*, 2023 WL 7110774, at *11; *King*, 2023 WL 8355359, at *3.

This case involves an even tighter nexus, as the Court observed twice.  The Court reversed on aiding-abetting because Defendants' "substantial assistance to

Jaysh al-Mahdi" aided the group's "terrorist attacks, foreseeably including the attacks against plaintiffs." *Atchley*, 22 F.4th at 225. And it reversed on proximate cause because it was "reasonably foreseeable" that Defendants' aid "would lead to the attacks that plaintiffs suffered." *Id*. at 227. Such foreseeability – tying Defendants' fungible aid to each Jaysh al-Mahdi attack – suffices under *Twitter*.

Defendants also did more than fund terrorists from afar. They bribed Jaysh al-Mahdi terrorists in the very building the terrorists used to orchestrate attacks. As the Court recognized, Jaysh al-Mahdi used "its takeover of the Ministry" not only "to fund" its "terrorist acts," but also to "facilitate" them. *Atchley*, 22 F.4th at 221. Jaysh al-Mahdi commanders led attacks from the headquarters. JA127 (¶¶ 89-90). They also used Ministry ambulances to ferry death squads around Baghdad. JA125-26 (¶ 86). In one attack, Jaysh al-Mahdi even rigged a Ministry ambulance with explosives and used it to attack Plaintiffs Staff Sergeant John Kirby, JA295-96 (¶¶ 559-563); Corporal Anthony Donald Pellecchia, JA303-04 (¶¶ 621-626); and Private First Class Andrew Fukuzawa, JA358-59 (¶¶ 1075-1077). The attenuated nexus *Twitter* rejected is not comparable.

*Twitter* also held that a defendant may be liable for "every single" attack by a terrorist group if the defendant "affirmatively gave aid that would assist each of [those] terrorist acts." 598 U.S. at 501-02. That is proper when the "role in an illicit enterprise" is "so systemic that the secondary defendant is aiding and

abetting every wrongful act committed by that enterprise." *Id.* at 496. In *Zobay*, for instance, the defendant's "millions of dollars in funding" and other support to Iran's Revolutionary Guard "plausibly assist[ed] each and every IRGC-led terrorist attack." 695 F. Supp. 3d at 348. Here, too, Defendants' multimillion-dollar bribes, "consisting of scores of transactions over a period of years," *Atchley*, 22 F.4th at 224, supplied pervasive aid to Jaysh al-Mahdi's terrorist enterprise.

### C. *Twitter* Does Not Affect The Court's Other Holdings

The Court should summarily reinstate its rulings on the Act's other elements. It sustained the complaint's allegations that Hezbollah "committed, planned, or authorized" each attack at issue. *Atchley*, 22 F.4th at 216 (quoting 18 U.S.C. § 2333(d)(2)). It likewise sustained the proximate-cause allegations because "Defendants' alleged support" was a "substantial factor in plaintiffs' injuries." *Id*. at 227. *Twitter* does not affect either ruling. The plan-or-authorize element there was undisputed, and no direct-liability claim was on appeal. 598 U.S. at 483-84. *Twitter* thus gives no reason to revisit the Court's well-reasoned holdings. As the government explained in opposing plenary review, this Court "articulate[d] generally accepted legal principles governing causation in the context of the particular and unusual allegations in this case." U.S. Br. 22.

## II.     THE GOVERNMENT'S BRIEF DOES NOT SUPPORT DISMISSAL

The government's support for a GVR should not lead this Court to reverse its prior judgment.  The Court has cautioned against drawing any "inferences" from the "weak" signals of a GVR order the government requests.  *In re Sealed Case*, 246 F.3d 696, 699 (D.C. Cir. 2001).  Caution is especially warranted here.

The government's brief endorsed the Supreme Court's "usual practice" of remanding whenever an intervening decision "may bear on the court of appeals' analysis."  U.S. Br. 11.  The government thought that course was warranted because this Court's last opinion "did not expressly apply" *Twitter*'s "culpable participation" standard.  *Id*. at 14.  This Court now can apply that standard expressly and cure the "errors" the government identifies (at 16).  *Supra* Part I.B.

Such modest revisions will resolve the government's reasons for supporting a GVR.  The government recognized that this case and *Twitter* "differ in a number of respects."  U.S. Br. 13.  Most importantly, the government observed, this case involves the "affirmative, atypical transactions" *Twitter* lacked.  *Id*. at 18.  So the government offered only mild critiques of this Court's opinion, mostly expressing uncertainty about whether the opinion fully tracked every part of *Twitter*'s framework.  *E.g.*, *id.* at 17 (calling it "unclear" whether this Court employed the *Twitter* standard).  Such minor critiques call at most for clarification, not reversal.

The government went on to identify two other "aspects" of this case it thought "may complicate" the analysis. *Id.* at 19. Neither does. *First*, the government occasionally read the complaint in Defendants' favor, suggesting the "cash bribes and excess goods" might serve "the Ministry's legitimate programs." *Id.* This Court already rejected that "untenably skeptical reading of the complaint." *Atchley*, 22 F.4th at 228. The complaint alleges that the Ministry functioned as a "de facto terrorist group," not as a "genuine medical institution." JA98 (¶ 3). It also alleges, as the government elsewhere conceded (at 6), that the corrupt payments bypassed the Ministry's nominally sovereign functions and so served no "legitimate charitable or medicinal purpose." JA150-51 (¶¶ 137-138).

Because "Jaysh al-Mahdi controlled the Ministry," the "[b]ribes and gifts coming into the Ministry under Jaysh al-Mahdi's command were bribes and gifts to Jaysh al-Mahdi." *Atchley*, 22 F.4th at 224. *Twitter* furnishes no basis to revisit that factual inference. And to the extent the government now intimates different facts, its reading of the complaint carries no weight. The government's role in foreign affairs may merit "respect," but that role does not "extend[] to making factual findings in conflict with the allegations in the complaint." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 754 F.3d 712, 724 (9th Cir. 2014).

The government earlier portrayed this case more accurately. In its *Twitter* brief, the government told the Supreme Court that the *Atchley* allegations

"support[] an inference of the requisite mens rea" because Defendants bribed "an entity defendants knew was engaged in anti-American acts of terrorism." U.S. *Twitter* Br. 22. It further identified this case as its lone example of a case that *did* involve a "sufficient nexus," stemming from "the direct channeling of . . . fungible resources to a foreign terrorist organization or its close affiliates." *Id.* at 34. The government even favorably cited this Court's opinion five times at oral argument, saying it involved "specific, knowing interactions between . . . the drug companies and the entity that was known to be a[n] . . . actor engaged actively in terrorist acts."[4] If the government's invitation brief here later used slightly different formulations, its earlier descriptions were more precise. The allegations here are nothing like the "inaction" theory the government convinced the Supreme Court to reject. U.S. *Twitter* Br. 34; *see id.* at 17-30 (proposing the test *Twitter* adopted).

*Second*, the government suggests (at 20) that the Court should consider "the extent of [Defendants'] alleged knowledge about Hezbollah's reliance on Jaysh al-Mahdi's use of Ministry resources." The complaint sufficiently alleges such knowledge based on "widespread [press] coverage." JA255 (¶ 374). Jaysh al-Mahdi's status as a Hezbollah proxy was open for all to see: Sadr publicly called Jaysh al-Mahdi "Hezbollah's striking arm in Iraq," Jaysh al-Mahdi fighters "waved

---

[4] Oral Arg. Tr. 75:4-9, *Twitter, Inc. v. Taamneh*, No. 21-1496 (U.S. Feb. 22, 2023); *see id.* at 81:25-82:12, 85:10-22, 88:16-24, 106:13-107:2.

Hezbollah banners at demonstrations," and they held public rallies "shout[ing] chants including 'Mahdi Army and Hezbollah are one' and 'we are Hezbollah.'" *Atchley*, 22 F.4th at 218 (footnote omitted); *see* JA253-55 (¶¶ 370-373).

Defendants have not pressed a Hezbollah-knowledge requirement, so the Court need not reach this issue. At any rate, *Twitter* says nothing about any such requirement. ISIS's role in the nightclub shooting there was undisputed, *see* 598 U.S. at 484, so the Supreme Court never addressed how knowledge of the principal tortfeasor's "designat[ion]" might affect the analysis, U.S. Br. 19-20. In fact, the government cites no authority – in the Act, in *Twitter*, or in any other case – suggesting that Defendants' knowledge of Hezbollah is even relevant.

The statute does not require a secondary actor to know of a designated organization's role in the terrorist act. It imposes two discrete requirements: that (1) a designated organization "commit[ ], plan[ ], or authorize[ ]" a terrorist act; and (2) the defendant "knowingly provid[e] substantial assistance" for "such an act." 18 U.S.C. § 2333(d)(2). The knowledge requirement is part of the substantial-assistance element, not the preceding plan-or-authorize element. Combining the two would defy the grammatical rule that adverbs like "knowingly" naturally modify "only the verbs" they precede – not the entire sentence in which they appear. *United States v. Dewalt*, 92 F.3d 1209, 1214 (D.C. Cir. 1996); *see Ruan v.*

*United States*, 597 U.S. 450, 470 (2022) (Alito, J., concurring) ("knowingly" naturally "modif[ies] the verbs that follow," not earlier "introductory phrase").

Congress intended the ordinary reading here. The word "knowingly" in the Act requires the defendant to consciously aid "another person in the commission of the actionable wrong – here, an act of international terrorism." *Twitter*, 598 U.S. at 495. Such knowledge need not encompass "all particulars of [Jaysh al-Mahdi's] plan," much less the details of Hezbollah's involvement. *Id*. Had Congress also wanted to require knowledge of the designated organization, it would have said so. *Cf.* 18 U.S.C. § 2339B(a)(1) (criminal statute requiring "knowledge that the organization is a designated terrorist organization").

## CONCLUSION

The Court should reinstate its judgment.

Respectfully submitted,

/s/ *Joshua D. Branson*
DAVID C. FREDERICK
JOSHUA D. BRANSON
ANDREW E. GOLDSMITH
DEREK C. REINBOLD
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
dfrederick@kellogghansen.com
jbranson@kellogghansen.com
agoldsmith@kellogghansen.com
dreinbold@kellogghansen.com

*Counsel for Plaintiffs-Appellants*
*Joshua Atchley, et al.*

August 26, 2024

30

# CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rule of Appellate Procedure 32(g), that this brief complies with the 6,500-word limit that this Court ordered on July 26, 2024 (Doc. No. 2066808), because, excluding the portions of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), the brief contains 6,499 words.

I further certify that this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared using Microsoft Word in a proportionally spaced typeface (Times New Roman, 14 point).

    /s/ *Joshua D. Branson*

Joshua D. Branson

August 26, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that, on August 26, 2024, I caused to be filed electronically the Supplemental Brief for Plaintiffs-Appellants Joshua Atchley, *et al.*, with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ *Joshua D. Branson*
Joshua D. Branson