**ORAL RE-ARGUMENT SCHEDULED FOR NOVEMBER 19, 2024**

**No. 20-7077**

# In the United States Court of Appeals for the District of Columbia Circuit

—————————

JOSHUA ATCHLEY, ET AL.,
*Plaintiffs-Appellants,*

*v.*

ASTRAZENECA UK LIMITED, ET AL.,
*Defendants-Appellees.*

—————————

Appeal from the United States District Court for the District of Columbia
No. 1:17-cv-02136-RJL (Hon. Richard J. Leon)

—————————

## SUPPLEMENTAL BRIEF FOR DEFENDANTS-APPELLEES

—————————

KANNON K. SHANMUGAM
JEH C. JOHNSON
WILLIAM T. MARKS
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
  *2001 K Street, N.W.*
  *Washington, DC 20006*
  *(202) 223-7300*

*Counsel for Johnson & Johnson,*
*Cilag GmbH International, Ethicon*
*Endo-Surgery, LLC, Ethicon, Inc.,*
*Janssen Ortho LLC, Janssen*
*Pharmaceutica NV, Johnson &*
*Johnson (Middle East) Inc., and*
*Ortho Biologics LLC*

LISA S. BLATT
  *Counsel of Record*
CHRISTOPHER N. MANNING
SARAH M. HARRIS
MELISSA B. COLLINS
AARON Z. ROPER
KRISTEN A. DEWILDE
WILLIAMS & CONNOLLY LLP
  *680 Maine Avenue SW*
  *Washington, DC 20024*
  *(202) 434-5000*
  *lblatt@wc.com*

*Counsel for Pfizer Inc., Pfizer*
*Pharmaceuticals LLC, Pfizer*
*Enterprises SARL, Pharmacia &*
*Upjohn Company LLC, and Wyeth*
*Pharmaceuticals LLC*

JESSICA S. CAREY
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
  1285 Avenue of the Americas
  New York, NY 10019-6064
  United States
  (212) 373-3000

Counsel for Johnson & Johnson,
Cilag GmbH International, Ethicon
Endo-Surgery, LLC, Ethicon, Inc.,
Janssen Ortho LLC, Janssen Phar-
maceutica NV, Johnson & Johnson
(Middle East) Inc., and Ortho Bio-
logics LLC

JOHN B. BELLINGER III
DAVID J. WEINER
ARNOLD & PORTER
KAYE SCHOLER LLP
  601 Massachusetts Ave., N.W.
  Washington, DC 20001
  (202) 942-5000

ROBERT REEVES ANDERSON
ARNOLD & PORTER
KAYE SCHOLER LLP
  1144 Fifteenth Street,
  Suite 3100
  Denver, CO 80202-1370
  (303) 863-2325

Counsel for GE Healthcare USA
Holding LLC, GE Medical Systems
Information Technologies, Inc., and
GE Medical Systems Information
Technologies GmbH

DAVID M. ZIONTS
S. CONRAD SCOTT
LELIA A. LEDAIN
COVINGTON & BURLING LLP
  One City Center
  850 Tenth Street, N.W.
  Washington, DC 20001
  (202) 662-5312

Counsel for F. Hoffmann-La Roche
Ltd

DAVID W. BOWKER
CATHERINE M.A. CARROLL
DONNA M. FARAG
WILMER CUTLER PICKERING
HALE AND DORR LLP
  2100 Pennsylvania Ave., NW
  Washington, DC 20037
  (202) 663-6000

Counsel for Genentech, Inc. and
Hoffmann-La Roche Inc.

PAUL S. MISHKIN
DAVID B. TOSCANO
CRAIG T. CAGNEY
DAVIS POLK & WARDWELL LLP
  450 Lexington Avenue
  New York, NY 10017
  (202) 450-4292

Counsel for AstraZeneca
Pharmaceuticals LP and
AstraZeneca UK Limited

# TABLE OF CONTENTS

Page

INTRODUCTION.................................................................................1

ARGUMENT .......................................................................................3

I.  The Aiding-and-Abetting Claims Fail Under *Taamneh* .........................3

   A.  *Taamneh* Clarifies the Anti-Terrorism Act Aiding-and-
       Abetting Framework ........................................................................4

   B.  The Complaint Does Not Satisfy *Taamneh*......................................7

       1.  Plaintiffs Fail to Allege that Any Defendant
           Consciously and Culpably Participated in Terrorist
           Attacks ....................................................................................7

       2.  Plaintiffs Fail to Allege the Required Nexus Between
           Any Defendant and Any Terrorist Attack............................19

   C.  Plaintiffs' Theory Seriously Threatens International
       Development and Post-Conflict Reconstruction ...........................23

II. The Direct-Liability Claims Fail Under *Taamneh* ...............................27

   A.  The Claims Fail to Allege Proximate Causation............................27

   B.  The Claims Fail the "Act of International Terrorism"
       Requirement ...................................................................................28

CONCLUSION.................................................................................31

I

# TABLE OF AUTHORITIES

Page

## CASES

*Aljabri v. bin Salman*, 106 F.4th 1157 (D.C. Cir. 2024)....................................29

*Am. Fam. Mut. Ins. Co. v. Grim*, 440 P.2d 621 (Kan. 1968)............................22

\* *Amazon Servs., LLC v. USDA*, 109 F.4th 573 (D.C. Cir. 2024) ............5, 8, 23

*Atchley v. AstraZeneca UK Ltd.*,
    22 F.4th 204 (D.C. Cir. 2022) ................................................6, 11, 13, 18, 27-29

*Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856 (D.C. Cir. 2022) ...........18

*Direct Sales Co. v. United States*, 319 U.S. 703 (1943).....................................16

*Doe v. GTE Corp.*, 347 F.3d 655 (7th Cir. 2003) ....................................................9

*Gonzalez v. Google LLC*, 2 F.4th 871 (9th Cir. 2021)........................................30

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ................4-6, 16-17, 19-20

*Hemi Grp., LLC v. City of New York*, 559 U.S. 1 (2010)...................................27

*Kemper v. Deutsche Bank AG*, 911 F.3d 383 (7th Cir. 2018)............................30

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)..........................................................................................27

*Montgomery v. Devoid*, 915 A.2d 270 (Vt. 2006) ..............................................17

*Ofisi v. BNP Paribas, S.A.*, 77 F.4th 667 (D.C. Cir. 2023) ...............................27

*People v. Brophy*, 120 P.2d 946 (Cal. App. 1942)................................................9

\* *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023)...............1-10, 12, 14-23, 27-29

*United States v. Peoni*, 100 F.2d 401 (2d Cir. 1938)....................................17, 22

\* Authorities upon which we chiefly rely are marked with asterisks.

II

Page

## STATUTES

18 U.S.C.
  § 2331 .................................................................................. 2, 29-30
  § 2333 ............................................................................................1
  § 2333(a) .................................................................................. 27-28
  § 2333(d)(2) ...................................................................................12

## OTHER AUTHORITIES

*De-risking in the Financial Sector*, World Bank (Oct. 7, 2016),
  https://tinyurl.com/32zc2tjt ...............................................................26

*Financial Reconstruction in Iraq: Hearings Before the Subcomm. on
  Int'l Trade & Fin. of the S. Comm. on Banking, Hous., & Urb. Affs.*
  (2004) .............................................................................................13

John Kirby, *Press Briefing*, White House (Oct. 26, 2023),
  https://tinyurl.com/bdfxbju5.............................................................25

*Remarks by President Biden on the Middle East*, White House
  (May 31, 2024), https://tinyurl.com/2vbr82sx ................................24

Bruce Riedel, *The Houthis After the Yemeni Ceasefire*, Brookings
  (Jan. 27, 2023), https://tinyurl.com/2n45wrba ...............................25

U.S. Dep't of State, *United States Announces Nearly $220 Million in
  Additional Humanitarian Assistance for the People of Yemen*
  (May 7, 2024), https://tinyurl.com/3ha4aw4w ................................25

## INTRODUCTION

This case returns to this Court after the Supreme Court's order granting certiorari, vacating this Court's judgment, and remanding for further consideration in light of *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023). *Taamneh* holds that aiding-and-abetting liability under the Anti-Terrorism Act, 18 U.S.C. § 2333, requires that defendants "consciously and culpably participated in" the specific "act of international terrorism that injured the plaintiffs" "in such a way as to help make it succeed." 598 U.S. at 497 (cleaned up); *accord id.* at 493, 496, 498 (similar). Defendants respectfully submit that *Taamneh* requires this Court to affirm the district court's dismissal of the complaint.

Plaintiffs allege that defendants—21 of the world's largest pharmaceutical and medical-device companies—manufactured or sold medicines or medical equipment to the Iraqi Health Ministry in transactions plaintiffs characterize as corrupt. Plaintiffs further allege that agents of the militia Jaysh al-Mahdi diverted defendants' medical goods and payments to fund attacks on Americans.

Defendants emphatically deny these allegations. But taking all allegations as true, plaintiffs' aiding-and-abetting claims fail under *Taamneh*. The complaint fails *Taamneh*'s requirement that each defendant must have

1

consciously and culpably participated in terrorist attacks. On the complaint's own telling, the defendants alleged to have made the purported bribes to the Ministry and its officials did so in the course of selling medical goods out of economic self-interest—not to support terrorism. Further, plaintiffs do not attempt to tie any defendant's alleged conduct to *specific* attacks, as *Taamneh* also requires. And plaintiffs do not and cannot allege that any defendant—by manufacturing medical goods or selling them to the Iraqi government—assumed the role of a virtual co-conspirator in *every* Jaysh al-Mahdi attack. *Taamneh* bars plaintiffs' attempt to reimagine the Anti-Terrorism Act as imposing aiding-and-abetting liability on every company that allegedly commits any wrongdoing in the course of business with entities allegedly linked to terrorists.

*Taamneh* likewise forecloses plaintiffs' direct-liability claims. Because defendants are too far removed from plaintiffs' injuries to have aided and abetted terrorist attacks, defendants a fortiori cannot be *directly* liable for those same attacks. They did not proximately cause plaintiffs' injuries. And, needless to say, selling medical goods is not an act that "appear[s] to be intended" to intimidate or coerce civilians or governments, as is also required for direct liability. 18 U.S.C. § 2331(1). This Court should reject plaintiffs' attempt to

2

equate selling medical goods to a U.S.-backed foreign government via alleged bribery with directly committing terrorist attacks.

In short, *Taamneh* forecloses plaintiffs' view of the Anti-Terrorism Act as a capacious fount of liability. The United States recently confirmed that it "encouraged private investment" in "rebuilding Iraq's healthcare system" after the fall of Saddam. U.S. Br. 4, *AstraZeneca UK Ltd. v. Atchley*, No. 23-9 (U.S. May 21, 2024) (U.S. Br.). And the United States continues to encourage companies and nonprofits to provide aid in conflict zones like Gaza and Yemen where terrorist organizations exercise significant influence or control, yet where humanitarian assistance is desperately needed. If plaintiffs can reclassify companies' and nonprofits' provision of goods, services, and other aid to governmental entities as aiding and abetting or even directly committing terrorism, many will be deterred from providing that critical aid.[1]

## ARGUMENT

## I.     The Aiding-and-Abetting Claims Fail Under *Taamneh*

Under *Taamneh*, plaintiffs' aiding-and-abetting claims should be dismissed because plaintiffs' complaint comes nowhere close to alleging that each

---

[1] This supplemental brief focuses on the issues that *Taamneh* most directly affects. Defendants preserve all other grounds for dismissal of the complaint urged in their principal brief.

defendant consciously and culpably participated in any of the tragic attacks at issue.

### A. *Taamneh* Clarifies the Anti-Terrorism Act Aiding-and-Abetting Framework

1.  In *Taamneh*, the Supreme Court reversed a Ninth Circuit decision permitting allegations that Google, Facebook, and Twitter aided and abetted an ISIS attack to proceed past a motion to dismiss. 598 U.S. at 478. The Supreme Court faulted the Ninth Circuit for "obscur[ing] the essence of aiding-and-abetting liability" by making three critical errors. *Id.* at 503.

*First*, the Ninth Circuit focused on the defendants' assistance to ISIS generally, instead of requiring allegations of conscious and culpable participation in the specific attack. *Id.*

*Second*, the Ninth Circuit's inquiry into whether the defendants provided "knowing" assistance asked only whether the defendants "were 'generally aware' of their role in ISIS' overall scheme," instead of demanding conscious and culpable participation in the specific attack. *Id.* at 503-04.

*Third*, the Ninth Circuit treated the factors from *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), "as a sequence of disparate, unrelated considerations without a common conceptual core," again instead of demanding allegations that each defendant consciously and culpably participated in the specific

attack. *Taamneh*, 598 U.S. at 504. As the Supreme Court elaborated, *Halberstam*'s "elements and factors should not be taken as inflexible codes: rather they should be understood in light of the common law and applied as a framework designed to hold defendants liable when they consciously and culpably participated in a tortious act in such a way as to help make it succeed." *Id.* at 497 (cleaned up). And in applying *Halberstam*, the Ninth Circuit "should have given much greater weight to defendants' arm's-length relationship with ISIS … and their undisputed lack of intent to support ISIS." *Id.* at 504.

As this Court recently put it: After *Taamneh*, "civil aiding-and-abetting liability requires a culpable mind" and "turn[s] centrally on the longstanding meaning of" aiding and abetting, not just *Halberstam*. *Amazon Servs., LLC v. USDA*, 109 F.4th 573, 580-81 (D.C. Cir. 2024) (citation omitted). Under the common law, the "conceptual core" of aiding and abetting is that each "defendant consciously and culpably participated in a wrongful act so as to help make it succeed." *Id.* at 578 (quoting *Taamneh*, 598 U.S. at 493) (cleaned up).

2. As the United States' invitation brief to the Supreme Court in this case observed, this Court's previous decision "made similar errors" to the Ninth Circuit's *Taamneh* decision. U.S. Br. 16.

*First*, like the Ninth Circuit in *Taamneh*, this Court asked whether "defendants knowingly provided substantial assistance to Jaysh al-Mahdi" *generally*—not whether each defendant consciously and culpably participated in specific attacks. *See Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 209 (D.C. Cir. 2022).

*Second*, this Court extensively relied on allegations that defendants were "generally aware" of Jaysh al-Mahdi's activities, without considering defendants' lack of culpable intent. *See id.* at 209-10, 213, 215, 221, 223-25.

*Third*, this Court hewed closely to the *Halberstam* factors, reasoning that Jaysh al-Mahdi's attacks were extraordinarily blameworthy, *id.* at 222, defendants' alleged transactions were collectively worth several million dollars, *id.*, and defendants made sales to the Ministry for at least four years, *id.* at 224. This Court also discounted defendants' undisputed lack of intent to support terrorism, stating that aiding-and-abetting liability reaches defendants "who may seek only financial gain but pursue it with a general awareness of aiding some type of tort or crime." *Id.* From start to finish, that analysis is inconsistent with *Taamneh*.

**B.    The Complaint Does Not Satisfy *Taamneh***

*Taamneh*'s new framework for aiding-and-abetting liability compels dismissal of plaintiffs' claims.   Allegations that defendants provided medical goods to the Iraqi government—even via alleged bribes—do not establish that each defendant consciously and culpably participated in attacks on U.S. servicemembers.  And plaintiffs fail to plead the required nexus between any defendant's allegedly wrongful contracting with the Ministry and any specific Jaysh al-Mahdi attack.

**1.    *Plaintiffs Fail to Allege that Any Defendant Consciously and Culpably Participated in Terrorist Attacks***

a.  To start, *Taamneh* demands allegations of each defendant's conscious and culpable participation in terrorist attacks.  This complaint lacks such allegations.  Because "general awareness" of one's role in another's wrongdoing was insufficient for aiding-and-abetting liability at common law, "general awareness" is equally insufficient under the Anti-Terrorism Act.  *Taamneh*, 598 U.S. at 504.  What matters is "whether defendants culpably associated themselves with [the attackers'] actions," not "the value of defendants'" assistance to the attackers.  *Id.*  "[T]he fundamental question of aiding-and-abetting liability" under *Taamneh* is thus:  "Did defendants consciously, voluntarily, and culpably participate in or support the relevant wrongdoing?"  *Id.* at

505.  The *Taamneh* opinion underscores that need for culpability over a dozen times.[2]

Under *Taamneh*, a defendant's "'lack of intent to support' the wrongdoing" carries "significant 'weight'" in the analysis.  *Amazon*, 109 F.4th at 583 (quoting *Taamneh*, 598 U.S. at 504).  In *Taamneh*, the Supreme Court thus faulted the Ninth Circuit for failing to "give[] much greater weight to defendants' … undisputed lack of intent to support ISIS."  598 U.S. at 504.  "[T]he lack of any defendant intending to assist ISIS" weighed heavily in showing that the allegations fell "far short" of stating an Anti-Terrorism Act claim.  *Id.* at 505.  That was so even though the internet-company defendants allegedly

---

[2] *E.g.*, 598 U.S. at 489 (aiding-and-abetting liability requires "truly culpable conduct"); *id.* at 490 ("culpable misconduct"); *id.* at 492 ("conscious, 'culpable conduct'" (citation omitted)); *id.* at 493 ("conscious, voluntary, and culpable participation in another's wrongdoing"); *id.* at 497 ("such knowing and substantial assistance … that [defendants] culpably participated in the … attack"); *id.* at 498 ("culpably associated themselves with the … attack, participated in it as something that they wished to bring about, or sought by their action to make it succeed" (cleaned up)); *id.* at 500 ("somehow culpable with respect to the … attack"); *id.* at 500-01 ("culpable assistance or participation in the … attack"); *id.* at 503 (plaintiffs' "burden to show that defendants somehow consciously and culpably assisted the attack"); *id.* at 504 ("conscious and culpable conduct"); *id.* (aid "both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor"); *id.* ("whether defendants culpably associated themselves with ISIS' actions"); *id.* at 506 ("The point of aiding and abetting is to impose liability on those who consciously and culpably participated in the tort at issue.").

"knowingly allow[ed] ISIS and its supporters to use their platforms," "profited from the advertisements placed on ISIS'" posts, and "were 'generally aware' of their role in ISIS' overall scheme." *Id.* at 481-82, 503 (citation omitted).

Absent culpable intent, knowledge that customers use one's product for nefarious purposes does not support liability. At common law, courts did not impose aiding-and-abetting liability on companies that served customers even "after discovering that the customers were using the service for illicit ends." *Id.* at 501 (citing *Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003); *People v. Brophy*, 120 P.2d 946, 956 (Cal. App. 1942)). Thus, telephone companies did not aid and abet illegal bookkeepers who use telephones. *Brophy*, 120 P.2d at 956. And web-hosting companies did not aid and abet illicit websites despite "profit[ing] from the sale of server space and bandwidth." *Doe*, 347 F.3d at 659. Culpable intent to support the wrongdoing—not mere knowledge that a counterparty is engaged in wrongdoing—is the touchstone of aiding-and-abetting liability under both the common law and the Anti-Terrorism Act.

b. Here too, defendants' "undisputed lack of intent to support" terrorism weighs extremely heavily against imposing liability for aiding and abetting heinous attacks on Americans, if not foreclosing such liability altogether. *See Taamneh*, 598 U.S. at 504. Nowhere does the complaint suggest that any

9

defendant (let alone all 21) had any intent whatsoever to aid terrorist acts. To the contrary, the complaint alleges that defendants were "eager to profit from sales" and "grow their market share" in "Iraq's lucrative healthcare market," and so sought "lucrative contracts" with the Iraqi government. JA97-98, 139, 160 (¶¶1, 4, 115, 157); *accord* Appellants' Br. 3; Appellants' Reply Br. 16. At worst, the complaint alleges that defendants were "indifferent" to what the Ministry and its officials did with their respective products and funds. *See Taamneh*, 598 U.S. at 500. Disinterested pursuit of economic self-interest is a far cry from "conscious, voluntary, and culpable participation" in terrorist attacks. *See id.* at 493.

The "highly attenuated" alleged link between each defendant and the attackers also cuts strongly against any showing of conscious and culpable participation. *See id.* at 500. Under *Taamneh*, "the more attenuated the nexus, the more courts should demand that plaintiffs show culpable participation through *intentional* aid that substantially furthered the tort." *Id.* at 506 (emphasis added). And, as the United States has observed, plaintiffs do not allege that any defendant "directly channeled resources to a designated foreign terrorist organization." U.S. Br. 19 (cleaned up).

Quite the contrary, plaintiffs' theory is highly indirect. The complaint alleges that individual manufacturer defendants provided medical goods or ingredients to supplier defendants from the same corporate family. JA177, 187, 200, 214, 227 (¶¶188, 211, 245, 281, 310). Each supplier defendant allegedly "deliver[ed] 'free goods' to MOH" (the Ministry) and paid "commissions" to "individual Sadrist officials" (*i.e.*, officials from the political party affiliated with Jaysh al-Mahdi). JA140, 153-54 (¶¶118, 143-44).[3] "Jaysh al-Mahdi agents" then allegedly "divert[ed] medical goods for a profit" by reselling them "on the black market." JA147 (¶132). Jaysh al-Mahdi, in turn, allegedly used that "diversion of funds, drugs, and medical devices from MOH" (the Ministry) "to support terrorist operations against Americans in Iraq." JA163 (¶165). That vast gulf between each defendant and the actual attackers

---

[3] This Court's previous decision characterized the complaint as alleging that defendants "made corrupt payments in both cash and goods *to Jaysh al-Mahdi*." 22 F.4th at 212 (emphasis added); *accord id.* at 216, 221, 223, 227, 229, 231, 234, 236. Respectfully, the complaint pervasively alleges that defendants engaged in "corrupt transactions with MOH" (the Ministry), not Jaysh al-Mahdi as an entity. JA145, 164, 274 (¶¶127, 167, 408); *see also* JA145-46, 148-51, 153-63 (¶¶128, 133-38, 142, 145-46, 150-51, 154-55, 158-59, 163-64). Even accepting that the complaint "plausibly alleges that Jaysh al-Mahdi *controlled* the Ministry," *Atchley*, 22 F.4th at 224 (emphasis added), each defendant's distance from Jaysh al-Mahdi *itself* weighs heavily against any inference of conscious and culpable participation in terrorist attacks.

confirms that no defendant consciously and culpably participated in terrorist attacks. That distance is particularly problematic because "plaintiffs point to no act of encouraging, soliciting, or advising the commission of [any] attack that would normally support an aiding-and-abetting claim." *Taamneh*, 598 U.S. at 500 (citation omitted).

Further attenuating any link to terrorism, the Anti-Terrorism Act requires conscious and culpable participation in terrorist acts committed, planned, or authorized by U.S.-designated foreign terrorist organizations—but Jaysh al-Mahdi is not and has never been such an organization. *See* 18 U.S.C. § 2333(d)(2). Plaintiffs themselves describe the United States as making a "strategic diplomatic decision" to not designate Jaysh al-Mahdi to "preserv[e] flexibility for members of the U.S. government to engage with the Sadrists if and when doing so would serve the national interest." JA246 (¶355); *see* U.S. Br. 20 n.2 (describing foreign-policy calculus behind designation decisions generally).

Plaintiffs assert that Hezbollah, which is a U.S.-designated foreign terrorist organization, "committed, planned, and/or authorized" the at-issue attacks. JA633 (¶3188). But plaintiffs do not allege that any defendant had any dealings with Hezbollah, and they allege that "defendants knew or recklessly

disregarded that their transactions helped fund *Jaysh al-Mahdi* attacks on Americans," not Hezbollah attacks. *See* JA163 (heading) (capitalization altered and emphasis added). That further attenuation from the actual designated terrorist organization also weighs against liability. *See* U.S. Br. 19-20.

It would be particularly extraordinary to interpret the Anti-Terrorism Act to encompass transactions with the Iraqi Health Ministry when the U.S. government—which of course would not condone attacks on its own soldiers—simultaneously supported the Ministry and encouraged private companies like defendants to do the same. The Solicitor General recently confirmed to the Supreme Court that "the United States invested billions of dollars" in Iraq, "including by rebuilding Iraq's healthcare system," and "encouraged private investment in those reconstruction efforts." U.S. Br. 4. The Solicitor General cited many of the same official reports describing U.S. government support for the Ministry of which this Court previously declined to take judicial notice, given concerns that they were "subject to dispute." 22 F.4th at 229; *see* U.S. Br. 4-5 (citing reports at JA661-64, 666-68, 674, 699; *Financial Reconstruction in Iraq: Hearings Before the Subcomm. on Int'l Trade & Fin. of the S. Comm. on Banking, Hous., & Urb. Affs.* (2004) (statement of Earl Anthony Wayne, Ass't Sec'y of State for Econ. & Bus. Affs.)). There can now be no dispute that

13

the United States supported the Ministry and encouraged the sale of medical supplies like those here.  Selling medicine and medical equipment to a U.S.-supported foreign government's healthcare system is worlds apart from harboring the requisite culpable intent to support terrorism.

c.  In their brief in opposition before the Supreme Court, plaintiffs incorrectly claimed that *Taamneh* "all-but-expressly endorsed liability" for providing routine services "in an unusual way," and suggested that common-law cases support liability when defendants provide aid in "unusual circumstances."  BIO 14-16, 20, *AstraZeneca UK Ltd. v. Atchley*, No. 23-9 (U.S. Aug. 23, 2023) (BIO).  Thus, plaintiffs asserted, defendants' alleged bribes to the Iraqi Health Ministry and its officials showed the requisite "culpable conduct" under *Taamneh*.  BIO 14.

To start, the complaint itself forecloses plaintiffs' characterization of defendants' alleged provision of free goods and commissions (the purported "bribes") as "unusual."  The complaint alleges that the Health Ministry's "standard practice was to demand 'free goods' as an explicit term of the contract," such that the "free goods" clause appeared in the Ministry's "standard bid instructions" and "standard sales contract."  JA141, 143, 148-49 (¶¶120, 123, 134).  Moreover, the complaint states that it was Ministry "officials'

14

regular practice" to insist on commissions and "standard practice for companies dealing with [the Ministry] to pay 'commissions' on every major sales contract." JA153, 155, 150-51 (¶¶142, 146, 157). While plaintiffs repeatedly characterize these transactions as "bribes" or "corrupt," they never identify any U.S. or Iraqi bribery law that defendants allegedly violated and disclaim any obligation to prove any violation of the Foreign Corrupt Practices Act. JA170 (¶179). Thus, even on the complaint's telling, each defendant was operating at "arm's length" from the Ministry, *see Taamneh*, 598 U.S. at 500, entering into economically motivated contracts no differently from any other merchant that followed Ministry "standard practice," JA148-49, 153 (¶¶134, 142).

Under *Taamneh*, that kind of transactional business relationship is entitled to "great[] weight" and further undercuts any showing of conscious and culpable participation in terrorist acts. 598 U.S. at 504. As the United States explained to the Supreme Court: Plaintiffs' reliance on transactions "generally pursuant to standard conditions and express contracts with the Ministry in furtherance of the Ministry's legitimate programs" "may complicate the question whether it is appropriate to draw an inference of conscious and culpable participation." U.S. Br. 19.

Even were defendants' transactions "unusual," that allegation would not support liability. *Taamneh* observed that the provision of "routine services … in an unusual way" "may" in some circumstances show culpability. 598 U.S. at 502. But the example in *Taamneh* tellingly involved unusual activity directly and inexorably tied to the principal wrong: A morphine distributor became a coconspirator in illegal morphine distribution by sending prescribing doctors *400 times* ordinary dosages. *Direct Sales Co. v. United States*, 319 U.S. 703, 707 (1943) (cited at *Taamneh*, 598 U.S. at 502). The exponentially higher quantities "ma[de] certain that the seller knows the buyer's intended illegal use" and "*intends* to further, promote and cooperate in it." *Id.* at 711 (emphasis added). The unusual circumstances there supported potential aiding-and-abetting liability because they permitted the inference that the defendant both knew the drugs subject to abuse were being sold illegally *and* intended to facilitate those sales.

Similarly, in *Halberstam*, the defendant helped launder years of stolen loot, including gold ingots smelted in her garage—acts done in an "unusual way under unusual circumstances" that evinced her culpable desire to become "a willing partner" in her live-in partner's burglaries. 705 F.2d at 486-87 (citation omitted). In both *Direct Sales* and *Halberstam*, the unusual manner of

16

the defendant's conduct was part and parcel of the principal wrong, permitting an inference of conscious and culpable participation in that wrong.

*Taamneh* thus does not support plaintiffs' per se rule that providing routine services in an atypical way (here, via alleged bribery) always permits an inference of culpability, because atypical transactions may have nothing to do with terrorism. *See* BIO 14-16. The United States agrees. U.S. Br. 18-19. The common law prohibited mixing and matching culpability. Someone who committed the offense of selling counterfeit bills did not aid and abet a secondary buyer's possession of those same bills. *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938) (Learned Hand, J.) (cited at *Taamneh*, 598 U.S. at 488, 491 n.10). Despite the seller's own wrongdoing, he lacked the "purposive attitude" required for aiding-and-abetting liability because it was of "no moment" to him what his buyer did with the bills. *Id.* Likewise, defendants that knowingly helped someone commit tax evasion by depositing money in their own bank account did not aid and abet theft, even though it turned out the deposited funds were stolen. *Montgomery v. Devoid*, 915 A.2d 270, 277 (Vt. 2006).

Even before *Taamneh*, this Court applied *Halberstam*'s common-law framework to hold that alleged "financial wrongdoing and serious violations of U.S. sanctions" with terrorist-affiliated banks did not morph into the intent

17

required to aid and abet terrorist attacks. *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 872 (D.C. Cir. 2022), *cert. denied*, 144 S. Ct. 280 (2023). Similarly, the complaint here nowhere alleges that any purported bribes were made with the purpose to assist terrorist activity, such that each specific defendant "consciously and culpably participated *in the tort at issue*," *i.e.*, terrorist attacks. *See Taamneh*, 598 U.S. at 506 (emphasis added). Notably, this Court's previous opinion did not rely on the bribery allegations in finding "knowing and substantial assistance," but only in its now-insufficient holding that defendants were allegedly "generally aware of their role in activity foreseeably lending support to acts of international terrorism." 22 F.4th at 221.

If plaintiffs' bribery allegations demonstrated the requisite culpable intent to participate in terrorist attacks, plaintiffs could always manufacture Anti-Terrorism Act claims by pairing some alleged wrongful conduct with downstream attacks. Transactions with entities alleged to have terrorist ties might be unusual or wrongful for any number of reasons: the deal could violate procurement regulations, the companies could lack proper import licenses, or various civil or criminal regulations might be violated. If other plaintiffs sued underground casinos where terrorists won millions, the atypical nature of illicit gambling would have nothing to do with aiding and abetting terrorism.

18

Unrelated wrongdoing does not demonstrate an intent to consciously and culpably participate in terrorist attacks as *Taamneh* requires.

Plaintiffs also emphasized that *Taamneh* involved "passive nonfeasance"—providing internet services—while plaintiffs here allege "active malfeasance"—allegedly corrupt contracting.  BIO 13.  But again, no amount of wrongdoing can support Anti-Terrorism Act liability if the wrongdoing does not demonstrate the defendant's conscious and culpable participation in terrorist acts.  Moreover, the passive nature of the alleged assistance in *Taamneh* was only one of many problems with that complaint, necessitating a particularly "strong showing of assistance and scienter."  598 U.S. at 500.  The United States agrees that *Taamneh* does not "approve imposing liability" for all "affirmative" misconduct.  U.S. Br. 18.  Nor does *Taamneh* suggest that a different legal standard applies to passive versus active conduct.  *Taamneh*'s account of the relevant common-law principles relies extensively on cases involving active misconduct—like *Halberstam*—before applying those principles to the passive allegations at hand.  *See* 598 U.S. at 484-93.

### 2. *Plaintiffs Fail to Allege the Required Nexus Between Any Defendant and Any Terrorist Attack*

a.  Separately, *Taamneh* clarifies that each defendant must have aided and abetted the "act of international terrorism that injured the plaintiff."  598

19

U.S. at 497. "[S]ubstantial assistance … to [the attackers'] activities in general" does not suffice. *Id.* at 503. Absent a "definable nexus" to the specific attack, plaintiffs face a "drastically increase[d]" burden. *Id.* A complaint can proceed (if at all) only by alleging assistance so "pervasive, systemic, and culpable" as to aid and abet "each and every … terrorist act committed anywhere in the world" by the attackers. *Id.* at 496, 502. That extremely high bar demands a "near-common enterprise" and "begins to blur with conspiracy liability." *Id.* (citation omitted); *e.g.*, *Halberstam*, 705 F.2d at 474 (finding both aiding-and-abetting and conspiracy liability where the defendant was a "willing partner" in her live-in partner's burglary business). *Taamneh* thus rejected "expansive" allegations that failed to "connect[] the [specific] attack with ISIS' use of [defendants'] platforms." 598 U.S. at 500-01.

Here, plaintiffs' complaint alleges no "definable nexus" between any defendant's alleged manufacture or sale of medical goods to the Iraqi government and any specific attack injuring any plaintiff. *See id.* at 503. Plaintiffs allege that "Jaysh al-Mahdi's diversion of funds, drugs, and medical devices from [the Ministry] … support[ed] terrorist operations against Americans in Iraq." JA163 (¶165). Similar to *Taamneh*, plaintiffs' theory "would

necessarily hold defendants liable as having aided and abetted each and every" attack committed by Jaysh al-Mahdi anywhere, anytime. *See* 598 U.S. at 501.

Plaintiffs cannot carry the "demanding" burden, U.S. Br. 15, of showing that any defendant's alleged support was so "pervasive, systemic, and culpable" as to aid and abet *every* Jaysh al-Mahdi attack, *see Taamneh*, 598 U.S. at 502. The complaint does not allege a conspiracy or common enterprise. By the complaint's own account, some defendants engaged in separate, arm's-length, profit-motivated business transactions with the Iraqi Health Ministry, while other defendants did not transact with the Ministry at all. Those transactions do not evidence each defendant's conscious and culpable participation in terrorism generally, *supra* pp. 7-14, much less conscious and culpable participation in each and every Jaysh al-Mahdi attack.

And, for obvious reasons, plaintiffs do not allege that any defendant's support was so "pervasive" and "systemic" as to assist each and every attack. *See Taamneh*, 598 U.S. at 502. The complaint does not and could not allege that major medical-goods companies were so pervasively and systemically involved with a murderous militia as to warrant de facto co-conspirator liability on par with the actual killers.

21

b.  In the Supreme Court, plaintiffs claimed to have pleaded an adequate nexus because "bankrolling terrorists creates a foreseeable risk of terrorist attacks."  BIO 17-18 (quoting *Taamneh*, 598 U.S. at 496).  As the United States has explained, plaintiffs "misunderstand[] the role of foreseeability under the common law and the [Anti-Terrorism Act], as explained in *Taamneh*."  U.S. Br. 15 n.1.  At common law, courts would hold defendants liable where joint tortfeasors "act[ed] in concert in the execution of a common purpose" and the defendant's co-tortfeasors committed additional, foreseeable torts "to carry out their original unlawful plan."  *Am. Fam. Mut. Ins. Co. v. Grim*, 440 P.2d 621, 625 (Kan. 1968) (cited at BIO 17; *Taamneh*, 598 U.S. at 496).  Thus, a boy who broke into a church to steal Cokes with his friends could be liable for a fire started when his friends lit torches to find their way.  *Id.*

But under *Taamneh*, plaintiffs still have to show that each defendant aided and abetted the principal tort, *i.e.*, that the defendant "consciously and culpably participated in" "the act of international terrorism that injured the plaintiffs" so "as to help make it succeed."  598 U.S. at 497 (cleaned up).  The common law did not make defendants who were one "step in the causal chain" liable for all wrongdoing by those "further down the line."  *See Peoni*, 100 F.2d at 403.  Plaintiffs cannot get around *Taamneh*'s demand for conscious and

culpable participation in specific attacks just by brandishing allegations that the ensuing harms were foreseeable.

Plaintiffs also highlighted allegations that Jaysh al-Mahdi used Ministry resources to commit attacks, for instance by staging attacks from Ministry buildings and using Ministry ambulances in attacks. BIO 19 (citing JA125-27, 295, 303-04, 358-59 (¶¶86, 89, 560-61, 622-23, 1076-77)). But defendants did not build Ministry facilities or supply ambulances (although the U.S. government built Ministry facilities, JA662, 667-68). Defendants supplied pharmaceuticals and medical equipment, like cancer medicine and X-ray machines. JA179, 197, 216, 228 (¶¶191, 238, 284, 312). The complaint never ties those medicines or equipment to specific attacks. If anything, plaintiffs' emphasis on how Jaysh al-Mahdi allegedly used *other* assistance to commit attacks underscores the lack of nexus here.

### C.    Plaintiffs' Theory Seriously Threatens International Aid and Post-Conflict Reconstruction

*Taamneh* requires courts to "cabin aiding-and-abetting to cases of truly culpable conduct" "[t]o avoid" expansive liability on "ordinary merchants." *Amazon*, 109 F.4th at 579 (quoting *Taamneh*, 598 U.S. at 489). Plaintiffs' theory raises those concerns in spades, and seriously threatens U.S.-encouraged international aid and post-conflict reconstruction.

While plaintiffs prominently feature their allegation that defendants' transactions were "corrupt," their theory is "not limited to … corrupt payments." JA97, 169-70 (¶¶1, 179). Rather, they claim, defendants should be liable for allegedly engaging in "transactions with a counterparty that was openly controlled by terrorists." JA170 (¶179). That theory necessarily implicates *every* transaction with the Iraqi Ministry of Health, even though the U.S. government affirms that it "encouraged private investment" in "Iraq's healthcare system." U.S. Br. 4.

Even if plaintiffs now want to limit their theory to so-called "unusual" transactions, the ease with which a plaintiff might allege *some* irregularity or illegality in contracting procedures threatens hosts of everyday transactions. If donating medical goods pursuant to "standard bid instructions" can be recast as bribery, JA141 (¶120), then any business or nonprofit will rightly fear that some purported wrongdoing in the course of contracting will be recast as conscious and culpable support for terrorism.

Those consequences do not stop with Iraq. In conflict zones, the dividing line between terrorists and political actors can be hazy. The conflict in Gaza is a prime example. The President has called on "the international community" to "rebuild homes, schools, and hospitals" in Gaza. *Remarks by President*

24

*Biden on the Middle East*, White House (May 31, 2024), https://tinyurl.com /2vbr82sx.  Hamas, a U.S.-designated foreign terrorist organization, still exercises significant on-the-ground control in Gaza, including over the Health Ministry.  *See* John Kirby, *Press Briefing*, White House (Oct. 26, 2023), https://tinyurl.com/bdfxbju5.  Other plaintiffs could easily allege that any medical aid to Gaza could foreseeably be diverted to Hamas, and that international businesses or nonprofits that assist in reconstruction efforts should be liable for every Hamas terrorist attack.

Similarly, in Yemen, the Houthis (who control most of the country) "received extensive training and material support from … Hezbollah" (a U.S.-designated foreign terrorist organization) and have been carrying out attacks on targets from the Red Sea to Tel Aviv.  *See* Bruce Riedel, *The Houthis After the Yemeni Ceasefire*, Brookings (Jan. 27, 2023), https://tinyurl.com /2n45wrba.  Despite the risk that aid could wind up in the wrong hands, the State Department has called on "donors" and "humanitarian organizations" to address the "devastating humanitarian crisis" in Yemen.  U.S. Dep't of State, *United States Announces Nearly $220 Million in Additional Humanitarian Assistance for the People of Yemen* (May 7, 2024), https://tinyurl.com /3ha4aw4w.

25

Under plaintiffs' theory, any aid in Gaza or Yemen that goes through their current governments or affiliated groups or could foreseeably be diverted thereto risks liability for aiding and abetting terrorism. As here, plaintiffs could allege that, by doing business with a foreign government "openly controlled by terrorists," defendants "knew or recklessly disregarded that their transactions with [those governments] financed terrorism." JA170 (¶179 & heading) (capitalization altered). Notably, under plaintiffs' reading of the nexus requirement, that liability would extend to *every* attack by Hamas or the Houthis, anywhere in the world.

If the price of doing business in troubled areas is stigmatic, massive treble-damages exposure for entire terrorist campaigns, then companies and nonprofits will simply refrain from serving these regions, as is already occurring. *See De-risking in the Financial Sector*, World Bank (Oct. 7, 2016), https://tinyurl.com/32zc2tjt. This Court should not read the Anti-Terrorism Act to hamstring the United States' foreign-policy objectives by perversely threatening companies that answer the United States' call for assistance with liability for supporting terrorism.

## II.    The Direct-Liability Claims Fail Under *Taamneh*

*Taamneh* also compels the dismissal of plaintiffs' direct-liability claims for two independent reasons:  Plaintiffs have not alleged that any defendant proximately caused their injuries.  And plaintiffs have not alleged that any defendant committed "act[s] of international terrorism." *See* 18 U.S.C. § 2333(a).

### A.    The Claims Fail to Allege Proximate Causation

Anti-Terrorism Act direct liability requires that the plaintiff's injuries occur "by reason of" the defendant's acts.  18 U.S.C. § 2333(a).  All agree that plaintiffs must therefore allege that each defendant proximately caused their injuries.  *Atchley*, 22 F.4th at 226.  The crux of proximate causation, the Supreme Court has held, is that a defendant is "directly responsible for the [plaintiffs'] harm." *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 11 (2010).

Plaintiffs cannot establish the proximate-causation element in light of *Taamneh*.  As this Court has noted since *Taamneh*, aiding-and-abetting liability does not attach where the asserted "'causal' chain is simply too remote." *Ofisi v. BNP Paribas, S.A.*, 77 F.4th 667, 675 (D.C. Cir. 2023).  Likewise, proximate causation "generally bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014).  It should follow a fortiori that, because

defendants' alleged acts are too remote for aiding-and-abetting liability, *supra* pp. 20-22, they are too remote for direct liability—a point the United States deems "reasonabl[e]."  U.S. Br. 21.

This Court previously held that plaintiffs' complaint adequately pleaded proximate causation because defendants' alleged aid was "a 'substantial factor'" in "Jaysh al-Mahdi's terrorist campaign" and because "[i]t was reasonably foreseeable that financially fortifying Jaysh al-Mahdi would lead to the attacks."  22 F.4th at 226-27.  That analysis is inconsistent with *Taamneh*.  By its text, the Anti-Terrorism Act focuses on "the act of international terrorism that injured the plaintiffs."  598 U.S. at 497.  Yet plaintiffs' proximate-causation theory is that defendants' transactions with each other or the Ministry substantially and foreseeably supported Jaysh al-Mahdi *generally*, not the specific attacks that injured the plaintiffs.  There are no allegations that any defendant directly caused any specific attack.  Under *Taamneh* and the Supreme Court's proximate-causation precedents, the direct-liability claims therefore fail.

## B.    The Claims Fail the "Act of International Terrorism" Requirement

Plaintiffs' direct-liability claims independently fail to allege that the defendants committed "act[s] of international terrorism."  18 U.S.C. § 2333(a).

This Court previously remanded that issue to the district court. 22 F.4th at 230. But this Court is free to affirm "on any basis supported by the record" and may choose to dispose of these claims on this obvious alternative ground. *See Aljabri v. bin Salman*, 106 F.4th 1157, 1165 (D.C. Cir. 2024) (citation omitted). Following *Taamneh*, it should be even clearer that manufacturing or selling medical goods to the Iraqi government—even in transactions involving bribes, as alleged—is not an "act of international terrorism."

The Anti-Terrorism Act defines "international terrorism" to require that the defendants' actions be "violent" or "dangerous to human life," criminal, and occur abroad. 18 U.S.C. § 2331(1)(A), (C). The Act further requires that the defendants' actions "appear to be intended … to intimidate or coerce a civilian population; … influence the policy of a government by intimidation or coercion; or … affect the conduct of a government by mass destruction, assassination, or kidnapping." *Id.* § 2331(1)(B).

Even if selling medical goods could be considered criminal and "violent" or "dangerous to human life," plaintiffs' claims would fail for lack of intent. *Taamneh* reinforces the importance of culpable intent under the Anti-Terrorism Act—a key ingredient for aiding-and-abetting liability missing here. *Supra* pp. 7-14. That lack of "terroristic intent" also means that defendants'

alleged acts did not "appear to be intended" to intimidate or coerce civilians or governments as required for direct liability. *See Kemper v. Deutsche Bank AG*, 911 F.3d 383, 389-90 (7th Cir. 2018) (quoting 18 U.S.C. § 2331(1)(B)). Other circuits analyze direct liability using "an objective standard" that examines "the apparent intentions of the actions." *Gonzalez v. Google LLC*, 2 F.4th 871, 899 (9th Cir. 2021), *vacated on other grounds*, 598 U.S. 617 (2023) (citation omitted) (collecting cases). When a defendant is "motivated by economics, not by a desire to 'intimidate or coerce,'" the "appear to be intended" requirement is not met. *Kemper*, 911 F.3d at 390.

The Seventh Circuit has thus held that a bank did not commit acts of international terrorism by allegedly helping Iran evade U.S. sanctions. *Id.* And the Ninth Circuit has held that Google did not commit acts of international terrorism when it allegedly "shared advertising revenue with ISIS" to further its own "economic self-enrichment." *Gonzalez*, 2 F.4th at 900. The Ninth Circuit likewise noted that providing "[m]edical assistance"—even to "known terrorists"—would not "appear to be intended to intimidate or coerce" civilians or governments. *Id.*

Here too, no defendant's alleged transactions with the Ministry were objectively intended to intimidate or coerce civilians or governments. On the

30

complaint's own telling, every defendant acted "to profit from sales in Iraq" and "grow [its] market share."  JA139, 160 (¶¶115, 157).  That kind of economically motivated, self-interested behavior cannot suffice to show that any defendant—let alone all 21—committed "act[s] of international terrorism" as required for direct liability.  One way or another, this Court should dismiss plaintiffs' baseless attempt to equate global medical companies with terrorists.

## CONCLUSION

The district court's judgment should be affirmed.

Respectfully submitted,

/s/ Lisa S. Blatt

KANNON K. SHANMUGAM
JEH C. JOHNSON
WILLIAM T. MARKS
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
  2001 K Street, N.W.
  Washington, DC 20006
  (202) 223-7300

Counsel for Johnson & Johnson,
Cilag GmbH International, Ethicon
Endo-Surgery, LLC, Ethicon, Inc.,
Janssen Ortho LLC, Janssen
Pharmaceutica NV, Johnson &
Johnson (Middle East) Inc., and
Ortho Biologics LLC

LISA S. BLATT
  Counsel of Record
CHRISTOPHER N. MANNING
SARAH M. HARRIS
MELISSA B. COLLINS
AARON Z. ROPER
KRISTEN A. DEWILDE
WILLIAMS & CONNOLLY LLP
  680 Maine Avenue SW
  Washington, DC  20024
  (202) 434-5000
  lblatt@wc.com

Counsel for Pfizer Inc., Pfizer
Pharmaceuticals LLC, Pfizer
Enterprises SARL, Pharmacia &
Upjohn Company LLC, and Wyeth
Pharmaceuticals LLC

JESSICA S. CAREY
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
  1285 Avenue of the Americas
  New York, NY 10019-6064
  United States
  (212) 373-3000

Counsel for Johnson & Johnson,
Cilag GmbH International, Ethicon
Endo-Surgery, LLC, Ethicon, Inc.,
Janssen Ortho LLC, Janssen
Pharmaceutica NV, Johnson &
Johnson (Middle East) Inc., and
Ortho Biologics LLC

JOHN B. BELLINGER III
DAVID J. WEINER
ARNOLD & PORTER
KAYE SCHOLER LLP
  601 Massachusetts Ave., N.W.
  Washington, DC 20001
  (202) 942-5000

ROBERT REEVES ANDERSON
ARNOLD & PORTER
KAYE SCHOLER LLP
  1144 Fifteenth Street,
  Suite 3100
  Denver, CO 80202-1370
  (303) 863-2325

Counsel for GE Healthcare USA
Holding LLC, GE Medical Systems
Information Technologies, Inc., and
GE Medical Systems Information
Technologies GmbH

AUGUST 26, 2024

DAVID M. ZIONTS
S. CONRAD SCOTT
LELIA A. LEDAIN
COVINGTON & BURLING LLP
  One City Center
  850 Tenth Street, N.W.
  Washington, DC 20001
  (202) 662-5312

Counsel for F. Hoffmann-La Roche
Ltd

DAVID W. BOWKER
CATHERINE M.A. CARROLL
DONNA M. FARAG
WILMER CUTLER PICKERING
HALE AND DORR LLP
  2100 Pennsylvania Ave., NW
  Washington, DC 20037
  (202) 663-6000

Counsel for Genentech, Inc. and
Hoffmann-La Roche Inc.

PAUL S. MISHKIN
DAVID B. TOSCANO
CRAIG T. CAGNEY
DAVIS POLK & WARDWELL LLP
  450 Lexington Avenue
  New York, NY 10017
  (202) 450-4292

Counsel for AstraZeneca Pharma-
ceuticals LP and AstraZeneca UK
Limited

## CERTIFICATE OF COMPLIANCE WITH
## TYPEFACE AND WORD-COUNT LIMITATIONS

I, Lisa S. Blatt, counsel for Defendants-Appellees and a member of the Bar of this Court, certify pursuant to Federal Rule of Appellate Procedure 32(g) that the foregoing supplemental brief is proportionally spaced, has a serif typeface of 14 points or more, and contains 6,191 words.

*/s/ Lisa S. Blatt*
LISA S. BLATT

**CERTIFICATE OF SERVICE**

I, Lisa S. Blatt, certify that on August 26, 2024, a copy of the foregoing Supplemental Brief for Defendants-Appellees was filed with the Clerk and served on all parties through the Court's electronic filing system. I further certify that all parties required to be served have been served.

/s/ Lisa S. Blatt
LISA S. BLATT