# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 19, 2024        Decided January 23, 2026

No. 20-7077

JOSHUA ATCHLEY, ET AL.,
APPELLANTS

v.

ASTRAZENECA UK LIMITED, ET AL.,
APPELLEES

———

On Remand from the Supreme Court of the United States

———

*Joshua D. Branson* argued the cause for appellants. With him on the supplemental briefs were *David C. Frederick*, *Andrew E. Goldsmith*, and *Derek C. Reinbold*.

*Stephen I. Vladeck* was on the supplemental brief for *amici curiae* Law Professors in support of appellants.

*Lisa S. Blatt* argued the cause for appellees. With her on the supplemental briefs were *Kannon K. Shanmugam*, *Jeh C. Johnson*, *William T. Marks*, *Christopher N. Manning*, *Sarah M. Harris*, *Melissa B. Collins*, *Aaron Z. Roper*, *Jessica S. Carey*, *John B. Bellinger III*, *David J. Weiner*, *Robert Reeves Anderson*, *David M. Zionts*, *David W. Bowker*, *Catherine M.A.*

2

*Carroll*, *Donna M. Farag*, *Paul S. Mishkin*, and *David B. Toscano*. *Alex Young K. Oh* entered an appearance.

*Jordan L. Von Bokern*, *Andrew J. Pincus*, and *Robert W. Hamburg* were on the brief for *amicus curiae* The Chamber of Commerce of the United States of America in support of appellees.

*Timothy P. Harkness*, *Kimberly H. Zelnick*, *Scott A. Eisman*, *Adam Rosenfeld*, *Maria Slobodchikova*, and *Elischke De Villiers* were on the brief for *amicus curiae* Charity & Security in support of appellees.

Before: PILLARD and WILKINS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*:   The terrorist group Jaysh al-Mahdi injured or killed hundreds of United States service members and civilians as part of its years-long campaign to harm Americans and drive the United States military out of Iraq.  Plaintiffs are victims of Jaysh al-Mahdi's attacks and family members of victims.  During the period in which the victims were attacked, Jaysh al-Mahdi openly controlled Iraq's Ministry of Health (Ministry) and used it as a vehicle to direct terrorist activity against Americans.   Plaintiffs claim defendants, large pharmaceutical and medical equipment manufacturers and suppliers, knowingly gave substantial assistance to the attacks that injured them, violating the Anti-Terrorism Act (ATA), as amended by the Justice Against Sponsors of Terrorism Act, and state law.

Plaintiffs allege that defendants assisted Jaysh al-Mahdi by doing business with the Ministry in an unusual and unlawful

3

way, to the benefit of the terrorist group.  According to the complaint, defendants paid illegal cash bribes directly to the group and supplied extra, off-the-books batches of valuable medical goods that Jaysh al-Mahdi monetized on the black market to fund its operations against Americans.  As they did so, defendants knew that the funds and goods they were gratuitously providing to Jaysh al-Mahdi financed its attacks against Americans, including the victims in this case. Defendants' agents finalized contracts at in-person meetings at the Ministry, where conspicuous displays of Jaysh al-Mahdi weaponry, fighters, and propaganda made clear who was in charge.  And defendants' compliance personnel had access to contemporaneous reports in mainstream media that detailed the terrorists' control of the Ministry and their use of cash and in-kind bribes to fund attacks.  Over the period in question, plaintiffs allege defendants repeatedly and voluntarily renewed contracts with and provided illegal bribes to Jaysh al-Mahdi, with payments occurring on the heels of attacks against Americans and providing support for further attacks.

The district court held that the complaint failed to state claims for either primary (direct) or secondary (aiding-and-abetting) liability under the ATA and that the court lacked personal jurisdiction over six foreign defendants.  On appeal, we reversed, holding that plaintiffs had pleaded facts sufficient to support their aiding-and-abetting claims, that plaintiffs had adequately pleaded that defendants' payments to Jaysh al-Mahdi proximately caused plaintiffs' injuries on the direct liability claims, and that U.S. federal courts had personal jurisdiction over the foreign defendants.  Shortly afterward, the Supreme Court granted defendants' petition for a writ of certiorari, vacated our decision, and remanded the case to us for further consideration in light of *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), which clarified the scope of secondary liability under the ATA.

4

Having considered *Taamneh* and with the aid of supplemental briefing and oral argument, we reverse the district court's dismissal of plaintiffs' secondary liability claims. Secondary liability under the ATA, as interpreted by *Taamneh*, requires conscious, voluntary, and culpable participation in another's tortious activity to ensure liability is limited to conduct that is genuinely blameworthy. It also requires a nexus between defendants' assistance and the acts of international terrorism that injure plaintiffs. Liability does not attach to those who, like the *Taamneh* defendants, passively and tangentially aid terrorists in the ordinary course of their business. This complaint, however, describes conduct that is far from "business as usual"—with allegations sufficient to satisfy both of *Taamneh*'s requirements. Plaintiffs adequately allege that defendants' participation was conscious, voluntary, and culpable: Defendants knew their assistance would be used to launch attacks on plaintiffs, and they repeatedly structured their transactions in an unusual and unlawful manner that served to facilitate Jaysh al-Mahdi's operations. Plaintiffs clearly identify a nexus between the alleged attacks and defendants' direct cash and in-kind payments to Jaysh al-Mahdi. The attacks, which were a discrete subset of Jaysh al-Mahdi's terrorist activities, were a natural and virtually inevitable consequence of defendants' unusual, corrupt, and plentiful assistance.

*Taamneh* did not address the standard for direct liability under the ATA and so we reinstate our holding on the direct liability claims that plaintiffs adequately pleaded that defendants' payments to Jaysh al-Mahdi proximately caused plaintiffs' injuries. Defendants did not challenge (nor did *Taamneh* address) our holdings that the manufacturer defendants were not too remote from the conduct alleged to be held liable and that certain foreign defendants were subject to the personal jurisdiction of U.S. federal courts. Accordingly,

5

we do not disturb those holdings and remand to the district court for further proceedings consistent with our opinions.

**I.**

The factual and procedural background of this case is spelled out in prior opinions. *See Atchley v. AstraZeneca UK Ltd.*, 474 F. Supp. 3d 194 (D.D.C. 2020); *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204 (D.C. Cir. 2022). We assume familiarity with those opinions and recapitulate the facts and procedural history most relevant following the Supreme Court's remand. The facts are drawn from plaintiffs' complaint and are assumed true for the purposes of reviewing defendants' motion to dismiss. *See Schubarth v. Fed. Republic of Germany*, 891 F.3d 392, 395 (D.C. Cir. 2018).

In 2003, the United States invaded Iraq. Even before the invasion, Hezbollah—a Lebanese group designated as a Foreign Terrorist Organization under U.S. law since 1997—made plans to undermine the expected U.S. presence. From April 2003, Hezbollah's "chief terrorist mastermind, Imad Mugniyeh," collaborated with the powerful Shiite cleric Muqtada al-Sadr to establish a fighting force in Iraq to violently expel the Americans. Third Am. Compl. ¶ 56 (J.A. 115).

Sadr modeled his movement in Iraq, the "Sadrist Trend," on Hezbollah. Each group had a political wing and a terrorist wing. In each, the two wings were closely connected, sharing funding and leadership. Jaysh al-Mahdi, the terrorist wing of the Sadrist Trend, was a deadly force in Iraq. Its attacks likely killed over five hundred Americans and injured many more. As Jaysh al-Mahdi took root and grew, Hezbollah recruited, trained, and armed its fighters and helped it plan and carry out operations in Iraq. By July 2007, General David Petraeus concluded that Jaysh al-Mahdi was "more of a hindrance to

6

long-term security in Iraq" than was al-Qaeda in Iraq. *Id.* ¶ 62 (J.A. 118) (quoting Michael R. Gordon & Gen. Bernard E. Trainor, *The Endgame: The Inside Story of the Struggle for Iraq, From George W. Bush to Barack Obama* 422 (1st ed. 2012)).

In the immediate aftermath of the fall of Saddam Hussein's regime, the Sadrists set their sights on the Iraqi Ministry of Health and Kimadia, Iraq's state-owned import company, as sources of power and funding. Sadrists began assuming key positions throughout the Ministry and purging employees disloyal to them in early 2004. Jaysh al-Mahdi's influence thus spread throughout the Ministry. According to one insider, at the height of the group's control, the Ministry employed an estimated 70,000 Jaysh al-Mahdi members. In 2005, after Sadrists won enough seats in parliamentary elections, Jaysh al-Mahdi solidified full control over the Ministry.

Jaysh al-Mahdi used the Ministry as a front and headquarters for its campaign of terrorist violence. For example, the organization converted the nation's public hospitals "into terrorist bases where Sunnis were abducted, tortured, and murdered." *Id.* ¶ 3 (J.A. 98). Ministry ambulances transported terrorist "death squads" around Baghdad. *Id.* And the Deputy Minister of Health converted the Ministry's Facilities Protection Service into a division of Jaysh al-Mahdi, deploying its officers to torture and kill Sadr's enemies. *See id.* Jaysh al-Mahdi's dominance was obvious to anyone physically present at Ministry headquarters: "Death to America" slogans adorned the halls, armed Jaysh al-Mahdi fighters freely roamed while Americans could not safely enter, and Jaysh al-Mahdi's flag flew at the entrance. *Id.* ¶¶ 3, 10 (J.A. 98, 101). Plaintiffs contend that the Ministry "functioned more as a terrorist apparatus than a health organization" during the relevant period. *Id.* ¶ 3 (J.A. 98). Sadrist control over the

7

Ministry and Kimadia "was at its apex from late 2004 through 2008," during which time "there was no meaningful distinction between" the Ministry and Jaysh al-Mahdi. *Id.* ¶ 104 (J.A. 134). In 2008, a different political party assumed control of the Ministry, but Jaysh al-Mahdi kept "de facto control" of the Ministry's contracting process until at least 2013. *Id.*

Jaysh al-Mahdi used its control of the Ministry to obtain financing for its terrorist activities by securing bribes from defendants in the medical-goods procurement process. Between 2004 and 2013, defendants, who are pharmaceutical and medical equipment manufacturers and their affiliated suppliers, allegedly made illegal payments in both cash and goods to Jaysh al-Mahdi, following methods already familiar from defendants' corrupt dealings with Kimadia under the earlier Oil-for-Food program during Saddam Hussein's reign. First, defendants paid cash bribes (called "commissions") to Jaysh al-Mahdi in order to obtain lucrative Kimadia contracts. These "commissions" were typically 20 per cent of any contract price. "The Sadrists extracted their 'commissions' from foreign medical-goods companies by using their leverage over multiple points of the transaction lifecycle." *Id.* ¶ 145 (J.A. 154). Second, defendants gave the Ministry extra, off-the-books batches of drugs and medical devices for free on top of the quantities Kimadia paid for. Free goods packaged alongside the paid goods, but which nobody expected to appear in the Ministry's inventory, were readily available to Jaysh al-Mahdi to provide to its fighters and sell on the black market.

The constant stream of bribes and free goods helped finance Jaysh al-Mahdi's terrorist attacks on U.S. nationals, including the victims in this case. The complaint details hundreds of individual acts of international terrorism committed by Jaysh al-Mahdi between 2005 and 2009 that killed or permanently maimed the victims. Virtually all the

8

attacks took place within Baghdad neighborhoods like Sadr City that were well known to be Jaysh al-Mahdi strongholds. And some attacks even took place in the immediate vicinity of the Ministry's headquarters in eastern Baghdad.

Defendants allegedly knew that their bribe payments and free good shipments were being used to fund Jaysh al-Mahdi and its numerous attacks on the victims in this case. Defendants' local agents, often called "Scientific Bureaus," finalized their contracts at the Ministry headquarters surrounded by terrorist propaganda and other indicia of Jaysh al-Mahdi's control. *Id.* ¶¶ 148-49, 180 (J.A. 155-56, 170). And, as sophisticated global businesses, defendants had corporate security and compliance operations keeping them abreast of risks in the markets they served. As part of those efforts, plaintiffs plausibly allege, defendants would have also become aware of frequent mainstream media reports describing Sadr's control of the Ministry and use of that position to launch terrorist attacks against Americans. Knowledge of Jaysh al-Mahdi's control was so widespread that some U.S. government personnel in Iraq referred to Jaysh al-Mahdi as "The Pill Army" because its fighters were sometimes paid in drugs that they either consumed or sold for cash on the black market. *Id.* ¶ 9 (J.A. 101).

Plaintiffs each assert two primary liability and two secondary liability claims under the ATA, as well as a variety of state-law claims arising from the same conduct. As noted above, the district court dismissed all of plaintiffs' claims and dismissed the foreign defendants for lack of personal jurisdiction. We reversed the district court on three points of law. First, we held that plaintiffs pleaded facts sufficient to support their secondary liability claims against the motion to dismiss for failure to state a claim. Specifically, plaintiffs adequately alleged that Hezbollah, a designated Foreign

9

Terrorist Organization, planned or authorized the relevant attacks as required under the ATA and that defendants knowingly provided substantial assistance to Jaysh al-Mahdi. Second, with respect to the direct liability claims, we reversed the district court's holding that the Ministry itself was an "independent intermediary" defeating proximate causation. *See Atchley*, 474 F. Supp. 3d at 209. We held that plaintiffs adequately pleaded that defendants' payments to Jaysh al-Mahdi proximately caused the victims' injuries and remanded to the district court to consider in the first instance whether plaintiffs also alleged that defendants themselves committed any acts of international terrorism (for example, by financing or providing material support for terrorism) within the meaning of the ATA. Finally, we held that U.S. federal courts had constitutional authority to exercise specific personal jurisdiction over the foreign supplier defendants because plaintiffs' claims "arise out of or relate to" those defendants' contacts with the United States.

Shortly thereafter, the Supreme Court decided *Taamneh*, which clarified the scope of secondary liability under the ATA. Defendants petitioned for a writ of certiorari, which the Supreme Court granted, vacating our judgment and remanding the case for further consideration in light of *Taamneh*.

## II.

We review *de novo* the district court's dismissal of the amended complaint for failure to state a claim, *Owens v. BNP Paribas, S.A. (Owens IV)*, 897 F.3d 266, 272 (D.C. Cir. 2018), and for lack of personal jurisdiction, *Livnat v. Palestinian Auth.*, 851 F.3d 45, 48 (D.C. Cir. 2017). We assume the truth of plaintiffs' factual allegations and draw all reasonable inferences in plaintiffs' favor. *Owens IV*, 897 F.3d at 272. We begin by addressing plaintiffs' claims under the ATA for both

10

secondary and direct liability and conclude by addressing personal jurisdiction.

**A.**

The ATA recognizes a private right of action in tort for United States nationals injured by acts of international terrorism. It authorizes victims of terrorism to recover against anyone shown to have played a primary (direct) or secondary (aiding-and-abetting) role in terrorist acts.

Plaintiffs assert both types of liability against defendants. Needless to say, plaintiffs do not allege that the defendant companies directly maimed or killed the victims; the claim is that the companies provided funds and goods that substantially assisted those who did. Specifically, plaintiffs contend that defendants repeatedly and directly provided cash bribes and discounted or free drugs and medical supplies to Jaysh al-Mahdi during a period when the group was known to have commandeered the Ministry of Health and adopted it as a base for an ongoing campaign of terrorist attacks against U.S. nationals. Plaintiffs allege defendants knowingly and substantially aided Jaysh al-Mahdi through their persistent and illegal business practices: For instance, plaintiffs allege some of defendants' bribes to Jaysh al-Mahdi officials were disguised as "free goods" "packaged . . . in a manner conducive to street resale" and provided off the books. Compl. ¶ 5 (J.A. 99). The victims, as U.S. nationals, were the targets of Jaysh al-Mahdi's terrorist campaign to intimidate Americans and drive U.S. forces out of Iraq.

The ATA as originally enacted authorized suit by "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism." 18 U.S.C. § 2333(a). As relevant here, the "by

11

reason of" language in the statute requires "some causal connection between the act of international terrorism and the U.S. national's injury." *Owens IV*, 897 F.3d at 270. The statute made no explicit reference to tort liability for aiders and abettors. *See id.* at 277. Some courts, including ours, interpreted that silence as barring such liability, applying a general presumption that Congress does not intend aiding-and-abetting liability without expressly saying so. *See, e.g.*, *id.* at 277-78; *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013); *see also Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 182 (1994) ("[W]hen Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors.").

In 2016, Congress amended the ATA via the Justice Against Sponsors of Terrorism Act (JASTA) to establish aiding-and-abetting liability for anyone who "knowingly provid[es] substantial assistance" to acts of international terrorism. 18 U.S.C. § 2333(d). The JASTA's express objective is:

> to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States.

JASTA, Pub. L. No. 114-222, § 2(b), 130 Stat. 852, 853 (2016) (Amendment). The statute names our decision in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), as providing the

12

"proper legal framework for how such liability should function." Amendment § 2(a)(5). In the JASTA, Congress also added an element to prove secondary liability that was not required for direct liability under the ATA: It confined aiding-and-abetting liability to injuries in which a designated Foreign Terrorist Organization, denominated as such under U.S. law, played a specified role. *See* 18 U.S.C. § 2333(d)(2).

Having considered the Supreme Court's interpretation of section 2333(d) in *Taamneh* and with the aid of supplemental briefing and oral argument, we hold that plaintiffs sufficiently allege secondary liability.

**1.**

Secondary liability for aiding and abetting "reaches persons who do not engage in the proscribed activities at all, but who give a degree of aid to those who do." *Cent. Bank of Denver*, 511 U.S. at 176. As relevant here, the ATA as amended by the JASTA provides for secondary liability against "any person who aids and abets, by knowingly providing substantial assistance" to "an act of international terrorism." 18 U.S.C. § 2333(d)(2). Aiding-and-abetting liability is confined to "an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189)." *Id*.

To state a claim of aiding and abetting under the ATA, plaintiffs thus need to plead three statutory elements: (1) an injury arising from an act of international terrorism; (2) which act was committed, planned, or authorized by a designated Foreign Terrorist Organization; and (3) that defendants aided or abetted the act of international terrorism by knowingly providing substantial assistance.

13

As to the first of those elements, defendants' initial appeal did not challenge the sufficiency of plaintiffs' allegations that plaintiffs each suffered injury from an act of international terrorism.  *See Atchley*, 22 F.4th at 216.  As to the second, defendants' supplemental briefing provides no basis for revisiting our prior holding that plaintiffs successfully alleged that Hezbollah, a designated Foreign Terrorist Organization, "planned and authorized" the attacks, *id*. at 218-19, so we hereby reinstate it.  Defendants dispute here only the third element of the aiding-and-abetting claim: whether they knowingly and substantially assisted the attacks against the victims through their alleged corrupt and illegal payments and gifts to Jaysh al-Mahdi.  We begin our analysis of the adequacy of plaintiffs' complaint as to that element with an overview of the salient aspects of the Supreme Court decision in *Taamneh* clarifying the framework for analyzing that third element.

**a.**

In *Taamneh*, the Supreme Court addressed a secondary liability claim under the amended ATA that sought to impose aiding-and-abetting liability on a company that failed to exclude terrorists from its generally available services.  Family members of an American killed in a 2017 terrorist attack on the Reina nightclub in Istanbul—perpetrated by a member of the Islamic State of Iraq and Syria (ISIS)—sued Twitter, Facebook, and Google, alleging that ISIS had used defendants' social media platforms to recruit terrorists, raise funds, and spread propaganda.  *Taamneh*, 598 U.S. at 478.  Plaintiffs did not allege "that defendants treated ISIS any differently from anyone else" using their platforms:  ISIS "was able to upload content to the platforms and connect with third parties, just like everyone else" on the platforms, and "defendants' recommendation algorithms matched ISIS-related content to users most likely to be interested in that content—again, just

14

like any other content." *Id.* at 500. Plaintiffs did not allege that ISIS used defendants' platforms to plan or coordinate the Reina attack. *Id.* at 498. Instead, plaintiffs sought to hold the companies liable for aiding and abetting terrorism based solely on allegations that they knew ISIS, a designated foreign terrorist organization, was generally using the companies' platforms and recommendation algorithms to reach new audiences, yet failed to take steps to stop the organization or its members from doing so. *Id.* at 481-82. That theory lacked any nexus to the attack on the Reina nightclub; it would "necessarily hold defendants liable as having aided and abetted each and every ISIS terrorist act committed anywhere in the world." *Id.* at 501.

The Court concluded that plaintiffs failed to plausibly allege that defendants aided and abetted ISIS in carrying out the Reina nightclub attack. *Id.* at 478. To arrive at that conclusion, the Court examined the ATA's language attaching liability to "any person who aids and abets, by knowingly providing substantial assistance, . . . an act of international terrorism." *Id.* at 483 (quoting 18 U.S.C. § 2333(d)(2)). The Court addressed two central questions: "First, what exactly does it mean to 'aid and abet'? Second, what precisely must the defendant have 'aided and abetted'?" *Id.* at 484.

Responding to the first question, the Court noted that while the ATA does not define "aids and abets," those terms "are familiar to the common law." *Id.* (citing *Cent. Bank of Denver*, 511 U.S. at 181). What is more, Congress specified our aiding-and-abetting decision in *Halberstam* as providing the "proper legal framework for how such liability should function." *Id.* at 485 & n.6 (citing Amendment § 2(a)(5), and *Halberstam*, 705 F.2d 472). As relevant in *Taamneh* and here, *Halberstam* synthesized three key elements from the common law: (1) The party whom the defendant aids must perform a wrongful act

15

that causes an injury; (2) the defendant must be generally aware of its role as part of an overall illegal scheme or tortious activity at the time the defendant provides assistance; and (3) the defendant must knowingly and substantially assist the principal violation. *Id.* at 486. *Halberstam* articulated six further factors to help determine whether a defendant's assistance was "substantial": "(1) the nature of the act assisted, (2) the amount of assistance provided, (3) whether the defendant was present at the time of the principal tort, (4) the defendant's relation to the tortious actor, (5) the defendant's state of mind, and (6) the duration of the assistance given." *Id.* at 486-87 (internal quotation marks and citation omitted).

At the same time, the Court in *Taamneh* warned that the elements and factors in *Halberstam* "should not be accepted as immutable components" of aiding-and-abetting liability and may "be merged or articulated somewhat differently without affecting their basic thrust." *Id.* at 487 (internal quotation marks and citation omitted). The Court stressed that aiding-and-abetting liability in *Halberstam* arose from a "distinctive fact pattern" in which Linda Hamilton, the bookkeeper and romantic partner of burglar Bernard Welch, was held liable for aiding and abetting a murder Welch committed during a home break-in that went awry. *Id*. at 485-86. Because Welch did not disclose to Hamilton the source of the jewelry and antiques he obtained during his solo nighttime forays, Hamilton was unaware that a burglary, let alone ensuing murder, was going to take place. *Id*. at 485-86. Yet Hamilton provided substantial assistance to Welch's business "by helping him turn his stolen goods into 'legitimate' wealth, thereby intending to help Welch succeed by performing a function crucial to any thief," and the couple amassed a substantial fortune with no other means of support. *Id*. at 485, 487 (internal quotation marks and citation omitted). Those circumstances sufficed to suggest that Hamilton was generally aware that she was substantially aiding

16

Welch in some type of personal property crime at night, of which violence such as Mr. Halberstam's death was a foreseeable risk. *Id.* at 485-87; *see Halberstam*, 702 F.2d at 488.

Drawing on the common law of aiding-and-abetting liability, the Court in *Taamneh* described *Halberstam*'s "basic thrust" as attaching liability to "conscious, voluntary, and culpable participation in another's wrongdoing." *Taamneh*, 598 U.S. at 488, 493. Culpability is measured by "the twin requirements" of "knowing" and "substantial" assistance, which "work[] in tandem" to permit a court to "infer conscious and culpable assistance," with a "lesser showing of one demanding a greater showing of the other." *Id.* at 491-92. Weaker allegations of state of mind can still support a claim for aiding-and-abetting liability so long as they are coupled with stronger allegations of substantiality. For instance, if a "provider of services does so in an unusual way" for the benefit of a tortfeasor, the provider may be liable for aiding and abetting the tort. *Id.* at 502.

Functionally, *Taamneh* explains, a combined showing of knowledge and substantiality is necessary to prevent aiding-and-abetting liability from sweeping in those who provide "only tangential assistance" (*e.g.*, bystanders who fail to call the police, or merchants who incidentally aid tortious activity through the ordinary conduct of their business). *Id.* at 488-89. A sufficiently strong showing on those dovetailing factors ensures liability is limited to those whose conduct is "truly culpable." *Id.* at 489.

Turning to the second question—what is it that the defendant must have aided and abetted?—the *Taamneh* Court again drew on the common law of aiding-and-abetting liability and the text of section 2333(d)(2) to hold that defendants must

17

have "aided and abetted *the act of international terrorism* that
injured the plaintiffs." *Id.* at 497 (emphasis added). That is to
say, liability under the ATA requires that defendants' alleged
assistance relate to, *i.e.* have a "nexus" with, the acts of
international terrorism. *Id.* at 495.

Like the ingredients of culpability, nexus operates on a
sliding scale. At one end lie cases with a "strict," "direct[]," or
"close" nexus between the assistance alleged and the act of
terrorism. *Id.* at 494, 496. In *Taamneh*, a close nexus might
have existed, for example, if ISIS had used defendants'
platforms to plan or coordinate the Reina nightclub attack. *See
id.* at 498. But the facts as pleaded in *Taamneh*—that ISIS used
defendants' platforms to recruit and propagandize for their
movement but not to support or carry out the specific terrorist
attack at issue, *id.* at 501—fall on the other end of the scale,
with practically no nexus at all between the alleged assistance
and the act of terrorism that harmed plaintiffs. When there is a
"lack of any concrete nexus between defendants' services" and
the act of terrorism, plaintiffs must prove defendants provided
such "systemic[] and pervasive[]" assistance to a terrorist
group that they could be said to aid and abet every act of
terrorism the group commits as part of a common enterprise.
*Id.* at 501. Between those two extremes, situations involving
"more remote support can still constitute aiding and abetting in
the right case." *Id.* at 496. The practical upshot is that to
survive a motion to dismiss plaintiffs must allege *some*
connection between defendants' assistance and the acts that
injured them. If they cannot, plaintiffs must instead allege
defendants provided a type of pervasive support that
demonstrates a "near-common enterprise" with the terrorist
group. *Id.* at 502.

To summarize, *Taamneh* draws on the common law to
establish two variables bearing on liability for aiding and

18

abetting under the ATA: (1) "culpability," which turns on the combined strength of plaintiffs' allegations regarding (a) the substantiality of the assistance defendants provide and (b) the degree of their awareness or intentionality about the harms they aid; and (2) a "nexus" measured by the closeness of the relationship between defendants' assistance and the act of international terrorism that injured plaintiffs.   As to the relationship between those two main variables, the Court explains:

> When there is a direct nexus between the defendant's acts and the tort, courts may more easily infer such culpable assistance.  But, the more attenuated the nexus, the more courts should demand that plaintiffs show culpable participation through intentional aid that substantially furthered the tort.

*Id.* at 506.  Put differently, the degree of connection between the culpable assistance and the tortious act sets the bar for how strong the indicia of culpability need be:  A weak connection between the defendant's knowing conduct and the act of terrorism requires a stronger degree of culpability, whereas a more direct nexus may establish liability despite relatively weaker indicia of culpability.

Guided by *Taamneh*, our renewed analysis of defendants' potential aiding-and-abetting liability proceeds along that path. Because the strength of the nexus between the assistance and the act of international terrorism sets the bar for the showing of culpability required, we begin by analyzing the nexus alleged here.  We then turn to culpability and evaluate the strength of the allegations regarding defendants' knowledge and the substantiality of their assistance.  We conclude that plaintiffs allege a plainly discernable nexus between defendants' corrupt payments and Jaysh al-Mahdi's attacks on U.S. nationals in

19

Iraq. Evaluating culpability, we conclude that plaintiffs make strong allegations regarding defendants' awareness and very strong allegations regarding the substantiality of defendants' assistance, provided through a scheme of bespoke bribery and gifts. Under the circumstances of this case, that nexus coupled with those culpability allegations suffice to state a claim for aiding-and-abetting liability under the ATA.

**b.**

In *Taamneh*, the Court underscored the importance of analyzing the nexus between defendants' alleged assistance and the act or acts of international terrorism that harmed plaintiffs. Indeed, the failure by plaintiffs in that case to draw any "concrete nexus" between the Reina nightclub attack and defendants' social media platforms was fatal to their claims. *Id.* at 501. They did not, for example, allege that ISIS "used defendants' platforms to plan or coordinate the Reina attack" or that the attacker himself "ever used Facebook, YouTube, or Twitter." *Id.* at 498. At most, plaintiffs alleged that ISIS maintained accounts on defendants' social media platforms, that defendants' recommendation algorithms treated ISIS-related content like any other content in promoting it to users most likely to be interested in it, and that defendants took insufficient steps to identify and remove ISIS supporters and content from their platforms. *Id.* Without a nexus between the assistance alleged and the Reina attack itself, plaintiffs' theory would have held defendants liable for aiding and abetting every ISIS terrorist act committed anywhere in the world. *Id.* at 501. And plaintiffs failed to allege facts sufficient to show that "defendants and ISIS formed a near-common enterprise of the kind that could establish such broad liability." *Id.* at 502.

The cash bribes and free pharmaceuticals defendants allegedly provided to Jaysh al-Mahdi have a far closer and

20

more distinct tie to Jaysh al-Mahdi's acts of terrorism against U.S. personnel in Iraq. Unlike the defendants in *Taamneh*, who merely failed to act while ISIS (like everybody else) used their platforms, and whose platforms lacked any connection to the Reina attacks, defendants here persistently pursued opportunities to do business with the Iraqi Ministry of Health and Kimadia in particular and made corrupt payments that "directly financ[ed]" Jaysh al-Mahdi's sustained campaign of terrorist attacks. Third Am. Compl. ¶ 1 (J.A. 97). Plaintiffs contend that defendants' activities enabled Jaysh al-Mahdi to purchase arms and ammunition, pay its fighters either in cash or "in diverted pharmaceuticals" provided for free as kickbacks, and plan attacks that would go on to "kill[] or injure[] thousands of Americans," including the victims in this case. *Id.* ¶¶ 1, 9 (J.A. 97, 101). And they argue that Jaysh al-Mahdi's repeated attacks on the victims were the obvious result of defendants' practices throughout the period in question. It is highly noteworthy that defendants continued to make payments despite a steady drumbeat of reporting on Jaysh al-Mahdi's use of these funds to plan and execute attacks on Americans. *See, e.g.*, *id.* ¶ 183 (J.A. 172-75). *Taamneh* expressly contemplated the imposition of aiding-and-abetting liability in a situation like this one, where a "provider of routine services does so in an unusual way," rendering the provider responsible for "some definable subset of terrorist attacks." 598 U.S. at 502.

Defendants disagree that the allegations reveal any nexus between their alleged assistance and the attacks that injured plaintiffs. They see no definable nexus between defendants' "manufacture or sale of medical goods . . . and any specific attack injuring any plaintiff" and object that the complaint "never ties those medicines or equipment to specific attacks." Appellees Br. 20, 23. In defendants' view, to state a claim for secondary liability, plaintiffs must trace a direct line between

21

the bribes that defendants provided (whether cash or in-kind) and the specific attacks that injured plaintiffs. Under that test, plaintiffs would need to allege, for example, that a particular cash bribe defendants funneled to Jaysh al-Mahdi was earmarked to pay for certain weapons and that those same weapons were then used in an attack that injured plaintiffs.

But the Supreme Court in *Taamneh* declined to adopt the defendants' proposed "direct traceability" test. Even as it held that the allegations before it fell short, it clarified that "aiding and abetting does not require the defendant to have known all particulars of the primary actor's plan" because, for example, a defendant may be liable for "other torts that were a foreseeable risk of [an] intended tort." 598 U.S. at 495-96 (internal quotation marks and citation omitted). Accordingly, the Court expressly rejected the *Taamneh* defendants' argument— echoed by defendants here—that they could be held liable only if there were a "strict nexus between their assistance and [the Reina nightclub] attack." *Id.* at 494. Instead, it suggested that "even more remote support can still constitute aiding and abetting in the right case." *Id.* at 496.

Requiring an overly rigid nexus is especially inappropriate when a plaintiff alleges that a defendant provided financial assistance. As the Supreme Court has previously noted, "[m]oney is fungible," and it is often effectively impossible for plaintiffs to plausibly allege that a particular dollar of funding enabled a specific attack. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 31 (2010). Requiring such allegations would be inconsistent with Congress's intent in enacting the JASTA, which sought "to provide civil litigants with the broadest possible basis . . . to seek relief against persons . . . that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities." Amendment § 2(b). It is noteworthy that, in

22

*Taamneh*, the Supreme Court suggests that funding-based claims may require less of a nexus. After dismissing most of the *Taamneh* plaintiffs' claims for lack of sufficient nexus, the Court dealt separately with plaintiffs' allegation that Google supported ISIS financially through revenue sharing. The Court found no merit in that claim, but only after determining that the complaint failed to provide sufficient detail about the substantiality of the financial assistance, such as the amount and frequency of the revenue sharing. *Taamneh*, 598 U.S. at 505-06.

Defendants further contend that plaintiffs' theory, like that of the *Taamneh* plaintiffs, "would necessarily hold defendants liable as having aided and abetted each and every attack committed by Jaysh al-Mahdi anywhere, anytime." Appellees Br. 20-21 (internal quotation marks and citation omitted). In their view, plaintiffs must therefore demonstrate that defendants' role in supporting Jaysh al-Mahdi was akin to that of a co-conspirator—so pervasive or "systemic that [they were] aiding and abetting every wrongful act committed by that enterprise." 598 U.S. at 496. Because plaintiffs have not so alleged, defendants conclude, their claims must fail.

That argument rests on a mistaken premise. Plaintiffs here do not seek to hold defendants liable on the theory that they aided and abetted every act of international terrorism Jaysh al-Mahdi committed anytime and anywhere. Instead, the complaint tells a localized story that ties defendants' alleged knowing provision of substantial aid to a defined subset of Jaysh al-Mahdi's tortious attacks—conduct that was circumscribed temporally and geographically. Temporally, the complaint alleges that defendants' payments to Jaysh al-Mahdi began in late 2004 and continued through 2013, which roughly corresponds to the timing of the alleged attacks and the "apex" of Jaysh al-Mahdi's control over the Ministry of Health and

23

Kimadia from 2005 to 2009. *Compare* Third Am. Compl. ¶ 7 (J.A. 100), *with id.* ¶ 16 (J.A. 104), *and id.* ¶ 104 (J.A. 134). Geographically, plaintiffs' claims are limited to aid provided through the Ministry for attacks in Iraq, even though Jaysh al-Mahdi carried out attacks elsewhere in the Middle East. *See, e.g., id.* ¶ 348 (J.A. 242-43) (discussing Jaysh al-Mahdi's activities in Lebanon). Plaintiffs allege that defendants signed the contracts with Jaysh al-Mahdi at the Ministry of Health headquarters in Baghdad, *id.* ¶ 121 (J.A. 142), and that most of Jaysh al-Mahdi's attacks occurred within Baghdad's city limits, *id.* ¶ 403 (J.A. 269-73). They even identify an attack by Jaysh al-Mahdi fighters doubling as Ministry security guards that targeted an American convoy just outside the Ministry's front gate. *Id.* ¶ 89 (J.A. 127). Because plaintiffs' allegations are limited to defendants' provision of aid to a temporally and geographically discrete set of Jaysh al-Mahdi's terrorist acts, plaintiffs need not plead that defendants and Jaysh al-Mahdi participated in a near-common enterprise of the type necessary to state claims against defendants for aiding Jaysh al-Mahdi's terrorist activities without regard to where or when they occurred.

We therefore hold that plaintiffs have alleged a nexus between defendants' assistance and the terrorist attacks that injured them because the complaint's allegations describe how defendants provided tailored, local assistance to Jaysh al-Mahdi at the time and in the immediate vicinity of a defined set of Jaysh al-Mahdi's attacks. These attacks against U.S. citizens were the predictable, virtually inevitable fallout of defendants' direct cash and in-kind payments to Jaysh al-Mahdi under the circumstances then prevailing. We recognize that the complaint does not spell out how Jaysh al-Mahdi converted defendants' assistance into weapons or equipment to carry out each specific attack, but the statute, as interpreted by *Taamneh*, does not require such detail about the connection. Only where

24

the nexus is generic and attenuated and there is no showing of a near-common enterprise are defendants shielded from liability.

A nexus that falls short of tracing defendants' support to any specific attack injuring any plaintiff does call for more robust culpability allegations to state an ATA claim than would be required if the nexus were more direct. *See Taamneh*, 598 U.S. at 506. Accordingly, our inquiry into culpability "demand[s] that plaintiffs show culpable participation through intentional aid that substantially furthered" the acts of terrorism in question. *Id.*

**c.**

Turning to the "culpability" variable, we evaluate the strength of plaintiffs' allegations regarding defendants' awareness and the substantiality of their assistance. As the Court noted in *Taamneh*, these requirements "work[] in tandem" to permit a court to "infer conscious and culpable assistance," with a "lesser showing of one demanding a greater showing of the other." 598 U.S. at 491-92. We conclude that plaintiffs' allegations suffice to show defendants knew their assistance would be used by Jaysh al-Mahdi to commit further acts of terrorism. And, when combined with strong allegations regarding the sheer scale of their support and the unusual and corrupt means by which defendants aided Jaysh al-Mahdi, their complaint supports a reasonable inference that defendants' conduct amounted to "conscious, voluntary, and culpable participation in another's wrongdoing." *Id.* at 493.

**i.**

In *Taamneh*, the Supreme Court clarified that the statutory inquiry into whether defendants' assistance was provided "knowingly" is "designed to capture the defendants' state of

25

mind with respect to their actions and the tortious conduct (even if not always the particular terrorist act)." *Id.* at 504. To state a legally sufficient ATA claim consistent with *Taamneh*'s common-law-based aiding-and-abetting analysis, a plaintiff must at least allege that the defendant knew the assistance it provided would be used to commit further acts of terrorism or would materially increase the likelihood that the tortfeasor would commit further such acts. Alleging that a defendant generally knew its assistance was going to a terrorist organization is insufficient. Such knowledge could meet only *Halberstam*'s "general awareness" prong. *See id.* And the ATA imposes liability for aiding and abetting "act[s] of international terrorism," not for incidentally supporting a terrorist organization. 18 U.S.C. § 2333(d)(2). That said, so long as a plaintiff makes meaningful showings of nexus and substantiality, the plaintiff need not allege that the defendant knew the particulars of each terrorist act it aided and abetted.

Contrary to defendants' assertions, *Taamneh* did not read a specific intent requirement into the ATA. The statute requires only that defendants "knowingly" provide substantial assistance. 18 U.S.C. § 2333(d)(2). Even as the Supreme Court in *Taamneh* for failing to give "greater weight to defendants' . . . undisputed lack of intent to support ISIS" in the circumstances of that suit, 598 U.S. at 504, the Court emphasized that a lack of purpose to help ISIS defeated the claim only because plaintiffs had failed to allege any discernable nexus between defendants' assistance and the Reina nightclub attack or any unusual feature of defendants' actions toward the tortfeasors, *id.* at 490, 500-01. A "conscious intent" may be required to impose liability on one who aids and abets a tort by "silence and inaction," but a lesser degree of knowledge can support liability for one who aids and abets by "affirmative assistance" toward commission of a tort. *See*

26

*Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 96-97 (5th Cir. 1975).

Consistent with that conclusion, courts considering common law aiding-and-abetting claims have long distinguished the intent necessary to establish *criminal* aiding and abetting from the less stringent state-of-mind requirement for *civil* aiding and abetting. The Second Circuit, for instance, has held that a vendor is criminally liable for aiding and abetting only if he "participate[d] in [the wrongful activity] as in something that he wishe[d] to bring about, that he [sought] by his action to make it succeed," but the vendor may be civilly liable for aiding and abetting a crime that is merely "a natural consequence" of his sale. *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938) (Hand, J.). Other courts have similarly concluded that "borrow[ing] . . . from definitions of aiding and abetting in the criminal field, where criminal intent is stressed because the abettor is a criminal principal, is entirely inappropriate" in the context of a statute that is "basically a remedial, not a criminal one." *Passaic Daily News v. Blair*, 308 A.2d 649, 656 (N.J. 1973). *See, e.g.*, *Monsen v. Consol. Dressed Beef Co.*, 579 F.2d 793, 802-03 (3d Cir. 1978); *Woods v. Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004, 1009-10 (11th Cir. 1985); *Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 251 (4th Cir. 1997).

Here, plaintiffs allege enough to support reasonable inferences that defendants knew their ongoing dealings with the Ministry of Health materially supported terrorist attacks against Americans. They allege that "[d]efendants knowingly structured their transactions to facilitate Jaysh al-Mahdi's diversion of funds, drugs, and medical devices from [the Ministry]" and knew that "Jaysh-al Mahdi used [what it diverted] to support terrorist operations against Americans in Iraq." Third Am. Compl. ¶ 165 (J.A. 163). Plaintiffs identify

27

three distinct, contemporaneous sources of information supporting those allegations.

First, they allege defendants had firsthand knowledge of Jaysh al-Mahdi's takeover of the Ministry and use of its resources to attack Americans.  Starting in 2004, the Ministry of Health allegedly required each of its suppliers to deliver contracts by hand to the Ministry's headquarters in Baghdad and execute them on premises.  To help them meet that requirement, defendants established or contracted with trusted sources on the ground in Baghdad, referred to as "Scientific Bureaus," staffed by local agents who spoke fluent Arabic and were familiar with Ministry and Kimadia employees.  Because those agents had to enter the Ministry to deliver and execute contracts on defendants' behalf, they had to walk by Sadrist propaganda posters lining the premises, Jaysh al-Mahdi fighters in the hallways, and an array of heavy weaponry displayed in the offices of officials.  Such overt, ubiquitous displays would have put them on notice as to Jaysh al-Mahdi's militarized control of the Ministry of Health.  And it is entirely reasonable to infer that those Bureaus kept defendants informed that the Ministry of Health had fallen under the control of Jaysh al-Mahdi, which was carrying out attacks using Ministry resources, including funds Jaysh al-Mahdi obtained as kickbacks from defendants.  *Id.* ¶ 182 (J.A. 171).

Second, beginning as early as 2005, public investigative reporting by independent news agencies and government sources alike documented the link between defendants' payments to Jaysh al-Mahdi and that group's terrorist attacks on Americans.  For example, the Los Angeles Times reported on "the diversion of millions of dollars" from the Ministry to Jaysh al-Mahdi, which the Council on Foreign Relations described as "an armed militia that has intermittently waged an insurgency against U.S. forces in Iraq."  *Id.* ¶ 183 (J.A. 172-

28

73).  A report by the U.S. State Department in 2006 stated that the Ministry was "openly under the control of . . . [Jaysh al-Mahdi]" and enabled the group "to finance operations from diverted medicines."  *Id.*  ¶ 184 (J.A. 175) (alterations and internal quotation marks omitted).  And a 2007 report by the head of the Iraqi Commission on Public Integrity was even more explicit:  It concluded that Jaysh al-Mahdi had "fully commandeered the [M]inistr[y] of [H]ealth," and "resold [medical supplies] *to fund the insurgency against the Americans*."  *Id.*  ¶ 173 (J.A. 167-68) (emphasis added).  60 Minutes then ran a piece describing the defendant pharmaceutical companies' payments as "ill-gotten gains" "being used to kill American troops."  *Id.*  ¶ 174 (J.A. 168).  Plaintiffs allege that defendants must have been aware of those widely reported stories.

    Third, each defendant maintained a corporate security group responsible for supervising its global supply chains and ensuring business practices remained legitimate.  Those corporate security groups researched open-source media as well as subscription-based reporting services.  They powerfully bolster the inference that defendants were aware of the news-media and governmental reporting about Jaysh al-Mahdi's commandeering of the Ministry of Health and funneling of its resources into terrorist attacks on United States personnel.  Remarkably, plaintiffs allege that one subscription service—Stratfor—published a message in 2007 to inform its clients (including defendants) that the Iraqi Deputy Minister of Health "is suspected of employing militia *fighters and selling health services and equipment* in return for millions of dollars that [the Deputy Minister] later funneled to Shiite militias."  *Id.*  ¶ 186 (J.A. 176) (emphasis added).

    The timing and repetition of defendants' assistance strengthens the allegation that defendants knew that Jaysh al-

29

Mahdi would use the assistance to conduct attacks against
Americans. Plaintiffs allege that defendants repeatedly signed
contracts with Jaysh al-Mahdi and provided it with cash and in-
kind bribes. Those transactions followed close on the heels of
publicized attacks and provided substantial support for further
attacks. For example, plaintiffs allege that between 2006 and
2008 AstraZeneca executed at least five different contracts
with the Ministry of Health facilitated by hefty bribes to Jaysh
al-Mahdi. *Id.* ¶ 191 (J.A. 179). During that period, Jaysh al-
Mahdi launched multiple, widely reported attacks on
Americans that killed or maimed many of the victims in this
case. AstraZeneca continued to sign contracts with the
Ministry of Health even after the Deputy Minister of Health
(himself a known commander of Jaysh al-Mahdi) was arrested
in 2007 on corruption charges. *Id.* ¶ 11 (J.A. 102). Plaintiffs
make similar, plausible allegations against each of the other
defendants. *See id.* ¶¶ 213, 246, 284, 312 (J.A. 188, 200-01,
215-16, 228-29).

Perhaps the strongest support for the inference of culpable
association is the "unusual" kind of assistance defendants
allegedly provided. *Taamneh* refers to "situations where [a]
provider of routine services does so in an unusual way" as
supporting aiding-and-abetting liability arising from what
might otherwise be ordinary business transactions. 598 U.S. at
502. As an example, the Supreme Court cites a case in which
it held that a licensed wholesale pharmacy's mail-order supply
of morphine to a doctor in far greater amounts than sent in
typical orders tended to show the pharmacy's culpability for
aiding and abetting illegal narcotics sales. *See id.* (citing *Direct
Sales Co. v. United States*, 319 U.S. 703, 707, 711-12, 714-15
(1943)). The unusual nature of those transactions indicated that
the business did not innocently treat the tortfeasor as any other
customer but rather understood that the tortfeasor intended to
use its goods for illicit purposes. *See Direct Sales*, 319 U.S. at

30

711.  In another recent case regarding aiding-and-abetting liability, the Court confirmed that a provider of generally available goods or services can be held secondarily liable for a customer's misuse of the goods if the provider engages in the type of conduct at issue in *Direct Sales*. *See Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 293 (2025).  The Court emphasized in *Smith & Wesson* that the pharmacy in *Direct Sales* "actively stimulated" the doctor's purchases, including "by giving him special discounts for his most massive orders," and that the pharmacy acted "against the backdrop of law enforcement warnings" that it was being used as a source of supply by lawbreaking doctors. *Id.* at 292-93.

Like the pharmacy in *Direct Sales*, the pharmaceutical companies here are alleged to have engaged in conduct that did not conform to generally accepted business practices.  Indeed, the complaint alleges that defendants participated in a long-running scheme to provide Jaysh al-Mahdi with cash and in-kind bribes that amounted to at least 20 per cent of the value of each contract, as well as off-the-books shipments of "free goods" that were not tied to any particular contract.  Third Am. Compl. ¶ 136 (J.A. 149-50); *id.* ¶¶ 142-44 (J.A. 153-54). When Jaysh al-Mahdi controlled the Ministry, its procurement terms contained "commercially unreasonable" provisions, "such as a requirement that the supplier re-supply 'free of charge' any drugs that expired before Kimadia was able to sell them." *Id.* ¶ 123 (J.A. 143); *see id.* ¶ 135 (J.A. 149). Defendants' decisions to provide the free goods "actively stimulated" Jaysh al-Mahdi's purchases of pharmaceuticals.

Moreover, the complaint asserts that the bribes were highly irregular and illegal under both U.S. and Iraqi law. Plaintiffs contend that U.S. law enforcement agencies, including the Securities and Exchange Commission and the Department of Justice, brought several Foreign Corrupt

31

Practices Act enforcement actions against many of the same companies when they used the same techniques to circumvent the restrictions of the Oil-for-Food Program with bribes to Iraqi officials under the Saddam Hussein regime.  *Id.* ¶ 49 (J.A. 112).  As for the corrupt dealings at issue in this case, the complaint alleges that Coalition forces' concerns about the Ministry of Health supporting Jaysh al-Mahdi's attacks led them to arrest the Deputy Minister of Health in 2007 "for orchestrating several kickback schemes to funnel millions of U.S. dollars to militia elements."  *Id.* ¶ 8 (J.A. 100).  No party has argued that such bribes were a lawful business practice during the period.  Indeed, at the *Taamneh* oral argument, counsel for the United States cited this case as an example of defendants allegedly "ben[ding] the rules" and culpably departing from "their usual course of business."  Tr. of Oral Arg. at 82-83, *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023) (No. 21-1496).  Taking the allegations in plaintiffs' complaint as true and drawing reasonable inferences therefrom, as we must at this stage, defendants' "unusual" conduct is highly probative of secondary liability under the ATA.  It is not business as usual for sophisticated transnational companies to provide cash and in-kind bribes to a known terrorist organization over a period of years when that organization is openly maiming and killing U.S. citizens.

Accordingly, we conclude that plaintiffs have successfully alleged that defendants knew Jaysh al-Mahdi would use their assistance to commit further acts of terrorism against the victims.  Plaintiffs' complaint therefore makes strong allegations of scienter, supporting the conclusion that defendants acted culpably.

32

**ii.**

We now turn to the question whether defendants' alleged assistance to Jaysh al-Mahdi's terrorist attacks was "substantial." The "point" of *Halberstam*'s six substantiality factors "is to help courts capture the essence of aiding and abetting: participation in another's wrongdoing that is both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor." *Taamneh*, 598 U.S. at 504. The Court's opinion in *Taamneh* faults the Ninth Circuit for "focusing . . . primarily on the value of defendants' platforms *to ISIS*, rather than whether defendants culpably associated themselves with ISIS' actions." *Id.* The *Taamneh* plaintiffs failed to allege a culpable association because "ISIS' ability to benefit from [defendants'] platforms was merely incidental to defendants' services and general business models," and those defendants had only an "arm's-length relationship with ISIS . . . no different from their relationship with . . . other users." *Id.* The crux of plaintiffs' complaint was the platforms' "failure to act" to detect and remove ISIS accounts and content from among the billions of user accounts and postings on their platforms. *Id.* at 501. But, as the Supreme Court notes, the common law generally disfavors failure to act as a basis for aiding-and-abetting-liability. *Id.* By contrast, the Court suggests, allegations of "more direct, active" aid, especially aid provided "in an unusual way," can show substantiality, and "might . . . establish liability with a lesser showing of scienter." *Id.* at 502.

Guided by *Taamneh*, we treat *Halberstam*'s substantiality factors not as "immutable components," but as conceptually related. *Id.* at 487. We accordingly highlight the subset of factors most germane to whether these defendants culpably associated themselves with the tortious conduct that harmed these plaintiffs. We recognize that different factors may be

33

decisive in other cases. Here, however, the most salient factors are (1) the relationship between defendants and Jaysh al-Mahdi; (2) the amount and kind of assistance defendants provided; and (3) the duration of defendants' assistance. We combine the latter two factors for analytical clarity.

First, plaintiffs allege a relationship between Jaysh al-Mahdi and defendants that was active, direct, and particularized. Unlike the defendants in *Taamneh*, who stood by when ISIS created standard accounts and made posts on the social media defendants' platforms just as hundreds of millions of users do each day, defendants here had bespoke dealings with Jaysh al-Mahdi. Defendants negotiated their contracts with the Ministry and directly supplied Jaysh al-Mahdi with cash and drugs to win its business. Defendants responded to the Ministry's unusual solicitations, proposing prices for the quantity of goods the Ministry sought, paying cash bribes to Jaysh al-Mahdi, and specifying the quantity of "extra goods" that they would provide to Jaysh al-Mahdi for free. Third Am. Compl. ¶¶ 4-5 (J.A. 98-99). If a defendant won a tendering round, it would—as the Ministry required—execute a formal sales contract by hand inside the Ministry headquarters in Baghdad, surrounded by Jaysh al-Mahdi fighters, propaganda, and weaponry. *Id.* ¶¶ 120-21 (J.A. 141-42). That voluntary, tailored relationship is the type courts require under the common law to ground aiding-and-abetting liability in culpable misconduct. It was notably absent from the arm's-length, failure-to-act allegations in *Taamneh*. 598 U.S. at 498-99.

Second, the scale of the aid defendants allegedly provided and the duration for which they provided it also support the inference that defendants culpably associated themselves with Jaysh al-Mahdi's attacks on Americans. Plaintiffs estimate that defendants provided "millions of U.S. dollars" that were funneled to Jaysh al-Mahdi's terrorist operations for nearly a

34

decade.  *Id.* ¶ 171 (J.A. 166).  In just one transaction in 2006, one of the defendants, Pfizer, allegedly provided Jaysh al-Mahdi an off-the-books payoff in the form of a hemophilia drug called BeneFix valued at $3.7 million.  The inference of defendants' culpability does not derive from the importance of their payments to Jaysh al-Mahdi's operations, which is not the focus of plaintiffs' allegations.  *Cf. Taamneh*, 598 U.S. at 505-06.  Rather, the allegations show that defendants, over a long period of time, associated themselves with Jaysh al-Mahdi's violent campaign of terrorism against U.S. nationals in Iraq via their provision of meaningful quantities of cash and cash-equivalents to that terrorist organization.

We therefore conclude that plaintiffs have made a particularly strong showing that defendants' aid was "substantial" and a strong showing that they knew how it was being used.  The complaint thus demonstrates that defendants culpably associated themselves with Jaysh al-Mahdi's attacks on U.S. nationals, including the victims in this case.

In sum, we hold that plaintiffs have stated a secondary liability claim under the ATA.  Plaintiffs plausibly allege a nexus between the assistance defendants provided to Jaysh al-Mahdi and the subset of attacks Jaysh al-Mahdi committed against U.S. nationals in Iraq between 2005 and 2009.  We recognize that the complaint does not directly trace individual dollars or drugs to their eventual use in specific attacks.  That the nexus is somewhat indirect raises the bar for plaintiffs, requiring them to reinforce their nexus allegations in order to demonstrate defendants' culpability.  They needed to plead that defendants' kickbacks provided assistance that was substantial and that defendants were aware of how that assistance was being used.  Plaintiffs meet that bar.  They plausibly allege that defendants knew Jaysh al-Mahdi used their assistance to carry out further attacks against Americans, yet defendants continued

35

to provide it. And plaintiffs plausibly allege that the "substantial" scale and illegality of defendants' assistance supports an inference that defendants culpably associated themselves with Jaysh al-Mahdi.

Plaintiffs will bear the burden at trial to prove all the elements of liability. But at this preliminary stage, their allegations and reasonable inferences drawn from them suffice to state an ATA aiding-and-abetting claim based on defendants' "conscious, voluntary, and culpable participation in [Jaysh Al-Mahdi's] wrongdoing." *Taamneh*, 598 U.S. at 493.

**2.**

Plaintiffs separately claim that defendants may be held directly liable for acts of international terrorism that defendants themselves committed. Those claims require allegations that plaintiffs, as nationals of the United States, were "injured in [their] person, property, or business by reason of an act of international terrorism." 18 U.S.C. § 2333(a). It is not contested that plaintiffs are U.S. nationals. The parties instead dispute whether plaintiffs adequately allege injury by reason of acts of international terrorism—that is, whether defendants' alleged financing, 18 U.S.C. § 2339C, and material support, 18 U.S.C. § 2339A, of Jaysh al-Mahdi was "international terrorism" within the meaning of the ATA, 18 U.S.C. § 2331(1). And they dispute whether defendants' conduct proximately caused plaintiffs' injuries. The district court dismissed the claims for failure to plead proximate causation without addressing what constitutes an "act of international terrorism" under the statute. *See* 474 F. Supp. 3d at 209.

In our pre-*Taamneh* opinion, we held only that plaintiffs adequately alleged the proximate causation required for direct liability under the ATA and remanded for the district court to

36

consider in the first instance whether plaintiffs alleged that defendants themselves committed any acts of international terrorism. *Taamneh* did not address the standard for direct liability under the ATA. Defendants nonetheless renew their argument that we should dismiss the claims "because defendants' alleged acts are too remote for aiding-and-abetting liability" so they are, *a fortiori*, "too remote for direct liability." Appellees Br. 27-28. That reasoning fails in view of our holding that plaintiffs have stated an aiding-and-abetting claim under the ATA. As we did in our earlier opinion, we decline here to determine in the first instance whether defendants committed any "act[s] of international terrorism" within the meaning of the ATA. Appellees Br. 28-31. Because *Taamneh* does not speak to it, we go no further than to remand to the district court for further consideration of plaintiffs' direct liability claims.

**3.**

In our original opinion, we also held that the manufacturer defendants could be held liable both directly and secondarily despite not dealing immediately with Jaysh al-Mahdi. We reached that conclusion because reports demonstrating the connection between the Ministry and Jaysh al-Mahdi were available to all parties and because the complaint contained sufficient allegations that suppliers acted as manufacturers' agents. Defendants did not petition the Supreme Court for review of that holding and *Taamneh* did not address the issue. We therefore reinstate the claims against the defendant manufacturers, again with recognition that this conclusion rests on pleadings, untested by further factual development, and that the district court may reach a different conclusion on consideration of the evidence.

37

**B.**

Finally, our earlier opinion held that U.S. federal courts have constitutional authority to exercise specific personal jurisdiction over certain foreign supplier defendants. Defendants did not seek certiorari on that issue, and a court "generally has no obligation to raise a question of personal jurisdiction on its own." *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 511 (D.C. Cir. 2018). In any event, although the Supreme Court has since reshaped the relevant jurisdictional inquiry in *Fuld v. Palestinian Liberation Organization*, 606 U.S. 1 (2025), it is unlikely that we would reach a different conclusion were we to apply the "more flexible jurisdictional inquiry" that *Fuld* prescribes, *id.* at 16. We therefore reaffirm our holding that the district court may exercise personal jurisdiction over defendants.

**III.**

For the foregoing reasons, we reverse the district court's order of July 17, 2020 granting defendants' motion to dismiss for failure to state a claim and the foreign defendants' motion to dismiss for lack of personal jurisdiction, as well as its attendant dismissal of plaintiffs' state-law claims. We remand for further proceedings consistent with this opinion.

*So ordered.*