**No. 20-7077**

# In the United States Court of Appeals for the District of Columbia Circuit

—————————

JOSHUA ATCHLEY, ET AL.,
*Plaintiffs-Appellants,*

*v.*

ASTRAZENECA UK LIMITED, ET AL.,
*Defendants-Appellees.*

—————————

Appeal from the United States District Court for the District of Columbia
No. 1:17-cv-02136-RJL (Hon. Richard J. Leon)

—————————

## PETITION FOR REHEARING EN BANC

—————————

KANNON K. SHANMUGAM
WILLIAM T. MARKS
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
 2001 K Street, N.W.
 Washington, DC 20006
 (202) 223-7300

*Counsel for Johnson & Johnson, Cilag GmbH International, Ethicon Endo-Surgery, LLC, Ethicon, Inc., Janssen Ortho LLC, Janssen Pharmaceutica NV, Johnson & Johnson (Middle East) Inc., and Ortho Biologics LLC*

LISA S. BLATT
 *Counsel of Record*
CHRISTOPHER N. MANNING
CHARLES L. MCCLOUD
MELISSA B. COLLINS
ROHIT P. ASIRVATHAM
R. SHANE ROBERTS, JR.
WILLIAMS & CONNOLLY LLP
 680 Maine Avenue SW
 Washington, DC 20024
 (202) 434-5000
 lblatt@wc.com

*Counsel for Pfizer Inc., Pfizer Pharmaceuticals LLC, Pfizer Enterprises SARL, Pharmacia & Upjohn Company LLC, and Wyeth Pharmaceuticals LLC*

JESSICA S. CAREY
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
  1285 Avenue of the Americas
  New York, NY 10019-6064
  United States
  (212) 373-3000

Counsel for Johnson & Johnson,
Cilag GmbH International, Ethicon
Endo-Surgery, LLC, Ethicon, Inc.,
Janssen Ortho LLC, Janssen
Pharmaceutica NV, Johnson &
Johnson (Middle East) Inc., and
Ortho Biologics LLC


JOHN B. BELLINGER III
DAVID J. WEINER
ARNOLD & PORTER
KAYE SCHOLER LLP
  601 Massachusetts Ave., N.W.
  Washington, DC 20001
  (202) 942-5000

ROBERT REEVES ANDERSON
ARNOLD & PORTER
KAYE SCHOLER LLP
  1144 Fifteenth Street,
  Suite 3100
  Denver, CO 80202-1370
  (303) 863-2325

Counsel for GE Healthcare USA
Holding LLC, GE Medical Systems
Information Technologies, Inc., and
GE Medical Systems Information
Technologies GmbH


DAVID M. ZIONTS
LELIA A. LEDAIN
COVINGTON & BURLING LLP
  One City Center
  850 Tenth Street, N.W.
  Washington, DC 20001
  (202) 662-5312

Counsel for F. Hoffmann-La Roche
Ltd


DAVID W. BOWKER
DONNA M. FARAG
WILMER CUTLER PICKERING
HALE AND DORR LLP
  2100 Pennsylvania Ave., NW
  Washington, DC 20037
  (202) 663-6000

Counsel for Genentech, Inc. and
Hoffmann-La Roche Inc.


LARA SAMET BUCHWALD
DAVID B. TOSCANO
CRAIG T. CAGNEY
DAVIS POLK & WARDWELL LLP
  450 Lexington Avenue
  New York, NY 10017
  (202) 450-4292

Counsel for AstraZeneca
Pharmaceuticals LP and
AstraZeneca UK Limited

## TABLE OF CONTENTS

Page

INTRODUCTION AND RULE 40(b) STATEMENT ....................................1

STATEMENT ...........................................................................................3

ARGUMENT ............................................................................................8

I.    The Panel's Aiding-and-Abetting Holding Requires Review ..................8

    A.    The Decision Eviscerates *Taamneh*'s Nexus Requirement ..........8

    B.    The Panel's Culpability Holding Likewise Flouts Supreme Court Precedent ...............................................................................13

    C.    The Decision Flouts the ATA's Requirement that Designated Terrorists Be Directly Involved in the Attacks ........16

II.    The Panel's Attenuated Proximate-Causation Standard for Direct Liability Also Requires Review .......................................................18

CONCLUSION........................................................................................22

# TABLE OF AUTHORITIES*

Page

## CASES

*Am. Fam. Mut. Ins. Co. v. Grim*, 440 P.2d 621 (Kan. 1968)............................10

* *Ashley v. Deutsche Bank Aktiengesellschaft*,
  144 F.4th 420 (2d Cir. 2025).......................................................2, 11-12, 15-16

*Colon v. Twitter, Inc.*, 14 F.4th 1213 (11th Cir. 2021) ......................................17

*Crosby v. Twitter, Inc.*, 921 F.3d 617 (6th Cir. 2019)...................................17, 20

*Direct Sales Co. v. United States*, 319 U.S. 703 (1943)....................................14

*Fields v. Twitter, Inc.*, 881 F.3d 739 (9th Cir. 2018) ..........................................20

*In re Terrorist Attacks*, 714 F.3d 118 (2d Cir. 2013) .........................................20

*Kemper v. Deutsche Bank AG*, 911 F.3d 383 (7th Cir. 2018)......................18, 20

*Ofisi v. BNP Paribas, S.A.*, 77 F.4th 667 (D.C. Cir. 2023) ...............................19

*Owens v. BNP Paribas, S.A.*, 897 F.3d 266 (D.C. Cir. 2018)............................19

*Republic of Hungary v. Simon*, 604 U.S. 115 (2025)...........................................9

*Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013) ..............................................20

* *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*,
  605 U.S. 280 (2025)............................................................................ 10-11, 14

* *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023)....................1-2, 6-11, 13-14, 17

## STATUTES

18 U.S.C.
  § 2333...............................................................................................4, 16, 18
  § 2334........................................................................................................21

---

* Authorities upon which we chiefly rely are marked with asterisks.

## INTRODUCTION AND RULE 40(b) STATEMENT

En banc review is warranted. For the second time, the panel has reversed the dismissal of claims of direct and secondary liability for terrorism against 21 of the world's largest pharmaceutical and medical-device companies. Precisely because terrorism is a heinous act, the Anti-Terrorism Act (ATA), the Supreme Court, and other circuits impose stringent requirements on plaintiffs making such allegations. The panel's decision once again nullifies those safeguards, recasting the provision of medical supplies and alleged "commissions" to Iraq's U.S.-supported Health Ministry as directly funding attacks on U.S. soldiers.

After the panel's original decision, the Supreme Court reemphasized that aiding-and-abetting liability attaches only to those defendants who "consciously and culpably participate[] in" "the act of international terrorism" "as something that they wished to bring about." *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 497-98 (2023) (cleaned up). At the urging of the United States, the Supreme Court vacated the panel decision and directed this Court to apply the *Taamneh* standard on remand. Doing so should have been straightforward: No nexus links defendants' provision of critical drugs and medical equipment to a rogue militia's attacks on U.S. servicemembers. Nor is there any

1

allegation that defendants engaged in those transactions with the goal of bringing about the attacks. Yet the panel found plaintiffs' allegations sufficient anyway because "money is fungible." Add.21a (alteration omitted). That conclusion defies the Supreme Court's guidance in *Taamneh*. And it directly splits with the Second Circuit, which, applying *Taamneh*, recently "rejected the notion that … aiding-and-abetting liability [can] attach based on" a "fungibility theory." *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420, 444 (2d Cir. 2025).

The panel also split from every other circuit that has considered the question by holding that companies aid and abet terrorism if their products reach groups that the Executive Branch has *declined* to designate as foreign terrorist organizations, so long as those undesignated groups receive encouragement or training from designated organizations.

As for direct liability, every circuit to consider the question has held that direct liability under the ATA attaches only to actions that directly cause plaintiffs' injuries. The panel nonetheless authorized liability based on transactions with a U.S.-supported foreign government ministry purportedly "co-opted" by terrorists.

The Court should correct the panel's extraordinary, outlier decision, which seriously distorts the ATA.

## STATEMENT

1.  After defeating Saddam Hussein, the United States poured billions of dollars into rebuilding Iraq, including Iraq's Health Ministry. JA97-98, 138-39; U.S. Br. 4, No. 23-9 (S. Ct. May 21, 2024). The U.S. government encouraged private companies like defendants to supply the Ministry with life-saving medical goods. U.S. Br. 4; Reconstruction Experts Br. 7-11.

In Iraq's 2005 elections, a Shi'ite coalition won and allocated cabinet seats among its constituent parties. JA119-20. The Sadrist Movement—whose leader Muqtada al-Sadr opposed American involvement in Iraq—received the Health Ministry post. JA116, 119-20. U.S. "national interest" required "engag[ing] with the Sadrists." JA246. The United States itself poured hundreds of millions into Iraq's health care system, in close coordination with the Ministry. JA667. And the United States specifically encouraged medical companies to enter "Iraqi Ministry contracts" for "healthcare" supplies. JA683-85.

2.  Defendants answered that call. The complaint alleges that defendants—some of the world's largest pharmaceutical and medical-goods

3

manufacturers and suppliers—sold medical goods to the Ministry. JA177-236. Plaintiffs further allege that defendants obtained market access by supposedly "brib[ing]" Ministry officials—an allegation defendants deny—including by providing free medical goods. JA153. Plaintiffs allege that defendants undertook these transactions "to grow their market share in Iraq," JA139—not to support terrorism.

3. Plaintiffs sued, accusing defendants of committing and abetting terrorism under the ATA. JA632-33, 638-41; 18 U.S.C. § 2333(a), (d)(2). Plaintiffs claim defendants knew or should have known that the Sadrist Movement also had a militia, Jaysh al-Mahdi, that "infiltrated" the Ministry and "diverted" Ministry resources—including massive X-ray and MRI machines—to "finance Jaysh al-Mahdi." JA101, 139. Plaintiffs allege that Ministry procurement officials would "diver[t]" defendants' "funds, drugs, and medical devices" to Jaysh al-Mahdi, which committed hundreds of attacks against U.S. personnel in Iraq from 2005 to 2011. JA97, 163-64.

The district court dismissed the complaint. JA809. On the aiding-and-abetting claims, the court held that liability attaches only to attacks "committed, planned, or authorized by" specifically designated terrorist groups. JA830 (quoting 18 U.S.C. § 2333(d)(2)). Because the State Department

4

declined to so designate Jaysh al-Mahdi, no aiding-and-abetting liability could attach.  JA830.  The court also rejected the aiding-and-abetting claims because the ATA's "substantial assistance" requirement demands that defendants "assum[e] a 'role' in terrorist activities"—a fact the plaintiffs had not pled.  JA833 (citation omitted).

On the direct-liability claims, the court held that defendants failed to plead proximate causation.  JA826.  Plaintiffs' pleadings established only that defendants transacted with the Ministry, a sovereign, "independent intermediary" that was not a terrorist group.  JA826-27 (citation omitted).

4.  A panel of this Court reversed.  On aiding-and-abetting liability, the panel held that designated foreign terrorist organizations "plan[]" or "authorize[]" any attack committed by another group so long as the designated organization generally provides "weaponry, training, and knowledge" or "exert[s] religious, personal, and operational authority."  Add.59a-60a, 72a.  The panel further held that plaintiffs adequately alleged that defendants provided sufficiently culpable substantial assistance.  Add.72a.

On direct liability, the panel held that plaintiffs adequately alleged that defendants proximately caused hundreds of terrorist attacks.  Add.73a.  The panel held that a "defendant's position 'one step removed' from the terrorists

does not defeat proximate causation" if defendants' money ends up with terrorists—even if defendants give that money to a sovereign government. Add.79a (citation omitted).

Defendants sought rehearing en banc, which this Court denied. Order (Feb. 2, 2023).

5. Defendants petitioned for certiorari. Pet., No. 23-9 (S. Ct. June 30, 2023). The United States filed a brief recommending the Supreme Court grant, vacate, and remand in light of *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023). Per the United States, the panel failed to trace a "definable nexus" between defendants' alleged payments and the specific attacks that injured plaintiffs. U.S. Br. 14. Absent that nexus, the United States explained, the panel should have required a "greater showing" of "intentional aid that substantially furthered the tort." U.S. Br. 14 (citation omitted). The United States also faulted the panel for not considering whether plaintiffs' theory swept so broadly as to require a showing of "pervasive, systemic, and culpable aid." U.S. Br. 14-15 (citation omitted). The Supreme Court granted, vacated, and remanded. Add.9a.

6. On remand, the panel reaffirmed its prior opinion. On aiding-and-abetting liability, the panel acknowledged that plaintiffs cannot "trace"

whether defendants' payments facilitated any "specific attacks." Add.34a. But the panel nonetheless identified "a plainly discernable nexus between defendants' corrupt payments and Jaysh al-Mahdi's attacks" because defendants "provided financial assistance" to the Ministry generally over a nine-year time period, "money is fungible," and the complaint was "circumscribed" to attacks "in Iraq, even though Jaysh al-Mahdi carried out attacks elsewhere." Add.18a, 21a-23a (citation omitted).

On culpability, the panel recited *Taamneh*'s holding that "the more attenuated the nexus, the more courts should demand that plaintiffs show culpable participation through intentional aid." Add.18a (quoting 598 U.S. at 506). But despite the "indirect" nexus in this case, Add.34a, the panel held that allegations of mere "knowledge," as opposed to "specific intent," suffice under the ATA when a plaintiff alleges "unusual" conduct like bribery, Add.25a, 29a.

On direct liability, the panel reinstated its previous opinion that plaintiffs adequately pleaded proximate causation. In the panel's view, "*Taamneh* did not address the standard for direct liability under the ATA." Add.36a.

## ARGUMENT

### I.    The Panel's Aiding-and-Abetting Holding Requires Review

"The point of aiding and abetting is to impose liability on those who consciously and culpably participated in the tort at issue." *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 506 (2023). The panel's opinion did not hew to that limit in multiple ways and unleashes sprawling liability that threatens to undermine sensitive-foreign policy determinations and deter essential work abroad.

### A.    The Decision Eviscerates *Taamneh*'s Nexus Requirement

*Taamneh* requires that the defendant "aided and abetted *the act* of international terrorism that injured the plaintiffs"—*i.e.*, there should be a "definable nexus" to each specific attack. 598 U.S. at 497, 503. "[S]ubstantial assistance … to [an attacker's] activities in general" does not suffice. *Id.* at 503.

1. The panel resuscitated plaintiffs' claims despite acknowledging that plaintiffs cannot "trace" whether or how any of defendants' payments facilitated "specific attacks." Add.34a. In the panel's view, general aid is sufficient because defendants allegedly "provided financial assistance," "[m]oney is fungible," and any one payment from any one defendant *might* have aided any one attack. Add.21a (citation omitted). That holding defies *Taamneh*.

8

*First*, without an allegation linking payments to specific attacks, it is impossible to know whether "defendants actually aided and abetted each tort." *See Taamneh*, 598 U.S. at 506. Just last Term, in another context, the Supreme Court reversed this Court's holding that a plaintiff could point to "the fungibility of money" to establish a "nexus" with a defendant's funds. *See Republic of Hungary v. Simon*, 604 U.S. 115, 125, 133-34 (2025) (citation omitted). Here too, a defendant who provides "financial assistance" to an enterprise, Add.21a, has not necessarily assisted "the actionable wrong," *Taamneh*, 598 U.S. at 494-95. On the complaint's own telling, defendants provided only a tiny fraction of the Ministry's two billion dollars in funding. JA167-68; *e.g.*, JA182, 191, 203. And, according to the complaint, the Ministry spent its money on many entirely legitimate activities, like funding "every public-sector doctor" and distributing "drugs and devices" to patients. JA121, 140-41. Defendants cannot be held liable for *all* acts of wrongdoing committed by Jaysh al-Mahdi simply because *some* of the Ministry's money received from *some* unknown source *might be* linked to *some* unspecified terrorist attack.

The panel also reasoned that *Taamneh*'s nexus requirement must be weak because *Taamneh* noted that in some cases, "a defendant may be liable for 'other torts that were a foreseeable risk of [an] intended tort.'" Add.21a

9

(quoting 598 U.S. at 495-96). But as the United States told the Supreme Court in this case, that view "misunderstands the role of foreseeability under the common law and the ATA, as explained in *Taamneh*." U.S. Br. 15 n.1. At common law, courts would hold defendants liable where joint tortfeasors "act[ed] in concert in the execution of a common purpose" and the defendant's co-tortfeasors committed additional, foreseeable torts "to carry out their original unlawful plan." *Am. Fam. Mut. Ins. Co. v. Grim*, 440 P.2d 621, 625 (Kan. 1968), *cited in Taamneh*, 598 U.S. at 495-96. But nobody contends that defendants acted to further a common enterprise of violence with Jaysh-al-Mahdi.

*Second,* the panel's nexus holding nullifies the critical rule that a defendant cannot be held liable for "a broad category of misconduct" by a principal unless the defendant provided the principal "pervasive, systemic, and culpable" aid. *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 292 (2025) (quoting *Taamneh*, 598 U.S. at 502). *Taamneh* underscored this key check on runaway liability five times. 598 U.S. at 496, 501-02, 506.

Here, the panel did not suggest that defendants provided pervasive and systemic aid, but nonetheless allowed plaintiffs to pursue claims for all of

10

Jaysh al-Mahdi's conduct in the entire country of Iraq over the nine years defendants allegedly provided assistance. Add.22a-23a. The panel contended that such allegations are sufficiently "circumscribed temporally and geographically" to not trigger the pervasive-and-systemic requirement. Add.22a-23a. But *Smith & Wesson* held that the Mexican government's allegations of countrywide violence within Mexico required a showing of "pervasive, systemic, and culpable assistance." 605 U.S. at 294 (citation omitted). And while the *Taamneh* plaintiffs brought claims only for injuries caused by "the Reina nightclub attack," because those plaintiffs' "*theory*" would have permitted victims of other attacks to bring similar claims, the plaintiffs had to clear the pervasive-and-systemic bar. 598 U.S. at 484, 501 (emphasis added). The same should have been true here.

2. The panel's holding, which permits liability when there is neither a "definable nexus" nor "pervasive, systemic, and culpable" assistance, demands review. Under the panel's logic, because money is fungible, any transaction of any amount, if potentially diverted to terrorists, could establish a nexus to countless attacks, across an entire nation, over the course of years.

3. The panel's nexus holding conflicts with the Second Circuit's recent decision in *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420, 444 (2d

11

Cir. 2025). *First, Ashley* flatly "rejected the notion that … aiding-and-abetting liability [can] attach based on" a "fungibility theory." *Id.* (citation omitted). The plaintiffs there posited a nexus "theory based on money's fungibility: because [the defendants there] engaged in widespread money laundering for individuals and entities with an apparent or possible connection to terrorists, some of the money must have gone to the terrorists' violent activities." *Id.* But, the Second Circuit held, such a theory shows only a "possib[ility]" that a defendant's money "facilitate[d]" an attack, not the requisite "discernable nexus." *Id.*

*Second, Ashley* refused to accept allegations that, like here, "d[id] not spell out" the link between defendants' alleged assistance and "specific attack[s]" that injured plaintiffs. Add.23a, 34a. In the Second Circuit, "liability only attaches for aiding and abetting a particular terrorist attack." *Ashley*, 144 F.4th at 448.

The panel did not cite—much less distinguish—*Ashley* despite defendants' bringing the case to the panel's attention. *See* Defs.' July 24, 2025, Rule 28(j) Letter. Liability for terrorism should not turn on the forum in which plaintiffs choose to sue.

12

## B.    The Panel's Culpability Holding Likewise Flouts Supreme Court Precedent

*Taamneh* reemphasized the common-law rule that aiding-and-abetting liability reaches only "those who consciously and culpably participated in the tort at issue."  598 U.S. at 506.  Where, as here, the nexus is "somewhat indirect," Add.34a, conscious and culpable participation must be shown "through *intentional* aid that substantially furthered the tort," *Taamneh*, 598 U.S. at 506 (emphasis added).  But no matter what, the defendant must have "'participate[d]' in [the] wrongful act *so as to help 'make it succeed.'"  Id.* at 493 (first alteration in original) (emphasis added) (citation omitted).  "[G]eneral awareness" of wrongdoing is insufficient.  *See id.* at 503-04.

1.    The panel evaded *Taamneh*'s culpable-participation standard by deeming allegations of general awareness sufficient if they are coupled with allegations of "unusual" conduct.  Add.29a-31a.  That is wrong and undermines *Taamneh*'s repeated efforts to enforce traditional limits on secondary liability.

The panel grounded its "unusualness" exception in *Taamneh*'s observation that the provision of "routine services … in an unusual way" "may" in some circumstances show culpability.  598 U.S. at 502.  But *Taamneh* did not mean that any unusualness suffices.  The illustrative example *Taamneh* provided involved activity where the unusualness indicated a desire to help the

13

tortious conduct succeed: A morphine wholesaler became a coconspirator in illegal morphine distribution by selling doctors *400 times* ordinary dosages. *Direct Sales Co. v. United States*, 319 U.S. 703, 706-07 (1943), *cited in Taamneh*, 598 U.S. at 502. Those unusual quantities of that "restricted commodit[y]" were relevant because they "show[ed]" that the seller "*intends* to further, promote and cooperate in" illegal narcotics trafficking. *Id.* at 710-13 (emphasis added). And indeed, the seller there "profit[ed]" from the ultimate illegal distribution of morphine. *Id.* at 713. As the Supreme Court recently reiterated, the unusual conduct in *Direct Sales* was relevant because it indicated that the defendant and wrongdoer "join[ed] both mind and hand" regarding the ultimate tort. *See Smith & Wesson*, 605 U.S. at 281-82 (quoting *Direct Sales*, 319 U.S. at 713).

There is no similar allegation here. To the contrary, the panel held only that the alleged "bribes" furthered the goal of ensuring the Ministry would "purchase … pharmaceuticals," not fund terrorism. Add.30a. Indeed, according to the complaint's own allegations, the commissions the panel calls "bribes" were not "unusual" at all; the complaint alleges they were required by the Ministry, JA98-100, a common part of the procurement process used in the Middle

14

East, JA140, and the only way to get cancer medications, antibiotics, and X-ray machines into war-torn Iraq, JA98-100, 178-79, 197-98, 215-16, 228-29.

2. The panel's culpability holding demands review. "*Taamneh* did not approve imposing liability whenever a plaintiff can identify an atypical transaction with an organization that affiliates with terrorists." U.S. Br. 18-19. But if the panel's decision stands, that could be the rule in the D.C. Circuit.

3. The panel's culpability holding again squarely conflicts with the Second Circuit's decision in *Ashley*. The Second Circuit rejected the argument that a bank aided and abetted terrorist attacks, even though the bank *continued* to provide services to a terrorist-linked company after "members of the U.S. military" urged the bank "to stop providing banking services" and "save American lives." *Ashley*, 144 F.4th at 429-30, 440. A specific warning from "members of the U.S. military" is far more indicative of culpability than the panel's potpourri of "propaganda posters," "investigative reporting," and "corporate security group" research. Add.26a-28a. Instead, *Ashley*, unlike the panel here, held that an aiding-and-abetting "claim requires 'intent to further [the terrorist organization's] terrorist activities.'" 144 F.4th at 444 (citation omitted). And plaintiffs' allegations of Ministry-standard "commissions" here can hardly be considered more "unusual" than the "money laundering" of

15

funds "likely to end up in the [terrorists'] pile of resources" at issue in *Ashley*.
*Id.* at 445. Again, the panel declined to even attempt to distinguish *Ashley*.

### C.    The Decision Flouts the ATA's Requirement that Designated Terrorists Be Directly Involved in the Attacks

The ATA limits liability to defendants who aid and abet attacks "committed, planned, or authorized by" a "designated" "foreign terrorist organization." 18 U.S.C. § 2333(d)(2). The panel here reinstated its prior decision, which gutted that limitation—and dragged this Court into yet another split.

1. The United States has never designated Jaysh-al-Mahdi as a foreign terrorist organization. Add.50a. But in the panel's view, that foreign-policy decision is irrelevant. Add.13a. The panel reaffirmed its holding that designated foreign terrorist organizations "plan[] or authorize[]" attacks by (1) generally providing "weaponry, training, and knowledge," Add.59a, or (2) "declaring a religious duty" to carry out attacks, Add.60a. Because Hezbollah, a designated group, allegedly provided such training and inspiration here, the panel attributed *every* Jaysh al-Mahdi attack to Hezbollah. Add.60a.

The panel's interpretation flouts the ATA's requirement that the designated group *itself* "commit[], plan[], or authorize[]" the "act" of terrorism. 18 U.S.C. § 2333(d)(2). The ordinary meaning of those words is that the designated group must carry out, direct, or sign off on the relevant attack, not

16

provide general support or inspiration. It would be passing strange if, as *Taamneh* held, general support to an enterprise were not enough to aid and abet an attack, *see* 598 U.S. at 494-95, but somehow enough to "commit[], plan[], or authorize[]" an attack.

2. This error demands review. The panel's interpretation vastly expands the universe of ATA liability. It transforms groups that the Executive Branch *declined* to designate into de facto foreign terrorist organizations. And it strips defendants of guidance about whom they can and cannot work with. Anyone can consult the State Department's list of designated organizations. But companies and nonprofits may not know which groups are trained by, inspired by, or in communication with designated organizations.

3. Contrary to the panel's decision, the Sixth and Eleventh Circuits both hold that a designated organization cannot plan or authorize an attack it does not "kn[o]w about … beforehand." *Colon v. Twitter, Inc.*, 14 F.4th 1213, 1222 (11th Cir. 2021); *accord Crosby v. Twitter, Inc.*, 921 F.3d 617, 626 (6th Cir. 2019). Here, plaintiffs never claim Hezbollah knew in advance of the vast majority of Jaysh-al-Mahdi's attacks.

## II. The Panel's Attenuated Proximate-Causation Standard for Direct Liability Also Requires Review

To establish direct liability, the ATA requires plaintiffs "plausibly to allege proximate causation"—that each defendant itself proximately caused each plaintiff's injuries. *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 391 (7th Cir. 2018); 18 U.S.C. § 2333(a). The panel vitiated that requirement by holding that transactions with a sovereign government multiple steps removed from terrorist acts can support direct liability. No other circuit would accept allegations that the world's leading pharmaceutical and medical-supply companies are directly liable for militants' attacks on U.S. servicemembers by reason of work with a U.S.-supported foreign government.

1. The panel erred in reinstating its holding that plaintiffs adequately pleaded proximate causation. Add.35a. That holding—that the ATA's proximate-causation standard is satisfied when goods foreseeably "find[] [their] way into terrorist hands," Add.76a—was plainly wrong. Allegations that defendants provided medicine and medical equipment to the Ministry of Health that Jaysh al-Mahdi "looted and sold" does not establish proximate causation of subsequent attacks on U.S. servicemembers. JA147, 170, 189. Particularly so given the legitimate governmental role of the Ministry, which breaks any

18

causal chain between defendants' interactions and transactions with the Ministry and Jaysh al-Mahdi's subsequent attacks.

*Taamneh* made that holding even less tenable. Even *aiding-and-abetting liability* does not attach where the asserted "causal chain is simply too remote." *Ofisi v. BNP Paribas, S.A.*, 77 F.4th 667, 675 (D.C. Cir. 2023) (quotation omitted). *A fortiori*, if defendants' alleged acts are too remote for aiding-and-abetting liability, *see supra* pp.8-11, they are too remote for direct liability—a point the United States deems "reasonabl[e]," U.S. Br. 21.

2. The panel's error demands review. If plaintiffs' allegations "demonstrat[e] a substantial connection between the defendant[s] and terrorism," *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 275 (D.C. Cir. 2018), the floodgates are open. Any entities that deal with governments or organizations allegedly co-opted or fleeced by terrorists could themselves be treated as "terrorists." That risk would inevitably chill assistance. And as it did in this case, the United States routinely urges businesses to rebuild fragile countries to aid American foreign policy. *See* U.S. Br. 4-5. Under the panel's rule, however, the safer course is to withhold help altogether. Chamber Br. 30-31; Charity Br. 34-35.

19

3. Each of the four other circuits to consider the question have rejected direct liability for acts of terrorism based on transactions lacking direct links to attacks. The Second and Seventh Circuits hold that business transactions with state sponsors of terrorism do not establish proximate causation, even where the foreign sovereign allegedly "control[s]" the terrorist group or supplies weapons used in the relevant attacks. *Kemper*, 911 F.3d at 387; *Rothstein v. UBS AG*, 708 F.3d 82, 85 (2d Cir. 2013). While the panel previously distinguished *Kemper* and *Rothstein* as involving sovereigns with multiple legitimate agencies, Add.76a, plaintiffs here concede that the Ministry performed legitimate healthcare functions to which defendants' funding flowed, *e.g.*, JA121, JA141. The Ministry plainly did not "exist solely to perform terrorist acts." *See Kemper*, 911 F.3d at 392.

And the panel's novel holding that transactions with sovereign governments "one step removed" from actual terrorists supports direct liability, Add.79a, takes this Court further out of step with the Second, Sixth, and Ninth Circuits, who "routinely dismiss" ATA claims without "a direct link between the defendants and the individual perpetrator," *see Crosby*, 921 F.3d at 625, 627 n.7; *In re Terrorist Attacks*, 714 F.3d 118, 124 (2d Cir. 2013); *Fields v. Twitter, Inc.*, 881 F.3d 739, 749-50 (9th Cir. 2018).

Absent this Court's intervention, the panel's minority rule could govern every ATA suit, given the ATA's broad venue rules, which require only one plaintiff from the forum or one defendant with an agent in the forum.  18 U.S.C. § 2334(a).

## CONCLUSION

The petition for rehearing en banc should be granted.

Respectfully submitted,

/s/ Lisa S. Blatt

KANNON K. SHANMUGAM
WILLIAM T. MARKS
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
  *2001 K Street, N.W.*
  *Washington, DC 20006*
  *(202) 223-7300*

*Counsel for Johnson & Johnson,*
*Cilag GmbH International, Ethicon*
*Endo-Surgery, LLC, Ethicon, Inc.,*
*Janssen Ortho LLC, Janssen*
*Pharmaceutica NV, Johnson &*
*Johnson (Middle East) Inc., and*
*Ortho Biologics LLC*

JESSICA S. CAREY
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
  *1285 Avenue of the Americas*
  *New York, NY 10019-6064*
  *United States*
  *(212) 373-3000*

*Counsel for Johnson & Johnson,*
*Cilag GmbH International, Ethicon*
*Endo-Surgery, LLC, Ethicon, Inc.,*
*Janssen Ortho LLC, Janssen*
*Pharmaceutica NV, Johnson &*
*Johnson (Middle East) Inc., and*
*Ortho Biologics LLC*

LISA S. BLATT
  *Counsel of Record*
CHRISTOPHER N. MANNING
CHARLES L. MCCLOUD
MELISSA B. COLLINS
ROHIT P. ASIRVATHAM
R. SHANE ROBERTS, JR.
WILLIAMS & CONNOLLY LLP
  *680 Maine Avenue SW*
  *Washington, DC 20024*
  *(202) 434-5000*
  *lblatt@wc.com*

*Counsel for Pfizer Inc., Pfizer*
*Pharmaceuticals LLC, Pfizer*
*Enterprises SARL, Pharmacia &*
*Upjohn Company LLC, and Wyeth*
*Pharmaceuticals LLC*

DAVID M. ZIONTS
LELIA A. LEDAIN
COVINGTON & BURLING LLP
  *One City Center*
  *850 Tenth Street, N.W.*
  *Washington, DC 20001*
  *(202) 662-5312*

*Counsel for F. Hoffmann-La Roche*
*Ltd*

22

JOHN B. BELLINGER III
DAVID J. WEINER
ARNOLD & PORTER
KAYE SCHOLER LLP
  601 Massachusetts Ave., N.W.
  Washington, DC 20001
  (202) 942-5000

ROBERT REEVES ANDERSON
ARNOLD & PORTER
KAYE SCHOLER LLP
  1144 Fifteenth Street,
  Suite 3100
  Denver, CO 80202-1370
  (303) 863-2325

*Counsel for GE Healthcare USA
Holding LLC, GE Medical Systems
Information Technologies, Inc., and
GE Medical Systems Information
Technologies GmbH*

FEBRUARY 23, 2026

DAVID W. BOWKER
DONNA M. FARAG
WILMER CUTLER PICKERING
HALE AND DORR LLP
  2100 Pennsylvania Ave., NW
  Washington, DC 20037
  (202) 663-6000

*Counsel for Genentech, Inc. and
Hoffmann-La Roche Inc.*

LARA SAMET BUCHWALD
DAVID B. TOSCANO
CRAIG T. CAGNEY
DAVIS POLK & WARDWELL LLP
  450 Lexington Avenue
  New York, NY 10017
  (202) 450-4292

*Counsel for AstraZeneca Pharma-
ceuticals LP and AstraZeneca UK
Limited*

23

## CERTIFICATE OF COMPLIANCE WITH
## TYPEFACE AND WORD-COUNT LIMITATIONS

I, Lisa S. Blatt, counsel for Defendants-Appellees and a member of the Bar of this Court, certify pursuant to Federal Rule of Appellate Procedure 32(g) that the foregoing Petition for Rehearing En Banc is proportionally spaced, has a serif typeface of 14 points or more, and contains 3,886 words.

/s/ Lisa S. Blatt
LISA S. BLATT

## CERTIFICATE OF SERVICE

I, Lisa S. Blatt, certify that on February 23, 2026, a copy of the foregoing Petition for Rehearing En Banc was filed with the Clerk and served on all parties through the Court's electronic filing system.  I further certify that all parties required to be served have been served.

/s/ Lisa S. Blatt
LISA S. BLATT

**ADDENDUM**

# TABLE OF CONTENTS

Opinion, D.C. Cir. No. 20-7077 (Jan. 23, 2026) ....................................................1a

Opinion, D.C. Cir. No. 20-7077 (Jan. 4, 2022) ....................................................38a

Certificate of Parties and Amici Curiae ..........................................................99a

Disclosure Statement .................................................................................101a

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 19, 2024        Decided January 23, 2026

No. 20-7077

JOSHUA ATCHLEY, ET AL.,
APPELLANTS

v.

ASTRAZENECA UK LIMITED, ET AL.,
APPELLEES

———

On Remand from the Supreme Court of the United States

———

Joshua D. Branson argued the cause for appellants. With him on the supplemental briefs were *David C. Frederick*, *Andrew E. Goldsmith*, and *Derek C. Reinbold*.

*Stephen I. Vladeck* was on the supplemental brief for *amici curiae* Law Professors in support of appellants.

*Lisa S. Blatt* argued the cause for appellees. With her on the supplemental briefs were *Kannon K. Shanmugam*, *Jeh C. Johnson*, *William T. Marks*, *Christopher N. Manning*, *Sarah M. Harris*, *Melissa B. Collins*, *Aaron Z. Roper*, *Jessica S. Carey*, *John B. Bellinger III*, *David J. Weiner*, *Robert Reeves Anderson*, *David M. Zionts*, *David W. Bowker*, *Catherine M.A.*

1a

*Carroll*, *Donna M. Farag*, *Paul S. Mishkin*, and *David B. Toscano*. *Alex Young K. Oh* entered an appearance.

*Jordan L. Von Bokern*, *Andrew J. Pincus*, and *Robert W. Hamburg* were on the brief for *amicus curiae* The Chamber of Commerce of the United States of America in support of appellees.

*Timothy P. Harkness*, *Kimberly H. Zelnick*, *Scott A. Eisman*, *Adam Rosenfeld*, *Maria Slobodchikova*, and *Elischke De Villiers* were on the brief for *amicus curiae* Charity & Security in support of appellees.

Before: PILLARD and WILKINS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*:  The terrorist group Jaysh al-Mahdi injured or killed hundreds of United States service members and civilians as part of its years-long campaign to harm Americans and drive the United States military out of Iraq.  Plaintiffs are victims of Jaysh al-Mahdi's attacks and family members of victims.  During the period in which the victims were attacked, Jaysh al-Mahdi openly controlled Iraq's Ministry of Health (Ministry) and used it as a vehicle to direct terrorist activity against Americans.  Plaintiffs claim defendants, large pharmaceutical and medical equipment manufacturers and suppliers, knowingly gave substantial assistance to the attacks that injured them, violating the Anti-Terrorism Act (ATA), as amended by the Justice Against Sponsors of Terrorism Act, and state law.

Plaintiffs allege that defendants assisted Jaysh al-Mahdi by doing business with the Ministry in an unusual and unlawful

2a

way, to the benefit of the terrorist group.  According to the complaint, defendants paid illegal cash bribes directly to the group and supplied extra, off-the-books batches of valuable medical goods that Jaysh al-Mahdi monetized on the black market to fund its operations against Americans.  As they did so, defendants knew that the funds and goods they were gratuitously providing to Jaysh al-Mahdi financed its attacks against Americans, including the victims in this case. Defendants' agents finalized contracts at in-person meetings at the Ministry, where conspicuous displays of Jaysh al-Mahdi weaponry, fighters, and propaganda made clear who was in charge.  And defendants' compliance personnel had access to contemporaneous reports in mainstream media that detailed the terrorists' control of the Ministry and their use of cash and in-kind bribes to fund attacks.  Over the period in question, plaintiffs allege defendants repeatedly and voluntarily renewed contracts with and provided illegal bribes to Jaysh al-Mahdi, with payments occurring on the heels of attacks against Americans and providing support for further attacks.

The district court held that the complaint failed to state claims for either primary (direct) or secondary (aiding-and-abetting) liability under the ATA and that the court lacked personal jurisdiction over six foreign defendants.  On appeal, we reversed, holding that plaintiffs had pleaded facts sufficient to support their aiding-and-abetting claims, that plaintiffs had adequately pleaded that defendants' payments to Jaysh al-Mahdi proximately caused plaintiffs' injuries on the direct liability claims, and that U.S. federal courts had personal jurisdiction over the foreign defendants.  Shortly afterward, the Supreme Court granted defendants' petition for a writ of certiorari, vacated our decision, and remanded the case to us for further consideration in light of *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), which clarified the scope of secondary liability under the ATA.

Having considered *Taamneh* and with the aid of supplemental briefing and oral argument, we reverse the district court's dismissal of plaintiffs' secondary liability claims. Secondary liability under the ATA, as interpreted by *Taamneh*, requires conscious, voluntary, and culpable participation in another's tortious activity to ensure liability is limited to conduct that is genuinely blameworthy. It also requires a nexus between defendants' assistance and the acts of international terrorism that injure plaintiffs. Liability does not attach to those who, like the *Taamneh* defendants, passively and tangentially aid terrorists in the ordinary course of their business. This complaint, however, describes conduct that is far from "business as usual"—with allegations sufficient to satisfy both of *Taamneh*'s requirements. Plaintiffs adequately allege that defendants' participation was conscious, voluntary, and culpable: Defendants knew their assistance would be used to launch attacks on plaintiffs, and they repeatedly structured their transactions in an unusual and unlawful manner that served to facilitate Jaysh al-Mahdi's operations. Plaintiffs clearly identify a nexus between the alleged attacks and defendants' direct cash and in-kind payments to Jaysh al-Mahdi. The attacks, which were a discrete subset of Jaysh al-Mahdi's terrorist activities, were a natural and virtually inevitable consequence of defendants' unusual, corrupt, and plentiful assistance.

*Taamneh* did not address the standard for direct liability under the ATA and so we reinstate our holding on the direct liability claims that plaintiffs adequately pleaded that defendants' payments to Jaysh al-Mahdi proximately caused plaintiffs' injuries. Defendants did not challenge (nor did *Taamneh* address) our holdings that the manufacturer defendants were not too remote from the conduct alleged to be held liable and that certain foreign defendants were subject to the personal jurisdiction of U.S. federal courts. Accordingly,

4a

we do not disturb those holdings and remand to the district court for further proceedings consistent with our opinions.

## I.

The factual and procedural background of this case is spelled out in prior opinions. *See Atchley v. AstraZeneca UK Ltd.*, 474 F. Supp. 3d 194 (D.D.C. 2020); *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204 (D.C. Cir. 2022). We assume familiarity with those opinions and recapitulate the facts and procedural history most relevant following the Supreme Court's remand. The facts are drawn from plaintiffs' complaint and are assumed true for the purposes of reviewing defendants' motion to dismiss. *See Schubarth v. Fed. Republic of Germany*, 891 F.3d 392, 395 (D.C. Cir. 2018).

In 2003, the United States invaded Iraq. Even before the invasion, Hezbollah—a Lebanese group designated as a Foreign Terrorist Organization under U.S. law since 1997—made plans to undermine the expected U.S. presence. From April 2003, Hezbollah's "chief terrorist mastermind, Imad Mugniyeh," collaborated with the powerful Shiite cleric Muqtada al-Sadr to establish a fighting force in Iraq to violently expel the Americans. Third Am. Compl. ¶ 56 (J.A. 115).

Sadr modeled his movement in Iraq, the "Sadrist Trend," on Hezbollah. Each group had a political wing and a terrorist wing. In each, the two wings were closely connected, sharing funding and leadership. Jaysh al-Mahdi, the terrorist wing of the Sadrist Trend, was a deadly force in Iraq. Its attacks likely killed over five hundred Americans and injured many more. As Jaysh al-Mahdi took root and grew, Hezbollah recruited, trained, and armed its fighters and helped it plan and carry out operations in Iraq. By July 2007, General David Petraeus concluded that Jaysh al-Mahdi was "more of a hindrance to

long-term security in Iraq" than was al-Qaeda in Iraq.  *Id.* ¶ 62 (J.A. 118) (quoting Michael R. Gordon & Gen. Bernard E. Trainor, *The Endgame: The Inside Story of the Struggle for Iraq, From George W. Bush to Barack Obama* 422 (1st ed. 2012)).

In the immediate aftermath of the fall of Saddam Hussein's regime, the Sadrists set their sights on the Iraqi Ministry of Health and Kimadia, Iraq's state-owned import company, as sources of power and funding.  Sadrists began assuming key positions throughout the Ministry and purging employees disloyal to them in early 2004.  Jaysh al-Mahdi's influence thus spread throughout the Ministry.  According to one insider, at the height of the group's control, the Ministry employed an estimated 70,000 Jaysh al-Mahdi members.  In 2005, after Sadrists won enough seats in parliamentary elections, Jaysh al-Mahdi solidified full control over the Ministry.

Jaysh al-Mahdi used the Ministry as a front and headquarters for its campaign of terrorist violence.  For example, the organization converted the nation's public hospitals "into terrorist bases where Sunnis were abducted, tortured, and murdered."  *Id.* ¶ 3 (J.A. 98).  Ministry ambulances transported terrorist "death squads" around Baghdad.  *Id.*  And the Deputy Minister of Health converted the Ministry's Facilities Protection Service into a division of Jaysh al-Mahdi, deploying its officers to torture and kill Sadr's enemies. *See id.*  Jaysh al-Mahdi's dominance was obvious to anyone physically present at Ministry headquarters: "Death to America" slogans adorned the halls, armed Jaysh al-Mahdi fighters freely roamed while Americans could not safely enter, and Jaysh al-Mahdi's flag flew at the entrance.  *Id.* ¶¶ 3, 10 (J.A. 98, 101).  Plaintiffs contend that the Ministry "functioned more as a terrorist apparatus than a health organization" during the relevant period.  *Id.* ¶ 3 (J.A. 98).  Sadrist control over the

6a

Ministry and Kimadia "was at its apex from late 2004 through 2008," during which time "there was no meaningful distinction between" the Ministry and Jaysh al-Mahdi. *Id.* ¶ 104 (J.A. 134). In 2008, a different political party assumed control of the Ministry, but Jaysh al-Mahdi kept "de facto control" of the Ministry's contracting process until at least 2013. *Id.*

Jaysh al-Mahdi used its control of the Ministry to obtain financing for its terrorist activities by securing bribes from defendants in the medical-goods procurement process. Between 2004 and 2013, defendants, who are pharmaceutical and medical equipment manufacturers and their affiliated suppliers, allegedly made illegal payments in both cash and goods to Jaysh al-Mahdi, following methods already familiar from defendants' corrupt dealings with Kimadia under the earlier Oil-for-Food program during Saddam Hussein's reign. First, defendants paid cash bribes (called "commissions") to Jaysh al-Mahdi in order to obtain lucrative Kimadia contracts. These "commissions" were typically 20 per cent of any contract price. "The Sadrists extracted their 'commissions' from foreign medical-goods companies by using their leverage over multiple points of the transaction lifecycle." *Id.* ¶ 145 (J.A. 154). Second, defendants gave the Ministry extra, off-the-books batches of drugs and medical devices for free on top of the quantities Kimadia paid for. Free goods packaged alongside the paid goods, but which nobody expected to appear in the Ministry's inventory, were readily available to Jaysh al-Mahdi to provide to its fighters and sell on the black market.

The constant stream of bribes and free goods helped finance Jaysh al-Mahdi's terrorist attacks on U.S. nationals, including the victims in this case. The complaint details hundreds of individual acts of international terrorism committed by Jaysh al-Mahdi between 2005 and 2009 that killed or permanently maimed the victims. Virtually all the

7a

attacks took place within Baghdad neighborhoods like Sadr City that were well known to be Jaysh al-Mahdi strongholds. And some attacks even took place in the immediate vicinity of the Ministry's headquarters in eastern Baghdad.

Defendants allegedly knew that their bribe payments and free good shipments were being used to fund Jaysh al-Mahdi and its numerous attacks on the victims in this case. Defendants' local agents, often called "Scientific Bureaus," finalized their contracts at the Ministry headquarters surrounded by terrorist propaganda and other indicia of Jaysh al-Mahdi's control. *Id.* ¶¶ 148-49, 180 (J.A. 155-56, 170). And, as sophisticated global businesses, defendants had corporate security and compliance operations keeping them abreast of risks in the markets they served. As part of those efforts, plaintiffs plausibly allege, defendants would have also become aware of frequent mainstream media reports describing Sadr's control of the Ministry and use of that position to launch terrorist attacks against Americans. Knowledge of Jaysh al-Mahdi's control was so widespread that some U.S. government personnel in Iraq referred to Jaysh al-Mahdi as "The Pill Army" because its fighters were sometimes paid in drugs that they either consumed or sold for cash on the black market. *Id.* ¶ 9 (J.A. 101).

Plaintiffs each assert two primary liability and two secondary liability claims under the ATA, as well as a variety of state-law claims arising from the same conduct. As noted above, the district court dismissed all of plaintiffs' claims and dismissed the foreign defendants for lack of personal jurisdiction. We reversed the district court on three points of law. First, we held that plaintiffs pleaded facts sufficient to support their secondary liability claims against the motion to dismiss for failure to state a claim. Specifically, plaintiffs adequately alleged that Hezbollah, a designated Foreign

Terrorist Organization, planned or authorized the relevant attacks as required under the ATA and that defendants knowingly provided substantial assistance to Jaysh al-Mahdi. Second, with respect to the direct liability claims, we reversed the district court's holding that the Ministry itself was an "independent intermediary" defeating proximate causation. *See Atchley*, 474 F. Supp. 3d at 209.  We held that plaintiffs adequately pleaded that defendants' payments to Jaysh al-Mahdi proximately caused the victims' injuries and remanded to the district court to consider in the first instance whether plaintiffs also alleged that defendants themselves committed any acts of international terrorism (for example, by financing or providing material support for terrorism) within the meaning of the ATA.  Finally, we held that U.S. federal courts had constitutional authority to exercise specific personal jurisdiction over the foreign supplier defendants because plaintiffs' claims "arise out of or relate to" those defendants' contacts with the United States.

Shortly thereafter, the Supreme Court decided *Taamneh*, which clarified the scope of secondary liability under the ATA. Defendants petitioned for a writ of certiorari, which the Supreme Court granted, vacating our judgment and remanding the case for further consideration in light of *Taamneh*.

## II.

We review *de novo* the district court's dismissal of the amended complaint for failure to state a claim, *Owens v. BNP Paribas, S.A. (Owens IV)*, 897 F.3d 266, 272 (D.C. Cir. 2018), and for lack of personal jurisdiction, *Livnat v. Palestinian Auth.*, 851 F.3d 45, 48 (D.C. Cir. 2017).  We assume the truth of plaintiffs' factual allegations and draw all reasonable inferences in plaintiffs' favor. *Owens IV*, 897 F.3d at 272.  We begin by addressing plaintiffs' claims under the ATA for both

secondary and direct liability and conclude by addressing personal jurisdiction.

**A.**

The ATA recognizes a private right of action in tort for United States nationals injured by acts of international terrorism. It authorizes victims of terrorism to recover against anyone shown to have played a primary (direct) or secondary (aiding-and-abetting) role in terrorist acts.

Plaintiffs assert both types of liability against defendants. Needless to say, plaintiffs do not allege that the defendant companies directly maimed or killed the victims; the claim is that the companies provided funds and goods that substantially assisted those who did. Specifically, plaintiffs contend that defendants repeatedly and directly provided cash bribes and discounted or free drugs and medical supplies to Jaysh al-Mahdi during a period when the group was known to have commandeered the Ministry of Health and adopted it as a base for an ongoing campaign of terrorist attacks against U.S. nationals. Plaintiffs allege defendants knowingly and substantially aided Jaysh al-Mahdi through their persistent and illegal business practices: For instance, plaintiffs allege that some of defendants' bribes to Jaysh al-Mahdi officials were disguised as "free goods" "packaged . . . in a manner conducive to street resale" and provided off the books. Compl. ¶ 5 (J.A. 99). The victims, as U.S. nationals, were the targets of Jaysh al-Mahdi's terrorist campaign to intimidate Americans and drive U.S. forces out of Iraq.

The ATA as originally enacted authorized suit by "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism." 18 U.S.C. § 2333(a). As relevant here, the "by

reason of" language in the statute requires "some causal connection between the act of international terrorism and the U.S. national's injury." *Owens IV*, 897 F.3d at 270. The statute made no explicit reference to tort liability for aiders and abettors. *See id.* at 277. Some courts, including ours, interpreted that silence as barring such liability, applying a general presumption that Congress does not intend aiding-and-abetting liability without expressly saying so. *See, e.g.*, *id.* at 277-78; *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013); *see also Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 182 (1994) ("[W]hen Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors.").

In 2016, Congress amended the ATA via the Justice Against Sponsors of Terrorism Act (JASTA) to establish aiding-and-abetting liability for anyone who "knowingly provid[es] substantial assistance" to acts of international terrorism. 18 U.S.C. § 2333(d). The JASTA's express objective is:

> to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States.

JASTA, Pub. L. No. 114-222, § 2(b), 130 Stat. 852, 853 (2016) (Amendment). The statute names our decision in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), as providing the

11a

"proper legal framework for how such liability should function." Amendment § 2(a)(5). In the JASTA, Congress also added an element to prove secondary liability that was not required for direct liability under the ATA: It confined aiding-and-abetting liability to injuries in which a designated Foreign Terrorist Organization, denominated as such under U.S. law, played a specified role. *See* 18 U.S.C. § 2333(d)(2).

Having considered the Supreme Court's interpretation of section 2333(d) in *Taamneh* and with the aid of supplemental briefing and oral argument, we hold that plaintiffs sufficiently allege secondary liability.

**1.**

Secondary liability for aiding and abetting "reaches persons who do not engage in the proscribed activities at all, but who give a degree of aid to those who do." *Cent. Bank of Denver*, 511 U.S. at 176. As relevant here, the ATA as amended by the JASTA provides for secondary liability against "any person who aids and abets, by knowingly providing substantial assistance" to "an act of international terrorism." 18 U.S.C. § 2333(d)(2). Aiding-and-abetting liability is confined to "an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189)." *Id*.

To state a claim of aiding and abetting under the ATA, plaintiffs thus need to plead three statutory elements: (1) an injury arising from an act of international terrorism; (2) which act was committed, planned, or authorized by a designated Foreign Terrorist Organization; and (3) that defendants aided or abetted the act of international terrorism by knowingly providing substantial assistance.

12a

As to the first of those elements, defendants' initial appeal did not challenge the sufficiency of plaintiffs' allegations that plaintiffs each suffered injury from an act of international terrorism. *See Atchley*, 22 F.4th at 216. As to the second, defendants' supplemental briefing provides no basis for revisiting our prior holding that plaintiffs successfully alleged that Hezbollah, a designated Foreign Terrorist Organization, "planned and authorized" the attacks, *id*. at 218-19, so we hereby reinstate it. Defendants dispute here only the third element of the aiding-and-abetting claim: whether they knowingly and substantially assisted the attacks against the victims through their alleged corrupt and illegal payments and gifts to Jaysh al-Mahdi. We begin our analysis of the adequacy of plaintiffs' complaint as to that element with an overview of the salient aspects of the Supreme Court decision in *Taamneh* clarifying the framework for analyzing that third element.

**a.**

In *Taamneh*, the Supreme Court addressed a secondary liability claim under the amended ATA that sought to impose aiding-and-abetting liability on a company that failed to exclude terrorists from its generally available services. Family members of an American killed in a 2017 terrorist attack on the Reina nightclub in Istanbul—perpetrated by a member of the Islamic State of Iraq and Syria (ISIS)—sued Twitter, Facebook, and Google, alleging that ISIS had used defendants' social media platforms to recruit terrorists, raise funds, and spread propaganda. *Taamneh*, 598 U.S. at 478. Plaintiffs did not allege "that defendants treated ISIS any differently from anyone else" using their platforms: ISIS "was able to upload content to the platforms and connect with third parties, just like everyone else" on the platforms, and "defendants' recommendation algorithms matched ISIS-related content to users most likely to be interested in that content—again, just

13a

like any other content." *Id.* at 500. Plaintiffs did not allege that ISIS used defendants' platforms to plan or coordinate the Reina attack. *Id.* at 498. Instead, plaintiffs sought to hold the companies liable for aiding and abetting terrorism based solely on allegations that they knew ISIS, a designated foreign terrorist organization, was generally using the companies' platforms and recommendation algorithms to reach new audiences, yet failed to take steps to stop the organization or its members from doing so. *Id.* at 481-82. That theory lacked any nexus to the attack on the Reina nightclub; it would "necessarily hold defendants liable as having aided and abetted each and every ISIS terrorist act committed anywhere in the world." *Id.* at 501.

The Court concluded that plaintiffs failed to plausibly allege that defendants aided and abetted ISIS in carrying out the Reina nightclub attack. *Id.* at 478. To arrive at that conclusion, the Court examined the ATA's language attaching liability to "any person who aids and abets, by knowingly providing substantial assistance, . . . an act of international terrorism." *Id.* at 483 (quoting 18 U.S.C. § 2333(d)(2)). The Court addressed two central questions: "First, what exactly does it mean to 'aid and abet'? Second, what precisely must the defendant have 'aided and abetted'?" *Id.* at 484.

Responding to the first question, the Court noted that while the ATA does not define "aids and abets," those terms "are familiar to the common law." *Id.* (citing *Cent. Bank of Denver*, 511 U.S. at 181). What is more, Congress specified our aiding-and-abetting decision in *Halberstam* as providing the "proper legal framework for how such liability should function." *Id.* at 485 & n.6 (citing Amendment § 2(a)(5), and *Halberstam*, 705 F.2d 472). As relevant in *Taamneh* and here, *Halberstam* synthesized three key elements from the common law: (1) The party whom the defendant aids must perform a wrongful act

14a

that causes an injury; (2) the defendant must be generally aware of its role as part of an overall illegal scheme or tortious activity at the time the defendant provides assistance; and (3) the defendant must knowingly and substantially assist the principal violation. *Id.* at 486. *Halberstam* articulated six further factors to help determine whether a defendant's assistance was "substantial": "(1) the nature of the act assisted, (2) the amount of assistance provided, (3) whether the defendant was present at the time of the principal tort, (4) the defendant's relation to the tortious actor, (5) the defendant's state of mind, and (6) the duration of the assistance given." *Id.* at 486-87 (internal quotation marks and citation omitted).

At the same time, the Court in *Taamneh* warned that the elements and factors in *Halberstam* "should not be accepted as immutable components" of aiding-and-abetting liability and may "be merged or articulated somewhat differently without affecting their basic thrust." *Id.* at 487 (internal quotation marks and citation omitted). The Court stressed that aiding-and-abetting liability in *Halberstam* arose from a "distinctive fact pattern" in which Linda Hamilton, the bookkeeper and romantic partner of burglar Bernard Welch, was held liable for aiding and abetting a murder Welch committed during a home break-in that went awry. *Id.* at 485-86. Because Welch did not disclose to Hamilton the source of the jewelry and antiques he obtained during his solo nighttime forays, Hamilton was unaware that a burglary, let alone ensuing murder, was going to take place. *Id.* at 485-86. Yet Hamilton provided substantial assistance to Welch's business "by helping him turn his stolen goods into 'legitimate' wealth, thereby intending to help Welch succeed by performing a function crucial to any thief," and the couple amassed a substantial fortune with no other means of support. *Id.* at 485, 487 (internal quotation marks and citation omitted). Those circumstances sufficed to suggest that Hamilton was generally aware that she was substantially aiding

15a

Welch in some type of personal property crime at night, of which violence such as Mr. Halberstam's death was a foreseeable risk. *Id*. at 485-87; *see Halberstam*, 702 F.2d at 488.

Drawing on the common law of aiding-and-abetting liability, the Court in *Taamneh* described *Halberstam*'s "basic thrust" as attaching liability to "conscious, voluntary, and culpable participation in another's wrongdoing." *Taamneh*, 598 U.S. at 488, 493. Culpability is measured by "the twin requirements" of "knowing" and "substantial" assistance, which "work[] in tandem" to permit a court to "infer conscious and culpable assistance," with a "lesser showing of one demanding a greater showing of the other." *Id.* at 491-92. Weaker allegations of state of mind can still support a claim for aiding-and-abetting liability so long as they are coupled with stronger allegations of substantiality. For instance, if a "provider of services does so in an unusual way" for the benefit of a tortfeasor, the provider may be liable for aiding and abetting the tort. *Id.* at 502.

Functionally, *Taamneh* explains, a combined showing of knowledge and substantiality is necessary to prevent aiding-and-abetting liability from sweeping in those who provide "only tangential assistance" (*e.g.*, bystanders who fail to call the police, or merchants who incidentally aid tortious activity through the ordinary conduct of their business). *Id.* at 488-89. A sufficiently strong showing on those dovetailing factors ensures liability is limited to those whose conduct is "truly culpable." *Id.* at 489.

Turning to the second question—what is it that the defendant must have aided and abetted?—the *Taamneh* Court again drew on the common law of aiding-and-abetting liability and the text of section 2333(d)(2) to hold that defendants must

16a

have "aided and abetted *the act of international terrorism* that injured the plaintiffs." *Id.* at 497 (emphasis added). That is to say, liability under the ATA requires that defendants' alleged assistance relate to, *i.e.* have a "nexus" with, the acts of international terrorism. *Id.* at 495.

Like the ingredients of culpability, nexus operates on a sliding scale. At one end lie cases with a "strict," "direct[]," or "close" nexus between the assistance alleged and the act of terrorism. *Id.* at 494, 496. In *Taamneh*, a close nexus might have existed, for example, if ISIS had used defendants' platforms to plan or coordinate the Reina nightclub attack. *See id.* at 498. But the facts as pleaded in *Taamneh*—that ISIS used defendants' platforms to recruit and propagandize for their movement but not to support or carry out the specific terrorist attack at issue, *id.* at 501—fall on the other end of the scale, with practically no nexus at all between the alleged assistance and the act of terrorism that harmed plaintiffs. When there is a "lack of any concrete nexus between defendants' services" and the act of terrorism, plaintiffs must prove defendants provided such "systemic[] and pervasive[]" assistance to a terrorist group that they could be said to aid and abet every act of terrorism the group commits as part of a common enterprise. *Id.* at 501. Between those two extremes, situations involving "more remote support can still constitute aiding and abetting in the right case." *Id.* at 496. The practical upshot is that to survive a motion to dismiss plaintiffs must allege *some* connection between defendants' assistance and the acts that injured them. If they cannot, plaintiffs must instead allege defendants provided a type of pervasive support that demonstrates a "near-common enterprise" with the terrorist group. *Id.* at 502.

To summarize, *Taamneh* draws on the common law to establish two variables bearing on liability for aiding and

17a

abetting under the ATA: (1) "culpability," which turns on the combined strength of plaintiffs' allegations regarding (a) the substantiality of the assistance defendants provide and (b) the degree of their awareness or intentionality about the harms they aid; and (2) a "nexus" measured by the closeness of the relationship between defendants' assistance and the act of international terrorism that injured plaintiffs. As to the relationship between those two main variables, the Court explains:

> When there is a direct nexus between the defendant's acts and the tort, courts may more easily infer such culpable assistance. But, the more attenuated the nexus, the more courts should demand that plaintiffs show culpable participation through intentional aid that substantially furthered the tort.

*Id.* at 506. Put differently, the degree of connection between the culpable assistance and the tortious act sets the bar for how strong the indicia of culpability need be: A weak connection between the defendant's knowing conduct and the act of terrorism requires a stronger degree of culpability, whereas a more direct nexus may establish liability despite relatively weaker indicia of culpability.

Guided by *Taamneh*, our renewed analysis of defendants' potential aiding-and-abetting liability proceeds along that path. Because the strength of the nexus between the assistance and the act of international terrorism sets the bar for the showing of culpability required, we begin by analyzing the nexus alleged here. We then turn to culpability and evaluate the strength of the allegations regarding defendants' knowledge and the substantiality of their assistance. We conclude that plaintiffs allege a plainly discernable nexus between defendants' corrupt payments and Jaysh al-Mahdi's attacks on U.S. nationals in

18a

Iraq.  Evaluating culpability, we conclude that plaintiffs make strong allegations regarding defendants' awareness and very strong allegations regarding the substantiality of defendants' assistance, provided through a scheme of bespoke bribery and gifts.  Under the circumstances of this case, that nexus coupled with those culpability allegations suffice to state a claim for aiding-and-abetting liability under the ATA.

**b.**

In *Taamneh*, the Court underscored the importance of analyzing the nexus between defendants' alleged assistance and the act or acts of international terrorism that harmed plaintiffs.  Indeed, the failure by plaintiffs in that case to draw any "concrete nexus" between the Reina nightclub attack and defendants' social media platforms was fatal to their claims.  *Id.* at 501.  They did not, for example, allege that ISIS "used defendants' platforms to plan or coordinate the Reina attack" or that the attacker himself "ever used Facebook, YouTube, or Twitter."  *Id.* at 498.  At most, plaintiffs alleged that ISIS maintained accounts on defendants' social media platforms, that defendants' recommendation algorithms treated ISIS-related content like any other content in promoting it to users most likely to be interested in it, and that defendants took insufficient steps to identify and remove ISIS supporters and content from their platforms.  *Id.*  Without a nexus between the assistance alleged and the Reina attack itself, plaintiffs' theory would have held defendants liable for aiding and abetting every ISIS terrorist act committed anywhere in the world.  *Id.* at 501.  And plaintiffs failed to allege facts sufficient to show that "defendants and ISIS formed a near-common enterprise of the kind that could establish such broad liability."  *Id.* at 502.

The cash bribes and free pharmaceuticals defendants allegedly provided to Jaysh al-Mahdi have a far closer and

more distinct tie to Jaysh al-Mahdi's acts of terrorism against U.S. personnel in Iraq.  Unlike the defendants in *Taamneh*, who merely failed to act while ISIS (like everybody else) used their platforms, and whose platforms lacked any connection to the Reina attacks, defendants here persistently pursued opportunities to do business with the Iraqi Ministry of Health and Kimadia in particular and made corrupt payments that "directly financ[ed]" Jaysh al-Mahdi's sustained campaign of terrorist attacks.  Third Am. Compl. ¶ 1 (J.A. 97).  Plaintiffs contend that defendants' activities enabled Jaysh al-Mahdi to purchase arms and ammunition, pay its fighters either in cash or "in diverted pharmaceuticals" provided for free as kickbacks, and plan attacks that would go on to "kill[] or injure[] thousands of Americans," including the victims in this case.  *Id.* ¶¶ 1, 9 (J.A. 97, 101).  And they argue that Jaysh al-Mahdi's repeated attacks on the victims were the obvious result of defendants' practices throughout the period in question.  It is highly noteworthy that defendants continued to make payments despite a steady drumbeat of reporting on Jaysh al-Mahdi's use of these funds to plan and execute attacks on Americans.  *See, e.g.*, *id.* ¶ 183 (J.A. 172-75).  *Taamneh* expressly contemplated the imposition of aiding-and-abetting liability in a situation like this one, where a "provider of routine services does so in an unusual way," rendering the provider responsible for "some definable subset of terrorist attacks." 598 U.S. at 502.

Defendants disagree that the allegations reveal any nexus between their alleged assistance and the attacks that injured plaintiffs.  They see no definable nexus between defendants' "manufacture or sale of medical goods . . . and any specific attack injuring any plaintiff" and object that the complaint "never ties those medicines or equipment to specific attacks." Appellees Br. 20, 23.  In defendants' view, to state a claim for secondary liability, plaintiffs must trace a direct line between

20a

the bribes that defendants provided (whether cash or in-kind) and the specific attacks that injured plaintiffs. Under that test, plaintiffs would need to allege, for example, that a particular cash bribe defendants funneled to Jaysh al-Mahdi was earmarked to pay for certain weapons and that those same weapons were then used in an attack that injured plaintiffs.

But the Supreme Court in *Taamneh* declined to adopt the defendants' proposed "direct traceability" test. Even as it held that the allegations before it fell short, it clarified that "aiding and abetting does not require the defendant to have known all particulars of the primary actor's plan" because, for example, a defendant may be liable for "other torts that were a foreseeable risk of [an] intended tort." 598 U.S. at 495-96 (internal quotation marks and citation omitted). Accordingly, the Court expressly rejected the *Taamneh* defendants' argument— echoed by defendants here—that they could be held liable only if there were a "strict nexus between their assistance and [the Reina nightclub] attack." *Id.* at 494. Instead, it suggested that "even more remote support can still constitute aiding and abetting in the right case." *Id.* at 496.

Requiring an overly rigid nexus is especially inappropriate when a plaintiff alleges that a defendant provided financial assistance. As the Supreme Court has previously noted, "[m]oney is fungible," and it is often effectively impossible for plaintiffs to plausibly allege that a particular dollar of funding enabled a specific attack. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 31 (2010). Requiring such allegations would be inconsistent with Congress's intent in enacting the JASTA, which sought "to provide civil litigants with the broadest possible basis . . . to seek relief against persons . . . that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities." Amendment § 2(b). It is noteworthy that, in

21a

*Taamneh*, the Supreme Court suggests that funding-based claims may require less of a nexus.  After dismissing most of the *Taamneh* plaintiffs' claims for lack of sufficient nexus, the Court dealt separately with plaintiffs' allegation that Google supported ISIS financially through revenue sharing.  The Court found no merit in that claim, but only after determining that the complaint failed to provide sufficient detail about the substantiality of the financial assistance, such as the amount and frequency of the revenue sharing.  *Taamneh*, 598 U.S. at 505-06.

Defendants further contend that plaintiffs' theory, like that of the *Taamneh* plaintiffs, "would necessarily hold defendants liable as having aided and abetted each and every attack committed by Jaysh al-Mahdi anywhere, anytime."  Appellees Br. 20-21 (internal quotation marks and citation omitted).  In their view, plaintiffs must therefore demonstrate that defendants' role in supporting Jaysh al-Mahdi was akin to that of a co-conspirator—so pervasive or "systemic that [they were] aiding and abetting every wrongful act committed by that enterprise."  598 U.S. at 496.  Because plaintiffs have not so alleged, defendants conclude, their claims must fail.

That argument rests on a mistaken premise.  Plaintiffs here do not seek to hold defendants liable on the theory that they aided and abetted every act of international terrorism Jaysh al-Mahdi committed anytime and anywhere.  Instead, the complaint tells a localized story that ties defendants' alleged knowing provision of substantial aid to a defined subset of Jaysh al-Mahdi's tortious attacks—conduct that was circumscribed temporally and geographically.  Temporally, the complaint alleges that defendants' payments to Jaysh al-Mahdi began in late 2004 and continued through 2013, which roughly corresponds to the timing of the alleged attacks and the "apex" of Jaysh al-Mahdi's control over the Ministry of Health and

22a

Kimadia from 2005 to 2009.  *Compare* Third Am. Compl. ¶ 7 (J.A. 100), *with id.* ¶ 16 (J.A. 104), *and id.* ¶ 104 (J.A. 134). Geographically, plaintiffs' claims are limited to aid provided through the Ministry for attacks in Iraq, even though Jaysh al-Mahdi carried out attacks elsewhere in the Middle East.  *See, e.g., id.* ¶ 348 (J.A. 242-43) (discussing Jaysh al-Mahdi's activities in Lebanon).  Plaintiffs allege that defendants signed the contracts with Jaysh al-Mahdi at the Ministry of Health headquarters in Baghdad, *id.* ¶ 121 (J.A. 142), and that most of Jaysh al-Mahdi's attacks occurred within Baghdad's city limits, *id.* ¶ 403 (J.A. 269-73).  They even identify an attack by Jaysh al-Mahdi fighters doubling as Ministry security guards that targeted an American convoy just outside the Ministry's front gate.  *Id.* ¶ 89 (J.A. 127).  Because plaintiffs' allegations are limited to defendants' provision of aid to a temporally and geographically discrete set of Jaysh al-Mahdi's terrorist acts, plaintiffs need not plead that defendants and Jaysh al-Mahdi participated in a near-common enterprise of the type necessary to state claims against defendants for aiding Jaysh al-Mahdi's terrorist activities without regard to where or when they occurred.

We therefore hold that plaintiffs have alleged a nexus between defendants' assistance and the terrorist attacks that injured them because the complaint's allegations describe how defendants provided tailored, local assistance to Jaysh al-Mahdi at the time and in the immediate vicinity of a defined set of Jaysh al-Mahdi's attacks.  These attacks against U.S. citizens were the predictable, virtually inevitable fallout of defendants' direct cash and in-kind payments to Jaysh al-Mahdi under the circumstances then prevailing.  We recognize that the complaint does not spell out how Jaysh al-Mahdi converted defendants' assistance into weapons or equipment to carry out each specific attack, but the statute, as interpreted by *Taamneh*, does not require such detail about the connection.  Only where

23a

the nexus is generic and attenuated and there is no showing of a near-common enterprise are defendants shielded from liability.

A nexus that falls short of tracing defendants' support to any specific attack injuring any plaintiff does call for more robust culpability allegations to state an ATA claim than would be required if the nexus were more direct. *See Taamneh*, 598 U.S. at 506. Accordingly, our inquiry into culpability "demand[s] that plaintiffs show culpable participation through intentional aid that substantially furthered" the acts of terrorism in question. *Id.*

**c.**

Turning to the "culpability" variable, we evaluate the strength of plaintiffs' allegations regarding defendants' awareness and the substantiality of their assistance. As the Court noted in *Taamneh*, these requirements "work[] in tandem" to permit a court to "infer conscious and culpable assistance," with a "lesser showing of one demanding a greater showing of the other." 598 U.S. at 491-92. We conclude that plaintiffs' allegations suffice to show defendants knew their assistance would be used by Jaysh al-Mahdi to commit further acts of terrorism. And, when combined with strong allegations regarding the sheer scale of their support and the unusual and corrupt means by which defendants aided Jaysh al-Mahdi, their complaint supports a reasonable inference that defendants' conduct amounted to "conscious, voluntary, and culpable participation in another's wrongdoing." *Id.* at 493.

**i.**

In *Taamneh*, the Supreme Court clarified that the statutory inquiry into whether defendants' assistance was provided "knowingly" is "designed to capture the defendants' state of

24a

mind with respect to their actions and the tortious conduct (even if not always the particular terrorist act)." *Id.* at 504. To state a legally sufficient ATA claim consistent with *Taamneh*'s common-law-based aiding-and-abetting analysis, a plaintiff must at least allege that the defendant knew the assistance it provided would be used to commit further acts of terrorism or would materially increase the likelihood that the tortfeasor would commit further such acts. Alleging that a defendant generally knew its assistance was going to a terrorist organization is insufficient. Such knowledge could meet only *Halberstam*'s "general awareness" prong. *See id.* And the ATA imposes liability for aiding and abetting "act[s] of international terrorism," not for incidentally supporting a terrorist organization. 18 U.S.C. § 2333(d)(2). That said, so long as a plaintiff makes meaningful showings of nexus and substantiality, the plaintiff need not allege that the defendant knew the particulars of each terrorist act it aided and abetted.

Contrary to defendants' assertions, *Taamneh* did not read a specific intent requirement into the ATA. The statute requires only that defendants "knowingly" provide substantial assistance. 18 U.S.C. § 2333(d)(2). Even as the Supreme Court faulted the Ninth Circuit in *Taamneh* for failing to give "greater weight to defendants' . . . undisputed lack of intent to support ISIS" in the circumstances of that suit, 598 U.S. at 504, the Court emphasized that a lack of purpose to help ISIS defeated the claim only because plaintiffs had failed to allege any discernable nexus between defendants' assistance and the Reina nightclub attack or any unusual feature of defendants' actions toward the tortfeasors, *id.* at 490, 500-01. A "conscious intent" may be required to impose liability on one who aids and abets a tort by "silence and inaction," but a lesser degree of knowledge can support liability for one who aids and abets by "affirmative assistance" toward commission of a tort. *See*

25a

*Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 96-97 (5th Cir. 1975).

Consistent with that conclusion, courts considering common law aiding-and-abetting claims have long distinguished the intent necessary to establish *criminal* aiding and abetting from the less stringent state-of-mind requirement for *civil* aiding and abetting. The Second Circuit, for instance, has held that a vendor is criminally liable for aiding and abetting only if he "participate[d] in [the wrongful activity] as in something that he wishe[d] to bring about, that he [sought] by his action to make it succeed," but the vendor may be civilly liable for aiding and abetting a crime that is merely "a natural consequence" of his sale. *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938) (Hand, J.). Other courts have similarly concluded that "borrow[ing] . . . from definitions of aiding and abetting in the criminal field, where criminal intent is stressed because the abettor is a criminal principal, is entirely inappropriate" in the context of a statute that is "basically a remedial, not a criminal one." *Passaic Daily News v. Blair*, 308 A.2d 649, 656 (N.J. 1973). *See, e.g.*, *Monsen v. Consol. Dressed Beef Co.*, 579 F.2d 793, 802-03 (3d Cir. 1978); *Woods v. Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004, 1009-10 (11th Cir. 1985); *Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 251 (4th Cir. 1997).

Here, plaintiffs allege enough to support reasonable inferences that defendants knew their ongoing dealings with the Ministry of Health materially supported terrorist attacks against Americans. They allege that "[d]efendants knowingly structured their transactions to facilitate Jaysh al-Mahdi's diversion of funds, drugs, and medical devices from [the Ministry]" and knew that "Jaysh-al Mahdi used [what it diverted] to support terrorist operations against Americans in Iraq." Third Am. Compl. ¶ 165 (J.A. 163). Plaintiffs identify

26a

three distinct, contemporaneous sources of information supporting those allegations.

First, they allege defendants had firsthand knowledge of Jaysh al-Mahdi's takeover of the Ministry and use of its resources to attack Americans. Starting in 2004, the Ministry of Health allegedly required each of its suppliers to deliver contracts by hand to the Ministry's headquarters in Baghdad and execute them on premises. To help them meet that requirement, defendants established or contracted with trusted sources on the ground in Baghdad, referred to as "Scientific Bureaus," staffed by local agents who spoke fluent Arabic and were familiar with Ministry and Kimadia employees. Because those agents had to enter the Ministry to deliver and execute contracts on defendants' behalf, they had to walk by Sadrist propaganda posters lining the premises, Jaysh al-Mahdi fighters in the hallways, and an array of heavy weaponry displayed in the offices of officials. Such overt, ubiquitous displays would have put them on notice as to Jaysh al-Mahdi's militarized control of the Ministry of Health. And it is entirely reasonable to infer that those Bureaus kept defendants informed that the Ministry of Health had fallen under the control of Jaysh al-Mahdi, which was carrying out attacks using Ministry resources, including funds Jaysh al-Mahdi obtained as kickbacks from defendants. *Id.* ¶ 182 (J.A. 171).

Second, beginning as early as 2005, public investigative reporting by independent news agencies and government sources alike documented the link between defendants' payments to Jaysh al-Mahdi and that group's terrorist attacks on Americans. For example, the Los Angeles Times reported on "the diversion of millions of dollars" from the Ministry to Jaysh al-Mahdi, which the Council on Foreign Relations described as "an armed militia that has intermittently waged an insurgency against U.S. forces in Iraq." *Id.* ¶ 183 (J.A. 172-

27a

73). A report by the U.S. State Department in 2006 stated that the Ministry was "openly under the control of . . . [Jaysh al-Mahdi]" and enabled the group "to finance operations from diverted medicines." *Id.* ¶ 184 (J.A. 175) (alterations and internal quotation marks omitted). And a 2007 report by the head of the Iraqi Commission on Public Integrity was even more explicit: It concluded that Jaysh al-Mahdi had "fully commandeered the [M]inistr[y] of [H]ealth," and "resold [medical supplies] *to fund the insurgency against the Americans*." *Id.* ¶ 173 (J.A. 167-68) (emphasis added). 60 Minutes then ran a piece describing the defendant pharmaceutical companies' payments as "ill-gotten gains" "being used to kill American troops." *Id.* ¶ 174 (J.A. 168). Plaintiffs allege that defendants must have been aware of those widely reported stories.

Third, each defendant maintained a corporate security group responsible for supervising its global supply chains and ensuring business practices remained legitimate. Those corporate security groups researched open-source media as well as subscription-based reporting services. They powerfully bolster the inference that defendants were aware of the news-media and governmental reporting about Jaysh al-Mahdi's commandeering of the Ministry of Health and funneling of its resources into terrorist attacks on United States personnel. Remarkably, plaintiffs allege that one subscription service—Stratfor—published a message in 2007 to inform its clients (including defendants) that the Iraqi Deputy Minister of Health "is suspected of employing militia *fighters and selling health services and equipment* in return for millions of dollars that [the Deputy Minister] later funneled to Shiite militias." *Id.* ¶ 186 (J.A. 176) (emphasis added).

The timing and repetition of defendants' assistance strengthens the allegation that defendants knew that Jaysh al-

28a

Mahdi would use the assistance to conduct attacks against Americans.  Plaintiffs allege that defendants repeatedly signed contracts with Jaysh al-Mahdi and provided it with cash and in-kind bribes.  Those transactions followed close on the heels of publicized attacks and provided substantial support for further attacks.  For example, plaintiffs allege that between 2006 and 2008 AstraZeneca executed at least five different contracts with the Ministry of Health facilitated by hefty bribes to Jaysh al-Mahdi.  *Id.* ¶ 191 (J.A. 179).  During that period, Jaysh al-Mahdi launched multiple, widely reported attacks on Americans that killed or maimed many of the victims in this case.  AstraZeneca continued to sign contracts with the Ministry of Health even after the Deputy Minister of Health (himself a known commander of Jaysh al-Mahdi) was arrested in 2007 on corruption charges.  *Id.* ¶ 11 (J.A. 102).  Plaintiffs make similar, plausible allegations against each of the other defendants.  *See id.* ¶¶ 213, 246, 284, 312 (J.A. 188, 200-01, 215-16, 228-29).

Perhaps the strongest support for the inference of culpable association is the "unusual" kind of assistance defendants allegedly provided.  *Taamneh* refers to "situations where [a] provider of routine services does so in an unusual way" as supporting aiding-and-abetting liability arising from what might otherwise be ordinary business transactions.  598 U.S. at 502.  As an example, the Supreme Court cites a case in which it held that a licensed wholesale pharmacy's mail-order supply of morphine to a doctor in far greater amounts than sent in typical orders tended to show the pharmacy's culpability for aiding and abetting illegal narcotics sales.  *See id.* (citing *Direct Sales Co. v. United States*, 319 U.S. 703, 707, 711-12, 714-15 (1943)).  The unusual nature of those transactions indicated that the business did not innocently treat the tortfeasor as any other customer but rather understood that the tortfeasor intended to use its goods for illicit purposes.  *See Direct Sales*, 319 U.S. at

711.  In another recent case regarding aiding-and-abetting liability, the Court confirmed that a provider of generally available goods or services can be held secondarily liable for a customer's misuse of the goods if the provider engages in the type of conduct at issue in *Direct Sales*.  *See Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 293 (2025).  The Court emphasized in *Smith & Wesson* that the pharmacy in *Direct Sales* "actively stimulated" the doctor's purchases, including "by giving him special discounts for his most massive orders," and that the pharmacy acted "against the backdrop of law enforcement warnings" that it was being used as a source of supply by lawbreaking doctors.  *Id.* at 292-93.

Like the pharmacy in *Direct Sales*, the pharmaceutical companies here are alleged to have engaged in conduct that did not conform to generally accepted business practices.  Indeed, the complaint alleges that defendants participated in a long-running scheme to provide Jaysh al-Mahdi with cash and in-kind bribes that amounted to at least 20 per cent of the value of each contract, as well as off-the-books shipments of "free goods" that were not tied to any particular contract.  Third Am. Compl. ¶ 136 (J.A. 149-50); *id.* ¶¶ 142-44 (J.A. 153-54).  When Jaysh al-Mahdi controlled the Ministry, its procurement terms contained "commercially unreasonable" provisions, "such as a requirement that the supplier re-supply 'free of charge' any drugs that expired before Kimadia was able to sell them."  *Id.* ¶ 123 (J.A. 143); *see id.* ¶ 135 (J.A. 149).  Defendants' decisions to provide the free goods "actively stimulated" Jaysh al-Mahdi's purchases of pharmaceuticals.

Moreover, the complaint asserts that the bribes were highly irregular and illegal under both U.S. and Iraqi law.  Plaintiffs contend that U.S. law enforcement agencies, including the Securities and Exchange Commission and the Department of Justice, brought several Foreign Corrupt

30a

Practices Act enforcement actions against many of the same companies when they used the same techniques to circumvent the restrictions of the Oil-for-Food Program with bribes to Iraqi officials under the Saddam Hussein regime. *Id.* ¶ 49 (J.A. 112). As for the corrupt dealings at issue in this case, the complaint alleges that Coalition forces' concerns about the Ministry of Health supporting Jaysh al-Mahdi's attacks led them to arrest the Deputy Minister of Health in 2007 "for orchestrating several kickback schemes to funnel millions of U.S. dollars to militia elements." *Id.* ¶ 8 (J.A. 100). No party has argued that such bribes were a lawful business practice during the period. Indeed, at the *Taamneh* oral argument, counsel for the United States cited this case as an example of defendants allegedly "ben[ding] the rules" and culpably departing from "their usual course of business." Tr. of Oral Arg. at 82-83, *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023) (No. 21-1496). Taking the allegations in plaintiffs' complaint as true and drawing reasonable inferences therefrom, as we must at this stage, defendants' "unusual" conduct is highly probative of secondary liability under the ATA. It is not business as usual for sophisticated transnational companies to provide cash and in-kind bribes to a known terrorist organization over a period of years when that organization is openly maiming and killing U.S. citizens.

Accordingly, we conclude that plaintiffs have successfully alleged that defendants knew Jaysh al-Mahdi would use their assistance to commit further acts of terrorism against the victims. Plaintiffs' complaint therefore makes strong allegations of scienter, supporting the conclusion that defendants acted culpably.

**ii.**

We now turn to the question whether defendants' alleged assistance to Jaysh al-Mahdi's terrorist attacks was "substantial." The "point" of *Halberstam*'s six substantiality factors "is to help courts capture the essence of aiding and abetting: participation in another's wrongdoing that is both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor." *Taamneh*, 598 U.S. at 504. The Court's opinion in *Taamneh* faults the Ninth Circuit for "focusing . . . primarily on the value of defendants' platforms *to ISIS*, rather than whether defendants culpably associated themselves with ISIS' actions." *Id.* The *Taamneh* plaintiffs failed to allege a culpable association because "ISIS' ability to benefit from [defendants'] platforms was merely incidental to defendants' services and general business models," and those defendants had only an "arm's-length relationship with ISIS . . . no different from their relationship with . . . other users." *Id.* The crux of plaintiffs' complaint was the platforms' "failure to act" to detect and remove ISIS accounts and content from among the billions of user accounts and postings on their platforms. *Id.* at 501. But, as the Supreme Court notes, the common law generally disfavors failure to act as a basis for aiding-and abetting-liability. *Id*. By contrast, the Court suggests, allegations of "more direct, active" aid, especially aid provided "in an unusual way," can show substantiality, and "might . . . establish liability with a lesser showing of scienter." *Id.* at 502.

Guided by *Taamneh*, we treat *Halberstam*'s substantiality factors not as "immutable components," but as conceptually related. *Id.* at 487. We accordingly highlight the subset of factors most germane to whether these defendants culpably associated themselves with the tortious conduct that harmed these plaintiffs. We recognize that different factors may be

32a

decisive in other cases. Here, however, the most salient factors are (1) the relationship between defendants and Jaysh al-Mahdi; (2) the amount and kind of assistance defendants provided; and (3) the duration of defendants' assistance. We combine the latter two factors for analytical clarity.

First, plaintiffs allege a relationship between Jaysh al-Mahdi and defendants that was active, direct, and particularized. Unlike the defendants in *Taamneh*, who stood by when ISIS created standard accounts and made posts on the social media defendants' platforms just as hundreds of millions of users do each day, defendants here had bespoke dealings with Jaysh al-Mahdi. Defendants negotiated their contracts with the Ministry and directly supplied Jaysh al-Mahdi with cash and drugs to win its business. Defendants responded to the Ministry's unusual solicitations, proposing prices for the quantity of goods the Ministry sought, paying cash bribes to Jaysh al-Mahdi, and specifying the quantity of "extra goods" that they would provide to Jaysh al-Mahdi for free. Third Am. Compl. ¶¶ 4-5 (J.A. 98-99). If a defendant won a tendering round, it would—as the Ministry required—execute a formal sales contract by hand inside the Ministry headquarters in Baghdad, surrounded by Jaysh al-Mahdi fighters, propaganda, and weaponry. *Id.* ¶¶ 120-21 (J.A. 141-42). That voluntary, tailored relationship is the type courts require under the common law to ground aiding-and-abetting liability in culpable misconduct. It was notably absent from the arm's-length, failure-to-act allegations in *Taamneh*. 598 U.S. at 498-99.

Second, the scale of the aid defendants allegedly provided and the duration for which they provided it also support the inference that defendants culpably associated themselves with Jaysh al-Mahdi's attacks on Americans. Plaintiffs estimate that defendants provided "millions of U.S. dollars" that were funneled to Jaysh al-Mahdi's terrorist operations for nearly a

33a

decade. *Id.* ¶ 171 (J.A. 166). In just one transaction in 2006, one of the defendants, Pfizer, allegedly provided Jaysh al-Mahdi an off-the-books payoff in the form of a hemophilia drug called BeneFix valued at $3.7 million. The inference of defendants' culpability does not derive from the importance of their payments to Jaysh al-Mahdi's operations, which is not the focus of plaintiffs' allegations. *Cf. Taamneh*, 598 U.S. at 505-06. Rather, the allegations show that defendants, over a long period of time, associated themselves with Jaysh al-Mahdi's violent campaign of terrorism against U.S. nationals in Iraq via their provision of meaningful quantities of cash and cash-equivalents to that terrorist organization.

We therefore conclude that plaintiffs have made a particularly strong showing that defendants' aid was "substantial" and a strong showing that they knew how it was being used. The complaint thus demonstrates that defendants culpably associated themselves with Jaysh al-Mahdi's attacks on U.S. nationals, including the victims in this case.

In sum, we hold that plaintiffs have stated a secondary liability claim under the ATA. Plaintiffs plausibly allege a nexus between the assistance defendants provided to Jaysh al-Mahdi and the subset of attacks Jaysh al-Mahdi committed against U.S. nationals in Iraq between 2005 and 2009. We recognize that the complaint does not directly trace individual dollars or drugs to their eventual use in specific attacks. That the nexus is somewhat indirect raises the bar for plaintiffs, requiring them to reinforce their nexus allegations in order to demonstrate defendants' culpability. They needed to plead that defendants' kickbacks provided assistance that was substantial and that defendants were aware of how that assistance was being used. Plaintiffs meet that bar. They plausibly allege that defendants knew Jaysh al-Mahdi used their assistance to carry out further attacks against Americans, yet defendants continued

34a

to provide it. And plaintiffs plausibly allege that the "substantial" scale and illegality of defendants' assistance supports an inference that defendants culpably associated themselves with Jaysh al-Mahdi.

Plaintiffs will bear the burden at trial to prove all the elements of liability. But at this preliminary stage, their allegations and reasonable inferences drawn from them suffice to state an ATA aiding-and-abetting claim based on defendants' "conscious, voluntary, and culpable participation in [Jaysh Al-Mahdi's] wrongdoing." *Taamneh*, 598 U.S. at 493.

**2.**

Plaintiffs separately claim that defendants may be held directly liable for acts of international terrorism that defendants themselves committed. Those claims require allegations that plaintiffs, as nationals of the United States, were "injured in [their] person, property, or business by reason of an act of international terrorism." 18 U.S.C. § 2333(a). It is not contested that plaintiffs are U.S. nationals. The parties instead dispute whether plaintiffs adequately allege injury by reason of acts of international terrorism—that is, whether defendants' alleged financing, 18 U.S.C. § 2339C, and material support, 18 U.S.C. § 2339A, of Jaysh al-Mahdi was "international terrorism" within the meaning of the ATA, 18 U.S.C. § 2331(1). And they dispute whether defendants' conduct proximately caused plaintiffs' injuries. The district court dismissed the claims for failure to plead proximate causation without addressing what constitutes an "act of international terrorism" under the statute. *See* 474 F. Supp. 3d at 209.

In our pre-*Taamneh* opinion, we held only that plaintiffs adequately alleged the proximate causation required for direct liability under the ATA and remanded for the district court to

consider in the first instance whether plaintiffs alleged that defendants themselves committed any acts of international terrorism. *Taamneh* did not address the standard for direct liability under the ATA. Defendants nonetheless renew their argument that we should dismiss the claims "because defendants' alleged acts are too remote for aiding-and-abetting liability" so they are, *a fortiori*, "too remote for direct liability." Appellees Br. 27-28. That reasoning fails in view of our holding that plaintiffs have stated an aiding-and-abetting claim under the ATA. As we did in our earlier opinion, we decline here to determine in the first instance whether defendants committed any "act[s] of international terrorism" within the meaning of the ATA. Appellees Br. 28-31. Because *Taamneh* does not speak to it, we go no further than to remand to the district court for further consideration of plaintiffs' direct liability claims.

**3.**

In our original opinion, we also held that the manufacturer defendants could be held liable both directly and secondarily despite not dealing immediately with Jaysh al-Mahdi. We reached that conclusion because reports demonstrating the connection between the Ministry and Jaysh al-Mahdi were available to all parties and because the complaint contained sufficient allegations that suppliers acted as manufacturers' agents. Defendants did not petition the Supreme Court for review of that holding and *Taamneh* did not address the issue. We therefore reinstate the claims against the defendant manufacturers, again with recognition that this conclusion rests on pleadings, untested by further factual development, and that the district court may reach a different conclusion on consideration of the evidence.

36a

**B.**

Finally, our earlier opinion held that U.S. federal courts have constitutional authority to exercise specific personal jurisdiction over certain foreign supplier defendants. Defendants did not seek certiorari on that issue, and a court "generally has no obligation to raise a question of personal jurisdiction on its own." *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 511 (D.C. Cir. 2018). In any event, although the Supreme Court has since reshaped the relevant jurisdictional inquiry in *Fuld v. Palestinian Liberation Organization*, 606 U.S. 1 (2025), it is unlikely that we would reach a different conclusion were we to apply the "more flexible jurisdictional inquiry" that *Fuld* prescribes, *id.* at 16. We therefore reaffirm our holding that the district court may exercise personal jurisdiction over defendants.

**III.**

For the foregoing reasons, we reverse the district court's order of July 17, 2020 granting defendants' motion to dismiss for failure to state a claim and the foreign defendants' motion to dismiss for lack of personal jurisdiction, as well as its attendant dismissal of plaintiffs' state-law claims. We remand for further proceedings consistent with this opinion.

*So ordered.*

37a

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 21, 2021          Decided January 4, 2022

No. 20-7077

JOSHUA ATCHLEY, ET AL.,
APPELLANTS

v.

ASTRAZENECA UK LIMITED, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-02136)

———

*Joshua D. Branson* argued the cause for appellants. With him on the briefs were *David C. Frederick* and *Andrew E. Goldsmith.*

*Michael J. Miller* and *Stephen I. Vladeck* were on the brief for *amici curiae* Law Professors in support of appellants.

*Jeffrey R. White* was on the brief for *amicus curiae* The American Association for Justice in support of appellants.

*Tejinder Singh* was on the brief for *amici curiae* 44 Former Military Officers, Intelligence Officials, and Analysts in support of appellants.

38a

*Michael A. Petrino* and *Jonathan E. Missner* were on the brief for *amici curiae* Eight United States Senators in support of appellants.

*Mazin A. Sbaiti* was on the brief for *amicus curiae* Iraq Anti-Corruption Experts in support of appellants.

*Kannon K. Shanmugam* argued the cause for appellees. With him on the brief were *Neil H. MacBride, Paul S. Mishkin, Beth S. Brinkmann, John E. Hall, David M. Zionts, Patrick J. Carome, David W. Bowker, Leon T. Kenworthy, John B. Bellinger, III, John David Cella, Robert Reeves Anderson, Lisa S. Blatt, Christopher N. Manning, Melissa B. Collins, Brian T. Gilmore, Jeh C. Johnson, Stacie M. Fahsel,* and *Jessica S. Carey*.  *Alex Young K. Oh* entered an appearance.

*Tara S. Morrissey, Paul Lettow, Andrew J. Pincus, Robert W. Hamburg*, and *James C. Stansel* were on the brief for *amici curiae* The Chamber of Commerce of the United States of America and the Pharmaceutical Research and Manufacturers of America in support of appellees.

*Michael J. Edney* and *Mark C. Savignac* were on the brief for *amici curiae* Iraq Reconstruction Experts, et al. in support of appellees.

*Timothy P. Harkness, Linda H. Martin, Kimberly H. Zelnick, David Y. Livshiz, Scott A. Eisman, Altin H. Sila, Nathan A. Hembree,* and *Noelle L. Williams* were on the brief for *amici curiae* Charity & Security Network and InterAction: The American Council for Voluntary International Action, Inc. in support of appellees.

39a

Before: PILLARD and WILKINS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*:  The known terrorist group Jaysh al-Mahdi injured or killed hundreds of United States service members and civilians as part of its years-long campaign to harm Americans and drive the United States' military presence out of Iraq.  Plaintiffs are victims of those attacks and the victims' family members.  In the period leading up to and during the attacks on plaintiffs, Jaysh al-Mahdi openly controlled Iraq's Ministry of Health (Ministry) and used it as a vehicle for terrorist activity.  "Due largely to its 2005-era control of the Ministry," plaintiffs contend, "Jaysh al-Mahdi became the deadliest terrorist group in the country.  It massacred thousands of people, including Plaintiffs and their family members."  Appellants Br. 2.  Plaintiffs claim defendants, large medical supply and manufacturing companies, knowingly gave substantial support to the attacks against them in violation of the Anti-Terrorism Act (ATA or Act), as amended by the Justice Against Sponsors of Terrorism Act (JASTA), and state law.  They allege that defendants, aware of Jaysh al-Mahdi's command of the Ministry, secured lucrative medical-supply contracts with the Ministry by giving corrupt payments and valuable gifts to Jaysh al-Mahdi.

Plaintiffs identify two ways in which they say defendants' dealings most vividly provided illegal support to the terrorist acts that harmed them.  First, defendants used local agents to deliver cash kickbacks to the terrorists who gave them business.  Second, defendants delivered extra, off-the-books batches of valuable medical goods that Jaysh al-Mahdi monetized on the black market to fund its operations, and also used as cash equivalents to pay terrorist fighters.  Critically, on

the facts plaintiffs allege, defendants undoubtedly had the degree of awareness that our precedent requires regarding the connection between their payments and gifts and the terrorist violence. Defendants' agents finalized contracts at in-person meetings at the Ministry, where Jaysh al-Mahdi weaponry, fighters, propaganda, and other indicia made clear who was in charge. And contemporaneous reports in mainstream media of the terrorists' control of the Ministry provided notice of the stakes of doing business with that entity. "Yet Defendants wanted to profit off the Ministry," plaintiffs assert, "and they were willing to pay terrorists for the opportunity." Appellants Br. 3.

The district court held that the complaint failed to state claims for either direct or secondary (aiding-and-abetting) liability under the ATA, and that it lacked personal jurisdiction over six foreign defendants.

We reverse on three points of law and remand the balance of the issues to be addressed by the district court consistent with our opinion. First, plaintiffs plead facts that suffice to support their aiding-and-abetting claim at the motion-to-dismiss stage. The complaint plausibly alleges that Hezbollah, a designated Foreign Terrorist Organization, planned or authorized the relevant attacks as required under the JASTA. It describes how Hezbollah helped establish Jaysh al-Mahdi in Iraq, then recruited, trained, and equipped Jaysh al-Mahdi's fighters with the intent that it carry out attacks to extirpate the American presence. And plaintiffs allege that defendants knowingly provided substantial assistance to Jaysh al-Mahdi— most clearly through their corrupt provision of free goods and cash bribes to do business with a Ministry completely overrun by Jaysh al-Mahdi. Aware of Jaysh al-Mahdi's ongoing terrorist operations, defendants allegedly secured lucrative medical-supply contracts by giving the organization millions

41a

of dollars of cash and cash-equivalents over a period of many years. Those allegations, which must be accepted as true at this motion-to-dismiss stage, support an inference that defendants aided and abetted acts of international terrorism.

Second, with respect to the direct liability claim, plaintiffs have adequately pleaded that defendants' payments to Jaysh al-Mahdi proximately caused plaintiffs' injuries. The complaint describes how Jaysh al-Mahdi controlled the Ministry and used it as a terrorist headquarters. Accepting those allegations, defendants' dealings with the Ministry were equivalent to dealing with the terrorist organization directly. The Ministry was therefore not an independent intermediary that broke the chain of causation, but a front for Jaysh al-Mahdi. With causation adequately alleged, the adequacy of the allegations of other direct-liability requisites remains open on remand.

Finally, the district court's personal jurisdiction analysis was unduly restrictive. The foreign supplier defendants' direct, valuable, and ongoing sourcing of medical supplies and drugs for the Iraqi Ministry from their affiliated manufacturers in the United States amounts to robust contact with the U.S. forum through which the foreign defendants purposefully availed themselves of the benefits of doing business here. The question is whether plaintiffs' claims arose out of or related to those contacts. We hold that they did. The foreign supplier defendants worked closely with their manufacturer affiliates in the United States to bring to market in Iraq U.S. drugs and medical supplies. They did so through the very bribes and gifts that plaintiffs allege materially supported terrorist acts against them, including through defendants' provision of extra, U.S.-manufactured goods on top of contract quantities. The resultant medical supply contracts with the Ministry were both the outlet for the U.S.-origin goods and the vehicle for Jaysh al-Mahdi's terrorist fundraising. The relationship between

42a

plaintiffs' claims and the foreign defendants' forum contacts supports the court's exercise of personal jurisdiction.

**BACKGROUND**

On review of an order granting a motion to dismiss for failure to state a claim, we must assume the truth of facts plausibly alleged in plaintiffs' Third Amended Complaint and draw all reasonable inferences in plaintiffs' favor. *See Owens v. BNP Paribas, S.A.* (*Owens IV*), 897 F.3d 266, 272 (D.C. Cir. 2018). Doing so permits us to establish governing propositions of law—a step that precedes either party's opportunity to obtain discovery and test the evidence in the adversarial process. Even when we do not individually describe them as allegations, all of the facts on which we rely are from the complaint, and are therefore assumed true at this stage of the litigation. As is always the case in this procedural posture, we recognize that defendants plan to dispute many of the facts alleged, and plaintiffs cannot ultimately prevail unless they can support their allegations with evidence.

Plaintiffs allege that Iraq's Ministry of Health and Kimadia, the Ministry's state-owned import company, have a long history dating back to the Saddam Hussein era of corrupting Iraq's medical-goods procurement process. Plaintiffs cast the involvement of defendants in that past corruption as an instructive precursor to defendants' involvement in events giving rise to this case. From 2000-2003, Kimadia obtained kickbacks on medical-goods contracts it awarded to international medical goods purveyors under the United Nations "Oil-for-Food" program. That program was a humanitarian exception to sanctions on Iraq that allowed the country to sell some of its oil for the limited purpose of purchasing essential food and medical supplies for its people. Kimadia exploited the exception, circumventing the program's

43a

limits by extracting a 10% cash kickback from humanitarian-goods suppliers. And Kimadia required suppliers to provide free medical goods—typically 10% in excess of the underlying contract quantities. Most of the defendants here (or their predecessors or affiliates) participated in that scheme. An extensive, independent, U.N.-commissioned inquiry led by Paul Volcker, former Chairman of the U.S. Federal Reserve, concluded that the scheme illegally funneled more than $1.5 billion to the Saddam Hussein regime.

In 2003, the United States invaded Iraq. Even before the invasion, Hezbollah—a Lebanese group designated as a Foreign Terrorist Organization under U.S. law since 1997—planned to undermine the expected U.S. presence. From April 2003, Hezbollah's "chief terrorist mastermind, Imad Mugniyeh," collaborated with the powerful Shiite cleric Muqtada al-Sadr to establish Jaysh al-Mahdi as a fighting force in Iraq to violently expel the Americans. Third Am. Compl. ¶ 56. As Jaysh al-Mahdi took root and grew, Hezbollah recruited, trained, and armed its fighters. It was Hezbollah that provided Jaysh al-Mahdi with explosively formed penetrators and trained the group's fighters how to use them. Recognized as a signature Hezbollah tool, explosively formed penetrators (Penetrators) are a sophisticated and highly destructive weapon that Jaysh al-Mahdi used in many of the terrorist attacks on the plaintiffs in this case.[1]

Sadr modeled his movement in Iraq, the "Sadrist Trend," on Hezbollah. Each group had a political wing and a terrorist wing. In each, the two wings were closely connected, sharing funding and leadership. Jaysh al-Mahdi, the terrorist wing of

[1] The odd nomenclature refers to projectiles formed by the explosive force of the blast that fires them toward their targets. As their name suggests, they are used to penetrate protective structures such as armored vehicles. *See* Third Am. Compl. ¶ 341.

the Sadrist Trend, was a deadly force in Iraq. Its attacks likely killed over five hundred Americans and injured many more. By July 2007, General David Petraeus concluded that Jaysh al-Mahdi was "more of a hindrance to long-term security in Iraq" than was al-Qaeda in Iraq. Third Am. Compl. ¶ 62 (quoting MICHAEL R. GORDON & GEN. BERNARD E. TRAINOR, THE ENDGAME: THE INSIDE STORY OF THE STRUGGLE FOR IRAQ, FROM GEORGE W. BUSH TO BARACK OBAMA 422 (1st ed. 2012)).

In the immediate aftermath of the fall of Saddam Hussein and close on the heels of the abuses of the Oil-for-Food program, the Sadrists set their sights on the Iraqi Ministry of Health as a source of power and funding. The United States tried unsuccessfully in 2003 and 2004, before the resumption of full sovereign authority by the Iraqis, to abolish Kimadia and replace it with a transparent, market-based procurement system for the Ministry of Health. Instead, in early 2004, Sadrists began assuming key positions throughout the Ministry and purging employees disloyal to them. Jaysh al-Mahdi's influence thus spread throughout the Ministry. According to one Ministry insider, at the height of the group's control, the agency employed an estimated 70,000 Jaysh al-Mahdi members. In 2005, after Sadrists won enough seats in the parliamentary election, Jaysh al-Mahdi solidified full control over the Ministry.

Jaysh al-Mahdi used the Ministry as a front and headquarters for its campaign of terrorist violence. For example, the organization converted the nation's public hospitals "into terrorist bases where Sunnis were abducted, tortured, and murdered." Third Am. Compl. ¶ 3. The Ministry's ambulances transported terrorist "death squads" around Baghdad. Id. And the Deputy Ministry of Health used the Ministry's Facilities Protection Service to torture and kill

45a

Sadr's enemies.  *Id.*  Jaysh al-Mahdi's dominance was obvious to anyone physically present at Ministry headquarters:  "Death to America" slogans adorned the halls, Jaysh al-Mahdi fighters freely roamed while Americans could not safely enter, and Jaysh al-Mahdi's flag flew at the entrance.  Plaintiffs contend that the Ministry "functioned more as a terrorist apparatus than a health organization" during the relevant time period.  *Id.*  Sadrist control over the Ministry and Kimadia "was at its apex from late 2004 through 2008," during which time "there was no meaningful distinction between the" Ministry and Jaysh al-Mahdi.  *Id.* ¶ 104.  In 2008, a different political party assumed control of the Ministry, but Jaysh al-Mahdi kept "de facto control" of the Ministry's contracting process until at least 2013.  *Id.*

Jaysh al-Mahdi used its control of the Ministry to obtain financing for its terrorist activities by extracting bribes from defendants in the medical-goods procurement process.  Between 2004 and 2013, defendants allegedly made corrupt payments in both cash and goods to Jaysh al-Mahdi, following the methods for currying favor already familiar from corrupt dealings with Kimadia under the Oil-for-Food program.  First, defendants made cash bribes (called "commissions") to Jaysh al-Mahdi in order to obtain lucrative Kimadia contracts.  These "commissions" were typically 20% of any contract price.  "The Sadrists extracted their 'commissions' from foreign medical-goods companies by using their leverage over multiple points of the transaction lifecycle."  Third Am. Compl. ¶ 145.  Second, defendants gave the Ministry extra batches of drugs and medical devices for free on top of the quantities Kimadia paid for.  Free goods packaged alongside the paid goods, but which nobody expected to appear in the Ministry's inventory, were readily available to Jaysh al-Mahdi to sell on the black market.

Each corrupt transaction relied on at least two corporate entities: a manufacturer of the relevant goods and its affiliated supplier that transacted with Kimadia. Defendants include both groups (as well as one parent company). The manufacturer defendants are AstraZeneca Pharmaceuticals LP; GE Healthcare USA Holding LLC; GE Medical Systems Information Technologies, Inc.; Ethicon, Inc.; Ethicon Endo-Surgery, LLC; Janssen Ortho LLC; Ortho Biologics LLC; Pfizer Pharmaceuticals LLC; Pharmacia & Upjohn Company LLC; Genentech, Inc.; and Hoffmann-La Roche Inc. The supplier defendants are AstraZeneca UK Limited; GE Medical Systems Information Technologies GmbH; Johnson & Johnson (Middle East) Inc.; Cilag GmbH International; Janssen Pharmaceutica N.V.; Pfizer Inc.; Wyeth Pharmaceuticals Inc.; Pfizer Enterprises SARL; and F. Hoffmann-La Roche Ltd. The parent company defendant is Johnson & Johnson, which oversaw and supervised the scheme by which its subsidiaries gave to Jaysh al-Mahdi. There are therefore twenty-one defendants from five corporate families—AstraZeneca, GE Healthcare, Johnson & Johnson, Pfizer, and Roche.

The stream of bribes and free goods helped finance Jaysh al-Mahdi's terrorist attacks on Americans, including plaintiffs. Indeed, because Jaysh al-Mahdi fighters were sometimes even paid in drugs that they then sold for cash on the black market, some U.S. government personnel in Iraq referred to the organization as "The Pill Army." Third Am. Compl. ¶ 9. Defendants were allegedly aware that their payments were being used to fund Jaysh al-Mahdi and its terrorist activities. Defendants' local agents, often called "Scientific Bureaus," finalized their contracts at the Ministry headquarters surrounded by terrorist propaganda and other indicia of Jaysh al-Mahdi's control. *Id.* ¶¶ 148-49, 180. And, as sophisticated global businesses, defendants had corporate security and compliance operations keeping them abreast of risks in the

47a

markets they serve.  As part of those efforts, plaintiffs plausibly allege, defendants would have become aware of frequent mainstream media reports describing Sadr's control of the Ministry and use of that position for support of terrorist attacks against Americans.

The complaint draws on many contemporaneous public accounts.  For example, a 2005 *New York Times* article explained that "Sadr, the rebellious Shiite cleric who led two armed uprisings against the American occupation," benefited "from the new cabinet lineup" since "the health minister . . . belong[ed] to Mr. Sadr's political movement."[2]  *The Guardian* reported that "[m]ost of the security guards in the morgue and the ministry are affiliated to [Sadr's] militia, the Mahdi army, one of the militias thought to be behind the sectarian killing going on in their neighbourhoods."[3]  And *CBS News*, relying on a U.S. intelligence report, announced that "[h]ospitals have become command and control centers for the Mahdi Army militia," the "militia is keeping hostages inside some hospitals, where they are tortured and executed," and "[t]hey're using ambulances to transport hostages and illegal weapons, and even to help their fighters escape from U.S. forces."[4]  The media highlighted Sadr's use of the Ministry's revenue stream to fund attacks.  For example, *NBC News* reported that "[s]upplies and medicine . . . have been siphoned off and sold elsewhere for profit because of corruption in the Iraqi Ministry

[2] Third Am. Compl. ¶ 183 (quoting Robert F. Worth, *The Struggle for Iraq: Politics; Iraq's Assembly Accepts Cabinet Despite Tension*, N.Y. TIMES (Apr. 29, 2005)) (formatting altered).
[3] Third Am. Compl. ¶ 183 (quoting Ghaith Abdul-Ahad, *Inside Iraq's Hidden War*, GUARDIAN (May 19, 2006)) (formatting altered).
[4] Third Am. Compl. ¶ 87 (quoting Melissa McNamara, *CBS: Death Squads in Iraqi Hospitals*, CBS NEWS (Oct. 4, 2006)) (formatting altered).

of Health," which was "in the 'grip' of the Mahdi Army, the anti-American militia run by the Shiite cleric Muqtada al-Sadr."[5]

Plaintiffs each assert two primary-liability and two secondary-liability claims under the Act, as well as a variety of state-law claims arising from the same conduct. Plaintiffs' Third Amended Complaint (at issue here) elaborates their claims in unusual detail. The complaint on behalf of hundreds of victims and their families is 588 pages long. It provides context and spells out connections relevant to the extraordinary events it describes. And it does so with reference to hundreds of identified sources. The allegations

> are based on an extensive investigation drawing on a broad array of public and non-public information, including evidence obtained from more than 12 Confidential Witnesses with direct and indirect knowledge of the alleged facts; public and non-public reports, contracts, and emails; U.S. diplomatic and military cables (as published by *WikiLeaks*); Iraqi market data and regulations; public statements by U.S. and Iraqi government officials; English- and Arabic-language press reports; and Plaintiffs' own recollections.

Third Am. Compl. ¶ 41.

As noted above, the district court dismissed plaintiffs' claims in full and dismissed the foreign defendants for lack of personal jurisdiction. The court dismissed plaintiffs' direct liability claims by treating the Ministry of Health as an

---

[5] Third Am. Compl. ¶ 183 (quoting Aram Roston & Lisa Myers, *'Untouchable' Corruption in Iraqi Ministries*, NBC NEWS (July 30, 2007)) (formatting altered).

49a

independent intermediary breaking the chain of proximate causation between defendants' payments and Jaysh al-Mahdi's attacks on plaintiffs. The court dismissed plaintiffs' secondary, aiding-and-abetting claims for two reasons. First, it held that no designated Foreign Terrorist Organization committed, authorized, or planned most of the relevant attacks, as required by the statute, because Jaysh al-Mahdi was never so designated. The court rejected allegations that Jaysh al-Mahdi acted as a proxy for the designated terrorist organization Hezbollah by characterizing Hezbollah's involvement as only "[g]eneral support or encouragement" to Jaysh al-Mahdi. *Atchley v. AstraZeneca UK Ltd.*, 474 F. Supp. 3d 194, 211 (D.D.C. 2020). It treated aiding-and-abetting liability as limited to cases in which the designated organization "*itself* had a significant role" in the particular attacks and read the complaint not to allege such a role. *Id*. at 212 (emphasis in original). Second, despite its express acknowledgment of allegations that "defendants knowingly provided medical goods to the Ministry for economic gain and were aware those goods would be used by [Jaysh al-Mahdi] to support terrorist attacks," *id.* at 213, the court held that plaintiffs did not adequately allege the requisite substantial assistance to Jaysh al-Mahdi, *id.* at 214.

The district court also held that the complaint failed to allege the suit-related contacts between the foreign defendants and the United States that are constitutionally required to empower the court to assert specific—or claim-linked—personal jurisdiction over them. Finally, because the court dismissed plaintiffs' federal law claims, it declined pendent jurisdiction over plaintiffs' state law claims.

Plaintiffs timely appealed.

**DISCUSSION**

We review *de novo* the district court's dismissal of the amended complaint for failure to state a claim, *Owens IV*, 897 F.3d at 272, and for lack of personal jurisdiction, *Livnat v. Palestinian Auth.*, 851 F.3d 45, 48 (D.C. Cir. 2017). We assume the truth of plaintiffs' factual allegations and draw all reasonable inferences in plaintiffs' favor. Although we would typically begin with personal jurisdiction as the antecedent question, we instead first consider whether the complaint states a claim because the personal jurisdiction issue applies to only six of the twenty-one defendants, and because consideration of claim-linked jurisdiction benefits from an understanding of plaintiffs' claims.

## I.    Anti-Terrorism Act Claims

The ATA recognizes a private right of action in tort for United States nationals injured by acts of international terrorism. It authorizes victims of terrorism to recover against anyone shown to have played a primary (direct) or secondary (aiding-and-abetting) role.

Plaintiffs assert both types of liability against defendants. Needless to say, plaintiffs do not allege that the defendant drug companies directly maimed or killed plaintiffs; the claim is that the companies funded and otherwise substantially assisted those who did. Specifically, plaintiffs contend that defendants sold their drugs and medical supplies in Iraq by bribing the Iraqi Ministry of Health and sweetening their deals with extra goods free of charge during a period when Jaysh al-Mahdi was known to have commandeered the Ministry and was using it as a base for terrorist attacks. They allege defendants' corrupt payments substantially and predictably aided Jaysh al-Mahdi. And plaintiffs were among the avowed targets of Jaysh al-

51a

Mahdi's notorious terrorist campaign to intimidate Americans and drive U.S. forces out of Iraq.

The ATA as originally enacted authorized suit by "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism." 18 U.S.C. § 2333(a). As relevant here, the "by reason of" language in the statute requires "some causal connection between the act of international terrorism and the U.S. national's injury." *Owens IV*, 897 F.3d at 270. The statute made no explicit reference to tort liability for aiders and abettors. *See id.* at 277. Some courts, including this one, interpreted that silence as barring such liability, applying a general presumption that Congress does not intend aiding-abetting liability without expressly saying so. *See, e.g.*, *id.* at 278; *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013).

In 2016, Congress amended the ATA in the Justice Against Sponsors of Terrorism Act to spell out a cause of action against anyone who knowingly provides substantial assistance to acts of international terrorism. 18 U.S.C. § 2333(d). The JASTA's express objective is

> to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States.

JASTA, Pub. L. No. 114-222, § 2(b), 130 Stat. 852, 853 (2016) (Amendment). The statute names our decision in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), as providing the "proper legal framework for how such liability should

52a

function." Amendment § 2(a)(5). But even as it cast a wide net, Congress included an element for secondary liability not required for primary liability under the ATA: Aiding-and-abetting liability under the JASTA is confined to injuries in which a designated Foreign Terrorist Organization, denominated as such under U.S. law, played a specified role. *See* 18 U.S.C. § 2333(d).

We hold that plaintiffs sufficiently allege secondary liability. And, because the district court erred in dismissing the direct liability claims on an erroneous theory of proximate causation, we also reverse that holding and remand for further consideration of whether plaintiffs otherwise adequately plead direct liability.

## A.   Secondary Liability

Secondary liability for aiding and abetting "reaches persons who do not engage in the proscribed activities at all, but who give a degree of aid to those who do." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 176 (1994). As relevant here, the ATA as amended by the JASTA provides for secondary liability against "any person who aids and abets, by knowingly providing substantial assistance" to "an act of international terrorism." 18 U.S.C. § 2333(d)(2). Aiding-and-abetting liability is confined to "an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189)." *Id*.

Plaintiffs thus need to plead three statutory elements: (1) an injury arising from an act of international terrorism; (2) that the act was committed, planned, or authorized by a designated Foreign Terrorist Organization; and (3) that defendants aided or abetted an act of international terrorism by knowingly

providing substantial assistance. As discussed below, *Halberstam*, in turn, spells out three elements that establish the referenced aiding or abetting—wrongful acts, general awareness, and substantial assistance—and further guides our consideration by reference to six "substantial assistance" factors. *See* 705 F.2d at 487-88.

Within the three statutory elements, defendants do not contest the allegations that plaintiffs each suffered injury from an act of international terrorism. They dispute the second and third elements: whether plaintiffs allege that Hezbollah "committed, planned, or authorized" those acts, and that defendants' corrupt payments to Jaysh al-Mahdi substantially assisted those attacks.

> ### i. Plaintiffs allege that Jaysh al-Mahdi's terrorist attacks were "committed, planned, or authorized by" Hezbollah

Secondary liability under the ATA is confined to injuries arising from acts of terrorism "committed, planned, or authorized by" a designated Foreign Terrorist Organization, 18 U.S.C. § 2333(d)(2), which is a special designation made by the Secretary of State under the Immigration and Nationality Act, 8 U.S.C. § 1189. In many ATA cases, it is not disputed that the challenged acts were committed by a Foreign Terrorist Organization formally designated as such under U.S. law. *See, e.g.*, *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 490-91 (2d Cir. 2021) (Hamas); *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 848 (2d Cir. 2021) (Hezbollah). Even while the United States knew of Jaysh al-Mahdi as a terrorist actor, however, it did not designate it as a Foreign Terrorist Organization. Plaintiffs contend that was due to "a concern among some U.S. policymakers about the best way to influence Sadr," and "caution against overly antagonizing his followers"

in order to "preserv[e] flexibility for members of the U.S. government to engage with the Sadrists if and when doing so would serve the national interest." Third Am. Compl. ¶ 355.

Defendants acknowledge that a joint Hezbollah–Jaysh al-Mahdi cell allegedly committed twenty-two of the attacks at issue here, injuring thirty-five of the direct victims in this case. The parties debate whether allegations that one of those attacks sparked a weeks-long battle that harmed an additional fifty-eight victims suffice to establish the requisite involvement of Hezbollah. For most of the attacks at issue, however, plaintiffs allege they were committed by Jaysh al-Mahdi with Hezbollah more in the background; as to the plaintiffs injured by those attacks, the first claim of secondary liability (Count One) depends on the allegations that Hezbollah planned or authorized the attacks even as Jaysh al-Mahdi fighters were the direct perpetrators. Plaintiffs' alternative theory (in Count Two) is that Jaysh al-Mahdi and Hezbollah created a RICO enterprise or campaign that functioned as the "act" of international terrorism that defendants aided. We do not directly address plaintiffs' RICO theory, which seeks the same relief, in view of our remand on the more straightforward aiding-and-abetting claim.

In evaluating allegations of Hezbollah's involvement in attacks it did not also commit, we must consider what Congress meant by requiring that a Foreign Terrorist Organization "planned" or "authorized" the relevant acts of international terrorism. Plaintiffs contend that to "plan" includes "to arrange the parts of: [to] design." Appellants Br. at 42 (quoting *Plan*, Merriam-Webster, https://www.merriam-webster.com/dictionary/plan (capitalization altered)). And they assert that to "authorize" means "to endorse, empower, justify, or permit" another's acts through "some recognized or proper authority (such as custom, evidence, personal right, or regulating

power)." *Id.* at 44 (quoting *Authorize*, Merriam-Webster, https://www.merriam-webster.com/diction-ary/authorize). Defendants offer no contrary reading of those terms; instead, they focus on their contention that Jaysh al-Mahdi "on its own" committed "more than 90% of the attacks at issue." Appellees Br. at 41.

Our analysis is informed by Congress's statutory findings in light of the realities of modern terrorism. Congress called on U.S. courts to provide litigants with the "broadest possible basis" for relief under the JASTA, reaching anyone who provides support, whether "directly or indirectly." Amendment § 2(b). To that end, the statutory text is not confined to acts of international terrorism "committed" by designated Foreign Terrorist Organizations, but also reaches those committed by someone else if they were "planned" or "authorized" by a designated group. It is well known that terrorist organizations, and Hezbollah in particular, often operate by proxy. *See* Third Am. Compl. ¶ 360 (explaining that "Hezbollah has coordinated terrorist attacks around the world primarily by acting through terrorist proxies"); Amicus Br. of 44 Former Military Officers, Intelligence Officials, and Analysts at 20 (explaining that "[m]any designated Organizations, including . . . Hezbollah, use proxies to attack Americans"). Congress thereby provided for aiding-and-abetting liability under the JASTA for those who aid or abet attacks in cases in which a designated terrorist group stands behind the fighters who pull the trigger or detonate the device.

Decisions in other ATA cases support aiding-and-abetting liability on the facts alleged here. In cases with facts like those before us, courts have held the requirement met. The district court in *Bartlett v. Société Générale de Banque Au Liban SAL* held that, where "third party paramilitary groups" committed the acts that harmed the plaintiffs, allegations that "Hezbollah

trained the Iraqi militias, . . . controlled and directed those militias, . . . planned the Attacks, . . . and designed and emplaced the weapons used in the Attacks" sufficed to establish the Foreign Terrorist Organization's role for purposes of aiding-and-abetting liability. No. 19-CV-00007, 2020 WL 7089448, at *8 (E.D.N.Y. Nov. 25, 2020) (internal quotation marks and citation omitted). Similarly, in *Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 96-97 (E.D.N.Y. 2019), the attacks themselves were carried out by an undesignated terrorist group. The court held that allegations that "describe Hezbollah as deeply involved in supporting and coordinating an extensive campaign of terrorist activity against American citizens in Iraq" permitted a reasonable inference "that a designated FTO, namely Hezbollah, was responsible for committing, planning, or, at the very least, authorizing the attacks that injured Plaintiffs." *Id*. at 97. In a situation markedly different from this case, in contrast, courts have held that the Pulse Night Club shooting by a "self-radicalized" individual allegedly inspired in part by "online content" from ISIS involved only a "tenuous connection" to ISIS insufficient to show the attack was "committed, planned, or authorized" by the Foreign Terrorist Organization. *Crosby v. Twitter, Inc.*, 921 F.3d 617, 626 (6th Cir. 2019); *see Colon v. Twitter, Inc.*, 14 F.4th 1213, 1222-23 (11th Cir. 2021) (same); *see also Gonzalez v. Google LLC,* 2 F.4th 871, 911-12 (9th Cir. 2021) (same for the San Bernardino attack).

Plaintiffs plausibly allege that Hezbollah both planned and authorized the attacks against them. The complaint describes in detail how Hezbollah acted through Jaysh al-Mahdi with the specific goal of harming Americans in Iraq. Hezbollah had been closely involved with Jaysh al-Mahdi since its founding. The chief terrorist mastermind of Hezbollah, Imad Mugniyeh, worked with Sadr to found Jaysh al-Mahdi with the shared goal of killing Americans and driving U.S. forces out of Iraq. As

early as January 2004, Hezbollah sent nearly 800 agents to Iraq to direct Jaysh al-Mahdi's terrorist campaign. Mugniyeh continued to supervise Jaysh al-Mahdi's campaign until his death in 2008, at which time he was replaced by other Hezbollah operatives. Plaintiffs identify by name numerous senior Hezbollah operatives who helped supervise Jaysh al-Mahdi's attacks. And the U.S. Treasury Department in 2009 "formally recognized the links between Hezbollah and Jaysh al-Mahdi when it designated [a] Jaysh al-Mahdi commander . . . as a Specially Designated Global Terrorist," noting that Hezbollah prepared Jaysh al-Mahdi to fight Coalition Forces. Third Am. Compl. ¶ 375. The Department did so again in 2012 when it found that Hezbollah helped form, train, and advise militants in Jaysh al-Mahdi. *Id.* ¶ 376.

Jaysh al-Mahdi itself proclaimed its identification with Hezbollah: Sadr declared that he was "Hezbollah's 'striking arm in Iraq,'"[6] and publicly acknowledged Jaysh al-Mahdi's "formal links with Hizbollah."[7] Jaysh al-Mahdi fighters marched under Hezbollah flags, waved Hezbollah banners at demonstrations, and shouted chants including "Mahdi Army and Hezbollah are one"[8] and "we are Hezbollah."[9]

---

[6] Third Am. Compl. ¶ 371 (quoting Wire, *Iraqi Cleric Calls for Alliance with Hezbollah, Hamas*, BUFFALO NEWS (Apr. 2, 2004), http://buffalonews.com/2004/04/02/iraqi-cleric-calls-for-alliance-with-hezbollah-hamas/).

[7] Third Am. Compl. ¶ 371 (quoting Nizar Latif & Phil Sands, *Mehdi Fighters 'Trained by Hizbollah in Lebanon'*, INDEPENDENT (Aug. 20, 2007)).

[8] Third Am. Compl. ¶ 373 (quoting *Iraq's Shia March for Hezbollah*, AL-JAZEERA (Aug. 4, 2006), www.aljazeera.com/archive/2006/08/200849131615702691.html).

[9] Third Am. Compl. ¶¶ 15, 373.

Hezbollah's alleged involvement in planning the attacks that injured and killed plaintiffs was deep and far reaching. Its provision of weaponry, training, and knowledge to Jaysh al-Mahdi with the intent of harming Americans in Iraq constituted a "plan." Hezbollah brought Jaysh al-Mahdi recruits to Iran and Lebanon and trained them to use their methods against American forces in Iraq. The training covered the use of basic weapons, improvised explosive devices, Penetrators, rockets, and more. Hezbollah spelled out in a "planning guide" how Jaysh al-Mahdi fighters should deploy the training and weaponry it provided. Third Am. Compl. ¶¶ 399, 402. The complaint also draws geographical connections between Hezbollah's presence and the attacks at issue in this case, detailing that Hezbollah coordinated with Jaysh al-Mahdi terrorists in specific locations where plaintiffs were injured or killed.

Hezbollah's planning role was particularly evident in attacks using Penetrators. Penetrators used in Iraq during this period were "exclusively associated with" Hezbollah. Third Am. Compl. ¶ 395 (quoting Minute, Deputy Chief of Assessments Staff to Sir Nigel Sheinwald, Iraq: Lebanese Training including manuscript comment Blair (May 3, 2007)). Hezbollah planned the Penetrator attacks by giving assistance to Jaysh al-Mahdi regarding Penetrator design, helping Jaysh al-Mahdi manufacture those weapons, teaching Jaysh al-Mahdi fighters how to use them, identifying specific target locations in Iraq, and sending senior Hezbollah terrorists to coordinate the Penetrator attacks. In other words, Hezbollah did not just provide deadly Penetrators, it then "instructed Jaysh al-Mahdi to use [Penetrators] against American soldiers" and taught them how to do so. *Id.* ¶ 395. The complaint explains the tactics for other types of attacks as well, linking them to corresponding Hezbollah training and direction. Plaintiffs'

allegations readily meet the minimum required to plead that Hezbollah "planned" the attacks.

The allegations that Hezbollah exerted religious, personal, and operational authority over Jaysh al-Mahdi show that it "authorized" the attacks as well. Hezbollah asserted religious authority over Jaysh al-Mahdi fighters by, for example, issuing a *fatwa* declaring a religious duty to attack Americans in Iraq. It exerted personal authority over Sadr, who openly aligned himself with Hezbollah. And Hezbollah exercised its command over Jaysh al-Mahdi by training and directing its fighters, who swore fealty to Hezbollah. Those allegations are legally sufficient at this stage to support the contention that Hezbollah authorized the attacks.

Those and many similar allegations of close integration and allegiance suffice to plausibly plead that Hezbollah planned and authorized Jaysh al-Mahdi's challenged attacks.

> ii. **Plaintiffs allege defendants aided and abetted Jaysh al-Mahdi's attacks against plaintiffs by "knowingly providing substantial assistance" to those acts**

We next address whether plaintiffs' allegations support their claim that defendants may be liable for "aid[ing] and abet[ting], by knowingly providing substantial assistance" to "act[s] of international terrorism." 18 U.S.C. § 2333(d)(2).

In enacting the JASTA, Congress expressly embraced the aiding-and-abetting analysis in *Halberstam v. Welch*—a unanimous opinion by Judge Wald, joined by Judges Scalia, and Bork—as providing "the proper legal framework for how [aiding-and-abetting] liability should function" under the Act. Amendment § 2(a)(5). *Halberstam* sustained Linda Hamilton's civil liability for aiding and abetting Bernard

60a

Welch's murder of Michael Halberstam during Welch's burglary of Halberstam's home.  705 F.2d at 474.  Hamilton was not even aware that Welch, her romantic partner, was going to burglarize Halberstam, much less murder him, nor was she present at the crime scene.  *Id.* at 475-76, 487-88.  It sufficed that she was a "passive but compliant partner" who lived with Welch during his extensive series of lucrative burglaries, *id.* at 474-75; assisted him in his "business" with back-office tasks like bookkeeping, inventory, and banking, *id.* at 475, 487; and benefited from the ill-gotten gains, *id.* at 487.  Hamilton never did anything violent.  *Id.* at 475-76, 488.  But Welch's evening absences and access to significant funds despite the couple's lack of typical employment would have suggested to Hamilton that Welch "was involved in some kind of personal property crime at night."  *Id.* at 488.  She knew "something illegal was afoot."  *Id.* at 486.  In sum, under the circumstances, Hamilton's office tasks constituted substantial assistance, and she had the requisite "general awareness of her role in a continuing criminal enterprise."  *Id.* at 488.  Since "violence" is a "foreseeable risk" of that enterprise, we sustained Hamilton's liability as an aider and abettor to the murder.  *Id.*

*Halberstam* sets out three elements of aiding-and-abetting liability:

> (1) the party whom the defendant aids must perform a wrongful act that causes an injury;

> (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance;

> (3) the defendant must knowingly and substantially assist the principal violation.

705 F.2d at 477. *Halberstam* further identifies six factors bearing on the third, substantial-assistance element, considered below. *Id.* at 483-84.

As to the first element, there is no dispute on this appeal that wrongful acts caused plaintiffs' injuries. Defendants argue that plaintiffs inadequately plead the second and third requirements, and the district court based its dismissal on its determination that plaintiffs fail to plead substantial assistance to acts of international terrorism under the third requirement.

### a. The **Halberstam** *Elements*

With no challenge before us to the first *Halberstam* element, we proceed to consider general awareness and substantial assistance. We conclude that plaintiffs have plausibly alleged both elements.

### 1. *General Awareness*

*Halberstam* explains that a "defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time he provides the assistance." 705 F.2d at 487-88. Under the ATA, "a defendant may be liable for aiding and abetting an act of terrorism if it was generally aware of its role in an 'overall illegal activity' from which an 'act of international terrorism' was a foreseeable risk." *Kaplan*, 999 F.3d at 860 (quoting *Halberstam*, 705 F.2d at 488). There is no specific intent requirement. *Id.* at 863. Whether a defendant's support "suffices to establish general awareness is a fact-intensive inquiry." *Id.* at 860. And *Halberstam*'s use of "generally" as a modifier for "aware" imparts "a connotation of something less than full, or fully focused, recognition." *Id.* at 863. Thus, a "defendant need not be generally aware of its role in the specific act that caused the plaintiff's injury; instead, it must be generally aware of its role in an overall illegal

activity from which the act that caused the plaintiff's injury was *foreseeable*." *Honickman*, 6 F.4th at 496 (emphasis in original) (citing *Halberstam*, 705 F.2d at 477, 488).

In considering whether plaintiffs have plausibly alleged defendants' general awareness of their role in the overall illegal activity, we bear in mind the challenges of establishing a defendant's state of mind without the benefit of discovery. "A complaint is allowed to contain general allegations as to a defendant's knowledge." *Kaplan*, 999 F.3d at 864. At the same time, discovery into a party's state of mind is intrusive and should not proceed based on bare, conclusory allegations. What plaintiffs must plead are "allegations of the facts or events they claim give rise to an inference" that defendants acted with the requisite mental state. *Id.* Plaintiffs have met that burden here.

The complaint plausibly alleges that defendants were aware of reports extensively documenting both Jaysh al-Mahdi's domination of the Ministry and its mission to engage in terrorist acts. For example, the media reported in April 2005 that the health minister was a devotee of Sadr's movement even as Sadr led armed rebellions against American troops. *Cf. Kaplan*, 999 F.3d at 864-65 (sustaining awareness allegations based on Hezbollah's statements in "press conferences and news media interviews"). Other reports highlighted Jaysh al-Mahdi's abuse of the Ministry's resources. Defendants would have been aware of such reports because each defendant had a corporate security group that would have tracked them as part of its due diligence. *See id*. at 865 (highlighting that banks' due diligence would uncover public reporting). Defendants also sent their agents into the Ministry to finalize deals on their behalf. Inside the Ministry, armed terrorist fighters circulated openly and anyone who entered could see Jaysh al-Mahdi's distinctive flag, weapons, Sadr posters, and "Death to

63a

America" slogans on display.  Yet, in dealing with the notoriously corrupt Ministry under the control of a terrorist group, defendants facilitated their transactions with bribes and structured them to include free goods of great value in funding terrorist acts.

Those allegations support an inference that defendants were generally aware they were engaged in illegal activity.  In *Halberstam*, Linda Hamilton's back-office work supported her liability for murder because she had reason to suspect her partner was involved in nighttime property crimes, and the fact that she performed her otherwise-innocuous services for him "in an unusual way under unusual circumstances for a long period of time" suggested her general awareness of illegality. 705 F.2d at 487.  Here, the corrupt provision of free goods and cash bribes to an entity defendants knew was engaged in anti-American acts of terrorism and was using its takeover of the Ministry to fund and facilitate those terrorist acts supports the inference that they were generally aware of their role in activity foreseeably lending support to acts of international terrorism. *Cf. Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 224 (2d Cir. 2019) (rejecting aiding-and-abetting claim against defendant bank that provided financial services to Saudi bank with known links to terrorism where plaintiffs "failed to allege that [defendant bank] was aware that by providing banking services" it was supporting a terrorist organization, "much less assuming a role in [its] violent activities").  We next weigh the six "substantial assistance" factors.

## 2.  *Knowing and Substantial Assistance*

For the third aiding-and-abetting element—whether the defendant "knowingly and substantially assist[ed] the principal violation," 705 F.2d at 477—*Halberstam* identifies six factors to weigh: (i) the nature of the act assisted, (ii) the amount and

kind of assistance, (iii) the defendants' presence at the time of the tort, (iv) the defendants' relationship to the tortious actor, (v) the defendants' state of mind, and (vi) the duration of assistance, *id.* at 483-84. No factor alone is dispositive, and the weight of each varies with the circumstances of the particular claim. What is required is that, on balance, the relevant considerations show that defendants substantially assisted the acts of terrorism. *See, e.g.*, *Halberstam*, 705 F.2d at 483-84, 488.

Here, the "knowledge component . . . requires that the defendant 'know[]' that it is providing 'assistance,' 18 U.S.C. § 2333(d)(2)—whether directly to the FTO or indirectly through an intermediary." *Kaplan*, 999 F.3d at 863-64 (alteration in original). "If the defendant knowingly—and not innocently or inadvertently—gave assistance, directly or indirectly, and if that assistance was substantial," then the "knowing and substantial assistance" element of aiding and abetting is sufficiently established. *Id.* at 864. Defendants do not argue that their provision of cash and free goods was in any way accidental, so the assistance was given knowingly. We next weigh the six "substantial assistance" factors.

**i. Nature of the act assisted.** The nature of the act assisted "dictates what aid might matter, *i.e.*, be substantial." *Halberstam*, 705 F.2d at 484. The nature of the act assisted in *Halberstam* was the burglary enterprise, and Hamilton's "aid in transforming large quantities of stolen goods into 'legitimate' wealth" was "indisputably important" to it. *Id.* at 488. Here, the acts assisted are Jaysh al-Mahdi's violent terrorizing, maiming, and killing of U.S. nationals in Iraq. "Financial support is 'indisputably important' to the operation of a terrorist organization, and any money provided to the organization may aid its unlawful goals." *See Gonzalez*, 2 F.4th at 905 (quoting *Halberstam*, 705 F.2d at 488). We further

65a

explained in *Halberstam* that, in assessing the "nature of the act" criterion, "a court might also apply a proportionality test to particularly bad or opprobrious acts, *i.e.*, a defendant's responsibility for the same amount of assistance increases with the blameworthiness of the tortious act or the seriousness of the foreseeable consequences." 705 F.2d at 484 n.13. The extraordinary blameworthiness of Jaysh al-Mahdi's terrorist attacks increases the responsibility of persons acting as defendants allegedly did. In relation to such vicious acts, even "relatively trivial" aid could count as substantial. *Id*. This factor supports substantiality.

**ii. Amount and kind of assistance.** We next consider the "amount and kind of assistance given [to] the wrongdoer." *Halberstam*, 705 F.2d at 484 (formatting modified). In *Halberstam*, the court held that, "although the amount of assistance Hamilton gave Welch may not have been overwhelming as to any given burglary in the five-year life of this criminal operation, it added up over time to an essential part of the pattern." *Id.* at 488 (formatting modified). Here, the complaint alleges that defendants gave Jaysh al-Mahdi at least several million dollars per year in cash or goods over a period of years. *Cf. Siegel*, 933 F.3d at 225 (lack of allegations that terrorist group ever received funds defendant bank provided to Saudi bank weighed against "substantial assistance").

We reject the contention that assistance must be shown to have been indispensable to the injurious acts for this factor to weigh in support of liability. According to defendants, because Iran provided a substantial part of Jaysh al-Mahdi's funding and weapons, any aid from defendants was immaterial. That is incorrect. Nothing in the JASTA suggests Congress intended secondary liability to extend only to the top funder of a terrorist action. As alleged, defendants' actions were a considerable

source of funding that helped the organization commit multiple terrorist acts. Because defendants' alleged assistance was at least significant, this factor supports substantiality.

**iii.  Presence at the time of the tortious conduct.**  In *Halberstam*, Linda Hamilton was "not present at the time of the murder or even at the time of any burglary," but because "the success of the tortious enterprise clearly required expeditious and unsuspicious disposal of the goods," we nonetheless concluded that "Hamilton's role in that side of the business was substantial."  705 F.2d at 488 (formatting modified).  Like Hamilton, these defendants were not physically present at the attacks on plaintiffs.  This factor cuts against counting defendants' supply of cash and goods to Jaysh al-Mahdi as substantial assistance.

**iv. Relationship.**  The fourth factor asks about defendants' "relation to the tortious actor."  *Halberstam*, 705 F.2d at 488 (formatting modified).  In *Halberstam*, we identified this factor as calling for consideration of whether the abettor's "position of authority [gives] greater force to his power of suggestion." *Id.* at 484.  We gave this factor "a low priority in our calculus" in that case after "a careful balancing" because Hamilton's romantic relationship with the tortfeasor made us "wary of finding a housemate civilly liable on the basis of normal spousal support activities."  *Id.* at 488.  Unlike in *Halberstam*, there is no special relationship here between defendants and the principal tortfeasors that would give us pause before recognizing liability.  We treat this factor as neither supporting nor detracting from substantiality.

**v.  State of mind.**  This factor favors aiding-and-abetting liability because defendants' assistance was knowingly provided with a general awareness that it supported the terrorist acts of a notoriously violent terrorist organization that had

overrun the Ministry of Health.  *See Halberstam*, 705 F.2d at 477, 488.  Hamilton's "knowing" assistance "evidence[d] a deliberate long-term intention to participate in an ongoing illicit enterprise" of "some type of personal property crime at night."  *Id*. at 488.  That sufficed to support her aiding-and-abetting liability for the murder, because violence is a "natural and foreseeable consequence" of such property crimes.  *Id*.  To be sure, this factor more powerfully supports aiding-and-abetting liability of defendants who share the same goals as the principal or specifically intend the principal's tort, but such intent is not required.  *See Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 & n.10 (2d Cir. 2018).  Knowledge of one's own actions and general awareness of their foreseeable results, not specific intent, are all that is required.

The district court itself acknowledged plaintiffs' allegations that "defendants knowingly provided medical goods to the Ministry for economic gain and were aware those goods would be used by [Jaysh al-Mahdi] to support terrorist attacks."  *Atchley*, 474 F. Supp. 3d at 213.  That acknowledgement alone required the court to find this factor supported plaintiffs' claim.  This is especially so because *Halberstam* held that the "particularly offensive nature of an underlying offense might also factor in the fifth criterion, the 'state of mind' of the defendant."  705 F.2d at 484 n.13.  Defendants' alleged awareness that, by bribing the Ministry, they were funding an entity's terrorist attacks on Americans in Iraq drives home the substantial character of their aid.

The district court instead counted this factor against plaintiffs by erroneously discerning a "one in spirit" requirement in *Halberstam*:  It thought the claim fell short because the "allegations do not even suggest defendants were 'one in spirit' with [Jaysh al-Mahdi's] desire to kill American citizens in Iraq or that defendants intended to help [Jaysh al-

Mahdi] succeed in doing so." 474 F. Supp. 3d at 213. That was error. *See* Amicus Br. of Law Professors at 27-29.

Congress did not limit secondary liability to those who are "one in spirit" with terrorists, or who substantially assist terrorism with a specific desire to advance terroristic outcomes. A specific intent, or "one in spirit," requirement is contrary to *Halberstam* as incorporated into the JASTA. The reference to "one in spirit" appears in *Halberstam* in a description of another case in which the "defendant's abusive cheering of the battery showed he was one in spirit with the assaulter[,]" adding factual support to the secondary liability in that case. 705 F.2d at 484 (citing *Rael v. Cadena*, 93 N.M. 684, 604 P.2d 822 (1979)). We upheld Hamilton's liability, however, even though she knew nothing about the murder so she could not have specifically intended it; it sufficed that she was generally aware of Welch's campaign of property crimes, which foreseeably posed a risk of such violence. *Id.* at 488. Aiding-and-abetting liability reaches actors like Linda Hamilton, who may seek only financial gain but pursue it with a general awareness of aiding some type of tort or crime. For their part, defendants do not press a requirement that aiders be "one in spirit" with the principal, but suggest that the absence of such a finding should count in our factor-balancing. Oral Arg. Rec. 1:13:03-1:13:55. We hold that, on balance, defendants' alleged state of mind supports substantial assistance.

**vi. Duration.** Under *Halberstam*, "[t]he length of time an alleged aider-abettor has been involved with a tortfeasor almost certainly affects the quality and extent of their relationship and probably influences the amount of aid provided as well; additionally, it may afford evidence of the defendant's state of mind." 705 F.2d at 484. The parties argue over whether the complaint alleges that defendants' aid spanned as much as a decade or as little as four years. Even on defendants' reading,

69a

four years is a significant duration.  *See id.* at 488 (noting that duration "strongly influenced [the court's] weighing of Hamilton's assistance," when the scheme lasted five years). The allegations do not describe a one-off transaction by a firm unfamiliar with its counterparty, but a set of enduring, carefully cultivated relationships consisting of scores of transactions over a period of years.  Here, duration leans decidedly in plaintiffs' favor.

In sum, assessing the allegations of the complaint under the *Halberstam* standard, we hold that they plausibly plead knowing assistance that was sufficiently "substantial" to state a secondary liability claim under the JASTA.  Plaintiffs have alleged that defendants' financial support was important to the development of Jaysh al-Mahdi, that defendants knowingly gave significant funding to Jaysh al-Mahdi, and that they did so over the course of several years with at least general awareness of their role in Jaysh al-Mahdi's terrorist activities. Under *Halberstam*, that is enough.

### b.  *"Directly or Indirectly"*

The district court also faulted the aiding-and-abetting claim for want of allegations that defendants substantially assisted Jaysh al-Mahdi "directly."  *Atchley*, 474 F. Supp. 3d at 213; *see also id.* at 212 ("But plaintiffs allege that defendants provided medical goods and devices to the Ministry, not" Jaysh al-Mahdi).  It read the complaint to allege that bribes and gifts reached Jaysh al-Mahdi only indirectly, through the Ministry. *Id.* at 212.  And indirect aid, the court thought, cannot support aiding-and-abetting liability under the Act.  *Id.* at 212-13.  That is doubly wrong.

First, the complaint contradicts the court's factual premise. It plausibly alleges that Jaysh al-Mahdi controlled the Ministry. Bribes and gifts coming into the Ministry under Jaysh al-

Mahdi's command were bribes and gifts to Jaysh al-Mahdi. The district court misread the complaint insofar as it inferred that, in their allegedly corrupt dealings with the Ministry of Health, defendants somehow avoided dealing with the people in charge there—the Jaysh al-Mahdi terrorists. *See* Part I-B, *infra*.

Second, the court applied an incorrect legal standard. The statute imposes no directness requirement. In defining secondary liability in § 2333(d)(2), Congress purposefully omitted any requirement of "direct" assistance. Its enacted findings drive home the point, declaring that the JASTA authorizes claims against defendants who provide "support, *directly or indirectly*, to [terrorists]." Amendment § 2(b) (emphasis added). The bipartisan U.S. Senators' amicus brief underscores that judicially engrafting a directness requirement would undermine the Act by "preclud[ing] liability when a defendant knowingly aids-and-abets (or conspires with) an individual terrorist agent, alter ego, or proxy of a terrorist organization that did not himself or herself commit the acts of terrorism at issue." Amicus Br. of Eight United States Senators at 23-24.

Defendants respond that the Amendment's preamble cannot change the statutory text, which in their view "plainly requires that the defendant 'aid and abet' the 'person who committed' the terrorist act." Appellees Br. at 45. To the contrary, the text provides that "liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." 18 U.S.C. § 2333(d)(2). It thus applies to both "any person who aids and abets . . . an act of international terrorism," and anyone who "conspires with the person who committed such an act." *Id*.; *see also Kaplan*, 999 F.3d at 855. Put another way, the JASTA

71a

"does not say that for aiding-and-abetting liability to be imposed a defendant must have given 'substantial assistance to' the principal; it simply says the defendant must have given 'substantial assistance.'" *Kaplan*, 999 F.3d at 855. Substantial assistance to the ultimate deed—whether provided directly or indirectly—is enough.

Even assuming the textual reference to "the person" who committed the act were meant to apply to aiding-and-abetting as well as conspiracy claims, it fails to do what defendants say. As a practical matter, one can substantially assist "a person" without doing so directly. Congress's enacted findings in the JASTA explain that it had such situations in mind: The statute provides for secondary liability to account for the fact that "[s]ome *foreign terrorist organizations, acting through affiliated groups or individuals*, raise significant funds outside of the United States for conduct directed and targeted at the United States." Amendment § 2(a)(3) (emphasis added). In providing that aiding people or entities that raise money they funnel to terrorist groups may be as off-limits as directly aiding the groups themselves, Congress anticipated aiding-and-abetting liability of indirect funders.

In sum, we hold that plaintiffs have stated a secondary liability claim under the JASTA. They have adequately alleged that Jaysh al-Mahdi's terrorist acts against plaintiffs were committed, planned, or authorized by Hezbollah. They have also adequately alleged that defendants aided and abetted those attacks by knowingly providing substantial assistance to Jaysh al-Mahdi with the general awareness that Jaysh al-Mahdi committed terrorist attacks, foreseeably including the attacks against plaintiffs. We next consider plaintiffs' more challenging claim that defendants are also directly liable under the ATA.

72a

## B.   Direct Liability

Plaintiffs separately claim that defendants may be held directly liable for acts of international terrorism they did not merely aid, but themselves committed.  That claim requires allegations that plaintiffs, as nationals of the United States, were "injured in [their] person, property, or business by reason of an act of international terrorism."  18 U.S.C. § 2333(a).  It is not contested that plaintiffs are U.S. nationals.  The parties dispute whether plaintiffs allege injury by reason of acts of international terrorism—*i.e.*, whether defendants' alleged financing, 18 U.S.C. § 2339C, and material support, 18 U.S.C. § 2339A, of Jaysh al-Mahdi was "international terrorism" within the meaning of 18 U.S.C. § 2331(1).  And they dispute whether defendants' conduct proximately caused plaintiffs' injuries.  The district court dismissed the claim for failure to plead proximate causation without addressing the scope of "act of international terrorism" under the statute.  *See Atchley*, 474 F. Supp. 3d at 209.  We hold that plaintiffs have adequately alleged proximate causation and remand for the district court to consider in the first instance whether plaintiffs have also alleged that defendants themselves committed any acts of international terrorism within the meaning of the ATA.

To plead proximate causation, plaintiffs must "plausibly allege (1) that [defendants'] acts were 'a substantial factor in the sequence of events' that led to their injuries and (2) that those injuries" were "'reasonably foreseeable or anticipated as a natural consequence of' [defendants'] conduct."  *Owens IV*, 897 F.3d at 273 (formatting modified) (quoting *Owens v. Republic of Sudan* (*Owens III*), 864 F.3d 751, 794 (D.C. Cir. 2017), *vacated on other grounds sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020)).  Those requirements are met by allegations of "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff

73a

has suffered." *Owens III*, 864 F.3d at 794 (quoting *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004)). Proximate causation functions to "eliminate[] the bizarre," *id.* (quoting *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 536 (1995)), by precluding liability based on an "attenuated" causal link "more aptly described as mere fortuity," *id*. (quoting *Paroline v. United States*, 572 U.S. 434, 445 (2014)).

With respect to the first element, allegations that defendants' funding substantially assisted Jaysh al-Mahdi's terrorist campaign in Iraq suffice to meet the requirement that defendants' acts were a "substantial factor" in the events leading to plaintiffs' injuries. In *Owens III*, we upheld a finding that Sudan had proximately caused two al-Qaeda bombings of embassies in other countries based on proof that Sudan had given al-Qaeda substantial assistance that helped it "grow its membership" and "develop its capabilities." 864 F.3d at 797. Sudan had supported al-Qaeda through various forms of in-kind aid. It had afforded "tax exceptions" and "customs privileges" that "allowed al Qaeda nearly to monopolize the export of several agricultural commodities, plowing its profits back into its broader organization." *Id*. at 794. Its intelligence service had protected al-Qaeda training camps from local police investigations. *Id.* And it had given indirect financial support by extending the privilege of investing in a state-owned bank, which allowed al-Qaeda access to the formal banking system. *Id*. at 795. We concluded that, "although Sudan did not directly fund al Qaeda or its business, the [district] court reasonably concluded its in-kind assistance had the same practical effect." *Id*.

Defendants' alleged support here was similarly a substantial factor in plaintiffs' injuries. They gave both cash and cash equivalents to the terrorist organization that harmed

74a

plaintiffs, which allowed that organization to grow. In fact, the ability to use the Ministry as a source of funding for Jaysh al-Mahdi—to funnel financial perks from suppliers like defendants straight into Jaysh al-Mahdi's coffers—was a significant reason Sadr sought to control that agency in the first place. Plaintiffs' nonconclusory, detailed allegations describe the free goods scheme, including percentages of free goods defendants gave Kimadia on top of contract quantities. They even identify many individual contracts for specific drugs and other medical goods with a "free goods" amount specified. Regarding the cash bribes, the complaint alleges that defendants routinely paid a 20% bribe on their contracts during the time period, identifies certain dealings by parties along with bribe amounts, and describes how the bribes operated at each phase of the transaction. And the plausibility of these major global corporations giving such bribes and gifts is bolstered by allegations that these same companies or their affiliates had previously participated in essentially the same kind of corruption during the Oil-for-Food program with different Ministry leadership using the same basic playbook.

The complaint also meets the second element of proximate causation. In view of plaintiffs' plausible allegations that defendants bribed Jaysh al-Mahdi with cash and goods, plaintiffs' injuries were "reasonably foreseeable or anticipated" natural consequences of that assistance. *Owens III*, 864 F.3d at 794 (quoting *Rothstein*, 708 F.3d at 91). Jaysh al-Mahdi was a known terrorist group, led by an anti-American cleric, estimated to have killed more than five hundred Americans and injured many others. Providing fungible resources to a terrorist organization allows it to grow, recruit and pay members, and obtain weapons and other equipment. It was reasonably foreseeable that financially fortifying Jaysh al-Mahdi would lead to the attacks that plaintiffs suffered. The same was true in *Owens III*: Sudan's material support to al-

75a

Qaeda foreseeably led to the bombings at issue, because "Sudan could not help but foresee that al Qaeda would attack American interests wherever it could find them." *Id.* at 798.

Defendants urge dismissal of plaintiffs' direct liability claims on the ground that the Ministry was an independent intermediary that defeated proximate causation. They draw support from cases in which assistance to a state sponsor of terrorism fell short of proximately causing harms committed by terrorists the state supported. In both *Owens IV* and *Rothstein*, for example, plaintiffs claimed that defendant banks aided terrorists by extending valuable banking privileges to sovereign states (Sudan and Iran, respectively). *Owens IV*, 897 F.3d at 268-69; *Rothstein*, 708 F.3d at 84-85. But proximate causation was lacking in *Owens IV* because the plaintiffs did not "allege that any currency processed by BNPP for Sudan" was "in fact sent to al Qaeda," nor that such aid from Sudan was necessary to the embassy bombings. 897 F.3d at 276. The same was true of the relationship between the bank and Iran in *Rothstein*. 708 F.3d at 97; *see Kemper v. Deutsche Bank AG*, 911 F.3d 383, 392-94 (7th Cir. 2018) (similar for Deutsche Bank AG and Iran).

The role of the Ministry of Health in this case is markedly different from that of the "independent intermediary" states—Sudan and Iran—in the prior cases. A sovereign state has "many legitimate agencies, operations, and programs to fund" so, even if the state is known to prop up terrorists, we cannot presume that aid to such a state finds its way into terrorist hands. *Owens IV*, 897 F.3d at 276 (quoting *Rothstein*, 708 F.3d at 97). But plaintiffs do not allege that defendants aided an autonomous nation with many functions and priorities. Rather, they allege that defendants gave to a single agency that had been overtaken by terrorists.

76a

The complaint extensively details Jaysh al-Mahdi's control over the Ministry, and references multiple reports to that effect by people on the ground in Iraq. The Ministry, on plaintiffs' account, was not an independent intermediary because it was thoroughly dominated by Jaysh al-Mahdi and "functioned more as a terrorist apparatus than a health organization." Third Am. Compl. ¶ 3. By early 2005, Sadr, the Jaysh al-Mahdi leader, had officially taken over the Ministry and placed his operatives at every level of its leadership. Jaysh al-Mahdi's command of the Ministry encompassed Kimadia, the Ministry's procurement arm with which defendants dealt. The group placed Sadrists in leadership roles throughout Kimadia, including as Director General. At the height of Sadrist control, the Ministry employed about 70,000 Jaysh al-Mahdi members and largely purged Sunnis and unaligned technocrats, even killing or running out doctors who were not loyal. Under Jaysh al-Mahdi, "[p]ublic hospitals were converted into terrorist bases where Sunnis were abducted, tortured, and murdered." *Id.* Ministry "ambulances transported Jaysh al-Mahdi death squads around Baghdad," and "terrorists openly patrolled the halls of [the Ministry] headquarters." *Id.* Hakim al-Zamili, Deputy Minister of Health and Jaysh al-Mahdi commander, even launched attacks from the roof of the Ministry headquarters. Recognizing proximate causation here is a far cry from holding the causation requirement met by non-governmental organizations "providing assistance to a non-sanctioned organization if the aid is later stolen, diverted, or extorted by groups that engage in terrorism." Amicus Br. of Charity & Security Network and InterAction: The American Council for Voluntary International Action, Inc. at 4-5; *see also id.* at 19-20.

Defendants' arguments to the contrary rest on an untenably skeptical reading of the complaint that

77a

impermissibly draws inferences against plaintiffs. They ask us to infer that Jaysh al-Mahdi actually did not control the Ministry. They do so by picking out allegations that Jaysh al-Mahdi would "loot," "steal," and "divert" supplies from the Ministry. Appellees Br. at 12-13, 27 (complaint citations omitted). Defendants say those references imply that the Ministry was an independent entity to which defendants sent their goods and equipment, and that Jaysh al-Mahdi only later stepped in to divert them to its own purposes. *Id.* at 29-30. In their view, then, their assistance to the Ministry could not have been a substantial factor in plaintiffs' injuries. Plaintiffs respond that words such as "looted" and "stole" in this context "signify illegality, not independence," and cite other examples of alter-ego entities described as "looting" or "stealing" from an entity with which they are identified. Appellants Reply at 5 (citations omitted). It remains open to defendants to seek to substantiate their narrative at a later stage, but we cannot adopt it on review of the complaint.

Defendants' insistence that they provided "life-saving medical goods" to the Ministry of Health, Appellees Br. at 9, not Jaysh al-Mahdi, does not alone defeat proximate causation. Aid directed to beneficial or legitimate-seeming operations conducted by a terrorist organization does not attenuate the role of the aid in causing terrorist acts. For example, in *Owens III*, we held that the defendant's funding to "al Qaeda-affiliated businesses" that "provided legitimate employment for al Qaeda operatives" and performed "infrastructure projects," 864 F.3d at 783, counted as material support that proximately caused al-Qaeda's attacks, *id.* at 794-98. In *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685 (7th Cir. 2008) (en banc), the Seventh Circuit held that Hamas's involvement "not only in terrorism but also in providing health, educational, and other social welfare services" likewise did not "get [defendants] off the liability hook." *Id.* at 698. It reached that conclusion

78a

because of "the fungibility of money" and because "Hamas's social welfare activities reinforce its terrorist activities." *Id.* The Supreme Court, too, recognizes that "[m]aterial support meant to promote peaceable, lawful conduct can further terrorism by foreign groups in multiple ways." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 30 (2010) (citation and quotation marks omitted). The same is true here. On the facts alleged in the complaint, the bribes and free goods were aid to Jaysh al-Mahdi that foreseeably furthered the organization's growth and supported its terrorist acts.

What is more, when a defendant aids an intervening intermediary, the defendant's position "one step removed" from the terrorists does not defeat proximate causation so long as plaintiffs allege "some facts demonstrating a substantial connection between the defendant and terrorism." *Owens IV*, 897 F.3d at 275. In the event that the evidence were to establish, contrary to the allegations of their complaint, that the Ministry remained meaningfully independent of Jaysh al-Mahdi, that would not necessarily defeat causation. The court would still need to consider whether plaintiffs established the requisite substantial connection. *Owens IV* permits them to do so by, for example, showing that the funds to the Ministry "actually [were] transferred to [Jaysh al-Mahdi] . . . and aided in" the terrorist acts. *Id*. at 276 (first alteration in original) (quoting *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 124 (2d Cir. 2013)). Unlike the plaintiffs in *Owens IV* and *Rothstein*, who simply assumed that aid to Sudan or Iran was aid to the terrorists they supported, plaintiffs here allege and would be entitled to try to show how the bribes and gifts were nonetheless substantially connected to Jaysh al-Mahdi's acts of terrorism that harmed plaintiffs.

Defendants urge us to take judicial notice of U.S. government support for the Iraqi Ministry of Health during the

79a

period of Sadrist control as a factor that they contend defeats any inference that defendants' aid proximately caused harm to plaintiffs.  Defendants assert that, on plaintiffs' theory, "the U.S. Government itself proximately caused Jaysh al-Mahdi's armed attacks."  Appellees Br. at 32.  They insist the government encouraged private-sector suppliers to support the Ministry of Health, and that "[t]he Supplier Defendants answered that call."  *Id.* at 9.  But plaintiffs nowhere allege that the government either made or encouraged the corrupt payments to Jaysh al-Mahdi that are the centerpiece of plaintiffs' claims. To the contrary, they allege that U.S. government efforts to bolster health infrastructure for the benefit of the Iraqi people generally steered clear of the Mahdi-controlled Ministry.  *See* Third Am. Compl. ¶¶ 76, 113.  We decline defendants' invitation to take judicial notice of documents reciting complex facts that appear subject to dispute.  *See* Appellants Reply Br. at 8-10; *see also Hurd v. District of Columbia*, 864 F.3d 671, 686-87 (D.C. Cir. 2017); *cf. Owens IV*, 897 F.3d at 273 ("Public records are subject to judicial notice on a motion to dismiss when referred to in the complaint and integral to the plaintiff's claim.").  The precise nature and context of any U.S. dealings with the Ministry, or encouragement of others to aid it, remain open to evidentiary development.

We hold that plaintiffs have alleged that defendants proximately caused plaintiffs' injuries, and remand for further consideration of plaintiffs' direct liability claims. The district court on remand will need to reach the issue whether plaintiffs have alleged that defendants themselves committed "acts of international terrorism" under the ATA.  *See* Third Am. Compl. ¶¶ 3208-21.  That is a legal question, but it was only lightly briefed on this appeal.  Because we must remand in any event, we decline to decide it in the first instance.

### C.   Manufacturers' Remoteness Defense

Finally, as to both primary and secondary liability, the manufacturer defendants argue that they are not liable even if the supplier defendants are.  They contend it was the suppliers who are alleged to have dealt directly with the Mahdi-controlled Ministry, and that they as manufacturers were further removed from the support to Jaysh al-Mahdi that is alleged to have contributed to plaintiffs' injuries.  And they say that, given their remoteness, they could not have been tipped off by the visual cues of Jaysh al-Mahdi's domination of the Ministry that plaintiffs allege as one indication of defendants' awareness of their role in Jaysh al-Mahdi's terrorist activities.

On this complaint, we cannot dismiss the claims against the manufacturers on the ground that they were uninvolved with how their goods were marketed in Iraq.  Allegations of awareness based on media reports apply to all defendants.  And plaintiffs allege that the suppliers acted as the manufacturers' agents with respect to the Iraqi contracts for their products.  The briefing did not develop the point, but both parties refer to the Restatement as describing the relevant agency principles.  Oral Arg. Rec. 42:10-42:41, 1:06:57-1:07:50.  As a general matter, "[a]gency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."  Restatement (Third) Of Agency § 1.01 (2006).

As described in the complaint, each supplier had to "demonstrate 'sole and exclusive rights to represent the manufacturer in the territory of Iraq for all of its products,' and each supplier had to procure a 'letter from the manufacturing company authorizing the supplier to represent them.'"  Third

Am. Compl. ¶ 157 (quoting USAID, *Pharmaceutical & Medical Products in Iraq* § 6.3.2.1.2, Contract No. 267-C-00-04-00435-00 (Apr. 17, 2007)) (brackets omitted). "Manufacturers thus had the right to control the suppliers' conduct vis-à-vis" the Ministry: "[M]anufacturers could refuse to authorize specific suppliers to sell in Iraq; could decline to produce documentation confirming that the suppliers acted on their behalf in negotiating with [the Ministry]; or could refuse to fulfill contracts that contained corrupt payments." *Id.* "Any one of those steps," plaintiffs allege, "which were in the manufacturer Defendants' power to control, would have precluded the corrupt payments at issue." *Id.*

The factual allegations describing how the supplier defendants acted as the manufacturers' agents in their interactions with the Ministry and Kimadia under the control of Jaysh al-Mahdi suffice at the pleading stage to prevent dismissal of the claims against the manufacturer defendants on this ground. Development of the factual record, including review of the specific contracts among defendants spelling out relevant terms, as well as other evidence of the nature of the relationships between the manufacturers and their affiliated suppliers, could materially bear on this issue. Of course, to the extent factual development could change the nature of the legal assessment of the relationships among the different types of defendants, those considerations are not now before us.

## II. Personal Jurisdiction

Finally, the foreign supplier defendants challenge the U.S. federal courts' constitutional authority to exercise specific personal jurisdiction over them. They dispute only whether plaintiffs' claims "arise out of or relate to" their contacts with the U.S. forum. We hold that they do.

Here is the short explanation why: First, the foreign supplier defendants deliberately and repeatedly established ample contacts with the United States. They agreed with U.S.-based manufacturers to act as their exclusive agents in Iraq. They then worked closely with the U.S. manufacturers, including through "cross-functional teams," Third Am. Compl. ¶¶ 237, 277, 298, to facilitate Iraqi sales and distribution. The foreign defendants sourced in the U.S. goods they supplied in Iraq, and specifically the goods they used to sweeten their deals with the Mahdi-controlled Ministry.

Second, those forum contacts were all squarely related to plaintiffs' claims. As described earlier in this opinion, the provision of free goods and cash bribes to Jaysh al-Mahdi are at the heart of all of plaintiffs' claims. Plaintiffs contend that bribing Jaysh al-Mahdi and giving it free goods violated the Act by aiding and abetting Jaysh al-Mahdi's terrorist violence against U.S. nationals in Iraq. And plaintiffs view the defendants' alleged bribery and provision of free goods as terror financing and material support for Jaysh al-Mahdi's violence against plaintiffs—support they contend itself constituted international terrorism in direct violation of the ATA.

Putting those two pieces together, it is evident that the foreign suppliers' forum contacts relate to plaintiffs' claims in multiple ways. The objective of the foreign suppliers' collaboration with the manufacturers in the United States was to secure the Iraqi market for the U.S. manufacturers' products. The foreign suppliers made the bribes and delivered the free U.S.-manufactured goods to Jaysh al-Mahdi in Iraq as a means of doing so. The goods they were accordingly able to sell on behalf of their U.S.-affiliated manufacturers were U.S. manufactured and U.S. Food and Drug Administration-approved products. Plaintiffs even allege that the U.S.

provenance of the free goods meant they "carried a high street value," Third Am. Compl. ¶ 153, which helped the foreign supplier defendants clinch those deals.  The ATA claims thus relate closely to the foreign defendants' U.S. contacts.

Now for the fuller explanation of the court's specific personal jurisdiction over the foreign supplier defendants.  The traditional personal jurisdiction analysis asks first whether an applicable long-arm statute authorizes the court to hear the case, and second whether doing so comports with due process.  *See Mwani v. bin Laden*, 417 F.3d 1, 8 (D.C. Cir. 2005).  Neither party addresses the statutory step, which is readily satisfied.  "Where, as here, a claim arises under federal law and, as the parties agree, a 'defendant is not subject to jurisdiction in any state's court of general jurisdiction,' Fed. R. Civ. P. 4(k)(2)(A) . . . personal jurisdiction may be asserted under Rule 4(k)(2)," which is essentially a federal long arm-statute.  *Est. of Klieman by & through Kesner v. Palestinian Auth.*, 923 F.3d 1115, 1120 (D.C. Cir. 2019), *cert. granted, judgment vacated*, 140 S. Ct. 2713 (2020), *and opinion reinstated in relevant part*, 820 F. App'x 11 (D.C. Cir. 2020); *see also Livnat*, 851 F.3d at 55.  "Besides proper service of process, it requires only that" jurisdiction be consistent with the United States Constitution and laws.  *Klieman*, 923 F.3d at 1120.

Implicitly accepting that Rule 4(k)(2)(A) applies, the foreign suppliers assert that the exercise of personal jurisdiction over them would exceed the constitutionally permissible reach of any U.S. court.  Due process prevents a court from deciding claims against parties that have not in some way affiliated themselves with the forum in which the court presides—typically a state, but in certain cases like this one, the entire United States.  As a constitutional minimum, a court's ability to exercise personal jurisdiction over a defendant

84a

requires that the defendant "have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

The parties agree that, for purposes of assessing specific jurisdiction over the foreign suppliers, "the relevant forum is 'the United States as a whole,'" *Klieman*, 923 F.3d at 1120 (quoting *Mwani*, 417 F.3d at 11), and that we apply the Due Process Clause of the Fifth rather than the Fourteenth Amendment, *see Mwani*, 417 F.3d at 11. Apart from the scope of the forum and potential federalism considerations, the Fifth and Fourteenth Amendment Due Process inquiries are generally analogous. *See Livnat*, 851 F.3d at 54-55; *but see Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 137 S. Ct. 1773, 1783-84 (2017) ("[W]e leave open the question whether the Fifth Amendment imposes the same restrictions [as the Fourteenth] on the exercise of personal jurisdiction by a federal court.").

Courts distinguish between all-purpose "general" personal jurisdiction and claim-linked "specific" jurisdiction; the dispute here is limited to whether the court may exercise specific personal jurisdiction over the six foreign supplier defendants to adjudicate these plaintiffs' claims against them.[10]

---

[10] The six foreign defendants are AstraZeneca UK Limited, GE Medical Systems Information Technologies GmbH, Cilag GmbH International, Janssen Phamaceutica N.V., Pfizer Enterprises SARL, and F. Hoffman-La Roche Ltd. All of the foreign defendants are suppliers, not manufacturers. Fifteen other defendants—all of the manufacturers, one parent company, and three suppliers—have either their place of incorporation or their principal place of business (or both) in the United States, and do not dispute personal jurisdiction here.

General personal jurisdiction exists in any forum in which a defendant is "at home," such as in a corporate defendant's place of incorporation and its principal place of business, and may be exercised without regard to whether the claims themselves have any connection to the forum. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021). Plaintiffs do not assert that U.S. courts have general personal jurisdiction over the foreign defendants. *Cf. Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014).

Specific jurisdiction, in contrast, "covers defendants less intimately connected with a [forum], but only as to a narrower class of claims." *Ford*, 141 S. Ct. at 1024. The "'essential foundation' of specific jurisdiction" is the "relationship among the defendant, the forum, and the litigation." *Id.* at 1028 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)). The dispute here is whether that relationship is "close enough to support specific jurisdiction." *Id.* at 1032.

To recap, plaintiffs must meet three requirements to establish a basis for the court's exercise of specific personal jurisdiction: (1) minimum contacts demonstrating that the defendant purposefully availed itself of the forum; (2) relatedness between the contacts and the claim; and (3) compliance with "fair play and substantial justice." The first and third requirements are plainly met here. We review them only briefly to provide context for the key issue—the relatedness of the forum contacts to the claims.

To meet the first requirement, a defendant must have minimum contacts with the forum reflecting "some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum." *Ford*, 141 S. Ct. at 1024 (alteration in original) (quoting *Hanson v. Denckla*, 357

U.S. 235, 253 (1958)).   When the Supreme Court in *International Shoe* reformulated personal jurisdiction doctrine into a minimum-contacts analysis, it "founded specific jurisdiction on an idea of reciprocity between a defendant and a State: When (but only when) a company 'exercises the privilege of conducting activities within a state'—thus 'enjoy[ing] the benefits and protection of [its] laws'—the State may hold the company to account for related misconduct." *Id.* at 1025 (alterations in original) (quoting *Int'l Shoe*, 326 U.S. at 319).  Thus, a defendant must have "deliberately 'reached out beyond' its home—by, for example, 'exploi[ting] a market' in the forum State or entering a contractual relationship centered there." *Id.* (alteration in original) (quoting *Walden v. Fiore*, 571 U.S. 277, 285 (2014)).   In considering whether a contractual relationship establishes the requisite contacts with a forum, we follow a realistic approach, not a mechanical test. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478-79 (1985).  We consider "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Id.* at 479.

The foreign defendants' alleged contacts with the United States suffice to plead purposeful availment.  As relevant here, each of the six foreign supplier defendants reached into the United States to contract with an affiliated U.S. manufacturer to be the manufacturer's exclusive agent in Iraq.  Pursuant to its contract and collaborative relationship with a U.S. manufacturer, each foreign supplier worked in Iraq to secure contracts to sell the U.S. manufacturer's goods there. Continuously over a period of years, each of the foreign defendants reached into the United States to source goods manufactured here to fulfill the Iraqi contracts.  Those U.S. contacts resulted not from anyone else's "unilateral activity," *cf. Hanson*, 357 U.S. at 253, but from the foreign suppliers' own course of dealing by which they "purposefully avail[ed]"

themselves of the privilege of conducting business in the forum, *id*.  The foreign suppliers' forum contacts were significant and ongoing, as confirmed by the terms of many contracts that, even in advance of discovery, the complaint describes.  Those contacts fulfill the constitutional requirement of minimum contacts reflecting purposeful availment of the U.S. forum.

To meet the third specific-jurisdiction requirement, the assertion of personal jurisdiction over the objecting defendant must "comport with 'fair play and substantial justice.'" *Burger King Corp.*, 471 U.S. at 476 (quoting *Int'l Shoe*, 326 U.S. at 320).  To determine whether it does, we consider a range of factors, including the burden on defendants, the forum's interests in adjudicating the case, plaintiffs' interests in "convenient and effective relief," and the judicial system's interest in the efficient resolution of the controversy.  *Id.* at 477 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)).

Considerations of fair play and substantial justice strongly support the exercise of personal jurisdiction over the foreign supplier defendants to adjudicate these plaintiffs' ATA claims.  Defendants—sophisticated international businesses with established and ongoing ties to their U.S. affiliates—assert no special burden from defending this matter in the United States.  *Cf. Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102, 114 (1987).  Nor do they question that plaintiffs and the United States manifestly have strong interests in the availability of a U.S. forum for these claims.  In amending the ATA, Congress declared that "wherever [they are] acting and wherever they may be found," Amendment § 2(b), entities or individuals that give material support to acts of terrorism that "threaten the security of nationals of the United States or the national security, foreign policy, or economy of the United

States . . . should reasonably anticipate being brought to court in the United States to answer for such activities," *id.* § 2(a)(6). If our courts were closed to plaintiffs' claims, no other forum would hold these defendants to account for these ATA violations.

The nub of the dispute centers on the second specific-jurisdiction requirement: that plaintiffs' claims "'arise out of or relate to the defendant's contacts' with the forum." *Ford*, 141 S. Ct. at 1025 (quoting *Bristol-Myers*, 137 S. Ct. at 1780). Put another way, "there must be 'an affiliation between the forum and the underlying controversy.'" *Bristol-Myers*, 137 S. Ct. at 1780 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). Either the claims must "arise out of" the defendants' forum contacts, or they must be related in some other way that is "close enough to support specific jurisdiction." *Ford*, 141 S. Ct. at 1032. One such example occurs when a defendant uses forum contacts as an instrument for achieving the wrong alleged. *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 171 (2d Cir. 2013). But the forum contacts need not themselves be unlawful. And the defendants' forum contacts need not have caused or given rise to the plaintiffs' claims. *Ford*, 141 S. Ct. at 1026. "That does not mean anything goes"—"the phrase 'relate to' incorporates real limits, as it must to adequately protect defendants foreign to a forum." *Id.*

Again, these plaintiffs' claims center on defendants' provision of cash bribes and free goods to Jaysh al-Mahdi that supported terrorist acts against plaintiffs. The claimed ATA-violating bribes arise from or relate to the foreign suppliers' U.S. contacts in at least four overlapping ways. We do not decide whether all four are necessary, nor whether one alone would suffice. We hold only that the relationships between the

89a

plaintiffs' claims and the foreign defendants' alleged contacts with the United States support specific jurisdiction here.

First, the foreign defendants' collaboration with U.S. manufacturers to market their American products in Iraq was why these foreign defendants were interacting with Jaysh al-Mahdi in the first place, and defendants' interactions with Jaysh al-Mahdi form the basis of the claim. The allegations make clear that a principal reason the foreign defendants were selling goods in Iraq at all was to capture a business opportunity beneficial to both the foreign suppliers themselves and their U.S. manufacturer affiliates. The complaint details the relationship between the foreign defendants' forum contacts and their ATA claims: The foreign supplier defendants worked with in-forum manufacturers, acting as those manufacturers' representatives in Iraq when they solicited Iraqi bids and fulfilled orders for the manufacturers' goods to be shipped there. The foreign defendants' ability to complete their sales of the U.S. manufacturers' products in Iraq thus depended on their forum contacts. The U.S. and foreign defendants' cooperative business model benefitted from the protections of U.S. law. Domestic contract law would have likely governed interactions between the foreign suppliers and their U.S. manufacturers, and their businesses benefited from the protections of U.S. food and drug law, customs and export law, and intellectual property regime.

Second, "the products to be distributed by [defendants] were being manufactured" in the forum. *St. Jude Med., Inc. v. Lifecare Int'l, Inc.*, 250 F.3d 587, 592 (8th Cir. 2001). The goods the foreign defendants supplied from their U.S. affiliate manufacturers were, at least in significant part, U.S. goods. For example, AstraZeneca UK Limited allegedly sold U.S.-manufactured drugs to the Ministry, including at least Arimidex (both the active pharmaceutical ingredient (API)

90a

manufacturing and drug formulation occurred in Delaware), and Meronem and Seroquel (the API was made in Delaware for both).[11]  For GE Medical Systems Information Technologies GmbH, the complaint identifies at least twelve medical-device contracts it executed with the Sadrist-controlled Ministry, and it claims that the entity sourced devices from the United States and certified to Kimadia their U.S. origin.  For Cilag GmbH International and Janssen Pharmaceutica N.V. (the two foreign suppliers for Johnson & Johnson), the complaint alleges they sold the Ministry U.S.-manufactured drugs, including Eprex (U.S. API), Topamax (U.S. API), Leustatin (U.S. API), and Remicade (U.S. API).  The complaint alleges that Pfizer Enterprises SARL supplied at least two drugs (Depo-Provera and Solu-Medrol) with U.S. API.  And it alleges that F. Hoffman-La Roche Ltd. supplied several drugs made with U.S. API, including Avastin, Herceptin, MabThera, Pegasys, and Xeloda.  The complaint also alleges on information and belief that discovery is likely to uncover other such transactions.

Third, the primary way in which plaintiffs allege that the foreign defendants actually violated the ATA was giving Jaysh al-Mahdi cash bribes and U.S.-manufactured free goods.  The ATA violation was part of how the foreign suppliers secured a market for U.S.-manufactured products, and the U.S. sourcing is therefore centrally "related to" plaintiffs' claims.  Contracts

[11] "API" is the drug's "active pharmaceutical ingredient."  The drug manufacturers often used a two-part manufacturing process.  The first was to make the API, which for many of the drugs was done at an American facility.  Then, either the same U.S. facility or an affiliate international facility combined the API with other materials to make the final drug.  That second process is called "drug formulation."  According to the complaint, the API is the most important part of the drug manufacturing process, the most difficult as a technical matter, and the step that imparts the most value.

91a

for all but one of the specific drugs discussed above indicated that defendants provided a "free of charge" amount on top of the quantity of drugs Kimadia actually paid for. And for that one drug, Topamax, that contract was allegedly obtained with an "Off-the-Books Payoff." Third Am. Compl. ¶ 253. The provision of U.S.-manufactured drugs was, along with the provision of cash bribes, the very instrumentality the foreign defendants allegedly used to violate the ATA. A plaintiff's cause of action rooted in a defendant's use of its contacts with the United States to violate U.S. law surely arises out of or relates to that plaintiff's claims.

Fourth, plaintiffs allege that Jaysh al-Mahdi specified that the U.S. provenance of the medical goods mattered to it. The complaint alleges that Jaysh al-Mahdi "prioritized obtaining U.S.-manufactured drugs, which tended to be most valuable on the black market" and thus more useful in financing acts of international terrorism. Third Am. Compl. ¶ 122. According to the complaint, "FDA approval was important" because "FDA-approved drugs carried a high street value, which made FDA-approved goods especially attractive for black-market diversion." *Id.* ¶ 153. The supplier defendants accordingly certified to Kimadia which drugs were American in origin, and wrote "USA" on the packaging of the U.S.-origin goods. And each procured U.S. export certificates and FDA approvals for the drugs at issue. Because the tort here is based in significant part on bribing and providing free goods to Jaysh al-Mahdi and thereby funding the terrorist acts that harmed plaintiffs, plaintiffs' allegations that the goods' United States provenance and labeling increased their black-market price and thus their value to Jaysh al-Mahdi as terrorism funding sources tie the claims to the foreign defendants' U.S. forum contacts.

The issue here is not that U.S. goods happen to be in the supply chain, as defendants contend. Rather, the complaint

92a

alleges coordination between affiliated firms within and outside the U.S. working together over a long period to supply products to serve the Iraqi market. Unlike in *Bristol-Myers*, for example, here it *is* "alleged that [the manufacturers] engaged in relevant acts together with [the distributors] in [the forum]." 137 S. Ct. at 1783. The foreign supplier defendants reached into the United States to contract with the U.S. manufacturers. It was those contracts that empowered the foreign suppliers as the U.S. manufacturers' agents to market U.S.-developed and U.S.-produced goods to the Mahdi-controlled Ministry in Iraq. And the foreign suppliers reached into the United States to obtain the goods. *Cf. Bristol-Myers*, 137 S. Ct at 1778 (finding forum contacts unrelated to claim where neither drug nor its marketing strategy were developed in the forum, and defendants "did not manufacture, label, package, or work on the regulatory approval of the product" there).

In sum, the foreign defendants entered into cooperative relationships with U.S. manufacturers to sell U.S.-origin drugs in Iraq; they in fact sold a large volume of U.S. drugs to the Madhi-controlled Ministry over an extended period of time; they used the U.S products, along with cash, to bribe Jaysh al-Mahdi to obtain those contracts; and Jaysh al-Mahdi particularly desired contracts facilitated with "gifts" of free U.S. goods as those goods provided more significant financing for the group's terrorist objectives. In all these ways, then, the foreign defendants' contacts with the United States relate to plaintiffs' ATA claims.

The Second Circuit's analysis in *Licci* illustrates the adequacy of this kind of connection between forum contacts and an ATA claim to support specific jurisdiction. *Licci* confirmed the New York district court's jurisdiction over a Lebanese bank with no operations, branches, or employees in the United States, 732 F.3d at 165, to hear ATA claims related

93a

to the bank's "repeated use of [a] correspondent account—and hence New York's banking system—as an instrument to achieve the wrong complained of," *id.* at 173. It saw the bank's use of the New York-based account as "part of the principal wrong" at issue, *id.* at 170, which was the bank's "repeated, intentional execution of U.S.-dollar-denominated wire transfers on behalf of" a financial arm of Hezbollah, *id.* at 171. It so held even though the bank could have processed the wire transfers "through correspondent accounts anywhere in the world." *Id.* The bank's New York contacts were sufficiently related to plaintiffs' claims, including ATA claims, to support the court's personal jurisdiction over it. *Id.*

Like the bank account in *Licci*, the contracts to sell U.S. goods in Iraq, and the goods themselves used to bribe Jaysh al-Mahdi, were "an instrument to achieve the very wrong alleged." 732 F.3d at 171. Defendants used the U.S. goods to fund Jaysh al-Mahdi, giving rise to the ATA claims at issue. And whereas the money used in *Licci* to violate the statute incidentally flowed through the United States, here, the goods used to violate the ATA originated in the forum and were specially desired by the terrorist organization because of that source. In both cases, then, the contacts with the U.S. forum sufficiently relate to the ATA claim to satisfy due process requirements.

The Supreme Court's elaboration in *Ford* on the requirement that a claim "arise out of or relate to" the defendant's forum contacts also supports our analysis. There, the Court addressed whether Ford was subject to specific jurisdiction in Montana and Minnesota for claims arising from car accidents involving Ford vehicles in each of those forum states, even though Ford had not designed, manufactured, or sold the cars at issue in the forum, and it was unilateral action of others that brought them there. 141 S. Ct. at 1023. Ford

contested personal jurisdiction, asserting that its forum contacts did not cause the plaintiffs' injuries and so lacked the requisite relationship to the claim; the harms, after all, would have been the same even without any of Ford's identified forum contacts. *Id.* at 1026, 1029.

The Supreme Court rejected Ford's insistence that forum contacts must have caused the harm on which the claim is based in order to support specific personal jurisdiction. It instead reaffirmed the "most common formulation of the rule" for specific jurisdiction, which requires "that the suit 'arise out of *or relate to* the defendant's'" forum contacts. *Id.* at 1026 (emphasis in original) (quoting *Bristol-Myers*, 137 S. Ct. at 1780). The Court emphasized how that classic phrasing "contemplates that some relationships will support jurisdiction without a causal showing." *Id.*

Defendants argue that their forum contacts were neither a but-for nor a proximate cause of the ATA violation. To the contrary, they were both. As described above, defendants needed the U.S. contacts in order to work with U.S. manufacturers to sell U.S. goods through delivering bribes and free U.S. goods in Iraq. And, as already explained, defendants' provision of cash and cash-equivalents allegedly proximately caused plaintiffs' injuries. In any event, *Ford* held that, while forum contacts that cause a claim suffice to show the claim "arises out of" those contacts, that kind of relationship is not required for the contacts to "relate to" the claim so as to support specific jurisdiction. 141 S. Ct. at 1026, 1032.

The district court, ruling without the benefit of the Court's decision in *Ford*, erred in holding that the defendants' forum contacts must be the conduct that would subject them to liability. Even as defendants appropriately disavow the notion that a forum contact is claim-related "only if it is itself illegal,"

95a

Appellees Br. at 66 (quoting Appellants Br. at 53), they assert the contacts here are "lacking under any standard" because they are "tangential to Plaintiffs' claims" based on transactions and attacks in Iraq. Appellees Br. at 64-65. We cannot agree. The foreign suppliers' forum contacts are closely entwined with all the claims. The point is not just, as defendants say, that "the goods sold were originally manufactured in the United States." Appellees Br. at 65 (quoting *Atchley*, 474 F. Supp. 3d at 206). These suppliers worked on behalf of the U.S. manufacturers as their exclusive representatives in Iraq to secure that market, bending over backward in embracing corrupt Iraqi terms to fulfill that role.

Defendants' remaining arguments are similarly unpersuasive. They assert that because certain of their Kimadia contracts identified a country other than the United States as the source of some goods, Jaysh al-Mahdi could not have actually cared about the goods' U.S. origin, making the Kimadia contracts' connections to the United States not relevant to the claim in the way plaintiffs posit. But securing the Iraqi market for U.S. goods was in fact what the foreign suppliers were doing in Iraq. For the drugs defendants characterize as not U.S.-manufactured, plaintiffs allege that critical active ingredients that determine the drugs' efficacy and comprise much of the drugs' value to Jaysh al-Mahdi were made in the United States. And they allege that the U.S. provenance of the drugs or their active ingredients mattered to Jaysh al-Mahdi.

For the above reasons, we reverse the district court's grant of the foreign defendants' motion to dismiss for lack of personal jurisdiction.

**CONCLUSION**

The sufficiency of these allegations as such does not prejudge defendants' fact-based defenses. It is beyond the bounds of the motion to dismiss to consider whether plaintiffs can substantiate their allegations with admissible evidence, or to assess defendants' contrary evidence. All we hold is that the allegations, together with the reasonable inferences to be drawn from them in plaintiffs' favor, suffice to state a legally cognizable claim.

We need not—and do not—decide several issues the district court itself did not reach. For one, we leave to the district court to decide in the first instance whether plaintiffs have alleged an act of international terrorism as required to plead direct liability. *See* 18 U.S.C. § 2333(a); § 2331(1). We also affirm the district court's discretionary choice not to resolve on the pleadings defendants' asserted act-of-war defense under 18 U.S.C. § 2336(a). *See Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 510 (E.D.N.Y. 2012). The statute would appear to foreclose treating an attack planned or authorized by a Foreign Terrorist Organization such as Hezbollah as an "armed conflict between military forces of any origin" because Congress specifically excluded so-designated organizations from the definition of "military force." 18 U.S.C § 2331(4), (6). But we are content with the district court's inclination to leave that question for resolution on a developed evidentiary record.

\*   \*   \*

For the foregoing reasons, we reverse the district court's July 17, 2020, order granting defendants' motion to dismiss for failure to state a claim and the foreign defendants' motion to dismiss for lack of personal jurisdiction, as well as its attendant

97a

dismissal of plaintiffs' state-law claims.  We remand for further proceedings consistent with this opinion.

*So ordered.*

## CERTIFICATE OF PARTIES AND AMICI CURIAE

Pursuant to D.C. Circuit Rules 28(a)(1)(A) and 40(c), the undersigned counsel certifies as follows:

All parties appearing before the district court and in this court are listed in the Brief for Plaintiffs-Appellants (Doc. No. 1895790).

The following individuals entered appearances as amici after Plaintiffs filed their initial brief:

- Professors William D. Araiza, William C. Banks, Erwin Chemerinsky, Brooke D. Coleman, Geoffrey S. Corn, William V. Dunlap, Stephen Dycus, Brenner M. Fissell, Jimmy Gurulé, Michael J. Kelly, Lee Kovarsky, Peter Margulies, Andrew Siegel, Adam Steinman, Rachel E. VanLandingham, Howard M. Wasserman, and Louise Weinberg

- American Association for Justice

- General (Ret.) George W. Casey Jr., General (Ret.) Stan McChrystal, General (Ret.) Vincent Brooks, General (Ret.) James T. Conway, General (Ret.) James D. Thurman, Lieutenant General (Ret.) H.R. McMaster, Lieutenant General (Ret.) Douglas E. Lute, Lieutenant General (Ret.) Sean B. MacFarland, Lieutenant General (Ret.) John F. Mulholland, Lieutenant General (Ret.) Michael Oates, Lieutenant General (Ret.) Ken Tovo, Lieutenant General (Ret.) Keith C. Walker, Lieutenant General (Ret.) Sir Graeme Lamb, Brigadier General (Ret.) Ricky Gibbs, Brigadier General (Ret.) Jon Lehr, Colonel (Ret.) Greg Baine, Colonel (Ret.) Robert M. Balcavage, Colonel (Ret.) Daniel (Dan) Barnett, Colonel (Ret.) Greg Bell, Colonel (Ret.) Beverly Beavers, Colonel (Ret.) Leo E. Bradley III, Colonel (Ret.) Nycki Brooks, Colonel (Ret.) Bryan Denny, Colonel (Ret.) Kevin Lutz, Colonel (Ret.) Patrick Mackin, Colonel (Ret.) Mark E. Mitchell, Colonel (Ret.) Chad McRee, Colonel (Ret.) James Phillips, Colonel

99a

Eric Schacht, Colonel (Ret.) Frank Sobchak, Colonel (Ret.) David Sutherland, Dr. and Lieutenant Colonel (Ret.) Jeanne Godfroy, Lieutenant Colonel (Ret.) Mark Grdovic, Dr. and Lieutenant Colonel (Ret.) John Nagl, Lieutenant Colonel (Ret.) Troy Perry, Lieutenant Colonel (Ret.) Steve Wood, Lieutenant Colonel (Ret.) Matt Zais, Command Sergeant Major (Ret.) Glenn Patti, Andrew Faldini, Professor Todd Huntley, Nicholas G. Kikis, Russell L. McIntyre, Dr. Daveed Gartenstein-Ross, and Bill Roggio

- Senators Charles E. Grassley, Richard Blumenthal, Mike Crapo, Joni K. Ernst, James M. Inhofe, John Kennedy, Marco Rubio, and Sheldon Whitehouse

- Stuart W. Bowen, Jr., Vincent Foulk, Elizabeth Warner, Chris King, James F. Mattil, Arthur Brennan, and Paul Tyson

- The Chamber of Commerce of the United States of America and the Pharmaceutical Research and Manufacturers of America (PhRMA)

- Jane Green, James K. Haveman Jr., Andrew Liepman, Philip Mudd, and Max Primorac

- Charity & Security Network and InterAction: The American Council for Voluntary International Action, Inc.

February 23, 2026                              */s/ Lisa S. Blatt*
                                               Lisa S. Blatt

100a

**DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, counsel for defendants-appellees make the following certifications:

AstraZeneca UK Limited—a private limited company organized under the laws of England and Wales, with its principal place of business in Cambridge, United Kingdom—is a biopharmaceutical company focusing on the discovery, development, manufacturing and commercialization of medicines. AstraZeneca UK Limited is an indirectly wholly-owned subsidiary of AstraZeneca PLC. AstraZeneca PLC is a public company organized under the laws of England and Wales and is publicly traded. On information and belief, no other publicly held company owns 10% or more of the voting interest in AstraZeneca UK Limited.

AstraZeneca Pharmaceuticals LP—a limited partnership organized under the laws of the State of Delaware with its principal place of business in Wilmington, Delaware—is a biopharmaceutical company focusing on the discovery, development, manufacturing and commercialization of medicines. AstraZeneca Pharmaceuticals LP is an indirectly wholly-owned subsidiary of AstraZeneca PLC. AstraZeneca PLC is a public company organized under the laws of England and Wales and is publicly traded. On information and belief,

no other publicly held company owns 10% or more of the voting interest in AstraZeneca Pharmaceuticals LP.

F. Hoffmann-La Roche Ltd—a Swiss corporation with its principal place of business at Basel, Switzerland—is a healthcare company focusing on the discovery, development, and delivery of pharmaceutical medicines and medical diagnostics for improved disease management and patient care. F. Hoffmann-La Roche Ltd is a wholly owned subsidiary of Roche Holding Ltd. Roche Holding Ltd is publicly traded on the Swiss Stock Exchange. On information and belief, no publicly held company owns 10% or more of the voting interest in Roche Holding Ltd.

Genentech, Inc.—a Delaware corporation with its principal place of business at South San Francisco, California—is a biotechnology company dedicated to discovering and developing medicines for people with serious and life-threatening diseases. Genentech, Inc. is a wholly owned subsidiary of Roche Holdings, Inc. Roche Holdings, Inc.'s ultimate parent, Roche Holding Ltd, is publicly traded on the Swiss stock exchange. On information and belief, no publicly held company owns 10% or more of the voting interest in Roche Holding Ltd.

102a

Hoffmann-La Roche Inc.—a New Jersey corporation with its principal place of business in Little Falls, New Jersey—operates as a research and development center whose primary business activity is the licensing of its U.S. patents. Hoffmann-La Roche Inc. is a wholly owned subsidiary of Roche Holdings, Inc. Roche Holdings, Inc.'s ultimate parent, Roche Holding Ltd, is publicly traded on the Swiss stock exchange. On information and belief, no publicly held company owns 10% or more of the voting interest in Roche Holding Ltd.

GE Healthcare USA Holding LLC is a healthcare company focused on providing healthcare technologies in medical imaging, digital solutions, patient monitoring and diagnostics, and performance enhancement solutions. GE Healthcare USA Holding LLC is owned by GE Medical Systems Information Technologies, Inc., which is not publicly traded.

GE Medical Systems Information Technologies GmbH manufactures and provides medical electronic equipment and systems for the diagnosis and monitoring of patients requiring critical care. GE Medical Systems Information Technologies GmbH is wholly owned by GE Healthcare Holding Germany GmbH, which is not publicly traded. GE Healthcare USA Holding

LLC and GE Medical Systems Information Technologies GmbH's ultimate parent is GE HealthCare Technologies Inc.

GE Medical Systems Information Technologies, Inc. manufactures and provides medical electronic equipment and systems for the diagnosis and monitoring of patients requiring critical care. GE Medical Systems Information Technologies, Inc. is a wholly owned indirect subsidiary of GE HealthCare Technologies Inc. GE HealthCare Technologies Inc. is a publicly held company. Upon information and belief, no publicly held company holds 10% or more of its stock. Upon information and belief, no other publicly held company owns 10% or more of the stock in GE Healthcare USA Holding LLC, GE Medical Systems Information Technologies GmBH, or GE Medical Systems Information Technologies, Inc.

Johnson & Johnson is a healthcare company incorporated in New Jersey that manufactures and provides pharmaceutical medicines and medical devices. Cilag GmbH International, Ethicon Endo-Surgery, LLC, Janssen Ortho LLC, and Ortho Biologics LLC are indirect subsidiaries of Johnson & Johnson. Ethicon, Inc. and Johnson & Johnson (Middle East) Inc. are wholly owned subsidiaries of Johnson & Johnson.  Janssen Pharmaceutica NV is a subsidiary of Johnson & Johnson and Johnson & Johnson International, which

104a

is a wholly owned subsidiary of Johnson & Johnson. Johnson & Johnson is a publicly owned corporation, and no publicly held corporation owns 10% or more of its stock.

Pfizer Inc. is a corporation incorporated in Delaware. Pfizer Inc. is publicly traded on the New York Stock Exchange, and, on information and belief, no publicly held corporation owns 10% or more of Pfizer Inc.'s voting shares.

Pfizer Enterprises SARL has merged into Pfizer Holdings International Luxembourg (PHIL) SARL, a limited liability company (société à responsabilité limitée) existing under the laws of Luxembourg. Pfizer Holdings International Luxembourg (PHIL) SARL is an indirect wholly-owned subsidiary of Pfizer Inc. Pfizer Inc. is publicly traded, and, on information and belief, no publicly-held corporation owns 10% or more of Pfizer Inc.'s voting shares.

Pfizer Pharmaceuticals LLC has since been renamed Viatris Pharmaceuticals LLC and is a limited liability company organized in Delaware. Viatris Pharmaceuticals LLC is an indirect wholly-owned subsidiary of Viatris Inc. Viatris Inc. is publicly traded, and, on information

and belief, no publicly-held corporation owns 10% or more of Viatris Inc.'s voting shares.

Pharmacia & Upjohn Company LLC is a limited liability company organized in Delaware. Pharmacia & Upjohn Company LLC is an indirect wholly owned subsidiary of Pfizer Inc. Pfizer Inc. is publicly traded, and, on information and belief, no publicly-held corporation owns 10% or more of Pfizer Inc.'s voting shares.

Wyeth Pharmaceuticals LLC (fka Wyeth Pharmaceuticals Inc.) is a limited liability company organized in Delaware. Wyeth Pharmaceuticals LLC is an indirect wholly-owned subsidiary of Pfizer Inc. Pfizer Inc. is publicly traded, and, on information and belief, no publicly-held corporation owns 10% or more of Pfizer Inc.'s voting shares.

February 23, 2026

*/s/ Lisa S. Blatt*
Lisa S. Blatt