**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

No. 20-7077

JOSHUA ATCHLEY, *et al.*,
*Plaintiffs-Appellants*,

v.

ASTRAZENECA UK LIMITED, *et al.*,
*Defendants-Appellees*.

Appeal from the United States District Court for the District of Columbia,
No. 1:17-cv-02136-RJL (Hon. Richard J. Leon)

**RESPONSE OF PLAINTIFFS-APPELLANTS JOSHUA ATCHLEY, *ET AL.*,
IN OPPOSITION TO PETITION FOR REHEARING EN BANC**

DAVID C. FREDERICK
JOSHUA D. BRANSON
ANDREW E. GOLDSMITH
DEREK C. REINBOLD
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
dfrederick@kellogghansen.com
jbranson@kellogghansen.com
agoldsmith@kellogghansen.com
dreinbold@kellogghansen.com

*Counsel for Plaintiffs-Appellants
Joshua Atchley, et al.*

March 18, 2026

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................... ii

GLOSSARY...........................................................................................iv

INTRODUCTION ....................................................................................1

STATEMENT ..........................................................................................2

    A.    Factual Background........................................................................2

    B.    Procedural History.........................................................................4

ARGUMENT ...........................................................................................7

I.    THE SECONDARY-LIABILITY CLAIMS DO NOT WARRANT EN BANC REVIEW ...........................................................................7

    A.    The Panel Correctly Assessed The Nexus Between Defendants' Substantial Aid To Jaysh al-Mahdi And A Defined Subset Of Jaysh al-Mahdi's Attacks .......................................8

    B.    The Panel Correctly Concluded That Defendants' Years Of Bribes To Terrorists Satisfy *Twitter*'s Culpability Requirement .................................................................................14

II.    DEFENDANTS' RECYCLED ARGUMENTS FROM *ATCHLEY I* STILL DO NOT WARRANT EN BANC REVIEW ...................................16

    A.    The Panel Correctly Sustained The Hezbollah Allegations In *Atchley I*...................................................................................17

    B.    The Panel Correctly Sustained The Direct-Liability Claims In *Atchley I* ................................................................................17

CONCLUSION ......................................................................................18

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

Page

**CASES**

*Am. Fam. Mut. Ins. Co. v. Grim*, 440 P.2d 621 (Kan. 1968).....................................8

*Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420
 (2d Cir. 2025).....................................................................................12

* *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204
 (D.C. Cir. 2022) .................................................................... 1-2, 5, 13, 17-18

* *Atchley v. AstraZeneca UK Ltd.*, 165 F.4th 592
 (D.C. Cir. 2026) ..................................................................2-4, 6-11, 13-18

*Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685
 (7th Cir. 2008) .....................................................................................10

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) .........................................8, 16

*Holder v. Humanitarian Law Proj.*, 561 U.S. 1 (2010)............................................10

*Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842
 (2d Cir. 2021)........................................................................................13

*Keel v. Hainline*, 331 P.2d 397 (Okla. 1958)..............................................................8

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*,
 376 F.3d 1123 (D.C. Cir. 2004)..................................................................10

*Moses v. BNP Paribas, S.A.*, 802 F. Supp. 3d 567 (S.D.N.Y. 2025)........................13

*Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017),
 *vacated and remanded sub nom. Opati v. Republic of Sudan*,
 590 U.S. 418 (2020).................................................................................10

*Republic of Hungary v. Simon*, 604 U.S. 115 (2025) ...............................................11

---

Authorities principally relied upon are designated by an asterisk (*).

ii

*Texas v. United States*, 798 F.3d 1108 (D.C. Cir. 2015) .............................................6

\* *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023) ................................. 1, 6-10, 14, 18


**STATUTES AND RULES**

Anti-Terrorism Act, 18 U.S.C. § 2331 *et seq.*:

§ 2333(d)(2) ......................................................................................5, 15, 17

Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222,
130 Stat. 852 (2016):

§ 2(a)(5) ...................................................................................................8

§ 2(b) ................................................................................................11, 12


**OTHER MATERIALS**

Brief for the United States as Amicus Curiae,
*AstraZeneca UK Ltd. v. Atchley*, No. 23-9
(U.S. filed May 21, 2024).................................................................... 6, 16-18

Oral Arg. Tr., *Twitter, Inc. v. Taamneh*, No. 21-1496
(U.S. Feb. 22, 2023).................................................................................16

# GLOSSARY

| | |
|---|---|
| Act | Antiterrorism Act, 18 U.S.C. § 2331 *et seq.* |
| Amendment | Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 (2016) |
| *Atchley I* | *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204 (D.C. Cir. 2022) |
| *Atchley II* | *Atchley v. AstraZeneca UK Ltd.*, 165 F.4th 592 (D.C. Cir. 2026) |
| Ministry | Iraq's Ministry of Health |
| Pet. | Defendants' Petition for a Writ of Certiorari, *AstraZeneca UK Ltd. v. Atchley*, No. 23-9 (U.S. filed June 30, 2023) |
| Senators Br. | Brief of Eight United States Senators as *Amici Curiae* in Support of Plaintiffs-Appellants, *Atchley v. AstraZeneca UK Ltd.*, No. 20-7077 (filed Apr. 23, 2021) |
| U.S. Br. | Brief for the United States as Amicus Curiae, *AstraZeneca UK Ltd. v. Atchley*, No. 23-9 (U.S. filed May 21, 2024) |
| U.S. *Twitter* Br. | Brief for the United States as Amicus Curiae in Support of Reversal, *Twitter, Inc. v. Taamneh*, No. 21-1496 (U.S. filed Dec. 6, 2022) |

iv

**INTRODUCTION**

Defendants' latest rehearing petition rehashes arguments they have been making for years.  The full Court rejected them once, and it should do so again.  Plaintiffs' complaint alleges "in unusual detail" how Defendants gave "millions of dollars of cash and cash-equivalents" to a terrorist group called Jaysh al-Mahdi.  *Atchley I*, 22 F.4th at 210, 213.  The reason for these bribes was simple:  Jaysh al-Mahdi had overrun Iraq's Ministry of Health, and Defendants secured lucrative contracts from that Ministry by paying off the terrorists who ran it.  Defendants knew their bribes supplied Jaysh al-Mahdi with vital funding to attack Americans in Iraq.  Plaintiffs—American service members and civilians who served in Iraq, and their families—were among the victims.

The panel properly held those allegations sufficient to plead aiding-and-abetting claims and proximate cause under the Antiterrorism Act.  Defendants now seek review by rewriting the panel opinion and the complaint it assessed, recasting themselves (at 3) as innocent parties that merely "answered th[e] call" to help rebuild Iraq.  Such factual assertions do not merit rehearing.

Legally, the petition fares no better.  It identifies no conflict, no unsettled question of exceptional importance, and no error warranting full-Court review.  The panel did just what the Supreme Court required in *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), "which clarified the scope of secondary liability under the

ATA." *Atchley II*, 165 F.4th at 597.  The panel assessed, on these specific facts, the culpability of Defendants' conduct and the nexus between their assistance and the attacks that injured Plaintiffs.  It then held that the complaint stated a claim by alleging direct, repeated, and knowing payments to the terrorist group that attacked Plaintiffs.  Defendants' disagreement is not with any new legal rule—it is with the panel's view of these unusually detailed allegations.

This case has been stuck at the motion-to-dismiss stage for nine years.  In that time, 34 plaintiffs have died waiting for discovery to begin—16 of them since this Court's first opinion in January 2022.  With each additional delay from Defendants' sequential pleading-stage appeals, more Plaintiffs will die, more evidence will grow stale, and more memories will fade.  It is time for this case to proceed to the merits.  The Court should promptly deny the petition, issue the mandate, and let discovery begin.

## STATEMENT

### A.    Factual Background

The complaint spans "588 pages" and draws on "hundreds of identified sources."  *Atchley I*, 22 F.4th at 213.  The panel rejected Defendants' "untenably skeptical reading of the complaint."  *Id*. at 228.  A fair reading—with the allegations "assumed true," *Atchley II*, 165 F.4th at 598—shows:

1.      In 2004, Jaysh al-Mahdi seized control of Iraq's Ministry of Health and its lucrative contracting apparatus. *Id.* at 598. It then "used the Ministry as a front and headquarters for its campaign of terrorist violence." *Id.* It converted Ministry hospitals into terrorist bases and torture sites. *Id.* It placed thousands of fighters on the Ministry's payroll. JA125 (¶ 85). And it dispatched Ministry ambulances to transport "'death squads' around Baghdad." *Atchley II*, 165 F.4th at 598. As the U.S. military documented, the Ministry was then a hub for "insurgent logistics flow" that posed a "significant threat to [Coalition forces]." JA794.

Jaysh al-Mahdi's dominance "was obvious to anyone physically present at Ministry headquarters." *Atchley II*, 165 F.4th at 598. Terrorist propaganda festooned Ministry facilities. JA121-22 (¶ 73). "'Death to America' slogans adorned the halls," Jaysh al-Mahdi's all-black flag flew over the entrances, and armed fighters patrolled. *Atchley II*, 165 F.4th at 598; JA121-22 (¶¶ 73-75). As the U.S. Embassy summarized in a 2006 report, the Ministry and its facilities were "openly under the control" of Jaysh al-Mahdi. JA123 (¶ 79).

2.      Jaysh al-Mahdi used the Ministry to fund terrorist attacks. JA135-38, 163-70 (¶¶ 105-112, 165-179). And Defendants "helped finance Jaysh al-Mahdi's terrorist attacks on U.S. nationals" through a "constant stream of bribes and free goods." *Atchley II*, 165 F.4th at 599.

Defendants used local agents to deliver "cash bribes (called 'commissions') to Jaysh al-Mahdi." *Id.*; JA153-63 (¶¶ 142-164). They also "supplied extra, off-the-books batches of valuable medical goods that Jaysh al-Mahdi monetized on the black market to fund its operations against Americans." *Atchley II*, 165 F.4th at 596. Defendants included the "free goods" in the same shipments as the "purchased goods" and packaged them for easy street resale. JA99, 112-13, 140-42 (¶¶ 5, 50-51, 119-120). Jaysh al-Mahdi was so dependent on the Ministry's resources that it became known as "The Pill Army." *Atchley II*, 165 F.4th at 599.

Defendants knew they were funding terrorist attacks. JA142, 163-76 (¶¶ 121, 165-187). They "finalized their contracts at the Ministry headquarters surrounded by terrorist propaganda and other indicia of Jaysh al-Mahdi's control." *Atchley II*, 165 F.4th at 599. They retained local agents who knew Jaysh al-Mahdi used the Ministry to fund its terrorist activities. *Id.* And they had "corporate security and compliance operations" that exposed them to extensive reporting on the terrorist connections. *Id.*

## B.    Procedural History

Plaintiffs are U.S. citizens, and their families, killed or injured by Jaysh al-Mahdi between 2005 and 2011. JA274-631 (¶¶ 409-3180). Defendants are large pharmaceutical and medical-device companies. The complaint specifies multiple

4

cash bribes each defendant paid; the corrupt local agents it used; and its contract numbers and "free goods" percentages.  JA177-236 (¶¶ 188-332).

1.    Plaintiffs sued in October 2017, bringing two direct-liability and two aiding-and-abetting claims under the Antiterrorism Act.  In July 2020, the district court dismissed those claims before discovery.

In January 2022, a panel of this Court "reverse[d] on three points of law" relevant here.  *Atchley I*, 22 F.4th at 209.  *First*, it held the allegations "support an inference that defendants aided and abetted acts of international terrorism."  *Id*. at 210.  *Second*, it held the allegations sufficient to plead that Hezbollah "committed, planned, or authorized," 18 U.S.C. § 2333(d)(2), the specific attacks at issue, *see Atchley I*, 22 F.4th at 216-19.  *Third*, it held "that plaintiffs have adequately alleged proximate causation" for the direct-liability claims.  *Id*. at 226.

In February 2023, the full Court unanimously denied Defendants' rehearing petitions.  Doc. No. 1984411.

2.    Three months later, the Supreme Court decided *Twitter*.  There, victims of an ISIS attack sued social-media companies for supposedly aiding it.  598 U.S. at 478-79.  The victims alleged that the companies "knew that ISIS was using their platforms but failed to stop it from doing so."  *Id*. at 478.  The Court held that was "mere passive nonfeasance."  *Id*. at 500.  So it dismissed the claims,

5

stressing that its holding would not foreclose claims based on "aid that is more direct, active, and substantial." *Id*. at 502.

Defendants sought certiorari. The Supreme Court called for the views of the United States, which opposed plenary review but recommended a GVR because this Court had rendered its decision "without the benefit of [the Supreme] Court's guidance" in *Twitter*. U.S. Br. 10-11. The Court granted, vacated, and remanded.

3.     On remand, "[h]aving considered [*Twitter*] and with the aid of supplemental briefing and oral argument," the panel again reversed. *Atchley II*, 165 F.4th at 597.[1] For aiding and abetting, the panel explained that *Twitter* requires (1) "conscious, voluntary, and culpable participation in another's tortious activity" plus (2) "a nexus between defendants' assistance and the acts of international terrorism that injury plaintiffs." "This complaint," the panel concluded, "describes conduct that is far from 'business as usual'—with allegations sufficient to satisfy both of [*Twitter*'s] requirements." *Id.*

The panel also "reinstate[d] our holding . . . that plaintiffs adequately pleaded that defendants' payments to Jaysh al-Mahdi proximately caused plaintiffs' injuries." *Id.* Because *Twitter* "did not address the standard for direct liability under the ATA," the panel saw no reason to "disturb" that conclusion. *Id.*

---

[1] "[I]t is well-settled that a GVR has no precedential weight and does not dictate how the lower court should rule on remand." *Texas v. United States*, 798 F.3d 1108, 1116 (D.C. Cir. 2015).

**ARGUMENT**

## I.     THE SECONDARY-LIABILITY CLAIMS DO NOT WARRANT EN BANC REVIEW

The panel's careful application of *Twitter* does not warrant further review. As it explained, *Twitter* "dr[ew] on the common law to establish two variables bearing on liability for aiding and abetting under the ATA." *Atchley II*, 165 F.4th at 604. The first variable is the defendants' "culpability," which turns on "the substantiality" of their assistance and "the degree of their awareness or intentionality about the harms they aid." *Id.* The second is the "nexus" between that "assistance and the act of international terrorism that injured plaintiffs." *Id.* *Twitter* explained how those variables interact: "When there is a direct nexus between the defendant's acts and the tort, courts may more easily infer such culpable assistance. But, the more attenuated the nexus, the more courts should demand that plaintiffs show culpable participation through intentional aid that substantially furthered the tort." 598 U.S. at 506.

Applying that sliding-scale approach, the panel held that the attacks here "were a natural and virtually inevitable consequence of defendants' unusual, corrupt, and plentiful assistance" to terrorists. *Atchley II*, 165 F.4th at 597. That factbound conclusion does not warrant rehearing.

7

A.    **The Panel Correctly Assessed The Nexus Between Defendants' Substantial Aid To Jaysh al-Mahdi And A Defined Subset Of Jaysh al-Mahdi's Attacks**

1.    *Twitter* clarified that the Act requires a defendant to have "aided and abetted the act of international terrorism that injured the plaintiffs." 598 U.S. at 497. But this does not "demand a strict nexus between the alleged assistance and [that] terrorist act." *Id.* A nexus suffices when the aid contributes to "a *foreseeable* terror attack." *Id*. at 502 (emphasis added). Foreseeability "does not require the defendant to have known all particulars of the primary actor's plan." *Id*. at 495 (cleaned up). Thus, in *Halberstam* itself, Linda Hamilton was liable for a murder she never directly assisted, because "violence" was a "foreseeable consequence" of the "personal property crime[s]" she did aid. *Halberstam v. Welch*, 705 F.2d 472, 488 (D.C. Cir. 1983); *see* Amendment § 2(a)(5) (instructing courts to apply *Halberstam* as "the proper legal framework" under the Act). Another aider-abettor was liable for arson because fire was a foreseeable risk of the nighttime break-in he helped. *See Am. Fam. Mut. Ins. Co. v. Grim*, 440 P.2d 621, 626 (Kan. 1968); *Twitter*, 598 U.S. at 495-96 (discussing *Grim*). And a student in a schoolhouse fight was liable for its foreseeable injuries even though he may not "have given any particular aid to the boy" who did the real fighting. *Halberstam*, 705 F.2d at 482 (discussing *Keel v. Hainline*, 331 P.2d 397 (Okla. 1958)).

8

Here, "plaintiffs allege a plainly discernable nexus between defendants' corrupt payments and Jaysh al-Mahdi's attacks on U.S. nationals in Iraq." *Atchley II*, 165 F.4th at 605. Indeed, Jaysh al-Mahdi's attacks on Plaintiffs "were the obvious result" of Defendants' bribes. *Id.* at 606. "[T]he complaint tells a localized story that ties defendants' alleged knowing provision of substantial aid to a defined subset of Jaysh al-Mahdi's tortious attacks—conduct that was circumscribed temporally and geographically." *Id.* at 607. For example, the complaint "identif[ies] an attack by Jaysh al-Mahdi fighters doubling as Ministry security guards that targeted an American convoy just outside the Ministry's front gate." *Id.* There is a direct connection between Defendants' bribes to terrorists inside the Ministry and those same terrorists' deadly attacks mere feet away. That's enough to satisfy *Twitter*'s flexible nexus requirement.

**2.** Defendants' nexus arguments distort the facts and misread *Twitter*. *First*, they contend (at 9) that every Antiterrorism Act case must include "an allegation linking payments to specific attacks." On their view, "plaintiffs would need to allege, for example, that a particular cash bribe defendants funneled to Jaysh al-Mahdi was earmarked to pay for certain weapons and that those same weapons were then used in an attack that injured plaintiffs." *Atchley II*, 165 F.4th at 606. But *Twitter* rejected that "direct traceability" test. *Id.* Here, as there,

"defendants overstate the nexus that [the Act] requires between the alleged assistance and the wrongful act." *Twitter*, 598 U.S. at 495.

An overly rigid nexus requirement is especially misplaced in terror-finance cases. *Atchley II*, 165 F.4th at 606. For one thing, bankrolling terrorists naturally creates a foreseeable risk of attacks. *See Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 690-91 (7th Cir. 2008) (en banc). For another, "[m]oney is fungible," *Holder v. Humanitarian Law Proj.*, 561 U.S. 1, 31 (2010), and plaintiffs often cannot realistically allege that a particular dollar bought the weapon used in a particular attack.

This Court has never required a plaintiff to draw a direct line from dollars to bombs. In *Owens v. Republic of Sudan*, for instance, this Court held that Sudan's funding of "al Qaeda-affiliated businesses" foreseeably aided al-Qaeda's embassy bombings in other countries years later. 864 F.3d 751, 783, 794 (D.C. Cir. 2017), *vacated and remanded on other grounds sub nom. Opati v. Republic of Sudan*, 590 U.S. 418 (2020). As the Court explained, a "direct traceability" test would render the Act "'ineffectual' because material support 'is fungible' and 'terrorist organizations can hardly be counted on to keep careful bookkeeping records.'" *Id.* at 799 (quoting *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1130 (D.C. Cir. 2004)). Requiring that kind of tracing would likewise thwart Congress's purpose to provide "the broadest possible basis" for "relief

10

against persons . . . that have provided material support, directly or indirectly, to [terrorists]." Amendment § 2(b).

*Second*, Defendants mischaracterize (at 9) the panel's reasoning. The panel did not—as Defendants now contend (at 2)—find the allegations sufficient because "money is fungible." Instead, it emphasized the "distinct tie" between "[t]he cash bribes and free pharmaceuticals" Defendants gave to Jaysh al-Mahdi and that group's "acts of terrorism against U.S. personnel in Iraq." *Atchley II*, 165 F.4th at 605. The panel also found it "highly noteworthy that defendants continued to make payments despite a steady drumbeat of reporting on Jaysh al-Mahdi's use of these funds to plan and execute attacks on Americans." *Id.* at 606.

Defendants find no support (at 9) in *Republic of Hungary v. Simon*, 604 U.S. 115 (2025). *Simon* was about the Foreign Sovereign Immunity Act's expropriation exception, which requires "a commercial nexus to the United States." *Id.* at 118. The plaintiffs there argued that Hungary should have to answer a U.S. lawsuit because it sold stolen art during the Holocaust, "commingled the proceeds from that property with money in a government treasury account, and then used, decades later, funds from that account in connection with commercial activity in the United States." *Id.* The Court rejected that theory in large part because the FSIA reflects a "restrictive theory" of sovereign immunity. *Id.* at 132. This case is different: Plaintiffs allege direct payments to terrorists, not mere "commingling" of funds.

11

And the Act was designed not to restrict access to U.S. courts, but to expand it as broadly as possible. *See* Amendment § 2(b).

Defendants fare no better with the Second Circuit's decision in *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420 (2d Cir. 2025). *Ashley* involved "sweeping theories of international criminal conspiracies spanning different continents and terrorist organizations without ever persuasively tying those theories to the terrorist attacks" at issue. *Id.* at 439. One defendant "refus[ed] to stop providing routine banking services" to companies selling fertilizer that terrorists then hijacked downstream to make explosives. *Id.* at 441. Others facilitated money laundering for customers "at least one step removed" from terrorists. *Id.* at 445. Stressing that Antiterrorism Act claims are "highly fact intensive," *id.* at 443, the Second Circuit affirmed dismissal.

The facts here are different. In *Ashley*, the banks laundered money for non-terrorist customers in far-flung geographies—countries or continents away from the terrorists—whose connection to terrorism was so "attenuat[ed]" that the banks had no "understanding" that "the foreseeable consequences" could include the attacks at issue. *Id.* at 444. The complaint also "barely offer[ed] any information about the Banks' transactions." *Id.* Against that backdrop, the *Ashley* court rejected the plaintiffs' fallback argument that the mere fungibility of money could substitute for the usual requirement of foreseeability. *Id.* Here, by contrast, the

12

complaint details how Defendants' aid to known terrorists led straight to the attacks that killed or maimed plaintiffs. *See Atchley II*, 165 F.4th at 605-608. That provides the "definable nexus" Defendants say (at 11) is missing and passes the "foreseeability" test *Ashley* flunked.

*Ashley* made no new law in the Second Circuit. The court there took pains to emphasize that its reasoning was consistent with the Second Circuit's pre-*Twitter* precedent, including *Kaplan v. Lebanese Canadian Bank, SAL*, which permits aiding-and-abetting claims against banks that indirectly service terrorist fronts. *See* 999 F.3d 842, 866 (2d Cir. 2021); *Moses v. BNP Paribas, S.A.*, 802 F. Supp. 3d 567, 582-83 (S.D.N.Y. 2025) (addressing *Ashley* and *Kaplan*). The panel's reasoning aligns with that same precedent. *See Atchley I*, 22 F.4th at 222-25 (applying *Kaplan*). Indeed, if this Court now adopted Defendants' rigid nexus test, it would *create* a circuit conflict. *See Kaplan*, 999 F.3d at 866 (plaintiffs stated claim that Lebanese bank aided and abetted attacks in Israel in 2006 by serving Hezbollah-associated customers in other countries beginning in 2003).

*Third*, Defendants argue (at 10-11) that the panel nullified the principle that a defendant cannot be held liable for a broad category of misconduct absent pervasive, systemic, and culpable aid. But as the panel explained, "[t]hat argument rests on a mistaken premise." *Atchley II*, 165 F.4th at 607. Plaintiffs do not seek to hold Defendants liable "for aiding Jaysh al-Mahdi's terrorist activities without

13

regard to where or when they occurred." *Id.* The claims are confined to "defendants' provision of aid to a temporally and geographically discrete set of Jaysh al-Mahdi's terrorist acts." *Id.* Given those limits, "plaintiffs need not plead that defendants and Jaysh al-Mahdi participated in a near-common enterprise." *Id.*

### B. The Panel Correctly Concluded That Defendants' Years Of Bribes To Terrorists Satisfy *Twitter*'s Culpability Requirement

*Twitter* instructed courts considering aiding-and-abetting claims to look for the same conduct "that has animated aiding-and-abetting liability for centuries": "conscious, voluntary, and culpable participation in another's wrongdoing." 598 U.S. at 493. The panel had little difficulty dispatching Defendants' culpability challenges. "It is not business as usual for sophisticated transnational companies to provide cash and in-kind bribes to a known terrorist organization over a period of years when that organization is openly maiming and killing U.S. citizens." *Atchley II*, 165 F.4th at 611. There is no need to rehear this case just to affirm that commonsense conclusion.

Defendants suggest (at 13) that the complaint alleges only "general awareness of wrongdoing." But the panel identified at least six reasons why there are "strong allegations of scienter" here. *Atchley II*, 165 F.4th at 612. Those reasons include that Defendants hand-delivered contracts to Ministry facilities overrun by terrorists and festooned with terrorist propaganda; that multiple sources specifically told Defendants the Ministry was using their medical goods to fund the

14

insurgency against Americans; that Defendants renegotiated contracts "close on the heels" of deadly attacks against Americans; and that they did all this for years on terms that were "highly irregular and illegal under both U.S. and Iraqi law." *See id.* at 609-12. Defendants have no response, so they ignore most of those points.

Defendants instead focus on just one of the panel's six points—"the 'unusual' kind of assistance defendants allegedly provided," *Atchley II*, 165 F.4th at 610—and argue (at 13-14) that unusual conduct counts toward secondary liability only if it "indicate[s] a desire to help the tortious conduct succeed." But *Twitter* "did not read a specific intent requirement into the ATA," which "requires only that defendants 'knowingly' provide substantial assistance." *Id.* at 608 (quoting 18 U.S.C. § 2333(d)(2)); *see id.* at 609 (contrasting "the intent necessary to establish *criminal* aiding and abetting from the less stringent state-of-mind requirement for *civil* aiding and abetting").

Defendants also argue the facts. They say (at 14-15) their bribes were not unusual because corruption was built into the Ministry's "procurement process." But corrupt conduct does not become ordinary (or lawful) through repetition. The Ministry's standard practice was itself designed to extract illegal revenue for whoever controlled it. JA111-13, 150-51, 154-63 (¶¶ 48-51, 137-138, 145-164). Johnson & Johnson thus admitted that it acted criminally in paying the same bribes to Saddam-era Ministry officials. JA207-09 (¶¶ 262-265). And Defendants

15

orchestrated "Off-the-Books Payoff[s]" that were not even part of the Ministry's standard practice.  JA149-50 (¶ 136); *see Atchley II*, 165 F.4th at 611.

Defendants likewise elide the most unusual feature of their conduct:  they directed corrupt payments and valuable gifts to Jaysh al-Mahdi while aware of Jaysh al-Mahdi's command of the Ministry.  *See* JA118-35 (¶¶ 63-104).  A company that negotiates with terrorists, amid terrorist weapons and propaganda, is behaving "in an unusual way."  *Halberstam*, 705 F.2d at 487.  Indeed, at the *Twitter* argument, the United States cited this very case as an example of defendants allegedly "ben[ding] the rules" and culpably departing from "their usual course of business."  Tr. of Oral Arg. at 82-83, *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023) (No. 21-1496).

## II.    DEFENDANTS' RECYCLED ARGUMENTS FROM *ATCHLEY I* STILL DO NOT WARRANT EN BANC REVIEW

Defendants press two more arguments for rehearing that this Court already rejected and the Supreme Court declined to address.  Making the same points and citing the same cases, Defendants again ask the Court to revisit whether Plaintiffs plausibly allege (1) that Hezbollah planned or authorized the attacks at issue and (2) that Defendants' payments proximately caused Plaintiffs' injuries.  As before, "[n]o further review of those questions is warranted."  U.S. Br. 21.

### A. The Panel Correctly Sustained The Hezbollah Allegations In *Atchley I*

Aiding-and-abetting liability under the Act covers injuries from attacks "committed, planned, or authorized by" a designated terrorist organization. 18 U.S.C. § 2333(d)(2). As Defendants "acknowledge[d]" in *Atchley I*, a joint Hezbollah–Jaysh al-Mahdi cell committed twenty-two of the attacks alleged here. 22 F.4th at 216. And for the other attacks, the panel determined that the complaint "describes in detail" Hezbollah's alleged "deep and far reaching" coordination with and support for Jaysh al-Mahdi during the relevant period. *Id.* at 218. That factbound conclusion "does not conflict with the decision of any other court of appeals." U.S. Br. 23.

Defendants' cursory attempt (at 17) to rewrite the complaint to allege only "general[ized] support or inspiration" from Hezbollah lacks merit. Defendants did not even address the Hezbollah allegations in their post-GVR briefing, so there is "no basis for revisiting [the panel's] prior holding that plaintiffs successfully alleged that Hezbollah, a designated Foreign Terrorist Organization, 'planned and authorized' the attacks." *Atchley II*, 165 F.4th at 602.

### B. The Panel Correctly Sustained The Direct-Liability Claims In *Atchley I*

For direct liability, *Atchley I* "articulate[d] generally accepted legal principles governing causation in the context of the particular and unusual

17

allegations in this case." U.S. Br. 22. The "detailed allegations" here supported an inference that Defendants' corrupt payments were "a substantial factor in plaintiffs' injuries." *Atchley I*, 22 F.4th at 227. It was also "reasonably foreseeable that financially fortifying Jaysh al-Mahdi would lead to the attacks that plaintiffs suffered." *Id*.

*Twitter* did not affect those direct-liability rulings. Because no such claim was before the Supreme Court, *see* 598 U.S. at 482 n.4, *Twitter* "did not address the standard for direct liability under the ATA." *Atchley II*, 165 F.4th at 614. So Defendants' arguments (at 18-19) on this point offer nothing new. The panel's "fact-specific determination does not create a division with other courts of appeals," U.S. Br. 22, and thus provides no basis for rehearing.

## CONCLUSION

The Court should deny the petition.

Respectfully submitted,

 /s/ *Joshua D. Branson*
DAVID C. FREDERICK
JOSHUA D. BRANSON
ANDREW E. GOLDSMITH
DEREK C. REINBOLD
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
dfrederick@kellogghansen.com
jbranson@kellogghansen.com
agoldsmith@kellogghansen.com
dreinbold@kellogghansen.com

*Counsel for Plaintiffs-Appellants
Joshua Atchley, et al.*

March 18, 2026

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rule of Appellate Procedure 32(g), that this brief complies with the 3,900-word limit that this Court ordered on March 13, 2026 (Doc. No. 2161943), because, excluding the portions of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), the brief contains 3,892 words.

I further certify that this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared using Microsoft Word in a proportionally spaced typeface (Times New Roman, 14 point).

/s/ *Joshua D. Branson*
Joshua D. Branson

March 18, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that, on March 18, 2026, I caused to be filed electronically the foregoing Response Of Plaintiffs-Appellants Joshua Atchley, *Et Al.*, In Opposition To Petition For Rehearing En Banc with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system.  All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

 /s/ *Joshua D. Branson*
Joshua D. Branson