Case No. 20-7077

## IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

JOSHUA ATCHLEY, ET AL.,

*Plaintiffs-Appellants,*

v.

ASTRAZENECA UK LIMITED, ET AL.,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

## PETITION OF DEFENDANTS-APPELLEES ASTRAZENECA UK LIMITED, CILAG GMBH INTERNATIONAL, F. HOFFMANN-LA ROCHE LTD, GE MEDICAL SYSTEMS INFORMATION TECHNOLOGIES GMBH, JANSSEN PHARMACEUTICA NV, AND PFIZER ENTERPRISES SARL FOR REHEARING EN BANC

S. Conrad Scott
COVINGTON & BURLING LLP
620 Eighth Ave.
New York, NY 10018
(212) 841-1000

Beth S. Brinkmann
   *Counsel of Record*
John E. Hall
David M. Zionts
Jordan L. Moran
COVINGTON & BURLING LLP
850 Tenth Street, N.W.
Washington, DC 20001
(202) 662-5312
bbrinkmann@cov.com

February 3, 2022

*Counsel for Defendant-Appellee
F. Hoffmann-La Roche Ltd*

*Additional counsel listed on inside cover.*

Kenneth L. Wainstein
DAVIS POLK & WARDWELL LLP
901 15th Street, N.W.
Washington, DC 20005
(202) 962-7030
ken.wainstein@davispolk.com

Paul S. Mishkin
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
(202) 450-4292

*Counsel for Defendant-Appellee
AstraZeneca UK Limited*

Kannon K. Shanmugam
Jeh C. Johnson
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, N.W.
Washington, DC 20006
(202) 223-7300
kshanmugam@paulweiss.com

Jessica S. Carey
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

*Counsel for Defendants-Appellees
Cilag GmbH International and
Janssen Pharmaceutica NV*

John B. Bellinger III
David J. Weiner
ARNOLD & PORTER
KAYE SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, DC 20001
(202) 942-5000
john.bellinger@arnoldporter.com

Robert Reeves Anderson
ARNOLD & PORTER
KAYE SCHOLER LLP
1144 Fifteenth Street
Suite 3100
Denver, CO 80202-1370
(303) 863-2325

*Counsel for Defendant-Appellee
GE Medical Systems
Information Technologies GmbH*

Lisa S. Blatt
Christopher N. Manning
Sarah M. Harris
Melissa B. Collins
Brian T. Gilmore
Aaron Z. Roper
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000
lblatt@wc.com

*Counsel for Defendant-Appellee
Pfizer Enterprises SARL*

ii

# TABLE OF CONTENTS

Rule 35(b)(1) Statement .................................................... 1

Statement ............................................................... 4

Reasons for Granting Rehearing En Banc ................................. 9

I.    Plaintiffs' Claims Concerning the Foreign Defendants'
     Transactions in Iraq With a Foreign Government Ministry
     Do Not Arise Out of or Relate to the U.S. Origin Of Some
     Goods. .............................................................. 9

II.   The Panel's Analysis Effectively Imputed to the Foreign
     Defendants the U.S. Contacts of Corporate Affiliates ............... 12

III.  The Panel's Decision Threatens Deleterious Practical
     Effects. ........................................................... 16

Conclusion ............................................................ 20

Certificate of Compliance ............................................. 22

Certificate of Service ................................................ 23

Addendum .............................................................. A-1

   Certificate of Parties and Amici Curiae ........................... A-2

   Disclosure Statement .............................................. A-4

   Panel Decision .................................................... A-7

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp.*,
    229 F.3d 254 (3d Cir. 2000) ................................................................ 11

*Bristol-Myers Squibb v. Superior Court of California*,
    137 S. Ct. 1773 (2017)................................................................ 14, 15

*Burlington Industries, Inc. v. Maples Industries, Inc.*,
    97 F.3d 1100 (8th Cir. 1996)................................................................ 11

*Calder v. Jones*,
    465 U.S. 783 (1984) ................................................................ 13

*Cannon Mfg. Co. v. Cudahy Packing Co.*,
    267 U.S. 333 (1925)................................................................ 13

*Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Exp.
World Corp.*, 230 F.3d 934 (7th Cir. 2000) ........................................ 13

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014)................................................................ 14

*Ford Motor Co. v. Mont. Eighth Jud. Dist.*,
    141 S. Ct. 1017 (2021).......................................................... 3, 15, 16

*Fraser v. Smith*,
    594 F.3d 842 (11th Cir. 2010)........................................................ 10

*Keeton v. Hustler Mag., Inc.*,
    465 U.S. 770 (1984)................................................................ 13

*Oldfield v. Pueblo de Bahia Lora S.A.*,
    558 F.3d 1210 (11th Cir. 2009)........................................................ 10

*Piper Aircraft Co. v. Reyno*,
    454 U.S. 235 (1981)................................................................ 18

iv

*RJR Nabisco, Inc. v. Eur. Cmty.*,
  579 U.S. 325 (2016) ................................................................ 18

*St. Jude Med., Inc. v. Lifecare Int'l, Inc.*,
  250 F.3d 587 (8th Cir. 2001) ............................................ 8, 12

*Volkswagen Aktiengesellschaft v. Schlunk*,
  486 U.S. 694 (1988) ................................................................ 13

*World-Wide Volkswagen Corp. v. Woodson*,
  444 U.S. 286 (1980) ................................................................ 19

## Statutes

Anti-Terrorism Act, 18 U.S.C. § 2333 .................................... 1, 5

## Other Authorities

Fed. R. App. P. 35(b)(1) ............................................................. 1

Fed. R. App. P. 35(b)(1)(A) ...................................................... 12

Fed. R. App. P. 35(b)(1)(B) ....................................................... 9

Jayne S. Ressler, Plausibly Pleading Personal Jurisdiction,
  82 Temp. L. Rev. 627, 633, 653–54 (2009) ......................... 18

## RULE 35(B)(1) STATEMENT

Plaintiffs are service members who were tragically killed or wounded in the Iraq War by the militia Jaysh al-Mahdi, and those victims' family members.  J.A.97.[1]  They brought this treble-damages action seeking to impose liability for those attacks on 21 companies that manufactured or supplied prescription drugs and/or medical devices ("medical supplies") purchased by Iraq's Ministry of Health, the government agency that administers Iraq's public healthcare system and all imports of medical supplies into that country.  J.A.98–101.  Plaintiffs contend that the supply of those medicines to the Health Ministry violated the Anti-Terrorism Act, 18 U.S.C. § 2333, and state tort law because the sectarian militia Jaysh al-Mahdi "infiltrated" the Ministry and raided its resources to support the militia's activities.  J.A.103, 632–46.

The District Court dismissed the action for lack of personal jurisdiction as to six non-U.S. entities (the "Foreign Defendants") that allegedly supplied medicines outside the United States to the Health

---

[1] "J.A." citations refer to the joint appendix, Doc. No. 1893959 (filed Apr. 9, 2021).  "Op." citations refer to the panel decision included in the addendum to this petition.

Ministry.  The Foreign Defendants are AstraZeneca UK Limited, GE Medical Systems Information Technologies GmbH, Cilag GmbH International, Janssen Pharmaceutica NV, Pfizer Enterprises SARL, and F. Hoffmann-La Roche Ltd.  The Foreign Defendants are filing this petition because it raises a jurisdictional issue that applies only to them; other Defendants have filed a separate petition for rehearing en banc on other issues.

The District Court explained that "all the relevant conduct that plaintiffs contend gives rise to liability … occurred in Iraq, not the United States." J.A.815 (emphasis omitted).  Plaintiffs nevertheless attempted to base specific personal jurisdiction over the Foreign Defendants on allegations that the Foreign Defendants purchased some of the medical supplies they sold to the Ministry (or, in some cases, just active ingredients) from corporate affiliates in the United States.  The District Court considered those allegations "at best tangential to plaintiffs' claims" and not supportive of the exercise of personal jurisdiction. J.A.815, 818.  A panel of this Court reversed, holding that Plaintiffs adequately alleged facts that, if true, would mean that the Foreign Defendants' purchases of some medicines or active ingredients from the

United States were "related to" Plaintiffs' claims that they were injured by the Foreign Defendants' overseas sales, and thus that the Foreign Defendants were subject to the personal jurisdiction of U.S. courts for those claims.  Op.52–59.

The Supreme Court has cautioned that in its jurisprudence on specific personal jurisdiction, "the phrase 'relate to' incorporates *real limits*, as it must to adequately protect defendants foreign to a forum." *Ford Motor Co. v. Mont. Eighth Jud. Dist.*, 141 S. Ct. 1017, 1026 (2021) (emphasis added).  The panel's decision disregards these limits and involves issues of exceptional importance warranting *en banc* review. The panel's analysis conflicts with decisions of other Circuits, which have rejected the exercise of specific personal jurisdiction over out-of-forum defendants based on allegations or evidence that those defendants purchased products from within the forum.  *See* Part I *infra*.  That analysis is at odds with Supreme Court precedent that each defendant's forum contacts must be evaluated individually, not conflated with contacts of corporate affiliates.  *See* Part II *infra*.  And it sends the troubling message to foreign companies that investing in relationships with U.S. affiliates, purchasing supplies from U.S. manufacturers (with

the American jobs that creates), and marketing "Made in the U.S.A." goods around the world could expose them to litigation in the United States over their non-U.S. activities. *See* Part III *infra*. This Court should grant *en banc* review to maintain "real limits" on specific personal jurisdiction over foreign defendants.

## STATEMENT

1.  The Foreign Defendants are incorporated and/or headquartered in Europe. *See* J.A.105–07. They allegedly sold medical supplies to Iraq's Health Ministry, which Plaintiffs acknowledge operated Iraq's public healthcare system and had a "monopoly" over "medical imports in Iraq." J.A.111, 120–21. Plaintiffs allege that after elections led to the Sadrist political movement being assigned leadership of the Ministry, a Sadrist-aligned militia, Jaysh al-Mahdi, infiltrated and looted from the Ministry to finance militia operations, including attacks on Americans in Iraq. J.A.118–35.

Plaintiffs allege that Ministry officials affiliated with Jaysh al-Mahdi extorted cash and in-kind payments from companies seeking to sell medical supplies in Iraq, including the Foreign Defendants. J.A.143, 153–59, 161–63. Specifically, when the Foreign Defendants sold medical

supplies to the Ministry, Ministry officials allegedly demanded additional quantities of medical supplies at no cost ("free goods").  J.A.139–53.  As the complaint tacitly acknowledges (J.A.140), pharmaceutical companies regularly can and do give public buyers free goods for charitable reasons or as a discounting mechanism.  Plaintiffs nonetheless allege that because of the Ministry's weak controls, free goods were stolen, diverted to the black market from shipments allegedly made by the Foreign Defendants to the Ministry in Iraq, and sold to raise money for Jaysh al-Mahdi.  J.A.140–50.

2.  The Foreign Defendants moved to dismiss for lack of personal jurisdiction, and the District Court granted the motion.  The Foreign Defendants were undisputedly not subject to U.S. courts' general personal jurisdiction.  J.A.813 n.3.  The District Court further determined that it lacked specific personal jurisdiction over the Foreign Defendants because "all the relevant conduct that plaintiffs contend gives rise to liability under the [Anti-Terrorism Act] occurred *in Iraq*, not the United States."  J.A.815.  As the District Court observed, "the alleged terrorist funding," "the terrorist attacks," and the "allegedly corrupt payments and in-kind donations" all "occurred in Iraq," and the

"allegedly corrupt contracts" between the Foreign Defendants and the Health Ministry were allegedly negotiated, finalized, and performed in Iraq. J.A.815; *see also, e.g.*, J.A.101.

Plaintiffs attempted to compensate for the absence of any meaningful connection between their claims and the Foreign Defendants' ties to the United States by focusing on the U.S. origins of the medical supplies they sold to the Ministry in Iraq. *E.g.*, J.A.102–03, 177–79, 184–87. But the District Court rejected the argument that it had personal jurisdiction over the Foreign Defendants because some of the medical supplies allegedly sold to the Iraqi Ministry had been manufactured in whole or part in the United States. J.A.818–20. As the District Court noted (and Plaintiffs do not dispute), "many of the goods sold by the foreign defendants were sourced from countries *other* than the United States," and the U.S. origin of some medical supplies or active ingredients was "at best tangential to plaintiffs' claims that [the Foreign Defendants] entered into corrupt contracts with the Iraqi Ministry." J.A.818–19; *see* J.A.700–89 (declarations attaching contracts specifying that goods would be sourced from non-U.S. countries). Although Plaintiffs argued that the alleged purchase of medical supplies or active ingredients from the

United States was "a material part" of the alleged scheme, they offered no plausible, non-conclusory allegations as to why the U.S. origin of some (but not all) drugs "specifically was material to the Ministry contracts." J.A.819.    Finally, the District Court noted that basing personal jurisdiction on the use of U.S.-made goods in non-U.S. transactions risked extending U.S. courts' specific personal jurisdiction to "countless transactions" simply because those transactions "involve[d] a U.S.-made product." J.A.820.[2]

3.    The panel reversed and remanded, concluding that Plaintiffs adequately alleged facts that, if true, would support the exercise of personal jurisdiction over Plaintiffs' claims against the Foreign Defendants.    Op.45–59.    The panel concluded that Plaintiffs adequately pleaded that their claims of injuries in Iraq, purportedly caused by the sale in Iraq by the Foreign Defendants of medical supplies to the Iraqi Health Ministry, were at least "related to" the Foreign Defendants' purchase of those supplies from the United States.    Op.50–53.

---

[2] Plaintiffs also contended that the Foreign Defendants were subject to U.S. personal jurisdiction because they "expressly aimed" their conduct at the U.S. by supporting terrorists and used U.S. banks to pay certain fees.  The District Court rejected both arguments, J.A.815, 819–21, and Plaintiffs did not renew them on appeal.

In reaching that conclusion, the panel relied on four "overlapping" factors, explicitly declining to say "whether all four are necessary [or] whether one alone would suffice." Op.52. According to the panel, jurisdiction could be based on allegations that—

1. The Foreign Defendants' purchases of U.S. drugs enabled interactions with Jaysh al-Mahdi[3] that formed the basis of Plaintiffs' claims, and those purchases were part of a "mutually beneficial" relationship in which the Foreign Defendants relied on U.S. affiliates for products and the U.S. affiliates relied on the Foreign Defendants to serve the Iraqi healthcare market, Op.53;[4]

2. "'[T]he products to be distributed by [defendants in Iraq] were being manufactured in'" the United States, "at least in significant part," Op. 53 (quoting *St. Jude Med., Inc. v. Lifecare Int'l, Inc.*, 250 F.3d 587, 592 (8th Cir. 2001));

3. "[T]he primary way in which plaintiffs allege that the foreign defendants actually violated the ATA was giving Jaysh al-Mahdi cash bribes and U.S.-manufactured free goods," making the alleged U.S. origin of some of those products "centrally related to" their claims, Op.54–55 (quotation marks omitted); and

---

[3] The panel repeatedly stated that the Foreign Defendants transacted with Jaysh al-Mahdi, rather than the Health Ministry, apparently crediting Plaintiffs' arguments that the Health Ministry was a mere front for Jaysh al-Mahdi, *cf.* J.A.164, notwithstanding the Ministry's continued delivery of public healthcare, *see* J.A.97, 121.

[4] The panel speculated that the contracts between the Foreign Defendants and their U.S. affiliates were "likely" governed by U.S. law. Op.53. Even assuming that contractual choice-of-law provisions are relevant to personal jurisdiction over third-party claims against one contracting party, the panel cited no allegations for that proposition. Op.56. The panel also assumed that the Foreign Defendants' businesses benefited from U.S. intellectual-property and other laws but again cited nothing suggesting what (if any) U.S. laws would apply to the Foreign Defendants' transactions with the Health Ministry. *Id.*

4. "Jaysh al-Mahdi specified that the U.S. provenance of the medical goods mattered to it," because goods approved by U.S. regulators were allegedly more valuable on the Iraqi black market, Op.55.

## REASONS FOR GRANTING REHEARING EN BANC

**I.    Plaintiffs' Claims Concerning the Foreign Defendants' Transactions in Iraq With a Foreign Government Ministry Do Not Arise Out of or Relate to the U.S. Origin Of Some Goods.**

This Court should grant *en banc* review because the panel's decision conflicts with decisions of other Circuits. *See* Fed. R. App. P. 35(b)(1)(B). In concluding that Plaintiffs adequately alleged that the District Court had personal jurisdiction over claims based on the Foreign Defendants' overseas sales of medical supplies, the panel relied heavily on Plaintiffs' allegations that the Foreign Defendants purchased some of those supplies from manufacturers in the United States. Op.53–55. As other courts of appeals have recognized, however, a defendant who does not reside in a forum generally does not establish minimum contacts enabling it to be sued there merely by purchasing goods from an entity in the forum. That is so even when the relationship between the purchase of the goods and the plaintiff's claims is far stronger than it is here.

9

For example, the Eleventh Circuit has held that a non-U.S. defendant is not subject to a U.S. court's personal jurisdiction over claims that a product purchased in the United States caused injury abroad.  In *Fraser v. Smith*, 594 F.3d 842, 844, 851–52 (11th Cir. 2010), the court held that a Turks & Caicos tour operator's purchase and repair of a boat in the United States did not mean that he could be sued in the United States for wrongful death after the boat exploded outside the United States.  As the Court explained, "[b]uying goods from within a forum does not make a nonresident defendant amenable to suit there on the unrelated tort claims of a third party."  *Id.* at 851.  Although personal jurisdiction in the United States might exist over an action arising from or related to the purchase itself (for example, a payment dispute over the purchase contract), third-party tort claims based on events outside the United States "have only an attenuated causal connection to the purchase itself."  *Id.*; *see also Oldfield v. Pueblo de Bahia Lora S.A.*, 558 F.3d 1210 (11th Cir. 2009) (Costa Rican company not subject to U.S. personal jurisdiction over tort suit arising from injury to U.S. national occurring outside the United States just because boat on which injury occurred was purchased from the United States).

10

The Third and Eighth Circuits have likewise held that a nonresident defendant's purchase from an entity in a forum of a product manufactured using misappropriated trade secrets is insufficient grounds for allowing the defendant to be sued in that forum. In *BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp.*, the Third Circuit held that the New Jersey federal court lacked personal jurisdiction over a Taiwanese company that arranged for a New Jersey manufacturer to manufacture parts of a chemical plant using technology misappropriated in Taiwan, because the "primary tortious conduct giving rise to [the plaintiff's] claim … and to the injury caused thereby [wa]s unrelated to the United States." 229 F.3d 254, 257, 261 (3d Cir. 2000). Likewise, in *Burlington Industries, Inc. v. Maples Industries, Inc.*, 97 F.3d 1100, 1103 (8th Cir. 1996), the Eighth Circuit held that an Alabama company was not subject to personal jurisdiction in Arkansas on a misappropriation-of-trade-secrets action on the grounds that it purchased from an entity in Arkansas machines that allegedly incorporated trade secrets stolen by third parties, and used those machines to make products that were incorporated into other goods that third parties sold in Arkansas. If anything, those cases presented a stronger case for the exercise of

11

personal jurisdiction than this one, in which Plaintiffs cannot allege that the Foreign Defendants' purchase of medical supplies or ingredients from the United States itself caused anyone harm.

The panel's decision finds no support in the Eighth Circuit's decision in *St. Jude Medical*, 250 F.3d 587 (cited Op.53). There, the out-of-state defendant's purchases of goods from the forum constituted just one of many forum contacts, "no one" of which "may have been enough to satisfy due process." *Id.* at 593. More importantly, *St. Jude* was a dispute between an in-state manufacturer and its out-of-state distributor that centered on their contractual relationship, and thus was at a minimum closely related to the distributor's contacts with the state. *Id.* at 590, 592. Nothing in *St. Jude* implies that an out-of-state distributor's purchases of goods from an in-state manufacturer would justify the exercise of personal jurisdiction over third parties' claims against that distributor based loosely on its sales of goods outside the state.

## II.  The Panel's Analysis Effectively Imputed to the Foreign Defendants the U.S. Contacts of Corporate Affiliates.

The panel's analysis compounded this circuit conflict by contravening Supreme Court precedent. *See* Fed. R. App. P. 35(b)(1)(A). As the Supreme Court has reiterated, "[e]ach defendant's contacts with

the forum … must be assessed individually." *Calder v. Jones*, 465 U.S. 783, 790 (1984); *accord Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 781 n.13 (1984).  Thus, when determining whether affiliated but distinct companies are subject to a court's personal jurisdiction, "the acts of one cannot be attributed to the other." *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Exp. World Corp.*, 230 F.3d 934, 944 (7th Cir. 2000); *see also Volkswagen Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 705 n.* (1988); *Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 335–36 (1925).

The panel's analysis disregarded this limitation.  The panel reiterated Plaintiffs' allegations that the Foreign Defendants "act[ed] as [the U.S.] manufacturers' representatives in Iraq when they solicited Iraqi bids and fulfilled orders for the manufacturers' goods to be shipped there" and "worked on behalf of the U.S. manufacturers as their exclusive representatives in Iraq to secure that market."  Op.53, 59.  But the panel did not explain the relevance to personal jurisdiction of allegations that the Foreign Defendants "worked on behalf" of U.S. affiliates.  Such allegations could, at most, suggest that U.S. entities formed contacts with Iraq through foreign affiliates; they say nothing about whether the

13

Foreign Defendants themselves engaged in suit-related conduct in the United States. Yet under the panel's reasoning, any foreign affiliate of a multinational corporation acquires U.S. contacts by engaging in activities outside the United States on behalf of a U.S. affiliate. That analysis runs contrary to settled precedent requiring each entity's contacts with the forum to be assessed individually, *see supra* p.13, and unfairly "stacks the deck" in favor of jurisdiction over foreign defendants. *Daimler AG v. Bauman*, 571 U.S. 117, 135 (2014).

Indeed, the Supreme Court has rejected the exercise of personal jurisdiction on analogous facts. In *Bristol-Myers Squibb v. Superior Court of California*, 137 S. Ct. 1773 (2017), the Court held that an out-of-state manufacturer that entered into an agreement with a California distributor to sell the manufacturer's pharmaceutical products could not be sued in California by plaintiffs who claimed to have been injured by these products elsewhere. *Id.* at 1783. This case is *Bristol-Myers Squibb*'s corollary: just as contracting with an in-forum distributor does not support jurisdiction over an out-of-forum manufacturer over injuries sustained out-of-forum, *id.*, the Foreign Defendants' contacts with an in-forum manufacturer cannot support jurisdiction over the Foreign

14

Defendants' out-of-forum sales that allegedly led to injuries abroad. Indeed, in *Bristol-Myers*, the Court held that specific jurisdiction was lacking even though the defendant's pharmaceutical products allegedly *directly caused* the plaintiffs' injuries, whereas here the Foreign Defendants' medical supplies are allegedly several steps removed from the plaintiffs' injuries.

Nor is *Ford Motor Co.*, 141 S. Ct. 1017, on which the panel relied heavily, to the contrary. *Ford* held that courts can exercise specific personal jurisdiction over claims against out-of-state defendants that relate to those defendants' forum contacts, not just claims arising directly from those contacts. *Id.* at 1026. But this case is nothing like *Ford*. There, the plaintiffs' injuries occurred *in the forums* where the plaintiffs sued, and the defendant had "advertised, sold, and serviced" there the same car models that injured the plaintiffs. *Id.* at 1028. The plaintiffs' claims were thus "related to" the manufacturer's forum contacts, even if they did not literally "arise out of" those contacts because the manufacturer initially sold the specific defective cars elsewhere. *Id.* at 1026–27. By contrast, Plaintiffs were injured *in Iraq*, and they assert claims predicated on sales of medical supplies *in Iraq*, alleged conduct

that is categorically unlike the alleged conduct (*i.e.*, purchases from U.S. affiliates) that Plaintiffs contend established minimum contacts with the United States.

Indeed, *Ford* cautioned that "'relate to' incorporates *real limits*, as it must to adequately protect defendants foreign to a forum." *Id.* at 1026 (emphasis added). By finding that Plaintiffs adequately pleaded personal jurisdiction over sales by *foreign companies* to a *foreign ministry* that allegedly caused harm in a *foreign country* based on vague allegations that the products were originally "sourced" from U.S. affiliates and that foreign customers value U.S.-made goods, the panel's analysis in this case belies the existence of any such limits.

## III. The Panel's Decision Threatens Deleterious Practical Effects.

In concluding that Plaintiffs adequately pleaded that the Foreign Defendants were subject to U.S. courts' personal jurisdiction, the panel relied on four sets of allegations that it cited as showing that Plaintiffs' claims were related to the Foreign Defendants' purchases of medical supplies from the United States and relationships with U.S. affiliates. *See* Op.53–55; *supra* pp.8–9. The panel's reliance on these allegations was not only legally erroneous, but also sends a dangerous message to

16

non-U.S. companies that negative consequences can flow from fostering relationships with U.S. businesses, purchasing U.S.-manufactured goods, and marketing and supplying U.S. products outside the United States.

The panel's emphasis on the U.S. origins of some medical supplies (or ingredients) sold to the Iraqi Health Ministry threatens to significantly expand U.S. courts' exercise of personal jurisdiction over non-U.S. defendants. If allegations that the Foreign Defendants here sold U.S.-made medical supplies outside the United States to a foreign government agency are enough to justify personal jurisdiction, any number of non-U.S. companies that sell U.S.-made goods to foreign customers could risk litigation in U.S. courts over injuries abroad allegedly linked to those goods. Such a development would place considerable burdens on non-U.S. companies forced to defend unrelated actions or transactions thousands of miles from home and from where the alleged misconduct occurred, in an unfamiliar legal system that is "already extremely attractive to foreign plaintiffs" in light of (among other things) the United States' reliance on jury trials in civil cases, rule that losing parties are generally not liable for prevailing parties' fees,

allowance of treble or punitive damages and contingent attorney's fees, and extensive discovery. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 252 & n.18 (1981); *see also RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 347 n.9 (2016) (approvingly citing amicus brief identifying "controversial features of the U.S. legal system" including "extensive discovery, jury trials, class actions, contingency fees, and punitive damages"). Although the panel answered only the question of what is necessary to plead personal jurisdiction, non-U.S. companies still face the specter of jurisdiction or the prospect of potentially expensive and intrusive jurisdictional discovery based on easily pleaded allegations that their conduct outside the United States had some relationship, however attenuated, to their purchases of goods from entities in the United States. *See* Jayne S. Ressler, Plausibly Pleading Personal Jurisdiction, 82 Temp. L. Rev. 627, 633, 653–54 (2009) (discussing how discovery relating to personal jurisdiction burdens defendants and increases settlement pressures). The prospect of being haled into U.S. courts to answer for alleged overseas conduct will incentivize non-U.S. companies to limit their ties to the United States—for example, by purchasing products and components from non-U.S. sources rather than U.S. manufacturers, by

winding down U.S. affiliates (or never forming them in the first place), or avoiding marketing their products as "Made in the U.S.A." *Cf.* J.A.185; Op. 59 (relying on conclusory allegations that Jaysh al-Mahdi preferred goods with "U.S.A." on the "packaging").

That erosion of any real limits on personal jurisdiction in U.S. courts does not merely pose problems for non-U.S. companies. It threatens to crowd U.S. courts' dockets with suits having much more to do with foreign jurisdictions than the United States. And it bodes ill for American firms and workers, who may suffer from decreased demand and employment opportunities as non-U.S. companies rationally limit their exposure to U.S. litigation by relocating their purchasing and affiliates.

The panel's express decision not to clarify how many and what combination of its four factors are enough to support personal jurisdiction in U.S. courts compounds the harms of its approach. By leaving these questions unresolved, the panel's decision offers none of the guidance and certainty that, as the Supreme Court has held, businesses need to "structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *World-*

*Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). Even if some non-U.S. companies that purchase U.S. products or work with U.S. affiliates could defeat jurisdiction after litigation and potentially burdensome discovery, these costs and uncertainty alone may chill non-U.S. businesses' willingness to invest in the United States.

## CONCLUSION

This Court should grant the petition for rehearing en banc.

February 3, 2022

Kenneth L. Wainstein
DAVIS POLK & WARDWELL LLP
901 15th Street, N.W.
Washington, DC 20005
(202) 962-7030
ken.wainstein@davispolk.com

Paul S. Mishkin
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
(202) 450-4292

*Counsel for Defendant-Appellee*
*AstraZeneca UK Limited*

Respectfully submitted,

/s/ Beth S. Brinkmann
Beth S. Brinkmann
   *Counsel of Record*
John E. Hall
David M. Zionts
Jordan L. Moran
COVINGTON & BURLING LLP
850 Tenth Street N.W.
Washington, DC 20001
(202) 662-5312
bbrinkmann@cov.com

S. Conrad Scott
COVINGTON & BURLING LLP
620 Eighth Ave.
New York, NY 10018
(212) 841-1000

*Counsel for Defendant-Appellee*
*F. Hoffmann-La Roche Ltd*

20

Kannon K. Shanmugam
Jeh C. Johnson
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, N.W.
Washington, DC 20006
(202) 223-7300
kshanmugam@paulweiss.com

Jessica S. Carey
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

*Counsel for Defendants-Appellees
Cilag GmbH International and
Janssen Pharmaceutica NV*

Lisa S. Blatt
Christopher N. Manning
Sarah M. Harris
Melissa B. Collins
Brian T. Gilmore
Aaron Z. Roper
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000
lblatt@wc.com

*Counsel for Defendant-Appellee
Pfizer Enterprises SARL*

John B. Bellinger III
David J. Weiner
ARNOLD & PORTER KAYE
SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, DC 20001
(202) 942-5000
john.bellinger@arnoldporter.com

Robert Reeves Anderson
ARNOLD & PORTER KAYE
SCHOLER LLP
1144 Fifteenth Street,
Suite 3100
Denver, CO 80202-1370
(303) 863-2325

*Counsel for Defendant-Appellee
GE Medical Systems
Information Technologies GmbH*

21

## CERTIFICATE OF COMPLIANCE

This Petition complies with the type-volume limitations of Federal Rule of Appellate Procedure 35(b)(2)(A) because it contains 3,872 words, exclusive of the parts of the Petition exempted by Rule 32(f).  This Petition complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

February 3, 2022                  /s/ Beth S. Brinkmann
                                  Beth S. Brinkmann

## CERTIFICATE OF SERVICE

I hereby certify that on February 3, 2022, I caused the foregoing Petition to be filed with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.  I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

February 3, 2022                          /s/ Beth S. Brinkmann
                                          Beth S. Brinkmann

# **ADDENDUM**

## CERTIFICATE OF PARTIES AND AMICI CURIAE

Pursuant to D.C. Circuit Rules 28(a)(1)(A) and 35(c), the undersigned counsel certifies as follows:

All parties appearing before the district court and in this court are listed in the Brief for Plaintiffs-Appellants (Doc. No. 1895790).

The following individuals entered appearances as amici after Plaintiffs filed their initial brief:

- Professors William D. Araiza, William C. Banks, Erwin Chemerinsky, Brooke D. Coleman, Geoffrey S. Corn, William V. Dunlap, Stephen Dycus, Brenner M. Fissell, Jimmy Gurulé, Michael J. Kelly, Lee Kovarsky, Peter Margulies, Andrew Siegel, Adam Steinman, Rachel E. VanLandingham, Howard M. Wasserman, and Louise Weinberg;

- The American Association for Justice;

- General (Ret.) George W. Casey Jr., General (Ret.) Stan McChrystal, General (Ret.) Vincent Brooks, General (Ret.) James T. Conway, General (Ret.) James D. Thurman, Lieutenant General (Ret.) H.R. McMaster, Lieutenant General (Ret.) Douglas E. Lute, Lieutenant General (Ret.) Sean B. MacFarland, Lieutenant General (Ret.) John F. Mulholland, Lieutenant General (Ret.) Michael Oates, Lieutenant General (Ret.) Ken Tovo, Lieutenant General (Ret.) Keith C. Walker, Lieutenant General (Ret.) Sir Graeme Lamb, Brigadier General (Ret.) Ricky Gibbs, Brigadier General (Ret.) Jon Lehr, Colonel (Ret.) Greg Baine, Colonel (Ret.) Robert M. Balcavage, Colonel (Ret.) Daniel (Dan) Barnett, Colonel (Ret.) Greg Bell, Colonel (Ret.) Beverly Beavers, Colonel (Ret.) Leo E. Bradley III, Colonel (Ret.) Nycki Brooks, Colonel (Ret.) Bryan Denny, Colonel (Ret.) Kevin Lutz, Colonel (Ret.) Patrick Mackin, Colonel (Ret.) Mark E. Mitchell, Colonel (Ret.) Chad McRee, Colonel (Ret.) James

A-2

Phillips, Colonel Eric Schacht, Colonel (Ret.) Frank Sobchak, Colonel (Ret.) David Sutherland, Dr. and Lieutenant Colonel (Ret.) Jeanne Godfroy, Lieutenant Colonel (Ret.) Mark Grdovic, Dr. and Lieutenant Colonel (Ret.) John Nagl, Lieutenant Colonel (Ret.) Troy Perry, Lieutenant Colonel (Ret.) Steve Wood, Lieutenant Colonel (Ret.) Matt Zais, Command Sergeant Major (Ret.) Glenn Patti, Andrew Faldini, Professor Todd Huntley, Nicholas G. Kikis, Russell L. McIntyre, Dr. Daveed Gartenstein-Ross, and Bill Roggio;

- Senators Charles E. Grassley, Richard Blumenthal, Mike Crapo, Joni K. Ernst, James M. Inhofe, John Kennedy, Marco Rubio, and Sheldon Whitehouse;

- Stuart W. Bowen, Jr., Vincent Foulk, Elizabeth Warner, Chris King, James F. Mattil, Arthur Brennan, and Paul Tyson;

- The Chamber of Commerce of the United States of America and the Pharmaceutical Research and Manufacturers of America (PhRMA);

- James K. Haveman Jr., Max Primorac, Jane Green, Andrew Liepman, and Philip Mudd; and

- Charity & Security Network and InterAction: The American Council for Voluntary International Action, Inc.

February 3, 2022                    /s/ Beth S. Brinkmann
                                   Beth S. Brinkmann

A-3

## DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, counsel for the Foreign Defendants certify as follows.

AstraZeneca UK Limited—a private limited company organized under the laws of England and Wales, with its principal place of business in Cambridge, United Kingdom—is a biopharmaceutical company focusing on the discovery, development, manufacturing and commercialization of medicines. AstraZeneca UK Limited is an indirectly wholly-owned subsidiary of AstraZeneca PLC. AstraZeneca PLC is a public company organized under the laws of England and Wales and is publicly traded. Upon information and belief, no other publicly held company owns 10% or more of the voting interest in AstraZeneca UK Limited.

Cilag GmbH International and Janssen Pharmaceutica NV are indirect subsidiaries of Johnson & Johnson, a healthcare company incorporated in New Jersey that manufactures and provides pharmaceutical medicines and medical devices. Johnson & Johnson is a

A-4

publicly owned corporation, and no publicly held corporation holds 10% or more of its stock.

F. Hoffmann-La Roche Ltd—a Swiss corporation with its principal place of business at Basel, Switzerland—is a healthcare company focusing on the discovery, development, and delivery of pharmaceutical medicines and medical diagnostics for improved disease management and patient care. F. Hoffmann-La Roche Ltd is a wholly owned subsidiary of Roche Holding Ltd. Roche Holding Ltd is publicly traded on the Swiss Stock Exchange. Upon information and belief, no corporation holds more than 10 percent of Roche Holding Ltd's voting shares.

GE Medical Systems Information Technologies GmbH manufactures and provides medical electronic equipment and systems for the diagnosis and monitoring of patients requiring critical care. GE Medical Systems Information Technologies GmbH, a German limited liability company with its principal place of business in Germany, is wholly owned by General Electric Deutschland Holding GmbH, which is also a German limited liability company that does not have any outstanding securities in the hands of the public. GE Medical Systems

A-5

Information Technologies GmbH also owns 100% of the stock of GE Healthcare GmbH, which is a German limited liability company that does not have any outstanding securities in the hands of the public. GE Medical Systems Information Technologies GmbH's ultimate parent is General Electric Company, which is publicly traded on the New York Stock Exchange. More than 10% of GE Medical Systems Information Technologies GmbH's membership interest is held indirectly by General Electric Company.

Pfizer Enterprises SARL was a limited liability company (société à responsabilité limitée), existing under the laws of Luxembourg. Pfizer Enterprises SARL has merged into Pfizer Holdings International Luxembourg (PHIL) SARL. Pfizer Holdings International Luxembourg (PHIL) SARL is a limited liability company (société à responsabilité limitée), existing under the laws of Luxembourg. Pfizer Holdings International Luxembourg (PHIL) SARL is an indirect wholly-owned subsidiary of Pfizer Inc. Pfizer Inc. is publicly traded, and, upon information and belief, no publicly-held corporation owns 10% or more of Pfizer Inc.'s voting shares.

February 3, 2022                    /s/ Beth S. Brinkmann
                                    Beth S. Brinkmann

A-6

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 21, 2021          Decided January 4, 2022

No. 20-7077

JOSHUA ATCHLEY, ET AL.,
APPELLANTS

v.

ASTRAZENECA UK LIMITED, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-02136)

———

*Joshua D. Branson* argued the cause for appellants.  With him on the briefs were *David C. Frederick* and *Andrew E. Goldsmith.*

*Michael J. Miller* and *Stephen I. Vladeck* were on the brief for *amici curiae* Law Professors in support of appellants.

*Jeffrey R. White* was on the brief for *amicus curiae* The American Association for Justice in support of appellants.

*Tejinder Singh* was on the brief for *amici curiae* 44 Former Military Officers, Intelligence Officials, and Analysts in support of appellants.

2

*Michael A. Petrino* and *Jonathan E. Missner* were on the brief for *amici curiae* Eight United States Senators in support of appellants.

*Mazin A. Sbaiti* was on the brief for *amicus curiae* Iraq Anti-Corruption Experts in support of appellants.

*Kannon K. Shanmugam* argued the cause for appellees. With him on the brief were *Neil H. MacBride, Paul S. Mishkin, Beth S. Brinkmann, John E. Hall, David M. Zionts, Patrick J. Carome, David W. Bowker, Leon T. Kenworthy, John B. Bellinger, III, John David Cella, Robert Reeves Anderson, Lisa S. Blatt, Christopher N. Manning, Melissa B. Collins, Brian T. Gilmore, Jeh C. Johnson, Stacie M. Fahsel,* and *Jessica S. Carey*. *Alex Young K. Oh* entered an appearance.

*Tara S. Morrissey, Paul Lettow, Andrew J. Pincus, Robert W. Hamburg,* and *James C. Stansel* were on the brief for *amici curiae* The Chamber of Commerce of the United States of America and the Pharmaceutical Research and Manufacturers of America in support of appellees.

*Michael J. Edney* and *Mark C. Savignac* were on the brief for *amici curiae* Iraq Reconstruction Experts, et al. in support of appellees.

*Timothy P. Harkness, Linda H. Martin, Kimberly H. Zelnick, David Y. Livshiz, Scott A. Eisman, Altin H. Sila, Nathan A. Hembree,* and *Noelle L. Williams* were on the brief for *amici curiae* Charity & Security Network and InterAction: The American Council for Voluntary International Action, Inc. in support of appellees.

3

Before: PILLARD and WILKINS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*:  The known terrorist group Jaysh al-Mahdi injured or killed hundreds of United States service members and civilians as part of its years-long campaign to harm Americans and drive the United States' military presence out of Iraq.  Plaintiffs are victims of those attacks and the victims' family members.  In the period leading up to and during the attacks on plaintiffs, Jaysh al-Mahdi openly controlled Iraq's Ministry of Health (Ministry) and used it as a vehicle for terrorist activity.  "Due largely to its 2005-era control of the Ministry," plaintiffs contend, "Jaysh al-Mahdi became the deadliest terrorist group in the country.  It massacred thousands of people, including Plaintiffs and their family members."  Appellants Br. 2.  Plaintiffs claim defendants, large medical supply and manufacturing companies, knowingly gave substantial support to the attacks against them in violation of the Anti-Terrorism Act (ATA or Act), as amended by the Justice Against Sponsors of Terrorism Act (JASTA), and state law.  They allege that defendants, aware of Jaysh al-Mahdi's command of the Ministry, secured lucrative medical-supply contracts with the Ministry by giving corrupt payments and valuable gifts to Jaysh al-Mahdi.

Plaintiffs identify two ways in which they say defendants' dealings most vividly provided illegal support to the terrorist acts that harmed them.  First, defendants used local agents to deliver cash kickbacks to the terrorists who gave them business.  Second, defendants delivered extra, off-the-books batches of valuable medical goods that Jaysh al-Mahdi monetized on the black market to fund its operations, and also used as cash equivalents to pay terrorist fighters.  Critically, on

4

the facts plaintiffs allege, defendants undoubtedly had the degree of awareness that our precedent requires regarding the connection between their payments and gifts and the terrorist violence. Defendants' agents finalized contracts at in-person meetings at the Ministry, where Jaysh al-Mahdi weaponry, fighters, propaganda, and other indicia made clear who was in charge. And contemporaneous reports in mainstream media of the terrorists' control of the Ministry provided notice of the stakes of doing business with that entity. "Yet Defendants wanted to profit off the Ministry," plaintiffs assert, "and they were willing to pay terrorists for the opportunity." Appellants Br. 3.

The district court held that the complaint failed to state claims for either direct or secondary (aiding-and-abetting) liability under the ATA, and that it lacked personal jurisdiction over six foreign defendants.

We reverse on three points of law and remand the balance of the issues to be addressed by the district court consistent with our opinion. First, plaintiffs plead facts that suffice to support their aiding-and-abetting claim at the motion-to-dismiss stage. The complaint plausibly alleges that Hezbollah, a designated Foreign Terrorist Organization, planned or authorized the relevant attacks as required under the JASTA. It describes how Hezbollah helped establish Jaysh al-Mahdi in Iraq, then recruited, trained, and equipped Jaysh al-Mahdi's fighters with the intent that it carry out attacks to extirpate the American presence. And plaintiffs allege that defendants knowingly provided substantial assistance to Jaysh al-Mahdi—most clearly through their corrupt provision of free goods and cash bribes to do business with a Ministry completely overrun by Jaysh al-Mahdi. Aware of Jaysh al-Mahdi's ongoing terrorist operations, defendants allegedly secured lucrative medical-supply contracts by giving the organization millions

5

of dollars of cash and cash-equivalents over a period of many years. Those allegations, which must be accepted as true at this motion-to-dismiss stage, support an inference that defendants aided and abetted acts of international terrorism.

Second, with respect to the direct liability claim, plaintiffs have adequately pleaded that defendants' payments to Jaysh al-Mahdi proximately caused plaintiffs' injuries. The complaint describes how Jaysh al-Mahdi controlled the Ministry and used it as a terrorist headquarters. Accepting those allegations, defendants' dealings with the Ministry were equivalent to dealing with the terrorist organization directly. The Ministry was therefore not an independent intermediary that broke the chain of causation, but a front for Jaysh al-Mahdi. With causation adequately alleged, the adequacy of the allegations of other direct-liability requisites remains open on remand.

Finally, the district court's personal jurisdiction analysis was unduly restrictive. The foreign supplier defendants' direct, valuable, and ongoing sourcing of medical supplies and drugs for the Iraqi Ministry from their affiliated manufacturers in the United States amounts to robust contact with the U.S. forum through which the foreign defendants purposefully availed themselves of the benefits of doing business here. The question is whether plaintiffs' claims arose out of or related to those contacts. We hold that they did. The foreign supplier defendants worked closely with their manufacturer affiliates in the United States to bring to market in Iraq U.S. drugs and medical supplies. They did so through the very bribes and gifts that plaintiffs allege materially supported terrorist acts against them, including through defendants' provision of extra, U.S.-manufactured goods on top of contract quantities. The resultant medical supply contracts with the Ministry were both the outlet for the U.S.-origin goods and the vehicle for Jaysh al-Mahdi's terrorist fundraising. The relationship between

6

plaintiffs' claims and the foreign defendants' forum contacts supports the court's exercise of personal jurisdiction.

## BACKGROUND

On review of an order granting a motion to dismiss for failure to state a claim, we must assume the truth of facts plausibly alleged in plaintiffs' Third Amended Complaint and draw all reasonable inferences in plaintiffs' favor. *See Owens v. BNP Paribas, S.A.* (*Owens IV*), 897 F.3d 266, 272 (D.C. Cir. 2018). Doing so permits us to establish governing propositions of law—a step that precedes either party's opportunity to obtain discovery and test the evidence in the adversarial process. Even when we do not individually describe them as allegations, all of the facts on which we rely are from the complaint, and are therefore assumed true at this stage of the litigation. As is always the case in this procedural posture, we recognize that defendants plan to dispute many of the facts alleged, and plaintiffs cannot ultimately prevail unless they can support their allegations with evidence.

Plaintiffs allege that Iraq's Ministry of Health and Kimadia, the Ministry's state-owned import company, have a long history dating back to the Saddam Hussein era of corrupting Iraq's medical-goods procurement process. Plaintiffs cast the involvement of defendants in that past corruption as an instructive precursor to defendants' involvement in events giving rise to this case. From 2000-2003, Kimadia obtained kickbacks on medical-goods contracts it awarded to international medical goods purveyors under the United Nations "Oil-for-Food" program. That program was a humanitarian exception to sanctions on Iraq that allowed the country to sell some of its oil for the limited purpose of purchasing essential food and medical supplies for its people. Kimadia exploited the exception, circumventing the program's

7

limits by extracting a 10% cash kickback from humanitarian-goods suppliers. And Kimadia required suppliers to provide free medical goods—typically 10% in excess of the underlying contract quantities. Most of the defendants here (or their predecessors or affiliates) participated in that scheme. An extensive, independent, U.N.-commissioned inquiry led by Paul Volcker, former Chairman of the U.S. Federal Reserve, concluded that the scheme illegally funneled more than $1.5 billion to the Saddam Hussein regime.

In 2003, the United States invaded Iraq. Even before the invasion, Hezbollah—a Lebanese group designated as a Foreign Terrorist Organization under U.S. law since 1997—planned to undermine the expected U.S. presence. From April 2003, Hezbollah's "chief terrorist mastermind, Imad Mugniyeh," collaborated with the powerful Shiite cleric Muqtada al-Sadr to establish Jaysh al-Mahdi as a fighting force in Iraq to violently expel the Americans. Third Am. Compl. ¶ 56. As Jaysh al-Mahdi took root and grew, Hezbollah recruited, trained, and armed its fighters. It was Hezbollah that provided Jaysh al-Mahdi with explosively formed penetrators and trained the group's fighters how to use them. Recognized as a signature Hezbollah tool, explosively formed penetrators (Penetrators) are a sophisticated and highly destructive weapon that Jaysh al-Mahdi used in many of the terrorist attacks on the plaintiffs in this case.[1]

Sadr modeled his movement in Iraq, the "Sadrist Trend," on Hezbollah. Each group had a political wing and a terrorist wing. In each, the two wings were closely connected, sharing funding and leadership. Jaysh al-Mahdi, the terrorist wing of

---

[1] The odd nomenclature refers to projectiles formed by the explosive force of the blast that fires them toward their targets. As their name suggests, they are used to penetrate protective structures such as armored vehicles. *See* Third Am. Compl. ¶ 341.

8

the Sadrist Trend, was a deadly force in Iraq.  Its attacks likely killed over five hundred Americans and injured many more.  By July 2007, General David Petraeus concluded that Jaysh al-Mahdi was "more of a hindrance to long-term security in Iraq" than was al-Qaeda in Iraq.  Third Am. Compl. ¶ 62 (quoting MICHAEL R. GORDON & GEN. BERNARD E. TRAINOR, THE ENDGAME: THE INSIDE STORY OF THE STRUGGLE FOR IRAQ, FROM GEORGE W. BUSH TO BARACK OBAMA 422 (1st ed. 2012)).

In the immediate aftermath of the fall of Saddam Hussein and close on the heels of the abuses of the Oil-for-Food program, the Sadrists set their sights on the Iraqi Ministry of Health as a source of power and funding.  The United States tried unsuccessfully in 2003 and 2004, before the resumption of full sovereign authority by the Iraqis, to abolish Kimadia and replace it with a transparent, market-based procurement system for the Ministry of Health.  Instead, in early 2004, Sadrists began assuming key positions throughout the Ministry and purging employees disloyal to them.  Jaysh al-Mahdi's influence thus spread throughout the Ministry.  According to one Ministry insider, at the height of the group's control, the agency employed an estimated 70,000 Jaysh al-Mahdi members.  In 2005, after Sadrists won enough seats in the parliamentary election, Jaysh al-Mahdi solidified full control over the Ministry.

Jaysh al-Mahdi used the Ministry as a front and headquarters for its campaign of terrorist violence.  For example, the organization converted the nation's public hospitals "into terrorist bases where Sunnis were abducted, tortured, and murdered."  Third Am. Compl. ¶ 3.  The Ministry's ambulances transported terrorist "death squads" around Baghdad.  *Id.*  And the Deputy Ministry of Health used the Ministry's Facilities Protection Service to torture and kill

9

Sadr's enemies. *Id.* Jaysh al-Mahdi's dominance was obvious to anyone physically present at Ministry headquarters: "Death to America" slogans adorned the halls, Jaysh al-Mahdi fighters freely roamed while Americans could not safely enter, and Jaysh al-Mahdi's flag flew at the entrance. Plaintiffs contend that the Ministry "functioned more as a terrorist apparatus than a health organization" during the relevant time period. *Id.* Sadrist control over the Ministry and Kimadia "was at its apex from late 2004 through 2008," during which time "there was no meaningful distinction between the" Ministry and Jaysh al-Mahdi. *Id.* ¶ 104. In 2008, a different political party assumed control of the Ministry, but Jaysh al-Mahdi kept "de facto control" of the Ministry's contracting process until at least 2013. *Id.*

Jaysh al-Mahdi used its control of the Ministry to obtain financing for its terrorist activities by extracting bribes from defendants in the medical-goods procurement process. Between 2004 and 2013, defendants allegedly made corrupt payments in both cash and goods to Jaysh al-Mahdi, following the methods for currying favor already familiar from corrupt dealings with Kimadia under the Oil-for-Food program. First, defendants made cash bribes (called "commissions") to Jaysh al-Mahdi in order to obtain lucrative Kimadia contracts. These "commissions" were typically 20% of any contract price. "The Sadrists extracted their 'commissions' from foreign medical-goods companies by using their leverage over multiple points of the transaction lifecycle." Third Am. Compl. ¶ 145. Second, defendants gave the Ministry extra batches of drugs and medical devices for free on top of the quantities Kimadia paid for. Free goods packaged alongside the paid goods, but which nobody expected to appear in the Ministry's inventory, were readily available to Jaysh al-Mahdi to sell on the black market.

10

Each corrupt transaction relied on at least two corporate entities: a manufacturer of the relevant goods and its affiliated supplier that transacted with Kimadia. Defendants include both groups (as well as one parent company). The manufacturer defendants are AstraZeneca Pharmaceuticals LP; GE Healthcare USA Holding LLC; GE Medical Systems Information Technologies, Inc.; Ethicon, Inc.; Ethicon Endo-Surgery, LLC; Janssen Ortho LLC; Ortho Biologics LLC; Pfizer Pharmaceuticals LLC; Pharmacia & Upjohn Company LLC; Genentech, Inc.; and Hoffmann-La Roche Inc. The supplier defendants are AstraZeneca UK Limited; GE Medical Systems Information Technologies GmbH; Johnson & Johnson (Middle East) Inc.; Cilag GmbH International; Janssen Pharmaceutica N.V.; Pfizer Inc.; Wyeth Pharmaceuticals Inc.; Pfizer Enterprises SARL; and F. Hoffmann-La Roche Ltd. The parent company defendant is Johnson & Johnson, which oversaw and supervised the scheme by which its subsidiaries gave to Jaysh al-Mahdi. There are therefore twenty-one defendants from five corporate families—AstraZeneca, GE Healthcare, Johnson & Johnson, Pfizer, and Roche.

The stream of bribes and free goods helped finance Jaysh al-Mahdi's terrorist attacks on Americans, including plaintiffs. Indeed, because Jaysh al-Mahdi fighters were sometimes even paid in drugs that they then sold for cash on the black market, some U.S. government personnel in Iraq referred to the organization as "The Pill Army." Third Am. Compl. ¶ 9. Defendants were allegedly aware that their payments were being used to fund Jaysh al-Mahdi and its terrorist activities. Defendants' local agents, often called "Scientific Bureaus," finalized their contracts at the Ministry headquarters surrounded by terrorist propaganda and other indicia of Jaysh al-Mahdi's control. *Id.* ¶¶ 148-49, 180. And, as sophisticated global businesses, defendants had corporate security and compliance operations keeping them abreast of risks in the

11

markets they serve. As part of those efforts, plaintiffs plausibly allege, defendants would have become aware of frequent mainstream media reports describing Sadr's control of the Ministry and use of that position for support of terrorist attacks against Americans.

The complaint draws on many contemporaneous public accounts. For example, a 2005 *New York Times* article explained that "Sadr, the rebellious Shiite cleric who led two armed uprisings against the American occupation," benefited "from the new cabinet lineup" since "the health minister . . . belong[ed] to Mr. Sadr's political movement."[2] *The Guardian* reported that "[m]ost of the security guards in the morgue and the ministry are affiliated to [Sadr's] militia, the Mahdi army, one of the militias thought to be behind the sectarian killing going on in their neighbourhoods."[3] And *CBS News*, relying on a U.S. intelligence report, announced that "[h]ospitals have become command and control centers for the Mahdi Army militia," the "militia is keeping hostages inside some hospitals, where they are tortured and executed," and "[t]hey're using ambulances to transport hostages and illegal weapons, and even to help their fighters escape from U.S. forces."[4] The media highlighted Sadr's use of the Ministry's revenue stream to fund attacks. For example, *NBC News* reported that "[s]upplies and medicine . . . have been siphoned off and sold elsewhere for profit because of corruption in the Iraqi Ministry

---

[2] Third Am. Compl. ¶ 183 (quoting Robert F. Worth, *The Struggle for Iraq: Politics; Iraq's Assembly Accepts Cabinet Despite Tension*, N.Y. TIMES (Apr. 29, 2005)) (formatting altered).

[3] Third Am. Compl. ¶ 183 (quoting Ghaith Abdul-Ahad, *Inside Iraq's Hidden War*, GUARDIAN (May 19, 2006)) (formatting altered).

[4] Third Am. Compl. ¶ 87 (quoting Melissa McNamara, *CBS: Death Squads in Iraqi Hospitals*, CBS NEWS (Oct. 4, 2006)) (formatting altered).

12

of Health," which was "in the 'grip' of the Mahdi Army, the anti-American militia run by the Shiite cleric Muqtada al-Sadr."[5]

Plaintiffs each assert two primary-liability and two secondary-liability claims under the Act, as well as a variety of state-law claims arising from the same conduct. Plaintiffs' Third Amended Complaint (at issue here) elaborates their claims in unusual detail. The complaint on behalf of hundreds of victims and their families is 588 pages long. It provides context and spells out connections relevant to the extraordinary events it describes. And it does so with reference to hundreds of identified sources. The allegations

> are based on an extensive investigation drawing on a broad array of public and non-public information, including evidence obtained from more than 12 Confidential Witnesses with direct and indirect knowledge of the alleged facts; public and non-public reports, contracts, and emails; U.S. diplomatic and military cables (as published by *WikiLeaks*); Iraqi market data and regulations; public statements by U.S. and Iraqi government officials; English- and Arabic-language press reports; and Plaintiffs' own recollections.

Third Am. Compl. ¶ 41.

As noted above, the district court dismissed plaintiffs' claims in full and dismissed the foreign defendants for lack of personal jurisdiction. The court dismissed plaintiffs' direct liability claims by treating the Ministry of Health as an

---

[5] Third Am. Compl. ¶ 183 (quoting Aram Roston & Lisa Myers, *'Untouchable' Corruption in Iraqi Ministries*, NBC NEWS (July 30, 2007)) (formatting altered).

13

independent intermediary breaking the chain of proximate causation between defendants' payments and Jaysh al-Mahdi's attacks on plaintiffs. The court dismissed plaintiffs' secondary, aiding-and-abetting claims for two reasons. First, it held that no designated Foreign Terrorist Organization committed, authorized, or planned most of the relevant attacks, as required by the statute, because Jaysh al-Mahdi was never so designated. The court rejected allegations that Jaysh al-Mahdi acted as a proxy for the designated terrorist organization Hezbollah by characterizing Hezbollah's involvement as only "[g]eneral support or encouragement" to Jaysh al-Mahdi. *Atchley v. AstraZeneca UK Ltd.*, 474 F. Supp. 3d 194, 211 (D.D.C. 2020). It treated aiding-and-abetting liability as limited to cases in which the designated organization "*itself* had a significant role" in the particular attacks and read the complaint not to allege such a role. *Id*. at 212 (emphasis in original). Second, despite its express acknowledgment of allegations that "defendants knowingly provided medical goods to the Ministry for economic gain and were aware those goods would be used by [Jaysh al-Mahdi] to support terrorist attacks," *id.* at 213, the court held that plaintiffs did not adequately allege the requisite substantial assistance to Jaysh al-Mahdi, *id.* at 214.

The district court also held that the complaint failed to allege the suit-related contacts between the foreign defendants and the United States that are constitutionally required to empower the court to assert specific—or claim-linked—personal jurisdiction over them. Finally, because the court dismissed plaintiffs' federal law claims, it declined pendent jurisdiction over plaintiffs' state law claims.

Plaintiffs timely appealed.

14

**DISCUSSION**

We review *de novo* the district court's dismissal of the amended complaint for failure to state a claim, *Owens IV*, 897 F.3d at 272, and for lack of personal jurisdiction, *Livnat v. Palestinian Auth.*, 851 F.3d 45, 48 (D.C. Cir. 2017). We assume the truth of plaintiffs' factual allegations and draw all reasonable inferences in plaintiffs' favor. Although we would typically begin with personal jurisdiction as the antecedent question, we instead first consider whether the complaint states a claim because the personal jurisdiction issue applies to only six of the twenty-one defendants, and because consideration of claim-linked jurisdiction benefits from an understanding of plaintiffs' claims.

**I.    Anti-Terrorism Act Claims**

The ATA recognizes a private right of action in tort for United States nationals injured by acts of international terrorism. It authorizes victims of terrorism to recover against anyone shown to have played a primary (direct) or secondary (aiding-and-abetting) role.

Plaintiffs assert both types of liability against defendants. Needless to say, plaintiffs do not allege that the defendant drug companies directly maimed or killed plaintiffs; the claim is that the companies funded and otherwise substantially assisted those who did. Specifically, plaintiffs contend that defendants sold their drugs and medical supplies in Iraq by bribing the Iraqi Ministry of Health and sweetening their deals with extra goods free of charge during a period when Jaysh al-Mahdi was known to have commandeered the Ministry and was using it as a base for terrorist attacks. They allege defendants' corrupt payments substantially and predictably aided Jaysh al-Mahdi. And plaintiffs were among the avowed targets of Jaysh al-

15

Mahdi's notorious terrorist campaign to intimidate Americans and drive U.S. forces out of Iraq.

The ATA as originally enacted authorized suit by "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism." 18 U.S.C. § 2333(a). As relevant here, the "by reason of" language in the statute requires "some causal connection between the act of international terrorism and the U.S. national's injury." *Owens IV*, 897 F.3d at 270. The statute made no explicit reference to tort liability for aiders and abettors. *See id.* at 277. Some courts, including this one, interpreted that silence as barring such liability, applying a general presumption that Congress does not intend aiding-abetting liability without expressly saying so. *See, e.g.*, *id.* at 278; *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013).

In 2016, Congress amended the ATA in the Justice Against Sponsors of Terrorism Act to spell out a cause of action against anyone who knowingly provides substantial assistance to acts of international terrorism. 18 U.S.C. § 2333(d). The JASTA's express objective is

> to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States.

JASTA, Pub. L. No. 114-222, § 2(b), 130 Stat. 852, 853 (2016) (Amendment). The statute names our decision in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), as providing the "proper legal framework for how such liability should

16

function."  Amendment § 2(a)(5).  But even as it cast a wide net, Congress included an element for secondary liability not required for primary liability under the ATA:  Aiding-and-abetting liability under the JASTA is confined to injuries in which a designated Foreign Terrorist Organization, denominated as such under U.S. law, played a specified role. *See* 18 U.S.C. § 2333(d).

We hold that plaintiffs sufficiently allege secondary liability.  And, because the district court erred in dismissing the direct liability claims on an erroneous theory of proximate causation, we also reverse that holding and remand for further consideration of whether plaintiffs otherwise adequately plead direct liability.

**A.  Secondary Liability**

Secondary liability for aiding and abetting "reaches persons who do not engage in the proscribed activities at all, but who give a degree of aid to those who do." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 176 (1994).  As relevant here, the ATA as amended by the JASTA provides for secondary liability against "any person who aids and abets, by knowingly providing substantial assistance" to "an act of international terrorism."  18 U.S.C. § 2333(d)(2).  Aiding-and-abetting liability is confined to "an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189)." *Id*.

Plaintiffs thus need to plead three statutory elements: (1) an injury arising from an act of international terrorism; (2) that the act was committed, planned, or authorized by a designated Foreign Terrorist Organization; and (3) that defendants aided or abetted an act of international terrorism by knowingly

17

providing substantial assistance. As discussed below, *Halberstam*, in turn, spells out three elements that establish the referenced aiding or abetting—wrongful acts, general awareness, and substantial assistance—and further guides our consideration by reference to six "substantial assistance" factors. *See* 705 F.2d at 487-88.

Within the three statutory elements, defendants do not contest the allegations that plaintiffs each suffered injury from an act of international terrorism. They dispute the second and third elements: whether plaintiffs allege that Hezbollah "committed, planned, or authorized" those acts, and that defendants' corrupt payments to Jaysh al-Mahdi substantially assisted those attacks.

> ### i.  Plaintiffs allege that Jaysh al-Mahdi's terrorist attacks were "committed, planned, or authorized by" Hezbollah

Secondary liability under the ATA is confined to injuries arising from acts of terrorism "committed, planned, or authorized by" a designated Foreign Terrorist Organization, 18 U.S.C. § 2333(d)(2), which is a special designation made by the Secretary of State under the Immigration and Nationality Act, 8 U.S.C. § 1189. In many ATA cases, it is not disputed that the challenged acts were committed by a Foreign Terrorist Organization formally designated as such under U.S. law. *See, e.g.*, *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 490-91 (2d Cir. 2021) (Hamas); *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 848 (2d Cir. 2021) (Hezbollah). Even while the United States knew of Jaysh al-Mahdi as a terrorist actor, however, it did not designate it as a Foreign Terrorist Organization. Plaintiffs contend that was due to "a concern among some U.S. policymakers about the best way to influence Sadr," and "caution against overly antagonizing his followers"

18

in order to "preserv[e] flexibility for members of the U.S. government to engage with the Sadrists if and when doing so would serve the national interest."  Third Am. Compl. ¶ 355.

Defendants acknowledge that a joint Hezbollah–Jaysh al-Mahdi cell allegedly committed twenty-two of the attacks at issue here, injuring thirty-five of the direct victims in this case. The parties debate whether allegations that one of those attacks sparked a weeks-long battle that harmed an additional fifty-eight victims suffice to establish the requisite involvement of Hezbollah.  For most of the attacks at issue, however, plaintiffs allege they were committed by Jaysh al-Mahdi with Hezbollah more in the background; as to the plaintiffs injured by those attacks, the first claim of secondary liability (Count One) depends on the allegations that Hezbollah planned or authorized the attacks even as Jaysh al-Mahdi fighters were the direct perpetrators.  Plaintiffs' alternative theory (in Count Two) is that Jaysh al-Mahdi and Hezbollah created a RICO enterprise or campaign that functioned as the "act" of international terrorism that defendants aided.  We do not directly address plaintiffs' RICO theory, which seeks the same relief, in view of our remand on the more straightforward aiding-and-abetting claim.

In evaluating allegations of Hezbollah's involvement in attacks it did not also commit, we must consider what Congress meant by requiring that a Foreign Terrorist Organization "planned" or "authorized" the relevant acts of international terrorism.  Plaintiffs contend that to "plan" includes "to arrange the parts of: [to] design."  Appellants Br. at 42 (quoting *Plan*, Merriam-Webster,          https://www.merriam-webster.com/ dictionary/plan (capitalization altered)).  And they assert that to "authorize" means "to endorse, empower, justify, or permit" another's acts through "some recognized or proper authority (such as custom, evidence, personal right, or regulating

19

power)." *Id.* at 44 (quoting *Authorize*, Merriam-Webster, https://www.merriam-webster.com/diction-ary/authorize). Defendants offer no contrary reading of those terms; instead, they focus on their contention that Jaysh al-Mahdi "on its own" committed "more than 90% of the attacks at issue." Appellees Br. at 41.

Our analysis is informed by Congress's statutory findings in light of the realities of modern terrorism. Congress called on U.S. courts to provide litigants with the "broadest possible basis" for relief under the JASTA, reaching anyone who provides support, whether "directly or indirectly." Amendment § 2(b). To that end, the statutory text is not confined to acts of international terrorism "committed" by designated Foreign Terrorist Organizations, but also reaches those committed by someone else if they were "planned" or "authorized" by a designated group. It is well known that terrorist organizations, and Hezbollah in particular, often operate by proxy. *See* Third Am. Compl. ¶ 360 (explaining that "Hezbollah has coordinated terrorist attacks around the world primarily by acting through terrorist proxies"); Amicus Br. of 44 Former Military Officers, Intelligence Officials, and Analysts at 20 (explaining that "[m]any designated Organizations, including . . . Hezbollah, use proxies to attack Americans"). Congress thereby provided for aiding-and-abetting liability under the JASTA for those who aid or abet attacks in cases in which a designated terrorist group stands behind the fighters who pull the trigger or detonate the device.

Decisions in other ATA cases support aiding-and-abetting liability on the facts alleged here. In cases with facts like those before us, courts have held the requirement met. The district court in *Bartlett v. Société Générale de Banque Au Liban SAL* held that, where "third party paramilitary groups" committed the acts that harmed the plaintiffs, allegations that "Hezbollah

20

trained the Iraqi militias, . . . controlled and directed those militias, . . . planned the Attacks, . . . and designed and emplaced the weapons used in the Attacks" sufficed to establish the Foreign Terrorist Organization's role for purposes of aiding-and-abetting liability. No. 19-CV-00007, 2020 WL 7089448, at *8 (E.D.N.Y. Nov. 25, 2020) (internal quotation marks and citation omitted). Similarly, in *Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 96-97 (E.D.N.Y. 2019), the attacks themselves were carried out by an undesignated terrorist group. The court held that allegations that "describe Hezbollah as deeply involved in supporting and coordinating an extensive campaign of terrorist activity against American citizens in Iraq" permitted a reasonable inference "that a designated FTO, namely Hezbollah, was responsible for committing, planning, or, at the very least, authorizing the attacks that injured Plaintiffs." *Id*. at 97. In a situation markedly different from this case, in contrast, courts have held that the Pulse Night Club shooting by a "self-radicalized" individual allegedly inspired in part by "online content" from ISIS involved only a "tenuous connection" to ISIS insufficient to show the attack was "committed, planned, or authorized" by the Foreign Terrorist Organization. *Crosby v. Twitter, Inc.*, 921 F.3d 617, 626 (6th Cir. 2019); *see Colon v. Twitter, Inc.*, 14 F.4th 1213, 1222-23 (11th Cir. 2021) (same); *see also Gonzalez v. Google LLC,* 2 F.4th 871, 911-12 (9th Cir. 2021) (same for the San Bernardino attack).

Plaintiffs plausibly allege that Hezbollah both planned and authorized the attacks against them. The complaint describes in detail how Hezbollah acted through Jaysh al-Mahdi with the specific goal of harming Americans in Iraq. Hezbollah had been closely involved with Jaysh al-Mahdi since its founding. The chief terrorist mastermind of Hezbollah, Imad Mugniyeh, worked with Sadr to found Jaysh al-Mahdi with the shared goal of killing Americans and driving U.S. forces out of Iraq. As

21

early as January 2004, Hezbollah sent nearly 800 agents to Iraq to direct Jaysh al-Mahdi's terrorist campaign. Mugniyeh continued to supervise Jaysh al-Mahdi's campaign until his death in 2008, at which time he was replaced by other Hezbollah operatives. Plaintiffs identify by name numerous senior Hezbollah operatives who helped supervise Jaysh al-Mahdi's attacks. And the U.S. Treasury Department in 2009 "formally recognized the links between Hezbollah and Jaysh al-Mahdi when it designated [a] Jaysh al-Mahdi commander . . . as a Specially Designated Global Terrorist," noting that Hezbollah prepared Jaysh al-Mahdi to fight Coalition Forces. Third Am. Compl. ¶ 375. The Department did so again in 2012 when it found that Hezbollah helped form, train, and advise militants in Jaysh al-Mahdi. *Id.* ¶ 376.

Jaysh al-Mahdi itself proclaimed its identification with Hezbollah: Sadr declared that he was "Hezbollah's 'striking arm in Iraq,'"[6] and publicly acknowledged Jaysh al-Mahdi's "formal links with Hizbollah."[7] Jaysh al-Mahdi fighters marched under Hezbollah flags, waved Hezbollah banners at demonstrations, and shouted chants including "Mahdi Army and Hezbollah are one"[8] and "we are Hezbollah."[9]

---

[6] Third Am. Compl. ¶ 371 (quoting Wire, *Iraqi Cleric Calls for Alliance with Hezbollah, Hamas*, BUFFALO NEWS (Apr. 2, 2004), http://buffalonews.com/2004/04/02/iraqi-cleric-calls-for-alliance-with-hezbollah-hamas/).

[7] Third Am. Compl. ¶ 371 (quoting Nizar Latif & Phil Sands, *Mehdi Fighters 'Trained by Hizbollah in Lebanon'*, INDEPENDENT (Aug. 20, 2007)).

[8] Third Am. Compl. ¶ 373 (quoting *Iraq's Shia March for Hezbollah*, AL-JAZEERA (Aug. 4, 2006), www.aljazeera.com/archive/2006/08/200849131615702691.html).

[9] Third Am. Compl. ¶¶ 15, 373.

22

Hezbollah's alleged involvement in planning the attacks that injured and killed plaintiffs was deep and far reaching. Its provision of weaponry, training, and knowledge to Jaysh al-Mahdi with the intent of harming Americans in Iraq constituted a "plan." Hezbollah brought Jaysh al-Mahdi recruits to Iran and Lebanon and trained them to use their methods against American forces in Iraq. The training covered the use of basic weapons, improvised explosive devices, Penetrators, rockets, and more. Hezbollah spelled out in a "planning guide" how Jaysh al-Mahdi fighters should deploy the training and weaponry it provided. Third Am. Compl. ¶¶ 399, 402. The complaint also draws geographical connections between Hezbollah's presence and the attacks at issue in this case, detailing that Hezbollah coordinated with Jaysh al-Mahdi terrorists in specific locations where plaintiffs were injured or killed.

Hezbollah's planning role was particularly evident in attacks using Penetrators. Penetrators used in Iraq during this period were "exclusively associated with" Hezbollah. Third Am. Compl. ¶ 395 (quoting Minute, Deputy Chief of Assessments Staff to Sir Nigel Sheinwald, Iraq: Lebanese Training including manuscript comment Blair (May 3, 2007)). Hezbollah planned the Penetrator attacks by giving assistance to Jaysh al-Mahdi regarding Penetrator design, helping Jaysh al-Mahdi manufacture those weapons, teaching Jaysh al-Mahdi fighters how to use them, identifying specific target locations in Iraq, and sending senior Hezbollah terrorists to coordinate the Penetrator attacks. In other words, Hezbollah did not just provide deadly Penetrators, it then "instructed Jaysh al-Mahdi to use [Penetrators] against American soldiers" and taught them how to do so. *Id.* ¶ 395. The complaint explains the tactics for other types of attacks as well, linking them to corresponding Hezbollah training and direction. Plaintiffs'

23

allegations readily meet the minimum required to plead that Hezbollah "planned" the attacks.

The allegations that Hezbollah exerted religious, personal, and operational authority over Jaysh al-Mahdi show that it "authorized" the attacks as well. Hezbollah asserted religious authority over Jaysh al-Mahdi fighters by, for example, issuing a *fatwa* declaring a religious duty to attack Americans in Iraq. It exerted personal authority over Sadr, who openly aligned himself with Hezbollah. And Hezbollah exercised its command over Jaysh al-Mahdi by training and directing its fighters, who swore fealty to Hezbollah. Those allegations are legally sufficient at this stage to support the contention that Hezbollah authorized the attacks.

Those and many similar allegations of close integration and allegiance suffice to plausibly plead that Hezbollah planned and authorized Jaysh al-Mahdi's challenged attacks.

> **ii.    Plaintiffs allege defendants aided and abetted Jaysh al-Mahdi's attacks against plaintiffs by "knowingly providing substantial assistance" to those acts**

We next address whether plaintiffs' allegations support their claim that defendants may be liable for "aid[ing] and abet[ting], by knowingly providing substantial assistance" to "act[s] of international terrorism." 18 U.S.C. § 2333(d)(2).

In enacting the JASTA, Congress expressly embraced the aiding-and-abetting analysis in *Halberstam v. Welch*—a unanimous opinion by Judge Wald, joined by Judges Scalia, and Bork—as providing "the proper legal framework for how [aiding-and-abetting] liability should function" under the Act. Amendment § 2(a)(5). *Halberstam* sustained Linda Hamilton's civil liability for aiding and abetting Bernard

24

Welch's murder of Michael Halberstam during Welch's burglary of Halberstam's home. 705 F.2d at 474. Hamilton was not even aware that Welch, her romantic partner, was going to burglarize Halberstam, much less murder him, nor was she present at the crime scene. *Id.* at 475-76, 487-88. It sufficed that she was a "passive but compliant partner" who lived with Welch during his extensive series of lucrative burglaries, *id.* at 474-75; assisted him in his "business" with back-office tasks like bookkeeping, inventory, and banking, *id.* at 475, 487; and benefited from the ill-gotten gains, *id.* at 487. Hamilton never did anything violent. *Id.* at 475-76, 488. But Welch's evening absences and access to significant funds despite the couple's lack of typical employment would have suggested to Hamilton that Welch "was involved in some kind of personal property crime at night." *Id.* at 488. She knew "something illegal was afoot." *Id.* at 486. In sum, under the circumstances, Hamilton's office tasks constituted substantial assistance, and she had the requisite "general awareness of her role in a continuing criminal enterprise." *Id.* at 488. Since "violence" is a "foreseeable risk" of that enterprise, we sustained Hamilton's liability as an aider and abettor to the murder. *Id.*

*Halberstam* sets out three elements of aiding-and-abetting liability:

> (1) the party whom the defendant aids must perform a wrongful act that causes an injury;

> (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance;

> (3) the defendant must knowingly and substantially assist the principal violation.

25

705 F.2d at 477. *Halberstam* further identifies six factors bearing on the third, substantial-assistance element, considered below. *Id.* at 483-84.

As to the first element, there is no dispute on this appeal that wrongful acts caused plaintiffs' injuries. Defendants argue that plaintiffs inadequately plead the second and third requirements, and the district court based its dismissal on its determination that plaintiffs fail to plead substantial assistance to acts of international terrorism under the third requirement.

### a.  The **Halberstam** *Elements*

With no challenge before us to the first *Halberstam* element, we proceed to consider general awareness and substantial assistance. We conclude that plaintiffs have plausibly alleged both elements.

### 1. *General Awareness*

*Halberstam* explains that a "defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time he provides the assistance." 705 F.2d at 487-88. Under the ATA, "a defendant may be liable for aiding and abetting an act of terrorism if it was generally aware of its role in an 'overall illegal activity' from which an 'act of international terrorism' was a foreseeable risk." *Kaplan*, 999 F.3d at 860 (quoting *Halberstam*, 705 F.2d at 488). There is no specific intent requirement. *Id.* at 863. Whether a defendant's support "suffices to establish general awareness is a fact-intensive inquiry." *Id.* at 860. And *Halberstam*'s use of "generally" as a modifier for "aware" imparts "a connotation of something less than full, or fully focused, recognition." *Id.* at 863. Thus, a "defendant need not be generally aware of its role in the specific act that caused the plaintiff's injury; instead, it must be generally aware of its role in an overall illegal

26

activity from which the act that caused the plaintiff's injury was *foreseeable*." *Honickman*, 6 F.4th at 496 (emphasis in original) (citing *Halberstam*, 705 F.2d at 477, 488).

In considering whether plaintiffs have plausibly alleged defendants' general awareness of their role in the overall illegal activity, we bear in mind the challenges of establishing a defendant's state of mind without the benefit of discovery. "A complaint is allowed to contain general allegations as to a defendant's knowledge." *Kaplan*, 999 F.3d at 864. At the same time, discovery into a party's state of mind is intrusive and should not proceed based on bare, conclusory allegations. What plaintiffs must plead are "allegations of the facts or events they claim give rise to an inference" that defendants acted with the requisite mental state. *Id.* Plaintiffs have met that burden here.

The complaint plausibly alleges that defendants were aware of reports extensively documenting both Jaysh al-Mahdi's domination of the Ministry and its mission to engage in terrorist acts. For example, the media reported in April 2005 that the health minister was a devotee of Sadr's movement even as Sadr led armed rebellions against American troops. *Cf. Kaplan*, 999 F.3d at 864-65 (sustaining awareness allegations based on Hezbollah's statements in "press conferences and news media interviews"). Other reports highlighted Jaysh al-Mahdi's abuse of the Ministry's resources. Defendants would have been aware of such reports because each defendant had a corporate security group that would have tracked them as part of its due diligence. *See id.* at 865 (highlighting that banks' due diligence would uncover public reporting). Defendants also sent their agents into the Ministry to finalize deals on their behalf. Inside the Ministry, armed terrorist fighters circulated openly and anyone who entered could see Jaysh al-Mahdi's distinctive flag, weapons, Sadr posters, and "Death to

27

America" slogans on display. Yet, in dealing with the notoriously corrupt Ministry under the control of a terrorist group, defendants facilitated their transactions with bribes and structured them to include free goods of great value in funding terrorist acts.

Those allegations support an inference that defendants were generally aware they were engaged in illegal activity. In *Halberstam*, Linda Hamilton's back-office work supported her liability for murder because she had reason to suspect her partner was involved in nighttime property crimes, and the fact that she performed her otherwise-innocuous services for him "in an unusual way under unusual circumstances for a long period of time" suggested her general awareness of illegality. 705 F.2d at 487. Here, the corrupt provision of free goods and cash bribes to an entity defendants knew was engaged in anti-American acts of terrorism and was using its takeover of the Ministry to fund and facilitate those terrorist acts supports the inference that they were generally aware of their role in activity foreseeably lending support to acts of international terrorism. *Cf. Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 224 (2d Cir. 2019) (rejecting aiding-and-abetting claim against defendant bank that provided financial services to Saudi bank with known links to terrorism where plaintiffs "failed to allege that [defendant bank] was aware that by providing banking services" it was supporting a terrorist organization, "much less assuming a role in [its] violent activities"). We next weigh the six "substantial assistance" factors.

### 2. *Knowing and Substantial Assistance*

For the third aiding-and-abetting element—whether the defendant "knowingly and substantially assist[ed] the principal violation," 705 F.2d at 477—*Halberstam* identifies six factors to weigh: (i) the nature of the act assisted, (ii) the amount and

28

kind of assistance, (iii) the defendants' presence at the time of the tort, (iv) the defendants' relationship to the tortious actor, (v) the defendants' state of mind, and (vi) the duration of assistance, *id.* at 483-84. No factor alone is dispositive, and the weight of each varies with the circumstances of the particular claim. What is required is that, on balance, the relevant considerations show that defendants substantially assisted the acts of terrorism. *See, e.g.*, *Halberstam*, 705 F.2d at 483-84, 488.

Here, the "knowledge component . . . requires that the defendant 'know[]' that it is providing 'assistance,' 18 U.S.C. § 2333(d)(2)—whether directly to the FTO or indirectly through an intermediary." *Kaplan*, 999 F.3d at 863-64 (alteration in original). "If the defendant knowingly—and not innocently or inadvertently—gave assistance, directly or indirectly, and if that assistance was substantial," then the "knowing and substantial assistance" element of aiding and abetting is sufficiently established. *Id.* at 864. Defendants do not argue that their provision of cash and free goods was in any way accidental, so the assistance was given knowingly. We next weigh the six "substantial assistance" factors.

    **i.  Nature of the act assisted.** The nature of the act assisted "dictates what aid might matter, *i.e.*, be substantial." *Halberstam*, 705 F.2d at 484. The nature of the act assisted in *Halberstam* was the burglary enterprise, and Hamilton's "aid in transforming large quantities of stolen goods into 'legitimate' wealth" was "indisputably important" to it. *Id.* at 488. Here, the acts assisted are Jaysh al-Mahdi's violent terrorizing, maiming, and killing of U.S. nationals in Iraq. "Financial support is 'indisputably important' to the operation of a terrorist organization, and any money provided to the organization may aid its unlawful goals." *See Gonzalez*, 2 F.4th at 905 (quoting *Halberstam*, 705 F.2d at 488). We further

29

explained in *Halberstam* that, in assessing the "nature of the act" criterion, "a court might also apply a proportionality test to particularly bad or opprobrious acts, *i.e.*, a defendant's responsibility for the same amount of assistance increases with the blameworthiness of the tortious act or the seriousness of the foreseeable consequences."   705 F.2d at 484 n.13.   The extraordinary blameworthiness of Jaysh al-Mahdi's terrorist attacks increases the responsibility of persons acting as defendants allegedly did.  In relation to such vicious acts, even "relatively trivial" aid could count as substantial.  *Id*.  This factor supports substantiality.

**ii.  Amount and kind of assistance.**  We next consider the "amount and kind of assistance given [to] the wrongdoer." *Halberstam*, 705 F.2d at 484 (formatting modified).   In *Halberstam*, the court held that, "although the amount of assistance Hamilton gave Welch may not have been overwhelming as to any given burglary in the five-year life of this criminal operation, it added up over time to an essential part of the pattern." *Id.* at 488 (formatting modified).  Here, the complaint alleges that defendants gave Jaysh al-Mahdi at least several million dollars per year in cash or goods over a period of years.  *Cf. Siegel*, 933 F.3d at 225 (lack of allegations that terrorist group ever received funds defendant bank provided to Saudi bank weighed against "substantial assistance").

We reject the contention that assistance must be shown to have been indispensable to the injurious acts for this factor to weigh in support of liability.  According to defendants, because Iran provided a substantial part of Jaysh al-Mahdi's funding and weapons, any aid from defendants was immaterial.  That is incorrect.  Nothing in the JASTA suggests Congress intended secondary liability to extend only to the top funder of a terrorist action.  As alleged, defendants' actions were a considerable

30

source of funding that helped the organization commit multiple terrorist acts.  Because defendants' alleged assistance was at least significant, this factor supports substantiality.

**iii.  Presence at the time of the tortious conduct.**  In *Halberstam*, Linda Hamilton was "not present at the time of the murder or even at the time of any burglary," but because "the success of the tortious enterprise clearly required expeditious and unsuspicious disposal of the goods," we nonetheless concluded that "Hamilton's role in that side of the business was substantial."  705 F.2d at 488 (formatting modified).  Like Hamilton, these defendants were not physically present at the attacks on plaintiffs.  This factor cuts against counting defendants' supply of cash and goods to Jaysh al-Mahdi as substantial assistance.

**iv. Relationship.**  The fourth factor asks about defendants' "relation to the tortious actor."  *Halberstam*, 705 F.2d at 488 (formatting modified).  In *Halberstam*, we identified this factor as calling for consideration of whether the abettor's "position of authority [gives] greater force to his power of suggestion." *Id.* at 484.  We gave this factor "a low priority in our calculus" in that case after "a careful balancing" because Hamilton's romantic relationship with the tortfeasor made us "wary of finding a housemate civilly liable on the basis of normal spousal support activities."  *Id.* at 488.  Unlike in *Halberstam*, there is no special relationship here between defendants and the principal tortfeasors that would give us pause before recognizing liability.  We treat this factor as neither supporting nor detracting from substantiality.

**v.  State of mind.**  This factor favors aiding-and-abetting liability because defendants' assistance was knowingly provided with a general awareness that it supported the terrorist acts of a notoriously violent terrorist organization that had

31

overrun the Ministry of Health. *See Halberstam*, 705 F.2d at 477, 488. Hamilton's "knowing" assistance "evidence[d] a deliberate long-term intention to participate in an ongoing illicit enterprise" of "some type of personal property crime at night." *Id*. at 488. That sufficed to support her aiding-and-abetting liability for the murder, because violence is a "natural and foreseeable consequence" of such property crimes. *Id*. To be sure, this factor more powerfully supports aiding-and-abetting liability of defendants who share the same goals as the principal or specifically intend the principal's tort, but such intent is not required. *See Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 & n.10 (2d Cir. 2018). Knowledge of one's own actions and general awareness of their foreseeable results, not specific intent, are all that is required.

The district court itself acknowledged plaintiffs' allegations that "defendants knowingly provided medical goods to the Ministry for economic gain and were aware those goods would be used by [Jaysh al-Mahdi] to support terrorist attacks." *Atchley*, 474 F. Supp. 3d at 213. That acknowledgement alone required the court to find this factor supported plaintiffs' claim. This is especially so because *Halberstam* held that the "particularly offensive nature of an underlying offense might also factor in the fifth criterion, the 'state of mind' of the defendant." 705 F.2d at 484 n.13. Defendants' alleged awareness that, by bribing the Ministry, they were funding an entity's terrorist attacks on Americans in Iraq drives home the substantial character of their aid.

The district court instead counted this factor against plaintiffs by erroneously discerning a "one in spirit" requirement in *Halberstam*: It thought the claim fell short because the "allegations do not even suggest defendants were 'one in spirit' with [Jaysh al-Mahdi's] desire to kill American citizens in Iraq or that defendants intended to help [Jaysh al-

32

Mahdi] succeed in doing so."  474 F. Supp. 3d at 213.  That
was error.  *See* Amicus Br. of Law Professors at 27-29.

Congress did not limit secondary liability to those who are
"one in spirit" with terrorists, or who substantially assist
terrorism with a specific desire to advance terroristic outcomes.
A specific intent, or "one in spirit," requirement is contrary to
*Halberstam* as incorporated into the JASTA.  The reference to
"one in spirit" appears in *Halberstam* in a description of
another case in which the "defendant's abusive cheering of the
battery showed he was one in spirit with the assaulter[,]"
adding factual support to the secondary liability in that case.
705 F.2d at 484 (citing *Rael v. Cadena*, 93 N.M. 684, 604 P.2d
822 (1979)).  We upheld Hamilton's liability, however, even
though she knew nothing about the murder so she could not
have specifically intended it; it sufficed that she was generally
aware of Welch's campaign of property crimes, which
foreseeably posed a risk of such violence.  *Id.* at 488.  Aiding-
and-abetting liability reaches actors like Linda Hamilton, who
may seek only financial gain but pursue it with a general
awareness of aiding some type of tort or crime.  For their part,
defendants do not press a requirement that aiders be "one in
spirit" with the principal, but suggest that the absence of such
a finding should count in our factor-balancing.  Oral Arg. Rec.
1:13:03-1:13:55.  We hold that, on balance, defendants' alleged
state of mind supports substantial assistance.

**vi. Duration.**  Under *Halberstam*, "[t]he length of time an
alleged aider-abettor has been involved with a tortfeasor almost
certainly affects the quality and extent of their relationship and
probably influences the amount of aid provided as well;
additionally, it may afford evidence of the defendant's state of
mind."  705 F.2d at 484.  The parties argue over whether the
complaint alleges that defendants' aid spanned as much as a
decade or as little as four years.  Even on defendants' reading,

33

four years is a significant duration.  *See id.* at 488 (noting that duration "strongly influenced [the court's] weighing of Hamilton's assistance," when the scheme lasted five years).  The allegations do not describe a one-off transaction by a firm unfamiliar with its counterparty, but a set of enduring, carefully cultivated relationships consisting of scores of transactions over a period of years.  Here, duration leans decidedly in plaintiffs' favor.

In sum, assessing the allegations of the complaint under the *Halberstam* standard, we hold that they plausibly plead knowing assistance that was sufficiently "substantial" to state a secondary liability claim under the JASTA.  Plaintiffs have alleged that defendants' financial support was important to the development of Jaysh al-Mahdi, that defendants knowingly gave significant funding to Jaysh al-Mahdi, and that they did so over the course of several years with at least general awareness of their role in Jaysh al-Mahdi's terrorist activities.  Under *Halberstam*, that is enough.

### b.  *"Directly or Indirectly"*

The district court also faulted the aiding-and-abetting claim for want of allegations that defendants substantially assisted Jaysh al-Mahdi "directly."  *Atchley*, 474 F. Supp. 3d at 213; *see also id.* at 212 ("But plaintiffs allege that defendants provided medical goods and devices to the Ministry, not" Jaysh al-Mahdi).  It read the complaint to allege that bribes and gifts reached Jaysh al-Mahdi only indirectly, through the Ministry.  *Id.* at 212.  And indirect aid, the court thought, cannot support aiding-and-abetting liability under the Act.  *Id.* at 212-13.  That is doubly wrong.

First, the complaint contradicts the court's factual premise.  It plausibly alleges that Jaysh al-Mahdi controlled the Ministry.  Bribes and gifts coming into the Ministry under Jaysh al-

34

Mahdi's command were bribes and gifts to Jaysh al-Mahdi. The district court misread the complaint insofar as it inferred that, in their allegedly corrupt dealings with the Ministry of Health, defendants somehow avoided dealing with the people in charge there—the Jaysh al-Mahdi terrorists. *See* Part I-B, *infra*.

Second, the court applied an incorrect legal standard. The statute imposes no directness requirement. In defining secondary liability in § 2333(d)(2), Congress purposefully omitted any requirement of "direct" assistance. Its enacted findings drive home the point, declaring that the JASTA authorizes claims against defendants who provide "support, *directly or indirectly*, to [terrorists]." Amendment § 2(b) (emphasis added). The bipartisan U.S. Senators' amicus brief underscores that judicially engrafting a directness requirement would undermine the Act by "preclud[ing] liability when a defendant knowingly aids-and-abets (or conspires with) an individual terrorist agent, alter ego, or proxy of a terrorist organization that did not himself or herself commit the acts of terrorism at issue." Amicus Br. of Eight United States Senators at 23-24.

Defendants respond that the Amendment's preamble cannot change the statutory text, which in their view "plainly requires that the defendant 'aid and abet' the 'person who committed' the terrorist act." Appellees Br. at 45. To the contrary, the text provides that "liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." 18 U.S.C. § 2333(d)(2). It thus applies to both "any person who aids and abets . . . an act of international terrorism," and anyone who "conspires with the person who committed such an act." *Id*.; *see also Kaplan*, 999 F.3d at 855. Put another way, the JASTA

35

"does not say that for aiding-and-abetting liability to be imposed a defendant must have given 'substantial assistance to' the principal; it simply says the defendant must have given 'substantial assistance.'" *Kaplan*, 999 F.3d at 855. Substantial assistance to the ultimate deed—whether provided directly or indirectly—is enough.

Even assuming the textual reference to "the person" who committed the act were meant to apply to aiding-and-abetting as well as conspiracy claims, it fails to do what defendants say. As a practical matter, one can substantially assist "a person" without doing so directly. Congress's enacted findings in the JASTA explain that it had such situations in mind: The statute provides for secondary liability to account for the fact that "[s]ome *foreign terrorist organizations, acting through affiliated groups or individuals*, raise significant funds outside of the United States for conduct directed and targeted at the United States." Amendment § 2(a)(3) (emphasis added). In providing that aiding people or entities that raise money they funnel to terrorist groups may be as off-limits as directly aiding the groups themselves, Congress anticipated aiding-and-abetting liability of indirect funders.

In sum, we hold that plaintiffs have stated a secondary liability claim under the JASTA. They have adequately alleged that Jaysh al-Mahdi's terrorist acts against plaintiffs were committed, planned, or authorized by Hezbollah. They have also adequately alleged that defendants aided and abetted those attacks by knowingly providing substantial assistance to Jaysh al-Mahdi with the general awareness that Jaysh al-Mahdi committed terrorist attacks, foreseeably including the attacks against plaintiffs. We next consider plaintiffs' more challenging claim that defendants are also directly liable under the ATA.

36

**B.  Direct Liability**

Plaintiffs separately claim that defendants may be held directly liable for acts of international terrorism they did not merely aid, but themselves committed.  That claim requires allegations that plaintiffs, as nationals of the United States, were "injured in [their] person, property, or business by reason of an act of international terrorism."  18 U.S.C. § 2333(a).  It is not contested that plaintiffs are U.S. nationals.  The parties dispute whether plaintiffs allege injury by reason of acts of international terrorism—*i.e.*, whether defendants' alleged financing, 18 U.S.C. § 2339C, and material support, 18 U.S.C. § 2339A, of Jaysh al-Mahdi was "international terrorism" within the meaning of 18 U.S.C. § 2331(1).  And they dispute whether defendants' conduct proximately caused plaintiffs' injuries.  The district court dismissed the claim for failure to plead proximate causation without addressing the scope of "act of international terrorism" under the statute.  *See Atchley*, 474 F. Supp. 3d at 209.  We hold that plaintiffs have adequately alleged proximate causation and remand for the district court to consider in the first instance whether plaintiffs have also alleged that defendants themselves committed any acts of international terrorism within the meaning of the ATA.

To plead proximate causation, plaintiffs must "plausibly allege (1) that [defendants'] acts were 'a substantial factor in the sequence of events' that led to their injuries and (2) that those injuries" were "'reasonably foreseeable or anticipated as a natural consequence of' [defendants'] conduct."  *Owens IV*, 897 F.3d at 273 (formatting modified) (quoting *Owens v. Republic of Sudan* (*Owens III*), 864 F.3d 751, 794 (D.C. Cir. 2017), *vacated on other grounds sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020)).  Those requirements are met by allegations of "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff

37

has suffered." *Owens III*, 864 F.3d at 794 (quoting *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004)). Proximate causation functions to "eliminate[] the bizarre," *id.* (quoting *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 536 (1995)), by precluding liability based on an "attenuated" causal link "more aptly described as mere fortuity," *id*. (quoting *Paroline v. United States*, 572 U.S. 434, 445 (2014)).

With respect to the first element, allegations that defendants' funding substantially assisted Jaysh al-Mahdi's terrorist campaign in Iraq suffice to meet the requirement that defendants' acts were a "substantial factor" in the events leading to plaintiffs' injuries. In *Owens III*, we upheld a finding that Sudan had proximately caused two al-Qaeda bombings of embassies in other countries based on proof that Sudan had given al-Qaeda substantial assistance that helped it "grow its membership" and "develop its capabilities." 864 F.3d at 797. Sudan had supported al-Qaeda through various forms of in-kind aid. It had afforded "tax exceptions" and "customs privileges" that "allowed al Qaeda nearly to monopolize the export of several agricultural commodities, plowing its profits back into its broader organization." *Id*. at 794. Its intelligence service had protected al-Qaeda training camps from local police investigations. *Id.* And it had given indirect financial support by extending the privilege of investing in a state-owned bank, which allowed al-Qaeda access to the formal banking system. *Id*. at 795. We concluded that, "although Sudan did not directly fund al Qaeda or its business, the [district] court reasonably concluded its in-kind assistance had the same practical effect." *Id*.

Defendants' alleged support here was similarly a substantial factor in plaintiffs' injuries. They gave both cash and cash equivalents to the terrorist organization that harmed

38

plaintiffs, which allowed that organization to grow.  In fact, the ability to use the Ministry as a source of funding for Jaysh al-Mahdi—to funnel financial perks from suppliers like defendants straight into Jaysh al-Mahdi's coffers—was a significant reason Sadr sought to control that agency in the first place.  Plaintiffs' nonconclusory, detailed allegations describe the free goods scheme, including percentages of free goods defendants gave Kimadia on top of contract quantities.  They even identify many individual contracts for specific drugs and other medical goods with a "free goods" amount specified.  Regarding the cash bribes, the complaint alleges that defendants routinely paid a 20% bribe on their contracts during the time period, identifies certain dealings by parties along with bribe amounts, and describes how the bribes operated at each phase of the transaction.  And the plausibility of these major global corporations giving such bribes and gifts is bolstered by allegations that these same companies or their affiliates had previously participated in essentially the same kind of corruption during the Oil-for-Food program with different Ministry leadership using the same basic playbook.

The complaint also meets the second element of proximate causation.  In view of plaintiffs' plausible allegations that defendants bribed Jaysh al-Mahdi with cash and goods, plaintiffs' injuries were "reasonably foreseeable or anticipated" natural consequences of that assistance.  *Owens III*, 864 F.3d at 794 (quoting *Rothstein*, 708 F.3d at 91).  Jaysh al-Mahdi was a known terrorist group, led by an anti-American cleric, estimated to have killed more than five hundred Americans and injured many others.  Providing fungible resources to a terrorist organization allows it to grow, recruit and pay members, and obtain weapons and other equipment.  It was reasonably foreseeable that financially fortifying Jaysh al-Mahdi would lead to the attacks that plaintiffs suffered.  The same was true in *Owens III*:  Sudan's material support to al-

39

Qaeda foreseeably led to the bombings at issue, because "Sudan could not help but foresee that al Qaeda would attack American interests wherever it could find them." *Id.* at 798.

Defendants urge dismissal of plaintiffs' direct liability claims on the ground that the Ministry was an independent intermediary that defeated proximate causation. They draw support from cases in which assistance to a state sponsor of terrorism fell short of proximately causing harms committed by terrorists the state supported. In both *Owens IV* and *Rothstein*, for example, plaintiffs claimed that defendant banks aided terrorists by extending valuable banking privileges to sovereign states (Sudan and Iran, respectively). *Owens IV*, 897 F.3d at 268-69; *Rothstein*, 708 F.3d at 84-85. But proximate causation was lacking in *Owens IV* because the plaintiffs did not "allege that any currency processed by BNPP for Sudan" was "in fact sent to al Qaeda," nor that such aid from Sudan was necessary to the embassy bombings. 897 F.3d at 276. The same was true of the relationship between the bank and Iran in *Rothstein*. 708 F.3d at 97; *see Kemper v. Deutsche Bank AG*, 911 F.3d 383, 392-94 (7th Cir. 2018) (similar for Deutsche Bank AG and Iran).

The role of the Ministry of Health in this case is markedly different from that of the "independent intermediary" states— Sudan and Iran—in the prior cases. A sovereign state has "many legitimate agencies, operations, and programs to fund" so, even if the state is known to prop up terrorists, we cannot presume that aid to such a state finds its way into terrorist hands. *Owens IV*, 897 F.3d at 276 (quoting *Rothstein*, 708 F.3d at 97). But plaintiffs do not allege that defendants aided an autonomous nation with many functions and priorities. Rather, they allege that defendants gave to a single agency that had been overtaken by terrorists.

40

The complaint extensively details Jaysh al-Mahdi's control over the Ministry, and references multiple reports to that effect by people on the ground in Iraq. The Ministry, on plaintiffs' account, was not an independent intermediary because it was thoroughly dominated by Jaysh al-Mahdi and "functioned more as a terrorist apparatus than a health organization." Third Am. Compl. ¶ 3. By early 2005, Sadr, the Jaysh al-Mahdi leader, had officially taken over the Ministry and placed his operatives at every level of its leadership. Jaysh al-Mahdi's command of the Ministry encompassed Kimadia, the Ministry's procurement arm with which defendants dealt. The group placed Sadrists in leadership roles throughout Kimadia, including as Director General. At the height of Sadrist control, the Ministry employed about 70,000 Jaysh al-Mahdi members and largely purged Sunnis and unaligned technocrats, even killing or running out doctors who were not loyal. Under Jaysh al-Mahdi, "[p]ublic hospitals were converted into terrorist bases where Sunnis were abducted, tortured, and murdered." *Id.* Ministry "ambulances transported Jaysh al-Mahdi death squads around Baghdad," and "terrorists openly patrolled the halls of [the Ministry] headquarters." *Id.* Hakim al-Zamili, Deputy Minister of Health and Jaysh al-Mahdi commander, even launched attacks from the roof of the Ministry headquarters. Recognizing proximate causation here is a far cry from holding the causation requirement met by non-governmental organizations "providing assistance to a non-sanctioned organization if the aid is later stolen, diverted, or extorted by groups that engage in terrorism." Amicus Br. of Charity & Security Network and InterAction: The American Council for Voluntary International Action, Inc. at 4-5; *see also id.* at 19-20.

Defendants' arguments to the contrary rest on an untenably skeptical reading of the complaint that

41

impermissibly draws inferences against plaintiffs. They ask us
to infer that Jaysh al-Mahdi actually did not control the
Ministry. They do so by picking out allegations that Jaysh al-
Mahdi would "loot," "steal," and "divert" supplies from the
Ministry. Appellees Br. at 12-13, 27 (complaint citations
omitted). Defendants say those references imply that the
Ministry was an independent entity to which defendants sent
their goods and equipment, and that Jaysh al-Mahdi only later
stepped in to divert them to its own purposes. *Id.* at 29-30. In
their view, then, their assistance to the Ministry could not have
been a substantial factor in plaintiffs' injuries. Plaintiffs
respond that words such as "looted" and "stole" in this context
"signify illegality, not independence," and cite other examples
of alter-ego entities described as "looting" or "stealing" from
an entity with which they are identified. Appellants Reply at 5
(citations omitted). It remains open to defendants to seek to
substantiate their narrative at a later stage, but we cannot adopt
it on review of the complaint.

Defendants' insistence that they provided "life-saving
medical goods" to the Ministry of Health, Appellees Br. at 9,
not Jaysh al-Mahdi, does not alone defeat proximate causation.
Aid directed to beneficial or legitimate-seeming operations
conducted by a terrorist organization does not attenuate the role
of the aid in causing terrorist acts. For example, in *Owens III*,
we held that the defendant's funding to "al Qaeda-affiliated
businesses" that "provided legitimate employment for al Qaeda
operatives" and performed "infrastructure projects," 864 F.3d
at 783, counted as material support that proximately caused al-
Qaeda's attacks, *id.* at 794-98. In *Boim v. Holy Land Found.
for Relief & Dev.*, 549 F.3d 685 (7th Cir. 2008) (en banc), the
Seventh Circuit held that Hamas's involvement "not only in
terrorism but also in providing health, educational, and other
social welfare services" likewise did not "get [defendants] off
the liability hook." *Id.* at 698. It reached that conclusion

42

because of "the fungibility of money" and because "Hamas's social welfare activities reinforce its terrorist activities." *Id.* The Supreme Court, too, recognizes that "[m]aterial support meant to promote peaceable, lawful conduct can further terrorism by foreign groups in multiple ways." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 30 (2010) (citation and quotation marks omitted). The same is true here. On the facts alleged in the complaint, the bribes and free goods were aid to Jaysh al-Mahdi that foreseeably furthered the organization's growth and supported its terrorist acts.

What is more, when a defendant aids an intervening intermediary, the defendant's position "one step removed" from the terrorists does not defeat proximate causation so long as plaintiffs allege "some facts demonstrating a substantial connection between the defendant and terrorism." *Owens IV*, 897 F.3d at 275. In the event that the evidence were to establish, contrary to the allegations of their complaint, that the Ministry remained meaningfully independent of Jaysh al-Mahdi, that would not necessarily defeat causation. The court would still need to consider whether plaintiffs established the requisite substantial connection. *Owens IV* permits them to do so by, for example, showing that the funds to the Ministry "actually [were] transferred to [Jaysh al-Mahdi] . . . and aided in" the terrorist acts. *Id.* at 276 (first alteration in original) (quoting *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 124 (2d Cir. 2013)). Unlike the plaintiffs in *Owens IV* and *Rothstein*, who simply assumed that aid to Sudan or Iran was aid to the terrorists they supported, plaintiffs here allege and would be entitled to try to show how the bribes and gifts were nonetheless substantially connected to Jaysh al-Mahdi's acts of terrorism that harmed plaintiffs.

Defendants urge us to take judicial notice of U.S. government support for the Iraqi Ministry of Health during the

43

period of Sadrist control as a factor that they contend defeats any inference that defendants' aid proximately caused harm to plaintiffs. Defendants assert that, on plaintiffs' theory, "the U.S. Government itself proximately caused Jaysh al-Mahdi's armed attacks." Appellees Br. at 32. They insist the government encouraged private-sector suppliers to support the Ministry of Health, and that "[t]he Supplier Defendants answered that call." *Id.* at 9. But plaintiffs nowhere allege that the government either made or encouraged the corrupt payments to Jaysh al-Mahdi that are the centerpiece of plaintiffs' claims. To the contrary, they allege that U.S. government efforts to bolster health infrastructure for the benefit of the Iraqi people generally steered clear of the Mahdi-controlled Ministry. *See* Third Am. Compl. ¶¶ 76, 113. We decline defendants' invitation to take judicial notice of documents reciting complex facts that appear subject to dispute. *See* Appellants Reply Br. at 8-10; *see also Hurd v. District of Columbia*, 864 F.3d 671, 686-87 (D.C. Cir. 2017); *cf. Owens IV*, 897 F.3d at 273 ("Public records are subject to judicial notice on a motion to dismiss when referred to in the complaint and integral to the plaintiff's claim."). The precise nature and context of any U.S. dealings with the Ministry, or encouragement of others to aid it, remain open to evidentiary development.

We hold that plaintiffs have alleged that defendants proximately caused plaintiffs' injuries, and remand for further consideration of plaintiffs' direct liability claims. The district court on remand will need to reach the issue whether plaintiffs have alleged that defendants themselves committed "acts of international terrorism" under the ATA. *See* Third Am. Compl. ¶¶ 3208-21. That is a legal question, but it was only lightly briefed on this appeal. Because we must remand in any event, we decline to decide it in the first instance.

44

## C.  Manufacturers' Remoteness Defense

Finally, as to both primary and secondary liability, the manufacturer defendants argue that they are not liable even if the supplier defendants are.  They contend it was the suppliers who are alleged to have dealt directly with the Mahdi-controlled Ministry, and that they as manufacturers were further removed from the support to Jaysh al-Mahdi that is alleged to have contributed to plaintiffs' injuries.  And they say that, given their remoteness, they could not have been tipped off by the visual cues of Jaysh al-Mahdi's domination of the Ministry that plaintiffs allege as one indication of defendants' awareness of their role in Jaysh al-Mahdi's terrorist activities.

On this complaint, we cannot dismiss the claims against the manufacturers on the ground that they were uninvolved with how their goods were marketed in Iraq.  Allegations of awareness based on media reports apply to all defendants.  And plaintiffs allege that the suppliers acted as the manufacturers' agents with respect to the Iraqi contracts for their products.  The briefing did not develop the point, but both parties refer to the Restatement as describing the relevant agency principles.  Oral Arg. Rec. 42:10-42:41, 1:06:57-1:07:50.  As a general matter, "[a]gency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."  Restatement (Third) Of Agency § 1.01 (2006).

As described in the complaint, each supplier had to "demonstrate 'sole and exclusive rights to represent the manufacturer in the territory of Iraq for all of its products,' and each supplier had to procure a 'letter from the manufacturing company authorizing the supplier to represent them.'"  Third

45

Am. Compl. ¶ 157 (quoting USAID, *Pharmaceutical & Medical Products in Iraq* § 6.3.2.1.2, Contract No. 267-C-00-04-00435-00 (Apr. 17, 2007)) (brackets omitted). "Manufacturers thus had the right to control the suppliers' conduct vis-à-vis the Ministry: "[M]anufacturers could refuse to authorize specific suppliers to sell in Iraq; could decline to produce documentation confirming that the suppliers acted on their behalf in negotiating with [the Ministry]; or could refuse to fulfill contracts that contained corrupt payments." *Id.* "Any one of those steps," plaintiffs allege, "which were in the manufacturer Defendants' power to control, would have precluded the corrupt payments at issue." *Id.*

The factual allegations describing how the supplier defendants acted as the manufacturers' agents in their interactions with the Ministry and Kimadia under the control of Jaysh al-Mahdi suffice at the pleading stage to prevent dismissal of the claims against the manufacturer defendants on this ground. Development of the factual record, including review of the specific contracts among defendants spelling out relevant terms, as well as other evidence of the nature of the relationships between the manufacturers and their affiliated suppliers, could materially bear on this issue. Of course, to the extent factual development could change the nature of the legal assessment of the relationships among the different types of defendants, those considerations are not now before us.

## II. Personal Jurisdiction

Finally, the foreign supplier defendants challenge the U.S. federal courts' constitutional authority to exercise specific personal jurisdiction over them. They dispute only whether plaintiffs' claims "arise out of or relate to" their contacts with the U.S. forum. We hold that they do.

46

Here is the short explanation why: First, the foreign supplier defendants deliberately and repeatedly established ample contacts with the United States. They agreed with U.S.-based manufacturers to act as their exclusive agents in Iraq. They then worked closely with the U.S. manufacturers, including through "cross-functional teams," Third Am. Compl. ¶¶ 237, 277, 298, to facilitate Iraqi sales and distribution. The foreign defendants sourced in the U.S. goods they supplied in Iraq, and specifically the goods they used to sweeten their deals with the Mahdi-controlled Ministry.

Second, those forum contacts were all squarely related to plaintiffs' claims. As described earlier in this opinion, the provision of free goods and cash bribes to Jaysh al-Mahdi are at the heart of all of plaintiffs' claims. Plaintiffs contend that bribing Jaysh al-Mahdi and giving it free goods violated the Act by aiding and abetting Jaysh al-Mahdi's terrorist violence against U.S. nationals in Iraq. And plaintiffs view the defendants' alleged bribery and provision of free goods as terror financing and material support for Jaysh al-Mahdi's violence against plaintiffs—support they contend itself constituted international terrorism in direct violation of the ATA.

Putting those two pieces together, it is evident that the foreign suppliers' forum contacts relate to plaintiffs' claims in multiple ways. The objective of the foreign suppliers' collaboration with the manufacturers in the United States was to secure the Iraqi market for the U.S. manufacturers' products. The foreign suppliers made the bribes and delivered the free U.S.-manufactured goods to Jaysh al-Mahdi in Iraq as a means of doing so. The goods they were accordingly able to sell on behalf of their U.S.-affiliated manufacturers were U.S. manufactured and U.S. Food and Drug Administration-approved products. Plaintiffs even allege that the U.S.

47

provenance of the free goods meant they "carried a high street value," Third Am. Compl. ¶ 153, which helped the foreign supplier defendants clinch those deals. The ATA claims thus relate closely to the foreign defendants' U.S. contacts.

Now for the fuller explanation of the court's specific personal jurisdiction over the foreign supplier defendants. The traditional personal jurisdiction analysis asks first whether an applicable long-arm statute authorizes the court to hear the case, and second whether doing so comports with due process. *See Mwani v. bin Laden*, 417 F.3d 1, 8 (D.C. Cir. 2005). Neither party addresses the statutory step, which is readily satisfied. "Where, as here, a claim arises under federal law and, as the parties agree, a 'defendant is not subject to jurisdiction in any state's court of general jurisdiction,' Fed. R. Civ. P. 4(k)(2)(A) . . . personal jurisdiction may be asserted under Rule 4(k)(2)," which is essentially a federal long arm-statute. *Est. of Klieman by & through Kesner v. Palestinian Auth.*, 923 F.3d 1115, 1120 (D.C. Cir. 2019), *cert. granted, judgment vacated*, 140 S. Ct. 2713 (2020), *and opinion reinstated in relevant part*, 820 F. App'x 11 (D.C. Cir. 2020); *see also Livnat*, 851 F.3d at 55. "Besides proper service of process, it requires only that" jurisdiction be consistent with the United States Constitution and laws. *Klieman*, 923 F.3d at 1120.

Implicitly accepting that Rule 4(k)(2)(A) applies, the foreign suppliers assert that the exercise of personal jurisdiction over them would exceed the constitutionally permissible reach of any U.S. court. Due process prevents a court from deciding claims against parties that have not in some way affiliated themselves with the forum in which the court presides—typically a state, but in certain cases like this one, the entire United States. As a constitutional minimum, a court's ability to exercise personal jurisdiction over a defendant

48

requires that the defendant "have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

The parties agree that, for purposes of assessing specific jurisdiction over the foreign suppliers, "the relevant forum is 'the United States as a whole,'" *Klieman*, 923 F.3d at 1120 (quoting *Mwani*, 417 F.3d at 11), and that we apply the Due Process Clause of the Fifth rather than the Fourteenth Amendment, *see Mwani*, 417 F.3d at 11. Apart from the scope of the forum and potential federalism considerations, the Fifth and Fourteenth Amendment Due Process inquiries are generally analogous. *See Livnat*, 851 F.3d at 54-55; *but see Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 137 S. Ct. 1773, 1783-84 (2017) ("[W]e leave open the question whether the Fifth Amendment imposes the same restrictions [as the Fourteenth] on the exercise of personal jurisdiction by a federal court.").

Courts distinguish between all-purpose "general" personal jurisdiction and claim-linked "specific" jurisdiction; the dispute here is limited to whether the court may exercise specific personal jurisdiction over the six foreign supplier defendants to adjudicate these plaintiffs' claims against them.[10]

---

[10] The six foreign defendants are AstraZeneca UK Limited, GE Medical Systems Information Technologies GmbH, Cilag GmbH International, Janssen Phamaceutica N.V., Pfizer Enterprises SARL, and F. Hoffman-La Roche Ltd. All of the foreign defendants are suppliers, not manufacturers. Fifteen other defendants—all of the manufacturers, one parent company, and three suppliers—have either their place of incorporation or their principal place of business (or both) in the United States, and do not dispute personal jurisdiction here.

49

General personal jurisdiction exists in any forum in which a defendant is "at home," such as in a corporate defendant's place of incorporation and its principal place of business, and may be exercised without regard to whether the claims themselves have any connection to the forum. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021). Plaintiffs do not assert that U.S. courts have general personal jurisdiction over the foreign defendants. *Cf. Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014).

Specific jurisdiction, in contrast, "covers defendants less intimately connected with a [forum], but only as to a narrower class of claims." *Ford*, 141 S. Ct. at 1024. The "'essential foundation' of specific jurisdiction" is the "relationship among the defendant, the forum, and the litigation." *Id.* at 1028 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)). The dispute here is whether that relationship is "close enough to support specific jurisdiction." *Id.* at 1032.

To recap, plaintiffs must meet three requirements to establish a basis for the court's exercise of specific personal jurisdiction: (1) minimum contacts demonstrating that the defendant purposefully availed itself of the forum; (2) relatedness between the contacts and the claim; and (3) compliance with "fair play and substantial justice." The first and third requirements are plainly met here. We review them only briefly to provide context for the key issue—the relatedness of the forum contacts to the claims.

To meet the first requirement, a defendant must have minimum contacts with the forum reflecting "some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum." *Ford*, 141 S. Ct. at 1024 (alteration in original) (quoting *Hanson v. Denckla*, 357

50

U.S. 235, 253 (1958)). When the Supreme Court in *International Shoe* reformulated personal jurisdiction doctrine into a minimum-contacts analysis, it "founded specific jurisdiction on an idea of reciprocity between a defendant and a State: When (but only when) a company 'exercises the privilege of conducting activities within a state'—thus 'enjoy[ing] the benefits and protection of [its] laws'—the State may hold the company to account for related misconduct." *Id.* at 1025 (alterations in original) (quoting *Int'l Shoe*, 326 U.S. at 319). Thus, a defendant must have "deliberately 'reached out beyond' its home—by, for example, 'exploi[ting] a market' in the forum State or entering a contractual relationship centered there." *Id.* (alteration in original) (quoting *Walden v. Fiore*, 571 U.S. 277, 285 (2014)). In considering whether a contractual relationship establishes the requisite contacts with a forum, we follow a realistic approach, not a mechanical test. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478-79 (1985). We consider "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Id.* at 479.

The foreign defendants' alleged contacts with the United States suffice to plead purposeful availment. As relevant here, each of the six foreign supplier defendants reached into the United States to contract with an affiliated U.S. manufacturer to be the manufacturer's exclusive agent in Iraq. Pursuant to its contract and collaborative relationship with a U.S. manufacturer, each foreign supplier worked in Iraq to secure contracts to sell the U.S. manufacturer's goods there. Continuously over a period of years, each of the foreign defendants reached into the United States to source goods manufactured here to fulfill the Iraqi contracts. Those U.S. contacts resulted not from anyone else's "unilateral activity," *cf. Hanson*, 357 U.S. at 253, but from the foreign suppliers' own course of dealing by which they "purposefully avail[ed]"

51

themselves of the privilege of conducting business in the forum, *id*. The foreign suppliers' forum contacts were significant and ongoing, as confirmed by the terms of many contracts that, even in advance of discovery, the complaint describes. Those contacts fulfill the constitutional requirement of minimum contacts reflecting purposeful availment of the U.S. forum.

To meet the third specific-jurisdiction requirement, the assertion of personal jurisdiction over the objecting defendant must "comport with 'fair play and substantial justice.'" *Burger King Corp.*, 471 U.S. at 476 (quoting *Int'l Shoe*, 326 U.S. at 320). To determine whether it does, we consider a range of factors, including the burden on defendants, the forum's interests in adjudicating the case, plaintiffs' interests in "convenient and effective relief," and the judicial system's interest in the efficient resolution of the controversy. *Id.* at 477 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)).

Considerations of fair play and substantial justice strongly support the exercise of personal jurisdiction over the foreign supplier defendants to adjudicate these plaintiffs' ATA claims. Defendants—sophisticated international businesses with established and ongoing ties to their U.S. affiliates—assert no special burden from defending this matter in the United States. *Cf. Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102, 114 (1987). Nor do they question that plaintiffs and the United States manifestly have strong interests in the availability of a U.S. forum for these claims. In amending the ATA, Congress declared that "wherever [they are] acting and wherever they may be found," Amendment § 2(b), entities or individuals that give material support to acts of terrorism that "threaten the security of nationals of the United States or the national security, foreign policy, or economy of the United

52

States . . . should reasonably anticipate being brought to court in the United States to answer for such activities," *id.* § 2(a)(6). If our courts were closed to plaintiffs' claims, no other forum would hold these defendants to account for these ATA violations.

The nub of the dispute centers on the second specific-jurisdiction requirement: that plaintiffs' claims "'arise out of or relate to the defendant's contacts' with the forum." *Ford*, 141 S. Ct. at 1025 (quoting *Bristol-Myers*, 137 S. Ct. at 1780). Put another way, "there must be 'an affiliation between the forum and the underlying controversy.'" *Bristol-Myers*, 137 S. Ct. at 1780 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). Either the claims must "arise out of" the defendants' forum contacts, or they must be related in some other way that is "close enough to support specific jurisdiction." *Ford*, 141 S. Ct. at 1032. One such example occurs when a defendant uses forum contacts as an instrument for achieving the wrong alleged. *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 171 (2d Cir. 2013). But the forum contacts need not themselves be unlawful. And the defendants' forum contacts need not have caused or given rise to the plaintiffs' claims. *Ford*, 141 S. Ct. at 1026. "That does not mean anything goes"—"the phrase 'relate to' incorporates real limits, as it must to adequately protect defendants foreign to a forum." *Id.*

Again, these plaintiffs' claims center on defendants' provision of cash bribes and free goods to Jaysh al-Mahdi that supported terrorist acts against plaintiffs. The claimed ATA-violating bribes arise from or relate to the foreign suppliers' U.S. contacts in at least four overlapping ways. We do not decide whether all four are necessary, nor whether one alone would suffice. We hold only that the relationships between the

53

plaintiffs' claims and the foreign defendants' alleged contacts with the United States support specific jurisdiction here.

First, the foreign defendants' collaboration with U.S. manufacturers to market their American products in Iraq was why these foreign defendants were interacting with Jaysh al-Mahdi in the first place, and defendants' interactions with Jaysh al-Mahdi form the basis of the claim. The allegations make clear that a principal reason the foreign defendants were selling goods in Iraq at all was to capture a business opportunity beneficial to both the foreign suppliers themselves and their U.S. manufacturer affiliates. The complaint details the relationship between the foreign defendants' forum contacts and their ATA claims: The foreign supplier defendants worked with in-forum manufacturers, acting as those manufacturers' representatives in Iraq when they solicited Iraqi bids and fulfilled orders for the manufacturers' goods to be shipped there. The foreign defendants' ability to complete their sales of the U.S. manufacturers' products in Iraq thus depended on their forum contacts. The U.S. and foreign defendants' cooperative business model benefitted from the protections of U.S. law. Domestic contract law would have likely governed interactions between the foreign suppliers and their U.S. manufacturers, and their businesses benefited from the protections of U.S. food and drug law, customs and export law, and intellectual property regime.

Second, "the products to be distributed by [defendants] were being manufactured" in the forum. *St. Jude Med., Inc. v. Lifecare Int'l, Inc.*, 250 F.3d 587, 592 (8th Cir. 2001). The goods the foreign defendants supplied from their U.S. affiliate manufacturers were, at least in significant part, U.S. goods. For example, AstraZeneca UK Limited allegedly sold U.S.-manufactured drugs to the Ministry, including at least Arimidex (both the active pharmaceutical ingredient (API)

54

manufacturing and drug formulation occurred in Delaware), and Meronem and Seroquel (the API was made in Delaware for both).[11]  For GE Medical Systems Information Technologies GmbH, the complaint identifies at least twelve medical-device contracts it executed with the Sadrist-controlled Ministry, and it claims that the entity sourced devices from the United States and certified to Kimadia their U.S. origin.  For Cilag GmbH International and Janssen Pharmaceutica N.V. (the two foreign suppliers for Johnson & Johnson), the complaint alleges they sold the Ministry U.S.-manufactured drugs, including Eprex (U.S. API), Topamax (U.S. API), Leustatin (U.S. API), and Remicade (U.S. API).  The complaint alleges that Pfizer Enterprises SARL supplied at least two drugs (Depo-Provera and Solu-Medrol) with U.S. API.  And it alleges that F. Hoffman-La Roche Ltd. supplied several drugs made with U.S. API, including Avastin, Herceptin, MabThera, Pegasys, and Xeloda.  The complaint also alleges on information and belief that discovery is likely to uncover other such transactions.

Third, the primary way in which plaintiffs allege that the foreign defendants actually violated the ATA was giving Jaysh al-Mahdi cash bribes and U.S.-manufactured free goods.  The ATA violation was part of how the foreign suppliers secured a market for U.S.-manufactured products, and the U.S. sourcing is therefore centrally "related to" plaintiffs' claims.  Contracts

---

[11] "API" is the drug's "active pharmaceutical ingredient."  The drug manufacturers often used a two-part manufacturing process.  The first was to make the API, which for many of the drugs was done at an American facility.  Then, either the same U.S. facility or an affiliate international facility combined the API with other materials to make the final drug.  That second process is called "drug formulation."  According to the complaint, the API is the most important part of the drug manufacturing process, the most difficult as a technical matter, and the step that imparts the most value.

55

for all but one of the specific drugs discussed above indicated that defendants provided a "free of charge" amount on top of the quantity of drugs Kimadia actually paid for. And for that one drug, Topamax, that contract was allegedly obtained with an "Off-the-Books Payoff." Third Am. Compl. ¶ 253. The provision of U.S.-manufactured drugs was, along with the provision of cash bribes, the very instrumentality the foreign defendants allegedly used to violate the ATA. A plaintiff's cause of action rooted in a defendant's use of its contacts with the United States to violate U.S. law surely arises out of or relates to that plaintiff's claims.

Fourth, plaintiffs allege that Jaysh al-Mahdi specified that the U.S. provenance of the medical goods mattered to it. The complaint alleges that Jaysh al-Mahdi "prioritized obtaining U.S.-manufactured drugs, which tended to be most valuable on the black market" and thus more useful in financing acts of international terrorism. Third Am. Compl. ¶ 122. According to the complaint, "FDA approval was important" because "FDA-approved drugs carried a high street value, which made FDA-approved goods especially attractive for black-market diversion." *Id.* ¶ 153. The supplier defendants accordingly certified to Kimadia which drugs were American in origin, and wrote "USA" on the packaging of the U.S.-origin goods. And each procured U.S. export certificates and FDA approvals for the drugs at issue. Because the tort here is based in significant part on bribing and providing free goods to Jaysh al-Mahdi and thereby funding the terrorist acts that harmed plaintiffs, plaintiffs' allegations that the goods' United States provenance and labeling increased their black-market price and thus their value to Jaysh al-Mahdi as terrorism funding sources tie the claims to the foreign defendants' U.S. forum contacts.

The issue here is not that U.S. goods happen to be in the supply chain, as defendants contend. Rather, the complaint

56

alleges coordination between affiliated firms within and outside the U.S. working together over a long period to supply products to serve the Iraqi market.  Unlike in *Bristol-Myers*, for example, here it *is* "alleged that [the manufacturers] engaged in relevant acts together with [the distributors] in [the forum]." 137 S. Ct. at 1783.  The foreign supplier defendants reached into the United States to contract with the U.S. manufacturers. It was those contracts that empowered the foreign suppliers as the U.S. manufacturers' agents to market U.S.-developed and U.S.-produced goods to the Mahdi-controlled Ministry in Iraq. And the foreign suppliers reached into the United States to obtain the goods.  *Cf. Bristol-Myers*, 137 S. Ct at 1778 (finding forum contacts unrelated to claim where neither drug nor its marketing strategy were developed in the forum, and defendants "did not manufacture, label, package, or work on the regulatory approval of the product" there).

     In sum, the foreign defendants entered into cooperative relationships with U.S. manufacturers to sell U.S.-origin drugs in Iraq; they in fact sold a large volume of U.S. drugs to the Madhi-controlled Ministry over an extended period of time; they used the U.S products, along with cash, to bribe Jaysh al-Mahdi to obtain those contracts; and Jaysh al-Mahdi particularly desired contracts facilitated with "gifts" of free U.S. goods as those goods provided more significant financing for the group's terrorist objectives.  In all these ways, then, the foreign defendants' contacts with the United States relate to plaintiffs' ATA claims.

     The Second Circuit's analysis in *Licci* illustrates the adequacy of this kind of connection between forum contacts and an ATA claim to support specific jurisdiction.  *Licci* confirmed the New York district court's jurisdiction over a Lebanese bank with no operations, branches, or employees in the United States, 732 F.3d at 165, to hear ATA claims related

57

to the bank's "repeated use of [a] correspondent account—and hence New York's banking system—as an instrument to achieve the wrong complained of," *id.* at 173. It saw the bank's use of the New York-based account as "part of the principal wrong" at issue, *id.* at 170, which was the bank's "repeated, intentional execution of U.S.-dollar-denominated wire transfers on behalf of" a financial arm of Hezbollah, *id.* at 171. It so held even though the bank could have processed the wire transfers "through correspondent accounts anywhere in the world." *Id.* The bank's New York contacts were sufficiently related to plaintiffs' claims, including ATA claims, to support the court's personal jurisdiction over it. *Id.*

Like the bank account in *Licci*, the contracts to sell U.S. goods in Iraq, and the goods themselves used to bribe Jaysh al-Mahdi, were "an instrument to achieve the very wrong alleged." 732 F.3d at 171. Defendants used the U.S. goods to fund Jaysh al-Mahdi, giving rise to the ATA claims at issue. And whereas the money used in *Licci* to violate the statute incidentally flowed through the United States, here, the goods used to violate the ATA originated in the forum and were specially desired by the terrorist organization because of that source. In both cases, then, the contacts with the U.S. forum sufficiently relate to the ATA claim to satisfy due process requirements.

The Supreme Court's elaboration in *Ford* on the requirement that a claim "arise out of or relate to" the defendant's forum contacts also supports our analysis. There, the Court addressed whether Ford was subject to specific jurisdiction in Montana and Minnesota for claims arising from car accidents involving Ford vehicles in each of those forum states, even though Ford had not designed, manufactured, or sold the cars at issue in the forum, and it was unilateral action of others that brought them there. 141 S. Ct. at 1023. Ford

58

contested personal jurisdiction, asserting that its forum contacts did not cause the plaintiffs' injuries and so lacked the requisite relationship to the claim; the harms, after all, would have been the same even without any of Ford's identified forum contacts. *Id.* at 1026, 1029.

The Supreme Court rejected Ford's insistence that forum contacts must have caused the harm on which the claim is based in order to support specific personal jurisdiction. It instead reaffirmed the "most common formulation of the rule" for specific jurisdiction, which requires "that the suit 'arise out of *or relate to* the defendant's'" forum contacts. *Id.* at 1026 (emphasis in original) (quoting *Bristol-Myers*, 137 S. Ct. at 1780). The Court emphasized how that classic phrasing "contemplates that some relationships will support jurisdiction without a causal showing." *Id.*

Defendants argue that their forum contacts were neither a but-for nor a proximate cause of the ATA violation. To the contrary, they were both. As described above, defendants needed the U.S. contacts in order to work with U.S. manufacturers to sell U.S. goods through delivering bribes and free U.S. goods in Iraq. And, as already explained, defendants' provision of cash and cash-equivalents allegedly proximately caused plaintiffs' injuries. In any event, *Ford* held that, while forum contacts that cause a claim suffice to show the claim "arises out of" those contacts, that kind of relationship is not required for the contacts to "relate to" the claim so as to support specific jurisdiction. 141 S. Ct. at 1026, 1032.

The district court, ruling without the benefit of the Court's decision in *Ford*, erred in holding that the defendants' forum contacts must be the conduct that would subject them to liability. Even as defendants appropriately disavow the notion that a forum contact is claim-related "only if it is itself illegal,"

59

Appellees Br. at 66 (quoting Appellants Br. at 53), they assert the contacts here are "lacking under any standard" because they are "tangential to Plaintiffs' claims" based on transactions and attacks in Iraq. Appellees Br. at 64-65. We cannot agree. The foreign suppliers' forum contacts are closely entwined with all the claims. The point is not just, as defendants say, that "the goods sold were originally manufactured in the United States." Appellees Br. at 65 (quoting *Atchley*, 474 F. Supp. 3d at 206). These suppliers worked on behalf of the U.S. manufacturers as their exclusive representatives in Iraq to secure that market, bending over backward in embracing corrupt Iraqi terms to fulfill that role.

Defendants' remaining arguments are similarly unpersuasive. They assert that because certain of their Kimadia contracts identified a country other than the United States as the source of some goods, Jaysh al-Mahdi could not have actually cared about the goods' U.S. origin, making the Kimadia contracts' connections to the United States not relevant to the claim in the way plaintiffs posit. But securing the Iraqi market for U.S. goods was in fact what the foreign suppliers were doing in Iraq. For the drugs defendants characterize as not U.S.-manufactured, plaintiffs allege that critical active ingredients that determine the drugs' efficacy and comprise much of the drugs' value to Jaysh al-Mahdi were made in the United States. And they allege that the U.S. provenance of the drugs or their active ingredients mattered to Jaysh al-Mahdi.

For the above reasons, we reverse the district court's grant of the foreign defendants' motion to dismiss for lack of personal jurisdiction.

60

## CONCLUSION

The sufficiency of these allegations as such does not prejudge defendants' fact-based defenses. It is beyond the bounds of the motion to dismiss to consider whether plaintiffs can substantiate their allegations with admissible evidence, or to assess defendants' contrary evidence. All we hold is that the allegations, together with the reasonable inferences to be drawn from them in plaintiffs' favor, suffice to state a legally cognizable claim.

We need not—and do not—decide several issues the district court itself did not reach. For one, we leave to the district court to decide in the first instance whether plaintiffs have alleged an act of international terrorism as required to plead direct liability. *See* 18 U.S.C. § 2333(a); § 2331(1). We also affirm the district court's discretionary choice not to resolve on the pleadings defendants' asserted act-of-war defense under 18 U.S.C. § 2336(a). *See Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 510 (E.D.N.Y. 2012). The statute would appear to foreclose treating an attack planned or authorized by a Foreign Terrorist Organization such as Hezbollah as an "armed conflict between military forces of any origin" because Congress specifically excluded so-designated organizations from the definition of "military force." 18 U.S.C § 2331(4), (6). But we are content with the district court's inclination to leave that question for resolution on a developed evidentiary record.

\*    \*    \*

For the foregoing reasons, we reverse the district court's July 17, 2020, order granting defendants' motion to dismiss for failure to state a claim and the foreign defendants' motion to dismiss for lack of personal jurisdiction, as well as its attendant

61

dismissal of plaintiffs' state-law claims.  We remand for further proceedings consistent with this opinion.

*So ordered*.